# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,                    )
                                                        )
        Plaintiff,                    )
                                                         )
    v.                    )    C.A. No. 07-17 (GMS)
                                                          )
KRAFT FOODS GLOBAL, INC.,                    )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and                    )
KRAFT FOODS INC.,                    )
                                                          )
        Defendants                    )

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

|  |  |
|---|---|
| | Richard L. Horwitz (#2246) |
| | David E. Moore (#3983) |
| | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL | Hercules Plaza, 6th Floor |
| | 1313 North Market Street |
| David M. Schlitz | P.O. Box 951 |
| William S. Foster, Jr. | Wilmington, DE 19899-0951 |
| C. John Brown | Tel: 302-984-6169 |
| BAKER BOTTS L.L.P. | rhorwitz@potteranderson.com |
| 1299 Pennsylvania Ave., N.W. | dmoore@potteranderson.com |
| Washington, D.C. 20004-2400 | |
| Tel. 202-639-7700 | *Attorneys for Defendants* |
| | *Kraft Foods Global, Inc., Tassimo Corporation,* |
| Dated: October 15, 2007 | *and Kraft Foods Inc.* |
| 825595 / 31118 | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION .................................................................................................... 1

PATENT-IN-SUIT ................................................................................................... 1

THE LAW OF CLAIM CONSTRUCTION ............................................................ 4

DISPUTED TERMS ................................................................................................ 5

    I.    A Filter Element Received In And Configured And Arranged To Subdivide The
         Interior Of Said Container Into First and Second Chambers ............................... 5

         A.   "a filter element received in and configured and arranged to subdivide the
                interior of said container into first and second chambers." ....................... 5

         B.   "first and second chambers" ................................................................. 12

    II.   "A second section overlying said second chamber." ....................................... 13

   III.  Terms Pertaining To The Lid Being Piercable ................................................ 14

         A.   "piercable" ............................................................................................. 15

         B.   "piercable to accommodate an inflow of liquid" and "piercable to
                accommodate an outflow of the beverage." ............................................. 18

CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996) ...................................................4

*Pause Tech., LLC v. TiVo, Inc.*,
   419 F.3d 1326 (Fed. Cir. 2005).........................................................................................9

*Nikken USA, Inc. v. Robinsons-May, Inc.*,
   51 Fed. Appx. 874, 65 USPQ2d 1611 (Fed. Cir. 2002)....................................................16

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006)............................4, 5

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001)........................................................................................18

*UV Coatings, Ltd v. Sico, Inc.*,
   250 F.3d 763, 2000 WL 986965 (Fed. Cir. 2000) ............................................................16

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)........................................................................................4,5

## INTRODUCTION

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Defendants") submit this memorandum in support of their proposed constructions for the disputed claim terms in the patent-in-suit. The disputed terms are set forth in the Final Joint Claim Construction Chart, filed October 9, 2007.

## PATENT-IN-SUIT

The patent-in-suit, U.S. Patent No. 6,607,762 ("the '762 Patent"), claims a simple disposable single serve beverage filter cartridge. Figures 4 and 3 respectively show the component parts and the whole of the first disclosed embodiment, and Figures 7 and 10 respectively show the component parts and the whole of the second disclosed embodiment.



In the first embodiment, the cartridge 10 has a lid 16, a filter 14 and a container 12. As shown in Fig. 3, the first chamber is labeled "A" and the second chamber is labeled "B". In the second embodiment, the cartridge 30 has a lid 36, a filter 34, and a container 32. Again, as in the first embodiment, the first chamber is labeled "A" and the second chamber is labeled "B".

As explained in the patent specification, disposable single serve beverage cartridges were known in the prior art. A7, col. 1, lines 15-27. In the prior art cartridges, the filter structurally subdivides the container to form a brewing chamber in which a beverage medium such as coffee is stored (first chamber) and a beverage receiving chamber from which the beverage exits the

container (second chamber). The prior art cartridge is depicted in Figures 1 and 2 of U.S. Patent No. 5,325,765 ("the '765 Patent"). In the '765 Patent, the cartridge 10 includes a lid (cover) 14, a filter 16 and a container (base) 12. The first chamber is designated by

 

FIG. 1                     FIG. 2

reference numeral "40" and the second chamber is designated by reference numeral "42".

When the prior art cartridge is used with a brewer equipped with inlet and outlet probes, the lid covering the first chamber and the bottom of the container are pierced from opposite directions by the tubular inlet and outlet probes, respectively. A7, col. 1, lines 27-34.

The '762 Patent asserts that there are disadvantages in the use of these prior art cartridges. As compared to the lid, the bottom of the rigid plastic container is relatively thick, with a higher resistance to piercing. Thus, it is asserted, in the course of being punctured by the outlet probe, the bottom exhibits a tendency to distort inward, with an accompanying buckling of the container sidewalls. According to the '762 Patent, bottom distortion accompanied by sidewall buckling can adversely affect the puncturing process, resulting in leakage around the outlet probe. *Id.*, col. 1, lines 39-50. Another asserted problem is the need to equip the brewer with expensive metallic outlet probes that can be sharpened to the extent necessary to affect piercing of the more resistant container bottoms. *Id.*, col. 1, lines 51-55. A third asserted problem is that some brewed liquid beverage is not able to evacuate the second chamber when the outlet probe is above the bottom of the container. *Id.*, col. 1, lines 56-59.

The '762 Patent's solution to these disadvantages is described in the Summary of the Invention, as follows:

> The lid has a first section overlying the first chamber and a second section overlying the second chamber. **The first and**

2

**second lid sections are yieldably piercable**, respectively from the same direction, by single or multiple inlet and outlet probes. The inlet probe admits heated liquid into the first chamber for infusion with the beverage medium, and the resulting brewed beverage passes through the filter element into the second chamber, from which it exits via the outlet probe.

The lid material has a lesser resistance to being yieldable pierced as compared to the resistance of the container bottom, and is thus less prone to inward distortion with accompanying buckling of the container sidewall. The net result is a cleaner puncture and in [sic] improved seal around the outlet probe.

The relative ease with which the lid may be pierced also makes it possible to equip tie [sic] brewers with less expensive plastic inlet and outlet probes, in single or multiple configurations.

*Id.*, col. 2, lines 13-24 (emphasis added).

In claims 1 and 10 the above described lid is claimed as follows:

a lid closing said access opening, [said lid and said outer container being impermeable to liquids and gases,[1]] said lid having a first section overlying said first chamber and a second section overlying said second chamber, the **first section of said lid being piercable to accommodate an inflow of liquid into said first chamber** for infusion with the beverage medium to produce a beverage, said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and the **second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge**[, said lid having less resistance to being pierced as compared to the resistance to piercing of said container.[2]]

A9, col. 5, lines 1-12; col. 6, lines 15-29 (emphases added to highlight the claim construction

issues)

---

[1] This limitation appears in claim 10 but not claim 1.

[2] This limitation appears in claim 10 but not claim 1.

3

## THE LAW OF CLAIM CONSTRUCTION

Proper claim construction requires an examination of the intrinsic evidence of the record, including the claims, the specification, and, if in evidence, the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The starting point for claim construction is a review of the words of the claims themselves. *Phillips v. AWH Corp.*, 415 F. 3d 1303, 1312 (Fed. Cir. 2005) (*en banc*), *cert. denied*, 546 U.S. 1170 (2006). The words of a claim are generally given their ordinary and customary meaning. The ordinary and customary meaning of a claim term is determined by evaluating the meaning a term would have to a person of ordinary skill in the art at the time of the application for a patent. *Id.* at 1312-13. To determine the customary and ordinary meaning of a claim term, the Court may look to the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence such as the meaning of technical terms and the state of the art. *Id.* at 1314. However, in some cases, as the immediate case, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* In such cases general purpose dictionaries may be helpful. *Id.*

But claim language does not stand alone. It is part of a "fully integrated written instrument." *Markman v. Westview Instruments, Inc.* 52 F.3d 967, 978 (Fed. Cir. 1995); *aff'd*, 517 U.S. 370 (1996). Therefore claims must be read in light of the specification, of which they are part. *Phillips*, 415 F.3d. at 1315. The Federal Circuit in *Phillips* discusses at length that the specification is usually the single best guide to the meaning of a term and is often dispositive of its meaning. *Id.*

The Court in its discretion may also consider extrinsic evidence, although it is less significant than the intrinsic evidence which controls. *Vitronics*, 90 F.3d at 1585. Nevertheless,

4

extrinsic evidence can assist in understanding the art and the ordinary and customary meaning of a term. *See, e.g., Phillips*, 415 F.3d at 1322 (Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words). The Court may rely upon dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict the intrinsic evidence. *Id.* at 1322-23 (citing *Vitronics*, 90 F.3d at 1584 n.6).

## DISPUTED TERMS

### I.     A Filter Element Received In And Configured And Arranged To Subdivide The Interior Of Said Container Into First and Second Chambers

Claims 1 and 10 require, "a [planar[3]] filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers." Plaintiff believes that all that needs to be construed in this limitation is "first and second chambers" Defendants believe that the whole limitation needs to be construed. In view of the specification of the '762 Patent, including the prior art cited therein, the limitation as a whole had a meaning to those skilled in the art at the time of the application for a patent.

### A.     "a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers."

| "a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers." | |
|---|---|
| Plaintiff: "a [planar] filter that lies in the flow path between the first and second chambers." | Defendants:  "A permeable material that is configured and arranged in the interior of the outer container such that the permeable material structurally divides the interior of said container to create two enclosed spaces: a first enclosed space in which a soluble beverage medium is stored, and a second enclosed space from which the beverage exits the cartridge." |

---

[3] In Claim 10.

Plaintiff has accused the Tassimo® T-Disc of infringing the '762 Patent. In order to read the claim element "a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers" onto the Tassimo® T-Disc, Plaintiff asks the Court to construe that element as merely requiring that the filter element lie in the flow path between the first and second chambers. However, as used in the prior art cited in the '762 Patent, in the '762 Patent itself and in other patents in the art, the filter element is a structural element that subdivides the interior of the container to create a first enclosed space to store the beverage medium and a second enclosed space from which the beverage exits the cartridge. The parties' different claim constructions are very significant with regard to the issue of infringement.

Claims 1 and 10 are apparatus claims that specify a number of structural elements. One of those structural elements is "a filter element[4] received in and configured and arranged to subdivide the interior of said container into first and second chambers." A8, col. 4, lines 63-65; col. 6, lines 10-12.[5] This structural element is not a point of novelty in the '762 Patent. As recognized in the specification of the '762 Patent, a beverage filter cartridge that is internally subdivided by a permeable filter into first and second chambers was known in the prior art and had gained widespread acceptance. A7, col. 1, lines 15-27 and 35-36.

U.S. Patent No. 5,325,765 ("the '765 Patent), to Sylvan *et al.*, which is one of the two prior art patents referenced in the '762 Patent, discloses the prior art beverage filter cartridge. Figures 1 and 2 from the '765 Patent are reproduced immediately below.

---

[4] Claims 1 and 10 specify "said filter element being permeable to liquid." A9, col. 5, lines 7-8; col. 6, lines 21-22.

[5] Claim 10 specifies a "planar" filter element. *See* n. 3, *supra*.

6



FIG. 1          FIG. 2

As depicted in these figures, the interior of the container--referred to in the '765 Patent as the base--is an empty volume. The filter is configured, dimensioned and placed in the interior of the base such that it subdivides the interior to create two defined enclosed spaces, referred to as chambers. "There is a self-supporting wettable filter element disposed in the base sealingly engaged with the opening of the base and having a form smaller than the predetermined shape of the base so that the filter element diverges from the base and divides the base into two sealed chambers." A49, col. 2, lines 11-16. "There is a first chamber for storing an extract of the beverage to be made and a second chamber for accessing the beverage outflow from the filter after the beverage has been made by combining a liquid with the extract." *Id.*, col. 2, lines 16-20. In the description of the preferred embodiment, it is detailed, "[t]he seal formed between the filter 16 and base 12 **creates two chambers,** chamber 40 in which coffee 22 is stored, and chamber 42 which receives the outflow from filter 16." A50, col. 3, line 66 - col. 4, line 1 (emphasis added).

U.S. Patent No. 5,840,189 ("the '189 Patent"), also to Sylvan *et al.*, is the second prior art patent referenced in the '762 Patent. The Abstract of the '189 Patent states, "[t]he filter element subdivides the base into first and second chambers, the first chamber for storing an extract of the beverage to be made, and a second empty chamber for accessing the beverage after the beverage outflow from the filter has been made by combining a liquid with the extract." A38. The Summary of the Invention explains, "[b]oth the cover and base are yieldably pierceable, the cover to accommodate an injection of liquid into the first chamber for combination with the extract to produce a beverage, and the base to accommodate the

7

outflow of the beverage from the second chamber." A41, col. 2, lines 17-21. Figures 1 and 2 of the '189 Patent, reproduced above, show that it is the filter element that structurally creates the first and second chambers.

Thus, prior to the filing of the application that matured into the '762 Patent, the known beverage filter cartridges used a filter element to structurally subdivide the interior of a container to form a first defined enclosed space for storing a beverage medium and a second defined enclosed space from which the beverage exits the cartridge.

The '762 Patent claims what was known in the prior art, a filter element that is configured and placed in the interior of the container such that it structurally creates a first enclosed space for storing the beverage medium and a second enclosed space from which the beverage exits the container. In the '762 Patent, as in the prior art, it is the filter element that structurally creates these two distinct chambers, as shown in Figures 4, 5, 7, and 13, below. Absent the filter there are not separate chambers to store the beverage medium and from which the beverage exits the cartridge.



The first chamber is formed to store the beverage medium. The specification discloses, "[a] beverage medium 'M', typically roasted ground coffee, is loaded into chamber A." A8, col. 3, lines 20-21. Claims 1 and 10 provide, "a soluble beverage medium is stored in said first chamber." A8, col. 4, lines 66-67; A9, col. 6, lines 13-14.

The second chamber is formed to allow the brewed beverage to exit the container to the exterior of the cartridge. The specification states, "the resulting brewed beverage passes through the filter element into chamber B from which it exits via the outlet probe." A8, col. 4, lines 42-44. "From here [the channels], the beverage flows downwardly into chamber B from which it is extracted by one or more tubular exit probes." *Id.*, col. 3, lines 46-48. Claims 1 and 10 provide that the section of the cartridge lid overlying the second chamber is "piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge." A9, col. 5, lines 9-12; col. 6, lines 24-27.

Claims 1 and 10 require that the filter element be "received in and configured and arranged to subdivide the interior of said container into first and second chambers". All the words in a patent claim have importance and cannot be ignored. *See Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005). The filter element cannot merely stand between the first and second chambers in the beverage flow path. It has to be shaped and placed into the interior of the container such that it is the structural element that creates the chamber in which the beverage medium is stored and the chamber from which the beverage exits the cartridge, as in the prior art. This is described in the specification:

> The filter element 14 is formed from sheet material shaped to conform to the shape of the upper edges of the support ribs. The filter element is received in the container 12, with the edges 14*a* of its front and back ends overlapping and sealed to the rim 12*c* of the container side wall 12*b*, and with the edges 14*b* of its sides overlapping and sealed to outermost ribs 12*d* which are formed integrally with the container side wall. When thus positioned, the filter element defines a first chamber "A" separate from a second chamber "B", the latter being in communication with open channels separating the support ribs 12*d*.

A7, col. 3, lines 9-20.

9

Like the beverage filter cartridge of the prior art '765 Patent, the filter is sealed to the edges of the outer container to create a first chamber ("A"), in which a beverage medium is stored, and a second chamber ("B"), from which the resultant brewed beverage may exit the cartridge. If the filter element was not so shaped and arranged in the container, there would not be a second chamber from which the beverage medium exits the cartridge.

With regard to the filter element, the only difference between the prior art cartridge and the cartridges disclosed in the '762 Patent, is that in the latter the filter is configured and arranged in the interior of the container such that it creates first and second chambers which are both directly covered by the lid. But this difference is inconsequential with regard to the requirement that the filter element subdivide the interior of said container into first and second chambers. In both the prior art cartridge and the cartridges disclosed in the '762 Patent, the filter element structurally divides the interior of the container to create a first chamber in which the beverage medium is stored and a second chamber from which the beverage exits the cartridge.

U.S. Patent No. 6,645,537 ('the '537 Patent"), to Sweeney *et al.*, was filed on February 13, 2001, the same day as the '762 Patent. Two of the four inventors are also named inventors of the '762 Patent. Claim 1 of the '537 Patent uses virtually identical language to that used in the '762 Patent: "said filter element being configured and positioned to subdivide the interior of said container into first and second chambers," (A170, col. 6, lines 17-19); " a beverage medium is stored in said first chamber," (*id.*, col. 6, Line 20); "and said bottom wall being piercable to accommodate and outflow of said beverage from said second chamber to the exterior of the cartridge," (*id.*, col. 6, lines 27-30). As shown in figures 4 and 12 from the '537 Patent, reproduced immediately left, the filter





element structurally divides the interior of the container creating chambers A and B.

The patents of other inventors working in the art disclose the use of a filter that subdivides the interior of the container into a first chamber to store the beverage medium and a second chamber from which the beverage is extracted from the cartridge. For example, U.S. Patent No. 6,810,788 ("the '788 Patent"), to Hale, discloses a beverage filter cartridge that includes a "laminated **filter structure subdividing the container to form a brewing chamber and a beverage receiving chamber**." A157, col. 2, lines 28-30 (emphasis added). Figures 2 and 4 of the '788 Patent are reproduced immediately below.



As described in the above quote from the '788 Patent, the filter 50 is a structural element. It subdivides the interior of the container to form a first defined enclosed space or compartment, *i.e.*, the brewing chamber 34, and a second defined enclosed space or compartment, *i.e.*, the beverage receiving chamber 36. A158, col. 3, lines 56-60. A beverage product 54 is stored in the brewing chamber 34 and the brewed beverage can be retrieved from the receiving chamber 36. *Id.*, col. 3, lines 60-65.

In view of all of the above, at the time of the '762 patent application, the phrase "a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers" had a meaning to those working in the art. Which is that the filter element structurally divides the interior of the container to form an enclosed space in which the

11

beverage medium is stored and a second enclosed space from which the beverage exits the cartridge.

Accordingly, the element "a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers" should be construed to mean "a permeable material that is configured and arranged in the interior of the outer container such that the permeable material structurally divides the interior of said container to create two enclosed spaces: a first enclosed space in which a soluble beverage medium is stored, and a second enclosed space from which the beverage exits the cartridge."

B.    "first and second chambers"

| first chamber | |
| --- | --- |
| Plaintiff:  "the part of the cartridge into which the liquid is introduced and through which it flows before reaching the filter." | Defendants:    "The enclosed space in which the beverage medium is stored." |
| second chamber | |
| Plaintiff:  "the part of the cartridge out of which the beverage flows after having passed through the filter." | Defendants:    "The enclosed space from which the beverage exits the cartridge." |

As discussed above, "first and second chambers" has meaning read in the context of "a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers."  In this context, those working in the art, including the named inventors of the '762 Patent, consistently used the term "chamber" to mean an enclosed space structurally created by the filter element.  In each patent discussed above, including the '762 Patent, the filter element creates a first enclosed space in which the beverage medium is stored. And in each patent, the second enclosed space created by the filter is the exit chamber from which the beverage out flows to the exterior of the cartridge.   Thus, in the beverage filter cartridge art, the first and second chambers had specific purposes.

12

The use of the term "chamber" by those working in the art is consistent with the ordinary meaning of the term. Webster's Third New International Dictionary defines "chamber" as "an enclosed or compartmented space for some special purpose." A58.

Thus, "first and second chambers" should be construed to mean, respectively, "the enclosed space in which the beverage medium is stored and the enclosed space from which the beverage exits the cartridge."

## II.    "A second section overlying said second chamber."

| a second section overlying said second chamber | |
|---|---|
| Plaintiff: "a portion of the lid positioned over the second chamber such that it can be pierced to allow outflow of the beverage from the container." | Defendants: "A portion of the lid laying directly over the enclosed space from which the beverage exits the container (*i.e.*, second chamber), such that there is no chamber in between said portion of the lid and said second chamber." |

Claims 1 and 10 require that the lid have "a first section overlying said first chamber and a second section overlying said second chamber." Describing the first disclosed embodiment, the specification states that the lid 16 is sealed to the rim 12c of the container wall 12b, and to any overlapping sealed edge portions of the filter. "When thus positioned, the lid has a first section 16a overlying chamber A, and a section 16b overlying chamber B." A8, col. 3, lines 21-25.

During prosecution, arguing to overcome a prior art rejection, the applicants stressed that in their invention the lid has to overlay both the first and second chambers. Addressing the '189 Patent, one of the two patents the Examiner relied upon, the applicants pointed out that in that patent "the cover overlies the inner chamber 34 but not the outer chamber 36." A19.

FIG. 2

As seen in Figure 2 from the '189 Patent immediately left, the cover (lid) 16 directly overlies the first chamber 34 in which the beverage medium is stored. It does not directly overlie the second chamber 36 because the first chamber 34 is in between the cover 16 and the second chamber 36. Thus, by their argument, the applicants excluded from the scope of their invention a cartridge in which the lid does not directly overlay the second chamber because there is a chamber in between the lid and the second chamber.

Accordingly, Defendants submit that the phrase "a second section overlying said second chamber" should be construed to mean "a portion of the lid laying directly over the enclosed space from which the beverage exits the container (*i.e.*, second chamber), such that there is no chamber in between said portion of the lid and said second chamber."

## III. Terms Pertaining To The Lid Being Piercable

Claims 1 and 10 provide, "the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber…and the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge." The phrases "said lid being piercable to accommodate an inflow of liquid " and "said lid being piercable to accommodate an outflow of the beverage" are easily understood by persons of ordinary skill in the art and lay persons alike. Nevertheless, Plaintiff's assertions in its reply to Defendants' invalidity assertions place in dispute the following terms: "piercable," "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of the beverage."

Defendants have identified to Plaintiff prior art that they believe anticipates the asserted claims of the '762 Patent. That prior art includes a lid that has sections overlying both the first and second chambers of the cartridge. It is beyond genuine dispute that in the prior art both lid

14

sections are capable of being pierced to allow liquid to flow into the first chamber and beverage to flow out of the second chamber to the exterior of the cartridge. In order to avoid the prior art, Plaintiff asks the Court to ignore the plain and ordinary meaning of "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of the beverage", and rather read into the claim element the limitations, "designed to be pierced to form an inlet that allows an inflow of liquid without leakage" and "designed to be pierced to form an outlet that allows an outflow of beverage without leakage." Defendants believe that the construction of this language is case dispositive.

A.    "piercable"

| "piercable" | |
|---|---|
| Plaintiff:  Keurig submits that this single adjective should not be construed in isolation, but rather as part of the phrases "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of beverage." | Defendants: "Capable of being pierced." |

"Piercable" is the critical term in the claim language "the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber…and the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge." It expresses the physical property of lid that is necessary to the claimed invention.

As discussed in the Patent-In-Suit section above, the object of the claimed invention of the '762 Patent is to avoid the disadvantages caused by opposite side piercing of a cartridge's lid and container. The '762 Patent's claimed solution to these disadvantages is a cartridge in which the lid has sections overlying the first and second chambers, which are both piercable. The reason for doing so is to allow inlet and outlet probes operating from the same side of the cartridge to pierce the lid section overlying the first chamber and the lid section overlying the

15

second chamber, respectively.  A7, col. 2, lines 5-13.  It is a necessary part of the invention that the lid sections overlying both the first and second chambers be capable of being pierced.  If one or both of the lid sections overlying the first and second chambers is not capable of being pierced, it would thwart the claimed invention.  Thus, the specification explains, "[t]he lid may be cut or blanked from any suitable impermeable heat sealable and yieldably piercable material, a preferred example being a metallic/polymer laminate…"  A8, col. 3, lines 32-34.

The word "piercable" is used consistently throughout the '762 Patent to express that the material used for the lid in the claimed invention must be capable of being pierced.  This is consistent with its ordinary and accustomed meaning.

According to Webster's Third New International Dictionary, "piercable" means "capable of being pierced."  A61.  The root word "pierce" means "to run into or through as a pointed instrument or weapon."  *Id.*  The suffix "-able" means "capable of."  A60.  The Federal Circuit has so recognized the meaning of the suffix "-able"  *E.g., UV Coatings, Ltd v. Sico, Inc.*, 250 F.3d 763 (table), 2000 WL 986965, *3 (Fed. Cir. 2000) ("The term 'sprayable' has a common accepted meaning.  'Spray,' according to Webster's Third New International Dictionary, means 'to apply something by atomizing and allowing to strike the surface in a uniform manner.'  The patentee added the suffix '-able' to indicate that the claimed formulation must be capable of being sprayed."); *see also Nikken USA, Inc. v. Robinsons-May, Inc.*, 51 Fed. Appx. 874, 884, n. 4, 65 USPQ2d 1611, 1617 (Fed. Cir. 2002) (Claim term "magnetizable," which includes the "-able" suffix, requires that the sheet itself be capable of being made a magnet).

As quoted above, in describing the material suitable for use as the lid, the patent states it must be a "piercable material", and gives a preferred example of such a material.[6]  A8, col. 3, lines 33-34.  Clearly what is described is the necessary physical property of the lid component. The suffix "-able" is used to express that the lid material has the physical property that it is capable of being pierced.[7]

The specification explains that inlet and outlet probes operate "from the same side of the cartridge to pierce different sections of the **readily piercable lid**."  *Id.*, col. 4, lines 47-49 (emphasis added).  Here again, the specification uses the term "piercable" to express that the lid of the claimed invention is capable of being easily pierced.

In discussing the prior art cartridge, the specification uses the term "piercable" to describe the physical properties of the lid, stating, "the container is closed by an **impermeable yieldably piercable lid** comprising a laminate of metallic foil and plastic."  A7, col. 1, lines 18-27 (emphases added).  In the '189 Patent, one of the prior art references cited in the specification, the inventors explained, "[t]he cover 16 is yieldably piercable with an instrument such as a tubular needle 42 or other penetrator."  A42, col. 3, lines 53-54.  Thus, the use of the term "piercable" in the '762 Patent is consistent with how others working in the field used the term.

Consistent with its use in the specification, the term "piercable" is used in several of the dependent claims to require that a material be capable of being pierced.  For example, claim 7 provides, "[t]he beverage filter cartridge of claim 1 wherein said filer element comprises a planar

---

[6]  The term "piercable" is also consistently used throughout the specification to express that the material used for the filter of the claimed invention must be capable of being pierced.  The '762 Patent states, "the filter element 14 may be cut or blanked from any suitably **pliable, permeable**, and yieldably **piercable material**, the preferred example being cellulose polypropylene."  A8, col. 3, lines 29-31 (emphases added).

[7]  The corresponding provisional application for the '762 Patent specifies the physical properties of the lid where it states that the lid "may be formed of any available **impermeable** yieldably **piercable material**."  A35 (emphases added).

sheet of **permeable piercable material**." A9, col. 6, lines 1-3 (emphasis added). A claim term should be construed consistently with its appearance in the same claim or in other claims of the same patent. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

Accordingly, the Defendants submit that the term "piercable" should be construed to mean "capable of being pierced."

**B.    "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of the beverage."**

| "piercable to accommodate an inflow of liquid" | |
|---|---|
| <u>Plaintiff</u>: "designed to be pierced to form an inlet that allows an inflow of liquid without leakage." | <u>Defendants</u>: "capable of being pierced to permit a flow of liquid into." |
| **"piercable to accommodate an outflow of the beverage"** | |
| <u>Plaintiff</u>: "designed to be pierced to form an outlet that allows an outflow of beverage without leakage." | <u>Defendants</u>: " capable of being pierced to permit a beverage to flow out." |

The disputed claim language is easily understood by people of ordinary skill in the art and lay persons alike. The first section of the lid is capable of being pierced to permit an inflow of liquid into the first chamber and the second section of the lid is capable of being pierced to permit the beverage to flow out of the cartridge. This reading is consistent with the description of the lid in the patent specification and the invention as a whole.

As discussed above with regard to the term "piercable", it is critical to the claimed invention that the cartridge lid have sections overlying both the first and second chambers and that both lid sections be capable of being pierced. Thus, the claims require that the lid sections overlying both the first and second chambers be piercable. Why are they required to be piercable? To accommodate an inflow of liquid into the first chamber and an outflow of beverage from the second chamber to the exterior of the cartridge.

In the Final Joint Claim Construction Chart, Plaintiff cites as support for its constructions of "piercable to accommodate an inflow" and "piercable to accommodate an outflow" a

18

definition of "accommodate" from Webster's New Universal Unabridged Dictionary: "to fit, adapt or make suitable." A53. Webster's Third New International Dictionary (2002) similarly defines "accommodate": as "adapted, suitable, fit." These definitions support Defendants' claim constructions. As described in the patent specification, a suitable material for the lid of the claimed invention is one that is piercable. A8, col. 3, lines 32-34. Being capable of being pierced makes the lid suitable to permit an inflow of liquid into the first chamber and suitable to permit the beverage to exit the second chamber to the outside of the cartridge.

Accordingly, Defendants submit that the phrase "piercable to accommodate an inflow of liquid" should be construed as meaning "capable of being pierced to permit a flow of liquid into [the first chamber]." And likewise, that the phrase "piercable to accommodate an outflow of the beverage" should be construed as meaning "capable of being pierced to permit a beverage to flow out [of the second chamber]."

## CONCLUSION

For all the reason stated above, this Court should adopt Defendants' proposed constructions for the disputed terms of the '762 Patent.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: October 15, 2007
825595 / 31118

By: /s/ David E. Moore
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    Tel: 302-984-6169
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo Corporation,*
*and Kraft Foods Inc.*

19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on October 15, 2007, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on October 15, 2007, I have Electronically Mailed the document to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com

By:  /s/ David E. Moore
      Richard L. Horwitz
      Kenneth L. Dorsney
      Potter Anderson & Corroon LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE  19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

805682 / 31118