**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KEURIG, INCORPORATED,          ) | |
|       ) | |
|     Plaintiff,     ) | |
|       ) | C.A. No. 07-17 (GMS) |
|    v.     ) | |
|       ) | **JURY TRIAL DEMANDED** |
| KRAFT FOODS GLOBAL, INC.,   ) | |
| TASSIMO CORPORATION, and   ) | |
| KRAFT FOODS INC.,     ) | |
|       ) | |
|     Defendants.    ) | |

**NOTICE OF RULE 30(b)(6) DEPOSITION**
**OF KEURIG, INCORPORATED (TOPIC NOS. 1-70)**

PLEASE TAKE NOTICE that on March 11, 2008 at 9:00 a.m. at the offices of Potter

Anderson & Corroon LLP, Hercules Plaza, 1313 N. Market Street, Wilmington, DE 19899, or at

such other time and place as agreed by the parties, Defendants Kraft Foods Global, Inc., Tassimo

Corporation, and Kraft Foods, Inc. (collectively, "Kraft Defendants"), pursuant to Fed. R. Civ. P.

26 and 30, shall take the deposition upon oral examination of Plaintiff Keurig, Incorporated. The

deposition will continue from day to day until completed and shall be taken before a duly

certified court reporter and notary public or other person authorized by law to administer oaths.

The deposition will be recorded by stenographic, sound and video means.

Pursuant to Fed. R. Civ. P. 30(b)(6), Keurig shall designate one or more officers,

directors, managing agents or other representatives who consent to testify on its behalf, to testify

to matters known or reasonably available to Keurig regarding the topics listed herein. To the

extent more than one deponent is identified, Keurig shall state in advance of the deposition

which portions of this notice each deponent is prepared to address. You are invited to attend and

exercise your rights under the Federal Rules of Civil Procedure.

## Definitions and Instructions

A.    "Concerning" shall mean, without limitation, referring to, alluding to, responding to, relating to, connected with, in connection with, commenting on, in respect of, about, regarding, discussing, showing, describing, mentioning, reflecting, analyzing, constituting, containing, pertaining to, evidencing, supporting or refuting.

B.    The term "Patent-in-Suit" shall mean United States Patent No. 6,607,762, entitled "Disposable Single Serve Beverage Cartridge."

C.    The term "Accused Products" shall mean all products that Keurig contends infringe the Patent-in-Suit.

D.    "Any" and "All" shall mean "any and all," which includes "each and every."

E.    The use of the singular form of any word includes the plural and vice versa.

F.    The connectives "and" and "or" shall be construed as broadly as possible so as to bring within the scope of the definitions and document requests all matters which by any other construction would fall outside their scope.

G.    "Including" shall be construed to mean "without any limitation."

H.    The past tense shall include the present tense and the present tense shall include the past so as to make the request inclusive rather than exclusive.

## Rule 30(b)(6) Deposition Topics

In accordance with Fed. R. Civ. P. 30(b)(6), the Kraft Defendants identify the following matters for examination:

1.    The sales made, royalties earned, costs incurred, and profits generated by Keurig on sales of Brewers and K-Cups through its direct-to-consumer channel.

2.    The sales made, royalties earned, costs incurred, and profits generated by Keurig on sales of K-Cups and related brewers through Keurig Authorized Distributors.

3.     The sales made, royalties earned, costs incurred, and profits generated by Keurig on sales of K-Cups and related brewers through channels other than direct-to-consumer and Keurig Authorized Distributors.

4.     The identification of any and all retailers that have sold Keurig K-Cups and related brewers, the quantum of sales made, royalties earned, costs incurred, and profits generated by Keurig as a result of sales made to those specific accounts, Including the identification of any and all financial statements and/or reports that depict such information.

5.     Financial projections and/or forecasts Concerning the at home on demand beverage system market, Including, but not limited to, the assumptions underlying those projections and/or forecasts and changes to those forecasts over time.

6.     Keurig's financial statements and other financial reporting schedules, Including, but not limited to, income statements, balance sheets, royalty accounting/auditing reports, and other ad-hoc financial reporting statements.

7.     The commercial success, popularity, and profitability enjoyed by Keurig's K-Cups and related brewers in the at home and away from home markets.

8.     For each type of K-Cup, the date on which it was first sold in the United States and the sales (in units and U.S. dollars) of each such product in the United States on a monthly basis since that date – by channel and account.

9.     Studies and/or analyses related to customer acquisition costs in the at home and away from home markets, Including, but not limited to, the assumptions underlying those projections and/or forecasts and changes to those studies/analyses over time.

10.     The current and historical business/financial relationship between Green Mountain and Keurig.

11.     Any agreement(s) with Green Mountain Concerning the sale of on-demand beverage products, Including but not limited to the financial terms of any such agreements and the negotiations leading up to them.

12.     The accounting and/or documentation Concerning any intercompany transactions that take place between Keurig and Green Mountain.

13.     The existing relationship between Keurig and Green Mountain, Including, but not limited to, the payment of royalties on K-Cups.

14.     Green Mountain's acquisition of Keurig Including financial projections, asset valuations, intellectual property valuations, proceeds apportionment, and/or other due diligence activities or analysis.

15.     Green Mountain's initial investment in Keurig Including financial projections, asset valuations, intellectual property valuations, proceeds apportionment, and/or other due diligence activities or analysis.

3

16.    Any other Green Mountain financial arrangements with Keurig (if any) Including financial projections, asset valuations, IP valuations, proceeds apportionment, and/or other due diligence activities or analysis.

17.    Identification of any other potential buyers considered by Keurig Including financial projections, asset valuations, proceeds apportionment, and/or other due diligence activities or analysis related to those other potential buyers.

18.    Identification of any investment bankers or other outside advisers used by Keurig during its transactions with Green Mounting Including any financial projections, asset valuations, proceeds apportionment, and/or other due diligence activities or analysis related to those parties.

19.    Any financial arrangements (*i.e.*, debt or equity) involving entities other than Green Mountain (if any) Including financial projections, asset valuations, IP valuations, proceeds apportionment, and/or other due diligence activities or analysis.

20.    The size, structure, and competitive dynamics of the at home on demand beverage system market in general.

21.    The size, structure, and competitive dynamics of the at home on demand beverage system market with specific regard to K-Cups and T-discs.

22.    The commercial relationship between the Kraft Defendants and Keurig.

23.    The market positioning of the Keurig brewer relative to other at home on demand beverage systems.

24.    Market projections and/or forecasts Concerning the at home on demand beverage system market, Including, but not limited to, the assumptions underlying those projections and/or forecasts and changes to those forecasts over time.

25.    Keurig's marketing activities Concerning the at home on demand beverage system market and the amount of investment made by Keurig associated with those activities.

26.    Market and/or customer research studies performed by Keurig and the outcome of any such studies, Including, but not limited to, the reasons why customers purchase the brewing machines they do.

27.    Market and/or customer research studies commissioned by Keurig but performed by third parties and the outcome of any such studies.

28.    Any other research (if any) Concerning consumer purchasing behavior for at home on demand beverage systems.

29.    Quantification of direct-to-consumer marketing, percentage of at home business, and projections going forward.

30.    The specific distribution channels utilized by Keurig.

31.    The impact of signing additional roasters on those roasters already under contract.

32.    The impact of signing additional roasters on the marketing of the Keurig beverage system.

33.    The impact of offering coffee variety on the sale and marketing of Keurig and competitive brewing systems.

34.    The impact of offering non-coffee variety on the sale and marketing of Keurig and competitive brewing systems.

35.    Keurig's Good/Better/Best marketing strategy, Including, but not limited to, the timing of the strategy and its impact on the marketplace.

36.    Keurig's decision to enter the mass channel, Including, but not limited to, the reasons Concerning its decision and the impact on its other retail relationships.

37.    The reasons Concerning Keurig's decision to not enter specific retail outlets, Including but not limited to Wal-Mart and K-Mart.

38.    Impact of Tassimo introduction on Keurig's marketing budget.

39.    Brand specific impact on customer purchase decision – for both coffee and brewing machine.

40.    Impact on Keurig of investments in the at home beverage delivery market made by other competitors (*e.g.* Tassimo), Including, but not limited to, Keurig's reliance on the marketing/promotional dollars spent by those competitors.

41.    Keurig's regional/geographic distribution capabilities.

42.    Market/customer related differences between the at home and away from home markets, Including, but not limited to, the financial accounting for sales made in those channels.

43.    Keurig's policies and practices Concerning protecting and/or licensing its intellectual property in general.

44.    Keurig's specific policies or practices (Including but not limited to negotiations) Concerning paying or charging royalties for intellectual property (Including, but not limited to, patent rights) related to consumable foods, liquids, and related packaging, Including, but not limited to, beverage media and on-demand beverage cartridges.

45.    Keurig licensing practices and policies with specific regard to its K-Cup agreements with its roasters, Including, but not limited to, the specific terms contained in Keurig's license agreements with its roasters.

46. Any agreement(s) Concerning the development and/or marketing of the Keurig brewers, Including but not limited to the termination of any such agreements.

47. Factors considered by Keurig in its determination of the reasonable royalty rates included in its existing license agreements with its roasters.

48. The royalty or licensing rates for the use of patented technology customarily charged or used in the market in which Keurig and other beverage filter cartridges are sold.

49. Any consideration by Keurig prior to this suit Concerning the granting of a license to the Kraft Defendants under the Patent-in-Suit with respect to the Accused Products.

50. Identification of any coffee roasters that Keurig claims it was unable to license as a result of the Defendants' alleged infringement (if any), Including, but not limited to, the reasons behind Keurig's beliefs in that regard.

51. Communications and/or correspondence with roasters that Keurig claims it was unable to license as a result of the Defendant's alleged infringement (if any).

52. Any correspondence between Keurig and Starbucks, Seattle's Best, Tazo, or Twinings.

53. Impact of exclusivity on Keurig's agreements with its roasters.

54. Keurig's patent portfolio.

55. Any alternative to the existing K-Cup design that has ever been available to Keurig.

56. The conception, design, and development of the K-Cup, Including alternative designs considered and the reason for acceptance/rejection of each different design style.

57. All concepts (whether or not adopted) considered when developing the K-Cups.

58. The design and benefits Concerning K-Cups.

59. Consideration by Keurig Concerning to the advantages and disadvantages of single side piercing relative to dual side piercing.

60. Identification of the factors Concerning Keurig's decision to offer K-Cups which do not incorporate the dual side piercing.

61. Consideration by Keurig Concerning the ability to have a successful "cartridge style" product in the at home on demand beverage system market that does not incorporate single side piercing.

62. Constraints associated with the existing K-Cup design, Including, but not limited to, the volume of coffee that can fit in the K-Cup.

63.    Consideration by Keurig Concerning leakage around the inlet and/or outlet probe when utilizing dual side piercing, Including but not limited to any complaints by Keurig's customers regarding any such leakage associated with K-Cups.

64.    Consideration by Keurig with Concerning the specific costs associated with utilizing dual side piercing, Including but not limited to any studies or analyses performed by Keurig's to quantify such costs.

65.    Consideration by Keurig (if any) Concerning plans to develop a single side pierced capsule, brewer, and/or production line.

66.    Consideration by Keurig (if any) Concerning the feasibility of offering an espresso, cappuccino, or latte product.

67.    The identity and quality of each single-serve coffee product that has ever been an acceptable substitute or alternative for any of the K-Cups in the United States, and all factual bases why such products was or is an acceptable substitute or alternative.

68.    The historical production capacity (both available and utilized) for Keurig and its partners related to both K-Cups and brewers.

69.    The projected commercial lifespan of the Keuirg/K-Cup technology platform.

70.    Keurig profits and/or subsidies Concerning brewer sales and distribution.


                                POTTER ANDERSON & CORROON LLP


OF COUNSEL                      By:  _/s/ David E. Moore_____
                                     Richard L. Horwitz (#2246)
David M. Schlitz                     David E. Moore (#3983)
William S. Foster, Jr.               Hercules Plaza, 6th Floor
C. John Brown                        1313 North Market Street
BAKER BOTTS L.L.P.                   P.O. Box 951
1299 Pennsylvania Ave., N.W.         Wilmington, DE 19899-0951
Washington, D.C. 20004-2400          Tel: 302-984-6169
Tel. 202-639-7700                    rhorwitz@potteranderson.com
                                     dmoore@potteranderson.com
Dated:  February 15, 2008
849013 / 31118                  *Attorneys for Defendants*
                                *Kraft Foods Global, Inc., Tassimo Corporation,*
                                *and Kraft Foods Inc.*


                                      7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on February 15, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on February 15, 2008, the attached document was served to the following person(s) as indicated below:

| **Via Hand Delivery & Electronic Mail** | **Via Electronic Mail** |
|---|---|
| John W. Shaw | Michael A. Albert |
| Karen E. Keller | Michael N. Rader |
| Young Conaway Stargatt & Taylor | Laura Topper |
| The Brandywine Building | Wolf, Greenfield & Sacks, P.C. |
| 1000 West Street, 17th Floor | 600 Atlantic Avenue |
| P. O. Box 391 | Boston, MA 02210 |
| Wilmington, DE 19899-0391 | malbert@wolfgreenfield.com |
| jshaw@ycst.com | mrader@wolfgreenfield.com |
| kkeller@ycst.com | ltopper@wolfgreenfield.com |

By:   */s/ David E. Moore*
      Richard L. Horwitz
      Kenneth L. Dorsney
      Potter Anderson & Corroon LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

805682 / 31118