# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

## LETTER TO THE HONORABLE GREGORY M. SLEET FROM DAVID E. MOORE ESQUIRE DATED APRIL 9, 2008

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

cc:    Clerk of Court

Counsel of Record



Potter
Anderson
&Corroon LLP

David E. Moore
Attorney at Law
dmoore@potteranderson.com
302 984-6147 Direct Phone
302 658-1192 Fax

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

**www.potteranderson.com**

April 9, 2008
Public Version Dated April 16, 2008

**VIA ELECTRONIC FILING**

The Honorable Gregory M. Sleet                    **PUBLIC VERSION**
J. Caleb Boggs Federal Building
844 King Street
Wilmington, DE  19801

     Re:  **Keurig Incorporated v. Kraft Global, Inc. et al.**
         **C.A. No. 07-17-GMS**

Dear Chief Judge Sleet:

     Pursuant to the Court's Correcting Entry of April 1, 2008 and the Scheduling Order in this case, Kraft Foods Global, Inc., Tassimo Corporation and Kraft Foods Inc. ("Kraft Defendants") request permission to file a motion for summary judgment that all of the asserted claims of the patent-in-suit, U.S. Patent No. 6,607,762 ("'762 Patent"), are invalid or not infringed.  Favorable action on the Kraft Defendants' motion for summary judgment would be dispositive of all of Keurig's claims against the Kraft Defendants.[1]

     Keurig asserts that claims 1, 2, 8, 9 and 10 of the '762 Patent are infringed.  As detailed below, Kenco Singles Cartridges which embody all of the elements of claims 1, 2, and 9 were in public use more than a year prior to the filing of the application for the '762 Patent.  Thus, claims 1, 2 and 9 are invalid pursuant to 35 U.S.C. §102(b).[2]

     Claims 8 and 10 require that the container be impermeable to liquids and gases. ▮

---

[1]  On April 8, 2008, the Kraft Defendants filed a motion for leave to amend their answers and counterclaims (D.I. 81) to add allegations of inequitable conduct.  If their motion is granted, that counterclaim would remain.

[2]  There are two prior art patents that anticipate the asserted claims of the '762 Patent or make obvious the asserted claims.  However, in order to keep the Kraft Defendants' motion for summary judgment very simple, the Kraft Defendants will only rely upon public use of the Kenco Singles Cartridge before the Critical Date of the '762 Patent in their motion for summary judgment.

The Honorable Gregory M. Sleet
April 9, 2008
Public Version Dated: April 16, 2008
Page 2

███████████████████████████████████████████████████ Nevertheless, Keurig seemingly contends that oxygen permeation of the T-Disc is at a commercially acceptable level and thus it is "impermeable" as that term is used in the '762 Patent. The evidence of record also shows that the Kenco Singles Cartridge is less permeable to oxygen than the T-Disc. Thus, either the T-Disc does not infringe claims 8 and 10, or to the extent the T-Disc is deemed to be "impermeable", the Kenco Singles Cartridge is likewise impermeable and claims 8 and 10 also are invalid pursuant to Section 102(b).

Pursuant to the Court's Scheduling Order, early in this case the Kraft Defendants served upon Keurig invalidity charts, which demonstrated that each element of the asserted claims was present in the Kenco Singles Cartridge. Keurig in turn served upon the Kraft Defendants its refutation to these invalidity contentions. Keurig's only assertion as to why the Kenco Singles Cartridge did not anticipate the asserted claims was that it did not include a single lid that is both (1) piercable to accommodate an inflow of liquid into the first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Keurig also stated that it did not concede that the Kenco Singles Cartridge was in public use.

Keurig's assertions placed into dispute the meaning of the claim terms "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of the beverage". In its claim construction order the Court construed "piercable to accommodate an inflow of liquid" as meaning "capable of being pierced to permit a flow of liquid into" and "piercable to accommodate an outflow of the beverage" as meaning "capable of being pierced to permit a beverage to flow out."

Thus, the issue with regard to the Kraft Defendants' Section 102(b) "in public use" invalidity defenses boils down to whether the Kenco Singles Cartridge was "in public use" more than a year prior to the filing of the application for the '762 Patent, and if so, whether it had a lid having a first section overlying the first chamber and a second section overlying the second chamber, the first section being *capable* of being pierced to permit an inflow of liquid into the first chamber and the second section being *capable* of being pierced to permit an outflow of beverage from the container.

## THE LAW

Whether a patent is invalid for public use is a question of law based on underlying facts. An invention is in public use if its is shown to or used by an individual other than the inventor under no limitation, restriction, or obligation of confidentiality. *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008). A single use of an article embodying the invention is sufficient to constitute "in public use". It is not necessary that the article be used or sold for profit. Nor is it necessary that the article be used with the knowledge or consent of the inventor. The invention need not necessarily be exposed to public view. Its presence may not be known to the user of the article. *Fisher-Price, Inc. v. Safety 1st, Inc.*, 279 F. Supp. 2d 530, 544 (D. Del. 2003).

The Honorable Gregory M. Sleet
April 9, 2008
Public Version Dated: April 16, 2008
Page 3

## UNDERLYING FACTS

a. <u>Kenco Singles Cartridges Were In Public Use More Than A Year Prior To The Critical Date</u>

For purposes of their motion for summary judgment, the Kraft Defendants will use the earliest possible Critical Date, February 18, 2000, the date of filing of the provisional application from which the '762 Patent claims priority.

The evidence of record establishes that during the period from at least November 1996 through 1998[3], Helen Glus used Kenco Medium Roast Singles Cartridges at least three times a day at her place of work, Philip Morris Companies, Inc., in New York City. Glus Dep. (Ex. B) 11-15. She was not under an obligation of confidentiality or secrecy to anybody with regard to the Kenco Singles Cartridges. *Id.* at 15-17. The Kenco Singles machine and Kenco Singles Cartridges that she used were in the kitchen on her floor. They were freely accessible to Ms. Glus, to her co-workers on her floor, as well as to employees from other floors and visitors to the building. *Id.* at 12-15, 73-74. Ms. Glus saw her co-workers and visitors use the Kenco Singles Cartridges. *Id.* at 14-15. Ms. Glus' deposition testimony is corroborated by documentary evidence, which were made exhibits at her deposition. Ms. Glus was responsible for ordering Kenco Singles Cartridges when the supply ran low. Her files include facsimiles in which she ordered Kenco Singles Cartridges; return facsimiles acknowledging receipt of the request, facsimiles stating that the requested Kenco Singles Cartridges had been dispatched, invoices for the dispatched Kenco Singles Cartridges and shipping documents for the dispatched Kenco Singles Cartridges. For instance, in one of her facsimiles she wrote "the machine is a <u>BIG</u> success. So much so, that we're ready to re-order certain items after such a short time. [including Medium Roast]" Defs.' Exhibit 50 (Ex. C). Three months after that facsimile she sent another facsimile stating "It's that time again. May I place the following order: [including Medium Roast]." Defs.' Exhibit 52 (Ex. D).

Keurig's counsel cross-examined Ms. Glus regarding the facts and circumstances of her use of the Kenco Medium Roast Singles Cartridges. The facts are not in dispute. Whether Ms. Glus' use of Kenco Singles Cartridges constitutes "in public use" is a purely a legal question.

b. <u>Kenco Singles Cartridges In Public Use Embodied All Of The Elements Of Claims 1, 2 and 9</u>

It is beyond dispute that in the November 1996 through December 1998 time period the Kenco Singles Cartridges had a single foil lid that had a first section overlying the first chamber in which the beverage medium was stored and a second section overlying the second chamber from which the beverage exited the container. It is also beyond dispute that the section of the lid

---

[3]  At her deposition Ms. Glus testified that she began using Kenco Singles Cartridges in December 1995 and used them into 1999. Glus Dep. (Ex. B) 6-11. But to simplify their motion for summary judgment, the Kraft Defendants will rely upon her use during the period from November 1996 through December 1998.

The Honorable Gregory M. Sleet
April 9, 2008
Public Version Dated: April 16, 2008
Page 4

overlying the second chamber was capable of being pierced to permit an outflow of liquid and was pierced in use with a Kenco Singles brewer. Thus, the first lid section, which was made of the same material as the second lid section, was likewise capable of being pierced to allow an inflow of liquid.

That the first lid section was capable of being pierced to permit an inflow of liquid was confirmed by tests performed in this case.



A Kraft employee, Lee Rowan, tested twenty Kenco Medium Roast Singles Cartridges manufactured on the Rychiger lines.

Separately, Andrew Bentley, another Kraft employee, tested twelve Kenco Singles Cartridges manufactured on the Rychiger lines.

---

4

[5] The Kraft Defendants do not have a labeled copy of Defendants' Exhibit 7, but the pages cited as Defendants' Exhibit 7 at page 211 of the

The Honorable Gregory M. Sleet
April 9, 2008
Public Version Dated: April 16, 2008
Page 5

c. Dependent Claim 2

Dependent claim 2 adds that the lid has less resistance to being pierced as compared to the resistance to being pierced of the outer container. It is self evident that the foil lid of the Kenco Singles Cartridge is less resistant to piercing than the hard plastic container.

d. Dependent Claim 9

Dependent claim 9 adds that the lid is impermeable to liquids and gases. The documentary evidence of record shows that the lid of the Kenco Singles Cartridge has less than a detectable level of permeability to oxygen. Pl's Exhibit 72 (Ex. G). This is considered impermeable.

If Keurig were to now argue that the lid of the Kenco Singles Cartridge is not impermeable, then it would have to concede that the lid of the accused T-Disc is likewise not impermeable, and thus does not infringe.

e. Dependent Claim 8 and Independent Claim 10

Dependent claim 8 and independent claim 10 require that the outer container be impermeable to liquids and gases.

Either the container of the T-Disc is not "impermeable" and does not infringe Claims 8 and 10, or the Kenco Singles Cartridge is "impermeable" and Claims 8 and 10 are also invalid on Section 102(b) grounds.

CONCLUSION

The issue of whether the asserted claims are invalid on the basis of Section 102(b) "in public use" is ripe for summary judgment. The factual record in this regard was fully developed in discovery, including the evidence specified above. The Kraft Defendants request the Court to make a legal determination based upon the underlying facts. By ruling on this legal issue the Court can efficiently dispose of this case.

The Honorable Gregory M. Sleet
April 9, 2008
Public Version Dated: April 16, 2008
Page 6

Respectfully,

/s/ David E. Moore

David E. Moore

DEM:nmt/860495/31118
Enclosures

cc:     Clerk of Court (Via Hand Delivery)
        Counsel of Record (Via Electronic Mail)

# EXHIBIT A

# KENCO MEDIUM ROAST SINGLES CAPSULE

## (Original provided to Court)



# EXHIBIT B

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF DELAWARE
     --------------------------------------------X
 3   KEURIG, INC.,
 4                           Plaintiff,
 5        - against -
 6   KRAFT FOODS GLOBAL, TASSIMO CORPORATION,
     KRAFT FOODS INTERNATIONAL,
 7
                             Defendants.
 8
     C.A. NO. 07-17 GMS
 9   --------------------------------------------X
10
11                        120 Park Avenue
                          New York, New York
12
13
                          March 4, 2008
14                        2:00 P.M.
15
16        Examination Before Trial of HELEN GLUS,
17   pursuant to Notice, taken by and before Renee
18   S. Harris, a Notary Public and Shorthand
19   Reporter of the State of New York.
20
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                  REF: 86800
```

Page 6

```
 1     H E L E N   G L U S, having first been duly

 2     sworn by a Notary Public for and within the

 3     State of New York, upon being examined,

 4     testified as follows:

 5

 6     EXAMINATION BY

 7     MR. SCHLITZ:

 8          Q.    Please state your name for the

 9     record.

10          A.    Helen Glus.  123 Mamaroneck Avenue,

11     Mamaroneck, New York, 10543.

12          Q.    I'm going to have to ask you to

13     speak up a little bit so we can all hear.

14          Mrs. Glus, who do you currently work

15     for?

16          A.    Louis Camilleri, chairman and CEO of

17     Altria Group, Inc.

18          Q.    Did you ever work for Kraft Foods?

19          A.    Yes, the international division.

20          Q.    Okay.  And can you tell me the dates

21     that you worked for Kraft Foods?

22          A.    Mr. Camilleri was transferred there

23     on December '95, and we stayed there till

24     August '96.

25          Q.    And you say "there"; where is there?
```

Page 7

```
 1                        GLUS
 2         A.    The Rye Brook office of Kraft Foods
 3   International.
 4         Q.    And is that in New York State?
 5         A.    Westchester.
 6         Q.    Westchester, New York State?
 7         A.    Mm-hmm.
 8         Q.    And when you arrived at the offices
 9   of Kraft Foods International Rye Brook, was
10   there a single-serve beverage machine there?
11         A.    Yes, there was.
12         Q.    Do you know what brand it was?
13         A.    We referred to it as the Kenco
14   machine.
15         Q.    Where was the Kenco machine that
16   you're referring to, where was that in the
17   building?
18         A.    On the seventh -- on my half of the
19   seventh floor in the kitchen.
20         Q.    Who had access to that machine?
21         A.    Everyone.
22         Q.    Everyone, meaning?
23         A.    Everyone who worked on that floor
24   who came to that floor, visited that floor.
25         Q.    Now did you personally have access
```

Page 8

```
 1                        GLUS
 2      to it?
 3           A.    Yes.
 4           Q.    We've talked about there was a Kenco
 5      singles machine.  Were there capsules for use
 6      with the Kenco singles machine at the same
 7      location?
 8           A.    Yes.
 9           Q.    Did you personally use those Kenco
10      singles capsules?
11           A.    Yes.
12           Q.    How often did you use them?
13           A.    Every day, seven times a day, at
14      least three times a day.
15           Q.    And you mentioned that you arrived
16      in December '95, there already was a machine;
17      and did you start using it in December of
18      '95?
19           A.    Yes.
20           Q.    And did you continue to use it
21      through August '96?
22           A.    Yes.
23           Q.    Let me ask the question first, and
24      wait if you would, please.
25                 Did you ever see anyone else use the
```

```
 1                         GLUS
 2     Kenco singles capsules?
 3          A.   Yes.
 4          Q.   Now I'm going to ask you to dig way
 5     back, and I appreciate we're talking about
 6     December '95.  But do you remember the
 7     flavors of beverage that you used of the
 8     singles -- of the Kenco's singles cartridges
 9     that you used?
10          A.   Tea, medium roast.  Those are the
11     two I used.
12          Q.   Okay.  And again, I understand it's
13     been a while, but can you describe the
14     appearance of the Kenco's singles cartridge
15     that you started to use in December of 1995?
16          A.   Can I use my hands?
17          Q.   Yes.
18          A.   It's about that long, about that
19     wide, square (indicating).  I don't remember
20     if the top, the part that you inserted, was
21     more rounded or maybe came more to a point.
22     Each one had a different label on the front
23     for what the product was.
24          Q.   And do you remember what the bottom
25     looked like?
```

1                              GLUS

2          A.    The foil, but that's all I remember.

3          Q.    And recently, have you seen the

4    Kenco's singles cartridge?

5          A.    Yes.

6          Q.    How recently?

7          A.    A month ago.

8          Q.    And was there any difference in the

9    appearance of what you saw a month ago from

10   what you --

11         A.    To me they looked exactly the same.

12         Q.    When you say "they," meaning what

13   you started to use in December '95?

14         A.    Yes.

15         Q.    Now, with regard to the Kenco's

16   singles cartridges that you were using from

17   December 1995 to August 1996, in Rye Brook --

18   we're going to separate the two times:  One

19   is Rye Brook and one is here in Park Avenue.

20         Were you under any obligation of

21   confidentiality or secrecy with anyone with

22   regard to the Kenco's singles cartridges?

23         A.    No.

24         Q.    To your knowledge were the other

25   uses under any obligation of confidentiality

1                          GLUS

2    or secrecy to anyone with regard to the

3    Kenco's singles cartridges?

4         A.    No.

5         Q.    More specifically, were you under

6    any obligation of confidentiality or secrecy

7    to a company called Keurig, the inventor,

8    employees of Keurig?

9         A.    No.

10        Q.    Were you free to show the cartridges

11   to anyone you wanted to show them to?

12        A.    Yes.

13        Q.    Now, after August 1996, did you

14   change companies that you worked for?

15        A.    Yes, Mr. Camilleri was given a new

16   position, senior vice president and chief

17   financial officer for Philip Morris

18   Companies, Inc., so we moved back to 120

19   Park.

20        Q.    And when you moved back -- when was

21   that?

22        A.    If I can look, August '96.

23        Q.    In August '96, when you arrived at

24   120 Park Avenue, on the floor that you worked

25   on, was there a Kenco's singles machine?

Page 12

1                         GLUS
2          A.    No.
3          Q.    Thereafter, was there a Kenco's
4    single machine?
5          A.    Yes.
6          Q.    Do you know how soon thereafter?
7          A.    Within months.
8          Q.    Okay.  And were you responsible for
9    ordering that machine?
10         A.    I was in the loop, but I believe it
11   was a phone call between my boss and I
12   believe Ronny Bell, but he told him that he
13   wanted a machine shipped here.
14         Q.    And when the machine arrived, did
15   there also arrive Kenco's singles cartridges
16   for use in the machine?
17         A.    Yes, there was an initial supply
18   delivery.
19         Q.    Where was that machine located?
20         A.    In the kitchen area on this floor.
21         Q.    "This floor" being --
22         A.    The 22nd floor.
23         Q.    The 22nd floor.  That kitchen area,
24   who had access to it?
25         A.    Everybody -- everybody.  It's for

Page 13

```
 1                        GLUS
 2      the purpose of the people on this floor, but
 3      for everybody who came on the floor.
 4           Q.   That would be other employees of
 5      Kraft in the building -- excuse me, of
 6      employers in the building?
 7           A.   Yes.
 8           Q.   Visitors to the building?
 9           A.   Yes.
10           Q.   And I asked you about the machine,
11      were there capsules, Kenco's singles
12      capsules, for use within that machine in the
13      same location?
14           A.   Yes.
15           Q.   And were they out in public view?
16           A.   Yes, they were in a storage kind of
17      view.
18           Q.   Okay.  Now, in 1996, did you ever
19      personally use the Kenco's singles capsules?
20           A.   Yes.
21           Q.   Again, how often?
22           A.   At least three times a day.
23           Q.   In 1997, did you use the Kenco's
24      singles capsules?
25           A.   Yes.
```

```
 1                         GLUS
 2          Q.    In 1998?
 3          A.    Yes.
 4          Q.    And in 1999?
 5          A.    Yes.
 6          Q.    Now, did you ever see others use the
 7     Kenco's singles cartridges in 1996?
 8          A.    Yes.
 9          Q.    In 1997?
10          A.    Yes.
11          Q.    In 1998?
12          A.    Yes.
13          Q.    In 1999?
14          A.    Yes.
15          Q.    And can you -- and I know this is a
16     difficult question, but can you remember
17     anybody that else that used them?
18          A.    All my coworkers on the floor at the
19     time, definitely.  Other people who would
20     come up for meetings, outsiders who came for
21     meetings.  Everybody used it.
22          Q.    When you say "outsiders" that came
23     to meetings, to your knowledge did any
24     visitors, non-Kraft employees, ever view and
25     use the Kenco's singles machine?
```

Page 15

1                                GLUS
2            A.    Yes.
3            Q.    Can you describe under which
4      circumstances that might have happened?
5            A.    Well, they would visit Mr.
6      Camilleri.  If you knew the layout of the
7      floor, Mr. Camilleri's office at the time was
8      by the kitchen, and his conference room was
9      opposite the kitchen.
10           So if people were there to meet with him
11     and he wasn't available, I would say:  Do you
12     want to go to conference room; would you like
13     coffee; we would go along the way.  We had
14     such a variety, so you would ask them what
15     they want.
16           Q.    Now, we talked about each of the
17     years '97, '98, '99, your personal use of the
18     Kenco's singles capsules, do you remember
19     what flavors you used?
20           A.    I used medium roast or regular tea.
21           Q.    Now, at any time in '96, '97, '98,
22     '99, were you under any obligation of
23     confidentiality or secrecy with regard to the
24     Kenco's singles cartridges and the use of
25     them?

1                          GLUS

2          A.    No.

3          Q.    Did anyone ever say to you:  Helen,

4    you're free to use these cartridges, but you

5    can't tell anybody about the cartridges?

6          A.    No.

7          Q.    Were your coworkers under any

8    obligation of confidentiality or secrecy with

9    regard to the use of Kenco's singles?

10         A.    No.

11         Q.    This may seem obvious, but were you

12   under any obligation of confidentiality or

13   secrecy with regard to the Kenco's singles

14   cartridges -- did you have any obligation of

15   confidentiality or secrecy to Keurig?

16         A.    No.

17         Q.    Did you have any obligation of

18   confidentiality or secrecy to a Mr. Lazarus,

19   who is one of the inventors of the patent

20   suit?

21         A.    No.

22         Q.    What about to his co-inventor?

23         A.    I don't know who these people are,

24   no.

25         Q.    But you didn't have any obligation

Page 17

```
 1                          GLUS
 2    of confidentiality or secrecy?
 3         A.   No.
 4         Q.   Now did there come a time when you
 5    were responsible for ordering the Kenco's
 6    singles cartridges for use in the machine on
 7    the 22nd floor?
 8         A.   Yes.
 9         Q.   Okay.  Now did you keep a file with
10    regard to those orders?
11         A.   Yes.
12         Q.   And where did you keep that file?
13         A.   In my desk drawer.
14         Q.   Did you provide copies of the
15    documents in that file to Kraft's attorneys
16    in this case to be produced in this case?
17         A.   Yes.
18         Q.   Okay.  I'm going to show you some
19    documents, if you would please hand this to
20    the court reporter.  Now.
21         I don't know what the last defense
22    exhibit is in Banbury, but I know it was
23    certainly not up to 50.
24         So let's mark this defendant's exhibit
25    50.
```

Page 73

```
 1                        GLUS
 2    capsule storage units in this particular
 3    order?
 4         A.   I think it was just our own
 5    experience.  We had an initial -- an initial
 6    capsule storage unit and it wound up because
 7    there were so many varieties, it wasn't
 8    enough.  So we wound up getting a second, so
 9    we just started them off with that.
10         Q.   Could you describe what the capsule
11    storage unit looks like?
12         A.   Measurements, again, it's about yay
13    high -- I can't explain it.  It has little
14    slots and there was rows, and I don't know
15    how.
16         Q.   So you would say about two feet
17    tall, a couple feed wide, something like
18    that?
19         A.   I guess, close.
20         Q.   And where was this capsule --
21         A.   I'm supposed to wait till you
22    finish.
23         Q.   So in the 120 Park Avenue location,
24    your capsule storage unit, where was it
25    located?
```

```
 1                          GLUS
 2          A.    Right next to the machine.
 3          Q.    So it was in the kitchen on the 22nd
 4     floor of 120 Park Avenue?
 5          A.    Correct.
 6          Q.    Next to the brewer?
 7          A.    Correct.
 8          Q.    And if the Rye Brook location, also,
 9     was it right next to the brewer?
10          A.    I believe so.
11          Q.    What does a box of Kenco's singles
12     cartridges look like?
13          A.    It's about that big, that wide, and
14     for some reason I think the earl gray box was
15     white, I don't remember if they were all
16     white boxes or not, and inside were these
17     like vacuum-sealed bags, and within them were
18     the cartridges, and I don't remember how
19     many.
20          Q.    That was my next question was:  How
21     many cartridges were in a box?
22          A.    In a box, I don't know.
23          Q.    Did it vary?  Do you recall if it
24     varied between the different flavors, if
25     different flavors had a different number of
```

# EXHIBIT C



From:        Louis C. Camilleri
Telephone:   (212) 878-2121
Telefax:     (212) 907-5777

**Date:**        November 6, 1996

**To:**          Mr. Doug Halliday

**Company:**     Maxpax International
                 Kraft Jacobs Suchard

**Fax Number:**  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-273152

**Pages:**       1 (including cover)

---

### Message

Dear Mr. Halliday:

I don't know if Louis mentioned it in his phone call, but the machine is a BIG success. So much so that we're ready to re-order certain items after such a short time. I'd appreciate it if you could arrange for the following "favorites" to be sent to us at 120 Park.

**Three (3) Boxes of Kenco Traditional Leaf Tea**

**Three (3) Boxes of Kenco Medium Roast**

**Three (3) Boxes of Kenco Espresso**

You've done so much for us already and I hate to bother you to place orders. If there's someone I can do this with (on what appears will be a very regular basis), please just let me know.

Thanks and kind regards,



EXHIBIT
3108
Defendants
50

K  0017222



P. 4

* * * TRANSMISSION RESULT REPORT ( NOV. 6 1996 11:50AM ) * * *

TTI 2125975777

| DATE | TIME | ADDRESS | MODE | TIME | PAGE | RESULT | PERS. NAME | FILE |
|------|------|---------|------|------|------|--------|-----------|------|
| NOV. 6 | 11:50AM | 01295 273152 | TCS | 0'22" | P. 1 | OK | | 346 |

B : BATCH          C : CONFIDENTIAL       * : TRANSFER        P : POLLING
M : MEMORY         L : SEND LATER         @ : FORWARDING      E : ECM
S : STANDARD       D : DETAIL             F : FINE           > : REDUCTION

K  0017223

# EXHIBIT D



**From:**    Louis C. Camilleri
**Telephone:**    (212) 828-3131
**Telefax:**    (212) 905-5771

**Date:**    February 4, 1997

**To:**    Ms. Liz Matthews

**Company:**    Maxpax International

**Fax Number:**    44-1295-223540

**Pages:**    1 (including cover)

<u>Message</u>

Dear Liz,

It's that time again. May I place the following order:

| | | |
|---|---|---|
| 1 | Box | Medium Roast – 1 |
| 2 | Boxes | Dark Roast – 2 |
| 2 | Boxes | Traditional Leaf Tea – 3 |
| 2 | Boxes | Earl Grey Tea |
| 3 | Boxes | Cappuccino – 2 |
| 2 | Boxes | Espresso – 3 |
| 2 | Boxes | Carte Noir – 4 |
| 2 | Boxes | Kronung – 3 |

Since our choices are expanding, it would be great if we could get another capsule storage unit.

I was told it might be helpful for you to indicate on shipping documents the name and phone number of our broker, which is:  Martin Strauss (717-723-7899).

One final, and very important thing, which Mr. Camilleri asked me to inquire about:  How are we being billed for all this?  We haven't seen anything on this end regarding the orders we've already placed.

As usual, thanks for all your help.

Kind regards,

EXHIBIT
52
Defendants
340.8

K  0017219



K 0017220

# EXHIBIT E

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT F

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT G

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT H

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT I

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT J

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT K

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT L

# EXHIBIT M

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT N

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT O

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT P

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

EXHIBIT Q

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY