IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>      Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>      Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED –**<br>**PUBLIC VERSION** |

**KEURIG'S OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE
TO FILE FIRST AMENDED ANSWERS AND COUNTERCLAIMS**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: April 29, 2008

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

I.    BACKGROUND ........................................................................................................... 3

      A.    Kraft Filed Its Motion More than a Month After the Deadline for Pleading
            Inequitable Conduct, a Week After the Close of Fact Discovery, and
            On the Eve of the Deadline for Summary Judgment Letter Briefing ..................... 3

      B.    Kraft Was Dilatory in Pursuing Deposition
            Testimony Related to Inequitable Conduct............................................................. 4

II.   ARGUMENT ................................................................................................................ 5

      A.    Good Cause Does Not Exist to Modify the Scheduling Order Because
            Kraft Was Dilatory and the Delay Would Prejudice Keurig .................................. 5

            1.    The Gauthier and Lazaris Depositions Were Not
                  Necessary Predicates to Kraft's Motion, and in
                  Any Event Kraft Was Dilatory in Scheduling Them .................................. 5

            2.    Kraft's Delay Would Unfairly Prejudice Keurig ......................................... 7

      B.    The Amendment Should Be Denied as Futile........................................................ 9

III.  CONCLUSION............................................................................................................. 13

# TABLE OF AUTHORITIES

Burlington Indus. Inc. v. Dayco Corp.,
    849 F.2d 1418 (Fed. Cir. 1988)................................................................................3

Computer Accel. Corp. v. Microsoft Corp.,
    No. 9:06-CV-140, 2007 WL 2315223 (E.D. Tex. Aug. 10, 2007) ......................3

C.R. Bard, Inc. v. M3 Sys., Inc.,
    157 F.3d 1340, 1365 (Fed. Cir. 1998).................................................................12

Gonzales v. Comcast Corp.,
    No. 03-445 (KAJ), 2004 WL 2009366 (D. Del. Aug. 25, 2004).........................5

FDIC v. Nat'l Union Fire Ins. Co.,
    205 F.3d 66 (2d Cir. 2000)..................................................................................11

Haberman v. Gerber Prods. Co.,
    236 Fed. Appx. 592 (Fed. Cir. 2007)....................................................................7

Hideout Records & Distrib. v. El Jay Dee, Inc.,
    601 F. Supp. 1048 (D. Del. 1984)..................................................................3, 10

Lifescan, Inc. v. Polymer Tech. Int'l Corp.,
    35 U.S.P.Q.2d 1225 (W.D. Wash. 1995)..............................................................8

Inline Connection Corp. v. AOL Time Warner Inc.,
    237 F.R.D. 361 (D. Del. 2006) ........................................................................8, 9

Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.,
    464 F.3d 1339 (Fed. Cir. 2006)............................................................................9

McLaughlin v. Diamond State Port Corp.,
    No. 03-617 (GMS), 2004 WL 2958664 (D. Del. Dec. 21, 2004) .......................8

MGM Well Servs., Inc. v. Mega Lift Sys., LLC,
    No. 05-1634, 2006 WL 1852322 (S.D. Tex. June 30, 2006).........................7, 8

Optivus Tech., Inc. v. Loma Linda Univ. Med. Ctr.,
    469 F.3d 978 (Fed. Cir. 2006)..............................................................................5

Sanofi-Synthelabo v. Apotex Inc.,
    470 F.3d 1368 (Fed. Cir. 2006)..........................................................................12

SIG Swiss Indus. v. Fres-Co Sys., USA, Inc.,
    No. 91-0699, 1993 WL 232884 (E.D. Pa. June 24, 1993)..............................7, 9

Tinder v. Pinkerton Security,
    305 F.3d 728 (7th Cir. 2002) ..............................................................................10

West v. Frank,
    492 F. Supp. 2d 1040 (W.D. Wis. 2007) ...........................................................11

DB02:6762684.1    065927.1001

After the close of discovery, and long after the February 29 deadline for such amendments set by the Court in the Scheduling Order (D.I. 34), Kraft seeks to add a baseless inequitable conduct claim that would unfairly prejudice Keurig and sully the reputation of its president Nicholas Lazaris, a leader who has provided decades of distinguished service in both government and private industry.

Kraft's theory, that Mr. Lazaris deliberately hid evidence of Kraft's Kenco Singles cartridge from his patent attorney and the Patent and Trademark Office (PTO), all with an intent to deceive the PTO into wrongly issuing the '762 patent, is completely unsupported by the evidence, and indeed is <u>directly contradicted by Mr. Lazaris' deposition testimony</u>. Mr. Lazaris had seen the Singles cartridge, but understandably deemed it considerably different from the patented invention because it used conventional opposite-side piercing rather than the same-side piercing technology that he developed. Nevertheless, Mr. Lazaris testified that he <u>did</u> discuss Singles with his patent attorney, Maurice Gauthier.[1] <u>See</u> Kraft Br. (D.I. 81) at 3. Apparently, Mr. Gauthier did not consider Singles any more relevant than Mr. Lazaris, since (as he testified) his practice was to disclose prior art to the PTO if it seemed relevant to him.

Given that Mr. Lazaris' testimony directly contradicts Kraft's theory, Kraft anchors its proposed pleading on the allegation that Mr. Lazaris <u>lied under oath</u> about whether he discussed Singles with Mr. Gauthier. Kraft's sole basis for this serious charge, however, is an unfair memory test that Kraft's counsel administered to Mr. Gauthier, the senior partner at his patent law firm, who has over 45 years' experience in practice.

---

[1] While Singles was not mentioned by name, the '762 patent explicitly discloses conventional opposite-side piercing cartridges in its "Description of the Prior Art." (Ex. 1 Col. 1).

Mr. Gauthier testified that he made it a practice to disclose to the PTO prior art that he considered material (and non-cumulative). He also testified that he had little memory of anything having to do with the prosecution of this particular patent, which happened nearly a decade ago and involved a client that Mr. Gauthier no longer represents. Having learned through its first few questions that Mr. Gauthier remembered little or nothing about the events in question, Kraft was careful to avoid refreshing his recollection. Rather than showing Mr. Gauthier a Singles cartridge – or even a picture of one (as has been done with several other witnesses in the case) – in an effort to learn what he might actually recall about it, Kraft's counsel instead asked a vaguely-worded question in generic terms.

Kraft now makes much of Mr. Gauthier's inability to "recall being advised of a single serve beverage cartridge that had a foil lid overlying both the chamber where the beverage medium is stored and the chamber from which the beverage exits the cartridge." (D.I. 81 at 4). Based on that solitary deposition question, and without the benefit of any visual reminder of what the Singles cartridge looked like, Mr. Gauthier unsurprisingly could not recall whether he had seen it. Mr. Gauthier was emphatic, however, that his lack of memory of these long-ago events at a deposition almost ten years later <u>gave him no reason whatsoever to doubt Mr. Lazaris' testimony</u> that Singles <u>had</u> been considered:

> Q.  Okay. And if your client, your then-client, the inventor, Mr. Lazaris, testified that he had provided you with notes with regard to the Kenco Singles cartridge, would you have any reason to dispute that?
>
> A.  Since I don't recall whether he did or he didn't, no, ***I wouldn't have a basis to dispute what he said***.

<u>See</u> Gauthier Depo. (Kraft Ex. J) at 23 (emphasis added).

The evidence thus points in only one direction – Mr. Lazaris and Mr. Gauthier <u>did</u> discuss Singles, which Mr. Gauthier ultimately determined to be immaterial.[2] Because Mr. Gauthier's inability to recall these events provides no basis <u>as a matter of law</u> on which to impugn Mr. Lazaris' testimony, Kraft's inequitable conduct allegation cannot succeed. <u>E.g.</u>, <u>Hideout Records & Distrib. v. El Jay Dee, Inc.</u>, 601 F. Supp. 1048, 1053 (D. Del. 1984) (granting summary judgment: "[A]n affiant's failure to remember an event is not a specific denial that the event occurred."). Kraft's proposed amendment would therefore be futile.

This is precisely the kind of inequitable conduct claim that the Federal Circuit has called the "plague of patent litigation." <u>Burlington Indus. v. Dayco Corp.</u>, 849 F.2d 1418, 1422 (Fed. Cir. 1988). <u>See also</u> <u>Computer Accel. Corp. v. Microsoft Corp.</u>, No. 9:06-CV-140, 2007 WL 2315223, *2-4 (E.D. Tex. Aug. 10, 2007) ("Denying the amendment does not deprive Defendant of an important defense, but merely one more opportunity to accuse Plaintiff of disreputable behavior."). Kraft's motion should be denied as futile, untimely and highly prejudicial to Keurig.

## I.  BACKGROUND

### A.  Kraft Filed Its Motion More than a Month After the Deadline for Pleading Inequitable Conduct, a Week After the Close of Fact Discovery, and <u>On the Eve of the Deadline for Summary Judgment Letter Briefing</u>.

Under the Court's Scheduling Order, motions to amend pleadings were due on August 6, 2007 and motions to plead inequitable conduct were due on February 29, 2008. (D.I. 34). The first time Kraft raised the issue of inequitable conduct was April 7, 2008 – more than a month after the deadline, a week after the close of fact discovery, and two days before the April 9 cutoff for requesting permission to file summary judgment motions. Kraft had never before suggested that it was considering such a pleading. Nor did Kraft ever request an extension of the deadline.

---

[2] Kraft does not challenge any determination by Mr. Gauthier about materiality. Kraft's pleading is based solely on accusing Mr. Lazaris of hiding Singles from Mr. Gauthier, then lying about it.

**B.    Kraft Was Dilatory in Pursuing Deposition
Testimony Related to Inequitable Conduct.**

Given Keurig's production of documents, Kraft's silence was striking.  On January 8 – more than seven weeks before the February 29 deadline – Keurig produced to Kraft a set of documents making clear that, during prosecution of the '762 patent, Mr. Lazaris had a Singles brewer (Ex. 2) and knew the relevant technical details of the Singles technology upon which Kraft now relies for its motion, i.e., that Singles used "foil" and had the "inlet and outlet punctured" during use. E.g., Ex. 3 at KEU0000351; Ex. 4.  On January 18, Keurig produced Mr. Lazaris' Kenco Singles file (over 100 pages of material). See Rader Declaration (Ex. 5) ¶ 3.

Despite having key Singles-related documents in hand in early January, Kraft was dilatory in seeking to depose Mr. Gauthier.  When Kraft finally subpoenaed him in February, Kraft designated March 10th as the date for the deposition. (D.I. 61).  Kraft requested this date knowing that it was after the February 29 inequitable conduct deadline.  In any event, as discussed below, the Gauthier and Lazaris depositions were not a necessary predicate to Kraft's requested amendment because they added nothing to the documents Kraft already had.

Notably, when Kraft did eventually depose Mr. Lazaris, its counsel did not even ask him directly whether he had turned over information about Singles to his counsel Mr. Gauthier.  The issue came up only in passing, when Mr. Lazaris answered a question about the documents that he had given to litigation counsel for production in this case. See 3/12/08 Lazaris Depo. (Ex. 6) at 94-95.  Kraft's counsel did question Mr. Lazaris at length regarding a wide array of other topics, over the course of two days and close to 400 pages of transcript.  Kraft does not suggest a shred of doubt about Mr. Lazaris' truthfulness, except with respect to the solitary question whether he and his patent counsel discussed Singles – and even then, based solely on Mr. Gauthier's inability to remember the details of a decade-old patent prosecution.

- 4 -

## II.    ARGUMENT

### A.    Good Cause Does Not Exist to Modify the Scheduling Order Because Kraft Was Dilatory and the Delay Would Prejudice Keurig.

The Court should deny Kraft's motion because Kraft cannot show "good cause" to modify the Court's scheduling order as required by Rule 16(b). E.g., Gonzales v. Comcast Corp., No. 03-445 (KAJ), 2004 WL 2009366 (D. Del. Aug. 25, 2004) (denying leave to amend after close of discovery). Good cause requires a showing that the scheduling deadline could not be met despite the moving party's diligent efforts. Id; see also Optivus Tech., Inc. v. Loma Linda Univ. Med. Ctr., 469 F.3d 978, 993 (Fed. Cir. 2006) (affirming denial of defendant's motion to add inequitable conduct defense; the "good cause" standard "primarily considers the diligence of the party seeking the amendment"). The procedural history set forth above makes clear that Kraft's pursuit of an inequitable conduct allegation was anything but diligent.

In its motion papers, Kraft ignores the good cause requirement and focuses instead on the more liberal Rule 15(a) standard. Yet amendment is inappropriate even under Rule 15(a) when it would unfairly prejudice the nonmoving party. Here, Kraft's delay magnifies the prejudice to Keurig and makes the proposed amendment particularly inappropriate.

### 1.    The Gauthier and Lazaris Depositions Were Not Necessary Predicates to Kraft's Motion, and in Any Event Kraft Was Dilatory in Scheduling Them.

In an attempt to justify its late filing of the present motion, Kraft claims that it could not have pled inequitable conduct prior to deposing Mr. Gauthier and Mr. Lazaris on March 12 and March 28, 2008. This contention is unfounded. In fact, as demonstrated below, every factual allegation added in Kraft's proposed pleading was known to Kraft long ago. In short, the Gauthier and Lazaris depositions were not necessary predicates to Kraft's amendment and therefore provide no justification (let alone good cause) for modifying the scheduling order.

- 5 -

| Allegation in Complaint | Pre-existing Information |
|---|---|
| Proposed Amended Pleading ¶ 24:[3]<br><br>"According to the inventors, it was well known in the prior art that the outlet for the beverage is formed by piercing the bottom of a relatively rigid plastic container, which has a higher resistance to piercing than the foil lid. In the course of being punctured by the outlet probe, the bottom distorts inwardly and causes buckling of the sidewalls, resulting in leakage around the outlet. Forming the outlet in the foil lid was central to Mr. Lazaris's claimed invention." | The '762 patent itself (Ex. 1), ███████ ██████████████████ emphasizes that, conventionally, "the bottom of the cup-shaped container is relatively thick, with a higher resistance to piercing … In the course of being punctured by the outlet probe, the bottom exhibits a tendency to distort inwardly, with an accompanying buckling of the container sidewall ... resulting in leakage around the outlet probe." (Col. 1, lines 39-50). |
| Proposed Amended Complaint ¶ 25:<br><br>"Mr. Lazaris has detailed knowledge of the Kenco Singles Cartridge, including its structure and operation, prior to the invention, prior to the filing of the application for the '762 Patent, and during the prosecution thereof. Mr. Lazaris knew that the outlet was formed in the foil lid on the bottom side of the Kenco Singles Cartridge. More specifically, he knew the outlet was formed by piercing the foil lid." | On January 8, 2008, Keurig produced to Kraft documents evidencing Mr. Lazaris' knowledge of Kenco Singles cartridges (Ex. 4) as well as the fact that those cartridges featured a "foil top/bottom," with "inlet and outlet punctured." (Ex. 3 at KEU00000351). |
| Proposed Amended Complaint ¶ 26:<br><br>"Mr. Lazaris disclosed two prior art patents to the PTO, both of which disclosed piercing the bottom of a rigid plastic container to form the outlet." | The fact that the two prior art patents were disclosed to the PTO and the Kenco Singles Cartridge was not disclosed to the PTO is a matter of public record and is apparent from the face of the '762 patent, ████████████ |

---

[3] References are to the paragraphs in the proposed amended pleadings of Tassimo Corporation and Kraft Foods Global, Inc. (Kraft Exs. A-D). The paragraph numbering in Kraft Foods, Inc.'s proposed amendment (Ex. E-F) is slightly different.

[4] Although not included anywhere in its pleading, Kraft relies in its brief on Mr. Gauthier's deposition testimony that his practice was to disclose prior art that appeared to be material and noncumulative. As noted above, this fact favors Keurig since it suggests that Mr. Gauthier, like Mr. Lazaris, considered the Kenco Singles cartridge immaterial. In any event, like the allegations that Kraft does make in its pleading, this one cannot fairly be characterized as "newly discovered" information. The rules of patent practice (37 C.F.R. § 1.56) require disclosure of material, noncumulative information. Kraft could not possibly have been surprised to learn that Mr. Gauthier's practice conforms to the Rules.

Waiting until after the amendment deadline to depose Mr. Gauthier and Mr. Lazaris reflects a lack of diligence that itself provides sufficient reason to deny Kraft's motion, particularly given that Kraft makes no effort to justify the delay. MGM Well Servs., Inc. v. Mega Lift Sys., LLC, No. 05-1634, 2006 WL 1852322, *2 (S.D. Tex. June 30, 2006) (denying motion to add inequitable conduct claim: "To the extent Defendant claims that certain unspecified information was recently discover[ed], Defendant does not describe what efforts it made to obtain the information sooner."); SIG Swiss Indus. v. Fres-Co Sys., USA, Inc., No. 91-0699, 1993 WL 232884, *2 (E.D. Pa. June 24, 1993) (denying motion to add inequitable conduct claim, explaining that the party should have pursued its "suspicions" earlier rather than waiting until five days prior to the close of discovery to assert the claim).

### 2. Kraft's Delay Would Unfairly Prejudice Keurig.

Granting Kraft's motion for leave to amend would unfairly prejudice Keurig for several reasons.

First, Kraft filed the proposed amendment a day before the Court's deadline for requesting permission to file dispositive motions, thereby denying Keurig the ability to seek summary judgment on Kraft's inequitable conduct theory despite the fact that it is baseless (and certainly unsupported by clear and convincing evidence) even when giving Kraft the benefit of all reasonable inferences. See Haberman v. Gerber Prods. Co., 236 Fed. Appx. 592, 601 (Fed. Cir. 2007) (affirming denial of motion to add inequitable conduct counterclaim and emphasizing that the patentee "would have been precluded from challenging [defendant's] counterclaim by summary judgment").

065927.1001

Indeed, even if the summary judgment deadlines were extended, the expense of filing a summary judgment motion on such a late pleading would itself prejudice Keurig. MGM, 2006 WL 1852322 at *2 (denying motion to add inequitable conduct counterclaim: "Plaintiff would be prejudiced because it appears from the current record that many, if not all, [of] the proposed amendments would be the subject of a dispositive motion which would require additional time and expense.").

An inequitable conduct defense would also open the door for Kraft to seek a separate bench trial as a strategy to delay Keurig's requested remedies in the event of a favorable jury verdict. Lifescan, Inc. v. Polymer Tech. Int'l Corp., 35 U.S.P.Q.2d 1225, 1238 (W.D. Wash. 1995) (denying motion to add inequitable conduct defense, explaining that the amendments would increase the length of the trial, causing scheduling difficulties and "delaying the eventual resolution of the entire case").

Moreover, Kraft's decision not to file its motion by the February 29 deadline impacted how Keurig planned its litigation strategy and budget. McLaughlin v. Diamond State Port Corp., No. 03-617 (GMS), 2004 WL 2958664, *4 (D. Del. Dec. 21, 2004) ("The purpose of a scheduling order is to provide concrete deadlines on which the parties can rely in planning their respective litigation strategies. If the court were to permit parties to ignore these deadlines, unfair surprise would abound."); Inline Connection Corp. v. AOL Time Warner Inc., 237 F.R.D. 361, 370 (D. Del. 2006) (denying motion to add inequitable conduct claim and emphasizing that an amendment causes undue prejudice if it would "add cost in the preparation to defend against new facts or theories").

Kraft wrongly assumes (D.I. 81 at 5) that its offer to permit discovery after the April 1 cut-off obviates the prejudice to Keurig. The very need to take additional fact discovery – for example, re-deposing Kraft's technical witnesses in Europe,[5] for example to probe the similarities and differences between the Kenco Singles technology and prior art disclosed to the PTO – would prejudice Keurig by increasing expenses and diverting counsel from other matters such as expert discovery and pretrial preparation. Inline, 237 F.R.D. at 370 (denying motion to add inequitable conduct claim and noting that an amendment causes undue prejudice if it would "result in additional discovery"); SIG Swiss, 1993 WL 232884 at *2 (explaining that allowing amendment would prejudice the non-moving party "because it would now be forced to reopen discovery to defend against" the inequitable conduct claim).[6]

## B.    The Amendment Should Be Denied as Futile.

The Court should also deny Kraft's motion for the entirely independent reason that the proposed inequitable conduct theory is futile and could not be proven, let alone by clear and convincing evidence, even with the benefit of all reasonable inferences. Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V., 464 F.3d 1339, 1354-55 (Fed. Cir. 2006) (affirming denial of motion for leave to amend: "When a party faces the possibility of being denied leave to amend on the ground of futility, that party … must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion."). This standard is particularly appropriate here because Kraft concedes (D.I. 81 at 5) that it does not seek additional discovery and already has all the information that it would present at trial.

---

[5] Counsel has already made two trips to the United Kingdom for depositions.

[6] Kraft also incorrectly asserts (D.I. 81 at 5) that Keurig "has all of the evidence and witnesses within its control." This simply is not true. It has been years since Mr. Gauthier represented Keurig. He has a busy law practice and no interest in the outcome of the litigation.

As discussed above, Kraft's only purported "evidence" of inequitable conduct is that Mr. Gauthier can neither confirm nor deny Mr. Lazaris' unambiguous testimony that he advised Mr. Gauthier about the Kenco Singles technology. Kraft contends (D.I. 81 at 4) that the witnesses contradict one another and that Mr. Lazaris is lying. No evidence whatsoever supports that accusation. Kraft's counsel did not even <u>show</u> Mr. Gauthier a Singles cartridge (nor any patent or other publication describing that cartridge) during the deposition. Counsel instead described the technology in the abstract terms quoted above. It is not the least bit surprising that a patent attorney who has prosecuted thousands of applications during 45 years of practice did not recall the details of one particular reference received almost a decade ago, particularly when he was not shown the reference. In any event, Mr. Gauthier was emphatic that his lack of memory of these long-ago events at a deposition almost ten years later gave him no reason whatsoever to doubt Mr. Lazaris' testimony regarding consideration of Singles.

Even without Mr. Gauthier's clarification that he does not dispute Mr. Lazaris' testimony, it is well-settled that one witness's inability to remember an event does not create a genuine issue of fact as to whether that event occurred when a second witness testifies affirmatively that it did. In <u>Hideout Records</u>, for example, this Court granted summary judgment of copyright infringement because the plaintiff had presented affidavits stating that infringing performances had occurred and the defendant's only response was an affidavit from a witness who did not recall the relevant songs being performed. 601 F. Supp. at 1053 ("Mrs. Nelkin's affidavit ... does not contradict or refute plaintiffs' evidence on this issue ... an affiant's failure to remember an event is not a specific denial that the event occurred."); <u>see also</u> <u>Tinder v. Pinkerton Security</u>, 305 F.3d 728, 736 (7th Cir. 2002) ("Tinder asserted only that she does not remember receiving or seeing the brochure, whereas the uncontroverted affidavits of Kathy

Rasmussen and Mark Cruciani indicate that the brochure was definitely sent and presumably received with her paycheck. Tinder's affidavit thus does not raise a genuine issue whether the brochure was distributed to her."); FDIC v. Nat'l Union Fire Ins. Co., 205 F.3d 66, 75 (2d Cir. 2000) (explaining that when a party bears the burden of proof, "memory lapses … do not create genuine issues of material fact"); West v. Frank, 492 F. Supp. 2d 1040, 1043 (W.D. Wis. 2007) ("[A] statement by a witness that he 'does not recall' a particular event happening is not enough to place in to dispute another witness's testimony that it did happen."). Thus, as a matter of law, the inequitable conduct pleading that Kraft seeks to introduce would be futile.

Kraft is wrong to suggest that one witness must be lying, such that a trial is required for the trier of fact "to decide whom to believe." (D.I. 81 at 4). Mr. Lazaris testified that he discussed the Singles information with Mr. Gauthier. Mr. Gauthier testified that he had no reason to doubt Mr. Lazaris' testimony. Mr. Gauthier also testified that he discloses material, non-cumulative prior art to the PTO when he learns of it. What happened is therefore clear: Mr. Lazaris disclosed the Kenco Singles technology to Mr. Gauthier, who reviewed it and determined that the information would not be "important to the examiner in his deliberation of patentability." See Gauthier Depo. (Ex. 8) at 26.

Mr. Gauthier's conclusion is not surprising, for the '762 patent is directed to same-side piercing whereas the Singles device (as Kraft admits) was designed for opposite-side piercing (i.e., with a water inlet on one side of the cartridge and the outlet on the other). The Singles technology suggests nothing at all about the key inventive feature in the '762 patent – forming both the inlet and the outlet through the foil lid on the same side of the cartridge – ███

███████████████████████████████████████████

█████████████████████

While Kraft now asserts that it is theoretically <u>possible</u> to use Singles cartridges for same-side piercing operation rather than the opposite-side piercing operation for which they are intended (an assertion with which Keurig and Keurig's technical expert, MIT Professor Slocum, disagree), ███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████ Kraft does not suggest that Mr. Gauthier or Mr. Lazaris would have recognized Kenco Singles' supposed same-side piercing functionality during prosecution of the '762 patent.  Rather, Kraft's allegations hinge on the idea that the Singles cartridge is pierced through foil to form the <u>outlet</u>, whereas the prior art that Mr. Lazaris disclosed to the PTO involved cartridges that were pierced through foil to form the <u>inlet</u>.  But this distinction does not change the fact that Singles comes no closer than the prior art that was before the Patent Examiner to disclosing Mr. Lazaris' invention, i.e., <u>both</u> the inlet and the outlet being made through foil.  In short, Singles was at best cumulative of the prior art of record.  Mr. Gauthier therefore acted prudently in reviewing the Singles technology after Mr. Lazaris discussed it with him (as Mr. Lazaris testified and Mr. Gauthier has no reason to question), and determining that the information was cumulative and need not have been provided to the PTO.[7]  See <u>C.R. Bard, Inc. v. M3 Sys., Inc.</u>, 157 F.3d 1340, 1365 (Fed. Cir. 1998) (reversing judgment of inequitable conduct because the prior art in question was cumulative of other references).

---

[7] Even if the Kenco materials had been material and Mr. Gauthier technically erred in not disclosing them to the PTO, there would still be no basis for an inequitable conduct charge given the complete lack of evidence that Mr. Gauthier (or Mr. Lazaris for that matter) intended to deceive the PTO.  Deceptive intent is a necessary element of any inequitable conduct theory and cannot be proven simply by asking the fact finder to infer intent from materiality.  <u>E.g.</u>, <u>Sanofi-Synthelabo v. Apotex Inc.</u>, 470 F.3d 1368, 1381 (Fed. Cir. 2006).

- 12 -

## IV.    CONCLUSION

For the above reasons, the Court should deny Kraft's untimely motion for leave to add a

an inequitable conduct defense and counterclaim.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Karen E. Keller
_____
John W. Shaw (No. 3362)
jshaw@ycst.com
Karen E. Keller (No. 4489)
kkeller@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

OF COUNSEL:
Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

Attorneys for Plaintiff Keurig, Incorporated

Dated: April 22, 2008

- 13 -

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on April 29, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Richard L. Horwitz, Esquire
*rhorwitz@potteranderson.com*
David E. Moore, Esquire
*dmoore@potteranderson.com*
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

Additionally, I hereby certify that on April 29, 2008, copies of the foregoing document were served by hand delivery and email on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

## BY E-MAIL

David Schlitz, Esquire
*david.schlitz@bakerbotts.com*
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*
John W. Shaw (No 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600
*Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 1

US006607762B2

(12) **United States Patent**         (10) **Patent No.:    US 6,607,762 B2**
Lazaris et al.                        (45) **Date of Patent:         Aug. 19, 2003**

(54) **DISPOSABLE SINGLE SERVE BEVERAGE FILTER CARTRIDGE**

(75) Inventors: **Nicholas G. Lazaris**, Newton, MA (US); **Roderick H. Beaulieu**, Cumberland, RI (US)

(73) Assignee: **Keurig, Incorporated**, Wakefield, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 11 days.

(21) Appl. No.: **09/782,665**

(22) Filed: **Feb. 13, 2001**

(65)          **Prior Publication Data**

US 2001/0048957 A1 Dec. 6, 2001

**Related U.S. Application Data**

(60) Provisional application No. 60/183,569, filed on Feb. 18, 2000.

(51) Int. Cl.$^7$ ............................................... **B65B 29/02**
(52) U.S. Cl. ........................ **426/79**; 426/113; 426/115; 426/433; 99/295; 99/317; 206/0.5; 206/222
(58) Field of Search ........................... 99/293–295, 323, 99/317; 426/77, 79, 81, 433, 435, 106, 113, 115; 206/0.5, 219, 222

(56)              **References Cited**

U.S. PATENT DOCUMENTS

5,300,308 A  *  4/1994  Louridas ....................... 426/112

| | | | |
|---|---|---|---|
| 5,325,765 A | | 7/1994 | Sylvan et al. ................. 99/295 |
| 5,431,276 A | * | 7/1995 | Lialin ......................... 206/222 |
| 5,762,987 A | * | 6/1998 | Fond et al. .................. 426/433 |
| 5,840,189 A | | 11/1998 | Sylvan et al. ............... 210/474 |
| 5,899,137 A | * | 5/1999 | Miller et al. ................. 99/295 |
| 6,007,853 A | * | 12/1999 | Lesser ......................... 426/77 |

* cited by examiner

*Primary Examiner*—Drew Becker
(74) *Attorney, Agent, or Firm*—Samuels Gauthier & Stevens

(57)          **ABSTRACT**

A beverage filter cartridge comprises an outer container with an access opening. A filter element is received in and configured and arranged to subdivide the interior of the container into first and second chambers. A beverage medium is stored in the first chamber. A lid closes the access opening. The lid has a first section overlying the first chamber and a second section overlying the second chamber. The first section of the lid is yieldably pierceable to accommodate an inflow of liquid into the first chamber for infusion with the beverage medium to produce a beverage. The filter element is permeable to accommodate a flow of the beverage from the first chamber into the second chamber, and the second section of the lid is yieldably pierceable to accommodate an outflow of the beverage from the second chamber to the exterior of the cartridge.

**10 Claims, 5 Drawing Sheets**



Case 1:07-cv-00017-GMS    Document 96-2    Filed 04/29/2008    Page 3 of 31



F I G. 1



F I G. 2



F I G. 3



FIG. 4

FIG. 5



FIG. 6

FIG. 8

FIG. 7



FIG. 9

FIG. 10



FIG.11

FIG.12



# FIG. 13

US 6,607,762 B2

1

# DISPOSABLE SINGLE SERVE BEVERAGE FILTER CARTRIDGE

## CROSS REFERENCES TO RELATED APPLICATIONS

This application claims priority from Provisional Patent Application Serial No. 60/183,569 filed Feb. 18, 2000.

## FIELD OF THE INVENTION

This invention relates to disposable single serve beverage filter cartridges.

## DESCRIPTION OF THE PRIOR ART

A known disposable single serve beverage filter cartridge is disclosed in U.S. Pat. Nos. 5,325,765 and 5,840,189 (Sylvan et al), dated respectively Jul. 5, 1994 and Nov. 24, 1998. This beverage filter cartridge is comprised basically of an impermeable yieldably pierceable cup-shaped container thermoformed or injection molded from a relatively rigid plastic material, and internally subdivided by a permeable cone-shaped filter into first and second chambers. A granular or powered dry beverage medium, e.g., roasted ground coffee, is stored in the first chamber, and the container is closed by an impermeable yieldably pierceable lid comprising a laminate of metallic foil and plastic.

During a brewing cycle, the lid and container bottom are pierced from opposite directions, respectively, by tubular inlet and outlet probes. The inlet probe admits heated liquid into the first chamber for infusion with the beverage medium, and the resulting brewed beverage passes through the filter into the second chamber from which it exits via the outlet probe for delivery to an underlying cup.

This known beverage filter cartridge has gained rapid and increasingly widespread acceptance, notwithstanding certain problems and disadvantages relating to its use that have persisted since its initial introduction.

For example, as compared to the lid, the bottom of the cup-shaped container is relatively thick, with a higher resistance to piercing. The bottom cannot easily be thinned without adversely affecting the required thickness of the cup's sidewall to prevent permeability to oxygen and the ability to connect the filter material to the sidewall without damaging the oxygen barrier material. Thus, in the course of being punctured by the outlet probe, the bottom exhibits a tendency to distort inwardly, with an accompanying buckling of the container sidewall. Bottom distortion accompanied by sidewall buckling can adversely affect the puncturing process, resulting in leakage around the outlet probe.

A related problem stems from the need to equip the brewers with expensive metallic outlet probes that can be sharpened to the extent necessary to effect piercing of the more resistant container bottoms, and that can resist wear over prolonged periods of use.

Additionally, some of the brewed liquid beverage is not able to be evacuated because the outlet probe opening is above the bottom of the container and some of the beverage has no means of drainage.

What is needed, therefore, is an improved beverage filter cartridge that obviates or at least significantly minimizes the above-noted problems and disadvantages.

## SUMMARY OF THE INVENTION

In accordance with the present invention, a beverage filter cartridge includes an impermeable outer container having an access opening. A planar filter element is configured and arranged to subdivide the container interior into first and second chambers. A beverage medium is stored in the first chamber and an impermeable lid closes the access opening.

The lid has a first section overlying the first chamber and a second section overlying the second chamber. The first and second lid sections are yieldably pierceable, respectively, from the same direction, by single or multiple inlet and outlet probes. The inlet probe admits heated liquid into the first chamber for infusion with the beverage medium, and the resulting brewed beverage passes through the filter element into the second chamber, from which it exits via the outlet probe.

The lid material has a lesser resistance to being yieldably pierced as compared to the resistance of the container bottom, and is thus less prone to inward distortion with accompanying buckling of the container sidewall. The net result is a cleaner puncture and improved seal around the outlet probe.

The relative ease with which the lid may be pierced also makes it possible to equip tie brewers with less expensive plastic inlet and outlet probes, in single or multiple configurations.

These and other features and advantages of the present invention will now be described in greater detail with reference to the accompanying drawings, wherein:

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of one embodiment of a beverage filter cartridge in accordance with the present invention;

FIG. 2 is a top plan view of the beverage filter cartridge shown in FIG. 1, with portions of the lid and filter element broken away to illustrate details of the container interior;

FIG. 3 is a sectional view on an enlarged scale taken along line 3—3 of FIG. 2;

FIG. 4 is an exploded view of the basic components comprising the beverage filter cartridge shown in FIGS. 1–3;

FIG. 5 is a cross sectional view similar to FIG. 3 showing the lid of the beverage filter cartridge punctured by inlet and outlet probes during a beverage brewing cycle;

FIG. 6 is a perspective view of another embodiment of a beverage filter cartridge in accordance with the present invention;

FIG. 7 is an exploded view of the basic components of the beverage filter cartridge shown in FIG. 6;

FIG. 8 is a side view of the beverage filter cartridge looking in the direction of arrow "X" in FIG. 6;

FIGS. 9, 10, 11 and 12 are sectional view on an enlarged scale taken respectively along lines 9—9, 10—10, 11—11 and 12—12 of FIG. 8; and

FIG. 13 is a sectional view similar to FIG. 10 showing the lid of the beverage filter cartridge punctured by inlet and outlet probes during a beverage brewing cycle.

## DETAILED DESCRIPTION OF ILLUSTRATED EMBODIMENTS

Referring initially to FIGS. 1–5, one embodiment of a beverage filter cartridge in accordance with the present invention is generally depicted at 10. The beverage filter cartridge includes an impermeable outer container 12, a permeable filter element 14, and an impermeable lid 16.

The outer container 12 is generally tray-shaped with a bottom wall 12a, a side wall 12b with a flat rim 12c

US 6,607,762 B2

3

surrounding an access opening 13, and a plurality of laterally spaced support ribs 12d projecting upwardly from the bottom wall and extending in parallel relationship in the lengthwise direction of the container.

As shown in FIG. 3, the ribs 12d join the sidewall 12b at 18, curve downwardly and then extend in parallel relationship to the bottom 12a before again curving upwardly to terminate as at 20.

The filter element 14 is formed from sheet material shaped to conform to the shape of the upper edges of the support ribs. The filter element is received in the container 12, with the edges 14a of its front and back ends overlapping and sealed to the rim 12c of the container side wall 12b, and with the edges 14b of its sides overlapping and sealed to outermost ribs 12d which are formed integrally with the container side wall. When thus positioned, the filter element defines a first chamber "A" separate from a second chamber "B", the latter being in communication with open channels separating the support ribs 12d.

A beverage medium "M", typically roasted ground coffee, is loaded into chamber A, after which the lid 16 is sealed to the rim 12c of the container wall 12b (and to any overlapping sealed edge portions of the filter). When thus positioned, the lid has a first section 16a overlying chamber A, and a second section 16b overlying chamber B.

The outer container may be formed, typically by injection molding, from an impermeable heat sealable material.

The filter element 14 may be cut or blanked from any suitably pliable, permeable and yieldably pierceable sheet material, a preferred example being cellulose polypropylene supplied by J. P. Crompton, Ltd. of Bury, Lancashire, England. The lid may be cut or blanked from any suitable impermeable heat sealable and yieldably pierceable material, a preferred example being a metallic/polymer laminate supplied by Heat Seal-Winpak, Ltd. of Montreal, Canada. The lid has less resistance to being yieldably pierced as compared to the outer container, which may or may not be yieldably pierceable.

During a brewing cycle, as shown in FIG. 5, the cartridge can be oriented vertically, and the lid 16 is pierced with one or more tubular infusion probes 22 to admit hot water under pressure into chamber A for infusion with the beverage medium M. The resultant beverage passes through the filer element 14 into the channels defined between the support ribs 12d. From here, the beverage flows downwardly into chamber B from which it is extracted by one or more tubular exit probes 24 which pierce the lid and filter element at a location overlying chamber B. The probes 22, 24 are oriented in the same direction to operate on one side of the cartridge, without piercing the outer container. The soluble beverage medium is completely soaked because the rate of hot water being injected into the container is greater than the outflow rate provided by the outlet probes, resulting in the second chamber B becoming filled with beverage extract and forcing the first chamber A to become completely filled with hot water.

Although not shown, it will be understood that the cartridge may be oriented in other ways than as illustrated in FIG. 5 before, during or after the brewing process.

A second embodiment of a beverage filter cartridge in accordance with the present invention if generally depicted at 30 in FIGS. 6–13. The cartridge components are illustrated separately in FIG. 7, and include an outer container 32, a planar filer element 34, and a lid 36.

The container 32 has a bottom wall 38, a front wall 40, a back wall 42, and side walls 44, 46. The front, back and

4

sidewalls extend upwardly from the bottom wall to a peripheral rim 48 surrounding an upper opening 50.

The side walls 44, 46 are appropriately contoured to define generally V-shaped ledges 52 extending between the front and back walls 40, 42, with the lower portions of the ledges 52 being spaced above the container bottom 38. The bottom 38 is preferably contoured to provide an upwardly protruding centrally located boss 54. The back wall 42 is contoured and the upper rim 48 is recessed to provide a well 56 opening towards the interior of the container.

The filter element 34 has front and back edge regions 34a, 34b, and side edge regions 34c. The filter element is configured, dimensioned and operatively positioned to subdivide the interior of the container into first and second chambers "A", "B", with the well 56 opening into and forming part of chamber B. When the filter element is thus positioned, it will be understood that its side edge regions 34c are secured as by heat sealing to the ledges 52 of the side walls 44, 46, and the front and back edge regions 34a, 34b are similarly secured to the front and back walls 40, 42. Preferably, the bottom of the filter element is also secured as by heat sealing to the upwardly protruding boss 54.

A beverage medium "M" is received through the upper opening 50 and stored in the first chamber A. The upper opening is then closed by securing the lid 36, as by heat sealing, to the peripheral container rim 48.

The outer container may be formed from impermeable heat sealable materials, a preferred example being polyethylene/EVOH/polystyrene supplied by Curwood Flexible Packaging of Oshkosh, Wis., U.S.A.

The materials from which the filter element 34 and lid 36 are formed may be the same as those described previously for the filter element 14 and lid 16 of the first embodiment.

The lid 36 has a first section 36a overlying chamber A, and a second section 36b overlying the well 56.

As shown in FIG. 13, at the onset of a brewing cycle, the lid section 36a is pierced by one or more inlet probes 58, and the lid section 36b and underlying portion of the filter element are pierced by an outlet probe 60. The inlet probe admits heated liquid into chamber A for infusion with the beverage medium M, and the resulting brewed beverage passes through the filter element into chamber B from which it exits via the outlet probe 60.

It will thus be seen that in both embodiments, the outer container is not pierced. Rather, liquid communication is established with the separate chambers A, B by inlet and outlet probes operating from the same side of the cartridge to pierce different sections of the readily pierceable lid.

Although the outer container and lid have been described as being formed from impermeable materials, it will be understood by those skilled in the art that, alternatively, permeable materials may be employed for one or both of these components. Where permeable materials are employed, the completed cartridges will preferably be subsequently enclosed, either individually or in batches, in impermeable wrappings. Materials for such wrappings are well known, and include for example EVOH films, aluminum foil, etc.

We claim:

1. A beverage filter cartridge comprising:

an outer container having an access opening:

    a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers;

    a soluble beverage medium stored in said first chamber; and

US 6,607,762 B2

5

a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge.

**2**. The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container.

**3**. The beverage filter cartridge of claim 1 wherein said filter element is piercable.

**4**. The beverage filter cartridge of claim 1 wherein a first section of said filter element coacts with interior surfaces of said container to define said first chamber, and a second section of said filter element underlies the second section of said lid.

**5**. The beverage filter cartridge of claim 1 wherein said container is provided with a flat rim surrounding and projecting outwardly from said access opening, and wherein edge segments of said filter element overlap and are heat sealed to segments of said rim.

**6**. The beverage filter cartridge of claim **4** wherein the second sections of both said lid and said filter element are piercable to accommodate the beverage outflow from said second chamber.

6

**7**. The beverage filter cartridge of claim 1 wherein said filter element comprises a planar sheet of permeable piercable material.

**8**. The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases.

**9**. The beverage filter cartridge of claim 1 or **8** wherein said lid is impermeable to liquids and gases.

**10**. A beverage filter cartridge comprising:

an outer container having a access opening;

a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers;

a soluble beverage medium stored in said first chamber; and

a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, said lid having first section overlying said first chamber and a second section overlying said second chamber, the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, said lid having less resistance to being pierced as compared to the resistance to piercing of said container.

* * * * *

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

THIS EXHIBIT HAS BEEN
REDACTED IN ITS
ENTIRETY

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>      Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>      Defendants. | Civil Action No. 07-017 |

## DECLARATION OF MICHAEL N. RADER
## IN SUPPORT OF KEURIG'S OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE
## TO FILE FIRST AMENDED ANSWERS AND COUNTERCLAIMS

Michael N. Rader states as follows:

1.      I am an attorney with Wolf, Greenfield & Sacks, counsel for Keurig, Inc., the

plaintiff in this patent infringement action.

2.      On Tuesday January 8, 2008, discs containing documents labeled KEU00000001

to KEU00031812 (including accompanying Exhibits 2, 3, and 4 to Keurig's Opposition to

Defendants' Motion for Leave to File First Amended Answers and Counterclaims) were sent to

counsel for Kraft for delivery on Wednesday January 9, 2008.

3.      On Friday January 18, 2008, discs containing documents labeled KEU00032640

to KEU00036157 were sent to counsel for Kraft for delivery on Monday January 21, 2008.

These materials included documents labeled KEU00036038 to KEU00036157, corresponding to

copies of materials from the file that Mr. Nicholas Lazaris kept concerning the Kenco Singles

technology.

4.     The week of February 4, 2008, counsel for Kraft contacted me regarding possible deposition dates for Mr. Lazaris and specifically requested a date during the first week of March 2008.


I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

/s/   Michael N. Rader

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - x

3  KEURIG, INCORPORATED,

4                    Plaintiff,

5      v.

6  KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION,
   and KRAFT FOODS, INC.,

7

                  Defendants.

8

   Civil Action No. 07-17 (GMS)

9  - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11     VIDEOTAPED DEPOSITION OF MAURICE E. GAUTHIER

12              Friday, March 28, 2008

13           10:02 a.m. through 10:44 a.m.

14          WOLF GREENFIELD & SACKS, P.C.

15             600 Atlantic Avenue

16            Boston, Massachusetts

17

18      Reporter:  Lisa A. Moreira, RDR, CRR

19

20

21

22

23     ELLEN GRAUER COURT REPORTING CO. LLC

        126 East 56th Street, Fifth Floor

24          New York, New York 10022

                212-750-6434

25              REF:  87140A

Page 6

GAUTHIER

1
2      MR. ALBERT: Fair enough. And just so
3    that this doesn't turn into a game about what was
4    said and what wasn't said in response to any
5    question, I'll just note again that there is no
6    waiver, there is no intent to waive, and no failure
7    to object to any particular question should be
8    deemed a waiver of that privilege, and no answer
9    given should be deemed a waiver of the privilege.
10      MR. SCHLITZ: One question I have,
11    Michael, is that at his deposition, Mr. -- I'm going
12    to butcher his name again -- Mr. Lazaris testified
13    to certain matters which you may believe are
14    attorney-client privileged, but he's -- the cat's
15    already out of the bag, and so to the extent that I
16    believe you've already waived the privilege to
17    certain matters, that will be our position as well.
18      MR. ALBERT: Okay. I don't believe that
19    Mr. Lazaris waived the privilege.
20      MR. SCHLITZ: Okay.
21      MR. ALBERT: But why don't we see how it
22    goes.
23      MR. SCHLITZ: Okay. Good.
24      MAURICE E. GAUTHIER,
25    a witness called on behalf of the Defendants, having

Page 7

GAUTHIER

1
2    been satisfactorily identified by the production of
3    his driver's license and duly sworn by the Notary
4    Public, was deposed and testified as follows:
5      DIRECT EXAMINATION
6    BY MR. SCHLITZ:
7      Q. Mr. Gauthier, last time we were in this
8    room, because of this whirring sound over your head,
9    at times you may not hear or fully understand my
10    question, and if that's the case, please just ask me
11    to repeat the question.
12      A. Of course.
13      Q. Could you please state your educational
14    background beginning with your college.
15      A. I graduated from the University of Rhode
16    Island with a degree in industrial engineering in
17    1957, and I graduated from Boston University School
18    of Law in 1962 with an LLB.
19      Q. And can you please tell me what "industrial
20    engineering" encompasses?
21      A. It's basically mechanical engineering with
22    an emphasis on the industrial aspects, time studies
23    and so forth.
24      Q. Does it include any studies, for instance,
25    material science?

Page 8

GAUTHIER

1
2      A. Yes. There was a course, I believe, in
3    metallurgy, but I think that's the only course
4    during my college education that touched on
5    materials.
6      Q. Over the course of your legal career, have
7    you dealt with the issues of material science?
8      A. Yes.
9      Q. Now. You graduated law school, I apologize,
10    in 19 -- what year did you graduate law school?
11      A. '62.
12      Q. '62, right. Beginning in 1962, can you tell
13    me your work history.
14      A. Yes, I began as an associate in the patent
15    law firm then called Russell, Chittick & Pfund.
16    I've been with that firm ever since. It's changed
17    names a number of years -- a number of times.
18      Q. And, in fact, you're the senior partner, I
19    believe?
20      A. I am.
21      Q. And this law firm has always been an
22    intellectual property firm; is that correct?
23      A. That's correct.
24      Q. Has there been an emphasis on patents at the
25    firm?

Page 9

GAUTHIER

1
2      A. Patent prosecution and trademarks and
3    copyrights, yes.
4      Q. So you just said patent prosecution. Does
5    it do patent litigation?
6      A. From time to time we've done patent
7    litigation over the years, yes.
8      Q. But your practice, has it principally been
9    patent prosecution?
10      A. Yes, it has.
11      Q. Okay. So you have a pretty low bar
12    registration number. What year did you pass the
13    patent bar?
14      A. 1962.
15      Q. And since 1962, and certainly not in any
16    exact numbers, but can you tell me approximately how
17    many patent applications you've prosecuted?
18      A. It would be a wild guess. I'm sure it's
19    probably in the thousands by now.
20      Q. Now, have you, in the -- I'm just trying
21    to -- 38 -- in 46 years that you've been practicing,
22    have you ever been accused of unethical conduct?
23      A. No.
24      Q. Have you ever been accused of malpractice?
25      A. Yes.

Page 22

GAUTHIER

1 at some time or one time, but I don't recall.
2      Q.  Okay.  And let's talk generically without a
3 name for it.  Were you exposed to a single-serve
4 beverage cartridge that had a foil lid that overlaid
5 both the chamber where the coffee medium or the
6 beverage medium was stored and the chamber from
7 which the beverage exited the cartridge?
8      A.  I don't recall being advised of anything
9 like that, no.
10      Q.  Okay.  Did you have any knowledge or do you
11 recall being advised of a cartridge in which the
12 foil lid or a foil overlaid the chamber from which
13 the beverage exited the cartridge?
14      MR. ALBERT:  Objection to the form of
15 the question.
16      Q.  Do you understand the question?
17      A.  I think you're asking me if I recall seeing
18 some cartridge that had a foil lid overlying the
19 compartment with the beverage in it?
20      Q.  Yes.
21      A.  No, I don't.
22      Q.  I'm sorry, and so you're saying no, you
23 don't; you just don't recall, or no, you were
24 never -- you never learned of that?

Page 23

GAUTHIER

1      A.  I don't recall much of what went on during
2 that period of time, so when I say, "No, I don't," I
3 don't recall.
4      Q.  Okay.  And if your client, your then-client,
5 the inventor, Mr. Lazaris, testified that he had
6 provided you with notes with regard to the Kenco
7 Singles cartridge, would you have any reason to
8 dispute that?
9      A.  Since I don't recall whether he did or he
10 didn't, no, I wouldn't have a basis to dispute what
11 he said.
12      Q.  Okay.  Now, I want to give you -- and this
13 answer may be obvious from your testimony, but do
14 you have any explanation why you did not disclose
15 the Kenco Singles cartridge to the Patent Office as
16 part of this prosecution?
17      A.  Well, first of all, I don't recall whether I
18 had any knowledge of it or not, and no, I don't have
19 any explanation as to why it wasn't disclosed.
20      Q.  Okay.
21      A.  I can only say to you that it's been the
22 practice of my firm over the years, that if we know
23 of prior art, we disclose it to the Patent Office.
24      Q.  Okay.  I'm sure that's right.  I don't doubt

Page 24

GAUTHIER

1 that.
2      Now, when the Patent Office --
3 considering the divisions of responsibility that you
4 testified to earlier, when the Patent Office sent
5 papers to your office, would they have reached you?
6      MR. ALBERT:  Objection.
7      A.  Are you talking about, for example, an
8 office action?
9      Q.  Yes.
10      A.  Okay.  An office action would come into our
11 office, and it would go directly to the docketing
12 clerk.  It would be docketed, and then it would be
13 forwarded to the responsible attorney.  In this case
14 it was probably me, so eventually I would get the
15 office action.
16      Q.  And during the period of 2000 to 2003, what
17 was your practice in terms of providing -- if you
18 had a practice -- of providing office actions to the
19 client?
20      A.  We would -- we would send the office action
21 and the references to the client and solicit their
22 comments, and at times confer with the client before
23 preparing a response.
24      Q.  Okay.  And, in fact, if you would look at

Page 25

GAUTHIER

1 Defendants' Exhibit 250, Page -- Line 5, this is a
2 communication from you to the inventor, Mr. Nick
3 Lazaris.  And, again, I don't want -- I'm not asking
4 you to tell me the substance, but it says,
5 "Attorney-client correspondence concerning first
6 office action regarding N-Cup patent application."
7      That's consistent with what you've just
8 said; is that correct?
9      A.  It appears to be.
10      Q.  Right.  And when your office received
11 notices of allowability -- you mentioned office
12 actions.  Notices of allowability, what was the
13 practice within your firm in terms of who received
14 it, and did they ultimately get to you?
15      A.  It was the same thing.  It would be docketed
16 and eventually sent to the responsible attorney, and
17 he would -- in this case, myself, or perhaps Mrs.
18 Powers, if I asked her to do it -- would send it on
19 to the client.
20      Q.  Okay.  Was it your practice to actually read
21 the notice of allowance?
22      A.  If it included comments by the examiners to
23 reasons for allowance, I'd probably look at it, yes.
24      Q.  Okay.  Again, with regard to your practices,

GAUTHIER

1
2    a few minutes ago -- and I don't want to
3    mischaracterize your testimony -- you said that your
4    practice was if you were provided with prior art,
5    you provided it to the Patent Office; is that
6    correct?
7        A.  That's correct.
8        Q.  Okay.  Was it your practice only to provide
9    what you considered anticipatory prior art?
10       A.  No.  No.  It might not anticipate a claim,
11   but if it would be used by the examiner.  If it was
12   considered -- should be considered by the examiner,
13   we would provide it.
14       Q.  And that would include art that could be
15   combined with other art; is that correct?
16       MR. ALBERT:  Objection to the form.
17       Q.  You can answer that.
18       A.  Most certainly.
19       Q.  And, in fact, it could include information
20   that was not prior art, technically prior art, but
21   would be of importance to the examiner in
22   determining patentability; isn't that correct?
23       MR. ALBERT:  Objection to the form.
24       A.  If it would be important to the examiner in
25   his deliberation of patentability, we would provide

GAUTHIER

1
2    it.
3        Q.  Right.
4        THE WITNESS:  Do you suppose I might
5    have one of those bottles of water?
6        MR. ALBERT:  Certainly.  Should we take
7    a short recess?
8        MR. SCHLITZ:  Yes, certainly.  Yes.
9        THE VIDEOGRAPHER:  Going off the record.
10   The time is 10:39.
11       (Recess taken)
12       THE VIDEOGRAPHER:  We're back on the
13   record.  The time is 10:42.
14   BY MR. SCHLITZ:
15       Q.  Mr. Gauthier, with regard to your -- the
16   policy that we spoke about on turning over prior
17   art, if you had it, to the Patent Office, can you
18   elaborate a little bit on how you would make a
19   determination whether to produce information to the
20   Patent Office?
21       A.  Well, to begin with, you -- if you err,
22   you're going to err on the side of giving more than
23   not enough, and the only thing I would be careful of
24   is not to overwhelm the patent examiner with a lot
25   of prior art and then somehow be accused that I was

GAUTHIER

1
2    hiding something in the bushes.
3        So if it's simply duplicative of what's
4    already there, then we would not provide it.  But
5    our policy was to err on the side of giving more
6    than less.
7        Q.  Okay.
8        MR. SCHITZ:  Mr. Gauthier, you will be
9    pleased to know that that's all the questions I
10   have, and you've been very forthright, and I very
11   much appreciate that.
12       THE WITNESS:  Well, thank you.  I'm
13   released?
14       MR. ALBERT:  You are.
15       THE VIDEOGRAPHER:  This marks the end of
16   Videotape No. 1 in the deposition of Maurice E.
17   Gauthier.  The time is 10:44.  We're going off the
18   record.
19       (Whereupon the deposition was concluded
20       at 10:44 a.m.)
21
22
23
24
25

A C K N O W L E D G M E N T

1
2
3    STATE OF          )
4                      ) ss.:
5    COUNTY OF         )
6
7        I, MAURICE E. GAUTHIER, hereby
8    certify that I have read the transcript of my
9    testimony taken under oath in my deposition;
10   that the transcript is a true, complete and
11   correct record of my testimony, and that the
12   answers on the record as given by me are true
13   and correct.
14
15       _____
16       MAURICE E. GAUTHIER
17
18   Signed and subscribed to before
     me, this      day of          ,
19   2008.
20
21   _____
22   Notary Public, State of _____
23
24
25

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, Esquire, hereby certify that on April 22, 2008, a true and correct

copy of the foregoing document was served in the manner indicated upon the following counsel of

record:

### <u>HAND DELIVERY AND E-MAIL</u>

Richard L. Horwitz, Esquire
*rhorwitz@potteranderson.com*
David E. Moore, Esquire
*dmoore@potteranderson.com*
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

### <u>E-MAIL</u>

David Schlitz, Esquire
*david.schlitz@bakerbotts.com*
Baker Botts LLP
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*
John W. Shaw (No 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600
*Attorneys for Plaintiff Keurig, Incorporated*

065927.1001