IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

        Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

        Defendants.

Civil Action No. 07-017-GMS

**REDACTED –
PUBLIC VERSION**

## KEURIG'S MOTION *IN LIMINE* NO. 2 – MOTION TO PRECLUDE KRAFT'S EXPERT FROM TESTIFYING ABOUT KRAFT'S TESTING OF SINGLES CARTRIDGES

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

Kraft's technical expert Malcolm Taylor should be precluded, under Fed. R. Evid. 702 and 703, from relying on or testifying about experiments that Kraft's employees performed on Kenco Singles cartridges (which Kraft alleges constitute prior art[1]).  Mr. Taylor's purported reliance on the Kraft testing does not meet his own criteria for sound engineering practice. Moreover, it would be unfairly prejudicial to Keurig if Kraft's ostensibly neutral expert were permitted to lend his credibility to testing carried out by Kraft's own employees for litigation purposes.[2]  The Third Circuit does not allow experts to bolster the credibility of a party's own litigation-driven experimental data by putting a stamp of independent expertise on it.

## I.    BACKGROUND

Mr. Taylor intends to testify that Kenco Singles cartridges embody every element of claim 1 of the patent-in-suit.  See Taylor Report (Ex. 1) at 3.  He bases his opinion on his "own assessment," including tests that he personally performed, but also proposes to testify that tests carried out by Kraft employees Andrew Bentley and Lee Rowan (in which Mr. Taylor had no involvement) likewise prove the point.  See id. at 8-9; Taylor Depo. (Ex. 2) at 173-174.

Mr. Taylor never saw the Kraft testing apparatus, never met with Mr. Bentley or Mr. Rowan, and never even discussed the tests with them by phone.  ██████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

---

[1] Keurig disputes whether Kenco Singles cartridges are prior art to Keurig's '762 patent. Moreover, even if they were prior art, the Singles cartridges would not anticipate the '762 patent as Kraft itself has admitted. See Keurig's Motion in Limine No. 1 at 1 n.1 and D.I. 91 at 2-5.

[2] Separately, in its Motion in Limine No. 1, Keurig moves to preclude Kraft's employees from describing their testing ██████████████████  This motion sets forth independent reasons why Mr. Taylor ████████████████ should be precluded from relying on or testifying about the Kraft employees' testing.

Because of the limited information he was provided, Mr. Taylor has little understanding of what the Kraft engineers actually did. For example, Mr. Taylor testified that he thought Mr. Bentley performed the tests reflected in the data sheet marked as Deposition Exhibit 13 (Exhibit 3 hereto), see id. at 118, ████████████████████████████ Mr. Taylor assumed that the needles used to pierce the cartridge foil in the Kraft tests came from an existing brewer (Ex. 2 at 123), ████████████████████████████ ████████████ Most significantly, Mr. Taylor admitted that he did not even know whether or not the data he reviewed were generated using the Kraft apparatus. (Ex. 2 at 118-119).

Mr. Taylor's own admissions about what constitute sound engineering practices in this field demonstrate that the Kraft testing, and his review thereof, do not constitute trustworthy methods that an expert might reasonably rely upon in forming a sound conclusion.

According to Mr. Taylor, a competent engineer should be "involved at every step along the way" of such testing, reviewing the work that other engineers on an engineering team are doing "on a daily basis." Id. at 41-43. But here, he did not. In particular, he would expect to receive "all the relevant information" from those performing tests. Id. at 44-45. But in this case, as previously noted, Mr. Bentley's report was withheld from Mr. Taylor (as well as from Keurig). Mr. Taylor emphasized the importance of working together in-person with the test engineers. Id. A competent engineer, he conceded, would not accept others' test results sight unseen, but instead would require personal contact and an opportunity to "look at how they are doing the testing." Id. at 46-47. Merely receiving a written report or compilation of data would not be adequate. Id.[3] In this case, however, Mr. Taylor did not meet any of these standards.

---

[3] In the past, Mr. Taylor followed his own guidelines for sound engineering practice when doing non-litigation consulting for Kraft. He held an in-person meeting and conferred with Kraft's engineers by telephone. Id. at 7-11.

## II.    ARGUMENT

### A.    Mr. Taylor Should Be Precluded from Testifying About Kraft's Testing Because Experts in the Field Would Not Reasonably Rely on Such Data.

Fed. R. Evid. 702 and 703 bar Mr. Taylor from testifying about the Kraft employees' testing, as Mr. Taylor's own admissions confirm that a reasonable engineer in Mr. Taylor's position would not rely on such data. Mr. Taylor had no involvement in the testing, was provided with extremely limited information about it, and ultimately came away from his "review" with considerable confusion about the facts.

In other words, trial testimony from Mr. Taylor regarding the Kraft testing would not be "the product of reliable principles and methods." Fed. R. Evid. 702. Nor do the three pages of results and corresponding deposition testimony constitute data "of a type reasonably relied up by experts" in the field. Fed. R. Evid. 703. The Court conducts an "independent evaluation" of whether these standards are met based on the evidentiary record, In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 748 (3d Cir. 1994), and Mr. Taylor's own description of ordinary engineering practice confirms that any testimony from him regarding Kraft's testing would not pass muster. See Cummins v. Lyle Indus., 93 F.3d 362, 369-72 (7th Cir. 1996) (affirming exclusion of expert testimony based on information that experts in the field would not reasonably rely upon: "Rule 702 is designed to ensure that, when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work.").

The situation here mirrors In re TMI Litigation, 193 F.3d 613 (3d Cir. 1999), in which the Third Circuit affirmed exclusion of a doctor's expert opinion because it was based on summary sheets of self-reported patient medical data, prepared (like the Kraft testing apparatus and data) by the plaintiff for use in the litigation. Id. at 698. The court ruled that the physician should have examined the patients herself, or at least should have reviewed their full medical files. Id.

Here, Kraft did not even provide Mr. Taylor with a copy of Mr. Bentley's report – something

Mr. Taylor conceded that he would have been interested in seeing. (Ex. 2 at 132). The limited

information that Kraft's lawyers did provide to Mr. Taylor (three isolated pages and deposition

transcripts) plainly is <u>not</u> the sort of data on which an engineer would ever rely to reach a reliable

real-world conclusion, as Mr. Taylor admits.

The Third Circuit likewise affirmed the exclusion of a defendant's expert because he had

relied on documents prepared by the defendant, yet "could not identify the source or basis of"

those documents. <u>Montgomery County v. Microvote Corp.</u>, 320 F.3d 440, 448-49 (3d Cir.

2003). The same is true here. Kraft gave Mr. Taylor three isolated pages of results, and he

admitted at deposition to being unfamiliar with their origin, to the point that he was unsure

whether or not they in fact reflect tests performed with Kraft's apparatus. (Ex. 2 at 118-119).

Under these circumstances, any testimony from Mr. Taylor about the Kraft testing would

be nothing more than "statements from [Kraft] employees dressed up to look like expert

testimony. As such, it is inadmissible." <u>Hot Wax, Inc. v. Warsaw Chem. Co.</u>, 45 F. Supp. 2d

635, 639 (N.D. Ill. 1999). While Mr. Taylor can describe his own testing, he should not be

allowed to bolster his testimony by referencing the opinions of others – let alone the work of

interested lay witnesses like the Kraft employees. <u>Mike's Train House v. Lionel, LLC</u>, 472 F.3d

398, 409 (6th Cir. 2006); <u>TMI</u>, 193 F.3d at 706 (calling such a tactic "the intellectual equivalent

of having the left hand put the rabbit into the hat so it can be pulled out by the right hand").

Mr. Taylor's departure from his usual engineering practice is particularly unreasonable

here ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

However, "reports specifically prepared for purposes of litigation are not, by definition, 'of a type reasonably relied upon by experts in the particular field.'" United States v. Cuong, 18 F.3d 1132, 1143 (4th Cir. 1994); see also Soden v. Freightliner Corp., 714 F.2d 498, 503 (5th Cir. 1983) (noting that expert opinions relying on information "prepared strictly in anticipation of litigation ... properly signal a trial judge to make a critical review of their bases"). Reliance by Mr. Taylor on litigation-driven testing by Kraft employees – testing with which Mr. Taylor has only a rudimentary familiarity in any event – would improperly lend his neutrality and credibility to that testing, which would unfairly prejudice Keurig and confuse the jury.

**B.    The Probative Value of Kraft's Testing Does Not Substantially Outweigh Its Prejudicial Effect on Keurig.**

Mr. Taylor should be precluded from discussing the results described in Kraft's three one-page summaries (Exs. 3, 4, 5) for the additional reason that these documents are otherwise inadmissible hearsay and their probative value does not substantially outweigh their prejudicial effect. Rule 703 "clearly establishes a presumption against disclosure to the jury of otherwise inadmissible evidence." Pineda v. Ford Motor Co., 520 F.3d 237, 247 n.14 (3d Cir. 2008); see also Turner v. Burlington N. Santa Fe R.R. Co., 338 F.3d 1058, 1062 (9th Cir. 2003) (precluding expert testimony based on third-party lab report that was otherwise inadmissible hearsay). There is little probative value to Mr. Taylor opining on the Kraft tests since he concedes that his opinion does not depend on them. (Ex. 2 at 174). By contrast, the prejudice to Keurig would be palpable if Kraft were permitted to mask the litigation bias inherent in data generated by Kraft's own employees by introducing that testing through an outside expert.

**III.    CONCLUSION**

Keurig asks the Court to preclude Kraft's technical expert Mr. Taylor from relying on or testifying about experiments that Kraft's own employees performed on Kenco Singles cartridges.

-5-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 11, 2008, a true and correct

copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on August 11, 2008, copies of the foregoing

document were served by e-mail on the above-listed counsel of record and on the following non-

registered participants in the manner indicated below:

### BY E-MAIL

> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

> /s/ *Karen E. Keller*
> John W. Shaw (No 3362) [*jshaw@ycst.com*]
> Adam W. Poff (No. 3990) [*apoff@ycst.com*]
> Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
> (302)-571-6600

> *Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

               Plaintiff,

       v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

            Defendants.

C.A. No. 07-17 (GMS)
**CONFIDENTIAL--ATTORNEYS'
EYES ONLY**


**JURY TRIAL DEMANDED**


**<u>EXPERT WITNESS REPORT OF MALCOLM E. TAYLOR</u>**

I.    *Curriculum Vitae* **of Malcolm E. Taylor**

I, Malcolm E. Taylor, have been informed that I should expect to testify on behalf of

defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc., as an expert

witness. My *curriculum vitae*, which is summarized below, is attached as Exhibit 1.

I am a resident of the state of New Hampshire; I reside at 618 Kearsarge Mountain Road,

Warner, NH 03278.

I was educated at Liverpool College of Technology in Liverpool, United Kingdom, where

I earned a B.S. in Mechanical Engineering in 1957.

I was employed for 28 years with Foster-Miller, Inc. ("FMI"), a technology and product

development company. Currently, I am semi-retired and work as a Senior Staff Engineer with

FMI on a consulting basis, but I also have relationships with other technology development

companies. Prior to my retirement from FMI, I served as a Division Manager where I acted as a

program manager, supervising projects and providing my technical expertise. My expertise lies

primarily in product development and production systems, and in particular, the packaging of

products, design/build of medical devices - disposable and reusable, and the automatic assembly

or processing of multiple parts. For example, I worked on projects related to consumer

packaging design; packaging and retort of food products; investigating problems with foil

packaging; cold-formed foil packaging and lid stock with foil layers; injection molded,

thermoformed, blow-molded plastics; adding gas barriers to permeable materials; and automatic

assembly and packaging of consumer and medical products.

I am recognized as an expert in the field of product development, production design, and

machine development, with over 40 years of experience as a design engineer. I am listed as

inventor or co-inventor on at least 20 U.S. patents. I have not served as an expert witness in the

previous 4 years, either at a trial or by deposition. Prior to my retirement, I was a longtime

2

member of both the American Society of Mechanical Engineers and the British Institution of Mechanical Engineers. My consulting fee for this case is $350 per hour.

## II.    Scope of Expert Representation

I have been informed that Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (the "Kraft Defendants") have been accused by the plaintiff, Keurig, Incorporated ("Keurig"), of infringing claims 1, 2, 8, 9 and 10 ("asserted claims") of U.S. Pat. No. 6,607,762 ("the '762 Patent"). I have been retained by the law firm of Baker Botts L.L.P. on behalf of the Kraft Defendants to formulate and render my independent opinion regarding whether the elements in the asserted claims are embodied or disclosed in certain prior art. I was told that I may be asked to provide a rebuttal report relating Keurig's infringement allegations. I have also been told that I will be asked to testify at trial.

## III.   Summary of Opinions

In my opinion, the Kenco Singles™ Cartridge, and more specifically the Kenco Singles™ Medium Roast Cartridge, embodies each and every limitation of claims 1, 2, 8, 9 and 10 of the '762 Patent. Furthermore, U.S. Patent No. 4,853,234 to Bentley *et al.* discloses each and every limitation of claims 1, 2, 8, 9 and 10 of the '762 Patent. In addition, U.S. Patent No. 4,452,130 to Klein discloses each and every limitation of claim 1 of the '762 Patent, and can be combined with the teachings of references in the consumer packaging field, which were available prior to the filing of the '762 Patent, with regard to the additional limitations described in claims 2, 8, 9 and 10 of the '762 Patent. The disclosure of both the '234 and '130 Patents would permit a person of ordinary skill in the consumer packaging field to construct the beverage filter cartridges illustrated in those patents.

3

My opinions with regard to the '762 Patent are based upon, among other things, my review of the '762 Patent; the Court's Order Construing the Terms of the '762 Patent of January 23, 2008; prior art cited during the prosecution of the '762 Patent; the Tassimo® disc ("T-disc"); the Kenco Singles™ Cartridge, and in particular the Kenco Singles™ Medium Roast Cartridge; U.S. Patent No. 4,853,234 ("the '234 Patent") to Bentley *et al.* entitled "Beverage Packages;" U.S. Patent No. 4,452,130 ("the '130 Patent") to Klein entitled "Electrical Apparatus Useful to Prepare a Hot Beverage;" certain deposition testimony and exhibits to depositions; and other documents and information, as well as my professional knowledge and experience.

I have attached a list of the documents and information I considered as Exhibit 2.

The specific reasons for my opinions follow below.

## IV.    The '762 Patent

### A    Person of Ordinary Skill

I have been asked to render an opinion as to what would be the qualifications of a person of ordinary skill in the art of the '762 Patent as of December 1999. The "art" at issue in the '762 Patent is consumer packaging. In December 1999, a person of ordinary skill in this art would have had a bachelor of science degree in materials science, package/packaging engineering, or mechanical engineering with at least two years relevant design experience in consumer packaging. Such a person would be familiar with materials used in consumer packaging, as well as the physical properties of such materials, and the production techniques used to fabricate consumer packaging.

### B    Prior Art Applied to Asserted Claims of '762 Patent

I was asked whether the elements of claims 1, 2, 8, 9 and 10 of the '762 Patent are embodied by the Kenco Singles™ Cartridge and disclosed by the '234 and '130 Patents. Below,

I have outlined my analysis for my conclusions with regard to each of the asserted claims of the '762 Patent. For claim 1, I broke down my analysis on a limitation by limitation basis.

These are the elements of claims 1 and 10[1] of the '762 Patent that I was looking for in the prior art I evaluated:

A beverage filter cartridge comprising:

(a) an outer container having an access opening:

(b) a [planar] filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers;

(c) a soluble beverage medium stored in said first chamber; and

(d) a lid closing said access opening, [said lid and said outer container being impermeable to liquids and gases,]

(e) said lid having a first section overlying said first chamber and a second section overlying said second chamber,

(f) the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage,

(g) said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and

(h) the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge

1.    Kenco Singles™ Medium Roast Cartridge

My analysis is based on my physical inspection of the Kenco Singles™ Medium Roast Cartridge ("Kenco Cartridge") where I removed the laminate foil lid and inspected its internal

---

[1]  Claim 10 differs from claim 1 in that claim 10 recites a "planar" filter element and that the lid and outer container are "impermeable to liquids and gases." These additional limitations of claim 10 are included in brackets.

structure.  Exhibit 3 illustrates where the limitations of claim 1 of the '762 Patent are present in the Kenco Cartridge.  I have reviewed the specifications of the Kenco Cartridge manufactured on the Rychiger line, and the Cartridge, in all material respects has remained unchanged since January 1995.  MacMahon Depo. Tr. (Ex. 4) 208-18; PD 4439, Issue Nos. 4-7 (Ex. 5);.  In addition, I have reviewed the specification for the foil laminate lid of the Kenco Cartridge, and the lid material is the same since November 1995.  MacMahon Depo. Tr. (Ex. 4) 218-29; PD 4446, Issue Nos. 3-8 (Ex. 6).  My analysis of the '762 Patent in view of my physical inspection of the Kenco Cartridge is as follows:

> a.     Independent Claim 1

**(a)  an outer container having an access opening:**

Upon observation and inspection of the Kenco Cartridge, it is my opinion that it includes an injection molded container having an access opening.  This is also seen in drawings of the container manufactured on the Rychiger line.  Defs.' Ex. 4 (PD 4439, Issue No. 3 marked by John MacMahon) (Ex. 7); PD4439 (Ex. 5).

**(b)  a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers;**

I was told to use the Court's definition of first and second chambers.  Using the Court's definition, upon observation and inspection of the Kenco Cartridge, upon observation and inspection of a partially assembled Kenco Cartridge, and upon review of the relevant detailed drawings and specifications, it is my opinion that the assembled filter element subdivides the container interior into first and second chambers.  MacMahon Depo. Tr. 217-19 (Ex. 4).

**(c)  a soluble beverage medium stored in said first chamber; and**

Whole coffee beans and whole tea leaves are of themselves not soluble.  Nevertheless,

when coffee beans are ground into small particles (approximately a millimeter or less) and tea

leaves are cut into small flakes, water soluble components of the beans and leaves are exposed.

These water soluble components can be leached or extracted out of bean grounds and tea by

means of flowing, suitably hot, water.  Thus, "soluble beverage medium" describes ground

coffee beans and/or cut tea leaves.  The liquor derived from the beverage extraction will be a mix

of beverage solids and water.  Upon inspection and observation, ground coffee is stored in the

first chamber (coffee storage chamber) of the Kenco Cartridge.

**(d)  a lid closing said access opening,**

Upon inspection and observation of the Kenco Cartridge, it includes an unprinted foil

laminate lid that provides a complete closure of the access opening.  This is also seen in the

specification for the lid.  PD 4446 (Ex. 6), Issue Nos. 4-6.

**(e)  said lid having a first section overlying said first chamber and a second section
overlying said second chamber,**

Upon observation and inspection of the completed Kenco Cartridge, upon observation

and inspection of a partially assembled Kenco Cartridge, and upon review of the relevant

detailed drawings and specifications, it is my opinion that the foil laminate lid has a first section

which overlies a first chamber and also has a second section which overlies a second chamber,

namely the coffee storage chamber and the liquid outlet chamber.  Assembled Cartridge (Ex. 3);

PD 4446 (Ex. 6), Issue Nos. 4-6.

**(f)  the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage,**

The foil laminate lid is formed of a 60µ layer of polypropylene, a 9µ layer of aluminum, and a 12µ layer of polyester.  PD 4446.  Based on my many years of experience with consumer packaging materials, and upon observation and inspection, I know that a lid of this material and thickness is capable of being pierced to permit a flow of liquid into the coffee storage chamber.

Flexible aluminum foils have been employed for many years in the medical industry and the food industry where high barrier to water vapor and gas loss/gain is important.  Foils have been provided where it is necessary to easily gain access to containers by peeling, tearing, piercing, or breaking, and have been incorporated into laminates with plastics and papers to provide different properties.  Thicker foils have been used for cold forming structures, thinner foils, with no real structural strength, have been used for purely barrier purposes.

The lid of the Kenco Cartridge is an example of a thin lid that closes an opening, provides barrier to water vapor and gas, and is easily pierced.  Piercing tubes of several different configurations could be employed to easily pierce the foil lamination and allow unrestricted water flow into the first chamber.  The foil laminate used for the Kenco Cartridge's lid is easily pierced since the 12µ polyester layer is merely there to protect the 9µ aluminum layer.  The main resistance to piercing, therefore, is the 60µ layer of polypropylene, which being somewhat stretchy, can be easily pierced by anything approaching a semi-sharp edge.

It is readily apparent that the first section of the lid is capable of being pierced to permit a flow of liquid into the coffee storage chamber.  This was confirmed by tests on the Kenco Cartridges carried out by Messrs. Andrew Bentley and Lee Rowan establishing that the first section of the lid is piercable to accommodate an inflow of liquid into the first chamber for

infusion with the beverage medium to produce a beverage.[2]  Mr. Rowan tested twenty Kenco

Singles™ Medium Roast Cartridges manufactured on the Rychiger lines.  In his tests, he pierced

the laminated foil lid sections overlying both the coffee storage and liquid outlet chambers with

inlet and outlet needles, respectively.  Hot water flowed through the inlet needle into the coffee

storage chamber and infused the coffee grounds.  The coffee liquor flowed through the filter into

the liquid outlet chamber and flowed out of the Kenco Cartridge through the outlet needle.

Rowan Depo. Tr. (Ex. 11) 122, 124; Pl.'s Ex. 13 (Ex. 12).  Separately, Mr. Bentley, tested twelve

Kenco Cartridges manufactured on the Rychiger lines.  Mr. Bentley's tests were identical to Mr.

Rowan, except that the lid was pierced at a number of location over the coffee storage chamber.

First Bentley Depo. Tr. (Ex. 13) 43-45; Pl.'s Exhibit 91 (Ex. 14).

    Moreover, I performed my own test with a hypodermic needle to brew a beverage using a

Kenco Cartridge.  First, I pierced the foil lid over the liquid outlet with a sharp object.  Next,

using a hypodermic needle filled with hot water, I injected the hot water directly into the coffee

storage chamber through the overlying foil.  When injecting the hot water, I held the Kenco

Cartridge in a vertical position as shown in Figure 5 of the '762 Patent.  I then saw coffee liquor

exit the Cartridge through the outlet hole.[3]  This result is consistent with the tests performed by

Messrs. Rowan and Bentley.  Thus, it is clear that the lid of the Kenco Cartridge is capable of

being pierced to permit a flow of liquid into the coffee storage chamber.

---

[2]  I was shown a second Kenco Cartridge, Gevalia French Vanilla, where the top inlet hole was open, but was
otherwise identical to the Kenco Singles™ Medium Roast Cartridge that I inspected.  This open hole did not change
the piercability of the foil laminate lid nor did it affect the flow of the beverage through the container, as
demonstrated by my own test with a hypodermic needle and the tests on these open-inlet cartridges performed by
Mr. Bentley.  Second Bentley Depo. Tr. (Ex. 8) 4-8; Pl.'s Ex. 202 (Ex. 9).  Nevertheless, I have been shown
production records that clearly demonstrate that all Kenco Singles™ Medium Roast Cartridges produced from
November 1996 through 1998 have a closed top inlet hole.  Kenco Singles™ Medium Roast Cartridge Production
Records (Ex. 10).

[3]  I also performed the test on a Cartridge with the open top inlet hole, and the results were identical.

**(g)  said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and**

Upon observation and inspection of a partially assembled cartridge, based on my years of personal experience with disposable device filters and the confirming tests carried out by Messrs. Bentley and Rowan, I am of the opinion that the filter element is permeable to liquid and will accommodate a flow of beverage from the first chamber into the second chamber.  It would be clear to a person of ordinary skill in the consumer packaging field  that the Kenco Cartridge's filter is permeable because a liquid beverage passes through the outlet and yet holds back the coffee grounds. In my personal test, only coffee liquor exited the outlet hole, and I did not observe any coffee grounds.

**(h)  the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge.**

In light of my opinion expressed with regard to the piercability of the first section of the lid, and confirming tests carried out by Messrs. Bentley and Rowan, it is also my opinion that the second section of the lid laminate is piercable to accommodate an outflow of beverage from the second chamber to the exterior of the cartridge.  The foil laminate used for the cartridge lid covers the entire access opening, including both the coffee storage and liquid outlet chambers. Thus, as discussed above, the foil laminate lid can be easily pierced by anything approaching a semi-sharp edge.  This was confirmed by my personal test, where the lid over the outlet was easily pierced and coffee liquor flowed out of the resulting hole.  Thus, it is clear that the lid section above the liquid outlet is capable of being pierced to permit the beverage passing through the filter to flow out of the Kenco Cartridge.

**EXHIBIT 2**

# In The Matter Of:

*KEURIG, INCORPORATEDv.*
*KRAFT FOODS GLOBAL, INC*

———————————————————————

## *MALCOLM E. TAYLOR*
### *July 3, 2008*

———————————————————————

## *MERRILL LEGAL SOLUTIONS*

### *101 Arch Street, 3rd Floor*
### *Boston, MA 02110*
*PH: 617-542-0300 / FAX: 617-338-6075*

**TAYLOR, MALCOLM E. - Vol. 1**

1  Q. My name is Mike Rader. My colleague is Charlie
2     Steenburg. I'm going to be asking you some
3     questions today obviously.
4        Have you had your deposition taken before?
5  A. No.
6  Q. Have you ever served as an expert witness in
7     litigation before?
8  A. No.
9  Q. Do you understand that whenever I ask a question,
10    you need to answer verbally?
11 A. Yes.
12 Q. And we'll try to go quickly given the timing, but if
13    you do need to take a break, will you just let me
14    know?
15 A. Sure.
16        MR. SCHLITZ: Every hour or so I'm going
17    to insist we take a break. It's tiresome and
18    tedious to be asked questions, so we will take a
19    break along the way.
20    BY MR. RADER:
21 Q. Do you understand that if Mr. Schlitz makes an
22    objection to a question that I ask you, you still
23    need to answer the question?
24 A. Yes.

1  Q. Prior to working on this case, did you ever do any
2     work for Kraft?
3  A. Yes.
4  Q. Can you describe that work?
5  A. Yes. I, along with others in FMI which is where I
6     used to work which is Foster-Miller, we had worked
7     in '06 on the Tassimo device.
8  Q. What was the nature of your work on Tassimo?
9  A. We were doing some conceptual work on the design.
10    It was really an advanced design to -- actually, on
11    one hand improve some things on it. Others were to
12    incorporate maybe the milk, for example, into the
13    package.
14 Q. Were you working on the cartridges or the brewer?
15 A. On the cartridges. We were not involved with the
16    brewer at all.
17 Q. Do I understand correctly Foster-Miller was hired as
18    some kind of consultant to Kraft?
19 A. Yes, that's fine. Yes, we were.
20 Q. You were an employee of Foster-Miller at the time.
21    Are you since retired?
22 A. I'm semi-retired, but I am retired from FMI.
23 Q. FMI is Foster-Miller, Inc.?
24 A. Yes, right.

1  Q. Do you still do any work with FMI?
2  A. Yes, I do on a consulting basis.
3  Q. Are you still doing any work for FMI that relates to
4     Kraft?
5  A. Not at this moment.
6  Q. How recently were you doing work at FMI that related
7     to Kraft?
8  A. It was '06 -- 2006.
9  Q. How long did that project last?
10 A. It lasted for about six months, I think.
11 Q. All during 2006?
12 A. Yes, in the early part.
13 Q. And more specifically what were you working on with
14    regard to the T-disc cartridge?
15 A. We were looking at a number of concepts for
16    improving the construction. One aim was to reduce
17    the costs. We were looking at options in the
18    barrier issues. We were looking at issues in
19    structure which would make it easier in assembly and
20    basically areas like that. I think we had about six
21    concepts all together.
22 Q. What do you mean when you say six concepts?
23 A. Six ideas, if you like.
24 Q. Six parts of the project?

1  A. No, no. These were different design ideas, if you
2     like, which may be made into a design on its own had
3     we gone ahead with them. As it happened we didn't
4     go ahead with them. They were offered as concepts
5     which is really ideas, and they were left at that
6     stage at Kraft, I believe, after the middle of '06.
7  Q. So are you saying that Kraft decided not to
8     implement any of the suggestions that you made?
9  A. Yes. I believe so, yes.
10 Q. How did the consulting engagement with Kraft get
11    started?
12 A. It was started through Ed Goldman most likely who is
13    over marketing and over the group basically within
14    FMI. We have done work in other departments within
15    Kraft, so we knew individuals at Kraft, not
16    specifically in England, but in other areas over
17    here in the U.S.
18 Q. What other work had you done for Kraft in the past?
19 A. The other work involved working the cheese area up
20    in the Chicago area, I think. We had done several
21    things up there, but nothing else in the coffee
22    area.
23 Q. And during what time period did you do work in the
24    cheese area for Kraft?

Page 10

1  A. That would have been probably around 2000-ish. I'm
2      not sure exactly the date. I can't remember.
3  Q. That's fine. Aside from the cheese work that you
4      did and the work that you did in '06 on the T-disc,
5      was there anything else that you've done for Kraft
6      over the years?
7  A. No, not that I can remember.
8  Q. Were you the person that Kraft approached for the
9      T-disc project or was there somebody else in the
10     company?
11 A. It would have been Ed Goldman who is the VP of our
12     group basically.
13 Q. And how did you end up getting assigned to that
14     project?
15 A. Mainly because I was a senior engineer and because I
16     have a lot of experience and background in
17     disposable packages in working in the medical
18     industry amongst other things and other companies on
19     and off over the years, some of which are in the
20     coffee industry, not specifically in this area, but
21     overall related to coffee in some way or another.
22 Q. Did you work with any engineers at Kraft during the
23     T-disc project?
24 A. Yes. Mostly based in England.

Page 11

1  Q. Who are those engineers?
2  A. The only one I can remember is Lee Rowan, I think.
3      I don't remember the other guys to be honest.
4  Q. Does the name John MacMahon ring a bell?
5  A. Not from that time. I have read his deposition of
6      course, but no, I don't recollect that name at the
7      time.
8  Q. Did you have any contact with Andrew Halliday
9      regarding the T-disc?
10 A. Not that I can remember anyway.
11 Q. What about Andrew Bentley?
12 A. No, I don't remember their names at all. There
13     were -- you know, we had met with only one or two
14     individuals who were over with us in the U.S., and
15     to be really honest, I'm not even sure who they were
16     right now. I don't think it was Lee.
17 Q. During that T-disc project that you did, did you
18     travel to the U.K. to their facility?
19 A. No, we didn't.
20 Q. You had a meeting in the U.S.?
21 A. We had a meeting in the U.S. We had a meeting on
22     the phone with them at one stage when we had all the
23     concepts together, so we had a conference with them
24     on the phone.

Page 12

1  Q. Did your work on the T-disc relate in any way to the
2      pierceability of the lid?
3  A. No.
4  Q. Did it relate to the fluid flow in the cartridge at
5      all?
6  A. No. No, it did not.
7  Q. You mentioned barrier issues. What was that about?
8  A. Oh, it was on the overall container. We were
9      looking at options of making a design which would
10     largely improve the barrier.
11 Q. Just in general what kinds of options were you
12     looking at?
13 A. We were looking at fillers in the propylene. We had
14     also looked at coatings as well as a barrier. They
15     are both viable, so --
16 Q. During that consulting engagement did you become
17     aware of the singles cartridge technology?
18 A. No, we did not.
19 Q. So was the first time that you became aware of the
20     singles cartridge technology in connection with your
21     consulting for this case?
22 A. With this case, right.
23 Q. Had you ever seen it or used it in your life before?
24 A. No, I had not.

Page 13

1          MR. RADER: Just to read into the record,
2      so far I've marked three exhibits; No. 1, entitled
3      Expert Witness Report of Malcolm Taylor; No. 2,
4      Rebuttal Expert Witness Report of Malcolm Taylor;
5      and No. 3, List of Documents and Information
6      Considered.
7  Q. Are Nos. 1 and 2, are those the two expert
8      reports --
9  A. Yes.
10 Q. -- that you prepared?
11 A. Yes.
12          MR. SCHLITZ: Let me just say, so that the
13     record is clear, wait for him to finish his question
14     and then you can answer because otherwise it's
15     difficult for the court reporter.
16 BY MR. RADER:
17 Q. No. 3, is that the list of -- we took No. 3, by the
18     way, from your rebuttal report. Is that the list of
19     everything that you reviewed?
20 A. It looks like it is. I haven't looked at it. Yes,
21     it is.
22 Q. Okay.
23 A. Yes.
24 Q. So Exhibits 1 and 2, these two reports, is it fair

4 (Pages 10 to 13)

1     his CV, Professor Slocum would be unable to do that?
2   A.  I don't think he has background to understand,
3     mainly because he doesn't have the experience.  I'm
4     not saying he isn't able to understand at all, but
5     he doesn't have the experience.  That's really all
6     I'm saying.  He could learn it, I'm sure.
7   Q.  If it turned out that he had enough experience to do
8     that, would you change your opinion about whether he
9     was one of skill in the art?
10  A.  No, because I still believe you need experience in
11     all the processes which are used in packaging design
12     and also assembly in the way of machinery, et
13     cetera.
14  Q.  You didn't talk to Professor Slocum in the course of
15     your work on the case, did you?
16  A.  No, I have not.
17  Q.  Did you review his publications?
18  A.  No.  There was a long list of them, and I didn't
19     review them.
20  Q.  Did you look at the patents that he is an inventor
21     on?
22  A.  I looked at them in title only, but that's all.
23  Q.  You didn't pull the patents themselves?
24  A.  No, I did not.  I'm sure he is a bright guy.

1   Q.  So I guess my question is, how did you conclude that
2     he wasn't one of skill in the art without having
3     done any of that investigation, finding out whether
4     he has the skills you've been describing?
5   A.  We have many PhDs in FMI.  I have worked with many
6     of them in materials, and I've worked with others in
7     mechanical engineering.  I've known professors at
8     MIT over the years because I have worked with them
9     at specific times, and I know well enough that if
10     you are an academic 80 percent of the time, you are
11     not, No. 1, a design engineer and, No. 2, you are
12     not really an experienced packaging engineer.
13  Q.  So you are assuming that he doesn't have those
14     skills or spend much of his time in those things; is
15     that fair to say?
16  A.  Exactly.
17  Q.  If that assumption turned out to be wrong, would you
18     revisit your conclusion?
19  A.  If it was proven at any time, sure.
20  Q.  Now, in the field of consumer packaging, let's call
21     it, what does one of skill in the art in that field
22     ordinarily do at a company?
23  A.  Well, he would be involved in designing packages for
24     a specific use, whether it's for packaging a liquid,

1     a solid, powders, whether it's for packaging a
2     protection around a device in the medical industry,
3     whether it's around a drug, and all these elements,
4     whether it's pills or liquids or powders, have been
5     packaged in flexible packaging over the years which
6     have needed a barrier all the way around, not only
7     in the lid, but in the base all the way around.
8     Some packages out there are made out of aluminum
9     entirely.
10  Q.  Does a consumer packaging engineer -- in your
11     experience, do people like that work on teams?  Do
12     they work alone?  How does that work?
13  A.  If you are working in a larger company, they more
14     often would work as a team, less as an individual.
15     If you are working for an R&D company like FMI, one
16     normally works in small groups where you'd have a
17     lead engineer and a designer.  You would work maybe
18     with somebody else on graphics or somebody involved
19     in the user interface.
20  Q.  So is it commonplace to split up projects into
21     pieces that different members of the team would do?
22  A.  Yes.  Once everybody is aware of the overall
23     objective, if you like, sure, that would be normal.
24  Q.  And how do you then fit those pieces together?

1   A.  Well, it's up to the lead engineer to keep overall
2     control on the project as a whole, and he would
3     supervise individuals who are looking after graphics
4     and individuals in materials, on looking ahead at
5     how you would make it in the long run, production,
6     production, what machinery is available, whether
7     it's available as is or whether you have to design
8     and build machinery on a specialty basis.
9   Q.  And have you been a lead engineer on those kind of
10     teams?
11  A.  Yes, I have.
12  Q.  In the consumer packaging area?
13  A.  I have.  Yes, I have.
14  Q.  In the contents of, you know -- I know you
15     distinguish between consulting companies and product
16     companies, but in the context of a company like
17     Kraft or Keurig, it would be more of the team
18     concept?
19  A.  Yes.  It would be, yes.
20  Q.  And does the lead engineer have to evaluate the work
21     that's done by the people working under him on the
22     team?
23  A.  Yes, he does usually on a daily basis all depending
24     on the urgency of the project.

1  Q. How does that work? Is it through meetings or memos
2     or what?
3  A. Meetings, e-mails, memos, personal one-to-one, all
4     depending on the urgency or importance of the aspect
5     that you are looking into, and sometimes you have to
6     work with a company on the outside, you know, a
7     supplier of materials.
8  Q. In your experience as lead engineer, did you have
9     people working under you that prototyped devices for
10    you?
11 A. Yes.
12 Q. How would you evaluate the effectiveness of that
13    prototyping?
14 A. Well, depending on the level of prototyping, if it
15    was fairly involved, you might work with a machine
16    company who would ultimately make an automatic
17    machine which would assemble each of the elements in
18    the package, and he would work with you on the
19    development basis or if it's a fairly simple package
20    where you could easily make up a model in the lab,
21    then you do it in-house. That would all depend on
22    the complexity and all the rest of it.
23 Q. So in good engineering practice, does the lead
24    engineer himself examine the prototype or can you

1     just rely on the people under you?
2  A. No. He would be involved at every step along the
3     way.
4  Q. So you would personally examine the prototype to see
5     how it worked?
6  A. Because you are developing it, you want to make sure
7     that all the objectives that you are looking at in
8     the design specification are being met. It's okay
9     to have a rough design where you are doing a test
10    rig and, you know, you have a leak here and a leak
11    there. It isn't important. You are looking at the
12    overall concept to make sure the overall concept is
13    working, then as you move along you develop other
14    issues in the process of whatever else you are
15    developing.
16 Q. Do you sometimes get memos from people on the team
17    or from outside consultants or vendors about
18    different parts of the project?
19 A. Once in a while if you are working in an area where
20    you would need a consultant then you might have to
21    hire one, but if it's within our own area of
22    expertise, obviously we wouldn't.
23 Q. But in terms of the work product that goes in along
24    the way in these projects, how does that work? Do

1     people write up memos or logbooks about the --
2  A. Yes, yes, yes. I'm sorry. You do have a logbook
3     that you update every -- usually at the end of the
4     day so you know what you've done. If you didn't,
5     you wouldn't have any reliable data at all because
6     as you develop you may have to back up and you may
7     have to go in a different route if you are up
8     against a block somewhere.
9  Q. Are there standards for good engineering practice
10    about how much detail you need in those logs or
11    memos?
12 A. No, not really. It really depends on what your
13    objectives are and how rapidly the whole thing is
14    moving along. You would have timelines all
15    depending on how large the program is altogether,
16    and you'd have an objective to reach each stepping
17    stone, if you like, which would offer you a
18    benchmark on how things are going, and if everything
19    is working as it ought to be, then you maybe have a
20    meeting at that stage and you move on.
21 Q. As the lead engineer would you expect the people
22    working under you to communicate to you all of the
23    information that they had recorded about the stuff
24    they are working on?

1  A. Yes. At least all the relevant information, sure.
2     In other words anything that related to functional
3     operation which was critical, if you like.
4  Q. So if somebody working under you was testing a
5     prototype or a product, you'd expect to get all the
6     reports that they generated about that testing?
7  A. Yes, or I'd go and look at it myself.
8  Q. Would your standards for evaluating written work
9     product be any different when you are dealing with
10    an outside consultant that's not within your own
11    company?
12 A. No. It would be the same, I think.
13 Q. You'd expect the outside people to adhere to the
14    same standards --
15 A. Yes.
16 Q. -- of your own company?
17 A. Absolutely.
18 Q. You'd communicate those standards to them?
19 A. When you say a standard, there really isn't any
20    standard per se of engineering effort, if you like.
21    There are engineering standards involved in design
22    and drawing and symbols and all that stuff. That's
23    a standard, but as far as how you organize your
24    work, how you do your work on a day-to-day basis is

12 (Pages 42 to 45)

Page 46

1  usually up to the lead engineer or whatever, you
2  know.
3  Q. If you had hired an outside company to do some
4     testing of a product or prototype, would you expect
5     to have the opportunity to speak to them directly
6     about their results?
7  A. Absolutely. You would work with them on a
8     day-to-day basis, even to go over there to visit
9     with them. Absolutely.
10 Q. So would it be enough to get from them just a
11    written report or a compilation of data or would you
12    need to be able to interact?
13 A. You'd have to interact, yes.
14 Q. Why is that so important?
15 A. Well, if you've got a product that you are
16    developing and you are responsible for making it
17    work, whatever it is, then you want to make sure
18    that the vendor or consultant is in line with what
19    you are thinking.
20 Q. And if they say they've done a test, would you take
21    their word for it --
22 A. No, I wouldn't.
23 Q. -- that it's the right test or would you --
24 A. No. I would visit with them. We'd have a meeting.

Page 47

1  We'd have a look at how they are doing the testing.
2  Q. Okay. Now, I'd like to grab a --
3     MR. SCHLITZ: We've gone for an hour. If
4  you want to go for more, I don't want to go for more
5  than another ten minutes, so if you want it take a
6  break now or you want to --
7     MR. RADER: Let's take a short break.
8  That's fine.
9     (Recess.)
10    (Exhibit 5, Cartridge marked for
11    identification.)
12 BY MR. RADER:
13 Q. Mr. Taylor, we've marked a cartridge as Exhibit 5,
14    and that's a single cartridge; is that correct?
15 A. Yes.
16 Q. When you worked on this case you had a chance to
17    study those?
18 A. Yes.
19 Q. Can you describe in your own words how that
20    cartridge works in its normal operation?
21 A. Yes. The blank at the bottom of the hole on, if you
22    like, the top side is pushed into the cartridge.
23    Water is introduced, runs along the channels on the
24    inside and then into the coffee bed. Water runs up

Page 48

1  through the coffee bed, up through the filter into
2  the chamber which is up above the filter and then up
3  and over into the outlet which is on the opposite
4  end. That's it basically. It's a simple operation.
5  Q. Okay. I'll just try to break it down a little bit.
6     When the cartridge goes into the machine, is it foil
7     up or foil down?
8  A. Foil down.
9  Q. And there is a beveled inlet at the part that goes
10    into the machine first; is that right?
11 A. I've never looked at the singles machine, but I
12    assume it enters in this way.
13 Q. And so on one end of the singles cartridge there
14    is -- it's square, and on the other end it's got
15    like a point to it?
16 A. Yes.
17 Q. And on that end with a point there is a beveled
18    inlet in the hard plastic case?
19 A. Yes.
20 Q. And that's where you are saying the water inlet
21    device punctures through?
22 A. Yes. It pushes out the blank at the bottom of the
23    hole.
24 Q. Did you look at some -- just as an aside, did you

Page 49

1  look at some cartridges -- some singles cartridges
2  that didn't have that blank there?
3  A. Yes, they just have a hole.
4  Q. So in that case the inlet device just goes right
5     into the hole without having to punch out a blank?
6  A. Right.
7  Q. It then introduces the water through that hole into
8     a manifold; is that correct?
9  A. Yes.
10 Q. And then the water feeds through the slots in the
11    manifold into the coffee bed?
12 A. Yes.
13 Q. And then the resulting liquid goes through -- in the
14    orientation when it's brewing it goes up through the
15    filter?
16 A. Right, that's correct.
17 Q. And it travels through a slot over to the outlet; is
18    that correct?
19 A. That's correct.
20 Q. And then it goes down through the outlet?
21 A. Yes, that's correct.
22 Q. And then in the machine there is a piercing device
23    that pierces the foil that covers the outlet?
24 A. Yes.

13 (Pages 46 to 49)

Page 114

1  Q. Kraft engineers?
2  A. Yes, right.
3  Q. Actually before I get to that, let me just ask you
4     one more question. Did you try to -- aside from
5     testing the singles cartridges, did you try to
6     create a test product or prototype based on either
7     the '234 Patent or the '130 Patent that you offered
8     opinions on?
9  A. With the water you mean?
10 Q. Did you actually build what was shown in those
11    patents?
12 A. No, I didn't.
13 Q. Okay. So your opinions on those are strictly based
14    on what's written?
15 A. On the drawings, what's actually written, yes,
16    right.
17 Q. Now, on pages 8 and 9 of your report you also talk
18    about some tests that were done by engineers at
19    Kraft; is that right?
20 A. Yes.
21 Q. Were you present when any of those tests were
22    performed?
23 A. No, I was not.
24 Q. Have you spoken with Mr. Bentley or Mr. Rowan or any

Page 115

1     other Kraft engineer about those tests?
2  A. No, I did not.
3  Q. How did you find out about those tests?
4  A. I had the information from my counsel.
5  Q. What information was that?
6  A. There was a drawing of the test and the results of
7     the test and the depositions obviously of Rowan and
8     whoever else, Andrew Bentley, right.
9  Q. Now, you understand that they both used a test rig?
10 A. Yeah, I understand that.
11 Q. Have you seen that rig?
12 A. No. Only in picture form.
13 Q. Have you seen pictures of it?
14 A. Well, only what was in the picture with the device
15    in there as well.
16 Q. Let's grab those pages. I have a document that's
17    previously been marked as I believe Exhibit 13. I
18    can't read the handwriting exactly. Then I have
19    Exhibit 91.
20 A. Uh-huh.
21 Q. Then I have Exhibit 202.
22 A. This is all I had.
23 Q. So you've got Exhibits 13, 91 and 202 in front of
24    you. You said that this is all you had?

Page 116

1  A. Yes.
2  Q. You didn't have any other pictures of the rig or
3     anything like that?
4  A. No. This is what I remember.
5  Q. So what is your understanding of what's shown in
6     Exhibit 13?
7  A. Well, 13 is just a volume of liquid. That's all
8     that's indicated from different cavities of the
9     housings, I assume, but that's how I took it to
10    read.
11 Q. So what is the -- it says "mold number" on the upper
12    left and then "cavity number." What do those
13    numbers refer to?
14 A. Mold would be a mold for making the housings and
15    because its multi-cavity-type mold, it's really a
16    means of identifying the cartridge itself, the
17    housing anyway.
18 Q. And what's the significance of that information on
19    this chart?
20 A. Well, it's just the amount of Mls that he took out,
21    that he was able to get out or at least the
22    repeatability, I guess. That's all I can get out of
23    it.
24 Q. In other words why are the mold and cavity numbers

Page 117

1     listed here? What does that add to this table?
2  A. I'm not sure, to be honest.
3  Q. Okay.
4  A. You know, I understand there were issues, not really
5     issues, but there were questions about alterations
6     and molds over the years and all the rest of it, and
7     I took it that it was part of that.
8  Q. But as you sit here today you don't know
9     specifically why that stuff is listed on this page?
10 A. No. There is not a lot of meaning there because it
11    merely indicates a mold number and cavity number or
12    date or at least a month anyway with a volume in
13    CCs. There is no other data there.
14 Q. So the month and manufacturer, what does that refer
15    to?
16 A. I assume of the cartridge with the coffee in it.
17 Q. And there are some Decembers and Novembers, but do
18    you know what years those were?
19 A. No, I don't.
20 Q. Do you know whether these were the cartridges with
21    the open hole or the closed holes?
22 A. There is no identification.
23 Q. Do you know whether these were singles cartridges or
24    T-discs?

30 (Pages 114 to 117)

Page 118

1  A. These are singles. I was aware of that.
2  Q. Okay. And then on the right-hand column, the Mls,
3     what does that refer to?
4  A. I assume it's the amount of coffee which they were
5     able or liquid or whatever that they were able to
6     extract out of the rig that they had.
7  Q. Is it the input or the output?
8  A. No. It's output, I think, but they are all within a
9     small amount of each other, so it's insignificant in
10    my mind. They are all essentially the same.
11 Q. Who created this document?
12 A. This I believe was Andrew Bentley, I think.
13 Q. What tests did he do to create this document?
14 A. He had the one which is shown on Exhibit 91.
15 Q. So he used the device that's shown in Exhibit 91?
16 A. I assumed, yes.
17 Q. You say you assumed. Do you know one way or another
18    whether it was that device or a different device
19    that led to the results in Exhibit 13?
20 A. No, because I can't remember, to be honest. I've
21    read such a lot of data and depositions, I can't
22    remember to be honest.
23 Q. Okay. So it could have been a different device that
24    led to these results?

Page 119

1  A. It may well have been. I'm just assuming because I
2     don't remember.
3  Q. Okay. Do you know if these were coffee cartridges
4     or tea cartridges?
5  A. I believe they were coffee cartridges, I think, from
6     what I remember.
7  Q. Do you remember what type of cartridges?
8  A. They were -- I think they used Lambert and Rychiger
9     type of cartridges.
10 Q. And that's for the results in Exhibit 13?
11 A. Yes, and also maybe on 202. Is that what it is?
12    Yeah.
13 Q. And do you know what type of coffee was in the
14    cartridges that were used to get the results in
15    Exhibit 13?
16 A. Only what's on the paper. There is a brand there on
17    202 which they talk about.
18 Q. I see. Now Exhibit 202, is that recording
19    information about the same tests as Exhibit 13?
20 A. I'm assuming it is at this stage because I don't
21    remember as I say.
22 Q. Okay.
23 A. Because on this particular one he's also talking
24    about drink volume.

Page 120

1  Q. I see. Now, in the tests shown in Exhibit 13 do you
2     know were those made -- were those results through
3     same-side piercing or opposite-side piercing?
4  A. I think they were on the same-side piercing.
5  Q. And how was the cartridge oriented in the tests?
6  A. It was vertical.
7  Q. And where was the inlet piercing made in the test
8     for Exhibit 13?
9  A. It was in a number of locations. It's on the
10    drawing here, A, B, C, D, E, I think.
11 Q. So you are referring to the picture in Exhibit 91?
12 A. On 91, sorry, yes.
13 Q. So in the tests that led to Exhibit 13, all the
14    various inlet positions were used that are shown in
15    Exhibit 91?
16 A. I assume so. They were all in the vertical in this
17    test, I think.
18 Q. But in terms of which inlet position was used for
19    each of the tests shown in Exhibit 13, do you know
20    which one or ones it was?
21 A. Well, they have them on that page actually. It
22    indicates on the -- above the drawing.
23 Q. I see. So that the tests that are listed in the
24    table on Exhibit 91 are the same tests that are

Page 121

1     listed in the table on Exhibit 13?
2  A. That's what I'm assuming, yeah, because I didn't
3     have any other information. I mean I had this one
4     obviously which is over the picture which they had.
5  Q. Okay.
6  A. It's obviously measuring the volume out of the
7     different positions or -- well, yeah, the positions
8     of the -- where the inlet was pierced, and they are
9     all in essence the same.
10 Q. Okay.
11 A. The difference is insignificant anyway.
12 Q. Now, to your knowledge did Mr. Bentley taste any of
13    the liquids that he produced with the rig?
14 A. He did not, I don't think, from what I remember.
15 Q. Do you know if anyone else at Kraft, Mr. Rowan or
16    Mr. MacMahon, tasted any of it?
17 A. I don't believe so.
18 Q. Now, can you just describe in your own words how the
19    rig that they used functioned?
20 A. The way I understand it is they had a clamp on the
21    back or plate, if you like, on the back of the
22    cartridge and then another one over the front of it
23    with some holes in it which would indicate the
24    positions of the inlet pierces, if you like, and

31 (Pages 118 to 121)

Page 122

1  there was a rubber gasket in between the plate on
2  the outside and against the cartridge, so there was
3  a gasket which would eliminate leakage and in
4  between the outer plate with the holes in the
5  cartridge itself, and then it was tightened up by
6  finger load -- finger tensioning, if you like.
7  Q. What do you mean by "finger tensioning"?
8  A. Well, to tighten up the wing nuts.
9  Q. And where was the hot water coming from?
10 A. It was a tube which was introduced in through the
11 rubber which was sandwiched, if you like, in between
12 the outer plate and the cartridge itself.
13 Q. And what was feeding that tube?
14 A. There would be water from the supply, hot water.
15 Q. Do you know what type of supply it was?
16 A. No, I have no recollection other than it was hot
17 water. That's all I remember.
18 Q. Do you know at what pressure the water was fed in?
19 A. No, I don't.
20 Q. And then how was the water -- how did the water exit
21 the cartridge?
22 A. Out through the outlet which is on the other side in
23 this case.
24 Q. What did the piercers for the inlet and the outlet

Page 123

1  look like?
2  A. The piercers, I believe they had used the ones which
3  they use on the existing or off one of the existing
4  piercers on the brewer or one of the brewers where I
5  think on the inlets they had a serrated tube ending
6  which allowed them to pierce, but it made a rather
7  ragged entry hole. I don't think it's what I would
8  have used, but that's all right.
9  Q. So for both the inlet and the outlet they had this
10 serrated item?
11 A. The inlet was a little different, I think. They had
12 one which they use on all the outlets, I think,
13 which is where they cut around most of the periphery
14 with a serrated edge and then they pull it over to
15 one side.
16 Q. I'm sorry. That's for the inlet or the outlet?
17 A. That's the outlet, sorry.
18 Q. So for the outlet they use the same jagged outlet
19 piercers that they used in the singles machine?
20 A. It was different. It was the one they usually use
21 on the outlet, and I think the inlet one -- I don't
22 know. They might have been the same. I'm not sure
23 because I didn't see any indication exactly. I was
24 only looking at the marks in and around the hole.

Page 124

1  Q. I'm sorry. What marks around the hole?
2  A. I had seen somewhere -- it was a drawing, I think.
3  No. It was a picture, and it showed an inlet hole
4  in through the foil and it was a little jagged.
5  It's a little bit like the outlet piercer which they
6  use on the Tassimo, I think.
7  Q. Was it taken from the Tassimo?
8  A. I don't know. I'm not sure if it was. I assumed it
9  was, but I don't know.
10 Q. And with regard to the outlet piercer, was that
11 taken from any machine?
12 A. It may well have been, but I'm not sure again.
13 Q. And who actually made the test rig?
14 A. I believe it was a mix of Bentley and Rowan, Andrew
15 Bentley and Lee Rowan. One of them or the
16 technician who was working with them arrived at a
17 test rig, I guess.
18 Q. So it is a combined effort --
19 A. I think so from what I read, yes.
20 Q. -- between Rowan and Bentley and the technician?
21 A. Yeah, that's what I assumed.
22 Q. You mentioned a rubber pad?
23 A. Yeah. I named it a gasket because that's what it
24 is.

Page 125

1  Q. Where was that located?
2  A. In between the front of the -- it was up against the
3  front of the lid, the foil lid, and under a plate
4  which went on top of it.
5  Q. Okay.
6  A. So it was compressed basically to some degree
7  anyway.
8  Q. So that it was pressing against the foil side of the
9  cartridge?
10 A. Yes.
11 Q. And it was forming a seal around the edge wall of
12 the cartridge?
13 A. It would form around the periphery of the cartridge,
14 yes, and depending on how they went in with the
15 piercer itself, I assume they had a pretty good seal
16 between the piercer and the rubber gasket.
17 Q. Do you know enough about the details of that?
18 A. No, I don't. I really don't because I didn't see
19 it.
20 Q. So you don't --
21 A. I'm just looking at what I read.
22 Q. So you don't know whether that seal formed right
23 around the needle or not?
24 A. No, I don't. I don't know the detail of that.

32 (Pages 122 to 125)

Page 130

1  leakage or spillage in the Kraft rig that they were
2  using?
3  A. I have no idea. I really don't know.
4  Q. So if they did have spillage as you've been
5  describing, would their tests --
6      MR. SCHLITZ: Objection. Misrepresents
7  his testimony.
8  BY MR. RADER:
9  Q. If they did have some spillage under the gasket or
10  whatever, would their tests have shown the cartridge
11  accommodating an inflow?
12  A. I mean I don't think they were really -- you know,
13  any test you make up isn't going to be perfect in
14  any -- it isn't really meant to. It's got a
15  product.
16  Q. Right.
17  A. One might expect leakage anyway, so to use that as a
18  benchmark is probably not reasonable. I mean I
19  would design it so it did not leak and then say,
20  Okay, it's not a benchmark. To say, you know, if
21  it's leaking is it a benchmark, I don't think so.
22  Q. Well, I guess my question was a little different.
23  If you are getting spillage even under a gasket,
24  would you consider that a demonstration of the

Page 131

1  cartridge accommodating an inflow?
2  A. Yeah, I think so because it's contained.
3  Q. So as long as it's contained?
4  A. That's all that matters, sure. It isn't the ideal
5  but it's contained.
6  Q. So now if you were designing an apparatus to test
7  out the same-side piercing technique with the
8  singles cartridges, would you want to verify the
9  results that you saw from Kraft in these three
10  documents?
11  A. No.
12  Q. Why not?
13  A. I'd rather design my own which would work better.
14  That's all.
15  Q. So you wouldn't rely on another party, you would
16  want to do your own?
17  A. Use my own, sure.
18  Q. Other than these three documents, Exhibit 13, 91 and
19  202, did you get any other documentation of any kind
20  of tests that the Kraft engineers did?
21  A. No, that's about it.
22  Q. Did you see a report -- again, other than these
23  three pages, did you see any other report prepared
24  by Mr. Bentley, for example?

Page 132

1  A. No, not that I can recollect anyway.
2  Q. If Mr. Bentley had prepared a report about the
3  testing that he did, is that something you'd want to
4  see?
5  A. I'd be interested, but it's not critical.
6  Q. Well, I guess you don't know what's in it, but --
7  A. I would be interested, but --
8  Q. Not knowing what's in it, is it possible that there
9  might be some information in that report that would
10  be important to you formulating your opinions?
11  A. I don't think so.
12  Q. Why do you say that?
13  A. Just because in my expert opinion what they had was
14  a rough test, and I wouldn't have used the
15  methodology which they did use, so anything I arrive
16  up with would be different, and I don't think there
17  is anything novel in what they did which would end
18  up outside of what I would learn if I did my own
19  test rig.
20  Q. And the test rig that you described that you might
21  use, did you actually go ahead and make any of
22  those?
23  A. I could if I wanted. I haven't.
24  Q. Okay. But in connection with your work on the case,

Page 133

1  you haven't done any of that?
2  A. No, I haven't done any other testing, no.
3  Q. Okay.
4      MR. SCHLITZ: Will you be taking a break?
5      MR. RADER: Why don't we take a couple of
6  minutes?
7      (Recess.)
8      (Exhibit 12, Patent 4,853,234 marked for
9  identification.)
10  BY MR. RADER:
11  Q. Mr. Taylor, I've now placed in front of you
12  Exhibit 12 which is a copy of the '234 Patent that
13  you studied; is that correct?
14  A. Right, yes.
15  Q. Can you begin by just describing in your own words
16  how this cartridge is described as operating, and
17  I'm referring to the embodiment that's shown on the
18  front page of the patent?
19  A. Yes, the main one, sure. Well, the water would come
20  up from the bottom and this is designed to run along
21  the manifold pathways in through castellations into
22  the coffee bed. This design has a gross filter for
23  holding back larger particles which are formed with
24  a lid on the top which is another foil lid, so it's

34 (Pages 130 to 133)

Page 170

1    that there were records from a Lambert line that had
2    been destroyed in the past?
3  A. Yeah, I think so.
4  Q. So you obviously didn't have those destroyed records
5    in front of you, right?
6  A. No, I didn't.
7  Q. So you don't know whether those destroyed records
8    show medium roast being manufactured on Lambert
9    lines?
10 A. No, I really don't know.
11 Q. So you can't really say with any degree of
12   confidence today that during that time period there
13   was no medium roast manufactured on Lambert lines
14   for which records have been destroyed?
15 A. I'm assuming, but I don't know, right.
16 Q. In your opinion is the ground coffee in a singles
17   cartridge a soluble beverage medium?
18 A. Yes, because solubility -- under the action of hot
19   water, it would take up coffee solids, and therefore
20   it's water soluble.
21 Q. Is your opinion the same for the ground coffee in
22   T-discs?
23 A. Yes, I believe so.  I mean the rates are different,
24   but --

Page 171

1  Q. You talk in your report about permeability of
2    cartridges?
3  A. Right.
4  Q. And do you recall talking about surface areas and
5    wall thicknesses --
6  A. Yes.
7  Q. -- of cartridges?
8  A. Yes.
9  Q. Did you do any independent testing of your own on
10   the surface area or wall thickness?
11 A. Yes, I did actually.  I did some measurement on the
12   walls to -- of each cartridge, actually.
13 Q. What measurement did you do?
14 A. Well, the singles is about 022 thick in thousandths
15   of an inch.  The T-disc was between 18 and 20
16   thousandths, of that order.
17 Q. So you used a caliper to measure those?
18 A. Yes.
19 Q. So there was a slight difference in the thickness?
20 A. Yes, thinner on the T-disc.
21 Q. What about surface area?  Did you do any
22   calculation?
23 A. Surface area is bigger because it's a diameter and
24   you actually have more surface area.

Page 172

1  Q. Did you run those numbers?
2  A. No, I didn't.  I made some rough measurements and it
3    looks larger.  I didn't run it.  I mean I had read
4    that somebody else had done it, so --
5  Q. But you yourself didn't actually do the calculation?
6  A. Not on that.  I did on the wall thickness.
7  Q. Okay.  What does frusto-conical mean?
8  A. That's a good question.  As I understand it it's a
9    cone with the top removed -- with the point removed.
10   If you have a cone and you cut it short, what's
11   remaining is a frusto-conical shape, if you like.
12 Q. Now, as part of your work on the case I understand
13   you reviewed certain deposition transcripts?
14 A. Yes, right.
15 Q. And those included Kraft engineers as well as some
16   Keurig personnel?
17 A. Only one I think from Keurig and that was
18   Mr. Lazaris, I think.
19 Q. Okay.  And you didn't follow up and have
20   conversations with any of the people whose
21   transcripts you read to sort of evaluate what they
22   were saying?
23 A. No, I haven't.
24 Q. Is it fair to say that in doing your analysis you

Page 173

1    had to assume that everything you were reading in
2    those transcripts was accurate?
3  A. Yeah.  That's the only thing I had, yes.
4  Q. So in doing your analysis for purposes of this case,
5    you couldn't -- given that you weren't actually
6    talking to these people, you couldn't dismiss
7    anything they were saying in their transcripts; is
8    that true?
9  A. I only had -- the only thing I had to rely on were
10   the transcripts.  Yeah, that's all I had.
11       MR. RADER:  Okay.  I thank you very much
12   for coming down today.  I'm done asking questions.
13   I know Mr. Schlitz has a few questions for you so
14   we'll turn it over to him.
15       MR. SCHLITZ:  I'm going to take a break to
16   figure out what I want to ask him.
17   (Recess.)
18 EXAMINATION BY MR. SCHLITZ:
19 Q. Mr. Taylor, I have a few questions that I would like
20   to ask you to clarify some of your statements
21   because I think that some of Mr. Rader's questions
22   were misleading and unfair.  I'd like the record to
23   be clear on this.
24       MR. RADER:  Objection.  Misleading.

44  (Pages 170 to 173)

Page 174

1    BY MR. SCHLITZ:
2    Q.  If you would turn to page 3 of your report, your
3        expert report?
4    A.  Page 3?
5    Q.  Yes, please, under summary of opinions; do you see
6        that?
7    A.  Yes.
8    Q.  The first two lines you say, "In my opinion the
9        Kenco's Singles Cartridge, and more specifically the
10       Kenco Singles Medium Roast Cartridge, embodies each
11       and every limitation of claims 1, 2, 8, 9 and 10 of
12       the '762 Patent"; do you see that?
13   A.  Yes.
14   Q.  Is that opinion based upon or dependent upon
15       Mr. Bentley's and/or Mr. Rowan's test?
16   A.  No.
17   Q.  What is that based on?
18   A.  Based on my own assessment of each of the elements
19       in the patent.
20   Q.  Okay.  But do you believe that Mr. Rowan and
21       Mr. Bentley's test and test results are sufficient
22       to prove that each element of these claims is
23       satisfied?
24   A.  Yes.

Page 175

1    Q.  Okay.  Now, Mr. Rader asked you whether you believed
2        that -- he asked you whether the '234 Patent to
3        Bentley described same-side piercing; do you
4        remember that?
5    A.  Yes.
6    Q.  And you answered no; do you remember that?
7    A.  Yes.
8    Q.  What did you mean did it describe same-side
9        piercing?
10   A.  What I meant, I think it was capable of same-side
11       piercing even though it isn't actually described,
12       but it's obviously capable because it has foil on
13       one side and non-foil on the other.
14   Q.  But when you say describe it, whether it describes
15       it, did you mean that it doesn't discuss same-side
16       piercing?
17   A.  Yes.  That's what I meant, yeah.
18   Q.  But in your opinion does the '234 Patent show a
19       structure that is capable of same-side piercing?
20   A.  Yes.  That's what I've said, right.
21   Q.  Okay.  Now, similarly he asked you some questions
22       whether the '234 Patent -- the structure in the '234
23       Patent is designed for same-side piercing; do you
24       remember that?

Page 176

1    A.  Yes.
2    Q.  And I believe you said no?
3    A.  Right.
4    Q.  But is the structure disclosed or shown in the '234
5        Patent capable of same-side piercing?
6    A.  Yes, absolutely.
7    Q.  And is it capable of -- is the lid section overlying
8        the first chamber where the coffee grounds are
9        stored or beverage is being stored capable of being
10       pierced to permit an inflow of liquid?
11   A.  Yes, absolutely.
12   Q.  Now, you talked about -- he asked you some questions
13       that elicited the response that it would be designed
14       to seal; do you remember that?
15   A.  Yes, I think so.
16   Q.  You kept talking about "it."  When you were
17       responding to those questions, what was the "it"
18       that you were referring to?
19            MR. RADER:  Objection to form.  You can
20       answer.
21   A.  It was --
22            MR. RADER:  You don't need my permission,
23       but --
24   A.  Well, I was referring to the brewer.  It isn't the

Page 177

1        package because the package is a passive device.
2        The only thing that can introduce any action is a
3        brewer.  I mean if you didn't have that, you
4        wouldn't have anything.
5    Q.  So all of those questions he asked you about what
6        you would design to create sealing, were you talking
7        about the cartridge or were you talking about the
8        brewer?
9    A.  No.  I was talking about the brewer and if I had to
10       design and build a test rig which had to do with
11       brewing rather than anything else, yeah.
12   Q.  Do you have any doubt that with a test rig or a
13       brewer that is properly designed for success, as
14       opposed to being designed for failure, that the
15       Kenco Singles Cartridge meets all of the elements of
16       the assorted claims?
17   A.  Yes, absolutely.
18   Q.  Now, if you would take Taylor Exhibit 12 -- before
19       we go to Exhibit 12, let me ask you, as a design
20       engineer if given the cartridge -- the Kenco Singles
21       Cartridge and asked to design a piercing mechanism
22       as part of a brewer for that to work in --
23   A.  Okay.
24   Q.  -- would you design it for success?

45 (Pages 174 to 177)

# EXHIBITS 3-8

## REDACTED IN THEIR ENTIRETY

## <u>RULE 7.1.1 CERTIFICATION</u>

I hereby certify that counsel for Plaintiff has complied with Rule 7.1.1 of the Local Rules

of Civil Practice and Procedure of the United States District Court for the District of Delaware.


_/s/ Adam W. Poff_
Adam W. Poff (No. 3990)