IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED –**<br>**PUBLIC VERSION** |

**KEURIG'S MOTION *IN LIMINE* NO. 3 – MOTION TO PRECLUDE KRAFT FROM INTRODUCING PURPORTED PRODUCTION RECORDS AND OTHER DOCUMENTS NOT QUALIFYING FOR THE BUSINESS RECORDS HEARSAY EXCEPTION**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

Keurig requests an order prohibiting Kraft from introducing (1) purported production records for Kenco Singles cartridges and (2) various faxes and other documents from Kraft employees Janice Appleton, Helen Glus, and Geraldine Greto ostensibly related to *ad hoc* shipments of Kenco Singles cartridges from England to the United States. The documents are classic examples of hearsay, and no exception is applicable.

The deposition of Michael Tamblin, who generated the production records for purposes of this litigation, revealed that he knows nothing about the underlying record-keeping procedures. He therefore is unable to lay the necessary foundation for the document as a business record under Fed. R. Evid. 803. For their part, Ms. Appleton, Ms. Glus, and Ms. Greto admit that they did not maintain Kenco Singles shipping documents (let alone complete sets of such documents) in the ordinary course of their business duties. They instead selectively preserved certain documents, without being able to identify a business-related reason. Their documents therefore do not qualify as business records either.

## I.    BACKGROUND

Kraft alleges that the Kenco Singles Medium Roast cartridges anticipate Keurig's '762 patent. Before that allegation could even be assessed on its merits, Kraft would as a threshold matter need to establish that Medium Roast cartridges were in public use in the United States prior to February 18, 1999 (the priority date of the '762 patent). See 35 U.S.C. § 102(b). Kraft produced copes of facsimile transmissions and other documents retained by Ms. Appleton (in England) and Ms. Glus and Ms. Greto (in the United States) in an attempt to corroborate their testimony that Ms. Glus and Ms. Greto worked with Ms. Appleton to obtain supplies of Kenco Singles cartridges for use in two of Kraft's U.S. offices. Examples of the documents in question are attached hereto as Exhibit 1.

Kraft has two types of production lines at its Banbury, England facility – lines built by the Lambert company that produce cartridges with an open inlet, and lines built by the Rychiger company that produce cartridges with a sealed inlet.  In its public use defense, Kraft seeks to rely on the Rychiger cartridges with the sealed inlet, and therefore bears the burden of proving by clear and convincing evidence that Singles cartridges used in the United States at the relevant time were made on the Rychiger line.  Kraft has focused its strategy on Singles cartridges of the Medium Roast variety, proceeding under the theory that all of the Medium Roast cartridges manufactured during the relevant time period came off the Rychiger line.



Kraft produced purported "production records" that do not reflect any production of Medium Roast Singles cartridges on Lambert lines between November 1996 and December 1998.



In any event, Kraft designated one of its UK employees, Michael Tamblin, to testify about the production records, and Keurig deposed him in England on April 2, 2008.  Mr. Tamblin testified that while he ran the query that generated the production report for purposes of the litigation, he was unfamiliar with the underlying data or how it had been recorded.

## II.    ARGUMENT

### A.    The Documents Are Inadmissible Hearsay.

The production record is classic hearsay under Fed. R. Evid. 801(c), as Kraft seeks to use it as evidence of what it purportedly states – i.e., that all Singles production from November 1996 to December 1998 occurred on Rychiger Lines rather than Lambert lines.

The Appleton, Glus, and Greto documents are also hearsay because Kraft would offer them to corroborate the witnesses' testimony.  Cf. Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1172 n.10 (Fed. Cir. 2006) (documents offered to corroborate inventor's testimony are hearsay and must qualify under an exception to be admissible); Chen v. Bouchard, 347 F.3d 1299, 1308 (Fed. Cir. 2003) (affirming exclusion of corroborating documents in patent case).

### B.    The Business Records Exception Does Not Apply.

The "business records" hearsay exception does not apply to the production records or the Appleton, Glus, and Greto documents because, as discussed below, none of those witnesses can lay the necessary foundation.  In both cases, moreover, the surrounding circumstances "indicate lack of trustworthiness" in that the records are incomplete and therefore unreliable.

#### 1.    Kraft Cannot Satisfy the Foundation Requirement.

To introduce the documents as business records under Fed. R. Evid. 803(6), Kraft would have to present foundation testimony from "the custodian or other qualified witness" that (1) the documents' creators had the personal knowledge necessary to make accurate statements; (2) they recorded the statements contemporaneously with the actions that were the subject thereof; (3) they made the records in the regular course of their business activity; and (4) such records were regularly kept by the business.  United States v. Pelullo, 964 F.2d 193, 200-202 (3d Cir. 1992) (district court erred in admitting hearsay documents without adequate Rule 803(6) foundation).

- 3 -

Mr. Tamblin's testimony would not satisfy <u>any</u> of the foundational requirements for the production records. He has never entered Singles production data, nor is he familiar with the circumstances under which others do so. Indeed, a number of the columns in the production spreadsheet are a mystery to him; he simply does not know their significance. <u>See</u> Tamblin Depo. (Ex. 3) at 16, 26, 41-42. Mr. Tamblin does not even know the difference between Rychiger and Lambert production lines – undercutting the very reason why Kraft desires to introduce these records in the first place. <u>Id.</u> at 12. Kraft's attempt to admit the production records on Mr. Tamblin's testimony thus invites legal error. <u>United States v. Riley</u>, 236 F.3d 982, 984-85 (8th Cir. 2001) (requiring new trial because hearsay evidence was introduced without a witness who had personal knowledge of how the records were prepared or maintained); <u>Kolmes v. World Fibers Corp.</u>, 107 F.3d 1534, 1543-44 (Fed. Cir. 1997) (exclusion of documents proper where witness "failed to testify concerning the record-keeping process").

For similar reasons, the partial records retained by Ms. Appleton, Ms. Glus, and Ms. Greto fail to qualify as business records because they were not regularly kept in the ordinary course of business. ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

Ms. Greto likewise collected data "on [her] own" and not at the request of her superior, and Ms. Glus emphasized that retaining records regarding Kenco Singles orders "wasn't part of [her] business duties." Rather, the records were "just something [that she] kept just for [her]self." <u>See</u> Greto Depo. (Ex. 5) at 94; Glus Depo. (Ex. 6) at 97-98. <u>See</u> <u>United States v. Ferber</u>, 966 F. Supp. 90, 98 (D. Mass. 1997) (records were inadmissible because there was no evidence that employer "required [them] to be maintained").

### 2.    The Documents Are Incomplete and Untrustworthy.

Even if Kraft <u>were</u> able to satisfy the threshold requirements under Fed. R. Evid. 803(6),

the Court should still exclude the documents in question because the circumstances "indicate

lack of trustworthiness."  Sworn admissions confirm that the documents are incomplete.



Such gaps render the records

untrustworthy; the omissions deny the jury a full understanding of the context of the shipments

and supposed "public use" in the United States.

### III.    CONCLUSION

For the above reasons, Kraft should be precluded from offering into evidence the Kenco

Singles production records (Bates Range K-ED-00126677-129858) or the documents

purportedly corroborating testimony from Ms. Appleton, Ms. Glus or Ms. Greto regarding

alleged shipments of Kenco Singles cartridges to the United States (Bates Range K0017156-

17308 and K0017464-17502).

DB02:7054260.1                                                                            065927.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
apoff@ycst.com
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

- 6 -

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 11, 2008, a true and correct

copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
David E. Moore, Esquire [*dmoore@potteranderson.com*]
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

Additionally, I hereby certify that on August 11, 2008, copies of the foregoing

document were served by e-mail on the above-listed counsel of record and on the following non-

registered participants in the manner indicated below:

## BY E-MAIL

David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
John W. Shaw (No 3362)  [*jshaw@ycst.com*]
Adam W. Poff (No. 3990) [*apoff@ycst.com*]
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 1



# M E M O R A N D U M

January 6, 1998

**TO:**    Janice Appleton    **AT:**  KJS Maxpax International, Banbury, UK
                                **Fax:** 8-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-273152 / **Tel:** 44-1295-223471

**FROM:**  Geri Greto    **AT:**  KF Coffee & Cereal Technology, Tarrytown, NY
                          **Fax:** 914-335-4367 / **Tel:** 914-335-4350

**SUBJECT:**  <u>KENCO COFFEE CARTRIDGES</u>

---

Hi Janice - are you still the contact person to arrange for shipment of Kenco Cartridges; I found a correspondence between you and I of July, '96?

I am the administrator for Bill Craig, Technology Director, and we would like to order the following for the Kenco Machine in our pantry:

One Case of Each:

    Hot Chocolate
    Espresso
    Cappuccino
    Earl Grey Tea

When you get an opportunity, could you let me know if you can handle this or if I should be contacting someone else.

Thank you - regards,

*Geri*

Maxpax

06 JAN '98 16:39                              914 335 4367        PAGE.01

K 0017170

## Glus, Helen

**From:**       Glus, Helen
**Sent:**       Thursday, October 22, 1998 5:37 PM
**To:**         Court, Caroline (KJS-UK)
**Subject:**    RE: Flight details
**Importance:** High

*Caroline,*

*Thanks for the notice of shipment.  Our stock arrived today.  One thing, though, instead of three boxes of Cappuccino, we received three boxes of Fine Leaf Tea.  We will keep them as we are eager to try something new, but could you arrange for shipment of the Cappuccino as well.  I can't let down the people who can't get through the day without a cup of Cappuccino!*

*Many thanks and kind regards,*

*Helen Glus*

**From:**       Court, Caroline (KJS-UK)
**Sent:**       Thursday, October 15, 1998 1:30 PM
**To:**         Glus, Helen
**Subject:**    Flight details

Helen
Flight details for your shipment of Singles is as follows:
Flight No. UA797 from London Heathrow to JFK 16.10.98
ETA New York - 21.05 16.10.98
MAWB No. 016-3483 4520

Best Regards

Caroline

K  0017180

# Kraft Jacobs Suchard

**Maxpax International**

**Facsimile Transmission**

To:      Helen Glus

cc:

From:     Liz Matthews, Secretary to Doug Halliday

Page 1 of:    1

if you receive illegible pages, please call: +44 1295 223400
or fax: +44 1295 223540

Date:     07/11/96

Subject:

Further to your letter to Doug, I am arranging for the requested product to be sent to you ASAP along with a capsule storage unit (branded Kenco) which Mr Camilleri requested.

I will contact you again shortly to let you know when and how the products will arrive.

When you need more supplies, please contact me on the telephone/fax number above, and I will arrange to get them sent.

Regards.

*Liz Matthews*

**Liz Matthews**



**Maxpax International**
**Kraft Jacobs Suchard Limited**
**Banbury**
**Oxon OX16 7QU**
**UK**

K 0017221

## Greto, Geri (MS Mail)

| | |
|---|---|
| From: | Greto, Geri (MS Mail) |
| To: | Nunn, Pat |
| Subject: | KENCO SINGLES CARTRIDGES |
| Date: | Thursday, May 18, 1995 11:10AM |
| Priority: | High |

Project Michigan is a great success here - and our supply is dwindling!

When you get an opportunity, could you ship us the following:

| FLAVOR | # OF CARTONS |
|---|---|
| Hot Chocolate | 2 |
| Medium Roast | 2 |
| Dark Roast | 1 |
| Light Roast | 1 |
| Decaf Roast | 3 |
| Hot Cappuccino | 2 |
| Earl Grey Tea | 2 |

Thank you in advance for your attention to our request,

       Geri

P. S.      I tried to send this message to you by Fax, but I keep getting a line failure - is your fax # 44-295-258015 ?



K  0017240

**Greto, Geri (MS Mail)**

*6/26*
*forwarded*
*to (MS Mail*

| | |
|---|---|
| **From:** | Greto, Geri (MS Mail) |
| **To:** | Nunn, Pat |
| **Subject:** | Kenco Singles |
| **Date:** | Monday, June 24, 1996 3:45PM |

Hi Pat, how are you?

It is time for me to order more cartridges, but I do realize that I keep contacting you, but that I really should be contacting Doug Halliday's assistant.  Back in February I made a notation by his name that his secretary's name was Liz, but I do not know her last name or her fax number.  Could you please forward this info to me.

Thanks so much for your help,

Geri

K  0017269

# EXHIBIT 2

THIS EXHIBIT HAS BEEN
REDACTED IN ITS
ENTIRETY

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

————————————————————————  :
                                              :
KEURIG INCORPORATED                           :
                                              :
                    Plaintiff     : Civil Action No.
                                  : 07–017 GMS
                  v               :
                                  :
KRAFT FOODS GLOBAL, INC           :
TASSIMO CORPORATION, and          :
KRAFT FOODS INC,                  :
                  Defendants      :
————————————————————————  :


VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL TAMBLIN

On Wednesday, 2nd April 2008


Commencing at 10.24 am


Taken at:
Baker Botts
41 Lothbury
London
EC2R 7HF
United Kingdom


Reported by: Miss Pamela Henley

KEURIG v KRAFT                2 APRIL 2007        DEPOSITION OF M. TAMBLIN

Page 10

Tamblin - Rader

1
2     A.    Six to eight months.  He is about
3  to finish.  It was only an assignment.
4     Q.    Someone else will replace him?
5     A.    Yes.
6     Q.    Prior to him you do not recall the
7  name of the person who did that?
8     A.    Prior to him it was a guy called
9  Paul Watts.
10     Q.    How long was he there?
11     A.    Four years, five years, perhaps.
12     Q.    Is the job of Mr Watts and
13  Mr Caiger -- is that analogous to what you do for
14  the other products?
15     A.    No, because they are based on days
16  as opposed to being a shift manager.
17     Q.    What is the difference?
18     A.    The difference mainly is that in
19  the Maxpax facility the day role was to do the
20  planning of the labour as I understood it, and the
21  actual running of the lines was assigned to what
22  they called team leaders who were really the line
23  technicians.
24     Q.    I see. So Mr Watts and Mr Caiger
25  their job would be to manage the labour, but not

Page 11

Tamblin - Rader

1
2  the lines themselves?
3     A.    That is right.
4     Q.    Do you know who the team leaders
5  have been over the years?
6     A.    I really do not know.  I have never
7  had any involvement over there.
8     Q.    Okay. In your facility it is
9  different because you...
10     A.    You had a manager on each shift
11  because it was a bigger operation.
12     Q.    So you essentially fill the roles
13  of both managing the labour and the lines
14  themselves?
15     A.    Yes.
16     Q.    So in your current job as
17  production manager and coffee packing --
18     A.    That is not my current job.
19     Q.    -- oh, sorry, that was your prior
20  job?
21     A.    Yes.
22     Q.    As the plant master data control
23  co-ordinator, your current job, that job does
24  encompass data for singles cartridges?
25     A.    Only the input in to make the

Page 12

Tamblin - Rader

1
2  recipe, yes.
3     Q.    When you say the recipe you mean
4  all the things --
5     A.    That make up the final SKU. Yes.
6     Q.    -- so in what -- in your current
7  job do you work in the same building as the
8  singles production lines?
9     A.    No.
10     Q.    Do you go over there at all?
11     A.    Very, very infrequently.  The last
12  time I went over was probably nine months ago.
13     Q.    Are you familiar with the Lambert
14  and Rychiger packing lines for singles cartridges?
15     A.    No, not at all.
16     Q.    Do you know how many packaging
17  lines there are for singles cartridges?
18     A.    I think it is four, but I am not
19  sure.
20     Q.    Do you how many lanes they each
21  have?
22     A.    No, not at all on that, no.
23     Q.    On the singles lines over the years
24  do you know what their procedures have been for
25  moving crews to different lines if they have

Page 13

Tamblin - Rader

1
2  breakdowns?
3     A.    I have no idea. As I say I have
4  never been involved in that department.  I really
5  do not know how it was managed.
6     Q.    Okay. The court reporter before you
7  came in marked what we are calling Exhibit 201,
8  which is a partial printout of some of the data
9  that we received.  The total data was several
10  thousand pages so I decided not to print out the
11  entire thing, but this is taken from the very
12  beginning of the 1994 section of the data.  Does
13  this document look familiar to you?
14     (Exhibit 201 marked for identification.)
15     A.    Yes, I think it is from the Excel
16  spreadsheet I provided.
17     Q.    Tell me about the Excel spread
18  sheet that you provided?
19     A.    What do you want to know? That data
20  is taken by a query and imported into Excel from
21  the -- what is now called our productivity server
22  which retains all this information.
23     Q.    What is the productivity server?
24     A.    It is for each area we have, as I
25  said, a coffee area, a Maxpax area, a flexibles

MARTEN WALSH CHERER LTD 12-14 NEW FETTER LANE        LONDON EC4A 1AG
TEL: 020 7936 6000   E-MAIL: info@martenwalshcherer.com  FAX: 020 7427 0093

KEURIG v KRAFT                    2 APRIL 2007        DEPOSITION OF M. TAMBLIN

Page 14

Tamblin - Rader

1
2    area. At one time we did have an R&G, which was
3    roast and ground coffee but that has been sold.
4    But for each area every shift the information
5    would be input into this system to record what we
6    have produced against what SKU.
7        Q.    So is there a terminal at each
8    production line?  Is that how it works?
9        A.    No, it is a server which is linked
10   to the computers in the production offices.  So
11   there would have been one in coffee packing where
12   I worked.  Obviously one in flexibles packing, one
13   in Maxpax.  There was also one in R&G when it
14   existed.  But as I say that has now been sold off.
15       Q.    Is Maxpax the -- another name for
16   the singles production area?
17       A.    That is where the singles occurs,
18   yes.  The original Maxpax business was an
19   in-cup --
20       Q.    I see.
21       A.    -- business.
22       Q.    So when you say "Maxpax" you are
23   referring to singles nowadays?
24       A.    It still produces in-cup as well so
25   it is just the building in which it produces

Page 15

Tamblin - Rader

1    everything, in-cup and the singles.
2        Q.    So when you say "Maxpax" you are
3    talking about that building?
4        A.    Yes, the Maxpax business.  That is
5    what it refers to.
6        Q.    So there is a computer in that
7    Maxpax building that links up to the productivity
8    servers?
9        A.    Yes.
10       Q.    And that computer has software on
11   it that allows you to enter this kind of data?
12       A.    That is correct.
13       Q.    That data gets stored on a central
14   server?
15       A.    Yes.
16       Q.    Where is that server?
17       A.    It is located in Banbury.
18       Q.    There is -- in each of the
19   production buildings there is a computer like
20   that?
21       A.    Yes.
22       Q.    So in -- there was one in the
23   coffee packing facility where you worked?
24       A.    That is correct, yes.

Page 16

Tamblin - Rader

1
2        Q.    Did you enter data on that
3    computer?
4        A.    On the coffee packing, yes.
5        Q.    Were you -- when you were the
6    production manager through 2005 was it your job to
7    enter data into that computer?
8        A.    That is correct, yes, for my shift.
9        Q.    How many shifts were there?
10       A.    In coffee packing there is three
11   shifts; a morning shift, an afternoon shift and a
12   night shift.  So each manager would be responsible
13   for entering their own information.
14       Q.    You never entered singles data like
15   what we have in Exhibit 201 into their computer?
16       A.    No.
17       Q.    Were you ever present when anyone
18   entered data into that computer?
19       A.    Not at all, no. As I say it is a
20   different building entirely.
21       Q.    Is it the same software or
22   different software?
23       A.    Same software, yes.
24       Q.    Now, what is the purpose of
25   entering the data into that productivity server?

Page 17

Tamblin - Rader

1
2        A.    To provide a record.  It is normal
3    business practice at Kraft to record what each
4    shift has produced against each SKU.
5        Q.    In the facility where you were
6    working in coffee packing as the shift supervisor
7    was it your responsibility to do that?
8        A.    Yes.
9        Q.    For each of the three shifts it was
10   the shift supervisor who did that?
11       A.    That is correct.
12       Q.    Did anyone else ever enter the data
13   on that facility besides the shift supervisors?
14       A.    No.
15       Q.    What would have happened if you
16   were sick one day or on vacation --
17       A.    There would be cover provided and
18   then that shift manager would have entered the
19   information.
20       Q.    -- okay. What happens to that data
21   after it goes into the productivity server? Is it
22   used for anything?
23       A.    It is used to generate reports
24   internally, so we can track things like is the
25   line running efficiently, how much labour is

MARTEN WALSH CHERER LTD 12-14 NEW FETTER LANE        LONDON EC4A 1AG
TEL: 020 7936 6000   E-MAIL: info@martenwalshcherer.com  FAX: 020 7427 0093

KEURIG v KRAFT                  2 APRIL 2007         DEPOSITION OF M. TAMBLIN

---

Page 26

Tamblin - Rader

1
2       Q.    How would the data at the end of
3   the day -- when you were working in coffee packing
4   when did you enter the data; at the end of the
5   day?
6       A.    End of the shift. End of the
7   working shift.
8       Q.    Do you know when the singles folks
9   entered the data in the Maxpax building?
10      A.    I do not know.
11      Q.    At the time of the shift when you
12  entered the data did you also have a line code and
13  a line number to enter?
14      A.    Yes.
15      Q.    How would you decide -- I assume
16  you would decide the line code based on which line
17  was running?
18      A.    That is correct. Yes.
19      Q.    How would you decide what to put in
20  for the line number?
21      A.    Because the SKU is linked to that
22  line number within the computer programme itself.
23      Q.    So that field is populated
24  automatically?
25      A.    Yes.

---

Page 27

Tamblin - Rader

1
2       Q.    The programme, were there like drop
3   down menus for data, or are you typing all the
4   data in?
5       A.    You would start off by typing the
6   shift date, and what shift you were; mornings,
7   afternoons or nights. But, essentially, after
8   that it was all drop down.
9       Q.    So it was all -- you were just
10  choosing from a menu --
11      A.    Apart from the product code. Once
12  you put the product code you had to enter,
13  everything else after that was drop down choice
14  from a menu.
15      Q.    -- so you entered the product code
16  and would the description automatically pop up?
17      A.    That is right.
18      Q.    And then the line code, would you
19  have to choose that?
20      A.    Not if it was unique to that line.
21  That would be automatically populated.
22      Q.    But on the singles side are the
23  particular products unique to specific lines?
24      A.    I really do not know.
25      Q.    In the work that you were doing

---

Page 28

Tamblin - Rader

1
2   your product was unique to specific lines?
3       A.    That is correct, yes.
4       Q.    What would happen if a line broke
5   down and you were going to manufacture the product
6   on a different line?
7       A.    You could not physically do that.
8   Each line was specific to a jar size.
9       Q.    So if one of your lines broke down
10  you would have to wait until it was fixed?
11      A.    Or move the crew to a different
12  line and produce a different SKU.
13      Q.    So if you wanted to produce that
14  same SKU --
15      A.    You would have to wait.
16          BY MR FOSTER:
17      Q.    Just for the record, Mr Tamblin,
18  are you speaking about the coffee business --
19      A.    This is --
20      Q.    -- or are you speaking of the
21  singles business?
22      A.    -- no, I am purely talking about
23  coffee here.
24          BY MR RADER:
25      Q.    When you were working in the --

---

Page 29

Tamblin - Rader

1
2       A.    The coffee production business.
3       Q.    -- okay. You do not know whether
4   the various lines in the singles side would
5   support the same product?
6       A.    No, I do not, no.
7       Q.    So you do not know whether the line
8   code would have popped up automatically or whether
9   they would have to choose that from a menu?
10      A.    No, I would not know.
11      Q.    Then in your experience working on
12  the coffee side the line number, would that pop up
13  automatically, or would you have to choose that --
14      A.    That would coffee, yes, because,
15  again, it is unique.
16      Q.    -- do you know whether it would for
17  singles?
18      A.    Again, I would not know.
19      Q.    And the next column "CONT"; do you
20  know what that means?
21      A.    That was whether the line ran
22  continually. So an eight hour shift whether it
23  was crewed to run for eight hours or whether you
24  part crewed it and then people had their meal
25  break. So the option was a yes or a no which was

---

8 (Pages 26 to 29)

KEURIG v KRAFT                    2 APRIL 2007        DEPOSITION OF M. TAMBLIN

Page 38

Tamblin - Rader

1           Tamblin - Rader
2    should have M for the area?
3        A.    Should do, yes.
4        Q.    And then in column M, the shift;
5    what does that refer to?
6        A.    That refers to the shift that has
7    produced that SKU, or that A shift, B shift or N
8    for nights.
9        Q.    So A is morning?
10       A.    They rotated. So A shift would do a
11   morning shift one week, an afternoon shift the
12   next, but they were always A shift, and B shift
13   were the reverse.
14       Q.    The people on that team would
15   either be part of A or B?
16       A.    Yes.
17       Q.    Then column N, the quarter, what
18   does that refer to?
19       A.    It is the business year spread up
20   into four quarters.
21       Q.    Is that field automatically
22   populated?
23       A.    No, again, it is a choice, but it
24   is from a drop down.
25       Q.    So it did not follow automatically

Page 39

1           Tamblin - Rader
2    from the date that was entered?
3        A.    No.
4        Q.    And then the week number, column O?
5        A.    Each quarter had 13 weeks so that
6    would refer to the week of that particular
7    quarter.
8        Q.    So when you were doing this for
9    coffee you were always aware of what week you were
10   in?
11       A.    Yes.
12       Q.    The shift hours column; what is
13   that?
14       A.    That is the length of the shift.
15   So eight hours would say it is an eight hour
16   shift.
17       Q.    The length of a typical shift in
18   coffee was how long?
19       A.    Eight hours.
20       Q.    That includes --
21       A.    On double days. Night shift was
22   eight hours, apart from Friday where it was ten
23   hours.
24       Q.    -- do you know what the shift
25   lengths were over in singles?

Page 40

1           Tamblin - Rader
2        A.    Exactly the same across the whole
3    site. Singles, Maxpax, flexibles and coffee.
4        Q.    Column Q, EFF; what is that?
5        A.    That is the efficiency. So that
6    would be the efficiency that that SKU was produced
7    at.
8        Q.    How is that number calculated?
9        A.    That is calculated from the
10   programme.
11       Q.    What does it represent?
12       A.    For the amount of time that that
13   particular SKU was booked then it calculates that
14   efficiency based on what the standard line speed
15   is.
16       Q.    So it is calculating it based on
17   how many cases came out?
18       A.    How many cases came out, yes.
19       Q.    On the second page in row 2, the
20   efficiency is 37, just over 37; do you see that?
21       A.    Yes.
22       Q.    What does that mean; is that 37 per
23   cent of something?
24       A.    It was 37 per cent of what the line
25   was rated at for the time that the SKU was booked.

Page 41

1           Tamblin - Rader
2    Which would refer back to the front sheet where it
3    was five and a half hours, produced 49 cases.
4        Q.    So in theory the line should have
5    been able to produce more?
6        A.    Looking at that figure, yes.
7        Q.    Were the shifts compared with A and
8    B for efficiency, that kind of thing?
9        A.    It certainly was in coffee, yes.
10   That was one of the reasons why I was doing this
11   type of analysis.
12       Q.    I see, okay. What about the next
13   column, detail?
14       A.    I really do not know what that is.
15   That was never an input.
16       Q.    Flipping to the next page, the next
17   column has at the "top EFF"; what is that?
18       A.    Again, I do not know what that is,
19   what that is referring to.
20       Q.    Do you know what the "BOT EFF" is?
21       A.    No, I do not know that either.
22       Q.    Column U "UNITS_CASE"; do you know
23   what that is?
24       A.    That would refer to the number of
25   individual units that go into the case. So the

MARTEN WALSH CHERER LTD  12-14 NEW FETTER LANE        LONDON EC4A 1AG
TEL: 020 7936 6000   E-MAIL: info@martenwalshcherer.com   FAX: 020 7427 0093

KEURIG v KRAFT                    2 APRIL 2007        DEPOSITION OF M. TAMBLIN

Page 42

1           Tamblin - Rader
2   top one it would be 160.
3       Q.   So 160 singles cartridges in a
4   case --
5       A.   Case.
6       Q.   -- then 375 in-cups in a case? The
7   lemon drink?
8       A.   Yes, that would be the in-cups,
9   yes.
10      Q.   What is column V, the conversion?
11      A.   I am really not sure what that
12  conversion refers to.
13      Q.   What about column W, the "PHYS_KG"?
14      A.   That would be the physical weight
15  of the case.
16      Q.   Over in coffee did you actually
17  weigh the case?
18      A.   They were standard weights because
19  of the configuration.
20      Q.   So that was not data that you had
21  to enter?
22      A.   No, not at all.
23      Q.   Was that true, if you know, on the
24  singles side?
25      A.   I do not know, but, again, it was

Page 43

1           Tamblin - Rader
2   written exactly the same so I would have thought
3   they would not have to.
4       Q.   What about the next column,
5   component?
6       A.   That refers to what was our
7   desserts business.  A code could be a component or
8   not a component.  An example which I can only give
9   from a desserts business is we produce sachets
10  which would then go into the final SKU so that
11  sachet would be a component, it would not be the
12  final SKU.  It was a way of tracking how efficient
13  it was.  So it should all be N for no.  Again, I
14  do not understand what the zero is.
15      Q.   I am sorry, one more time, what
16  would it mean to call something a component?
17      A.   If it was going to be used in
18  another pack which eventually became the final
19  SKU.
20      Q.   It did not have its own SKU number
21  if it was part -- it would go into something which
22  had a SKU number?
23      A.   Correct.
24      Q.   So you would think that on singles
25  and in-cup it would all be no?

Page 44

1           Tamblin - Rader
2       A.   That is what I would have thought,
3   yes.
4       Q.   Do you think those are a mistake in
5   that column?
6       A.   I think they probably are.
7   Because, again, that is not something that is
8   entered by the manager. That should be within the
9   programme.
10      Q.   So for the rows that have the O
11  instead of the N for the component would you trust
12  the rest of the data on those rows?
13      A.   Yes, looking at it I would say that
14  would be accurate, yes.
15      Q.   Any idea how the Os could have
16  gotten in there?
17      A.   No, I really do not know.
18      Q.   Column Y, the line speed; what does
19  that refer to?
20      A.   Speed of the line and units per
21  minute.
22      Q.   Is that the actual speed or the
23  theoretical speed?
24      A.   That is the theoretical.
25      Q.   Let us go on to the next page.

Page 45

1           Tamblin - Rader
2   Column Z, "STD_CREW"; what is that?
3       A.   Sorry, which page are we on now?
4       Q.   It is going to be the fourth page.
5   Column Z?
6       A.   Oh, standard crew.
7       Q.   What does that refer to?
8       A.   That would be what the ideal
9   crewing would be.
10      Q.   And if it is not a whole number
11  like the 4.6 on that page what does that mean?
12      A.   That means that one operator would
13  be doing something else for a portion of the time.
14      Q.   I see. Then the double AA column
15  "LINE DESC"; what is that?
16      A.   That is the line description for
17  each of the lines in that area.
18      Q.   So Lambert 3, Lambert 1, those B
19  lines that produced singles cartridges?
20      A.   Yes.
21      Q.   If it says line 3, line 7 it would
22  be producing in-cup?
23      A.   That is correct.
24      Q.   How does that compare to column C,
25  the line code? Is that the same information?

MARTEN WALSH CHERER LTD 12-14 NEW FETTER LANE        LONDON EC4A 1AG
TEL: 020 7936 6000   E-MAIL: info@martenwalshcherer.com  FAX: 020 7427 0093

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

Page 1

1   UNITED STATES DISTRICT COURT
2   DISTRICT OF DELAWARE
    ---------------------------------------------X
3   KEURIG, INCORPORATED,
4                         Plaintiff,
    -against-
5
    KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION &
6   KRAFT FOODS, INC.,
7                         Defendants.
    ---------------------------------------------X
8
9
                          555 South Broadway
10                        Tarrytown, New York  10591
11
                          March 5th, 2008
12                        2:00 p.m.
13
14
15          Videotaped Deposition of the Defendant,
16   by: GERALDINE A. GRETO, held pursuant to Court
17   Order, at the above time and place, before Notary
18   Public of the State of New York.
19
20
21
22
23       ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                  REF: 86864

                    GRETO
1
2          Q      Keurig's counsel asked you about
3    feedback from users of the cartridges. Do you
4    remember that?
5          A      Right.
6          Q      Are you aware of that?
7          A      Uh-huh.
8          Q      And you said you collected it and
9    gave it to your boss; is that right?
10         A      Right.
11         Q      Did your boss ask you to collect
12   that data?
13         A      No, I just did it because I
14   counted all the cartridges and I just did it on my
15   own.
16         Q      But he didn't -- but there was no
17   -- was there any form that he asked you to fill out
18   and collect information?
19         A      No.
20         Q      Was there any -- did he ask you to
21   survey your co-workers?
22         A      No.
23         Q      Okay now, earlier Keurig's counsel
24   asked you about the Kenco Singles capsule.  He
25   showed you this Gevalia capsule, but he asked you

                    GRETO
1
2    about the Kenco Singles capsule and he asked you,
3    was there always a hole. Do you remember that?
4          A      Yes.
5          Q      And you answered yes, there was a
6    hole; is that right?
7          A      Yes.
8          Q      Do you know if that hole was
9    always open in the sense that there was no lid or
10   foil in the hole?
11         A      I'm thinking you could see foil in
12   the hole. I think I remember that. It wasn't open.
13                MR. HRYCYSZN:   I object to the
14           sigh from opposing counsel.
15                MR. SCHLITZ: I mean, I'm just
16           trying to think.  That is fine.  I'm
17           very happy with that answer.  So there
18           is no sigh. Okay --
19         Q      Well, let me ask you one more
20   question.  In answering Keurig's counsel's
21   questions, did you mean to say that this hole was
22   always open?
23         A      I can't recall.
24         Q      Okay.  Do you recall that
25   sometimes it may have had foil?

                    GRETO
1
2          A      Right.
3                MR. HRYCYSZN:  Objection,
4           leading.
5                MR. SCHLITZ:  Okay, that's what
6           she said, I have no further questions.
7                MR. HRYCYSZN:   I do have a
8           couple of quick follow-up questions
9           based on the testimony here.
10   EXAMINATION BY MR. HRYCYSZN:
11         Q      Ms. Greto, do you know if Mr.
12   Craig had asked anybody else to gather feedback
13   regarding the use of Kenco Singles cartridges at the
14   White Plains office or at the Tarrytown office?
15         A      No.
16         Q      So you don't know if he had?
17         A      He didn't and --
18         Q      So you know for certain that he
19   had not asked anybody else.  Is that what you're
20   saying?
21         A      If they used it?  I don't
22   understand what your question is.
23         Q      Let me go ahead and rephrase my
24   question. Do you know for a fact, that Mr. Craig did
25   not ask anybody else other than yourself, to collect

                    GRETO
1
2    feedback regarding the use of the Kenco Singles
3    cartridges, at either the White Plains office or at
4    the Tarrytown office?
5          A      He didn't ask anyone else to
6    collect feedback.  He didn't ask me to collect
7    feedback.
8          Q      How do you know that?
9          A      Because he didn't ask me.  I just
10   did it.
11         Q      Okay, but how do you know he
12   didn't ask anybody else who worked under him?
13         A      I don't know of him asking anyone
14   then, I guess.
15         Q      So he could have asked somebody
16   else to collect that information; is that correct?
17                MR. SCHLITZ:  Objection.
18           Speculation.  You're calling for
19           speculation.
20         Q      Can you answer the question?
21         A      Well, the way you're putting it,
22   he could have.  Unless I'm standing there with him,
23   I guess he could have.  But I don't know of any, of
24   him ever doing that.
25                MR. HRYCYSZN:  No further

**EXHIBIT 6**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-------------------------------------------X

KEURIG, INC.,

                    Plaintiff,

     – against –

KRAFT FOODS GLOBAL, TASSIMO CORPORATION,
KRAFT FOODS INTERNATIONAL,

                    Defendants.

C.A. NO. 07–17 GMS

-------------------------------------------X

                  120 Park Avenue
                  New York, New York

                  March 4, 2008
                  2:00 P.M.

     Examination Before Trial of HELEN GLUS,

pursuant to Notice, taken by and before Renee

S. Harris, a Notary Public and Shorthand

Reporter of the State of New York.

        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
            New York, New York 10022
               212-750-6434
               REF: 86800

Page 94

```
1              GLUS
2       A.  Correct.
3            MR. HRYCYSZYN:  I think that's
4    probably all I've got, but if you want
5    to take a break and I'll just look
6    through some stuff and make sure.
7            (SHORT BREAK TAKEN.)
8       Q.  Ms. Glus, you earlier said that
9    there might be identification of some
10   visitors to the 22nd floor of the 120 Park
11   Avenue location identified in Mr. Camilleri
12   calm's calendar; do you recall that?
13      A.  Yes.
14      Q.  Do you know if Mr. Camilleri still
15   has his calendar from '95, '96, '97, '98, '99
16   or 2000?
17      A.  We'd have to check.  I couldn't say
18   for certainty.
19      Q.  So sitting here today, you're not
20   sure if he has them?
21      A.  I'm not positive.
22      Q.  Have you spoken to Mr. Camilleri
23   about the subject matter of this deposition
24   today?
25      A.  Yes.
```

Page 95

```
1              GLUS
2       Q.  Did you speak to Mr. Camilleri in
3    particular about visitors of non-Kraft,
4    non-Philip Morris employees who might have
5    had access to the brewer?
6       A.  No.
7       Q.  Sitting here today, can you identify
8    any other person who might know of non-Kraft
9    employees who had access to the brewer on the
10   22nd floor of the 120 Park Avenue location?
11      A.  I would say maybe family of
12   employees.  I mean, I know for myself, I
13   can't say with certainty, but I know for
14   myself, my children have visited many times,
15   even back then.
16         So it's possible when they came to see
17   me at the office that they went in and they
18   saw it or made something for themselves.
19   That's just an automatic easy one to think
20   of.
21      Q.  Let me make sure I understand.  But
22   you're not specifically -- but you don't
23   remember sitting here today that any member
24   of your family did, in fact, go in and use
25   the Kenco brewer with a Kenco singles
```

Page 96

```
1              GLUS
2    cartridge some time between '95 and 2000; is
3    that correct?
4       A.  No, I can't say with certainty.
5       Q.  And perhaps my question wasn't
6    clear.  Can you identify anybody who could
7    specifically identify any non-Kraft employee
8    who would have used the Kenco brewer here at
9    the 120 Park Avenue location between '96 and
10   2000?
11      A.  Not at this moment, no.
12         MR. HRYCYSZYN:  That's all I've
13   got.
14         MR. SCHLITZ:  Just a few follow-up
15   questions.
16   EXAMINATION BY
17   MR. SCHLITZ:
18      Q.  Ms. Glus, is there a conference room
19   opposite the kitchen that Mr. Camilleri used?
20      A.  Pretty much opposite, just a smidge
21   off, yes.
22      Q.  And the times when visitors were
23   waiting for Mr. Camilleri, did you ever take
24   any of them into the kitchen?
25      A.  Yes.
```

Page 97

```
1              GLUS
2       Q.  And did they use the machine?
3       A.  Yes, usually what would happen is
4    they were sitting by his office, which was
5    near the kitchen.  If he wasn't ready, I
6    would say:  Do you want to go in this
7    conference room.
8         They would say yes, and would you like
9    some coffee, and especially when we used the
10   Kenco machine, because there were so many
11   varieties, it was just easier to bring them
12   in and say, which would you like.
13      Q.  And to get to the bathroom, do you
14   have to pass by the kitchen?
15      A.  Yes.
16      Q.  Last question.  Early in your
17   deposition, you testified that you kept a
18   file and that the documents that we have
19   shown you today came out of that file; is
20   that correct?
21      A.  Yes.
22      Q.  Does that file include every
23   document you ever received with regard to the
24   orders of the Kenco singles?
25      A.  Probably most definitely not.
```

Page 98

GLUS

Q.  And why is that?

A.  Because I'm sometimes lazy and I don't file everything.  I file what I think I need to.  It wasn't -- as we talked about, it wasn't part of my business duties.  So it was just something I kept just for my own self to say, okay, I ordered it and to follow up, didn't come, but not because I had to keep it like expenses.  It was just if I was lazy or not.

MR. SCHLITZ:  That's all the questions.

MR. HRYCYSZYN:  Thank you.

(TIME NOTED:  3:55 P.M.)

---

Page 99

A C K N O W L E D G M E N T

STATE OF NEW YORK          )
                          :
COUNTY OF NEW YORK        )

I, HELEN GLUS, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of MARCH 4, 2008; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

---------------------
HELEN GLUS

Signed and subscribed to before me this_____ day of _____ , 2008.

_____

Notary Public, State of New York

---

Page 100

C E R T I F I C A T E

STATE OF NEW YORK   )
                    :
COUNTY OF NEW YORK )

I, RENEE S. HARRIS, Shorthand Reporter and a Notary Public within and for the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such an examination is a true record of the testimony given by such a witness.

I further certify that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this     day of          , 2008.

---------------------
RENEE S. HARRIS

---

Page 101

***ERRATA***
ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434

OF CASE:  KEURIG V. KRAFT
DATE OF DEPOSITION:  MARCH 4, 2008
NAME OF WITNESS:  HELEN GLUS

PAGE LINE FROM      TO        REASON

Subscribed and sworn before me this ___ day of _____, 2008.

## <u>RULE 7.1.1 CERTIFICATION</u>

I hereby certify that counsel for Plaintiff has complied with Rule 7.1.1 of the Local Rules

of Civil Practice and Procedure of the United States District Court for the District of Delaware.


/s/ *Adam W. Poff*_____
Adam W. Poff (No. 3990)