## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT DELAWARE

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION IN LIMINE TO PRECLUDE
## EXPERT TESTIMONY OF TED LINGLE

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 4, 2008
Public Version Dated: August 11, 2008
877075 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft"), by counsel, state the following in support of its Motion *in Limine* to preclude Ted Lingle from testifying as an expert witness at trial.[1]    In particular, Kraft respectfully moves to preclude Mr. Lingle's testimony because: (1) it is an improper attempt to usurp the Court's role with regard to claim construction; (2) it would not assist the jury as required by Rule 702; and (3) Mr. Lingle is not even one of ordinary skill in the relevant art of the patent-in-suit, let alone an expert in that art.

## ARGUMENT

### I.    Lingle's Report is an Improper Attempt to Provide Claim Construction

The patent-in-suit, U.S. Patent No. 6,607,762 ("the '762 Patent"), claims the structure of a single serve beverage filter cartridge.  Mr. Lingle does not purport to be one of ordinary skill in this art.  Rather, he purports to be an expert in coffee brewing.  Plaintiff Keurig, Incorporated ("Keurig") seeks to have Mr. Lingle testify as to the meaning of the term "beverage" as used in the asserted claims in the patent-in-suit and to establish the subjective criteria for determining whether a drink is a beverage.  Based upon that meaning and subjective criteria, Keurig intends to have Mr. Lingle and its technical expert, Dr. Slocum, testify that the prior art Kraft is relying upon to invalidate the patent-in-suit did not make a "beverage." ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[1] Pursuant to D. Del. LR 7.1.1, the parties met and conferred, and Plaintiff will oppose the motion.

He acknowledges, however, that under his specialized definition,[2] one of ordinary skill in the art could not ascertain what a "beverage" is but ███████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

Moreover, when asked whether the term "beverage" has a meaning in the '762 Patent that is different from its plain and ordinary meaning, Mr. Lingle replied: "I believe it does." *Id.* at 64. Applying his definition of "beverage," a term for which Keurig did not seek claim construction, Mr. Lingle contends that, according to his well-trained palate and sense of smell, beverages brewed from the Kenco Singles™ ("Singles") cartridges ███████████████████████████████

███████████████████████████████████████████

The time for construing the terms of the patent-in-suit is long passed. The parties agreed to special procedures in the Scheduling Order by which the Court would construe any disputed claim terms. *See* Scheduling Order (D.I. 34). First, to determine which claim terms may be disputed, the parties exchanged infringement and validity contentions, as well as responses thereto. Kraft identified the prior art it was relying upon, which it has consistently replied upon throughout this litigation and intends to rely upon at trial. Kraft's Joint Invalidity Contentions (Ex. 4) at 1-2. Keurig responded by asserting what was absent from that prior art, and there was no statement that the identified prior art did not make a "beverage." Keurig's Response to Kraft's Joint Invalidity Contentions (Ex. 5). Based upon the exchange of infringement and invalidity contentions, the parties subsequently exchanged lists of disputed terms requiring construction by this Court. Keurig asked the court to construe "piercable to accommodate an

---

[2]  Dr. Alexander Slocum, Keurig's technical expert, understands that Mr. Lingle presents a specialized definition of "beverage" and testified in deposition that he relied on that definition rather than the plain and ordinary meaning of the term. Slocum Dep. Tr. (Ex. 3) at 8.

inflow" and "piercable to accommodate an outflow." September 18, 2007 Letter from G. Hrycyszyn to D. Schlitz (Ex. 6). But Keurig did not contend that the term "beverage," standing alone or in the context of any claim element, needed construing.

The parties also did extensive briefing of the disputed claim terms. In its briefs, Keurig urged the Court to adopt its construction of the claim element "piercable to accommodate an outflow of beverage." Keurig's Opening Br. (Ex. 7) at 10-11. But Keurig argued that this element should construed to mean "designed to be pierced to form an outlet that allows an outflow of beverage without leakage." *Id.* at 10. It never stated that the term "beverage" needed to be construed and never proposed a definition for the term "beverage." Keurig did not propose criteria to determine if a drink is a beverage. And it did not offer the expert testimony of Mr. Lingle in this regard. At the *Markman* hearing, the meaning of "beverage" was not discussed. And of course, this Court has not construed the term "beverage."

Keurig cannot now rely upon "expert" testimony at trial in lieu of having requested and obtained a claim construction from this Court. It is axiomatic that claim construction is a question of law and is within the sole province of the Court. Keurig is attempting to usurp this Court's role and authority by having an expert witness dictate to the jury what a claim term means and the criteria for satisfying that claim term.

Having failed to make the term "beverage" a claim construction issue, Keurig cannot now contend that expert testimony is now needed to assist the jury in understanding the meaning of "beverage" and to set the criteria for determining whether a drink is a "beverage." Since Keurig did not seek a claim construction of "beverage" during the claim construction process, the term must be given its plain and ordinary meaning. There is no need for an expert to assist the jury in understanding the plain and ordinary meaning of a term. And it is not appropriate to have a

purported coffee brewing expert testify that in his judgment a drink does not meet his subjective criteria as to acceptable taste, odor, color, or strength to qualify as a cup of coffee. Mr. Lingle contends that a person of ordinary skill in the art could not even ascertain what a "beverage" is without consulting an expert. Lingle Dep. Tr. (Ex. 2) at 75-76. Of course, this renders the claims indefinite.[3] *See* 35 U.S.C § 112.

## II.     Lingle's Testimony Would Not Assist the Trier of Fact

Under Rule 702, expert testimony must "'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, (1993) (quoting Fed. R. Evid. 702). Mr. Lingle's testimony is not intended to assist the jury in understanding the evidence and making a factual determination. Rather, it is intended to set criteria for a beverage that are not in the patent-in-suit and then tell the jury that in his judgment the drink produced by the Singles cartridge does not have the flavor, color, odor or strength to qualify as a cup of coffee.

## III.     Lingle is Not an Expert in the Relevant Art of the '762 Patent

Rule 702 also requires that a technical expert in a suit for patent infringement have specialized knowledge in the relevant art of the patent-in-suit. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743 (3d Cir. 1994) (must be connection between expert testimony and factual issues in the case). But Mr. Lingle lacks expertise in brewer or beverage cartridge design, or even fluid mechanics. Lingle Dep. Tr. (Ex. 2) at 18, 93-94. In short, Mr. Lingle is not an expert in the single-serve beverage filter cartridge art – the relevant art of the '762 Patent. Rather, he is an expert in "[c]offee,

---

[3] Mr. Lingle's proposed definition of "beverage" runs contrary to the maxim that claims should be construed to preserve validity. *See Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008).

coffee brewing, coffee tasting." *Id.* at 5. Keurig's other technical expert, Dr. Alexander Slocum, asserts that "a person of ordinary skill in the relevant art would include a *skilled mechanical or materials engineer*." Slocum Dep. Tr. (Ex. 3) at 168 (emphasis added). Mr. Lingle studied civil engineering and he has never been a practicing engineer. Lingle Dep. Tr. (Ex. 2) at 5-6. Thus, not only is Mr. Lingle not an expert, he is not even a person of ordinary skill in the art. Accordingly, Mr. Lingle is not qualified as an expert to give opinions with respect to issues of infringement and validity with regard to the '762 Patent. Thus, the Court must preclude his testimony on those issues, as well as preclude Keurig's technical expert, Dr. Alexander Slocum, from relying on the subject matter disclosed in Mr. Lingle's expert reports.

## CONCLUSION

For the foregoing reasons, Kraft respectfully requests that the Court grant this Motion *in Limine* to testimony at trial.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: August 4, 2008
877075 / 31118

By: */s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 11, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on August 11, 2008, the attached document was Electronically Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By:  */s/ David E. Moore*
　　　Richard L. Horwitz
　　　David E. Moore
　　　Potter Anderson & Corroon LLP
　　　Hercules Plaza, 6th Floor
　　　1313 N. Market Street
　　　P.O. Box 951
　　　Wilmington, DE 19899-0951
　　　(302) 984-6000
　　　rhorwitz@potteranderson.com
　　　dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF DELAWARE
     -------------------------------------X
 3   KEURIG, INCORPORATED,
 4                          Plaintiff,
 5   VS
 6   KRAFT FOODS GLOBAL, INC., TASSIMO
     CORPORATION, and KRAFT FOODS, INC.,
 7
                            Defendants.
 8
     Civil Action No. 07-CV-0017-GMS
 9   -------------------------------------X
10
11
12        VIDEOTAPED DEPOSITION OF TED R. LINGLE
13              Friday, June 27, 2008
14              9:11 a.m. - 2:05 p.m.
15          WOLF, GREENFIELD & SACKS, P.C.
16              600 Atlantic Avenue
17           Boston, Massachusetts 02210
18
19     Court Reporter:  Loretta Hennessey, RDR, CRR
20
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24              New York, New York 10022
                     212-750-6434
25                    REF: 87840
```

```
 1                      LINGLE
 2   please swear in the witness.
 3                  TED R. LINGLE, Sworn
 4                 having been satisfactorily
 5   identified by production of his California driver's
 6   license and duly sworn, was examined and testified
 7   as follows:
 8                  DIRECT EXAMINATION
 9   BY MR. SCHLITZ:
10       Q.   Mr. Lingle, what is your area of
11   expertise?
12       A.   Coffee, coffee brewing, coffee tasting.
13       Q.   Now, you graduated from the United States
14   Military Academy; is that correct?
15       A.   That's correct.
16       Q.   In what year?
17       A.   1966.
18       Q.   Okay.  And you got a degree in civil
19   engineering; is that correct?
20       A.   That's correct.
21       Q.   What does civil engineering cover?
22       A.   Civil engineering was sort of a catch-all
23   degree for a heavily science-based education that
24   was somewhat unique to the Military Academy at the
25   time.  There were no majors.  All the cadets were
```

1                          LINGLE
2    required to take a fairly prescribed set of courses.
3    To give you an example, in the four years that I was
4    there, I had an opportunity to take three electives.
5        Q.    Okay.  Now, when you -- after you
6    graduated -- did you graduate from the Military
7    Academy?
8        A.    Yes, I did.
9        Q.    Okay.  Did you then go into the Army?
10       A.    Yes, I served four years on active duty.
11       Q.    Okay.  And what jobs did you have on
12   active duty?
13       A.    I was a Second Lieutenant.  I had an
14   opportunity to command a platoon and an opportunity
15   to command an armored recon troop in Germany, and
16   then I spent a year in Vietnam as an advisor to a
17   Vietnamese reserve military unit.
18       Q.    So you didn't practice as a civil
19   engineer, did you?
20       A.    No, I did not.
21       Q.    Okay.  And then when you left the Army --
22   how many years did you spend in the Army?
23       A.    I was in the Army for four years.
24       Q.    When you left the Army, what did you do,
25   what -- next job?

```
 1                    LINGLE
 2       Q.   And what is the Coffee Quality Institute?
 3       A.   It's actually a non-profit 501(c)(3) trust
 4   that SCAA started in 1996, and its purpose is to
 5   work internationally, meaning working with
 6   coffee-producing countries, to improve the quality
 7   of coffee and the lives of the people who produce
 8   it.
 9       Q.   Okay.  It has nothing to do with designing
10   single-serve beverage cartridges, does it?
11       A.   No, it does not.
12       Q.   It has nothing to do with designing
13   brewers, does it?
14       A.   No, it does not.
15       Q.   And in your work here today as an expert
16   witness, were you -- is the Wolf Greenfield firm
17   paying you personally or are they paying the
18   organization?
19       A.   They're paying the organization.
20       Q.   And is that going to jeopardize their
21   non-tax status?
22       A.   No.
23       Q.   Well, how is this a, is your work in this
24   case part of the mission of a non-tax organization?
25       A.   It involves the, sort of the public
```

1                          LINGLE

2        A.    If -- it could be if the other components

3   were there, the aroma, taste, and body.

4        Q.    Well, how would one reading this patent in

5   suit -- you've read the patent, haven't you?

6        A.    Yes, I have.

7        Q.    Okay.  Now, you're an expert on coffee,

8   but how would one of ordinary skill in the art with

9   regard to the art of single-serve beverage

10  cartridge, how would that person know if it is a

11  coffee beverage?

12       A.    I'm not quite sure I understand your

13  question.  Could you repeat it?

14       Q.    You're one who's an expert, you told me,

15  in coffee, right?

16       A.    Yes, that's correct.

17       Q.    Now, the -- one of ordinary skill in the

18  art in building and constructing single-serve

19  coffee, excuse me, single-serve beverage cartridges

20  is not one who's an expert in coffee, you'd agree

21  with that?

22       A.    I'd agree with that.

23       Q.    Okay.  And how would that person know if

24  the, if the beverage that extracts, that exited a

25  cartridge was a coffee beverage?

Page 32

1                      LINGLE

2        A.    Well, I'm sure that that engineer would

3     hire someone like me who is a coffee expert and can

4     advise them on what the parameters are that they're

5     shooting for in terms of creating a coffee beverage

6     with the right level of color, body and flavor.

7        Q.    All right.  So it would require hiring an

8     expert like you?

9        A.    Yes, it would require someone who

10    understands the coffee beverage.

11       Q.    Okay.  Now, there are not many of you in

12    the world, so if a, if a, an engineer of ordinary

13    skill in the art wanted to use TDS as a measure,

14    would that be an acceptable measure?

15       A.    That's an acceptable metric for measuring

16    on a scientific basis the extract that you've

17    created in that beverage cartridge.

18    But I would disagree with the premise that there

19    aren't many people like me in the world.  I'm sure

20    there are many coffee experts at a company like

21    Kraft.  I mean, I've met a few of them.  They're

22    very fine coffee people.

23       Q.    Absolutely.  And maybe you'll meet some

24    more at the trial.

25    But if someone's not at a major company like Kraft,

1                    LINGLE

2    application, it means one that the average person

3    would go out on a commercial level and purchase

4    either for home use or for consumption away from

5    home.

6        Q.   Okay.  My question to you is, does

7    "beverage" have a meaning in the patent that is

8    different than its ordinary meaning?

9        A.   I believe it does.

10       Q.   Okay.  What do you believe the ordinary

11   meaning of "beverage" is?

12       A.   The ordinary meaning would be a product

13   that could be either sold or consumed for a person's

14   enjoyment.

15       Q.   So it's --

16       A.   I mean, there would be certain categories

17   I would exclude.  I wouldn't include tap water in

18   the context of a beverage.

19       Q.   So you think the word "beverage" has a

20   commercial, has a commercial connotation?

21       A.   When I read the patent, then I was

22   assuming, my assumption is the average person

23   reading that patent would assume this was a beverage

24   for commercial application.

25       Q.   Okay.  And what is the basis of that

1                          LINGLE

2        Q.    Okay.  And if they did hire someone who

3    held themselves out as having expertise in coffee

4    taste and smell --

5        A.    Uh-huh.

6        Q.    -- could that person say that a particular

7    strength coffee wouldn't be acceptable to anybody?

8        A.    Yes, you can establish parameters that

9    would categorically exclude some fluids as being

10   acceptable when represented as a coffee beverage.

11       Q.    All right.  And traditionally the metric

12   for that in the industry has been TDS; is that

13   right?

14       A.    Yes, that's been the most common.

15       Q.    Now, what is the -- going back to your

16   statement, "That is, one does not obtain output

17   liquid of sufficient strength and with an adequate

18   flavor and aroma profile," what is the measure of

19   adequate flavor?

20       A.    The flavor would be a subjective

21   measurement, so it's a person tasting the fluid

22   saying, no, this isn't right.

23       Q.    Okay.  But is there a metric for measuring

24   that?

25       A.    Not that I know of.

1                          LINGLE

2         Q.    Okay.  So one who is of ordinary skill in

3    the art in designing and making single-serve

4    beverage cartridges wouldn't have a metric, that

5    person would have to go to an expert in coffee; is

6    that correct?

7         A.    That's correct.

8         Q.    Okay.  What is the measure of acceptable

9    aroma profile?

10        A.    That's also subjective.

11        Q.    Okay.  And one of ordinary skill in the

12   art, an engineer in building, constructing

13   single-serve beverage cartridges, what would be the

14   metric that person would have to use to determine if

15   the resultant beverage satisfies the aroma profile?

16        A.    That would also be subjective.  They would

17   taste and smell the fluid and say, "yes, this smells

18   like coffee," or, "no, this doesn't smell like

19   coffee."

20        Q.    Okay.  But what I'm trying to understand

21   is what if that engineer, you know, thinks that a

22   beverage that has just barely traceable aroma is

23   acceptable.  Would you accept that?

24        A.    Accept it in what way?

25        Q.    Well, since it's subjective, could that

```
 1                         LINGLE
 2   is outside the acceptable range for consumers?
 3        A.   Yes, using the metric as an analogy.
 4        Q.   Okay.  But if it were in the -- if that
 5   metric were in the acceptable range for consumers,
 6   would you have any reason to say that the piercing
 7   into the manifold area would not produce a
 8   acceptable coffee beverage?
 9        A.   Well, I'd still want to taste the beverage
10   so we're not using soluble solids as the only method
11   of --
12        Q.   I understand that.  But you explained why
13   you thought piercing directly into the coffee bed,
14   but I'm -- since -- if you use the manifold, and you
15   get this more even distribution, why would it not
16   create a coffee beverage?
17        A.   If I understand your question correctly,
18   you're saying if we use the manifold with same-side
19   piercing?
20        Q.   Yes.
21        A.   I'm not exactly sure of the answer because
22   it has to do with the fluid dynamics of the way the
23   water would actually move through that manifold, and
24   I think that's more in the area of expertise of
25   someone who's an expert in fluid design.
```

1                          LINGLE

2         Q.    And that's not your area?

3         A.    No.  I understand some of fluid mechanics,

4    but that's not my area of expertise.

5         Q.    Okay.  And under any circumstances, you're

6    not going to agree with what I have to say.

7    Now, but you, you told me earlier that when you were

8    working for Lingle Brothers, you did, you did tell

9    customers about drip filter coffee, right?

10        A.    Yes.

11        Q.    Okay.  So the -- I think you used the word

12   -- when you were saying why the Kenco Singles using

13   same-side piercing would not produce a particularly

14   acceptable cup of coffee, you mentioned several

15   things.  You mentioned, I think, pressure; is that

16   right?

17        A.    The flow rate, yes, the pressure.

18        Q.    The flow rate?  What is the flow rate?

19        A.    That would be the rate at which the water

20   travels through the coffee bed.

21        Q.    Is that speed or is that --

22        A.    That's speed.

23        Q.    That's speed?  Okay.

24   Now, would the rate that it is, that the water is

25   introduced into the coffee bed, would that make a

# EXHIBIT 3

Page 1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - x

3    KEURIG, INCORPORATED,

4                        Plaintiff,

5         v.

6    KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
     KRAFT FOODS INC.,

7

                         Defendants.

8

     Civil Action No. 07-CV-0017-GMS

9    - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12      VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM

13              Wednesday, June 11, 2008

14                9:10 a.m. to 5:00 p.m.

15           WOLF, GREENFIELD & SACKS, P.C.

16                600 Atlantic Avenue

17              Boston, Massachusetts

18

19       Reporter:  Marianne R. Wharram, CSR/RPR

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor

24              New York, New York 10022
                    212-750-6434

25                  REF: 87765

1                         SLOCUM

2    construction, or claim construction, what different

3    terms mean.  That's what I have to ultimately abide

4    by is what is the Court's claim construction.

5         Q.   In your expert report, you opine about the

6    meaning of the word beverage; is that correct?

7              MR. RADER:  Objection to the form.  You

8    can answer.

9         A.   Well, my understanding for the term

10   beverage -- because I'm not an expert in that area,

11   I relied -- the Court itself didn't give me an

12   exact definition of what beverage is.  I have to

13   refer back explicitly to that document, but in that

14   respect, I relied on Mr. Lingle, who is an

15   acknowledged expert in the field of coffee

16   beverages.  And then, when I actually ran the

17   various tests in various scenarios, I also, because

18   I'm a fairly avid coffee drinker, would then taste

19   the stuff made by the various ways I did.

20        Q.   (BY MR. SCHLITZ)  But when you read the

21   patent, what was your understanding?  Before --

22   when did you speak to Mr. Lingle?

23        A.   I first met Mr. Lingle a couple of months

24   ago when I did my extensive tests with the hot

25   water to actually attempt to create the beverage.

1                        SLOCUM

2    opinion as to whether the patent discloses a single

3    foil?

4         A.  Well, yeah, if there was a single piece of

5    foil everywhere, then that is a single piece of

6    foil.

7         Q.  And are you basing your opinion on the

8    commercial product?

9         A.  No.  That helps.  It doesn't say it has to

10   be that way.

11        Q.  But how does it help?

12        A.  It helps me understand how one skilled in

13   the art and practices the art --

14        Q.  Okay.

15        A.  -- and verifies my reading of -- of this.

16   As you said earlier, could it go that way?  It

17   could.

18        Q.  Now, you say in footnote four, in my

19   opinion, a person of ordinary skill in the relevant

20   art would include a skilled mechanical or materials

21   engineer, whether or not he or she had specifically

22   worked in the consumer packaging industry.  Okay.

23   I take it that is your opinion today as to what one

24   of ordinary skill in the art would be?

25        A.  Correct.

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | |
| | ) | |
| Defendants | ) | |

## DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS

Pursuant to the Court's Scheduling Order of July 17, 2007, Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively, "Kraft"), submits the following invalidity contentions for claims 1, 2, and 8-10 of U.S. Patent No. 6,607,762 ("'762 Patent") asserted by Plaintiff Keurig. Kraft reserves the right to supplement these invalidity contentions, or cite additional prior art, as discovery progresses or if Plaintiff Keurig modifies its disclosure of asserted claims or infringement contentions.

Kraft provides its invalidity contentions in the claim chart below. Kraft cites three (3) pieces of prior art, and submits four (4) invalidity contentions based on the cited prior art: the Kenco Singles® capsules in public use in the United States prior to the December 1, 1999 date of invention of the '762 Patent alleged by Plaintiff Keurig, as shown in Exhibit A; U.S. Patent No. 4,853,234 ("'234 Patent") to Bentley *et al.* entitled "Beverage Packages," as shown in Exhibit B; U.S. Patent No. U.S. Patent No. 4,452,130 to Klein entitled "Electrical Apparatus Useful to Prepare a Hot Beverage" ("'130 Patent"), as shown in Exhibit C; and as

further shown when inverted in Exhibit D; and, finally, the '130 Patent in view of its operation as disclosed.

These invalidity contentions are consistent with Keurig's infringement contentions in Keurig's Disclosure of Infringement Contentions served on July 27, 2007. As indicated in the Kraft defendants' non-infringement claim charts, the Tassimo® Discs do not infringe the '762 patent. Nevertheless, as shown by the following invalidity contentions, if claims 1, 2 and 8-10 of the '762 Patent are applied as Keurig applied these claims in its infringement claim charts, and reiterated in its counsel's letter dated August 3, 2007, then the cited prior art anticipates.

<u>**Invalidity Claim Charts**</u>

**A. Kenco Singles™ Capsule**

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The Kenco Singles capsule is a beverage filter cartridge. |
| an outer container having an access opening: | **YES.** The Singles capsule has an outer container with an access opening. |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The Kenco Singles includes a permeable filter received in and configured and arranged in the inner container such that it separates two chambers in the interior of the container so that infused beverage created in the first chamber must flow through the filter element before it can enter the second chamber. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The Kenco Singles include a first chamber in which a beverage medium is stored. Beverage media suitable for use with Singles capsules include, for example, roast and ground coffee, tea, and powdered chocolate. |

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

      Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

      Defendants.

Civil Action No. 07-017-GMS

## PLAINTIFF'S RESPONSE TO DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORP., AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS

In response to Defendants Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.'s Joint Invalidity Contentions ("Invalidity Contentions"), Plaintiff Keurig, Incorporated ("Plaintiff" or "Keurig") provides the following validity contentions for asserted claims 1, 2, 8, 9, and 10 of United States Patent No. 6,607,762 (the "'762 patent").

Plaintiff bases these validity contentions on its current knowledge, understanding and belief as to the facts and information available to it as of the date of these disclosures. This case is still in the early stages of discovery and Plaintiff has not yet completed its investigation, collection of information, discovery or analysis related to this action. Accordingly, Plaintiff reserves the right to supplement, amend or modify the information contained herein and introduce such information and any subsequently-identified documents at trial. As discovery is taken, and additional details are provided regarding the alleged prior public use or if Defendants modify their invalidity contentions, Plaintiff's validity contentions may need to be amended, supplemented and/or corrected.

I.    **THE '762 PATENT IS VALID IN LIGHT OF THE ALLEGED PRIOR ART IDENTIFIED BY DEFENDANTS**

The alleged prior art identified in Defendants' Invalidity Contentions *inter alia* does not disclose each and every element of the claimed invention of the '762 patent. Defendants, in their Invalidity Contentions, allege that the '762 patent is invalid under four separate bases of invalidity. Defendants contend that the '762 patent is anticipated by a capsule called Kenco Singles which was allegedly in public use in the United States prior to the invention of the claimed matter of the '762 patent.[1] Defendants also identify two prior art patents that allegedly anticipate the '762 patent, including United States Patent No. 4,853,234, entitled "Beverage Packages" (the "'234 patent"), and United States Patent No. 4,452,130, entitled "Electrical Apparatus Useful to Prepare a Hot Beverage" (the "'130 patent").[2] Defendants also allege that the '130 patent anticipates the '762 patent in a different configuration than disclosed in the '130 patent – a configuration Defendants have dubbed "inverted."

---

[1] Defendants contend that the Kenco Singles capsule was in public use in the United States more than one year prior to the date of filing of the application that issued as the '762 patent. However, Defendants have provided no evidence supporting this contention and Keurig does not concede this issue.

[2] Defendants also included a copy of United States Patent No. 5,111,740, entitled "Electrical Apparatus Useful to Prepare a Hot Beverage" (the "'740 patent"), in the Exhibits to their Invalidity Contentions. However, Defendants' Invalidity Contentions provide no separate allegations of invalidity with respect to this patent. Defendants' Invalidity Contentions simply refer to the '740 patent in their contentions for the '130 patent. Accordingly, Keurig has not provided a detailed response as to which elements are not taught or disclosed in this patent. However, it is clear that the '740 patent does not disclose each and every element of the claimed invention of the '762 patent. Keurig reserves the right to supplement this response if Defendants supplement or otherwise amend their invalidity contentions to allege that the '740 patent invalidates the '762 patent.

DB02:6215370.1                                                                065927.1001

### A.    Kenco Singles Capsules Do not Anticipate the '762 Patent

Kenco Singles capsules do not anticipate the '762 patent under 35 U.S.C. § 102 because the Kenco Singles capsules do not include each and every element of the claimed invention of the '762 patent. With respect to independent claims 1 and 10 of the '762 patent, the Kenco Singles capsules do not include a single lid that is both: (1) pierceable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) pierceable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the Kenco Singles capsules for at least these same reasons. Accordingly, for at least these reasons, the Kenco Singles capsules do not anticipate the '762 patent.

### B.    The '234 Patent Does not Anticipate the '762 Patent

The '234 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '234 patent does not disclose each and every element of the claimed invention of the '762 patent. With respect to independent claims 1 and 10 of the '762 patent, the '234 patent does not disclose a single lid that is both: (1) pierceable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) pierceable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '234 patent for at least these same reasons. Accordingly, for at least these reasons, the '234 patent does not anticipate the '762 patent.

### C.    The '130 Patent Does not Anticipate the '762 Patent

The '130 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '130 patent does not disclose each and every element of the claimed invention of the '762 patent.

3

With respect to independent claims 1 and 10 of the '762 patent, the '130 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '234 patent for at least these same reasons. Accordingly, for at least these reasons, the '234 patent does not anticipate the '762 patent.

### D.    The '130 Patent Does not Anticipate the '762 Patent in an "Inverted" Configuration

The '130 patent in an "inverted" configuration does not anticipate the '762 patent under 35 U.S.C. § 102. Defendants allege that the filter carrier unit disclosed in the '130 patent can be "inverted," *i.e.*, turned upside down, to anticipate the '762 patent. However, this "inverted" configuration is not disclosed or in any way suggested in the '130 patent. And the disclosure of the '130 patent does not enable a functioning beverage filter cartridge in the "inverted" configuration. In addition, with respect to independent claims 1 and 10 of the '762 patent, Defendants' "inverted" configuration of the '130 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '130 patent in Defendants' "inverted" configuration for at least these same reasons. Accordingly, for at least these reasons, Defendants' "inverted" configuration of the '130 patent does not anticipate the '762 patent.

4

## II.    CLAIM 10 OF THE '762 PATENT IS NOT INDEFINITE

Defendants, in their Invalidity Contentions, do not assert that any terms in the claims of the '762 patent are indefinite under 35 U.S.C. § 112(2). Indeed, Defendants, in their Invalidity Contentions, were able to identify where each of the elements of the claimed invention of the '762 patent are allegedly disclosed in the identified prior art, admitting that Defendants can (or at least claim to be able to) understand the claim language.

In Defendants Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.'s Joint Response to Plaintiff's Disclosures of Asserted Claims and Infringement Contentions, Defendants allege that the claim language "and the **and** [SIC] section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge" is indefinite. Defendants' suggestion that a minor typographical error evident from the face of the patent renders the patent claims indefinite is contrary to well established law.[3] This claim language includes a typographical error that was introduced during printing of the patent – "and the **and** section" should read "and the **second** section." It is clear from the context of the claim language and the disclosure in the specification that the second section of the lid is being referred to. Indeed, the prosecution history confirms that "and" was supposed to be "second." This claim language is from a claim added during prosecution of the application that issued as the '762 patent.[4] In the amendment where this language was added, the correct language ("second") appears. This amendment is part of the prosecution history and makes clear what the correct word is. Accordingly, this claim language is not insolubly ambiguous.

---

[3] *See, e.g., Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (holding that a district court can retroactively correct errors in claim language when the error is evident from the face of the patent).
[4] *See* Amendment to Office Action Mailed on September 24, 2002 at 4.

DB02:6215370.1                                                                065927.1001

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
*msquire@ycst.com*

*Attorneys for Plaintiff Keurig, Incorporated*

OF COUNSEL:

Michael A. Albert
Michael N. Rader
Laura E. Topper
Gerald B. Hrycyszyn
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

Dated: August 31, 2007

# EXHIBIT 6


**Wolf Greenfield**
SPECIALISTS IN INTELLECTUAL PROPERTY LAW

Gerald B. Hrycyszyn
ghrycyszyn@wolfgreenfield.com
direct dial 617.646.8313

September 18, 2007

David Schlitz, Esq.
Baker Botts L.L.P.
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

      Re:    Keurig v. Kraft, et al.
              Civil Action No. 07-017 GMS
              <u>Our File No.: K0502.60000US00</u>

Dear David:

      In accordance with our agreement regarding the claim construction schedule, Keurig provides the following notice of the claim terms that it contends require construction:

1. "first and second chambers" in claims 1 and 10 of the '762 patent;
2. "piercable to accommodate an inflow" in claims 1 and 10 of the '762 patent; and
3. "piercable to accommodate an outflow" in claims 1 and 10 of the '762 patent.

                     Very truly yours,

                     WOLF, GREENFIELD & SACKS, P.C.

                     Gerald B. Hrycyszyn

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

      Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

      Defendants.

Civil Action No. 07-017-GMS

## KEURIG INCORPORATED'S OPENING CLAIM CONSTRUCTION BRIEF

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Chad S.C. Stover (No. 4919)
*cstover@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
Gerald B. Hrycyszyn
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated:   October 15, 2007

A.    "piercable to accommodate an inflow of liquid" and
      "piercable to accommodate an outflow of beverage"

| Language from Claims 1 and 10 that Keurig Suggests Requires Construction | Keurig's Proposed Construction |
|---|---|
| piercable to accommodate an inflow of liquid | designed to be pierced to form an inlet that allows an inflow of liquid without leakage |
| piercable to accommodate an outflow of beverage | designed to be pierced to form an outlet that allows an outflow of beverage without leakage |

The claim language "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of beverage" should be construed as complete phrases and in the context of the entire claim, as clarified by the specification. The adjective "piercable" cannot be taken in isolation and construed in a vacuum as Kraft urges the Court to do. This word is part of larger phrases whose meaning lies at the heart of the claimed invention of the '762 patent, which is directed to **same-side piercing** of a single-serve beverage filter cartridge lid to create "a cleaner puncture and an improved seal" that avoids leakage.

While just about anything is theoretically "piercable" if given the right tools and enough force, the patent plainly does not cover any and all lids that can somehow be pierced. Rather, it covers a cartridge with a lid that is piercable in a particular manner, namely "to accommodate an inflow" or "outflow." What does this qualification to the word "piercable" require? As discussed below, the patent specification answers this question by clarifying that it must be designed to be pierced **so as to form** a particular type of seal onto an **inlet and outlet**, avoiding leakage.

The adjective "piercable" in claims 1 and 10 must be construed along with the claim language that it modifies, "to accommodate an inflow of liquid" and "to accommodate an outflow of beverage," in the context of the entire claim. "Proper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation." Pause Tech. LLC

- 10-

v. TiVo Inc., 419 F.3d 1326, 1331 (Fed. Cir. 2005) (internal citations omitted). In the context of

the claim language, the adjective "piercable" modifies the phrase "to accommodate," whose

plain and ordinary meaning is "to fit, adapt, or make suitable." Webster's New Universal

Unabridged Dictionary at A52-A53; see also Oxford Dictionary of Current English at A54-A56

(accommodate – "to adapt to or fit in with"). Taken together, "piercable," meaning "capable of

being pierced," and "to accommodate," meaning "to fit, adapt, or make suitable," should be read

to mean adapted or made suitable to be pierced, i.e., "designed to be pierced."

Moreover, taken together with the remaining words in those phrases, "piercable to

accommodate **an inflow of liquid**" and "piercable to accommodate **an outflow of beverage**,"

must be read in light of the purpose of the invention, which in this case is a single-serve beverage

filter cartridge that allows same-side piercing of the cartridge while minimizing leakage. "[T]he

interpretation to be given a [patent claim] term can only be determined and confirmed with a full

understanding of what the inventors actually invented and intended to envelop with the claim."

Phillips, 415 F.3d at 1316. It is therefore important to "consider the functions of an invention"

when determining the meaning of the claim terms. Medrad, Inc. v. MRI Devices Corp., 401 F.3d

1313, 1319 (Fed. Cir. 2005). Here, the specification of the '762 patent emphasizes that the

claimed single-serve beverage filter cartridge is designed such that the "first and second lid

sections are yieldably **piercable**, respectively, **from the same direction** . . . [such that the] net

result is a **cleaner puncture and an improved seal**." ('762 Patent at A7, col. 2, ll. 6-20

(emphasis added)). And the specification further states that the claimed invention is targeted at

avoiding potential problems with the design of prior art cartridges which "can **adversely affect**

**the puncturing process, resulting in leakage**." ('762 Patent at A7 at col. 1, ll. 45-50 (emphasis

added)). A person of ordinary skill in the art certainly would not view a cartridge as being

- 11 -