IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS |

## KEURIG'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE EXPERT TESTIMONY OF DR. ALEXANDER SLOCUM

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

Kraft's motion *in limine* to limit the testimony of Keurig's engineering expert, MIT Professor Alexander Slocum, is based on several erroneous assumptions.

First, Kraft incorrectly assumes that the testimony of Keurig's coffee expert Ted Lingle[1] is inadmissible, and that Professor Slocum therefore cannot reference it. As explained in Keurig's opposition to Kraft's companion motion *in limine* (D.I. 107), however, Mr. Lingle's testimony is proper and Professor Slocum is entitled to rely on it. When a patented invention encompasses multiple technical disciplines, it is addressed to people with skills in each of those fields. E.g., Enzo Biochem., Inc. v. Calgene, Inc., 188 F.3d 1362, 1373 (Fed. Cir. 1999) (patents involving "distinct arts" are to be assessed from the perspective of "the adepts of each"). In any event, Professor Slocum made his own observations about the liquid in question – independent of Mr. Lingle – that he explained in both his expert report and his deposition. Professor Slocum is entitled to share those observations with the jury.

Kraft also argues that Professor Slocum should not be permitted to mention the Singles cartridge's "aspect ratio" (i.e., the relation of its depth to its other dimensions). Kraft contends that his deposition was the first time he stated that the Singles cartridge's shallowness prevents satisfactory brewing with same-side piercing (because the water, injected through the foil lid, burrows a hole through the thin coffee bed). But Professor Slocum explained the "burrowing" phenomenon in his expert report. His use of the phrase "aspect ratio" in response to questioning at deposition was merely another way of explaining the burrowing problem. Expert reports need not use the exact same words that the expert ultimately utters at trial, so long as the concepts expounded at the deposition (and at trial) are fairly disclosed in the report, as they were here.

---

[1] Mr. Lingle, a recognized expert in coffee brewing and "cupping" (tasting) will testify that the liquid produced by Kenco Singles cartridges in a same-side piercing configuration is not a "beverage" as required by claim 1 of Keurig's '762 patent.

# I.    BACKGROUND

Professor Slocum's rebuttal report outlines numerous flaws in the invalidity theories that Kraft and its engineering expert Malcolm Taylor have articulated.  Much of Professor Slocum's analysis concerns the Singles cartridge, the alleged prior art on which Kraft has focused throughout the case.

For example, Professor Slocum notes that the foil lid on a Singles cartridge (which is designed for conventional <u>opposite</u>-side piercing, not same-side piercing as in the '762 patent) lacks a support structure against which to press a gasket to form a reliable seal.  <u>See</u> Slocum Rebuttal Report (Ex. A) at 21.  Attempting to pierce the foil lid to accommodate an inflow of hot water therefore leads to catastrophic lid failure as Professor Slocum's tests showed.  <u>Id.</u> at 22, 25. As Professor Slocum also notes in his report, this is <u>precisely</u> what Kraft itself told the European Patent Office when confronted with a Singles patent as prior art to its own patent application on the T-Disc (the Kraft product accused of infringement in this case).  <u>Id.</u> at 21-22.

Professor Slocum's testing of Singles cartridges also revealed another problem with any attempt to use them in a same-side piercing configuration.  Whatever water did traverse the foil lid into the coffee bed would "shoot[] through the coffee grounds and literally burrow[] a hole" through the coffee – rather than dispersing through the coffee bed and properly extracting the soluble coffee solids in the way the cartridge was designed to be used.  <u>Id.</u> at 25.  The burrowing problem led to production of a foul-tasting liquid that simply was not coffee.  Professor Slocum concluded that the liquid would not qualify as a beverage.  <u>Id.</u> at 25-26.

Indeed, the liquid was so appalling that Professor Slocum testified, "if I ever bought that anywhere, I'd take it right back and say I want my money back or a … real cup of coffee." See Slocum Depo. (Ex. B) at 209.  Mr. Lingle, an expert with over three decades of experience in the coffee industry, analyzed the liquid and concurred that it was not a beverage. (Ex. A at 25).

## II.    ARGUMENT

### A.    Professor Slocum is Entitled to Rely on Mr. Lingle's Testimony.

The first half of Kraft's motion is moot because it turns on the incorrect premise that Mr. Lingle's opinions are "inadmissible." (D.I. 106 at 1).  Kraft argued that point in D.I. 107, and Keurig's opposition explains why Mr. Lingle's testimony plainly is admissible.  Mr. Lingle is a recognized expert in growing, brewing, and "cupping" (tasting) coffee, and his testimony will address a question of fact on which he has undisputed expertise (i.e. whether the liquid created through same-side piercing of a Singles cartridge is a coffee beverage).

### B.    Kraft Does Not Challenge Professor Slocum's Entitlement to Describe His Own Independent Observations of the Singles Liquids.

Professor Slocum personally observed and tasted the Singles liquids obtained from the various tests described in his rebuttal report, and Keurig is entitled to ask him to describe his observations for the jury.  Professor Slocum's rebuttal report lists the objective measurements of "total dissolved solids" for those liquids, as well as Professor Slocum's sensory observations, and includes several photographs.  (Ex. A at 23, 26).  Kraft's counsel extensively questioned Professor Slocum regarding his observations at his deposition.

Notably, Kraft bears the burden of proving, by clear and convincing evidence, that the Singles cartridges produce a beverage when used in a same-side piercing configuration.  Yet Kraft has offered no evidence on this point.  Kraft elected not to retain a coffee expert, and its technical expert Mr. Taylor failed even to taste any of the liquids that he prepared in his tests.

See Taylor Depo. (Ex. C) at 107.  By contrast, as noted above, Professor Slocum carefully

evaluated the liquids and reported on his observations in his expert report.  While Professor

Slocum is not a coffee expert like Mr. Lingle, and will not duplicate Mr. Lingle's expert

testimony, he is entitled to describe his own observations as a skilled engineer performing his

experiments and observing the resulting liquids.  Professor Slocum's observations of the Singles

liquids are not subject to attack by Kraft and are admissible at trial.

> **C.      Professor Slocum is Entitled to Testify Regarding the Singles Cartridge's**
> **Aspect Ratio, Which Merely Explains His Description of the**
> **"Burrowing" Phenomenon in His Rebuttal Expert Report.**

Professor Slocum's testimony regarding the "aspect ratio" of the Singles cartridge clearly

complies with Rule 26(a)(2)(B) because it is merely an explanation of the burrowing

phenomenon that he disclosed in his rebuttal expert report.[2]  As noted above, Professor Slocum's

report explains that in a shallow Singles cartridge, the pressurized water "shoots through the

coffee grounds and literally burrows a hole."  (Ex. A at 25).  When pressed for further details

about this phenomenon at his deposition, Professor Slocum explained the connection between

the "shallowness" (or flat "aspect ratio") of the cartridge and the burrowing problem:

> The problem with just taking something of this aspect ratio and piercing ... and
> then injecting your fluid is that the water, which comes in at a reasonable
> pressure, shoots right through the coffee, or whatever your drink is, into the filter
> and then rushes out your filter, so you don't get good wetting….And I opened up
> cartridges…after they were used and….you would always burrow a hole.  And I
> can discuss more in terms of scientific principles of aspect ratios if you want.

(Ex. B at 27-28) (emphasis added).

---

[2] Professor Slocum's rebuttal report describes both the "sealing" and "burrowing" problems that
occur when Singles cartridges are used in a same-side piercing configuration. (Ex. A at 21, 25).
Kraft's suggestion in its motion (at 3) that Professor Slocum invented the latter at his deposition
is wrong.  Likewise, Kraft's suggestion (at 3) that Professor Slocum's testimony raised
enablement issues is baseless – indeed, prior to filing its motion *in limine* (more than two months
after Professor Slocum's deposition), Kraft never even mentioned enablement.  It would be far
too late for Kraft to raise such a defense this close to trial.

Professor Slocum also stressed the connection between flat aspect ratios and burrowing several more times during the deposition. Id. at 152, 248-249.[3]

Kraft's motion tries to suggest that the flat "aspect ratio" of the Singles cartridge, and its consequences for the liquid produced via same-side piercing, were new concepts introduced in Professor Slocum's deposition. That simply is not true. Professor Slocum described the burrowing issue in his report. He amplified on it at deposition by further explaining the relationship between the cartridge's flat aspect ratio and burrowing. Disclosures under Rule 26(a)(2)(B) need not include each and every word that an expert ultimately uses at trial to explain his opinion. Indeed, it is perfectly permissible for trial testimony to "elaborate on" or provide "reasonable explanation" of the opinions contained in the expert report. Forest Labs., Inc. v. Ivax Pharms., Inc., 237 F.R.D. 106, 113, 116 (D. Del. 2006) (overruling defendant's objection to expert's testimony). See also Boehringer Ingelheim Int'l GMBH v. Barr. Labs., Inc., C.A. No. 05-700, 2008 WL 2756127, at *3 (D. Del. July 15, 2008) (expert's trial testimony was "a permissible synthesis of and/or elaboration on" the opinions in his report). Discussion of "aspect ratios" by Professor Slocum at trial would be entirely consistent with his expert report (and deposition) and therefore should be allowed.

## III.  CONCLUSION

For the above reasons, the Court should deny Kraft's motion *in limine* to limit Professor Slocum's expert testimony.

---

[3] Professor Slocum's detailed explanation of "aspect ratios" during his deposition provided Kraft yet further notice on the issue. Preclusion would therefore be inappropriate. Forest, 237 F.R.D. at 110-11 (rejecting challenge to admission of expert opinion following bench trial where expert report itself – even absent further explanation through deposition testimony – "sufficiently disclosed the opinions").

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 15, 2008, a true and correct

copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on August 15, 2008, copies of the foregoing

document were served by e-mail and hand delivery on the above-listed counsel of record and on the

following non-registered participants in the manner indicated below:

### BY E-MAIL

> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> John W. Shaw (No 3362) [*jshaw@ycst.com*]
> Adam W. Poff (No. 3990) [*apoff@ycst.com*]
> Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
> (302)-571-6600
>
> *Attorneys for Plaintiff Keurig, Incorporated*

Exhibit A

CONFIDENTIAL – ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

       Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

       Defendants.

Civil Action No. 07-017 (GMS)

**CONFIDENTIAL
ATTORNEYS' EYES ONLY**

**RULE 26(A)(2)(B) REBUTTAL EXPERT REPORT OF
PROFESSOR ALEXANDER SLOCUM
MAY 13, 2008**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

64.    My tests of Lambert cartridges revealed that at least as much (and often much more) liquid exits through the inlet hole as through the outlet nozzle.  While the liquid that exits through the outlet nozzle can be captured in a cup, the liquid that exits through the inlet hole cannot easily be captured and instead oozes out of the hole, dripping all over the cartridge and onto the floor.  (Were the cartridge mounted inside a brewer, the coffee would of course drip into the brewer.)

65.    My tests of both Lambert and Rychiger cartridges also revealed another set of fundamental problems with creation of an inlet through the foil.  The foil over the coffee bed lacks any kind of support structure against which to press a gasket or other device to form a seal. (By contrast, the Tassimo T-Discs that are accused of infringement in this case are provided with a support structure, such that their lids are piercable to accommodate an inflow.)

66.    In a submission that I have reviewed, Kraft itself explained to the European Patent office ("EPO") that, because a patent describing the Singles cartridge does not describe an appropriate support structure like that of the T-Disc, its lid is not piercable to accommodate an inflow of water to brew a beverage.  Specifically, Kraft submitted a patent application for a claim covering

> A cartridge (1) containing one or more beverage ingredients (200) and being formed from substantially air- and water-impermeable materials, the cartridge defining a storage chamber (130; 134) containing the one or more beverage ingredients and a manifold chamber (16), the cartridge comprising an opening (12) through which the one or more beverage ingredients can be filled into the storage chamber, the opening being closed by a lid (5) having a first portion overlying the manifold chamber and a second portion overlying the storage chamber, **characterised in that** the first portion of the lid is piercable in use to accommodate an inflow of an aqueous medium into the manifold chamber and the lid is piercable in use to accommodate an outflow of beverage formed from interaction of the aqueous medium and the one or more beverage ingredients in the storage chamber.

(EP 1440913).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

67.     The EPO initially rejected this claim on the theory that the Singles-type cartridge disclosed in a prior art Kraft patent described all of these features.  In particular, the EPO reasoned that the disclosed cartridge technically included a lid with a "first portion overlying the manifold chamber" wherein that portion was "pierceable to accommodate an inflow of an aqueous medium into the manifold chamber" even though the cartridge was designed to be pierced on the opposite side for the inflow. (12/2/04 Communication Regarding EP Application No. 04 250 384.7).

68.     Kraft successfully responded by emphasizing that the cartridge lacked a "suitable element" against which the inlet piercer could abut (so as to avoid "a large degree of leakage") and therefore did not have a lid that was "suitable for being pierced to accommodate an inflow of aqueous medium into the manifold chamber." (6/9/05 Response).

69.     I agree with this analysis and in fact confirmed it empirically.  When attempting to pierce the foil lid over the Kenco coffee bed to create an inflow, with different needles, at a variety of pressures, and in a variety of orientations, I experienced spewing of coffee and liquid that was difficult to control, and danger of burns.  On one occasion I was burned by the hot liquid flowing over my rubber glove and onto my forearm.

70.     The following photograph is one example of the dangerous conditions that resulted when I attempted to pierce the foil side of a Singles cartridge to form an inlet for hot water.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



71.     The following table summarizes a series of tests that I performed, in conjunction with Ted Lingle, a coffee expert retained by Keurig.

| Experiment | Orientation of Cartridge | Pressure | Time to Dispense 180 ml | Total Dissolved Solids |
|---|---|---|---|---|
| 1 | Foil down, with plate | 3.2 psi | 19 seconds | 615 ppm |
| 2 | Foil down, with plate | 15.7 psi | 12 seconds | 635 ppm |
| 3 | Foil up, with plate | 14.7 psi | 27 seconds | 865 ppm |
| 4 | Foil up, with plate | 15.4 psi | 8.2 seconds | 629 ppm |
| 5 | Foil up, with plate | 3.4 psi | 1 minute 6 seconds | 674 ppm |
| 6 | Vertical, with plate; outlet nozzle at the bottom | 3.1 psi | 19.2 seconds | 802 ppm |
| 7 | Vertical, with plate; outlet nozzle at the bottom | 15 psi | 13.72 seconds | 769 ppm |
| 8 | Foil down, with plate; sealing tab removed | 15 psi | 9.13 seconds | 220 ppm |
| 9 | Foil down, with plate; sealing tab removed | 3 psi | 18.67 seconds | 327 ppm |

76.     The tests revealed that the cartridge structure would not permit me to obtain a satisfactory seal at the inlet.  Trying a variety of techniques, for example applying a metal plate to the foil side of the cartridge, and clamping the inlet hose with a pair of pliers, I was able to reduce but not eliminate the problem of water exiting the system at the inlet without entering the cartridge.  In some cases, for example at higher pressures like those at which Singles cartridges are designed to operate, the spewing water became an even more serious problem, posing risk of burns as previously noted.

77.     The tests also showed that even the water that did make it into the cartridge with the ground coffee did not brew a coffee beverage.   Instead, the pressurized liquid (bypassing the manifold) shoots through the coffee grounds and literally burrows a hole:



78.     The result was a liquid (in Mr. Taylor's language, a "coffee liquor") that I understand Mr. Lingle, an expert coffee "cupper," does not consider a beverage within the meaning of the '762 patent.  Although not a trained "cupper," I am an avid coffee drinker and I concur that the liquids produced would not qualify as a beverage:







|  Experiment 2  |  Experiment 8  |

79.    To avoid risk of burns I performed another series of experiments using cold water. In this series of experiments, I tried not only the Singles piercer, but a thin (1/8" outside diameter) metal needle piercer akin to a "hypodermic" type needle.  I ran the experiments at about 22 psi (within the expected pressure range for Singles cartridges)[12] and with a variety of parameters, including:

- Lambert-type and Rychiger-type cartridges

- orientation of the cartridge (vertical, foil up, and foil down); and

- with and without a metal plate covering the foil side (with a hole for the inflow piercer).

80.    Consistent with my results described earlier in this report, I found that the Singles cartridges failed to exhibit appropriate consistent sealing capability at the inlet, and therefore were not able to accommodate an inflow to brew a beverage as required by the '762 patent claims.  The following photographs are representative of the tests:

---

[12] I did not perform the hot water testing at 22 psi because the experiments would have posed an unacceptably high risk of burns from sputtering and spewing scalding water.

Exhibit B

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE
- - - - - - - - - - - - - - - - - - - - - - - - x
KEURIG, INCORPORATED,

                    Plaintiff,

        v.

KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
KRAFT FOODS INC.,

                    Defendants.

Civil Action No. 07-CV-0017-GMS
- - - - - - - - - - - - - - - - - - - - - - - - x




        VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM

                Wednesday, June 11, 2008

                9:10 a.m. to 5:00 p.m.

            WOLF, GREENFIELD & SACKS, P.C.

                600 Atlantic Avenue

                Boston, Massachusetts



        Reporter:  Marianne R. Wharram, CSR/RPR





        ELLEN GRAUER COURT REPORTING CO. LLC
         126 East 56th Street, Fifth Floor
            New York, New York 10022
                212-750-6434
                REF: 87765

Page 26

SLOCUM

1 philosophies or whatever why this type of approach
2 for this type of aspect ratio cartridge I -- is my
3 opinion fundamentally doesn't work well, if at all.
4 If you delete the manifolds and you just do
5 same-side piercing and with respect to can you
6 actually same-side pierce something like this
7 without making a mess, that's a separate --
8 separate issue, but just in terms of making a
9 beverage, and I believe, as I described when I
10 wrote my report, that when I run tests, I don't get
11 a beverage in the definition of my palate or
12 Mr. Lingle's expert opinion.
13    Q.  Let me understand what you just said.
14 First of all, when you said a cartridge, a rati--
15 what did you --
16    A.  Aspect ratio.
17    Q.  What is an aspect ratio of a cartridge?
18    A.  Okay, so when you -- when you want to
19 describe the aspect ratio of something -- so if I
20 can have a pen?
21    Q.  Here's a pen.
22    A.  It's easier for me to point with this than
23 a finger.  This is a little flatter than your
24 typical cartridge, but specifically, when I'm

Page 27

SLOCUM

1 referring to aspect ratio, the length and the width
2 of a coffee bed and what's those -- what are those
3 proportions with respect to the depth between where
4 you're putting in the fluid and where it wants to
5 exit.
6    Q.  All right.
7    A.  Now, all these flat cartridges, I would
8 say, have a flat aspect ratio.  The depth is
9 shallow.
10    Q.  When you say these, you were pointing to
11 something.
12    A.  I'm sorry.  The Singles cartridges or the
13 cartridge from the '234 patent.
14    Q.  Okay.
15    A.  So when you go -- or the embodiment of
16 Figure -- nominally, Figure 4.
17    Q.  Right.
18    A.  Now, compare those proportions to what I
19 think is the actual useful embodiment of Figures 6,
20 7 and 8 of the '762 patent, which is that aspect
21 ratio is more kind of one-to-one, the depth with
22 here, and in the actual, these flat type
23 cartridges, it's like three or four-to-one is the
24 characteristic aspect ratio.  The problem with just

Page 28

SLOCUM

1 taking something of this aspect ratio and piercing,
2 in the language of the patent, and then injecting
3 your fluid is that the water, which comes in at a
4 reasonable pressure, shoots right through the
5 coffee, or whatever your drink is, into the filter
6 and then rushes out your filter, so you don't get
7 good wetting -- that's wetting, excuse me -- of the
8 bed of -- and you end up putting through the
9 required amount of fluid to fill your cup, but it
10 really only acts on a small region of coffee, which
11 is why I think it comes out so -- so weak and why I
12 said yeck, it doesn't really taste like coffee.
13 When you have a -- and that's why I believe the
14 '234 and the Singles, they both have this
15 manifolding system --
16    Q.  All right.
17    A.  -- to evenly wet.  And I opened up
18 cartridges from the Singles machine after they were
19 used and I looked at the bed and I opened up the
20 cartridges after I would do my test and I looked at
21 the bed, and the tests I ran, you would always
22 burrow a hole.  And I can discuss more in terms of
23 scientific principles of aspect ratios if you want.
24    Q.  Please do.

Page 29

SLOCUM

1    A.  Oh, okay.  So when you -- there's a
2 fundamental principle called St. Benant's
3 principle.  It's B-E-N-A-N-T.  And it says if you
4 want to control or dominate the structure of
5 something, you want to have three to four
6 characteristic dimensions.  So for example, if I
7 want to, you know, hold on -- if I was to try to
8 hold on to your arm and not have it move, if I just
9 grabbed the wrist, even with two hands, you could
10 pop your arm off, but if I were to grab the wrist
11 and the elbow, which is, you know, like three to
12 five arm thicknesses away, I could hold you pretty
13 well.  That also applies in fluid systems, and
14 particularly mixing chambers, that if I have an
15 inlet point and I want to now have mixing, I don't
16 want my outlet point to be -- and the reciprocal is
17 true -- one-third of a characteristic dimension
18 away.  I want it to be more than one.  So when you
19 look at this kind of an aspect ratio structure, a
20 characteristic dimension of import is, you know,
21 what is happening in the chamber.  Well, the
22 function is I want to as uniformly as possible mix
23 the water with all the coffee to get all the
24 flavoring out, so if I bring in my inlet point and

SLOCUM

1
2     A. I don't know.
3     Q. Okay. It is clear -- it says it is clear
4  from context that the laminated foil is intended to
5  cover compartment, 21, only. The outlet, 37, if
6  covered, would be covered by a separate foil. What
7  do you mean it's clear from context the laminate
8  foil is intended to cover compartment, 21, only?
9     A. They only talk about covering the coffee
10 bed region with foil. I don't have any indication
11 that the teaching says continue the foil and also
12 cover outlet, 37.
13    Q. Well, doesn't it say, quote, in use, a
14 laminated foil is sealed along the lower edge, 23,
15 of the body portion, and isn't this part of 23,
16 lower edge of the body portion?
17    A. Well, yes and no. Sure, you could seal it
18 everywhere as we just said. I'm not precluded from
19 running one strip of foil everywhere, but no in the
20 context of someone practicing it. I'm only going
21 to put the foil where I need the foil. And there's
22 nothing that teaches me that I need the foil over
23 there. And like, again, the Lambert cartridges,
24 for example, don't use foil. The Rychiger ones do
25 have a covering, although not foil, so sometimes

SLOCUM

1
2  you do and don't. This is the outlet, 37, you're
3  talking about, right?
4     Q. Right.
5     A. That's what I'm saying. Sometimes as
6  practiced in the art 37 is covered and sometimes
7  it's not. And I'm saying 37 as in figuratively,
8  not this particular patent.
9     Q. Okay. The -- now, in paragraph -- excuse
10 me. In paragraph six you say, if you turn to page
11 two, paragraph 6, second sentence, moreover, the
12 lid that is disclosed in the '234 patent is not
13 pierceable to accommodate an inflow of liquid,
14 paren, i.e., capable of being pierced to permit a
15 flow of liquid into, end quote, based on the
16 Court's claim construction to brew a coffee
17 beverage that can be extracted through the same lid
18 as required by the asserted claims. Do you see
19 that?
20    A. I do.
21    Q. Just so I understand, it's not -- you said
22 the lid is not pierceable. Now, is it -- you say
23 it's not pierceable to accommodate an inflow of
24 liquid. Is it not capable of being punctured to
25 allow inflow of liquid? I'm just trying to see

SLOCUM

1
2  where the dispute is.
3     A. Okay. I think earlier this morning we did
4  kind of a mapping between the Singles cartridge and
5  this cartridge where I pointed out that on
6  Figure 4, which is the other side, that the
7  castellations on the bottom form essentially the
8  same function as the filter paper.
9     Q. Right.
10    A. So I read this in terms again of the
11 function that this cartridge has to do when I read
12 the claim. So where I think we will have a problem
13 -- there's two problem areas with this design and
14 if we use it with -- using the input thing to punch
15 through the foil here. The first problem area that
16 we discussed extensively earlier was the issue of
17 do we have a leak or a weep versus a catastrophic
18 failure and I think we addressed that already in
19 terms of all the different possibilities, but
20 making the beverage, then we're going to have the
21 same burrowing issue here as we do the aspect ratio
22 problem I see of injecting water in here directly
23 as opposed to bringing this water in through this
24 encircling manifold.
25    Q. Mm-hmm. Okay. If you -- if you pierced up

SLOCUM

1
2  here within the manifold, would you have the same
3  problem?
4     A. I don't think you'd have the -- well, you
5  wouldn't have the burrowing issue.
6     Q. Right.
7     A. What you have here now, as I mentioned
8  earlier, this aspect ratio problem. Now you're
9  really severe on your aspect ratio, because your
10 piercing device is on the order of the size of this
11 dimension, but the foil goes way off on the other
12 sides, and the foil -- my experience in playing
13 with these things is you get kind of a trough shape
14 and then the fluid definitely squirts out.
15    Q. Wouldn't the fluid go along the manifold?
16    A. No, this is not the fluid squirting out --
17 I mean, the fluid would go along the manifold, but
18 it's very hard to make a -- I was not able to make
19 a seal on this just playing with -- on the Singles
20 cartridges, because the Singles cartridges also
21 have that -- I wish we had one here -- zone on this
22 manifold side that you could pierce way off on the
23 edge.
24    Q. Yeah, but if you pierced in here, in the
25 center, okay, it would distribute along the

Page 206

SLOCUM

1
2     A. -- other than the normal we would vary by a
3  couple of degrees, but not -- I didn't start like
4  at 150 and go up in ten degree increments or
5  anything, no.
6     Q. Let's go back to something. You, I
7  believe, expressed the opinion that the patent
8  requires you to -- that a full cup or near a full
9  cup exit the container; is that correct?
10     MR. RADER: Objection.
11  Mischaracterizes.
12     Q. (BY MR. SCHLITZ) Well, if I
13  mischaracterized it, then please correct me. I'm
14  just trying to understand. This is a predicate for
15  the next question.
16     A. The cartridge, yes.
17     Q. Yes. Okay. And can you please point to me
18  or explain to me what the basis of that belief is?
19     A. Well, the basis of that belief is that what
20  the patent teaches, it's a beverage cartridge used
21  in a brewer. Well, all the beverage cartridges I
22  looked at, well, they all nominally will make a
23  cup, 180 milliliters, of coffee, so I used that as
24  my baseline, and if it -- it's to be in the art, all
25  teaching and intent, one skilled in the art, all

Page 207

SLOCUM

1
2  the other terms we used before, that's what this
3  thing needs to be able to do to satisfy the
4  function of the claim and indeed the teaching and
5  what the patent is trying to help us build.
6     Q. And if you only get a half a cup, the
7  resultant -- what comes out of the container, or
8  cartridge, okay, you wouldn't consider that a
9  beverage?
10     A. I guess let me just paraphrase or clarify.
11  If I made a half cup of something and then turned
12  the flow of water off so no more water flowed into
13  the cup, pulled it away, and here I had this half
14  cup of coffee liquor, as it was described by our
15  ex-- the coffeeologist, you do a TDS on that and
16  the coffeeologist says that's an acceptable coffee,
17  that's a coffee beverage, then my answer is yes.
18     Q. It would be half a cup of beverage?
19     A. It would be half a cup of beverage.
20     Q. Right. Okay. And you as one of ord-- you
21  indicated in your footnote you consider yourself as
22  one of ordinary skill in the art; is that right?
23     A. Yeah, whatever footnote in here we have,
24  yes.
25     Q. All right. Okay. Without a -- without a

Page 208

SLOCUM

1
2  whatever you just called it, a coffeeologist or
3  whatever, a Mr. Lingle next to you --
4     A. A cuppy -- a cupper, I think he refers to
5  himself to.
6     Q. Well, I think you're misusing the word
7  cupper.
8     A. Okay. I'm sorry. Without a Mr. Lingle
9  next to me.
10     Q. How would you know if it's a resultant
11  beverage?
12     A. I would taste it.
13     Q. Right. Would you test the TDS?
14     A. Oh, if I had a TDS meter I would, but I
15  tasted all of these in addition to the -- I think
16  he actually volunteered to taste some of them, so
17  -- and I know what I like, but --
18     Q. And test six just didn't meet your liking;
19  is that right?
20     MR. RADER: Objection to form. Go
21  ahead.
22     A. What I appear to like personally is
23  somewhere north of a thousand. You know, when I
24  say somewhere north of a thousand, I think the
25  actual -- did I write down what the actual number

Page 209

SLOCUM

1
2  was out of the machine? I think it was around
3  1,200 or so. I think that's what the Kenco
4  normally brews or whatever, and that's okay.
5     Q. (BY MR. SCHLITZ) So number six didn't meet
6  your liking; is that correct?
7     A. Well, to be honest with you, 1 through 9,
8  none of them met my liking. Some were downright
9  awful, like 8 and 9.
10     Q. What was six?
11     A. You know, that's -- to me, that's just kind
12  of brown water, but I mean, I can detect that there
13  is coffee in it.
14     Q. Right.
15     A. And it smells like coffee. And when you
16  taste it, if I ever bought that anywhere, I'd take
17  it right back and say I want my money back or a
18  real -- a real cup of coffee.
19     Q. But that's you.
20     A. That's me, that's Mr. Lingle, that's --
21     Q. Well, Mr. Lingle has a gold -- a silver
22  tongue, doesn't he?
23     A. But that's me. That's me.
24     Q. That's you?
25     A. And I -- I consider myself an average

SLOCUM

1
2 assuming my I think pretty generous estimates
3 there.
4    Q.  Okay.  Now, turning to page 21, paragraph
5 65, it says my problem -- my tests of both Lambert
6 and Rychiger cartridges, you also get another set
7 of fundamental problems with the creation of an
8 inlet to the foil.  The foil over the coffee bed
9 lacks any kind of support structure against which
10 to press a gasket or other device to form a seal.
11 Okay.  That -- in there, you were testing by
12 piercing the foil sort of midpoint in the first
13 chamber; is that correct?
14    A.  Correct.
15    Q.  Okay.  And then you say by contrast, the
16 Tassimo T-discs that are accused of infringing in
17 this case are provided with a support structure
18 such that the sides -- the lids are pierceable to
19 accommodate an inflow, but -- so here you're saying
20 that one of the things is you lack a -- a support
21 structure, right?
22    A.  Correct.
23    Q.  Okay.  But if we're using a -- this seal
24 that you mentioned earlier, okay, would that still
25 be a problem?

SLOCUM

1
2    A.  Yes.  Would you like me to explain why?
3    Q.  Yes, please.  Yeah.
4    A.  So when you pierce through the foil, the
5 cartridge itself is not that rigid and the foil has
6 elasticity.  And I can -- when you initially
7 pierce, the foil bulges all the way in, I mean
8 really far in.  And when it finally pierces, pop,
9 it snaps through.  Now, I can push the seal up
10 against the foil such that the foil is still
11 deflected way in and the seal is pushing hard
12 against the foil.  And then a very curious thing
13 happens.  You can actually push it so the end of
14 the nozzle pushes all the way up against the filter
15 and you get no coffee.  You get basically clear
16 liquid.
17    Q.  What if you don't?  What if you don't?
18    A.  So the harder and further you push in, the
19 less weep, the less chance of catastrophic failure
20 you get is what my preliminary test showed, but you
21 get no -- you get no coffee, and no one would even
22 argue, because then the liquid is almost clear.  So
23 the way I ran the tests were in the condition where
24 the foil was nominally planar, and that's what -- I
25 just put the pressure of the seal to keep the foil

SLOCUM

1
2 planar or maybe pushed in just a little bit to
3 start -- let the seal start to work, and that's
4 where I would get, you know, these -- that's how I
5 did my tests.  If you -- if you held it out so the
6 seal was never touching, then you always had
7 disaster, because you --
8    Q.  But if you put it slightly deeper, you'd
9 have less seepage?
10    A.  You would have a chance of it working
11 sometimes.  That's the weepage I was talking about
12 earlier.
13    Q.  And -- so I'm trying to understand what you
14 just said.  Are we talking about -- in what
15 orientation?
16    A.  All orientations.
17    Q.  Let's take the vertical orientation.  If
18 you put the -- if you put the piercer in halfway,
19 let's say, and you have a -- if you put the piercer
20 in and you have a -- some type of rubber seal,
21 okay, will it work?
22        MR. RADER:  Objection to form.  Go
23 ahead.
24    A.  The farther you push the piercer in, the
25 weaker the cup of coffee, because the burrow

SLOCUM

1
2 distance, your aspect ratio, really goes off then.
3 The farther you push it in, the better your chance
4 of sealing, and when I say chance of sealing,
5 because every now and then you would get these
6 catastrophic failures.  I didn't run any -- enough
7 tests with it pushed all the way in, which is where
8 I'd notice I'd push it all the way in and I'd get
9 this kind of clear dribble coming out, and I think
10 on those I didn't see a catastrophic failure, but I
11 just wasn't making anything that even began to even
12 start to look like coffee, so I said this wasn't a
13 real test.  So I had to run my tests for meeting
14 what I thought was the intent of the claims and the
15 function and everything we've already been through
16 in what was a realistic use of the system.
17    Q.  So I can understand, in the '762 patent, if
18 you look at figures -- well, look at Figure 5.
19    A.  Okay.
20    Q.  Will that work without a support structure?
21    A.  Well, as I marked up here, you get
22 burrowing, so it doesn't work in terms of you don't
23 -- I don't feel you get a beverage.  Will it work
24 in terms of can I actually use this and not have
25 catastrophic failure?  Um, I don't think so.

Exhibit C

# In The Matter Of:

*KEURIG, INCORPORATEDv.*
*KRAFT FOODS GLOBAL, INC*

———————————————————————

## *MALCOLM E. TAYLOR*
*July 3, 2008*

———————————————————————

## *MERRILL LEGAL SOLUTIONS*
### *101 Arch Street, 3rd Floor*
### *Boston, MA 02110*
*PH: 617-542-0300 / FAX: 617-338-6075*

**TAYLOR, MALCOLM E. - Vol. 1**

Page 106

1  A. Yeah, it's a disposable.
2  Q. You said you tested three or four cartridges?
3  A. Yes. I didn't have many.
4  Q. In what orientations did you have them?
5  A. I had one upside down in the normal route. I had
6    another one like this as in the test I had at Kraft.
7  Q. How many did you do in each of those positions?
8  A. Two of each probably.
9  Q. And did you take contemporaneous notes of what you
10    were doing?
11  A. No. All I just -- all I wanted was a demonstration.
12    I was putting hot -- I put in hot water through and
13    the beverage I was having out of the other end was
14    brown, so it was obviously absorbing coffee. That's
15    all I have to do because that's all that's in the
16    claim.
17  Q. Did you see any water exiting through the hole where
18    you had pierced?
19  A. No, it wasn't in fact.
20  Q. In any of your experiments?
21  A. No.
22  Q. To your knowledge you didn't actually pressurize the
23    chamber, though?
24  A. No. I mean I didn't because it's not mentioned in

Page 107

1    the claim at all.
2  Q. How long did it take you to do the testing that you
3    did?
4  A. Couple of minutes.
5  Q. Couple of minutes?
6  A. Yeah.
7  Q. How long did it take you to sort of design in your
8    mind what the testing was going to look like?
9  A. It was also minutes.
10  Q. How did you secure the cartridge? Was it your wife
11    holding it?
12  A. Yes.
13  Q. How much liquid did you get out of the outlet?
14  A. Well, it was the excess of the amount of -- over the
15    amount that was left in the chamber obviously, but
16    it wasn't a huge amount because I wasn't aiming at
17    any specific volume.
18  Q. So you didn't measure the volume?
19  A. No, I didn't measure it because it wasn't necessary.
20  Q. Was it a couple of teaspoons?
21  A. Yeah, probably.
22  Q. Did you taste the liquid?
23  A. No, I don't have to because it's not in the claim.
24  Q. Did you smell the liquid?

Page 108

1  A. Yeah, a little bit, and it had a coffee smell.
2  Q. What temperature was the water that you injected?
3  A. It was hot. It was out of a kettle actually, so it
4    was as much as I could hold in the syringe because I
5    didn't have any insulation.
6  Q. Do you know what the temperature was?
7  A. No, I don't. It would have been somewhere in
8    between -- well, it might have been around 150 F
9    maybe.
10  Q. 150 degrees Farenheit?
11  A. F, right.
12  Q. Did you take any photos of the test?
13  A. No, I didn't.
14  Q. What did you do with the cartridges when you were
15    done?
16  A. I threw them out.
17  Q. Then what did you do with the liquid?
18  A. Also dumped it.
19  Q. Did you take any notes on your observations of the
20    test?
21  A. No. Only what is in the report.
22  Q. And how far in advance of preparing the report did
23    you do the test?
24  A. A week, a week or two probably.

Page 109

1  Q. Now, it says in the footnote in your report that you
2    did the hypodermic needle test on a Lambert-type
3    cartridge with the open inlet?
4  A. Right.
5  Q. That was one of the three or four that you did?
6  A. Yes.
7  Q. What orientation did you do that one?
8  A. One that was in the vertical because it's open. I
9    mean actually that was the one I had to have
10    inverted. I could have put something over the hole,
11    but I didn't.
12  Q. So you did that one vertically with the open hole
13    toward the top?
14  A. Upright, yeah.
15  Q. What would normally be the inlet hole?
16  A. Yes, right.
17  Q. And you did that in order to avoid leakage out the
18    hole?
19  A. Yes, because obviously it would leak if I laid it in
20    any other way.
21  Q. If you had pressurized it, would it have leaked
22    notwithstanding that the hole was at the top?
23  A. Well, of course, yes.
24  Q. Was the hypodermic needle normal to the surface of

28 (Pages 106 to 109)