IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KEURIG, INCORPORATED,<br><br>        Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>        Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED –<br><u>PUBLIC VERSION</u>** |

**KEURIG'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*<br><u>TO PRECLUDE EXPERT TESTIMONY OF TED LINGLE</u>**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

Kraft seeks to preclude Keurig's coffee expert, Ted Lingle, from testifying that Kenco Singles cartridges (which Kraft alleges constitute prior art) fail to "produce a beverage" via same-side piercing as required by claim 1 of Keurig's '762 patent. Kraft's motion should be denied. Mr. Lingle is a recognized leader and expert in the coffee industry, and will address a factual question about coffee on which he has considerable – and undisputed – expertise.[1]

Kraft had the opportunity to present expert testimony that Singles cartridges produce a beverage via same-side piercing – an issue on which Kraft bears the burden of proof – but elected not to do so. If Kraft is nevertheless going to claim that the "beverage" claim limitation is met, then Keurig is certainly entitled to respond. Kraft's motion is an improper attempt to compensate for its own tactical choice not to retain a coffee expert by excluding Keurig's expert.

Mr. Lingle's testimony will not, as Kraft tries to suggest, intrude on the Court's role in construing the claims. Kraft (like Keurig) elected not to ask the Court to construe the term "beverage," preferring instead to let that term have its ordinary meaning. The ordinary meaning of "beverage," and the appropriate method for determining whether a particular liquid meets that standard, are questions of fact for the jury as to which Mr. Lingle's testimony can be helpful.

## I.    BACKGROUND

Mr. Lingle has extensive experience in all aspects of the coffee industry, including growing, roasting and brewing. He has written several books on coffee brewing. See Opening Expert Report (Ex. A) at 2-3. Keurig retained him as an expert on a number of issues, and Mr. Lingle prepared opening and rebuttal expert reports detailing his opinions. (Exs. A and B).

---

[1] As a threshold matter, Kraft's motion is fatally flawed because it seeks to preclude all testimony from Mr. Lingle, yet addresses only his rebuttal expert report on patent validity and provides no explanation why he should be precluded from offering the testimony outlined in his opening expert report (e.g., on infringement and damages issues). In any event, as explained below, Kraft's request to exclude Mr. Lingle's validity testimony is meritless.

### A.     Mr. Lingle's Infringement and Damages-Related Opinions

Mr. Lingle's opening report (Ex. A) describes his opinions related to infringement and damages – issues on which Keurig bears the burden of proof.

On infringement, Mr. Lingle will testify that the ground coffee and tea in Kraft's accused T-Discs are soluble beverage media as required by claim 1 of the '762 patent.  (Ex. A at 8).[2]

Mr. Lingle will also provide background information about the coffee industry and the coffee brewing process, and will explain the benefits of Keurig's same-side piercing invention. (Ex. A at 11-13).  This testimony is relevant to the question of how valuable the invention is, and therefore what reasonable royalty Keurig should receive under the Georgia-Pacific factors.

### B.     Mr. Lingle's Validity-Related Opinions

Mr. Lingle's rebuttal report (Ex. B) explains his opinions regarding Kraft's invalidity defense.  Mr. Lingle will testify that Singles cartridges simply do not "produce a beverage" via same-side piercing as required by claim 1 of the '762 patent.  Having analyzed the liquids that Keurig's engineering expert Professor Alexander Slocum obtained when testing Singles cartridges in a same-side piercing configuration, Mr. Lingle will explain that water injected through the foil lid of a Singles cartridge (rather than through the pre-molded inlet hole on the opposite side) burrows a hole through the coffee bed, over-extracting some of the coffee and under-extracting the rest.  Same-side piercing of Singles cartridges thus produces a weak and foul-tasting liquid that fails both objective and subjective criteria for qualifying as a beverage. (Ex. B at 2-8).  See also Lingle Depo. (Ex. D) at 28-30, 84, 90-91, 119-120.

---

[2] Although this point is uncontroversial, Kraft has refused to concede it.  See Kraft's Resp. to Keurig's Req. for Admission Nos. 4-6 (Ex. C at 3).

C.    **Procedural Posture**

Keurig notified Kraft of its position that Singles cartridges fail to meet the "to produce a beverage" limitation almost a year ago, on August 31, 2007, in its response to Kraft's invalidity contentions. Keurig explained that Singles cartridges lack "a single lid that is both: (1) pierceable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium <u>to produce a beverage</u>; and (2) pierceable to accommodate an <u>outflow of a beverage</u> from a second chamber to the exterior of the cartridge." (Ex. E at 3) (emphasis added).[3]  In other words, Keurig explained that Singles cartridges (designed for opposite-side piercing) simply would not work to make a beverage if one tried to use them with same-side piercing.

In January 2008, Kraft revealed to Keurig, for the first time, that it had conducted physical tests of Singles cartridges in a same-side piercing configuration.[4]  After learning of Kraft's tests, Keurig asked its experts to perform their own tests to determine (*inter alia*) whether Singles cartridges produce a beverage via same-side piercing.

II.    **ARGUMENT**

A.    **Mr. Lingle's Testimony Regarding Testing of Singles Cartridges Will Assist the Jury in Resolving a Key Question of Fact.**

Mr. Lingle analyzed the liquids Professor Slocum obtained from Singles cartridges when he pierced them in the manner Kraft suggests. He measured the solids dissolved in the liquids using an accepted scientific instrument. He also viewed, smelled and tasted the liquids, and applied his undisputed decades of expertise as a coffee "cupper" or taster.

---

[3] Kraft's brief incorrectly asserts that Keurig's August 2007 communication to Kraft ignored the "to produce a beverage" claim limitation. (D.I. 107 at 2).

[4] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Because Kraft refused to produce its engineer's report on his apparatus and tests, Keurig has moved *in limine* to exclude evidence of the testing. (D.I. 108).

Based on all these forms of testing, Mr. Lingle concluded that the liquids do not meet the plain and ordinary meaning of a "beverage."[5] Determining plain and ordinary meaning, and assessing whether that meaning is satisfied, are classic questions of fact that in no way intrude on the Court's role in claim construction. In <u>Cordis Corp. v. Medtronic Ave, Inc.</u>, 511 F.3d 1157 (Fed. Cir. 2008), for example, because the district court did not specify a particular way of determining "wall thickness" as a matter of claim construction, the Federal Circuit held that the appropriate method was a question of fact for the jury based on expert testimony. <u>Id.</u> at 1181. <u>See also</u> <u>Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.</u>, 510 F. Supp. 2d 356, 362 n.2 (D. Del. 2007) ("The issues of when it is determined that ACA is at an 'acceptable level' or how it is determined that ACA is at an 'acceptable level' are essentially different, potentially triable, issues of fact....Accordingly, the court will not foreclose expert testimony as to the meaning of the acceptability limitation."); <u>Agere Systems, Inc. v. Atmel Corp.</u>, C.A. No. 02-CV-864, 2005 WL 2994702, *11 (E.D. Pa. Aug. 17, 2005) (court denied motions *in limine* and allowed each party "to present its case to the jury based on its belief as to what the plain and ordinary meaning of the patents' language is"). Likewise, because this Court's <u>Markman</u> order did not address the word "beverage" or specify a particular method of determining whether a liquid constitutes one, Mr. Lingle should be allowed to describe the term's plain and ordinary meaning and explain to the jury how he evaluated the Singles liquids against that standard.

---

[5] Kraft argues that Mr. Lingle applied a definition of "beverage" other than its ordinary meaning. (D.I. 107 at 2). Kraft bases its argument on a single line from Mr. Lingle's deposition that it takes out of context. In fact, Mr. Lingle explained that the ordinary meaning of "beverage" is a liquid that "could be either sold or consumed for a person's enjoyment" (Ex. D at 64), and that this ordinary meaning is consistent with the '762 patent's focus on consumer acceptability. <u>Id.</u> at 65-66. In the specific context of brewed coffee beverages as described in the '762 patent, Mr. Lingle explained that there are certain objective criteria (measurement of dissolved solids) and subjective criteria (evaluation of texture, body, taste and aroma) that are used to determine whether a particular liquid <u>meets that plain and ordinary meaning</u>. <u>Id.</u> at 28-30, 84. Mr. Lingle does not rely on, nor will he testify to, anything other than plain and ordinary meaning.

**B.    Mr. Lingle's Expertise Puts Him in an Ideal Position to Assess
Whether Singles Cartridges Produce a Beverage With Same-Side Piercing.**

Mr. Lingle's decades of experience in coffee brewing, including as a coffee "cupper"

(taster) and renowned cupping trainer, and Executive Director of the Coffee Quality Institute,

more than qualify him to testify regarding whether the Singles liquids constitute coffee

beverages.  Kraft's argument to the contrary (D.I. 107 at 4-5) turns on the false premise that only

a person of skill in the technical art encompassing the <u>entire</u> claim (including the engineering and

fluid dynamics aspects thereof) can offer expert testimony on issues related to infringement or

invalidity.  This simply is not true; when a patented invention encompasses multiple technical

disciplines, it is addressed to people with skills in each of those fields.  E.g., Enzo Biochem., Inc.

v. Calgene, Inc., 188 F.3d 1362, 1373 (Fed. Cir. 1999) (patents involving "distinct arts" are to be

assessed from the perspective of "the adepts of each").  Kraft makes much of Mr. Lingle's

testimony that he is not a practicing engineer with skill in all the arts to which the '762 patent

relates, but as a matter of law this is simply irrelevant given Mr. Lingle's undisputed expertise in

one of these arts, namely analyzing coffee liquids.  Endress + Hauser, Inc. v. Hawk Measurement

Sys. Pty. Ltd., 122 F.3d 1040, 1042 (Fed. Cir. 1997) (rejecting as "meritless" the defendants'

objection to expert testimony on the ground that the expert had acknowledged he was not a

person of ordinary skill in the art).  Cf. Sprint Commc'ns Co. v. Vonage Holdings Corp., 500 F.

Supp. 2d 1290, 1345 (D. Kan. 2007) (declining to strike expert who "may not technically qualify

as a person of ordinary skill in the art....[because] any shortcomings in his qualifications go to

the weight of his testimony, not its admissibility.").  Indeed, Kraft does not cite a single patent

case in which an expert was precluded based on the specific nature of his or her expertise.

**III.    CONCLUSION**

Kraft's motion *in limine* to preclude Mr. Lingle's expert testimony should be denied.

- 5 -

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

- 6 -

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 22, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
David E. Moore, Esquire [*dmoore@potteranderson.com*]
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

Additionally, I hereby certify that on August 22, 2008, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

## BY E-MAIL

David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
John W. Shaw (No 3362)  [*jshaw@ycst.com*]
Adam W. Poff (No. 3990) [*apoff@ycst.com*]
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

      Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

      Defendants.

Civil Action No. 07-017 (GMS)

## RULE 26(A)(2)(B) EXPERT REPORT OF TED LINGLE
## APRIL 15, 2008

## I.  SCOPE OF WORK AND COMPENSATION

I have been engaged by counsel for Keurig, Incorporated ("Keurig") to examine the materials discussed in the body of this report and/or listed in Exhibit A, and to evaluate whether Defendants' (collectively, "Kraft") Tassimo "T-Discs" include all of the features described in the asserted claims of Keurig's U.S. Patent No. 6,607,762 ("the '762 patent"). I have also been asked to provide a perspective on background issues such as the coffee industry, the process of brewing coffee, the development of "single-serve" systems like those sold by Keurig and Kraft, and the value of particular benefits that the invention described in the '762 patent makes possible.

I expect to provide testimony at trial conveying and explaining the opinions set forth in this report. I further expect to provide testimony covering additional background information pertinent to this case. My testimony may include use of exhibits and demonstrations. I have not yet prepared such exhibits or demonstrations, but expect to do so in accordance with the Court's scheduling orders. In support of my opinions, I may also use any of the documents produced by the parties in discovery and/or industry publications, and particularly those documents referred to in the body of this report or in any exhibit hereto. If additional documents come to light at a later time, I reserve the right to address those as well.[1]

My compensation in this case, which follows my standard fee schedule and is not contingent in any way on the outcome of this litigation, is as follows: $100 per hour for trial preparation activities; $300 per hour for deposition testimony; $1,500 for a half-day of trial testimony; and $2,500 for a full day of trial testimony.

---

[1] For example, I understand from Keurig's counsel that Kraft recently produced a large quantity of documents that Keurig's counsel has not yet been able to review in detail.

## II.    QUALIFICATIONS

I am the Executive Director of the Coffee Quality Institute ("CQI"), a non-profit organization that the Specialty Coffee Association of America (SCAA) founded in 1996 in order to improve the quality of coffee and also the lives of the people who produce it.  I became Executive Director of CQI in 2006.

I previously served for 15 years as the Executive Director of the SCAA, an organization that I co-founded with other industry members in 1983.  The SCAA is the trade association for the specialty coffee industry and is involved in setting quality standards and providing industry training in the areas of coffee processing, roasting, cupping and brewing.  During my tenure as Executive Director, the SCAA grew in size from 350 to over 2,400 members.  The SCAA also established a number of technical standards that advance quality guidelines in all facets of coffee, from seed to cup.  I remain on the organization's staff as Senior Advisor on technical specifications for coffee quality.

I also worked as vice president of marketing for Lingle Bros. Coffee, Inc. for 20 years from 1970 to 1990.  During this period I directed the company's sales programs for the food service, office coffee service, and specialty coffee market segments.  I was responsible for establishing quality standards for the company's products and conducting training programs for both company personnel and customers.  In addition, I represented the company on various coffee industry boards and committees.

I graduated from the United States Military Academy with a B.S. in civil engineering.

I have served on committees of the National Coffee Association and the National Coffee Service Association.  I was also Chairman and a member of the Board of Directors of the Coffee Development Group/Promotion Fund of the International Coffee Organization.

I have received a number of coffee industry honors.  In 1998, I was awarded the National Medal of Merit by the Federation of Coffee Growers of Colombia.  In 2004, I was awarded the Order Flor de Café Medal of Merit by the Guatemalan National Coffee Association.  In 2007, I was awarded the Bwana Kahawa Lifetime Achievement Award by the Eastern African Fine Coffees Association (EAFCA).  EAFCA officers dubbed me the "grandfather of the specialty coffee movement."

I have testified before the U.S. House Committee on International Relations Subcommittee on the Western Hemisphere at hearings concerning "The Coffee Crisis in the Western Hemisphere."

Through my three decades of  practical work experience in the coffee industry, I have become intimately familiar with the process of brewing coffee and the many variables that contribute to the quality of the product.  I pioneered the use of the Coffee Conductivity Meter, an electronic instrument used to measure coffee strength.  I also have extensive experience

"cupping" coffee (i.e., evaluating the sensory effects of coffee's aroma, taste, and body). I travel extensively internationally teaching these skills in many coffee producing countries.

I have written a number of books related to the coffee industry. For example, I wrote The Coffee Cupper's Handbook, which is now in its third edition. Coffee cupping is the traditional means for professional coffee tasters to make sensory evaluations of coffee beans. I wrote the Cupper's Handbook in order to promote the discussion of meaningful and accurate coffee flavor terminology. The book describes flavor chemistry and explains the sources of coffee's aroma, taste, and body.

Likewise, The Coffee Brewing Handbook: A Systematic Guide to Coffee Preparation is a compendium of the many scientific studies on coffee brewing conducted by the coffee industry during the last fifty years. I wrote the Brewing Handbook to help coffee merchants understand how to maximize the potential of the coffee beans that they purchase.

I have also written shorter books (The Basics of Cupping Coffee and The Basics of Brewing Coffee) in order to distil the content of my handbooks for a broader audience.

Exhibit B lists various books and articles that I have written, particularly over the last ten years. I regularly write for CQI and SCAA circulars as well as other trade publications.

A list of the cases during the last four years in which I have testified as an expert either at trial or by deposition is provided in Exhibit C.

## III.    SUMMARY OF OPINIONS

Based on my review of Kraft's products, as well as the other materials listed in Exhibit A, it is my opinion that Kraft's Tassimo T-Discs having an internal filter (i.e., filter coffee, crema, tea, and espresso T-Discs) include all of the features in the asserted claims (i.e., claims 1, 2, 8, 9, and 10) of Keurig's '762 patent.

It is also my opinion that various advantages of the same-side piercing technology described in Keurig's '762 patent, and adopted in Kraft's Tassimo / T-Disc system, translate into real-world benefits that boost sales of Kraft's Tassimo brewers and T-Discs.

**"[A] soluble beverage medium stored in said first chamber"**

Any coffee, crema coffee, espresso, or tea T-Disc sold by Kraft has a soluble beverage medium stored in the first chamber of the cartridge (i.e., the portion of the cartridge into which water flows before passing through the filter).  As discussed above, a significant portion of the substances found in ground coffee and tea are soluble in hot water.  These soluble substances in fact give coffee and tea their aroma and taste.  As I explain more fully in the background section, coffee brewing is the art of controlling coffee strength (i.e., solubles concentration) and extraction (i.e., solubles yield).  Total dissolved solids has been a key metric for the coffee industry for more than 50 years, and the coffee conductivity meter that I pioneered is a useful tool for making these measurements.

The fact that not <u>all</u> of the substances in roasted ground coffee or tea are soluble under normal brewing conditions is immaterial.  Most of the insoluble bean fiber is left behind in the spent coffee grounds (or leaf fiber in the case of tea), and additional insoluble substances are removed during the brewing process by means of a filter (one of the components described and claimed in the '762 patent.   If only instant coffee or other <u>completely</u> soluble ingredients constituted a "soluble beverage medium," there would be no need for a filter.  Accordingly, I see no basis for interpreting the word "soluble" in the claim to mean "completely soluble," as I understand Kraft has proposed.  Indeed, such an extreme interpretation would directly contradict other aspects of the '762 patent specification.  The '762 patent explains that the beverage medium loaded into the first chamber is "typically roasted ground coffee." (Col. 3, line 20).  Roasted ground coffee, which is not "completely" soluble, is the ingredient for Kraft's coffee, crema coffee, and espresso T-Discs.

One can look at the "soluble beverage medium" issue from another angle as well.  That portion of the coffee grounds which dissolves to form the coffee is of course a "soluble beverage medium."  I understand from Keurig's counsel that in U.S. patent law, adding material or structure to a device that infringes a patent claim does not avoid infringement.  In the case of the T-Disc, using coffee grounds that include a soluble component and an insoluble component does not change the fact that the soluble component (at a minimum) constitutes a soluble beverage medium.

**"a lid closing the access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber"**

A T-disc has a lid that covers the access opening.  This lid is necessary to retain the contents of the T-disc inside the outer container.  A portion of the lid covers the section of the cartridge into which water flows before it passes through the internal filter.  In other words, a "first section" of the lid (shown in blue below) overlies the "first chamber" as the Court has construed the term.  Another portion of the lid covers the section of the cartridge into which the liquid (now a solution of water and coffee or tea "soluble solids") flows after passing through the filter (shown in red below):

### Claim 8

Infringement of claim 8 depends on infringement of claim 1.  The only additional requirement is that the outer container be "impermeable to liquids and gases."  The T-Disc satisfies this limitation.  The hard plastic of the container keeps unwanted liquid from reaching the beverage media (roast and ground coffee, tea, etc.) inside the T-Disc.  I have personally tested T-Discs and observed that they are watertight.  The hard plastic of the container also minimizes the flow of oxygen and other gases into the beverage media.  Kraft informs customers that T-Discs can be enjoyed up to six weeks after opening the outer carton wrapping.[2]  Assuming timely delivery of a T-Disc to a consumer, six weeks is a commercially reasonable period of time for the T-Disc to remain unspoiled.  Hence, the T-Disc would be considered effectively oxygen impermeable.

### Claim 9

Infringement of claim 9 depends on infringement of claim 1.  The only additional requirement is that the lid be "impermeable to liquids and gases."  The T-Disc satisfies this limitation.  The lid keeps unwanted liquid from reaching the beverage media (roast and ground coffee, tea, etc.) inside the T-Disc.  As noted above, I have personally tested T-Discs and observed that they are watertight.  The content of the lid also minimizes the flow of oxygen and other gases into the beverage media.  The lid includes an aluminum layer, and aluminum is known to be a good oxygen barrier.

### Claim 10

Independent claim 10 of the '762 patent essentially combines the requirements of independent claim 1 with the requirements of dependent claims 2, 8, and 9.  T-Discs therefore infringe claim 10 for the reasons that I have explained above.[3]

**B.    The Benefits of Same-Side Piercing to Kraft's Tassimo & T-Disc System**

The same-side piercing invention described in Keurig's '762 patent offers a number of important advantages that contribute to the desirability of the Tassimo and T-Disc system.

By making the inlet and outlet piercers operate from the same direction, the developers of the Tassimo brewers were able to incorporate a very simple combined design that includes both piercers in one unit which can be made of plastic (rather than metal, which is more expensive) and is easily removable from the brewer.

---

[2]  Response to Frequently Asked Question No. 18,
http://www.tassimo.ca/tassimo/page?siteid=tassimo-prd&locale=caen1&PagecRef=531.

[3]  Claim 10 does require a "planar filter element" whereas simply claim 1 specifies a "filter element."  I understand that Kraft agrees that the distinction is immaterial for the purposes of the present case.  The Court noted this agreement in the Claim Construction Order (page 2, note 2).



This design, which is made possible by the same-side piercing invention, has a variety of advantages including the following:

• The cheaper the piercer unit, the lower the price that Kraft or its partners need to charge for the Tassimo brewers. Particular "price points" (e.g., under $100) can be important when it comes to coffee brewers, helping Kraft to sell more brewers and ultimately more T-Discs.

• The Tassimo brewer's piercer unit can readily be removed and cleaned – even in the dishwasher. The Tassimo User Guide[4] specifically notes that the piercing unit is "easily removable" and "dishwasher safe." For sanitation reasons, this is particularly important when using a milk T-Disc to make a latte, cappuccino, or chai tea. In fact, the Tassimo User Guide recommends rinsing the piercing unit after using a milk or chocolate T-Disc. My understanding is that Kraft has actively promoted the Tassimo system's ability to produce milk-based drinks – a feature that current Keurig systems do not include. In short, same-side piercing, which facilitates removal and cleaning of the piercer unit, plays an important role in Defendants' ability to differentiate their products in this way.

• The piercer can also be removed to check for blockage or damage. Defendants advise such inspection in response to several frequently asked questions (e.g., Nos. 33 and 35).[5] Defendants also sell replacement piercer units. The ability of customers to troubleshoot and repair Tassimo brewers in this manner distinguishes Tassimo from typical consumer electronic devices (including most coffee brewers) and fosters favorable word-of-mouth.

---

[4] http://www.tassimodirect.com/tassimo/cust/UserGuide.pdf.

[5] http://www.tassimo.ca/tassimo/page?siteid=tassimo-prd&locale=caen1&PagecRef=531.

• By allowing the key mechanical components and tubing for both the inflow and outflow to sit in the roughly the same location (underneath the T-Disc, which is inserted with the lid down), the same-side piercing invention also gave designers the flexibility to create a compact and attractive brewer.  Defendants tout the fact that Tassimo is only 30.2 cm high, "making it a compact addition to any kitchen." (FAQ 23).

I, Ted R. Lingle submit this report pursuant to Fed. R. Civ. P. 26(a)(2).  I may adjust my analysis in light of the views offered by Kraft (or its expert witnesses) or based on information that is provided to me in the future.  I may express additional views in an expert report submitted in rebuttal to expert reports submitted by Kraft.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated:  April 14, 2008                    _____

                                          Ted R. Lingle

Exhibit B

CONFIDENTIAL – ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

       Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

       Defendants.

Civil Action No. 07-017 (GMS)

**CONFIDENTIAL
ATTORNEYS' EYES ONLY**

**RULE 26(A)(2)(B) REBUTTAL EXPERT REPORT OF TED LINGLE**
<u>**MAY 13, 2008**</u>

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.      SCOPE OF WORK AND QUALIFICATIONS

I have been engaged by counsel for Keurig, Incorporated ("Keurig") to review and respond to the expert report submitted by Malcolm E. Taylor dated April 15, 2008.  As described more fully in the expert report that I previously submitted in this case, I have worked in the coffee industry for decades and I am intimately familiar with the process by which a coffee beverage is produced, from seed to cup.

I expect to provide testimony at trial conveying and explaining the opinions set forth in this report.  I further expect to provide testimony covering additional background information pertinent to this case and my testimony.  My testimony may include use of exhibits and demonstrations. I have not yet prepared such exhibits or demonstrations, but expect to do so in accordance with the Court's scheduling orders.  In support of my opinions, I may also use any of the documents produced by the parties in discovery and/or industry publications, and particularly those documents referred to in the body of this report or in any exhibit hereto.  If additional documents come to light at a later time, I reserve the right to address those as well.

Exhibit A lists the additional materials (apart from those listed in Exhibit A of my opening report) that I have reviewed for this report.

## II.      SUMMARY OF OPINIONS

In my opinion, piercing the foil lid of a Singles cartridge containing ground coffee (like those that Mr. Taylor and the Kraft employees tested) and injecting a quantity of water into the cartridge (as opposed to making use of the pre-molded inlet hole on the side of the cartridge opposite the foil lid) does not produce a "beverage" within the meaning of Keurig's '762 patent. That is, one does not obtain output liquid of sufficient strength and with an adequate flavor and aroma profile so as to be accepted as a coffee beverage by consumers.  Therefore, while the Singles cartridge does contain a "soluble beverage medium," it does not have a single lid with both (1) a "first section … being pierceable to accommodate an inflow of liquid … for infusion with the beverage medium to produce a beverage" and (2) a "second section … being permeable to accommodate an outflow of the beverage to the exterior of [the] cartridge."

In my opinion U.S. Patent Nos. 4,853,234 ("the '234 patent") and 4,452,130 ("the '130 patent") likewise fail to disclose a cartridge meeting the above claim limitations.  A typical engineer in the coffee industry reading the patents would not understand them to describe a cartridge that is potentially (let alone necessarily) capable of producing a beverage within the meaning of the '762 patent when making use of the same-side piercing concept that Keurig's inventors pioneered.

It is also my opinion that the outer container of the Singles cartridge is not impermeable to gases within the meaning of that phrase as used in claim 8 of the '762 patent.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

III.     **OPINIONS AND EXPLANATIONS**

A.     **The Singles Cartridge is Not Capable of Converting
       A Soluble Beverage Medium Into a Corresponding
       Beverage Through Same-Side Piercing.**

Mr. Taylor opines that the Singles cartridge[1] has a lid with (1) a "first section … being pierceable to accommodate an inflow of liquid … for infusion with the beverage medium to produce a beverage" and (2) a "second section … being piercable to accommodate an outflow of the beverage to the exterior of [the] cartridge." Specifically, Mr. Taylor concludes that (1) the foil lid of the Singles cartridge is physically capable of being pierced to permit a flow of liquid into the coffee storage chamber; and (2) the lid is also physically capable of being pierced a second time to permit a flow of liquid out of the cartridge after that liquid has been in contact with the ground coffee.

Mr. Taylor's analysis overlooks the defining feature of the '762 patent invention: a single-serve filter cartridge that takes a soluble beverage medium (e.g., ground coffee) and converts it into a finished product that consumers will want to purchase and drink. For example, the '762 patent notes the "widespread acceptance" that certain prior art single-serve filter cartridges had gained in the marketplace. (Col. 1, lines 35-36). The patent stresses the value of using impermeable materials for the outer container and lid, or enclosing the cartridges within an impermeable wrap. This prevents oxidation and preserves freshness. In the context of the '762 patent, therefore, "beverage" means a brewed liquid (e.g., coffee) of sufficient strength and with an adequate flavor and aroma profile so as to be accepted by consumers for purchase and consumption.

While Mr. Taylor suggests that it is theoretically possible to take a Singles cartridge (designed for conventional opposite-side piercing), inject hot water into the lid, and ultimately collect a "coffee liquor" through a second piercing of the same lid, he offers no analysis of or opinion on whether that "liquor" constitutes a beverage within the meaning of the '762 patent.

Working with Alexander Slocum, a professor of engineering at the Massachusetts Institute of Technology, I tested a series of Singles cartridges and concluded that the liquid obtained when trying to use those cartridges in a same-side piercing setup is not a beverage within the meaning of the '762 patent. I observed Professor Slocum carry out a series of experiments using a newly-opened sleeve of Singles cartridges containing ground coffee (specifically, Kenco Colombian Coffee) as the soluble beverage medium:

---

[1] I understand that Keurig and Kraft disagree as to whether the Singles cartridge qualifies as "prior art" to Keurig's '762 patent. I have not been asked to render an opinion on that subject.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

The table below details the sets of parameters tested, all of which involved piercing the foil lid for both inflow of water and outflow of liquid.  The table also indicates the corresponding total dissolved solids (TDS)[2] of the liquids obtained from the testing.  The testing was performed using parameters designed to duplicate the water volume (180 mL) and peak temperature (185 degrees F) generated by a Singles brewer.[3]

| Experiment | Orientation | Pressure | Time | TDS |
|---|---|---|---|---|
| 1 | Foil down, with plate | 3.2 psi | 19 seconds | 615 ppm |
| 2 | Foil down, with plate | 15.7 psi | 12 seconds | 635 ppm |
| 3 | Foil up, with plate | 14.7 psi | 27 seconds | 865 ppm |
| 4 | Foil up, with plate | 15.4 psi | 8.2 seconds | 629 ppm |
| 5 | Foil up, with plate | 3.4 psi | 1 minute 6 seconds | 674 ppm |
| 6 | Vertical, with plate; outlet nozzle at the bottom | 3.1 psi | 19.2 seconds | 802 ppm |
| 7 | Vertical, with plate; outlet nozzle at the bottom | 15 psi | 13.72 seconds | 769 ppm |

These experiments, using Singles cartridges containing ground coffee as the soluble beverage medium, yielded liquids that simply did not constitute coffee beverages within the meaning of the '762 patent.[4]  Photos of several of the liquids follow below.

---

[2] These readings were taken using a coffee conductivity meter.  My earlier report describes this instrument and my role in its development.

[3] A Singles brewer was tested using a Kenco Colombian Singles cartridge in order to establish these parameters.  I also inspected a Singles cartridge after it had been used in the Singles brewer and noted that it had been pierced on the foil side only for the outlet.  In other words, the Singles brewer uses conventional opposite-side piercing technology.

[4] I was not present when Kraft's engineers (or Mr. Taylor) tested Singles cartridges and therefore did not see or taste the resulting liquids.  Even if those liquids constituted coffee beverages within the meaning of the '762 patent (which I doubt in light of Professor Slocum's results) such tests would not establish that Singles cartridges are <u>necessarily</u> pierceable to accommodate an inflow and an outflow and to produce a beverage as I understand is required by the '762 patent claims.  Professor Slocum's testing shows that, under a wide variety of conditions and parameters, Singles cartridges do not meet those claim limitations.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



Experiment 2

CONFIDENTIAL – ATTORNEYS' EYES ONLY



Experiment 4

CONFIDENTIAL – ATTORNEYS' EYES ONLY



Experiment 5

CONFIDENTIAL – ATTORNEYS' EYES ONLY

I smelled and tasted several of these liquids, confirming my visual analysis that they do not constitute coffee beverages within the meaning of the '762 patent. The TDS measurements also support this conclusion. Even the strongest of the liquids obtained in Professor Slocum's testing (experiment 3 – 865 ppm) had a TDS reading almost 20 percent lower than that of the cup of coffee brewed by inserting a Kenco Colombian Singles cartridge into an actual Kenco Singles brewer for opposite-side piercing as designed (1080 ppm).

I also understand that Professor Slocum did further same-side-piercing testing using the Kenco Colombian Singles cartridges. In particular, I understand that he removed the inlet seals (so as to simulate cartridges produced on a "Lambert" production line) and obtained output liquids less than one third as concentrated (220 and 327 ppm) as the Singles brewer baseline. Based on the TDS readings alone, such liquids plainly do not constitute beverages within the meaning of the '762 patent.





---

[5] A person of skill in the art, viewing the Singles cartridge, would appreciate that the manifold is intended to be used and that the cartridge is intended to be pierced for the inlet at the beveled inlet hole on the side of the cartridge opposite the foil lid. For purposes of the experiments described in this report, I asked Professor Slocum to use the Singles cartridges in a same-side piercing setup even though one of skill in the art would not have been motivated to do so.

**B.      The Cartridges Described in the '234 and '130 Patents Are
Not Capable of Converting a Soluble Beverage Medium Into a
Corresponding Beverage Through Same-Side Piercing.**

For similar reasons, it is my opinion that the '234 and '130 patents likewise fail to
disclose a cartridge with a soluble beverage medium and a lid that is both (1) capable of being
pierced to accommodate an inflow of liquid for infusion with the beverage medium to produce a
beverage within the meaning of the '762 patent and (2) capable of being pierced to accommodate
an outflow of that beverage to the exterior of the cartridge.

As with Kenco Singles cartridges, the embodiments described in the '234 and '130
patents are designed for conventional opposite-side piercing.  There is no disclosure or
suggestion in either of these patents of the idea of same-side piercing through a foil lid for both
inflow of liquid and outflow of beverage.

The cartridges described in the '234 patent are similar in many respects to the Singles
cartridges; the '234 patent even describes using water at high pressures up to 150 psi. (Col. 5,
lines 35-36).  The embodiment that Mr. Taylor discusses in his report is also described as
including slots through which the water passes before infusing up through the beverage medium
(after traveling down the inlet, from the top of the cartridge to the bottom). (Col. 7, lines 22-26).
This manifold-based distribution of the hot water is critical for transforming the soluble beverage
medium (e.g., ground coffee) into a corresponding beverage.  If one instead tried to utilize the
cartridges described in the '234 patent by means of same-side piercing, the results would be
similar to what I observed with the Singles cartridge testing described and illustrated above.

The cartridge in the '130 patent is designed for the ordinary top-down flow of hot water
through the soluble beverage medium.  Mr. Taylor nevertheless proposes to flip the cartridge
upside down and have the hot water flow up through the coffee bed.  What might happen in such
a scenario, and whether it would produce a coffee beverage, is unknown.[6]  In my opinion,
without even distribution of hot water jets as provided with a Singles-type manifold system, the
"upside down" approach is very unlikely to produce a beverage within the meaning of the '762
patent.

**C.      The Singles Cartridge is Not Impermeable to Gases.**

Claim 8 of the '762 patent requires that the outer container of the cartridge be
"impermeable to liquids and gases."  Singles cartridges do not meet this requirement because
Kraft's own packaging materials indicate that the cartridges are only best if used within one
month of opening the metallic sleeve that serves as an oxygen barrier:

---

[6] Mr. Taylor reports neither having made nor tested cartridges as described in the '234 and '130
patents.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



The package pictured above contained cartridges with closed inlet holes, yet Kraft includes the same one-month recommendation on sleeves containing cartridges with <u>open</u> inlet holes even though the contents of those cartridges are directly open to the air:



CONFIDENTIAL – ATTORNEYS' EYES ONLY

According to Kraft's own packaging, therefore, the outer container of the Kenco Singles cartridges adds no additional oxygen barrier protection relative to a cartridge that is completely open to the air (via a hole in the container).



I, Ted R. Lingle, submit this report pursuant to Fed. R. Civ. P. 26(a)(2). I may adjust my analysis in light of the views offered by Kraft (or its expert witnesses) or based on information that is provided to me in the future.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated: May 13, 2008

Ted R. Lingle

- 11 -

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit A – Additional Materials Considered for Rebuttal Report

- Expert Witness Report of Malcolm E. Taylor (dated 4/15/08), including Exhibits 1-15

- U.S. Patent No. 4,853,234

- U.S. Patent No. 4,452,130

- Various Kenco Singles cartridges

- Deposition Transcript of Andrew Bentley (2/27/08)

- Deposition Transcript of Hubert Weber (4/1/08)

Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | |
| | ) | |
| Defendants | ) | |

**DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION,
AND KRAFT FOODS INC.'S RESPONSE TO KEURIG'S
FIRST SET OF REQUESTS FOR ADMISSION**

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc.

(collectively, "the Kraft Defendants"), by counsel, hereby submits its Response to Keurig, Inc.'s

("Keurig"), First Requests for Admission, as follows:

**GENERAL OBJECTIONS**

The Kraft Defendants generally object to Keurig's Requests for Admission (the

"Requests") on the grounds stated below. These objections apply to each of the Requests unless

otherwise specifically indicated below. Neither the Kraft Defendants' specific objections nor its

responses shall be deemed a waiver of these General Objections.

1.    The Kraft Defendants object to the Requests to the extent they impose any

requirement or discovery obligation exceeding those set forth in the Federal Rules of Civil

Procedure and the Local Rules of U.S. District Court for the District of Delaware.

3.      Admit that a T-DISC includes a filter element received in and configured and arranged to subdivide the interior of the container into **first and second chambers**.

**RESPONSE**:   This Request is answered with regard to the Court's Order Construing the Terms of U.S. Patent No. 6,607,762 ("Order"), dated January 23, 2008.  To the same extent that the Kenco Singles Cartridge includes a filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers, the T-DISC likewise includes a filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers. If, and to the extent, Plaintiff applies the Court's claim constructions in a way as to deny that the Kenco Singles Cartridge includes a filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers, it is denied that the T-DISC includes a filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers.

4.      Admit that ground coffee is a soluble beverage medium.

**RESPONSE**: Denied.

5.      Admit that tea is a soluble beverage medium.

**RESPONSE**: Denied.

6.      Admit that a T-DISC includes a soluble beverage medium stored in the first chamber.

**RESPONSE**:  This Request calls for a claim construction, and, thus, the Kraft Defendants can neither admit nor deny.

3

Exhibit D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------------X

KEURIG, INCORPORATED,

                              Plaintiff,

VS

KRAFT FOODS GLOBAL, INC., TASSIMO
CORPORATION, and KRAFT FOODS, INC.,

                              Defendants.

Civil Action No. 07-CV-0017-GMS

----------------------------------------X


         VIDEOTAPED DEPOSITION OF TED R. LINGLE

              Friday, June 27, 2008

               9:11 a.m. - 2:05 p.m.

          WOLF, GREENFIELD & SACKS, P.C.

               600 Atlantic Avenue

            Boston, Massachusetts 02210


      Court Reporter:  Loretta Hennessey, RDR, CRR




         ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
                New York, New York 10022
                     212-750-6434
                     REF: 87840

LINGLE

Lingle knows, he can certainly answer.

Q. Is the aroma, taste, body and color measured in any other way than TDS?

A. It can be, but traditionally it has not been.

Q. In what other way can it be measured?

A. You can measure color with light refraction. You can measure body with an oven dehydration.
Essentially the coffee industry was trying to find some parameter, some metric for evaluating what it did that was inexpensive, easily understood and readily applied. And so in the '50s the Coffee Brewing Center came up with this concept of dissolved solids as a way of evaluating on a scientific level what was contained in that beverage.

Q. Okay. Now, on Page 4, the penultimate paragraph references Exhibit D, and that's the page that we looked at at the very back with this chart on it; is that correct?

A. That's correct.

Q. And this came from a book that you wrote?

A. Yes.



LINGLE

Q. Okay. Is the information in that book still accurate?

A. Yes.

Q. Okay. Now, in your area of expertise in coffee consumption, how many cups a day does the average coffee drinker drink?

(Discussion off the record.)

Q. Okay. What is the average number of cups of coffee a day a coffee consumer drinks in the United States?

A. I believe that number this year was something on the order of 2.7.

Q. And do you know if that's broken down to so many cups at home and then so many cups away from home per day?

A. Yes, the National Coffee Association does coffee drinking trend studies that get into those various aspects about where coffee is consumed and in what quantity and what type.

Q. Okay. And how many cups a day does the average coffee drinker drink at home?

A. I don't recall those numbers. I'd have to look at that study.

Q. Do you believe it's at least one?



LINGLE

A. I'm sure it's at least one.

Q. Do you think it's at least two?

A. Yeah, I think that would depend on the coffee drinker.

Q. Okay. Now, a little while ago you said that a beverage has to have a certain amount of TDS in order to be, total dissolved solids in it, to be acceptable to the average consumer?

A. That is correct.

Q. Let's drill that down a little bit. If a, if a beverage has less than -- well, you -- while we certainly don't accept the number a thousand, you used the number a thousand. Okay? If a beverage has a thousand, is measured at a thousand TDS, then you would say that is a coffee beverage; is that correct?

A. Right, with the understanding that that number represents a uniform or controlled extraction of the flavoring material. The TDS is only a metric, and it was a way the industry used to measure the extraction of the, from the beverage medium, the ground particles. And in that number is the assumption that there's particulate matter, meaning suspended solids that create body, and also



LINGLE

a certain level of gaseous material that create coffee's aroma.
And so you can't use a single number as being reflective of the entire beverage, which has color, body, and flavor, "flavor" meaning taste and aroma. The dissolved solids, things that dissolve, are basically the things that we taste, but the assumption in that number, that metric is that those other components are present. So I can't really say that there's a single number that separates the coffee as being a beverage versus one that's not.

Q. Well, on Page 4 in the second paragraph, when I asked you, how do you measure aroma, taste, body and color, you said with, by the total dissolved solids, didn't you?

A. I said that was the most common method, but not the only method.

Q. But not the only method. But it's the most common method?

A. That's correct.

Q. Okay. So if we have -- using your number, if a -- if the minimum acceptable to a consumer is a thousand, while I don't accept that number, if you take that number, then is that a coffee beverage?

LINGLE

1                LINGLE
2     A. And I answered that as yes.
3     Q. Okay. And just so I understand, that
4 would be one percent; is that correct?
5     A. Right. Correct.
6     Q. Now, if a beverage measures less than a
7 thousand, using your number, in your view it's no
8 longer a coffee beverage; is that correct?
9     A. It would depend on the other factors. I
10 can't say and would not pretend to say that TDS is
11 the sole definition of what constitutes a coffee
12 beverage; it's simply a measurement indicating the
13 amount of flavoring material that's present.
14     Q. Well, doesn't it also measure, correspond
15 to aroma?
16     A. If the coffee's been properly brewed,
17 then, yes, they're all in proportion. If the
18 coffee's not properly brewed, then you can have a
19 high TDS, but none of the other parameters that
20 constitute a coffee beverage.
21     Q. What do you mean "properly brewed"?
22     A. The uniform extraction from all the
23 particles.
24     Q. So, well -- so a beverage that has 900
25 TDSs, could be a coffee beverage; is that right?

LINGLE

1                LINGLE
2     A. If -- it could be if the other components
3 were there, the aroma, taste, and body.
4     Q. Well, how would one reading this patent in
5 suit -- you've read the patent, haven't you?
6     A. Yes, I have.
7     Q. Okay. Now, you're an expert on coffee,
8 but how would one of ordinary skill in the art with
9 regard to the art of single-serve beverage
10 cartridge, how would that person know if it is a
11 coffee beverage?
12     A. I'm not quite sure I understand your
13 question. Could you repeat it?
14     Q. You're one who's an expert, you told me,
15 in coffee, right?
16     A. Yes, that's correct.
17     Q. Now, the -- one of ordinary skill in the
18 art in building and constructing single-serve
19 coffee, excuse me, single-serve beverage cartridges
20 is not one who's an expert in coffee, you'd agree
21 with that?
22     A. I'd agree with that.
23     Q. Okay. And how would that person know if
24 the, if the beverage that extracts, that exited a
25 cartridge was a coffee beverage?

LINGLE

1                LINGLE
2     A. Well, I'm sure that that engineer would
3 hire someone like me who is a coffee expert and can
4 advise them on what the parameters are that they're
5 shooting for in terms of creating a coffee beverage
6 with the right level of color, body and flavor.
7     Q. All right. So it would require hiring an
8 expert like you?
9     A. Yes, it would require someone who
10 understands the coffee beverage.
11     Q. Okay. Now, there are not many of you in
12 the world, so if a, if a, an engineer of ordinary
13 skill in the art wanted to use TDS as a measure,
14 would that be an acceptable measure?
15     A. That's an acceptable metric for measuring
16 on a scientific basis the extract that you've
17 created in that beverage cartridge.
18 But I would disagree with the premise that there
19 aren't many people like me in the world. I'm sure
20 there are many coffee experts at a company like
21 Kraft. I mean, I've met a few of them. They're
22 very fine coffee people.
23     Q. Absolutely. And maybe you'll meet some
24 more at the trial.
25 But if someone's not at a major company like Kraft,

LINGLE

1                LINGLE
2 just picks up the patent and wants to design -- but
3 is an engineer, has a couple of years experience,
4 he's a mechanical engineer, couple of years
5 experience in developing consumer products, okay,
6 that person who doesn't have a silver palate like
7 you that can taste at least different things, how
8 would that person know?
9     A. Well, the literature on coffee brewing and
10 what constitutes an acceptable coffee beverage is
11 fairly widespread, so anyone who's going to the
12 trouble of designing a brewing cartridge, which is
13 really a fairly sophisticated brewing system, is
14 going to spend the time to understand what the final
15 result should be from that cartridge design.
16     Q. Okay. Now, in your -- explain, if you
17 would, please, explain why you believe a drink has
18 to be acceptable to consumers to be considered a
19 coffee beverage?
20     A. When you talk about brewed coffee and
21 coffee beverage, then in my mind implicit in that is
22 one that's commercially viable, meaning that someone
23 will pay you for it with the expectation of getting
24 a cup of coffee.
25     Q. And you've read the patent in suit, I take

LINGLE

1
2  it's based on the, my understanding of what the
3  patent says.
4      Q.  If you would turn to the first, not the
5  coverage page but the first page of this rebuttal
6  report.  Okay.  Are you there?
7      A.  Uh-huh.
8      Q.  Okay.  Under "Summary of Opinion," it
9  says, on the fourth line -- well, let's read the
10  whole thing.  "In my opinion, piercing the foil lid
11  of a Singles cartridge containing ground coffee
12  (like those that Mr. Taylor and the Kraft employees
13  tested) and injecting a quantity of water into the
14  cartridge (as opposed to making use of the
15  pre-molded inlet hole on the side of the cartridge
16  opposite the foil lid)," and this is what I'm
17  interested in, "does not produce a 'beverage' within
18  the meaning of Keurig's '762 patent."  Do you see
19  that?
20      A.  Uh-huh.
21      Q.  You put the word "beverage" in quotations,
22  and you say "'beverage' within the meaning of
23  Keurig's '762 patent."  Do you see that?
24  Does the word "beverage" in Claim 1 of the patent,
25  where it appears, have a special meaning that's

LINGLE

1
2  different than the ordinary and usual meaning of
3  that word?
4      A.  I think that is defined in the patent as a
5  brewed beverage.
6      Q.  Right.
7      A.  Okay?  And so I wanted to put the word in
8  quotes to emphasize that we're using this word,
9  which could be generic, in a very specific
10  application, and that's brewed beverage.
11      Q.  Okay.
12      A.  Again, brewed coffee beverage.
13      Q.  Wait.  Let's take this in parts.
14      A.  Okay.
15      Q.  You say, so it's not used in its generic
16  sense.  Do you mean its ordinary sense?
17      A.  Ordinary --
18          MR. RADER:  Objection to form.
19      Q.  Excuse me?
20      A.  Ordinary in what those of us who are
21  consumers would interpret that to mean, consumers of
22  a beverage, one that we purchased.
23      Q.  I'm sorry, and this is not your fault, I
24  just didn't understand what you just said.
25      A.  To me the word "beverage" in this

LINGLE

1
2  application, it means one that the average person
3  would go out on a commercial level and purchase
4  either for home use or for consumption away from
5  home.
6      Q.  Okay.  My question to you is, does
7  "beverage" have a meaning in the patent that is
8  different than its ordinary meaning?
9      A.  I believe it does.
10      Q.  Okay.  What do you believe the ordinary
11  meaning of "beverage" is?
12      A.  The ordinary meaning would be a product
13  that could be either sold or consumed for a person's
14  enjoyment.
15      Q.  So it's --
16      A.  I mean, there would be certain categories
17  I would exclude.  I wouldn't include tap water in
18  the context of a beverage.
19      Q.  So you think the word "beverage" has a
20  commercial, has a commercial connotation?
21      A.  When I read the patent, then I was
22  assuming, my assumption is the average person
23  reading that patent would assume this was a beverage
24  for commercial application.
25      Q.  Okay.  And what is the basis of that

LINGLE

1
2  assumption?
3      A.  That it basically talked about a brewed
4  beverage, meaning one that was prepared in a way
5  that involved controlled strength and controlled
6  extraction in order to meet some beverage standard,
7  either tea or coffee or whatever.
8      Q.  And what is the word -- what is it in the
9  words "brewed beverage" that to you connotes
10  controlled, some type of controlled standard?
11      A.  That's basically the science of coffee
12  brewing is controlling the extraction, controlling
13  the strength.  It's not a random process, it's a
14  controlled process.
15      Q.  Okay.  And is there anything explicit in
16  the patent that you point to that says it has to be
17  commercially acceptable?
18      A.  In the patent it uses the phrase
19  "widespread acceptance."
20      Q.  Right.
21      A.  Okay?  And when you're reading a patent
22  about a product that's designed to commercially
23  produce a beverage, then I think it's fair to assume
24  that that's the intent of those words.
25      Q.  Okay.  I'm sorry, you just said when

Page 66

```
1              LINGLE
2  you're reading a --
3         MR. SCHLITZ:  Can you read back what
4  he just said.
5         (Answer read).
6     Q.  What is it in the patent that suggests to
7  you or, rather, explicitly says to you that it is
8  designed to commercially, designed for a commercial
9  product?
10         MR. RADER:  Objection, asked and
11  answered.
12     A.  The whole intent of that brewing cartridge
13  is to produce a coffee beverage that's commercially
14  viable.
15     Q.  Okay.  That's your reading of it, and I'm
16  saying:  What -- can you point to me what it is in
17  the patent that leads you to believe that?
18     A.  The nature of the product, I mean, it's
19  designed to produce a beverage.  The understanding
20  that I have that I'm assuming the person who granted
21  the patent would have, that that was a commercial
22  application, and the fact that it was suggesting
23  that it was an advance on a current, existing patent
24  that had widespread acceptance.  Everything there
25  says this is a commercial product.
```

Page 67

```
1              LINGLE
2     Q.  And is your opinion based on your belief
3  that the apparatus built according to this patent
4  has to have commercial acceptance?
5     A.  That the resulting product has a
6  commercial acceptance in the marketplace, yes.
7     Q.  So, just so the record is clear, you are
8  -- your opinion is based on your understanding or
9  belief that the patent requires that the apparatus
10  that is disclosed and built would have commercial
11  acceptance?
12     A.  That the intent of this patent is for a
13  commercial device.
14         MR. SCHLITZ:  Okay.  Could you read
15  back his answer, please.
16         (Answer read).
17     Q.  And thus is it your opinion that -- okay.
18         (Discussion off the record.)
19     Q.  So --
20         MR. SCHLITZ:  Give me the patent,
21  please.
22         (Document marked as Exhibit 3
23         for identification)
24         (Document exhibited to witness.)
25     Q.  You have the patent in front of you?
```

Page 68

```
1              LINGLE
2     A.  Yes, I do.
3         MR. RADER:  Did you mark this as
4  Exhibit 3?
5     Q.  Now, if you would turn to column 5.  This
6  is -- if you first look --
7     A.  Excuse me for a minute.
8     Q.  Yes?
9     A.  Being an old guy, I need to go get my
10  glasses if I'm going to look at this.
11     Q.  You know what, I'm older than you so I
12  certainly understand that.
13     A.  Well, maybe not.
14     Q.  Maybe not, maybe so.  We're about the
15  same.
16         VIDEO OPERATOR:  Going off the
17  record, the time is 11:04.
18         (Video off.)
19         (Discussion off the record.)
20         (Video on.)
21         VIDEO OPERATOR:  We're back on the
22  record, the time is 11:06.
23     Q.  We're looking at Claim 1 of the patent,
24  and on Page 5 it says, "A lid closing said access
25  opening, said lid having a first section overlying
```

Page 69

```
1              LINGLE
2  said first chamber and a second section overlying
3  said second chamber."  Now this is where I would ask
4  you to concentrate.  "The first section of said lid
5  being pierceable to accommodate an inflow of liquid
6  into said first chamber for infusion with the
7  beverage medium to produce a beverage."  Do you see
8  that?
9     A.  Yes, I do.
10     Q.  Now, in your report you actually
11  acknowledge that the Court has already interpreted
12  the terms "said lid being pierceable to accommodate
13  inflow of liquid;" is that correct?
14     A.  That's correct.
15     Q.  And what did the Court -- do you remember
16  what the Court said that means?  It's not a pop
17  quiz.
18     A.  No, I don't recall specifically.
19     Q.  Okay.  Well, if I tell you that it said,
20  "capable of being pierced to permit an inflow of
21  liquid."  Okay?
22  Then it goes on to say -- so that those terms the
23  Court has already --
24     A.  Uh-huh.
25     Q.  -- construed.
```

Page 82

LINGLE

1  you're referring to when you say "it."
2  Q.  Okay.  Well, let me understand that.  You
3  ran eight or nine tests with Professor Slocum; is
4  that correct?
5  A.  That's correct.
6  Q.  Okay.  Now, you didn't run -- and let's
7  turn to Page 4 of your rebuttal report.  You have
8  one set of variables which is foil down, with a
9  plate.  Do you see that?
10  A.  Yes.
11  Q.  And it's at 3.2 psi, right?
12  A.  Yes.
13  Q.  And for 19 seconds, right?  And you got
14  615 PPMs.
15  Now, that would, if I understand it, you put 615
16  PPM, in fact that should be 6,150 PPM?
17  A.  Yes.
18  Q.  Okay.  And you only did that once, right?
19  Correct?
20  A.  That is correct.
21  Q.  Okay.  But then you have another set of
22  variables, which is foil down, with plate, at 15.7
23  psi at 12 seconds and you got 635 PPMs.
24  A.  Uh-huh.

Page 83

LINGLE

1  Q.  Then you have foil up, with plate, at 14.7
2  psi for 27 seconds and you got 865.  So the 865 is
3  several hundred more than the foil down, with plate,
4  so that would be variable is what you're saying to
5  me?
6  MR. RADER:  Objection to form.
7  A.  That is correct.
8  Q.  Right.  Okay.  Is part of your opinion
9  based on the fact that there is that variability?
10  A.  Yes, that's what I've testified.
11  Q.  Okay.  Now, so that we're not -- so I
12  understand this and we're not caught in the, in
13  these numbers, just the fact that what is, what TDS
14  is acceptable.  Okay?  And let's assume for a moment
15  that, let's assume that 665 was a, is acceptable to
16  consumers but -- excuse me, 865 is acceptable to
17  consumers but 635 is not.  Okay?
18  A.  But I think that's not a fair assumption,
19  because the assumption we have is that if it's
20  reasonably well brewed, that number is going to be
21  close to a thousand.
22  Q.  I'm sorry, say that again now?
23  A.  If the coffee is brewed correctly, that
24  number is going to be close to a thousand.

Page 84

LINGLE

1  Q.  What number?
2  A.  The "acceptable to consumer" number.
3  Q.  I understand that.  We can even use your
4  number.  Okay?
5  A.  Okay.
6  Q.  If this -- if your third test was a
7  thousand -- no, let's say if your third test was
8  1200, okay, but your first two tests -- and we're --
9  for this discussion, although I don't agree with it,
10  we'll accept the one percent, a thousand, as the
11  cut-off for acceptability.
12  If the third test was a 1200 but if the first two
13  tests were only 800, okay, or 615, 635, okay, would
14  you then be opining that the -- would it still be
15  your opinion that the Kenco Singles is not capable
16  of producing a coffee beverage?
17  A.  I would say yes, but with the
18  understanding that my opinion is not based totally
19  on dissolved solids, it's also based on the texture,
20  the body of the beverage, the taste of the beverage,
21  and the aroma of the beverage --
22  Q.  Right.
23  A.  -- that there's a subjective element here
24  as well.

Page 85

LINGLE

1  Q.  You said "yes," something.  What were you
2  saying yes to?
3  A.  Yes, that the beverage that I watched
4  produced with single-side piercing of that Kenco
5  cartridge would not be an acceptable coffee beverage
6  for the consumer.
7  Q.  Okay.  But I was trying to understand is
8  it, if you, in my example of 1200 in example, in
9  test 3, but 615, 635 in tests 1 and 2, is it not
10  acceptable because of the variability?
11  A.  No, my point on variability was not
12  suggesting that that be tied directly to
13  acceptability.
14  Q.  Okay.
15  A.  It's that the fact that when used in
16  single-side piercing does not create the same result
17  when it's used in the way it was designed, which is
18  opposite-side piercing.
19  Q.  Okay.  Well, I'm going to get to that
20  because that's a very interesting observation.  But
21  in order to be capable of producing a coffee
22  beverage, in your mind, does it have to be, and to
23  satisfy the claims, does it have to be capable of
24  producing a coffee beverage at all variables?

Page 90

LINGLE

1    same for tests 1 through 7; is that correct?
2        A.  That's correct.
3        Q.  Okay.  Now, going back to something we
4    talked about earlier, your -- if I understand you
5    correctly, your opinion is based on, that the Kenco
6    Singles is not capable of producing a coffee
7    beverage when used in same-side piercing, is based
8    on your, the tests that you performed, you and
9    doctor, Professor Slocum, and your review of Mr.
10   Bentley and Mr. Rowan's test results, right?
11       A.  (Witness nods.)
12       Q.  And we've already talked about that Mr.
13   Rowan and Mr. Bentley, it's simply based on the
14   metrics because you weren't able to taste and smell?
15       A.  Uh-huh.
16       Q.  Okay.  And if I understood you correctly,
17   you said that the reason -- well, I don't want to
18   presume.  What -- do you have an opinion as to the
19   reason that the Kenco's Singles cartridge is not
20   capable of producing a beverage cartridge, a coffee
21   beverage?
22       A.  When used in same-side piercing?
23       Q.  Yes.
24       A.  It's because the injection of the fluid at
25

Page 91

LINGLE

1    one point causes the fluid to move through the
2    coffee and tunnel, meaning it's overextracting some
3    coffee particles and underextracting or not
4    extracting others, so you get a partial extraction
5    and a poor flavor.
6        Q.  Okay.  And why is that with regard to the
7    Kenco's Singles, why do you get those tunneling and
8    you don't get full wetting and such, that you
9    just --
10       A.  The nature of the fluid in moving through
11   the particles is to follow the path of least
12   resistance.
13       Q.  Yes.  And explain that.
14       A.  Well, it means the water wants to exit the
15   cartridge as soon as it can, so as soon as it
16   encounters an obstacle like a coffee particle,
17   instead of trying to move through the coffee
18   particle, it moves around it, so the water in effect
19   bypasses the coffee and moves directly to the exit
20   point, and that's what produces that weak,
21   underextracted sort of tasteless brew.
22       Q.  Okay.  Now, and I think you said something
23   about the manifold.  What were you saying about the
24   manifold?
25

Page 92

LINGLE

1        A.  Well, the cartridge is a well-engineered
2    cartridge that's designed to take the inlet water
3    and move it to, I think it's five or six different
4    openings on the side of the cartridge, and in also
5    disbursing the flow of the water into the cartridge
6    from one single point to about ten or 12 different
7    points.  It also greatly reduces the pressure.  And
8    by reducing the pressure, then it slows down the
9    flow, and that causes the particles to be wetted and
10   extracted in a uniform manner before the resulting
11   beverage exits the cartridge.
12       Q.  Okay.  Now, if you were to inject water
13   through the foil, but into the, into the manifold,
14   would the Kenco's Singles cartridge produce a coffee
15   beverage?
16       A.  No, I believe that's the test that
17   Professor Taylor and Mr. Bentley did, and it still
18   came up short --
19       Q.  Because --
20       A.  -- so there -- I'm not --
21       Q.  Came up short in what measurement?
22       A.  Low in the soluble solids.
23       Q.  Okay.  But what you've just said is based
24   on your belief that the metric, the resulting metric
25

Page 93

LINGLE

1    is outside the acceptable range for consumers?
2        A.  Yes, using the metric as an analogy.
3        Q.  Okay.  But if it were in the -- if that
4    metric were in the acceptable range for consumers,
5    would you have any reason to say that the piercing
6    into the manifold area would not produce a
7    acceptable coffee beverage?
8        A.  Well, I'd still want to taste the beverage
9    so we're not using soluble solids as the only method
10   of --
11       Q.  I understand that.  But you explained why
12   you thought piercing directly into the coffee bed,
13   but I'm -- since -- if you use the manifold, and you
14   get this more even distribution, why would it not
15   create a coffee beverage?
16       A.  If I understand your question correctly,
17   you're saying if we use the manifold with same-side
18   piercing?
19       Q.  Yes.
20       A.  I'm not exactly sure of the answer because
21   it has to do with the fluid dynamics of the way the
22   water would actually move through that manifold, and
23   I think that's more in the area of expertise of
24   someone who's an expert in fluid design.
25

1                    LINGLE
2    and the flavor of that beverage.
3        Q.   I understand.  And you think those were
4    all quite weak?
5        A.   Some were, in terms of a normal coffee
6    flavor, undetectable.
7        Q.   But at least the 865, the one that got 865
8    certainly was detectable?
9        A.   Not as I would define a coffee beverage.
10   If I could expand for just a minute.
11       Q.   Yes, okay.
12       A.   When we think of a coffee beverage, it's
13   really a balance of ingredients, and the reason we
14   do that is because there's no single component that
15   represents coffee's flavor.  Coffee's a very complex
16   beverage, it has some 1200 different compounds that
17   are part of it.  So what we're really tasting when
18   we taste a coffee beverage is the balance of the
19   mixture.  If a portion of that mixture is absent, or
20   is not present in sufficient strength to raise it
21   above our threshold, our taste threshold, it's just
22   the same as it isn't there.
23       Q.   Right.
24       A.   So the resulting sort of flavor, the
25   subjective evaluation of the outflow of the tests we

1                    LINGLE
2    ran on the Kenco cartridges did not represent a
3    coffee beverage, it's not just the TDS.
4        Q.   What I'm trying to say is because it
5    didn't have, in your opinion, enough coffee aroma,
6    but in an ice coffee, the aroma is practically
7    nonexistent?
8        A.   That's correct.
9        Q.   Okay.  And in an iced coffee the flavor
10   has been substantially diluted with the ice, right?
11       A.   But you still have a coffee-like flavor.
12       Q.   You have a coffee-like flavor.  Right.
13   Okay.
14   You're saying at 865, you wouldn't have a coffee
15   flavor?
16       A.   None of those extracts had a coffee-like
17   flavor.
18       Q.   Okay.  Well, what was the flavor --
19   describe to me the flavor that, on test 3, foil up,
20   with plate, 14.7 psi, 27 seconds, 865.
21       A.   All of the flavors were bitter and
22   astringent.
23       Q.   I didn't ask you -- I asked you about that
24   one.
25       A.   It was bitter and astringent.

1                    LINGLE
2        Q.   Bitter and astringent.  Okay.  Some people
3    like it bitter and astringent, don't they?
4        A.   Not if that's the only coffee compound you
5    taste.
6        Q.   Okay.  Now, let me understand this.  Your
7    view is because it didn't -- it burrowed and it
8    didn't go through the coffee, it didn't pick up
9    enough, it didn't pick up enough of it, okay, but
10   you mentioned some 1400 compounds or something in
11   coffee?
12       A.   1200.
13       Q.   1200 compounds.  Any reason -- it would
14   pick up those compounds in those where it did touch
15   or did extract, right?
16       A.   (Witness nods.)
17       Q.   It just didn't have enough of it, isn't
18   that your point?  It's not that it didn't have the
19   1200 compounds, it's just didn't have enough to suit
20   your tastes?
21       A.   It didn't have enough to pass the
22   threshold I have for evaluating what is a coffee and
23   what's not a coffee.
24       Q.   But that is -- didn't pass that threshold?
25   Right.  Okay.  I'm just going back again to the ice

1                    LINGLE
2    coffee, make sure I understand.  Okay?
3        A.   Uh-huh.
4        Q.   When you have ice coffee, the aroma
5    practically goes away because --
6        A.   (Witness nods.)
7        Q.   Okay.  But it's still a coffee?
8        A.   The flavor you get is still a recognizable
9    coffee flavor.
10       Q.   Okay.  But the flavor you get has been
11   substantially diluted, right?
12       A.   As the ice melts, the flavor is diluted.
13       Q.   Okay.  But it's still a coffee as the ice
14   melts?
15       A.   That's correct.
16       Q.   Okay.  And so it can be, it can be -- in
17   ice coffee, it can have a very weak coffee flavor as
18   the ice melts?
19       A.   The ice will dilute the flavor.
20       Q.   Okay.  Turning to your, turning to your
21   rebuttal report in the third paragraph under Summary
22   of Opinions, you say, "It is also my opinion that
23   the outer container of the Singles cartridge is not
24   impermeable to gases within the meaning of that
25   phrase as used in claim 8 of the '762 patent."  Do

Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>    Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>    Defendants. | Civil Action No. 07-017-GMS |

**PLAINTIFF'S RESPONSE TO DEFENDANTS KRAFT FOODS GLOBAL, INC.,
TASSIMO CORP., AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS**

In response to Defendants Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.'s Joint Invalidity Contentions ("Invalidity Contentions"), Plaintiff Keurig, Incorporated ("Plaintiff" or "Keurig") provides the following validity contentions for asserted claims 1, 2, 8, 9, and 10 of United States Patent No. 6,607,762 (the "'762 patent").

Plaintiff bases these validity contentions on its current knowledge, understanding and belief as to the facts and information available to it as of the date of these disclosures. This case is still in the early stages of discovery and Plaintiff has not yet completed its investigation, collection of information, discovery or analysis related to this action. Accordingly, Plaintiff reserves the right to supplement, amend or modify the information contained herein and introduce such information and any subsequently-identified documents at trial. As discovery is taken, and additional details are provided regarding the alleged prior public use or if Defendants modify their invalidity contentions, Plaintiff's validity contentions may need to be amended, supplemented and/or corrected.

### A.    Kenco Singles Capsules Do not Anticipate the '762 Patent

Kenco Singles capsules do not anticipate the '762 patent under 35 U.S.C. § 102 because the Kenco Singles capsules do not include each and every element of the claimed invention of the '762 patent.  With respect to independent claims 1 and 10 of the '762 patent, the Kenco Singles capsules do not include a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge.  Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the Kenco Singles capsules for at least these same reasons.  Accordingly, for at least these reasons, the Kenco Singles capsules do not anticipate the '762 patent.

### B.    The '234 Patent Does not Anticipate the '762 Patent

The '234 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '234 patent does not disclose each and every element of the claimed invention of the '762 patent.  With respect to independent claims 1 and 10 of the '762 patent, the '234 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge.  Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '234 patent for at least these same reasons.  Accordingly, for at least these reasons, the '234 patent does not anticipate the '762 patent.

### C.    The '130 Patent Does not Anticipate the '762 Patent

The '130 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '130 patent does not disclose each and every element of the claimed invention of the '762 patent.

3

Exhibit F

THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,               )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )    C. A. No. 07-17 (GMS)
                                    )
KRAFT FOODS GLOBAL, INC.,           )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and            )
KRAFT FOODS INC.,                   )
                                    )
        Defendants                  )

### DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS

Pursuant to the Court's Scheduling Order of July 17, 2007, Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively, "Kraft"), submits the following invalidity contentions for claims 1, 2, and 8-10 of U.S. Patent No. 6,607,762 ("'762 Patent") asserted by Plaintiff Keurig. Kraft reserves the right to supplement these invalidity contentions, or cite additional prior art, as discovery progresses or if Plaintiff Keurig modifies its disclosure of asserted claims or infringement contentions.

Kraft provides its invalidity contentions in the claim chart below. Kraft cites three (3) pieces of prior art, and submits four (4) invalidity contentions based on the cited prior art: the Kenco Singles® capsules in public use in the United States prior to the December 1, 1999 date of invention of the '762 Patent alleged by Plaintiff Keurig, as shown in Exhibit A; U.S. Patent No. 4,853,234 ("'234 Patent") to Bentley *et al.* entitled "Beverage Packages," as shown in Exhibit B; U.S. Patent No. U.S. Patent No. 4,452,130 to Klein entitled "Electrical Apparatus Useful to Prepare a Hot Beverage" ("'130 Patent"), as shown in Exhibit C; and as

further shown when inverted in Exhibit D; and, finally, the '130 Patent in view of its operation as disclosed.

These invalidity contentions are consistent with Keurig's infringement contentions in Keurig's Disclosure of Infringement Contentions served on July 27, 2007. As indicated in the Kraft defendants' non-infringement claim charts, the Tassimo® Discs do not infringe the '762 patent. Nevertheless, as shown by the following invalidity contentions, if claims 1, 2 and 8-10 of the '762 Patent are applied as Keurig applied these claims in its infringement claim charts, and reiterated in its counsel's letter dated August 3, 2007, then the cited prior art anticipates.

<u>**Invalidity Claim Charts**</u>

**A.  Kenco Singles™ Capsule**

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The Kenco Singles capsule is a beverage filter cartridge. |
| an outer container having an access opening: | **YES.** The Singles capsule has an outer container with an access opening. |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The Kenco Singles includes a permeable filter received in and configured and arranged in the inner container such that it separates two chambers in the interior of the container so that infused beverage created in the first chamber must flow through the filter element before it can enter the second chamber. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The Kenco Singles include a first chamber in which a beverage medium is stored. Beverage media suitable for use with Singles capsules include, for example, roast and ground coffee, tea, and powdered chocolate. |

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The Kenco Singles capsule includes an aluminum foil lid closing the access opening. The Singles' lid having a section that directly covers the first chamber, in which beverage medium is stored and infused with liquid, and another section that directly covers the second chamber including the outlet. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** The section of the Singles' foil lid directly covering the first chamber is *piercable* to accommodate an inflow of liquid for infusion with the stored beverage medium to produce a beverage in the same manner as depicted in the '762 Patent. *Cf.* '762 Patent, Column 3, Lines 40-46; **Fig. 5.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** The Singles' filter welded to the communication channels is a paper filter that permits a flow of brewed beverage from the first chamber to the second chamber. |
| the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** The section of the Singles' foil lid directly covering the second chamber is piercable to expose to the outlet and permit an outflow of the brewed beverage to the exterior of the capsule. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that has a greater resistance to piercing than the aluminum foil lid. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that is impermeable to liquids and gases. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The Singles capsule has a lid comprising a layer of aluminum foil that is impermeable to liquids and gases. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The Kenco Singles capsule is a beverage filter cartridge. |
| an outer container having a access opening; | **YES.** The Singles capsule has an outer container with an access opening. |

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The Kenco Singles includes a permeable planar filter received in and configured and arranged in the inner container such that it separates two chambers in the interior of the container so that infused beverage created in the first chamber must flow through the filter element before it can enter the second chamber. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The Kenco Singles include a first chamber in which a beverage medium is stored. Beverage media suitable for use with Singles capsules include, for example, roast and ground coffee, tea, and powdered chocolate. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** The Kenco Singles capsule includes an aluminum foil lid closing the access opening. The aluminum foil lid and the polypropylene outer container are both impermeable to liquids and gases. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The Singles' lid includes a section that directly covers the first chamber, in which beverage medium is stored and infused with liquid, and another section that directly covers the second chamber including the outlet. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** The section of the Singles' foil lid directly covering the first chamber is *piercable* to accommodate an inflow of liquid for infusion with the stored beverage medium to produce a beverage in the same manner as depicted in the '762 Patent. *Cf.* '762 Patent, Column 3, Lines 40-46; **Fig. 5.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** The Singles' filter welded to the communication channels is a paper filter that permits a flow of brewed beverage from the first chamber to the second chamber. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** The section of the Singles' foil lid directly covering the second chamber is piercable to expose to the outlet and permit an outflow of the brewed beverage to the exterior of the capsule. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that has a greater resistance to piercing than the aluminum foil lid. |

B.  U.S. Patent No. 4,853,234

| Claim Language - '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.**  The '234 Patent discloses "a sealed beverage package containing one or more beverage ingredients and being formed from substantially air-and water-impermeable materials."  '234 Patent, Abstract. |
| an outer container having an access opening: | **YES.**  The '234 Patent discloses an outer container 20, that includes a lower edge 23 that defines an access opening.  *See* Column 7, Lines 9-17; **Fig. 5.** |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.**  The '234 Patent discloses that a filter 36 separates a first chamber 21, which contains beverage ingredients, from a second chamber 37, so that infused beverage created in the first chamber 21 must flow through the filter 36 before it can enter the second chamber 37.  *See* '234 Patent, Column 7, Lines 41-46; **Fig. 4.**  In addition, outlet channels 31, 32, 33 comprise slots 30 that can be formed of a dimension that acts as a filter to separate collection chamber 35, in fluid communication with second chamber 37, from first chamber 21.  *See* '234 Patent, Column 7, Lines 27-30, 41-42. |
| a soluble beverage medium stored in said first chamber; and | **YES.**  First chamber 21 contains beverage ingredients, such as roast and ground coffee particles.  *See* '234 Patent, Column 7, Lines 12-15. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.**  A foil 25 is sealed along the lower edge 23 of outer container 20.  *See* '243 Patent, Column 7, Lines 17-21; **Fig. 6.**  Foil 25 has a section directly covering the first chamber 21 and another section directly covering the second chamber 37. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.**  Foil 25 is formed of a *piercable* material and includes a section overlying first chamber 21 that can be pierced to permit an inflow of liquid directly into chamber 21 to infuse the beverage ingredient stored therein. |

| Claim Language – '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** Filter 26 is a permeable filter, made of a conventional filter material, that accommodates a flow of brewed beverage from the first chamber 21 to the second chamber 37. *See* '234 Patent, Column 4, Lines 9-12. |
| the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** Foil 25 is formed of a piercable material and includes another section overlying second chamber 37 that can be pierced to permit an outflow of brewed beverage to the exterior of outer container 20. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Outer container 20, which is formed of rigid polypropylene, has a greater resistance to piercing than foil 25, which can be aluminum or a laminated material. *See* '243 Patent, Column 2, Lines 15-19. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** Outer container 20 is formed of a rigid plastic material, such as polypropylene, that is impermeable to liquids and gases. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** Foil 25 is formed of an aluminum sheet or a laminated material that is impermeable to liquids and gases. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The '234 Patent discloses "a sealed beverage package containing one or more beverage ingredients and being formed from substantially air-and water-impermeable materials." '234 Patent, Abstract. |
| an outer container having a access opening; | **YES.** The '234 Patent discloses an outer container 20, that includes a lower edge 23 that defines an access opening. *See* Column 7, Lines 9-17; **Fig. 5.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The '234 Patent discloses that a planar filter 36 separates a first chamber 21, which contains beverage ingredients, from a second chamber 37, so that infused beverage created in the first chamber 21 must flow through the filter 36 before it can enter the second chamber 37. *See* '234 Patent, Column 7, Lines 41-46; **Fig. 4.** |

| Claim Language - '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| a soluble beverage medium stored in said first chamber; and | **YES.** First chamber 21 contains beverage ingredients, such as roast and ground coffee particles. *See* '234 Patent, Column 7, Lines 12-15. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A foil 25 is sealed along the lower edge 23 of outer container 20. *See* '243 Patent, Column 7, Lines 17-21; **Fig. 6**. Both the outer container 20, which is formed of a rigid plastic material, and the foil 25, which is formed of aluminum or a laminate material, are impermeable to liquids and gases. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** Foil 25 has a section directly covering the first chamber 21 and another section directly covering the second chamber 37. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Foil 25 is formed of a *piercable* material (aluminum or a laminate) and includes a section overlying first chamber 21 that can be pierced to permit an inflow of liquid directly into chamber 21 to infuse the beverage ingredient stored therein. |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** Filter 26 is a permeable filter, made of a conventional filter material, that accommodates a flow of brewed beverage from the first chamber 21 to the second chamber 37. *See* '234 Patent, Column 4, Lines 9-12. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** Foil 25 is formed of a piercable material and includes another section overlying second chamber 37 that can be pierced to permit an outflow of brewed beverage to the exterior of outer container 20. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Outer container 20, which is formed of rigid polypropylene, has a greater resistance to piercing than foil 25, which can be aluminum or a laminated material. *See* '243 Patent, Column 2, Lines 15-19. |

### C.  U.S. Patent No. 4,452,130 (Inverted)

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| **Claim 1** | When inverted, the beverage filter cartridge disclosed in the '130 Patent has all of the elements of claim 1 of the '762 Patent.  This can be readily seen from the cartridge structure illustrated in an inverted posture depicted in Exhibit D. |
| A beverage filter cartridge comprising: | **YES.**  The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance.  *See* '130 Patent, Abstract.  An inverted filter carrier is depicted in Exhibit D. |
| an outer container having an access opening: | **YES.**  An outer container 11 has an access opening.  *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.**  A filter 12 separates a first chamber storing a flavor substance 15 from a collecting channel 18 in fluid communication with a second chamber 17 via a passageway 19, so that infused beverage created in the first chamber must flow through the filter 12 before it can enter the second chamber 17. |
| a soluble beverage medium stored in said first chamber; and | **YES.**  The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage.  *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.**  A lid 14 seals the access opening of the outer container.  *See* '130 Patent Column 2, Lines 12-15.  The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.**  A section of the lid 14 overlying the chamber storing the flavor substance 15 is *piercable* to accommodate an inflow of liquid, such as hot water, to infuse the flavor substance 15 to produce a brewed beverage.  *Cf.* '130 Patent, Column 2, Lines 37-38 and 55-60; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.**  A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17.  *See* '130 Patent, Column 2, Lines 60-63. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** A section of lid 14 overlying second chamber 17 is *pierceable* to accommodate an outflow from the outside container 11. *Cf.* '130 Patent, Column 2, Lines 25-29. After a liquid under pressure is injected into the first chamber storing the flavor substance, brewed beverage can pass through the filter 12, and flow through the collecting channel 18 to a passageway 19. The brewed beverage can then flow to the second chamber 17 and exit the filter cartridge 11 at the outlet formed by the piercing of the lid 14 at the section overlying the second chamber. *See* Exhibit D; *cf.* '130 Patent, Column 2, Lines 61-65. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES. Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent, which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The lid 14 and a lower lid 13, which closes a lower portion of second chamber 17, seals the flavor substance stored in the filter unit 11 from the atmosphere and the water stored in cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The lid 14 closes the access opening of filter unit 11 to seal the flavor substance 15 stored therein from the atmosphere and the water stored in the cup 10. *See* '130 Patent, Column 2, Lines 12-15. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| **Claim 10** | When inverted, the beverage filter cartridge disclosed in the '130 Patent has all of the elements of claim 10 of the '762 Patent. This can be readily seen from the cartridge structure illustrated in an inverted posture depicted in Exhibit D. |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. An inverted filter carrier is depicted in Exhibit D. |
| an outer container having a access opening; | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A planar filter 12 separates a first chamber storing a flavor substance 15 from a collecting channel 18 in fluid communication with a second chamber 17 via a passageway 19, so that infused beverage created in the first chamber must flow through the filter 12 before it can enter the second chamber 17. The planar filter 12 assumes a frustoconical shape of the filter carrier 11. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 and the lower lid 13 seal the flavor substance 15 stored in the filter carrier 11 from the atmosphere and the water stored in a cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** A section of the lid 14 overlying the chamber storing the flavor substance 15 is *piercable* to accommodate an inflow of liquid, such as hot water, to infuse the flavor substance 15 to produce a brewed beverage. *Cf.* '130 Patent, Column 2, Lines 37-38 and 55-60; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** A section of lid 14 overlying second chamber 17 is *piercable* to accommodate an outflow from the outside container 11. *Cf.* '130 Patent, Column 2, Lines 25-29. After a liquid under pressure is injected into the first chamber storing the flavor substance, brewed beverage can pass through the filter 12, and flow through the collecting channel 18 to a passageway 19. The brewed beverage can then flow to the second chamber 17 and exit the filter cartridge 11 at the outlet formed by the piercing of the lid 14 at the section overlying the second chamber. *See* Exhibit E; *cf.* '130 Patent, Column 2, Lines 61-65. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** **Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent, which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |

## D. U.S. Patent No. 4,452,130

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. |

| Claim Language – '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| an outer container having an access opening: | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A filter 12 separates two chambers in the interior of the container so that infused beverage created in a first chamber, storing a flavor substance 15, must flow through the filter 12 before it can enter the second chamber 17. The filter 12 separates the first chamber from a collecting channel 18 in fluid communication with the second chamber 17 via a passageway 19. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Hot water outlets 25 pierce a section of the lid 14 overlying the chamber storing the flavor substance 15. *See* '130 Patent, Column 2, Lines 37-38; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** A tube 27 penetrates a section of lid 14 overlying second chamber 17 to access a lower lid 13 at a bottom portion of section of the second chamber 17 to accommodate an outflow from the outside container 11. *See* '130 Patent, Column 2, Lines 25-29. After brewed beverage drips through the filter 12, the beverage collects in the channel 18, flows through a passageway 19, and exits a hole at the bottom of second chamber 17. *Id.,* Column 2, Lines 61-65. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Fig. 1 of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, U.S. Patent No. 5,111,740 to Klein ("'740 Patent"), which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. The '740 Patent is attached as Exhibit E. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The lid 14 and a lower lid 13, which closes a lower portion of second chamber 17, seals the flavor substance stored in the filter unit 11 from the atmosphere and the water stored in cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The lid 14 closes the access opening of filter unit 11 to seal the flavor substance 15 stored therein from the atmosphere and the water stored in the cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. |
| an outer container having a access opening; | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A planar filter 12 separates two chambers in the interior of the container so that infused beverage created in a first chamber, storing a flavor substance 15, must flow through the filter 12 before it can enter the second chamber 17. The filter 12 separates the first chamber from a collecting channel 18 in fluid communication with the second chamber 17 via a passageway 19. The planar filter 12 assumes a frustoconical shape of the filter carrier 11. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 and the lower lid 13 seal the flavor substance 15 stored in the filter carrier 11 from the atmosphere and the water stored in a cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Hot water outlets 25 pierce a section of the lid 14 overlying the chamber storing the flavor substance 15. *See* '130 Patent, Column 2, Lines 37-38; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** A tube 27 penetrates a section of lid 14 overlying second chamber 17 to access a lower lid 13 at a bottom portion of section of the second chamber 17 to accommodate an outflow from the outside container 11. *See* '130 Patent, Column 2, Lines 25-29. After brewed beverage drips through the filter 12, the beverage collects in the channel 18, flows through a passageway 19, and exits a hole at the bottom of second chamber 17. *Id.*, Column 2, Lines 61-65. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES. Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent", which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |

- 14 -

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: August 10, 2007
812042 / 31118

By:  /s/ Kenneth L. Dorsney
        Richard L. Horwitz (#2246)
        Kenneth L. Dorsney (#3726)
        Hercules Plaza, 6th Floor
        1313 North Market Street
        P.O. Box 951
        Wilmington, DE 19899-0951
        Tel: 302-984-6169
        rhorwitz@potteranderson.com
        kdorsney@potteranderson.com

*Attorneys for Defendants Kraft Foods Global, Inc.,
Tassimo Corporation, and Kraft Foods Inc.*

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on August 10, 2007, a true and correct copy of

the within document was caused to be served on the attorney of record at the following addresses

as indicated:

## VIA HAND DELIVERY

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com
kkeller@ycst.com

## VIA ELECTRONIC MAIL

Michael A. Albert
Michael N. Rader
Laura Topper
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com

/s/ Kenneth L. Dorsney
Kenneth L. Dorsney

799719 / 31118