## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO KEURIG'S MOTION *IN LIMINE* NO. 2

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700

Dated:  August 15, 2008
Public Version Dated:  August 22, 2008
878762 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

Defendants Kraft Foods Global Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft") oppose Plaintiff, Keurig, Inc.'s ("Keurig") Motion *in Limine* No. 2 to preclude Kraft's expert, Malcolm Taylor, "from relying on or testifying about experiments that Kraft's employees performed on Kenco Singles cartridges." Keurig's argument, that experts would not reasonably rely on the testing of Kenco Singles Cartridges ("Singles Cartridge"), is based on misstatements of both Mr. Taylor's testimony and the relevant law. As such, Keurig's Motion should be denied.

Kraft will introduce evidence at trial that the Singles Cartridge embodies each and every element of asserted claim 1 of U.S. Patent No. 6,607,762 ("the '762 Patent"). Kraft will further introduce evidence that the Singles Cartridge was both: (1) in the possession of the inventor of the '762 Patent; and (2) in public use in the United States prior to filing date of the '762 Patent. In response, Keurig has attempted to prevent Kraft from introducing fact evidence of Singles shipments to the United States (Keurig's Motions *in Limine* Nos. 3 and 4). Moreover, Keurig submits its Motion *in Limine* No. 2, as well as its first Motion *in Limine*, to exclude fact evidence of Kraft's tests demonstrating that the Singles Cartridge includes all the elements of claim 1 of the '762 Patent. These motions are just part and parcel of Keurig's strategy to mischaracterize unfavorable evidence as "prejudicial" and escape the inevitable finding that the Singles Cartridge anticipates the sole asserted claim of the '762 Patent.[1]

## ARGUMENT

### I.    Mr. Taylor Was Not Confused About The Singles Cartridge Tests

Keurig's assertion that Mr. Taylor was confused or ignorant of the Singles Cartridge testing is based on selective quotations of Mr. Taylor's deposition. ███████████████

---

[1] Both Mr. Rowan and Mr. Bentley intend to testify at trial regarding the data from their tests based upon their personal knowledge. Thus, such data is not hearsay as Keurig suggests. Mot. at 5.

But the deposition testimony shows that Mr. Taylor was actually presented with three Exhibits when he was asked "Who created this document?" and answered that he believed it was Mr. Bentley. Mot. at 2 (citing Taylor Depo. Tr. (Pl.'s Mot. Ex. 2) at 118); *Id.* at 115 ("So you've got Exhibits 13, 91 and 202 in front of you."). From the record it is not clear which document the question was referring to.

Keurig argues that Mr. Taylor did not know whether the data he reviewed was generated using the Kraft apparatus. Mot. at 2. But the deposition testimony clearly reveals that, while Mr. Taylor couldn't remember whether it was the *exact same* device used to run the tests, the test device was a Kraft-designed rig as pictured:

> Q. So he used the device that's shown in Exhibit 91?
> A. I assumed, yes.
> ...
> Q. And where was the inlet piercing made in the test for Exhibit 13?
> A. It was in a number of locations. It's on the drawing here, A, B, C, D, E, I think.

Pl.'s Mot. Ex. 2 at 120 (discussing photos of the Kraft rig); Pl.'s Depo. Ex. 91 (Pl.'s Mot. Ex. 4). Finally, although Mr. Taylor did think that the needles used in Kraft's tests came from an existing brewer (Mot. at 2), it is because the needles were machined to have the same dimensions and be "very similar" to the needles in an existing brewer. Bentley Depo. Tr. (Ex. 1) at 13:3-20.

Mr. Taylor was not confused by or ignorant of the tests performed by Mr. Bentley and Mr. Rowan. Mr. Taylor was provided with three sets of test results and the transcripts from Keurig's lengthy depositions of Mr. Bentley and Mr. Rowan.[2] Pl.'s Mot. Ex 2 at 115:3-8. As

---

[2] As such, Keurig's citation and reliance on *Montgomery County v. Microvote Corp*, 320 F.3d 440 (3rd Cir. 2003), discussing an expert's opinion based on a document he did not know the source, identity, or method of generation of, is wholly misplaced. Mot. at 4.

such, and as indicated in his report, Mr. Taylor simply used the tests to confirm his evaluation of the piercability of the Singles Cartridge. Pl. Mot. Ex. 1 at 8-10.

## II.    Mr. Taylor's Testimony Is Unrelated to Determination Of Reasonable Reliance

Keurig asserts that "Mr. Taylor's own admissions about what constitute sound engineering practices . . . demonstrate that the Kraft testing, and his review thereof, do not constitute trustworthy methods." Mot. at 2. Here, as before, Keurig's assertions are supported only by out-of-context quotes from Mr. Taylor's deposition. For example, Keurig claims Mr. Taylor stated that a competent engineer should "review[] the work that other engineers on an engineering team are doing 'on a daily basis.'" *Id.* Mr. Taylor's actual deposition testimony reveals that the urgency of the project dictates the frequency of review:

> Q. And does the lead engineer have to evaluate the work that's done by the people working under him on the team?
> A. Yes, he does <u>usually</u> on a daily basis <u>all depending on the urgency of the project</u>.
> Q. How does that work? Is it through meetings or memos or what?
> A. Meetings, e-mails, memos, personal one-to-one, <u>all depending on the urgency or importance of the aspect that you are looking into</u>, and sometimes you have to work with a company on the outside, you know, a supplier of materials.

Pl.'s Mot. Ex. 2 at 41:20-42:7 (emphases added).

Most importantly, Mr. Taylor's testimony was in response to questions about his commercial work in "designing packages for a specific use." *Id.* at 39:20-40:9. Neither Mr. Taylor, Mr. Bentley, nor Mr. Rowan were designing commercial consumer packaging; the Singles Cartridge was a pre-existing product that merely needed to be tested for piercability. Taylor Depo. Tr. (Ex. 2) at 178:11-179:3. In any event, in response to questioning about engineering standards, Mr. Taylor clearly stated:

> When you say a standard, there really isn't any standard per se of engineering effort, if you like. There are engineering standards involved in design and drawing and symbols and all that stuff. That's a standard, but as far as how you

> organize your work, how you do your work on a day-to-day basis is usually up to
> the lead engineer or whatever, you know.

Pl.'s Mot. Ex. 2 at 45:19-46:2. Further, when asked whether he keeps notes in a lab notebook

when testing a product, Mr. Taylor stated:

> It all depends at what stage you do that. In other words you can rig up a rough
> test to figure out if the idea works or not. On that you don't need any notes really.
> You would then maybe make up another test rig which would have a lot more
> bells and whistles on it, if you like, and you would take notes under those
> conditions, but on just a rough shot test, no. You just have to have observations
> and you remember them.

Ex. 2 at 112:20-113:4.

### III.    Mr. Taylor's Consideration Of Singles Cartridge Testing Was Reasonable

Keurig's motion does not question the accuracy of the test results that Mr. Taylor

considers. Indeed, Keurig has had the opportunity to depose both Mr. Bentley and Mr. Rowan

(Pl.'s Mot. Exs. 6 & 7) and will have the opportunity to cross examine one or both of Mr.

Bentley and Mr. Rowan at trial when they are on the witness stand and demonstrate the test in

open court. Keurig's argument is based solely upon the fact that Mr. Taylor has looked to test

results provided by Kraft's employees to validate his own inspection and test results. In this

regard, Keurig has cited to no binding authority to indicate that reliance on Kraft's tests is *per se*

unreasonable under Rule 703. On the contrary, Keurig's cases are readily distinguishable.

Keurig asserts that the instant case "mirrors *In re TMI Litigation*," which pertains to the

reliance of an immunologist on self-reported data of patients. Mot. at 3. Specifically, the report

detailed her opinion that blood samples from individuals exposed to ionizing radiation from

nuclear weapons testing exhibited immune system depression. *In re TMI Litigation*, 193 F.3d

613, 696 (3d Cir. 1999). But her report also stated that "it is undoubtedly necessary to carry out

a dynamic examination of all persons" to determine whether exposure to radiation was the cause.

*Id.* When challenged, the expert ruled out any other causes of immune system depression based

- 4 -

solely on self-reported medical data. *Id.* at 696-97. The panel noted that "[t]here is nothing improper about a medical report prepared solely for litigation. . . . . However, a physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms." *Id.* at 698 (citations omitted). Thus, the expert "should have either reviewed her study subjects' medical and hospital records or examined the subjects herself." *Id.*

Mr. Taylor's report makes clear that his consideration of the tests performed by Andrew Bentley and Lee Rowan merely *confirmed* his own investigation and tests.[3] To form his opinion, Mr. Taylor considered the materials and thicknesses of the lid components (60μ of polypropylene, 9μ of aluminum, and 12μ of polyester) as well as the Singles Cartridge's internal structure. Pl. Mot. Ex. 1 at 8-9. Mr. Taylor also performed his own tests by piercing the foil at a first location to inject water and at a second location to witness outflow of "coffee liquor." *Id.* at 9. Mr. Taylor considered the tests by Kraft employees merely to confirm his own. *Id.* ("This was confirmed by tests on the Kenco Cartridges carried out by Messrs. Andrew Bentley and Lee Rowan"). As in *TMI*, there is nothing improper about Kraft preparing a test solely for the purpose of litigation. Because Mr. Taylor does not rely solely upon those tests, he refers to them simply to confirm his evaluation of the Singles Cartridge, his reliance is not misplaced.[4]

CONCLUSION

For the above reasons, Kraft requests that Keurig's motion *in limine* to preclude Kraft from offering any evidence of its testing of the Kenco Singles Cartridges be denied.

---

[3] Unlike in *Mike's Train House v. Lionel, LLC*, 472 F.3d 398 (6th Cir. 2006) and *U.S. v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994), Mr. Taylor does not intend to testify as to the opinions or conclusions of Mr. Bentley or Mr. Rowan, but merely to the fact that the data they collected confirms his own tests and investigation.

[4] Likewise, Keurig's citation of *Hot Wax, Inc. v. Warsaw Chem. Co.* is inapposite because the expert's opinion in that case was "premised entirely on out-of-court statements from unnamed [ ] employees." 45 F. Supp. 2d 635, 639 (N.D. Ill. 1999).

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 15, 2008
Public Version Dated: August 22, 2008
8787462 / 31118

By: _/s/ David E. Moore_____
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 North Market Street
     P.O. Box 951
     Wilmington, DE 19899-0951
     Tel: 302-984-6169
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

- 6 -

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 22, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on August 22, 2008, the attached document was Electronically Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: /s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

# In The Matter Of:

*KEURIG, INCORPORATEDv.*
*KRAFT FOODS GLOBAL, INC*

---

*MALCOLM E. TAYLOR*
*July 3, 2008*

---

## MERRILL LEGAL SOLUTIONS
*101 Arch Street, 3rd Floor*
*Boston, MA 02110*
*PH: 617-542-0300 / FAX: 617-338-6075*

TAYLOR, MALCOLM E. - Vol. 1

110

1   the foil?
2   A. Yes, it was.
3   Q. Now, I just want to go back to something that I
4      asked you before and clarify.
5   A. Sure.
6   Q. I believe you testified that you don't know the
7      exact pressure at which the singles cartridges
8      ordinarily operate, but --
9   A. No.
10  Q. -- are you aware that the coffee bed is pressurized
11     to some degree in the normal operation?
12  A. Yes, I'm aware. I mean it has to be in order to get
13     the water up through the filter and up over into the
14     outlet.
15  Q. Although you said you were able to do that even
16     without pressurizing it?
17  A. Well, only -- well, there is some pressure obviously
18     from the needle --
19  Q. Okay.
20  A. -- into the coffee bed, but it's -- you don't need
21     much if the rate of flow is low. If you had a high
22     flow, you'd need a much higher pressure I'm sure.
23  Q. Okay. And in order to make a whole cup of coffee
24     under normal conditions --

111

1   A. You'd need a lot more water.
2   Q. You need more water and --
3   A. And a much bigger syringe, one or the other.
4   Q. And you need a higher pressure to make that cup of
5      coffee than what you used in your test?
6   A. I really don't think so because if you regulate the
7      water flow into it, as long as you have enough hot
8      water, you could squeeze enough in there from the
9      barrel. Say you had an inch and a half down in the
10     a barrel, you could fill it easily and have enough
11     over maybe to fill a cup, sure. You know, there is
12     no specification anywhere in either patent actually.
13     There is nothing.
14  Q. You would agree with me that Claim 1 of the Keurig
15     Patent does require that the cartridge be capable of
16     producing a beverage, whatever that means, right?
17        MR. SCHLITZ: Objection. You are asking
18     for a legal conclusion.
19  BY MR. RADER:
20  Q. Well, you read the claims, right?
21  A. Yeah. It just means make a beverage, whatever that
22     means. There isn't any definition.
23  Q. And you are not here to opine on that?
24  A. No. I'm not, no.

112

1   Q. Was your hypodermic syringe or needle test a
2      realistic test of whether that foil is pierceable to
3      accommodate an inflow under the sort of real world
4      conditions of brewing a cup of coffee?
5        MR. SCHLITZ: Objection to form.
6   A. That's actually within the terms of the patent and
7      its claim. I thought it was adequate because it's a
8      package design. It's not a process design.
9   Q. Just back to my question, though, within the real
10     world conditions of brewing a cup of coffee, do you
11     think that your test was a realistic representation
12     for that?
13  A. No. It was a test. It's not a real world making of
14     a cup of coffee.
15  Q. Now, ordinarily -- I think we talked a little bit
16     about this before in your work at Foster-Miller.
17     Ordinarily when you are testing a product or a
18     prototype, would you ordinarily take notes in a lab
19     notebook or something?
20  A. Not necessarily. It all depends at what stage you
21     do that. In other words you can rig up a rough test
22     to figure out if the idea works or not. On that you
23     don't need any notes really. You would then maybe
24     make up another test rig which would have a lot more

113

1      bells and whistles on it, if you like, and you would
2      take notes under those conditions, but on just a
3      rough shot test, no. You just have to have
4      observations and you remember them.
5   Q. So in your work as an engineer if you were doing a
6      test that was going to be the test you were going to
7      rely upon for your design or your analysis, is that
8      the type of thing you would take notes on and --
9   A. Yes.
10  Q. -- take pictures of?
11  A. Yes, you would of course.
12  Q. Okay. So that the experiments you did here with the
13     hypodermic needle, they wouldn't meet the standard
14     that you would apply to the kind of test that you
15     would rely on in your engineering analysis; is that
16     fair to say?
17  A. No. It was just an initial test in order to meet
18     the needs of the claim. That's all. There wasn't
19     any other intent.
20  Q. All right. Now, let me ask you, in your report on
21     pages 8 to 9 of your report you also talked about
22     some tests done by Keurig engineers; is that right?
23        MR. SCHLITZ: Keurig or Kraft?
24        MR. RADER: Sorry. My slip.

**MERRILL LEGAL SOLUTIONS**
**(617) 542-0039**

**178**

1  A. Of course.
2  Q. Would you design it -- if in your first design you
3     had some kind of failure, would you then just accept
4     that or would you then make changes to achieve
5     success?
6  A. You would design around them. That's what you do.
7  Q. That's what design engineers do?
8  A. That's what they do, yeah, absolutely.
9        MR. RADER: Objection.
10 A. Sure.
11 Q. In Professor Slocum's report he criticizes
12    Mr. Bentley and Mr. Rowan because they used a test
13    rig that he said was designed for experimental
14    purposes to achieve success; do you have any opinion
15    about that statement?
16        MR. RADER: Objection to form.
17 A. It was only designed to prove piercing. That's all.
18    That was the intent, that it was achievable through
19    the foil.
20 Q. But do you see -- as a design engineer and someone
21    who's been project leader, do you see any problem
22    with designing a rig that would achieve success?
23 A. No. No, I don't. As I mentioned earlier on, you
24    would look at the issues in front of you and you

**179**

1     would design around them. I mean that's what you
2     use and your experience to design a rig that works,
3     if you like.
4  Q. Now, if you turn to Taylor Exhibit 12?
5  A. What was that again?
6  Q. This is the '234 Patent.
7  A. Oh, okay.
8  Q. Now, if you turn to column 7?
9  A. Okay.
10 Q. Starting with line 17 it says, "In use a laminated
11    foil is sealed both along the upper edge 22 of the
12    body portion and the lower edge 23 of the body
13    portion"; do you see that?
14 A. Yes.
15 Q. Now, if you turn to figure 5, do you see the 23, the
16    ledge that is 23?
17 A. Yes.
18 Q. Does that go around the whole cartridge?
19 A. Yes, it does.
20 Q. And is the language that I just read to you in this
21    figure 5 where you see 23 goes around the whole
22    cartridge, is that the basis of your belief -- your
23    opinion that this discloses a structure that has a
24    single lid?

**180**

1  A. Yes.
2        MR. RADER: Objection. Leading.
3  A. Yes, it is.
4  Q. Does the fact that Mr. Rader questioned you at
5     length about statements that Mr. Bentley and
6     Mr. MacMahon expressed about the commercial product,
7     do those statements in any way change your view that
8     this lid -- ledge 23 goes the whole way around?
9  A. No, it doesn't. That's what I indicated earlier.
10    This is my independent -- as a design engineer it
11    runs all the way around. It's designed for one lid.
12 Q. And your opinion is based on reading the '234
13    Patent; is that correct?
14 A. Yes.
15 Q. And your opinion is not based on reading
16    Mr. MacMahon or Mr. Bentley's deposition; is that
17    correct?
18 A. That's correct.
19 Q. Let's assume for the sake of argument in this case
20    that the commercial embodiment of the Mark II had
21    two lids, would that change your opinion as to what
22    the '234 Patent shows?
23 A. No, it wouldn't.
24        MR. SCHLITZ: Okay. I have no other

**181**

1     questions.
2     FURTHER EXAMINATION BY MR. RADER:
3  Q. Just to wrap up on that one point. Mr. Taylor, you
4     also saw the testimony of Mr. MacMahon and
5     Mr. Bentley about the patent itself, right?
6  A. Yes, I did.
7  Q. And based on that, can you say with any degree of
8     certainty that the interpretation that this patent
9     describes the two foils is an invalid
10    interpretation?
11 A. I think it's invalid, yeah.
12 Q. Can you say that to a reasonable degree of
13    certainty, though?
14 A. Yes, I can, just from my experience. That's all.
15 Q. But again, Mr. Taylor, as I think we established at
16    the end of your testimony, since you didn't speak
17    with Mr. MacMahon or Mr. Bentley you have to take
18    their statements at deposition as true for purposes
19    of your analysis, don't you?
20 A. That's all I could do.
21 Q. And given that fact, don't you have to at least
22    allow for the possibility in your analysis that the
23    '234 Patent describes two lids instead of one?
24 A. You know my own opinion is I don't see it. That's

46 (Pages 178 to 181)

**MERRILL LEGAL SOLUTIONS**
**(617) 542-0039**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on August 15, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on August 15, 2008, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: _/s/ David E. Moore_
  Richard L. Horwitz
  David E. Moore
  Potter Anderson & Corroon LLP
  Hercules Plaza, 6th Floor
  1313 N. Market Street
  P.O. Box 951
  Wilmington, DE 19899-0951
  (302) 984-6000
  rhorwitz@potteranderson.com
  dmoore@potteranderson.com

805682 / 31118