## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' OPPOSITION TO KEURIG'S MOTION *IN LIMINE* NO. 3

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: August 15, 2008
Public Version Dated: August 22, 2008
878744 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Tel:  302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft"), by counsel, hereby file this opposition to Keurig's Motion *in Limine* No. 3. Plaintiff Keurig, Incorporated ("Keurig") seeks to exclude evidence at trial regarding production records and other documents they asked for during the course of litigation, which Kraft produced prior to the close of discovery. Keurig's Motion should be denied for two reasons. First, Keurig's Motion should be denied because Keurig asserts baseless grounds for exclusion of this highly-relevant and probative evidence for which an appropriate foundation has been laid. Second, not until such evidence is actually offered at trial will the Court be in a position to even consider excluding the evidence.

ARGUMENT

Keurig seeks to exclude two classes of business records produced during discovery by Kraft that show the public use of Kraft's products anticipates Keurig's '762 patent: (1) documents retained by Kraft employees Janice Appleton, Helen Glus, and Geraldine Greto ("shipping documents") that show Kraft's Kenco Singles cartridges ("Singles Cartridges") were shipped to the United States for consumption on multiple occasions prior to February 18, 1999; and (2) ████████ production records ("production records")[1] ██████████████████

Keurig seeks to evade the issue of whether its patent is invalid by moving the Court to exclude documentary evidence that demonstrates the public use of Singles Cartridges. Keurig seeks to exclude both classes of documentary evidence on the same grounds – that each is hearsay not subject to any exception and that each is untrustworthy. Keurig is wrong and wastes this Court's time by citing the Federal Circuit's decisions in *Medichem* and *Chen*, which have

---

[1]  As a courtesy, Kraft also provided Keurig with a native Excel version of the production records.

nothing to do with Rule 803 or business records, but instead relate to corroborating inventor testimony that is presumed to be unreliable. Mot. at 3.

As an initial matter, Keurig's Motion does not even contend that the evidence it seeks to exclude is not relevant or probative. Indeed such a contention would border on the frivolous. The relevance of the business records at issue is significant as they prove that the '762 Patent is invalid due to prior use of Singles Cartridges in this country. *See* 35 U.S.C. §§ 102(a), (b). Stated another way, when the documents are introduced, Keurig's case evaporates. The shipping documents demonstrate, without question, that Singles Cartridges were circulated for use in the United States as early as 1995. Janice Appleton, Helen Glus, and Geraldine Greto are all Kraft employees who testified at length during deposition about the documents in question. And all three witnesses testified at deposition to their own personal knowledge that Singles cartridges were in public use in the United States prior to February 18, 1999. *See, e.g.*, Greto Depo. Tr. (Ex. 1) 19:22–20:15; Glus Depo. Tr. (Ex. 2) at 11:23–14:21; Appleton Depo. Tr. (Ex. 3) 41:16–42:9. Moreover, Ms. Glus and Ms. Greto will be available at trial.

With respect to the production documents, the analysis is the same.[2] Kraft produced the documents promptly upon their discovery in March 2008. Because all counsel were previously scheduled to be in England for Keurig's depositions of Mr. Hubert Weber and Mr. Andrew Bentley, Kraft also made the production records' custodian, Michael Tamblin, available to testify about those records. At deposition, Tamblin's testimony demonstrated that Kraft's regular practice was to keep production records for the Singles business. That evidence, and the

---

[2]  Contrary to Keurig's assertion, Kraft's case is not limited to the Kraft Kenco Medium Roast Singles Cartridges ███████████████████. Although, Kraft focused on those cartridges solely for purposes of summary judgment, Kraft asserts that all varieties Singles cartridges listed on the shipping documents ██████████████████████ anticipate the '762 Patent.

Appleton, Glus, Greto documents, are highly relevant and probative of the invalidity of the '762 patent.

Further, the hearsay exclusionary rule does not apply to either the shipping documents or to the production records because they <u>clearly</u> admissible under the business records exception set forth in Fed. R. Evid. 803(6). Contrary to Keurig's assertion, Kraft can satisfy the foundation requirements of Rule 803(6) for both the shipping documents and for the production documents. In fact, a close examination of the depositions of Appleton, Glus, and Greto demonstrates that an appropriate foundation was laid for the admissibility of the documents.[3] *See e.g.*, Ex. 1 at 8:13–28:22; Ex. 2 at 29:4–30:14; Ex. 3 at 23:21–62:3. Each witness testified from her own personal knowledge. *See, e.g.*, Ex. 1 at 9:2–10:15; 26:11–28:22; Ex. 2 at 20:19–21:18; 25:24–26:14; Ex. 3 at 23:21–25:8; 64:20–65:10; *see also United States v. Console*, 13 F.3d 641, 658 (3d Cir. 1993) (Documents created from personal knowledge "provide sufficient indicia of trustworthiness to satisfy the business record exception."). And each testified that the files from which the documents came were regularly kept in the ordinary course of their responsibilities as employees of Kraft. Ex. 1 at 8:14–9:5; Ex. 2 at 17:4–17:17; Ex. 3 at 79:15–80:3. Finally, there is no suggestion that the shipping documents were created for purposes of this litigation.

The same is true for the production records. An appropriate foundation was laid at deposition for the admissibility of the documents. As described above, because counsel were scheduled to be in England for two of Keurig's depositions, Kraft offered Michael Tamblin to testify on short notice because he was the plant master data-controller working on ▬▬▬▬

---

[3] Moreover, any communications from Appleton, Glus, and Greto are admissible as present sense impressions and were authenticated as such at deposition  In addition, the shipping documents are admissible under Fed. R. Evid. 807 because: (1) the relevance of these shipping documents are not contested, (2) Keurig has had sufficient opportunity to address these documents in advance of trial, and (3) they are more probative than any other evidence that could be obtained by reasonable efforts for events that took place a decade ago.

computer system that generated the records, Tamblin Depo. Tr. (Ex. 4) at 5:21–23, and prior to 2005, Tamblin was the production manager who was familiar with data entry into the computer. *Id.* at 16:5-8. Tamblin, the custodian of the production records, was questioned by Keurig's counsel at length regarding the production records and his personal involvement in generating and producing the documents. *Id.* at 18:14–16. And again, there is no suggestion that the production records were created for purposes of litigation; Tamblin testified from personal knowledge that production records were regularly kept in the ordinary course of Kraft's business. *Id.* at 16:24–17:4.[4]

To the extent, as Keurig claims, Tamblin couldn't recall certain details about the production documents, that does not mean the documents are inadmissible. Rule 803(6) does not require that the custodian to have created the records but instead that the custodian be familiar with the system from which they were generated. *United States v. Pellulo*, 964 F.2d 193, 201 (3d Cir. 1992). Mr. Tamblin requested Kraft's IT personnel to generate a program that could query the ▮▮▮▮ production database to create the records in question. Ex. 4 at 18:14-19:21. Furthermore, Mr. Tamblin used the system personally in his prior role as a production manager with a different division ▮▮▮▮, which includes the Singles business. *Id.* at 14:22-16:4. Any perceived deficiencies in testimony goes to the weight of the evidence, and should be evaluated by a jury. Keurig had ample opportunity to depose Tamblin and will have further opportunity to explore his testimony at trial. But the production documents are admissible as business records.

Similarly, Keurig's final argument that the documents should not be admitted because they are "incomplete and untrustworthy" is unpersuasive. Mot. At 5. Rule 803(6) declares that

---

[4]  Notably, in a contemporaneous motion *in limine*, Keurig is also seeking to exclude the testimony of witnesses that can also authenticate the production records – and in greater detail.

business records are admissible "unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). Neither is present here, Keurig's misleading citations to *Medichem* and *Chen* notwithstanding. As described above, the sources of the documents – Appleton, Glus, Greto, and Tamblin all testified and were questioned at length by Keurig's counsel regarding the production records and each's personal involvement in generating, maintaining, and producing the documents. Once again, Keurig's counsel had the opportunity to question them on any deficiency in their testimony or in the production of documents, which goes to the weight of the evidence, not its admissibility.

CONCLUSION

For the foregoing reasons, Keurig's Motion should be denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700


Dated:  August 15, 2008
Public Version Dated:  August 22, 2008
878744 / 31118

By:  */s/ David E. Moore*
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 North Market Street
     P.O. Box 951
     Wilmington, DE  19899-0951
     Tel:  302-984-6169
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 22, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on August 22, 2008, the attached document was Electronically

Mailed to the following person(s):

| | |
|---|---|
| John W. Shaw | Michael A. Albert |
| Karen E. Keller | Michael N. Rader |
| Young Conaway Stargatt & Taylor | Laura Topper |
| The Brandywine Building | Gerald B. Hrycyszyn |
| 1000 West Street, 17th Floor | Wolf, Greenfield & Sacks, P.C. |
| P. O. Box 391 | 600 Atlantic Avenue |
| Wilmington, DE  19899-0391 | Boston, MA  02210 |
| jshaw@ycst.com | malbert@wolfgreenfield.com |
| kkeller@ycst.com | mrader@wolfgreenfield.com |
| | ltopper@wolfgreenfield.com |
| | ghrycyszyn@wolfgreenfield.com |

By:  /s/ David E. Moore
          Richard L. Horwitz
          David E. Moore
          Potter Anderson & Corroon LLP
          Hercules Plaza, 6th Floor
          1313 N. Market Street
          P.O. Box 951
          Wilmington, DE  19899-0951
          (302) 984-6000
          rhorwitz@potteranderson.com
          dmoore@potteranderson.com

805682 / 31118

# Exhibit 1

Page 1

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF DELAWARE

    ----------------------------------------------X

3   KEURIG, INCORPORATED,

4                           Plaintiff,

    -against-

5

    KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION &

6   KRAFT FOODS, INC.,

7                           Defendants.

    ----------------------------------------------X

8

9

                            555 South Broadway

10                          Tarrytown, New York   10591

11

                            March 5th, 2008

12                          2:00 p.m.

13

14

15          Videotaped Deposition of the Defendant,

16   by: GERALDINE A. GRETO, held pursuant to Court

17   Order, at the above time and place, before Notary

18   Public of the State of New York.

19

20

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC

            126 East 56th Street, Fifth Floor

24            New York, New York 10022

                  212-750-6434

25                 REF: 86864

Page 2

```
 1   A P P E A R A N C E S :
 2
 3   WOLF, GREENFIELD & SACKS, P.C.
 4       Attorneys for the Plaintiff
 5       600 Atlantic Avenue
         Boston, Massachusetts 02210-2206
 6
     BY:   GERALD B. HRYCYSZYN, ESQUIRE
 7
 8
 9   BAKER BOTTS, LLP
10       Attorneys for the Defendants
11       1299 Pennsylvania Avenue NW
         Washington, DC 20004
12
     BY:   DAVID SCHLITZ, ESQUIRE
13
14
15   THOMAS MARCOUX, ESQUIRE
16       Senior Patent Counsel
         Kraft Foods
17
         555 South Broadway
18       Tarrytown, New York 10591
19
20
21   ALSO PRESENT:
22       FRED ESPOSITO, Videographer
23
24
25
```

Page 4

```
 1   ------------ E X H I B I T S (Cont'd) ------------
 2   PLAINTIFF'S   DESCRIPTION              PAGE
 3   Exhibit 103  Document Bates stamped K0017271   73
 4   Exhibit 104  Document Bates stamped
                  K00170307-8              74
 5
     Exhibit 105  Document Bates stamped
 6                K0017260-261            81
 7   Exhibit 106  Document Bates stamped
                  K0017226-229            84
 8
     Exhibit 107  Document Bates stamped K0017159   84
 9
     Exhibit 108  Document Bates stamped
10                K0017252-253            86
11   Exhibit 109  Document Bates stamped
                  K0017467-468            88
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   ------------------ I N D E X ------------------
 2   WITNESS       EXAMINATION BY      PAGE
 3   GERALDINE A. GRETO    MR. SCHLITZ       7
 4
 5   ------------ E X H I B I T S ------------
 6   DEFENDANT'S  DESCRIPTION               PAGE
 7   Exhibit 74  Document Bates stamped K0017256    9
 8   Exhibit 75  Document Bates stamped K0017254   13
 9   Exhibit 76  Document Bates stamped
                 K0017258-259            22
10
     Exhibit 77  Document Bates stamped K0017236   25
11
     Exhibit 78  Document Bates stamped K0017262   26
12
     Exhibit 79  Document Bates stamped K0017241   29
13
     Exhibit 80  Document Bates stamped K0017240   30
14
     Exhibit 81  Document Bates stamped K0017239   32
15
     Exhibit 82  Document Bates stamped
16                K0017238-251           32
17   Exhibit 83  Document Bates stamped K0017266   35
18   Exhibit 84  Document Bates stamped K0017265   36
19   Exhibit 85  Document Bates stamped K0017269   37
20   Exhibit 86  Document Bates stamped K0017272   38
21   Exhibit 87  Document Bates stamped K0017253   40
22   Exhibit 88  Document Bates stamped K0017246   42
23   Exhibit 89  Document Bates stamped K0017273   43
24   Exhibit 90  Document Bates stamped K0017248   46
25
```

Page 5

```
 1          FEDERAL STIPULATIONS
 2
 3          IT IS HEREBY STIPULATED AND AGREED, by
 4   and between the attorneys for the respective parties
 5   herein, that the sealing and filing of the within
 6   deposition be waived; that such deposition may be
 7   signed and sworn to before any officer authorized to
 8   administer an oath, with the same force and effect
 9   as if signed and sworn to before the officer before
10   whom said deposition is taken.
11          IT IS FURTHER STIPULATED AND AGREED,
12   that all objections, except as to form, are reserved
13   to the time of trial.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1          PROCEEDINGS
2            * * * *
3          VIDEOGRAPHER: This is tape one.
4    We're now on the record at 2:00 p.m.,
5    Wednesday, March 5th, 2008.
6          This is the opening of the
7    deposition of Geraldine A. Greto, in
8    the matter of Keurig, Incorporated
9    versus Kraft Foods. This deposition is
10   being held at Kraft Foods.
11         The court reporter is Lisa Regen,
12   with Ellen Grauer Court Reporting. I'm
13   the legal videographer, Fred Esposito
14   with Ellen Grauer. Counsel, please
15   introduce themselves.
16         MR. SCHLITZ:  My name is David
17   Schlitz from the law firm of Baker
18   Botts. And I represent the Kraft
19   defendants.
20         MR. HRYCYSZN:  Gerry Hrycyszn
21   with Wolf Greenfield. I represent
22   Keurig, Incorporated.
23         MR. MARCOUX: Thomas Marcoux. I'm
24   in-house counsel at Kraft Foods.
25         VIDEOGRAPHER:  Will the court
```

Page 7

```
1    reporter please swear in the witness?
2    G E R A L D I N E  A.  G R E T O,
3          having been duly sworn by Notary
4          Public Lisa Regen, upon examination,
5          testified as follows:
6
7          THE REPORTER: Please state your
8    full name and address for the record.
9          THE WITNESS: Geraldine A. Greto,
10   65 Arthur Court, Port Chester, New York
11   10573.
12   EXAMINATION BY
13   MR. SCHLITZ:
14         Q    Ms. Greto, I know that you're
15   nervous about this deposition. Just relax and
16   listen to the questions. Just answer the questions
17   to the best of your knowledge. And if you want to
18   take a break at any time, feel free to do so. If
19   you want some water, just let us know.
20         In 1994, by whom were you
21   employed?
22         A    Kraft Foods.
23         Q    And at what Kraft Foods location
24   were you employed?
25         A    White Plains.
```

Page 8

```
1                    GRETO
2          Q    Is that White Plains in the State
3    of New York?
4          A    Yes, White Plains, New York.
5          Q    And for whom did you work?
6          A    Bill Craig.
7          Q    Now, did there come a time in
8    1994, when there was a Kenco Singles Machine at
9    White Plains?
10         A    Yes.
11         Q    Do you know approximately when in
12   1994?
13         A    I think it was September.
14         Q    Okay, now did you keep a file with
15   regard to the Kenco Singles Machine and Kenco
16   Singles Cartridges?
17         A    Yes.
18         Q    Where did you keep that file?
19         A    In the file drawer, right next to
20   my chair where I sit.
21         Q    And you did so as part of your
22   work?
23         A    Is it part of my work?
24         Q    Yes.
25         A    Yes.
```

Page 9

```
1                    GRETO
2          Q    Did you provide the contents of
3    that file to Kraft's attorney for production in this
4    case?
5          A    Yes.
6          MR. SCHLITZ: This would be
7    Defendant's Exhibit 74.
8          (Whereupon Defendant's Exhibit 74
9    - document Bates stamped K0017256 was
10   marked for identification.)
11         Q    Ms. Greto, I'd ask you to take a
12   moment to look at the document.
13         A    Yes.
14         Q    Is this one of the documents that
15   came out of the file we just mentioned?
16         A    Yes.
17         Q    Now, it's dated September 14th,
18   1994; is that correct?
19         A    Uh-huh.
20         Q    And at the bottom -- it is in
21   memorandum form. It says, from Bill Craig.
22         Do you see that?
23         A    Yes.
24         Q    And it says, at GF White Plains.
25   What is GF White Plains?
```

Page 10

GRETO

1
2      A    General Foods.
3      Q    Okay, I'm sorry, go ahead. You
4  were going to say something?
5      A    We were General Foods before we
6  were Kraft.
7      Q    And where it says thanks, it says
8  Bill/GG?
9      A    Right.
10     Q    Is GG your initials?
11     A    That's me; right.
12     Q    So did you prepare this document?
13     A    Yes.
14     Q    And did you sign it?
15     A    Yes.
16     Q    Now, it says -- first of all, you
17  see that above the line, there is a little coffee
18  cup with steam coming out?
19     A    Yeah.
20     Q    Can you tell me what that is?
21     A    It's a coffee cup with steam
22  coming out of it. And I -- that is my format, my
23  template I use for when I do memos. And because we
24  were in Maxwell House Coffee, I used to put it on
25  all my little memos, not just that one, all of them.

Page 11

GRETO

1
2      Q    And in the body of the memo it
3  says, "We received the Michigan machine." Do you
4  see that?
5      A    Right.
6      Q    Do you know what the reference to
7  the Michigan machine is?
8      A    It's the Kenco machine because it
9  was the Michigan project, or Project Michigan they
10  called it.
11     Q    It says, "It works great.
12  Everybody loves it."
13     A    Right.
14     Q    When you say, "everybody loves it"
15  what did that mean?
16     A    Everybody who drank the coffee and
17  used it.
18     Q    And when you say everybody that
19  drank the coffee and used it, who was using the
20  Kenco Singles machine and Kenco cartridges?
21     A    All the employees in our area and
22  whoever else came to visit. Any repair people or --
23  it was out there for anyone to use.
24     Q    Now, there is I believe a set of
25  initials. And then it says "9:16 a.m." Do you see

Page 12

GRETO

1
2  that?
3      A    When I send a fax, I always note,
4  you know, it went through.
5      Q    Now, when you say everybody loves
6  it, were you among the people who were using it?
7      A    Oh, yes.
8      Q    And when you were using the Kenco
9  machines, were you also using the Kenco Singles
10  capsules?
11     A    Yes.
12     Q    And when you used the Kenco
13  Singles capsules, did you use them in between
14  September 14, 1994, and the end of December 31st,
15  nineteen -- during 1994?
16     A    Yes.
17     Q    Okay, and amongst the capsules you
18  used, did you use capsules for coffee?
19     A    Yes.
20     Q    And when you used the capsules for
21  coffee, do you remember what flavor you used?
22     A    I used the medium.
23     Q    Is that the medium roast?
24     A    Medium roast, yes.
25     Q    Did you use the Kenco Singles

Page 13

GRETO

1
2  coffee capsules in '95, 1995?
3      A    Yes.
4      Q    Did you -- same question for '96?
5      A    Yes.
6      Q    Same question for '97?
7      A    Yes.
8      Q    And the same question for '98?
9      A    Yes.
10          MR. SCHLITZ: Now, would you mark
11  this?
12          (Whereupon Defendant's Exhibit
13          75 - document Bates stamped K0017254
14          was marked for identification.)
15     Q    Now, I would ask you to take a
16  moment and look at -- we have put in front of you
17  Defendant's Exhibit 75, which has the Bates numbers
18  K0017254, and K0017255.
19          If you would take the time to look
20  at those two pages and tell me after you have done
21  so.
22     A    Tell me -- tell you what it says?
23     Q    No, just tell me you have looked
24  at it and you're ready to answer questions.
25     A    You can ask me questions.

Page 14

GRETO

1
2    Q    First of all, is this one of the
3  documents that came out of the file that you kept --
4    A    Yes.
5    Q    -- with regard to Kenco Singles.
6  Now, looking at this, whose handwriting is this?
7    A    Mine.
8    Q    And at the top of the page it
9  says, "eight bags in each case, twenty cartridges in
10  each bag." Can you explain what that means?
11    A    When you got a case, there is
12  eight bags in it. And each of the bags contained
13  twenty cartridges.
14    Q    Well, is this something that you
15  looked at and counted, and then wrote down on this
16  page?
17    A    Well, yes, I counted them, yes.
18  So that I would know how many we have.
19    Q    Now, then it says, "received
20  machine 9/2/1994." Is that September 2nd, 1994?
21    A    Yes.
22    Q    And so, if you look back at
23  Defendant's Exhibit 74, the first exhibit in front
24  of you?
25    A    Uh-huh.

Page 15

GRETO

1
2    Q    And then look at 75, it says you
3  received the machine on September 2nd, '94. And
4  then you wrote this memo on September, twelve days
5  later?
6    A    Right.
7    Q    Saying that you actually received
8  the Michigan machine?
9    A    Right.
10    Q    Now, then you come down right
11  below that. And it says "W/six cases of coffee,
12  three cases of tea, one case of hot chocolate." Do
13  you see that?
14    A    Yes.
15    Q    Okay, so let's take that first.
16  What does it mean, "W/six cases"?
17    A    The word with, W is with, slash,
18  so with the machine. I recall that this means that
19  they sent also the capsules, the cartridges, coffee,
20  tea and hot chocolate.
21    Q    Okay, now, and then under bags,
22  you have, "We have four cases." And above you had
23  said that each case had eight. So six times eight
24  is forty-eight. So that is why -- that is the
25  forty-eight; is that correct?

Page 16

GRETO

1
2    A    Right.
3    Q    Then you said that each bag had
4  twenty cartridges. So we take forty-eight times
5  twenty and you got nine sixty; is that correct?
6    A    Right.
7    Q    Now, then we come down a little
8  bit. And we have, you see where it says 3/21/1995?
9    A    Yes.
10    Q    Is that March 21st, 1995?
11    A    Yes.
12    Q    Can you explain what you have here
13  between for March 21st, 1995?
14    A    It would mean to me that they did
15  not include the flavors espresso and cappi. And my
16  boss said, let's try that. Let's get some. And
17  that's what I did.
18    Q    Okay, now cappi, is that
19  capuccino?
20    A    Yes.
21    Q    Now, then we have these lines.
22  And then you have 6/95. You see that?
23    A    Right.
24    Q    Is that June '95?
25    A    Yes.

Page 17

GRETO

1
2    Q    Okay, and I can't -- I'm having a
3  little hard time. It says, ordered something
4  received -- what does that mean?
5    A    Ordered then received. So the
6  following in parenthesis cases.
7    Q    So you you're now listing below
8  that cases that you actually received?
9    A    Yes.
10    Q    And you have the number of cases.
11  You have the flavor. Then a little bit you have a
12  bags, number of cartridges then you have something,
13  already had from previous cartridges some numbers;
14  is that right? Do you see that?
15    A    Yes.
16    Q    So let's take two lines down, with
17  medium roast. You order and received two cases of
18  medium roast; is that correct?
19    A    Yes.
20    Q    And based on your previous count,
21  since each case had eight bags, you listed here,
22  sixteen bags of medium roast; is that right?
23    A    Uh-huh, yes.
24    Q    And that would mean that you got
25  three hundred, since each bag had twenty cartridges,

Page 18

GRETO

1    GRETO
2    you had three twenty cartridges; right?
3        A    Yes.
4        Q    You already had from previous
5    cartridges you have eighty in stock; is that
6    correct?
7        A    Yes.
8        Q    Okay, and since each case has a
9    hundred and sixty, you had used by this point June,
10    '95, you used at least eighty; is that correct, of
11    the medium roast?
12        A    Yes, that's correct.
13        Q    Now, if you turn to the next page,
14    0017255, you see at the top, it says, "had as of"
15    and then six. It seems like you have inserted a
16    number five there?
17        A    Yes, I think I realized I should
18    have put the date. And that means the fifth, I
19    think.
20        Q    So June 5th, 1995?
21        A    Uh-huh.
22        Q    And so, when you look at the
23    front page where you say 6/95, you had ordered and
24    received as of six -- June 5th, 1995, these --
25        A    What I asked for.

Page 19

1    GRETO
2        Q    -- right. Okay. Now, the Kenco
3    Singles machine in White Plains, where was it kept?
4        A    In the pantry, where the
5    refrigerator is, and the sink, and the counter is
6    and that.
7        Q    And you may have already answered
8    this, but who had access to that pantry?
9        A    All the employees, plus any
10    visitors that came to visit, plus any repair men
11    that came to visit, and in the evening, the cleaning
12    people.
13        Q    And were the Kenco Singles
14    cartridges out in the open?
15        A    Yes. I used to put them in a
16    little basket, variety.
17        Q    You used to?
18        A    Yes.
19        Q    Stating the obvious, it was not --
20    they were not in a locked drawer?
21        A    No, it was not locked.
22        Q    And they weren't -- and was there
23    any attempt to keep the Singles cartridges secret in
24    any way?
25        A    No.

Page 20

1    GRETO
2        Q    Was the kitchen or pantry locked?
3        A    No.
4        Q    And in fact, as you said, the
5    cleaning crew could come in at night and have access
6    to them?
7        A    Certainly.
8        Q    Any visitors could have access?
9        A    Yes, they could.
10        Q    And in fact, all the employees?
11        A    Yes.
12        Q    And you have testified that you
13    personally used the coffee cartridges in '94,
14    '95,'96, '97 and '98?
15        A    Right.
16        Q    Now, when you -- at any time,
17    during that period, '94, to '98, were you under any
18    obligation of secrecy or confidentiality with regard
19    to the Kraft Kenco Singles coffee cartridges?
20        A    No.
21        Q    And again, I apologize, stating
22    the obvious. But were you under any obligation of
23    secrecy or confidentiality with regard to those
24    cartridges to a company called Keurig?
25        A    No.

Page 21

1    GRETO
2        Q    There are two inventors named with
3    regard to the patent in suit, a Mr. Lazarus and a
4    Mr. Bolio. First of all, have you ever heard of
5    these two people?
6        A    No.
7        Q    Okay, were you under any
8    obligation of confidentiality of secrecy to these
9    two people --
10        A    No.
11        Q    -- with regard to the Kraft
12    cartridges?
13        A    No.
14        Q    Did you ever see others use -- you
15    have testified that you personally used the Kraft
16    singles cartridges for coffee. Were you under any
17    other obligation to others -- excuse me, did you
18    ever see others use the Kraft singles cartridges?
19        A    Yes.
20        Q    Can you identify anybody that you
21    saw?
22        A    My co-employees, whatever area I
23    was working in. Jennifer Guthrie, Debbie
24    Robastelli, Bill Craig.
25        Q    Bill Craig, you saw Mr. Craig use

Page 22

GRETO

1
2   them?
3        A    Yes.
4            (Whereupon Defendant's Exhibit 76
5        - document Bates stamped K0017258 was
6        marked for identification.)
7        Q    Ms. Greto, if you first take the
8   time to look at Defendant's Exhibit 76, which is
9   K0017259, and 0017258.
10       A    Yes.
11       Q    Do you see that?
12       A    Yes.
13       Q    First, at the bottom of this, it
14  says Bill/GG. Are those your initials?
15       A    That's me.
16       Q    So did you prepare this document
17  and sign it?
18       A    Yes.
19       Q    And did this document come out of
20  your files?
21       A    Yes.
22       Q    It says, "Ted, I'd like to get a
23  Michigan machine here in the United States for
24  demonstration purposes."
25       A    Right.

Page 23

GRETO

1
2        Q    Do you know what that means, "for
3   demonstration purposes?"
4        A    We weren't going to sell or
5   anything. We were just going to use it.
6        Q    Right, but did --
7        A    For us.
8        Q    -- did Mr. Craig demonstrate the
9   machine and show it to visitors?
10       A    Yes.
11       Q    Now, this page it says, May 16 --
12  excuse, me. It says the May 16, 1994 document says
13  "How can I buy one and have it converted to run on
14  one ten volts as a plug in unit and receive it in
15  Tarrytown?" Do you see that?
16       A    Yes.
17       Q    Then if you turn to the next page,
18  which is dated August 29, 1994. You see that?
19       A    Right.
20       Q    Again it says Bill/GG. Are those
21  your initials?
22       A    Yes, it is.
23       Q    Did you prepare this document?
24       A    Yes, I did.
25       Q    Did you sign it?

Page 24

GRETO

1
2        A    Yes.
3        Q    The second paragraph says, "Is
4   there a problem with modifying this machine and
5   sending me one in White Plains (rather than
6   Tarrytown as previously requested)." You see that?
7        A    Yes.
8        Q    So in fact, this is the machine
9   that we spoke about earlier. It was delivered to
10  White Plains, not Tarrytown; is that correct?
11       A    Yes.
12       Q    Now, and I believe you just
13  answered this. But I need to make sure. In fact,
14  you saw -- did you ever see Mr. Craig demonstrate
15  this machine to visitors?
16       A    I don't know if I was actually
17  there watching him demonstrate it. But I know
18  whoever came to visit him, he took them to the
19  pantry, and let's have a cup of coffee. Look at
20  this great machine.
21            (Whereupon Defendant's Exhibit
22       77 - document Bates stamped K0017236
23       was marked for identification.)
24       Q    I show you Defendant's Exhibit
25  77. Did this come out of your files?

Page 25

GRETO

1
2        A    Yes.
3        Q    There is some handwritten notes on
4   there. Can you identify whose handwriting that is?
5        A    That's mine.
6        Q    Can you read them and explain them
7   to us?
8        A    "3/17 received only one box of
9   espresso, no inside said will forward one more and
10  two cappi ASAP." And then I wrote, "3/20 received
11  one espresso and one cappi." This is the way I'm
12  interpreting, and still need one more cappi. That
13  is not what it says. But that is what I'm
14  interpreting.
15       Q    Okay, you said it's not what is
16  says?
17       A    Well, it's still nees.
18       Q    Yes, still need one cappi?
19       A    Still need one cappi.
20       Q    But in fact, these are your
21  contemporaneous notes saying that on March 17th, you
22  did receive a box of espresso; is that right?
23       A    Yes.
24       Q    And on March 20th, you received
25  one box of espresso and one box of capuccino. Is

Page 26

GRETO

1
2  that correct?
3       A    Yes.
4       Q    And then, if you go down to this
5  document, it is -- they were being sent to White
6  Plains, New York; is that correct?
7       A    Yes.
8            (Whereupon Defendant's Exhibit 78
9       - document Bates stamped K0017241 was
10      marked for identification.)
11      Q    Okay, I show you Defendant's
12  Exhibit 77, which is K0017262. Is this a document
13  that came out of your files?
14      A    Yes.
15      Q    And it is dated what?
16      A    May 16th, 1995.
17      Q    And it's to a Pat Nunn. Do you
18  know who Pat Nunn is?
19      A    She was the secretary at Kraft,
20  Jacobs Suchard, in Banbury that I mostly or KJS,
21  whatever you want to call it. And she was kind of
22  like my contemporary. She worked for the research
23  and development person over there.
24      Q    Now, it says from, and then where
25  the highlighting it, but can you --

Page 27

GRETO

1
2       A    That is me because that means that
3  is my file copy. And I highlight it. One went to
4  Bill. I always put it in his thing to show him that
5  I did it.
6       Q    And again, cross out says at KF
7  White Plains?
8       A    Now, we became Kraft, GF to KF.
9       Q    KF means Kraft Foods?
10      A    Right.
11      Q    And then White Plains is the
12  location?
13      A    Correct.
14      Q    And that is in New York State;
15  right?
16      A    New York, White Plains, New York.
17      Q    Now, first line of the text says,
18  "Project Michigan is a great success here. And our
19  supply is dwindling." What do you mean, our supply
20  is dwindling?
21      A    Everybody loved to use that
22  machine. And we were running out of cartridges, so
23  I had to keep ordering them.
24      Q    And then you have in handwriting,
25  it say, "one carton equals eight bags, equals twenty

Page 28

GRETO

1
2  cartridges per bag, which equals a hundred and sixty
3  cartridges." You see that?
4       A    Right.
5       Q    So, that is something you counted
6  and noted?
7       A    Right.
8       Q    So, if you go down, and we see,
9  medium roast, it says cartons, two. So this, here
10  you're ordering two cartons; is that right?
11      A    Right.
12      Q    Half/bag you had forty -- you had
13  four bags in stock; is that right?
14      A    Yes.
15      Q    And thus you had eighty
16  cartridges; is that right?
17      A    Right.
18      Q    And since one carton has eight
19  bags and a hundred sixty cartridges, from this you
20  know that the users had used at least eighty of the
21  medium roast cartridges; is that correct?
22      A    That's correct.
23           (Whereupon Defendant's Exhibit 79
24      - document Bates stamped K0017241 was
25      marked for identification.)

Page 29

GRETO

1
2       Q    Now, this is dated May 16th,
3  1995, okay. Then I'm going to show you the next
4  document, Defendant's 79. This is also dated May
5  16th, 1995. You see at the top?
6       A    Yes.
7       Q    And it's from you; is that
8  correct?
9       A    Yes.
10      Q    Can you see decipher this for me
11  and tell me what it says?
12      A    I think it's saying that this fax
13  that I sent, this as the cover sheet, didn't go
14  through. I kept having a problem.
15      Q    Okay?
16      A    Try again.
17      Q    So you -- the fax that you had
18  tried to send for Defendant's Exhibit 77, hadn't
19  gone through; right?
20      A    That's what this says, yes.
21      Q    So then, now I take it from that,
22  you monitored. You didn't just send these things.
23  You monitored if they went through, et cetera; is
24  that right?
25      A    I always followed up, yes.

# Exhibit 2

Page 1

```
 1    UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF DELAWARE

      - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

 3    KEURIG, INC.,

 4                              Plaintiff,

 5         - against -

 6    KRAFT FOODS GLOBAL, TASSIMO CORPORATION,

      KRAFT FOODS INTERNATIONAL,

 7

                              Defendants.

 8

      C.A. NO. 07-17 GMS

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

10

11                         120 Park Avenue

                           New York, New York

12

13

                           March 4, 2008

14                         2:00 P.M.

15

16         Examination Before Trial of HELEN GLUS,

17    pursuant to Notice, taken by and before Renee

18    S. Harris, a Notary Public and Shorthand

19    Reporter of the State of New York.

20

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC

            126 East 56th Street, Fifth Floor

24             New York, New York 10022

                    212-750-6434

25                  REF: 86800
```

Page 2

```
 1   A P P E A R A N C E S :
 2
 3      BAKER BOTTS
 4         Attorneys for Defendants
 5         1299 Pennsylvania Ave, NW
 6         Washington, DC 20004
 7      BY:  DAVID M. SCHLITZ, ESQ.
 8
 9
10      WOLF GREENFIELD
11         Attorneys for Plaintiffs
12         600 Atlantic Avenue
13         Boston, Massachusetts 02210
14      BY:  GERALD HRYCYSZYN, ESQ.
15      ALSO PRESENT:  CLINTON HALLMAN, KRAFT
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   ---------- E X H I B I T S (Cont'd) ----------
 2   DEFENDANT'S   DESCRIPTION              PAGE
 3   Exhibit 68   K0017187          45
 4   Exhibit 69   K0017186          46
 5   Exhibit 70   K0017189          47
 6   Exhibit 71   K0017182          49
 7   Exhibit 72   K0017181          50
 8   Exhibit 73   K0017180          51
 9   PLAINTIFF'S                    PAGE
10   Exhibit 101   Coffee pack      63
11   Exhibit 102   K0017210         66
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   ------------- I N D E X -------------
 2   WITNESS           EXAMINATION BY        PAGE
 3   HELEN GLUS        MR. SCHLITZ           6
 4
 5
 6   ------------- E X H I B I T S -------------
 7   DEFENDANT'S   DESCRIPTION              PAGE
 8   Exhibit 50   K001722-23        18
 9   Exhibit 51   K001721           20
10   Exhibit 52   K0017219          20
11   Exhibit 53   K0017218          24
12   Exhibit 54   K0017217          26
13   Exhibit 55   K0017216          26
14   Exhibit 56   K0017214          29
15   Exhibit 57   K0017212          30
16   Exhibit 58   K0017204          32
17   Exhibit 59   K0017202          33
18   Exhibit 60   K0017203          34
19   Exhibit 61   K0017201          37
20   Exhibit 62   K0017199          37
21   Exhibit 63   K0017200          37
22   Exhibit 64   K0017197          39
23   Exhibit 65   K0017191          41
24   Exhibit 66   K0017196          42
25   Exhibit 67   K0017192          43
```

Page 5

```
 1      S T I P U L A T I O N S
 2
 3      IT IS HEREBY STIPULATED AND AGREED
 4   by and between the attorneys for the
 5   respective parties herein, that filing,
 6   sealing and certification be and the
 7   same are hereby waived.
 8      IT IS FURTHER STIPULATED AND
 9   AGREED that all objections, except as to
10   the form of the question, shall be
11   reserved to the time of the trial.
12      IT IS FURTHER STIPULATED AND
13   AGREED that the within deposition may be
14   signed and sworn to before any officer
15   authorized to administer an oath, with
16   the same force and effect as if signed
17   and sworn to before the Court.
18
19
20
21
22
23
24
25
```

Page 6

1  H E L E N  G L U S, having first been duly
2  sworn by a Notary Public for and within the
3  State of New York, upon being examined,
4  testified as follows:
5
6  EXAMINATION BY
7  MR. SCHLITZ:
8      Q.  Please state your name for the
9  record.
10     A.  Helen Glus.  123 Mamaroneck Avenue,
11 Mamaroneck, New York, 10543.
12     Q.  I'm going to have to ask you to
13 speak up a little bit so we can all hear.
14     Mrs. Glus, who do you currently work
15 for?
16     A.  Louis Camilleri, chairman and CEO of
17 Altria Group, Inc.
18     Q.  Did you ever work for Kraft Foods?
19     A.  Yes, the international division.
20     Q.  Okay.  And can you tell me the dates
21 that you worked for Kraft Foods?
22     A.  Mr. Camilleri was transferred there
23 on December '95, and we stayed there till
24 August '96.
25     Q.  And you say "there"; where is there?

Page 7

1              GLUS
2      A.  The Rye Brook office of Kraft Foods
3  International.
4      Q.  And is that in New York State?
5      A.  Westchester.
6      Q.  Westchester, New York State?
7      A.  Mm-hmm.
8      Q.  And when you arrived at the offices
9  of Kraft Foods International Rye Brook, was
10 there a single-serve beverage machine there?
11     A.  Yes, there was.
12     Q.  Do you know what brand it was?
13     A.  We referred to it as the Kenco
14 machine.
15     Q.  Where was the Kenco machine that
16 you're referring to, where was that in the
17 building?
18     A.  On the seventh -- on my half of the
19 seventh floor in the kitchen.
20     Q.  Who had access to that machine?
21     A.  Everyone.
22     Q.  Everyone, meaning?
23     A.  Everyone who worked on that floor
24 who came to that floor, visited that floor.
25     Q.  Now did you personally have access

Page 8

1              GLUS
2  to it?
3      A.  Yes.
4      Q.  We've talked about there was a Kenco
5  singles machine.  Were there capsules for use
6  with the Kenco singles machine at the same
7  location?
8      A.  Yes.
9      Q.  Did you personally use those Kenco
10 singles capsules?
11     A.  Yes.
12     Q.  How often did you use them?
13     A.  Every day, seven times a day, at
14 least three times a day.
15     Q.  And you mentioned that you arrived
16 in December '95, there already was a machine;
17 and did you start using it in December of
18 '95?
19     A.  Yes.
20     Q.  And did you continue to use it
21 through August '96?
22     A.  Yes.
23     Q.  Let me ask the question first, and
24 wait if you would, please.
25     Did you ever see anyone else use the

Page 9

1              GLUS
2  Kenco singles capsules?
3      A.  Yes.
4      Q.  Now I'm going to ask you to dig way
5  back, and I appreciate we're talking about
6  December '95.  But do you remember the
7  flavors of beverage that you used of the
8  singles -- of the Kenco's singles cartridges
9  that you used?
10     A.  Tea, medium roast.  Those are the
11 two I used.
12     Q.  Okay.  And again, I understand it's
13 been a while, but can you describe the
14 appearance of the Kenco's singles cartridge
15 that you started to use in December of 1995?
16     A.  Can I use my hands?
17     Q.  Yes.
18     A.  It's about that long, about that
19 wide, square (indicating).  I don't remember
20 if the top, the part that you inserted, was
21 more rounded or maybe came more to a point.
22 Each one had a different label on the front
23 for what the product was.
24     Q.  And do you remember what the bottom
25 looked like?

Page 10

GLUS

1
2     A.  The foil, but that's all I remember.
3     Q.  And recently, have you seen the
4  Kenco's singles cartridge?
5     A.  Yes.
6     Q.  How recently?
7     A.  A month ago.
8     Q.  And was there any difference in the
9  appearance of what you saw a month ago from
10  what you --
11     A.  To me they looked exactly the same.
12     Q.  When you say "they," meaning what
13  you started to use in December '95?
14     A.  Yes.
15     Q.  Now, with regard to the Kenco's
16  singles cartridges that you were using from
17  December 1995 to August 1996, in Rye Brook --
18  we're going to separate the two times:  One
19  is Rye Brook and one is here in Park Avenue.
20     Were you under any obligation of
21  confidentiality or secrecy with anyone with
22  regard to the Kenco's singles cartridges?
23     A.  No.
24     Q.  To your knowledge were the other
25  uses under any obligation of confidentiality

Page 11

GLUS

1
2  or secrecy to anyone with regard to the
3  Kenco's singles cartridges?
4     A.  No.
5     Q.  More specifically, were you under
6  any obligation of confidentiality or secrecy
7  to a company called Keurig, the inventor,
8  employees of Keurig?
9     A.  No.
10     Q.  Were you free to show the cartridges
11  to anyone you wanted to show them to?
12     A.  Yes.
13     Q.  Now, after August 1996, did you
14  change companies that you worked for?
15     A.  Yes, Mr. Camilleri was given a new
16  position, senior vice president and chief
17  financial officer for Philip Morris
18  Companies, Inc., so we moved back to 120
19  Park.
20     Q.  And when you moved back -- when was
21  that?
22     A.  If I can look, August '96.
23     Q.  In August '96, when you arrived at
24  120 Park Avenue, on the floor that you worked
25  on, was there a Kenco's singles machine?

Page 12

GLUS

1
2     A.  No.
3     Q.  Thereafter, was there a Kenco's
4  single machine?
5     A.  Yes.
6     Q.  Do you know how soon thereafter?
7     A.  Within months.
8     Q.  Okay.  And were you responsible for
9  ordering that machine?
10     A.  I was in the loop, but I believe it
11  was a phone call between my boss and I
12  believe Ronny Bell, but he told him that he
13  wanted a machine shipped here.
14     Q.  And when the machine arrived, did
15  there also arrive Kenco's singles cartridges
16  for use in the machine?
17     A.  Yes, there was an initial supply
18  delivery.
19     Q.  Where was that machine located?
20     A.  In the kitchen area on this floor.
21     Q.  "This floor" being --
22     A.  The 22nd floor.
23     Q.  The 22nd floor.  That kitchen area,
24  who had access to it?
25     A.  Everybody -- everybody.  It's for

Page 13

GLUS

1
2  the purpose of the people on this floor, but
3  for everybody who came on the floor.
4     Q.  That would be other employees of
5  Kraft in the building -- excuse me, of
6  employers in the building?
7     A.  Yes.
8     Q.  Visitors to the building?
9     A.  Yes.
10     Q.  And I asked you about the machine,
11  were there capsules, Kenco's singles
12  capsules, for use within that machine in the
13  same location?
14     A.  Yes.
15     Q.  And were they out in public view?
16     A.  Yes, they were in a storage kind of
17  view.
18     Q.  Okay.  Now, in 1996, did you ever
19  personally use the Kenco's singles capsules?
20     A.  Yes.
21     Q.  Again, how often?
22     A.  At least three times a day.
23     Q.  In 1997, did you use the Kenco's
24  singles capsules?
25     A.  Yes.

Page 14

GLUS

1
2    Q.  In 1998?
3    A.  Yes.
4    Q.  And in 1999?
5    A.  Yes.
6    Q.  Now, did you ever see others use the
7    Kenco's singles cartridges in 1996?
8    A.  Yes.
9    Q.  In 1997?
10   A.  Yes.
11   Q.  In 1998?
12   A.  Yes.
13   Q.  In 1999?
14   A.  Yes.
15   Q.  And can you -- and I know this is a
16   difficult question, but can you remember
17   anybody that else that used them?
18   A.  All my coworkers on the floor at the
19   time, definitely.  Other people who would
20   come up for meetings, outsiders who came for
21   meetings.  Everybody used it.
22   Q.  When you say "outsiders" that came
23   to meetings, to your knowledge did any
24   visitors, non-Kraft employees, ever view and
25   use the Kenco's singles machine?

Page 15

GLUS

1
2    A.  Yes.
3    Q.  Can you describe under which
4    circumstances that might have happened?
5    A.  Well, they would visit Mr.
6    Camilleri.  If you knew the layout of the
7    floor, Mr. Camilleri's office at the time was
8    by the kitchen, and his conference room was
9    opposite the kitchen.
10   So if people were there to meet with him
11   and he wasn't available, I would say:  Do you
12   want to go to conference room; would you like
13   coffee; we would go along the way.  We had
14   such a variety, so you would ask them what
15   they want.
16   Q.  Now, we talked about each of the
17   years '97, '98, '99, your personal use of the
18   Kenco's singles capsules, do you remember
19   what flavors you used?
20   A.  I used medium roast or regular tea.
21   Q.  Now, at any time in '96, '97, '98,
22   '99, were you under any obligation of
23   confidentiality or secrecy with regard to the
24   Kenco's singles cartridges and the use of
25   them?

Page 16

GLUS

1
2    A.  No.
3    Q.  Did anyone ever say to you:  Helen,
4    you're free to use these cartridges, but you
5    can't tell anybody about the cartridges?
6    A.  No.
7    Q.  Were your coworkers under any
8    obligation of confidentiality or secrecy with
9    regard to the use of Kenco's singles?
10   A.  No.
11   Q.  This may seem obvious, but were you
12   under any obligation of confidentiality or
13   secrecy with regard to the Kenco's singles
14   cartridges -- did you have any obligation of
15   confidentiality or secrecy to Keurig?
16   A.  No.
17   Q.  Did you have any obligation of
18   confidentiality or secrecy to a Mr. Lazarus,
19   who is one of the inventors of the patent
20   suit?
21   A.  No.
22   Q.  What about to his co-inventor?
23   A.  I don't know who these people are,
24   no.
25   Q.  But you didn't have any obligation

Page 17

GLUS

1
2    of confidentiality or secrecy?
3    A.  No.
4    Q.  Now did there come a time when you
5    were responsible for ordering the Kenco's
6    singles cartridges for use in the machine on
7    the 22nd floor?
8    A.  Yes.
9    Q.  Okay.  Now did you keep a file with
10   regard to those orders?
11   A.  Yes.
12   Q.  And where did you keep that file?
13   A.  In my desk drawer.
14   Q.  Did you provide copies of the
15   documents in that file to Kraft's attorneys
16   in this case to be produced in this case?
17   A.  Yes.
18   Q.  Okay.  I'm going to show you some
19   documents, if you would please hand this to
20   the court reporter.  Now,
21   I don't know what the last defense
22   exhibit is in Banbury, but I know it was
23   certainly not up to 50.
24   So let's mark this defendant's exhibit
25   50.

GLUS

1  GLUS
2      (A DOCUMENT WAS RECEIVED AND MARKED
3      DEFENDANT'S EXHIBIT 50,
4      IN EVIDENCE, AS OF THIS DATE.)
5      Q.  Can you take a second to look at the
6  document?
7      A.  Yes.
8      Q.  Can you describe what this document
9  is?
10     A.  It's a fax to me from Mr. Halliday
11  just saying how happy we were with the
12  machine and asking for more boxes of product.
13     Q.  Now, first of all, did this document
14  come out of your file?
15     A.  Yes, it did.
16     Q.  At the top there is a Philip Morris
17  letterhead.  Is this the letterhead that
18  you --
19     A.  At the time it was my standard fax
20  cover sheet.
21     Q.  Okay.  And this is dated November 6,
22  1996; is that right?
23     A.  That's right.
24     Q.  Do you have any reason to believe
25  this was not sent about November 6, 1996?

GLUS

1  GLUS
2      A.  It was sent.
3      Q.  Okay.  Now, you say it was sent.
4  Now you look at the next page, K0017223; what
5  is this page?
6      A.  That's the transmission report from
7  the fax machine.
8      Q.  So this show that is it was --
9      A.  That it went through; that the
10  transmission was okay.
11     Q.  Now, looking at the message itself,
12  it says, "Dear Mr. Halliday, I don't know if
13  Lewis mentioned it in his phone call, but the
14  machine is a big success."
15     What do you mean, a big success?
16     A.  That everyone on the machine thought
17  it was the greatest thing since sliced bread.
18     Q.  "Everyone on the machine," everyone
19  on the --
20     A.  Everyone on the floor.
21     Q.  "So much so that we are ready to
22  re-order certain items after a short time."
23     What do you mean reorder certain items
24  after a short time?
25     A.  Well, I believe it came -- as I

GLUS

1  GLUS
2  said, we got an initial supply, but it was
3  going like crazy.  So I had to reorder more
4  stock.
5      Q.  When you say were "going like
6  crazy," what do you mean, going like crazy?
7      A.  People were using it all day long.
8      Q.  Now, it says: "I'd appreciate it if
9  you could arrange for the following favorites
10  to be sent to us on 120 Park Avenue."  And
11  you list Kenco traditional leaf tee, Kenco
12  medium roast, Kenco's espresso.  Were these
13  the favorite flavors?
14     A.  At the time they were the favorites,
15  the bestest-selling.
16     (A DOCUMENT WAS RECEIVED AND MARKED
17      DEFENDANT'S EXHIBIT 51,
18      IN EVIDENCE, AS OF THIS DATE.)
19     Q.  Okay.  Now I'm going to show you a
20  next document, Defendant's Exhibit 51.  At
21  the bottom right-hand corner, litigation
22  number we call Bates Nos. 2321; what is this
23  document?
24     A.  This appears to me to be a letter
25  from Liz Matthews saying she is sending the

GLUS

1  GLUS
2  product along with the capsule storage unit
3  and that she would let me know when the
4  products were going to arrive and to let her
5  know when I needed more.
6      Q.  And this is dated November 7, 1996;
7  is that correct?
8      A.  That's correct.
9      Q.  Which if you look at Defendant's
10  Exhibit 50 is one day after you requested the
11  product; is that correct?
12     A.  Yes.
13     Q.  And this facsimile is addressed to
14  you; is that correct?
15     A.  That's correct.
16     Q.  And did this facsimile come out of
17  your files?
18     A.  Yes, it did.
19     Q.  Now, when you made orders, did you
20  stay on top of whether they are delivered or
21  not?
22     A.  I tried to.
23     Q.  And if you made an order and it
24  didn't come, did you do anything?
25     A.  I'm sure I would have e-mailed them

Page 22

GLUS

1
2 or called them.
3     Q. So you have no reason to believe
4 that this wasn't --
5     A. Well, I know it came because I would
6 have had a lot of people to answer to if it
7 didn't. So I know when I ordered, I got a
8 product.
9     (A DOCUMENT WAS RECEIVED AND MARKED
10     DEFENDANT'S EXHIBIT 52,
11     IN EVIDENCE, AS OF THIS DATE.)
12     Q. Now, handing you -- if you would
13 look at Defendant's Exhibit 52 which is
14 K0017219 through K0017220, would you tell me
15 what these documents are?
16     A. Again another fax to Ms. Matthews
17 asking for more product.
18     As I said, the earlier one where we had
19 just those three items, the choices expanded.
20 So we needed more, another cartridge, another
21 storage unit to hold all the cartridges, so I
22 asked for another one of those. And then
23 there was a question about billing that
24 Mr. Kepler had.
25     Q. Now it says here: "I was told it

Page 23

GLUS

1
2 might be helpful for you to indicate on the
3 shipping documents and the name and phone
4 number of our broker, which is Martin
5 Strauss."
6     Do you see that?
7     A. Yes.
8     Q. Is that correct that you were the
9 international broker for bringing things into
10 customs to Martin Strauss?
11     A. Yes, it was.
12     Q. Now, the next page which is 220,
13 what is this?
14     A. Again, it's a fax transmission
15 sheet.
16     Q. Now, where you say: "Dear Liz," and
17 it says, "it's that time again."
18     What do you mean, "it's that time
19 again?"
20     A. I always took -- time for me to be a
21 pest and order more product.
22     Q. And again, I apologize. It may seem
23 obvious, but why are you ordering more
24 product?
25     A. Because we were running out and we

Page 24

GLUS

1
2 didn't have enough.
3     Q. When you say "we were running out,"
4 would people have used -- when you look at
5 the previous exhibit, which is dated November
6 6, 1996, you had ordered nine boxes of
7 cartridges.
8     A. Right.
9     Q. Now, this is three months later,
10 February 4, 1996; so almost three months
11 later.
12     Had people been using the cartridges and
13 the nine boxes that you had received?
14     A. Yes.
15     Q. Here you are requesting 16 more
16 boxes; is that correct?
17     A. That's right.
18     (A DOCUMENT WAS RECEIVED AND MARKED
19     DEFENDANT'S EXHIBIT 53,
20     IN EVIDENCE, AS OF THIS DATE.)
21     Q. Show you Defendant's Exhibit 53,
22 K0017218, can you tell me what this is?
23     A. This is Liz's reply to me from the
24 previous exhibit saying that the arrangements
25 for the product and the storage unit were

Page 25

GLUS

1
2 being made; two of them were out of stock;
3 and that we weren't going to be billed.
4     Q. Okay. So it says: "We are making
5 arrangements for the product and capsules of
6 the storage unit to be sent to you. There
7 may be some delay in getting the carte
8 noire," c-a-r-t-e, and then n-o-i-r-e, and
9 then the Kronung, K-r-o-n-u-n-g, products.
10 Do you see that?
11     A. Yes.
12     Q. Now, if you look at the dates,
13 Defendant's Exhibit 52 and Defendant's
14 Exhibit 53. Defendant's Exhibit 52 where
15 you've ordered the 16 boxes dated February 4,
16 1997, and this is dated, what?
17     A. February 5, 1997.
18     Q. So a day later?
19     A. Yes.
20     Q. So you ordered them on February 4
21 and you got a reply on February 5, that they
22 were being sent to you?
23     A. Yes.
24     (A DOCUMENT WAS RECEIVED AND MARKED
25     DEFENDANT'S EXHIBIT 54,

Page 26

```
1              GLUS
2     IN EVIDENCE, AS OF THIS DATE.)
3       Q.  Can you tell me what this is,
4    Defendant's Exhibit 54, which is K0017217;
5    what is this document?
6       A.  It's a fax from Liz Matthews telling
7    me that the products listed were being sent
8    to me on February 15; plus the capsule
9    storage unit and the flight details and the
10   other two products were going to be produced
11   and dispatched the following week.
12      Q.  Okay.  And did this document come
13   from your files?
14      A.  Yes, it did.
15     (A DOCUMENT WAS RECEIVED AND MARKED
16     DEFENDANT'S EXHIBIT 55,
17     IN EVIDENCE, AS OF THIS DATE.)
18      Q.  Please look at Defendant's Exhibit
19   55 which is K0017216.  Do you see that?
20      A.  Yes, I do.
21      Q.  First of all, did this document come
22   from your files?
23      A.  Yes, it did.
24      Q.  Can you tell me what this document
25   is?
```

Page 27

```
1              GLUS
2       A.  I don't really know what officially
3    this document is called.  I don't know if
4    it's a bill of lading or an invoice; I don't
5    know.
6       Q.  If you look at the date, it is dated
7    February 13, 1997; is that correct?
8       A.  Yes.
9       Q.  And if you look at the date of the
10   previous exhibit, Defendant's Exhibit 54,
11   that's likewise dated February 13, 1997; is
12   that correct?
13      A.  Yes.
14      Q.  Now, if you look at the previous
15   exhibit, it has one box of medium -- it says:
16   "The following product is being dispatched
17   from the U.K. on Saturday, 15 February." It
18   says one box of medium roast; do you see
19   that?
20      A.  Yes.
21      Q.  From Defendant's Exhibit 55, do you
22   see medium roast coffee, quantity, what is
23   that?
24      A.  One.
25      Q.  And on Defense Exhibit 51, it says
```

Page 28

```
1              GLUS
2    two boxes of dark roast, and you see on
3    Defendant's Exhibit 55, it says dark roast
4    coffee; what is the quantity?
5       A.  Two.
6       Q.  And then on Defendant's Exhibit 54,
7    it says two boxes of traditional tea, and on
8    Defendant's Exhibit 55, it says traditional
9    tea; how many, the quantity?
10      A.  Two.
11      Q.  And then on defendant's 54, it says
12   two boxes of earl gray tea, and then on
13   Defendant's Exhibit 55, it says earl gray
14   tea; what quantity?
15      A.  Two.
16      Q.  Then we go to cappuccino, three
17   boxes; and boxes of espresso on
18   Defendant's Exhibit 55, we have how many
19   boxes?
20      A.  Three.
21      Q.  Defendant's Exhibit 54, we have two
22   boxes of espresso; and Defendant's Exhibit
23   55, we have espresso, how many?
24      A.  Two.
25     (A DOCUMENT WAS RECEIVED AND MARKED
```

Page 29

```
1              GLUS
2     DEFENDANT'S EXHIBIT 56,
3     IN EVIDENCE, AS OF THIS DATE.)
4       Q.  Now, show you Defendant's Exhibit
5    56, which is K0017214.
6       Do you have that in front of you?
7       A.  Yes.
8       Q.  Did this come out of your files?
9       A.  Yes.
10      Q.  Now, is this addressed to you?
11      A.  Yes.
12      Q.  And this is dated March 10, 1997; is
13   that correct?
14      A.  Yes.
15      Q.  And it is a bill for two types of
16   Kenco singles cartridges; can you read what
17   they are?
18      A.  French dark coffee and Kronung.
19      Q.  Now, if you look, go back to
20   Defendant's Exhibit 54 -- excuse me.  Just go
21   back to Defendant's Exhibit 52, the bottom of
22   the list of order, you have two boxes of
23   carte noire?
24      A.  Yes.
25      Q.  And two boxes of Kronung; is that
```

8 (Pages 26 to 29)

GLUS

1  right?
2      A.  Yes.
3      Q.  Now, if you then go to Defendant's
4  Exhibit 54, can you tell us what Ms. Matthews
5  told you in this document?
6      A.  That they were being produced
7  tomorrow, the 14th of February, and that they
8  will be dispatched by DHL early the next
9  week.
10     Q.  So now going to Defendant's Exhibit
11 56, does this reflect that those two flavors
12 were dispatched to you?
13     A.  Yes.
14     (A DOCUMENT WAS RECEIVED AND MARKED
15     DEFENDANT'S EXHIBIT 57,
16     IN EVIDENCE, AS OF THIS DATE.)
17     Q.  Now, I'm going to show you
18 Defendant's Exhibit 57, which is K0017212.
19 And can you tell me what -- first, did this
20 document come from your files?
21     A.  Yes.
22     Q.  And midway about a third down, it
23 says: "Attention, Helen Glus."
24     Do you see that?

GLUS

1      A.  Yes.
2      Q.  Is that you?
3      A.  Yes.
4      Q.  Okay.  At the top, it says: "Martin
5  Strauss, Air Freight Corp.," do you see that?
6      A.  Yes.
7      Q.  Do you know who Martin Strauss, Air
8  Freight Corp. is?
9      A.  It was our broker.
10     Q.  And do you know what this document
11 is?
12     A.  I want to say like the bill of
13 lading, but I'm not really positive.
14     Q.  Okay.  But if you see, if you go
15 back and look at Exhibit 54, do you see that?
16     A.  Yes.
17     Q.  And it says flight details as
18 follows, and it has the -- what airline is
19 this being sent on?
20     A.  United.
21     Q.  And this bill of lading from Martin
22 Strauss Air Freight, what airline was this
23 being sent on?
24     A.  United.

GLUS

1      Q.  And to whose attention?
2      A.  Mine.
3      (A DOCUMENT WAS RECEIVED AND MARKED
4      DEFENDANT'S EXHIBIT 58,
5      IN EVIDENCE, AS OF THIS DATE.)
6      Q.  Now, I show you Defendant's Exhibit
7  58, which is K0017204, through K0017206.
8      A.  Okay.
9      Q.  Can you tell us me, first of all,
10 did this document come out of your files?
11     A.  Yes.
12     Q.  Now below it says: "Kind regards,
13 Helen."  Is that you?
14     A.  Yes.
15     Q.  So did you send this?
16     A.  Yes, I did.
17     Q.  And what is this document?
18     A.  Another request for product.
19     Q.  Okay.  If you would look back to
20 Defendant's Exhibit 54 -- excuse me,
21 Defendant's Exhibit 52, it's dated February
22 4, 1997, and you said there were 16 boxes
23 ordered; correct?
24     A.  Yes.

GLUS

1      Q.  Okay.  This is roughly a little over
2  three months later; what's the date of this?
3      A.  No.  What is the date?
4      Q.  May 13th.
5      A.  May 13th.
6      Q.  And May 13th, you were ordering 18
7  more boxes; is that correct?
8      A.  Yes.
9      Q.  Why would you have ordered 18 boxes
10 of capsules three months later?
11     A.  Because our supply was running low.
12     Q.  And when you say your supply was
13 running low, is that because people were
14 using them?
15     A.  Yes.
16     Q.  Including yourself?
17     A.  Absolutely.
18     (A DOCUMENT WAS RECEIVED AND MARKED
19     DEFENDANT'S EXHIBIT 59,
20     IN EVIDENCE, AS OF THIS DATE.)
21     Q.  If you look at Defendant's Exhibit
22 59, which is K0017202, first of all, did this
23 document come from your files?
24     A.  Yes.

# Exhibit 3

Page 1

```
 1
 2
                IN THE UNITED STATES DISTRICT COURT
 3                  FOR THE DISTRICT OF DELAWARE

 4       _____        :

         KEURIG INCORPORATED                      :
 5
                          Plaintiff              : Civil Action No.
 6                                               : 07-017 GMS
                          v                      :
 7                                               :
         KRAFT FOODS GLOBAL, INC                  :
 8       TASSIMO CORPORATION, and                 :
         KRAFT FOODS INC,                         :
 9                        Defendants             :
         _____        :
10
11          VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
12                                OF
13                         JANICE APPLETON
14            On Thursday, 21st February 2008
15
                    Commencing at 9.12 am
16
                         Taken at:
17          Best Western Banbury House Hotel
                         Oxford Road
18                         Banbury
                         Oxfordshire
19                         OX16 9AH
                       United Kingdom
20
21
22
23
24       Reported by: Miss Pamela Henley
25
```

KEURIG v KRAFT                    21 FEBRUARY 2008              DEPSOSITION OF J. APPLETON

---

Page 2

1
2       A P P E A R A N C E S
3
4
5
6   On behalf of the Plaintiff:
7       Wolf, Greenfield & Sacks, PC
8       600 Atlantic Avenue
9       Boston, MA 02210
10          BY:  Michael N Rader
11
12  On behalf of the Defendants:
13      Baker Botts LLP
14      The Warner
15      1299 Pennsylvania Avenue
16      NW Washington, DC 2004-2400
17          BY: DAVID SCHLITZ
18
19  Court Reporter:
20
21      Pamela Henley
22      Marten Walsh Cherer Limited
23      6th Floor
24      12-14 New Fetter Lane
25      London EC4A 1LT

---

Page 3

1
2          I N D E X
3   DEPONENT
4   Janice Appleton
5   Examination:              Page No:
6   Direct Examination by Mr Rader      4
7
8          EXHIBIT INDEX
9
10  Number              Page No:
11  1                   23
12  2                   62
13  3                   64
14  4                   66
15  Defendant's
16  1                   81
17
18
19
20
21
22
23
24
25

---

Page 4

1       Confidential - Attorneys' Eyes Only
2               JANICE APPLETON
3           having been duly sworn
4    was examined and did testify as follows
5           DIRECT EXAMINATION:
6   BY MR RADER:  Good morning, Ms Appleton. My name
7   is Mike Rader and we met briefly off the record.
8   Just a couple of preliminaries before I ask you
9   some questions; have you ever had your deposition
10  taken before?
11      A.   No.
12      Q.   A couple of preliminaries then.
13  First, I think you know this, but I will just need
14  to ask you to make sure you answer all my
15  questions verbally rather than, for example,
16  nodding your head so that the court reporter can
17  get down your answers, okay?
18      A.   Yes.
19      Q.   Now, Mr Schlitz probably told you
20  this, but I want to make sure you understand, if
21  he objects to a question that I ask you unless he
22  for some reason instructs you not to answer it do
23  you understand that notwithstanding the objection
24  you will still need to provide a response?
25      A.   I do.

---

Page 5

1       Confidential - Attorneys' Eyes Only
2       Q.   Okay. And last if at any point you
3   need to take a break, run to the bathroom or get
4   something to drink will you let me know?
5       A.   Yes, I will.
6       Q.   Are you feeling all right today and
7   ready and prepared to give your best testimony?
8       A.   Yes, I am fine, thank you.
9       Q.   I do not expect this to take too
10  long, I think an hour or maybe two should be
11  enough.
12          Ms Appleton, are you a current
13  Kraft employee?
14      A.   Yes, I am.
15      Q.   At what Kraft facility do you work?
16      A.   I work in the Banbury office of
17  Kraft.
18      Q.   What is the full name of your
19  employers?  Is it just Kraft or is it some other
20  name?
21      A.   Just Kraft Foods.
22      Q.   How long have you worked at Kraft
23  Foods?
24      A.   20 years permanently and nearly 21
25  because I worked nine months as a temporary

---

2 (Pages 2 to 5)

KEURIG v KRAFT                    21 FEBRUARY 2008                    DEPOSITION OF J. APPLETON

Page 22

Confidential - Attorneys' Eyes Only
1
2    Q.    You mentioned that you had some
3    responsibility, again we are still on the
4    purchasing of the system rolls, you mentioned you
5    had some responsibility in the distribution or
6    shipping area; is that of the singles machines?
7    A.    Yes.
8    Q.    And not the cartridges?
9    A.    We tended to utilise as far as
10   France, Germany and Spain were concerned if we did
11   not have full truck loads they would either put
12   the request to ship the equipment if that was not
13   a full trip load, I would ask them to utilise with
14   product if they had any to shift.
15   Q.    By "product" you mean the
16   cartridges?
17   A.    Yes.
18   Q.    Then would you then actually
19   co-ordinate them getting the product?  Did your
20   role extend any further beyond that in terms of
21   the cartridges?
22   A.    Not as far as France, Germany and
23   Spain.
24   Q.    What about any other countries?
25   A.    The USA.

Page 23

Confidential - Attorneys' Eyes Only
1
2    Q.    What was your role with regard to
3    singles cartridges in the US?
4    A.    Reference some of the documents it
5    came through the vending director's secretary, a
6    request for me to ship some product.
7    Q.    Was that a regular part of your job
8    or just something that you did to help her out?
9    A.    I suppose it was not within the
10   normal procedure, so it was -- I would not say it
11   was not my job to do it, but I would not say it
12   was the normal way that we shipped product coming
13   through me.
14   Q.    My understanding from reviewing the
15   documents, and I will put them in front of you in
16   a second, but my understanding is that when you
17   made those shipments to the US there was no
18   payments in return for those; is that right?
19   A.    I think some of them were free of
20   charge.  I am not quite sure if all of them were.
21   Q.    We will look at those in
22   particular.  Let us start doing that now actually.
23   I am going to ask the court reporter to mark this
24   as Plaintiff's Exhibit 1.
25       (Exhibit 1 marked for identification)

Page 24

Confidential - Attorneys' Eyes Only
1
2    Ms Appleton, you have Exhibit 1 in front of you
3    and I will just point out what we call litigation
4    numbers or Bates numbers in the lower right-hand
5    corner from K17156 through K17171
6        MR SCHLITZ:  Excuse me. I object.
7    This is a compilation of documents that were
8    provided.  This is not a single document.
9        MR RADER:  Correct.  It is a
10   compilation.
11       MR SCHLITZ:  So you are making this
12   as an exhibit a compilation?
13       MR RADER:  Yes.
14       MR SCHLITZ:  I want it to be
15   understood that some of these documents may not be
16   whole.  Some of them -- the way that she kept them
17   in her files.  We provided to you stapled the way
18   they were kept in the files.
19       MR RADER:  Just for your
20   information, Mr Schlitz, the reason I chose this
21   group is because by e-mail dated February 14th,
22   2008 your colleague, Mr Foster, represented to us
23   that this specific group of documents came from
24   Ms Appleton's files, and I want to ask her about
25   that.  Rather than marking every single page. I

Page 25

Confidential - Attorneys' Eyes Only
1
2    thought it would be convenient.
3        MR SCHLITZ:  Okay.
4        By MR RADER:
5    Q.    So, Ms Appleton, I will just start
6    on the first page; is this document on the first
7    page a document that is familiar to you?
8    A.    Yes.
9    Q.    In your own words can you describe
10   what this document is?
11   A.    This is a fax from my predecessor,
12   Martina Clausing, to our export department to
13   arrange shipment of brewer and some cup stacks,
14   some capsules.
15   Q.    So when you say "your predecessor"
16   you are referring to in the position of purchasing
17   and assisting?
18   A.    She was the one who was on
19   maternity leave.
20   Q.    And so you took over from her some
21   time in 1995?
22   A.    1995.
23   Q.    Now, just to make sure I understand
24   the date correctly, this is December 1st 1994,
25   this fax?

7 (Pages 22 to 25)

MARTEN WALSH CHERER LTD              12-14 NEW FETTER LANE              LONDON EC4A 1AG
TEL: 020 7936 6000            E-MAIL: info@martenwalshcherer.com        FAX: 020 7427 0093

KEURIG v KRAFT                21 FEBRUARY 2008                DEPSOSITION OF J. APPLETON

Page 26

1        Confidential - Attorneys' Eyes Only
2        A.    Yes.
3        Q.    We do it differently in the States.
4        A.    Yes, you do.
5        Q.    Now, my understanding, at least
6    from counsel, is that this document came from
7    files that were described as being your files; is
8    that correct?
9        A.    Yes, that is correct.
10       Q.    Now, obviously, this is not a
11   document that you created, right?
12       A.    No.
13       Q.    It is -- it was created and sent at
14   a time when you were not yet in the position we
15   have been speaking about, right?
16       A.    Yes.
17       Q.    So can you just describe what --
18   where you located this document?
19       A.    In my filing cabinet that I
20   inherited from my predecessor.
21       Q.    Where is that filing cabinet
22   located?
23       A.    At the side of my desk.
24       Q.    That is obviously in your office in
25   the Banbury facility?

Page 27

1        Confidential - Attorneys' Eyes Only
2        A.    Well, it is open plan. I do not
3    have an office.
4        Q.    Is that -- I think that is what we
5    referred as cubicles; do you use that word?
6        A.    We refer to it as open plan because
7    we are not partitioned off at all. The --
8        MR SCHLITZ:    Just desks. It is a
9    big room.
10       A.    Desks within an area.
11       BY MR RADER:
12       Q.    And next to your desk you have a
13   filing cabinet and that is where you found the
14   documents?
15       A.    Yes.
16       Q.    Was it inside a file that was
17   labelled in any way?
18       A.    It is in the hangers that you put
19   in there and it is filed USA.
20       Q.    So the file just says "USA"?
21       A.    Yes.
22       Q.    Can you just describe, broadly, in
23   that filing cabinet, and this may seem like a very
24   detailed set of questions, but what types of
25   documents are in that filing cabinet, in general?

Page 28

1        Confidential - Attorneys' Eyes Only
2        A.    In that particular drawer it is --
3    each of the files is a country. So wherever I
4    have shipped to, or had any dealings with any
5    country then there is the country's name on each
6    of those files.
7        Q.    You say it is things that you have
8    shipped to a country; is it just singles
9    cartridges or other things that you may have
10   shipped at --
11       A.    Other things.
12       Q.    -- is that a system, a filing
13   system that you inherited from Ms Clausing?
14       A.    I suppose, yes, and I have put my
15   own spin on it, I suppose.
16       Q.    How so?
17       A.    Well, I am not sure she kept every
18   country. I do not know whether she kept them in
19   the format that I keep them in.
20       Q.    Do you recall what it looked like
21   when you inherited it from her?
22       A.    No, I am afraid I do not.
23       Q.    Was there a USA file at the time
24   you took over the --
25       A.    Oh, yes, there has always been a

Page 29

1        Confidential - Attorneys' Eyes Only
2    USA file.
3        Q.    -- now, it says here at the top of
4    the page "Kraft Jacobs Suchard", did I pronounce
5    that correctly?
6        A.    Jacobs.
7        Q.    What is that?
8        A.    Jabobs is the German coffee, as
9    Kenco is UK Jacobs is German.
10       Q.    Is that -- I take it this is...
11       A.    That is what the company was called
12   at one time.
13       Q.    So was Ms Clausing an employee of
14   Kraft Jacobs Suchard?
15       A.    Yes. As was I.
16       Q.    So even though you were located in
17   the UK technically at the time you were in the
18   planning and logistics division you were an
19   employee of the German --
20       A.    No, that was just the name of the
21   company at the time. We started off as General
22   Foods. Then we had a name change, I think it was
23   as we -- as the company obtained certain other
24   companies like Suchard that was the name that we
25   had at the time, Kraft Jacobs Suchard and then we

8 (Pages 26 to 29)

Page 30

```
 1        Confidential - Attorneys' Eyes Only
 2  became Kraft Foods.
 3        Q.   -- and then below that it says
 4  Maxpax International; what does that refer to?
 5        A.   That is what the -- half of the
 6  away from home business was called at the time,
 7  Maxpax. It was simply known as Maxpax. And that
 8  is the in cup and the singles side.
 9        Q.   Is that the programme that you
10  referred to earlier where they get the machine for
11  free?
12        A.   No, Maxpax was the logo that the
13  vending machines, the input vending machines were
14  known as. They were quite innovative at the time
15  that they were created, the Maxpax machines,
16  because of the -- how it produced the cup of
17  coffee, which was in cup. The product was in the
18  cup and the water filled it.
19             Previous to that most vending
20  machines had a tube that the coffee came down and
21  sometimes you could get half a cup of coffee and
22  half a cup of soup, whichever you had, and that
23  was the way vending machines worked. So Maxpax was
24  the company that created the -- this particular
25  type of vending machine.
```

Page 31

```
 1        Confidential - Attorneys' Eyes Only
 2        Q.   I see, okay. And you are referring
 3  to the in cup vending machine?
 4        A.   Yes.
 5        Q.   Who is Sue Stephenson?
 6        A.   Sue Stephenson was a person that
 7  worked in our export department at the time and
 8  she was responsible for shipping.
 9        Q.   What about Caroline Walley?
10        A.   She also worked there. I am
11  assuming that as it went to both of them I am not
12  quite sure whether Caroline may have been on
13  maternity leave at that time or whether she had
14  just come back, hence Sue or Caroline.
15        Q.   And since they are sending a fax my
16  assumption would that be these people are working
17  at a different facility; is that right?
18        A.   They are in the same office block,
19  but possibly on a different floor.
20        Q.   So is this the precursor to e-mail?
21        A.   Yes, very much so.
22        Q.   Send a fax to someone working on
23  another floor?
24        A.   Yes.
25        Q.   When you say they were in shipping,
```

Page 32

```
 1        Confidential - Attorneys' Eyes Only
 2  are they the people who would actually take
 3  whatever the item is, put it in a box, get it to
 4  the --
 5        A.   No, they would liaise with
 6  transport agencies.
 7        Q.   -- so in this kind of situation who
 8  would actually go get the thing to be shipped, the
 9  singles cartridges or whatever, put it in a box
10  and ship it; who would actually do that physical
11  labour?
12        A.   The capsules in the box would be
13  done by the factory because they are produced and
14  created as finished goods in a box and they would
15  sit in our finished goods warehouse on the Banbury
16  site. The machines would be in our distribution
17  warehouse, which at this time was possibly
18  Hatfield in Hertfordshire, and so an order would
19  be put on the system to arrange the shipment, and
20  the guy in the warehouse would pick that order and
21  it would be loaded on to a container, the
22  transport company would go in and collect.
23        Q.   So in a situation like the one we
24  have been talking about, where an order was placed
25  for a certain amount of product to be sent to the
```

Page 33

```
 1        Confidential - Attorneys' Eyes Only
 2  United States, would it be Ms Stephenson and
 3  Ms Walley who would communicate to someone in the
 4  warehouse what needed to be sent? Is that how it
 5  would work?
 6        A.   Yes, they would liaise with the
 7  transport agency and possibly the warehouse. In
 8  actual fact at this time I think we would have had
 9  a certain amount of product in the warehouses, the
10  distribution warehouses, and that would be --
11  depending on where the deliveries needed to go
12  post code wise as to how many boxes or cases of
13  that product would be in the warehouse.
14             A little bit the same as the
15  equipment where we need to ensure that we have a
16  sufficient amount of machines to cover our
17  forecasts then they would need to ensure that they
18  had a sufficient amount of cases of equipment to
19  go out to the customers.
20        Q.   So let me ask you a couple more
21  questions about this document. In the middle of
22  the page in the listing of product to be shipped
23  there is a reference and it says one Spanish
24  brewer; do you see that?
25        A.   Yes.
```

KEURIG v KRAFT                    21 FEBRUARY 2008              DEPSOSITION OF J. APPLETON

Page 34

1     Confidential - Attorneys' Eyes Only
2     Q.    What does that refer to?
3     A.    That is a singles brewer with
4  Spanish branding.
5     Q.    Were there other types of branding
6  as well at the time?
7     A.    UK branding, French branding,
8  German branding.
9     Q.    Do you have any idea why a Spanish
10  brewer was chosen here?
11     A.    Possibly because we had one in
12  stock.
13     Q.    Were the machines, to your
14  knowledge, any different, or was it just --
15     A.    No, it is just branding.
16     Q.    -- okay. Then there is a list of
17  one case each of various types of coffee; do you
18  see that?
19     A.    Yes.
20     Q.    I assume those are cases of singles
21  cartridges?
22     A.    Yes.
23     Q.    And they are supposed to go to a
24  Mr David Yuile; did I pronounce that right?
25     A.    I do not know. I do not know the

Page 35

1     Confidential - Attorneys' Eyes Only
2  man.
3        MR SCHLITZ:  You did pronounce it
4  right
5        BY MR RADER:
6     Q.    Did you ever have any contact with
7  Mr Yuile?
8     A.    No.
9     Q.    Never spoken with him?
10     A.    No.
11     Q.    Then below that it says the items
12  are to be sent free of charge; do you have any
13  idea why that was so?
14     A.    No, not really. They were put
15  against a sample budget number I think belonged
16     Q.    Do you know why Ms Clausing did
17  that?
18     A.    Well, when she passed that on to me
19  all she said was this was how we ship this kind of
20  thing. The sample budget number I think belonged
21  to the vending director. So I think you had to
22  pay for the goods from the factory so you could
23  not have goods from the factory free of charge so
24  although we were sending them to the USA free of
25  charge they had to be charged from the factory

Page 36

1     Confidential - Attorneys' Eyes Only
2  against something and that was the vending
3  director's sample budget number.
4     Q.    So you would have to -- sort of on
5  an ad hoc basis have some way of accounting it
6  within a company?
7     A.    Yes.
8     Q.    Now, do you have any idea why
9  Mr Yuile was getting a free brewer and free
10  singles cartridges?
11     A.    No.
12     Q.    Ms Clausing did not tell you when
13  she transferred the job to you --
14     A.    No.
15     Q.    -- and the cases of singles
16  cartridges and the brewer that were -- let me see.
17  Let me back up for a minute. Do you know whether
18  the singles cartridges that Ms Clausing requested
19  here were ever actually sent to Mr Yuile?
20     A.    Well, the fact that we have put the
21  request to Sue one assumes that if he did not
22  receive them he would have requested that and
23  followed it up because he was obviously expecting
24  them.
25     Q.    Now, you were not in the position

Page 37

1     Confidential - Attorneys' Eyes Only
2  at that time where he would have contacted you
3  about that, right?
4     A.    No.
5     Q.    So do you have any -- did you find
6  in your files any documents that confirmed that
7  this shipment actually went?
8     A.    No.
9     Q.    Did you find any notes from
10  Ms Clausing or any other documents at all that
11  would corroborate that he received the shipment?
12     A.    No.
13     Q.    Now, if the cartridges were
14  shipped, the singles cartridges that are listed
15  here, they would have been inside a case; is that
16  right?
17     A.    Yes.
18     Q.    In other words, one case each of
19  these different types?
20     A.    Yes.
21     Q.    What do those cases look like? Was
22  it cardboard?
23     A.    Cardboard cases. Yes. The capsules
24  are in like a kind of laminate sleeve, and then
25  there are so many sleeves in a box. I am not

MARTEN WALSH CHERER LTD            12-14 NEW FETTER LANE            LONDON EC4A 1AG
TEL: 020 7936 6000            E-MAIL: info@martenwalshcherer.com            FAX: 020 7427 0093

KEURIG v KRAFT                          21 FEBRUARY 2008                    DEPSOSITION OF J. APPLETON

---

Page 38

1       Confidential - Attorneys' Eyes Only
2   quite sure of the number.
3       Q.    But the term "case" would refer to
4   the box?
5       A.    Yes.
6       Q.    Okay. And that box is sealed up at
7   the factory?
8       A.    In the factory, yes.
9       Q.    Did you -- well, obviously, you
10  were not in the position, but just to confirm, did
11  you ever actually see the cases that would have
12  been sent to Mr Yuile?
13      A.    No.
14      Q.    Would Ms Clausing have actually
15  seen those cases and seen the box that was being
16  shipped --
17      A.    No.
18      Q.    -- would Ms Stephenson and
19  Ms Walley have actually seen the shipment itself?
20      A.    No.
21      Q.    So the only person who would have
22  seen what was shipped would have been the person
23  at the factory?
24      A.    The man who would pick the shipment
25  at the distribution warehouse.

---

Page 39

1       Confidential - Attorneys' Eyes Only
2       Q.    Okay.
3       A.    The man produces them at the
4   factory, they are in cases. Those cases get
5   shipped on a regular basis to the distribution
6   warehouses, and this shipment would have been
7   arranged with the distribution warehouse with a
8   transport company to come in and collect a pallet.
9   If you see at the side there it has one pallet, so
10  the brewer, and one each of those cases would have
11  been picked and strapped to a pallet and then the
12  transport agency would come in and collect that
13  pallet.
14      Q.    So somehow Ms Stephenson and
15  Ms Walley would have communicated to that person?
16      A.    Yes.
17      Q.    Do you know whether that type of
18  thing was done by fax or by phone?
19      A.    I do not. I do not know their
20  order system and I do not know whether it works
21  the same as it works now.
22      Q.    Was it the same at a later time
23  when you were making these sorts of requests, was
24  it a similar kind of procedure where you would
25  place a request to someone else who would get the

---

Page 40

1       Confidential - Attorneys' Eyes Only
2   product shipped?
3       A.    Yes.
4       Q.    In all the cases where you placed
5   these types of requests you never actually saw the
6   boxes that were shipped?
7       A.    No.
8       Q.    You did not take them to DHL of
9   FedEx or something like that?
10      A.    No.
11          THE COURT REPORTER: Would you wait
12  until Mr Rader has finished his question before
13  you answer.
14          THE WITNESS: Sorry.
15          BY MR RADER:
16      Q.    The next page is K17157. Is this
17  another page that you inherited from Ms Clausing?
18      A.    Yes. That is the request from Andy
19  Wiggins to ship the first page.
20      Q.    Now, I am sorry, I may have asked
21  you, but who is Andy Wiggins?
22      A.    He was, I am not quite sure what
23  his title was, but he worked in equipment
24  development at that time. It was called equipment
25  development.

---

Page 41

1       Confidential - Attorneys' Eyes Only
2       Q.    Do you have any idea why he placed
3   this request with Ms Clausing?
4       A.    No, I do not.
5       Q.    Did Ms Clausing ever come back from
6   maternity leave?
7       A.    No.
8       Q.    So she is not with the company now?
9       A.    No.
10      Q.    Do you know if Mr Wiggins is at the
11  company now?
12      A.    No.
13      Q.    I should phrase that again so it is
14  not confusing. Is Mr Wiggins at the company now?
15      A.    No.
16      Q.    My fault. Now, the next page is
17  K17518. Can you describe what this document is?
18      A.    This is a fax, again to
19  Sue Stephenson, to arrange a shipment to the USA.
20      Q.    So this would have proceeded in a
21  similar fashion where she would have made
22  arrangements with someone in shipping?
23      A.    Yes.
24      Q.    And the date here is August 14th
25  1995?

---

11 (Pages 38 to 41)

KEURIG v KRAFT                 21 FEBRUARY 2008                DEPSOSITION OF J. APPLETON

---

Page 42

1    Confidential - Attorneys' Eyes Only
2    A.    Yes.
3    Q.    It says here -- is this your
4  handwriting, by the way?
5    A.    It is, yes.
6    Q.    It says here the shipment was to
7  arrive no later than Wednesday, August 23rd 1995;
8  do you see that?
9    A.    Yes.
10    Q.    Why was that?
11    A.    That was the request that I had
12  from the following page.
13    Q.    Okay.  So the next page, that is
14  K17159, is that a request that you got from
15  Doug Halliday?
16    A.    Yes.
17    Q.    Who was Doug Halliday?
18    A.    He was the vending director for
19  Maxpax International at that time.
20    Q.    And he asked you to make a delivery
21  to Mr Craig in New York?
22    A.    Yes.
23    Q.    Who was Mr Craig?
24    A.    Group Research Director Maxwell
25  House Division.

---

Page 43

1    Confidential - Attorneys' Eyes Only
2    Q.    Did you ever meet Mr Craig?
3    A.    No.
4    Q.    Talk to him on the phone?
5    A.    No.
6    Q.    Any contact with him?
7    A.    No.
8    Q.    Did Mr Halliday explain why the
9  product was to be shipped to Mr Craig?
10    A.    No.
11    Q.    Did he tell you what Mr Craig was
12  going to do with the product?
13    A.    No.
14    Q.    Did he tell you if Mr Craig had a
15  singles machine somewhere in his facility?
16    A.    No.
17    Q.    Now in Mr Halliday's memo to you he
18  did not tell you how to make that intracompany
19  charge, did he?
20    A.    No.
21    Q.    You charged it against the same
22  sample budget number?
23    A.    Yes.
24    Q.    How did you decide to do that?
25    A.    Because that is what I was

---

Page 44

1    Confidential - Attorneys' Eyes Only
2  previously instructed by my predecessor that this
3  is how we dealt with this kind of thing.
4    Q.    When you say "this kind of thing" I
5  want to make sure I understand because all of
6  these documents centre around a certain set of
7  circumstances where you are sending some product
8  to the United States. When you say "this kind of
9  thing" is there any kind of name that you would
10  put to this activity within your business?
11    A.    Possibly I would just refer to them
12  as ad hoc shipments, you know, on request.
13    Q.    Meaning it was not part of any
14  regular programme, but just something you did if
15  you happened to get a request?
16    A.    Yes.
17    Q.    Now, for this August 14th 1995
18  order did you receive any confirmation from
19  Ms Stephenson or from shipping that the shipment
20  was actually sent?
21    A.    No, it does not look like it.
22    Q.    Did you receive any confirmation
23  from Mr Craig that he received it?
24    A.    No.
25    Q.    Did he get anything from -- well,

---

Page 45

1    Confidential - Attorneys' Eyes Only
2  let me back up.  Do you know which shipping
3  service you used?
4    A.    No, I do not on this occasion.  It
5  does normally say on the invoice if we do receive
6  a copy of the invoice.  But I have written on the
7  bottom to Sue Stephenson: "Can you please advise
8  shipment departure and arrival times" simply
9  because this one was going airfreight.  So I would
10  assume that I would have received that possibly --
11  could have been by e-mail, which I have not kept.
12    Q.    Do you have any recollection as you
13  sit here today of getting that confirmation?
14    A.    No.
15    Q.    Okay. Let us move on to the next
16  one, K17160.  This is another fax from you to
17  Ms Stephenson dated April 2nd, 1996?
18    A.    Yes.
19    Q.    This was for a shipment to a Ms
20  Helen Glus; is that right?
21    A.    Yes.
22    Q.    Who is Ms Glus?
23    A.    I am not quite sure what her title
24  was actually.
25    Q.    Did you have occasion to speak with

---

12 (Pages 42 to 45)

KEURIG v KRAFT                    21 FEBRUARY 2008                    DEPOSITION OF J. APPLETON

Page 46

1        Confidential - Attorneys' Eyes Only
2    her directly?
3        A.    No.
4        Q.    Or meet with her?
5        A.    No.
6        Q.    Do you know why -- on this occasion
7    do you know who requested that you make the
8    shipment to Ms Glus?
9        A.    I would say Liz Matthews again who
10   was Doug Halliday's secretary because I have put
11   at the bottom there: "Can you let me know details
12   to pass to Liz Matthews".
13       Q.    Okay. Do you recall the
14   conversation with Ms Matthews about this?
15       A.    No.
16       Q.    I realise it was a long time ago.
17       A.    Yes.
18       Q.    Do you recall if she told you why
19   this shipment was being made?
20       A.    No.
21       Q.    Did she tell you anything about
22   whether Ms Glus had a singles machine or where it
23   was or how she was using it?
24       A.    No.
25       Q.    Again, the actual cases -- let me

Page 47

1        Confidential - Attorneys' Eyes Only
2    back up for a second. It says "3 cases of" and
3    then there is an identification number; do you see
4    that?
5        A.    Yes.
6        Q.    Does that refer to a particular
7    flavour of singles cartridges?
8        A.    It is medium roast.
9        Q.    So you recognise these numbers?
10       A.    Yes.
11       Q.    And, again, those cases would have
12   been shipped by someone that Ms Stephenson
13   contacted?
14       A.    Yes.
15       Q.    You did not see the box or anything
16   like that?
17       A.    No.
18       Q.    Back at the time in 1995, '96 in
19   your office where you worked did you have a
20   singles brewer?
21       A.    I think we have our vending
22   equipment on the landing of each floor for the use
23   of all of the people on each floor.
24       Q.    Did you have that -- do you recall
25   whether you had at the time, '95/96?

Page 48

1        Confidential - Attorneys' Eyes Only
2        A.    I do not recall at all what we had.
3        Q.    Do you nowadays, let us talk about
4    nowadays.
5        A.    Yes.
6        Q.    Do you drink singles coffee?
7        A.    No, I drink singles tea.
8        Q.    Okay. Have you ever drunk singles
9    coffee?
10       A.    Yes.
11       Q.    So you are a coffee drinker?
12       A.    Occasionally, yes.
13       Q.    Do you recall when was the first
14   time that you had occasion to drink a cup of
15   singles brew coffee?
16       A.    It would have been probably at the
17   launch of the singles brewer in the UK. I do not
18   know what date that was, to be honest.
19       Q.    Do you recall when you first got a
20   singles machine on the landing or anywhere else at
21   the office that you used?
22       A.    No, I do not recall at all.
23       Q.    I do not think it is part of your
24   job description, but I just need to confirm a
25   couple of things; do you have any involvement at

Page 49

1        Confidential - Attorneys' Eyes Only
2    all with design of cartridge products?
3        A.    No.
4        Q.    Over the years at Kraft have you
5    ever been involved with engineering or technical
6    design for singles cartridges for example?
7        A.    No.
8        Q.    Have you ever studied the technical
9    features of singles cartridges?
10       A.    No. Only from an interest point of
11   view, how does it work.
12       Q.    In terms of -- when you say how
13   does it work, can you flesh that out a little bit
14   more?
15       A.    Well, I think it was -- I did a
16   factory visit and saw the capsules being produced
17   and so you see the tea going in and the little
18   channel round the outside that the water goes
19   round and then it punctures and the water floods
20   in and brews through.
21       Q.    So did you ever take a singles
22   cartridge in your hand and carefully study it for
23   any product features or technical aspects or
24   anything like that?
25       A.    Only as a matter of interest,

13 (Pages 46 to 49)

KEURIG v KRAFT                21 FEBRUARY 2008              DEPSOSITION OF J. APPLETON

Page 50

1    Confidential - Attorneys' Eyes Only
2    peeling the top off to see how it works.
3        Q.    Are you familiar at all with
4    changes to the design of the singles cartridge
5    over time or anything like that?
6        A.    No.
7        Q.    When you use a singles cartridge
8    today or when you have used them to insert them
9    into a machine did you study them at all, or were
10   you mainly interested in putting it in a machine
11   to make a cup of coffee?
12       A.    Mainly interested in a cup of tea
13   or a cup of coffee.
14       Q.    Let us go on to the next page,
15   which is K17161, and let us see, now this is --
16   can you just describe what this document is?
17       A.    This is a copy of the invoice
18   relating to the following page where I have
19   requested a shipment.
20       Q.    Okay, so this -- I see it. So this
21   invoice is dated August 2nd 1996?
22       A.    Yes.
23       Q.    And you placed a request on the
24   next page, K17161?
25       A.    Yes.

Page 51

1    Confidential - Attorneys' Eyes Only
2        Q.    Placed a request on July 10, 1996,
3    right?
4        A.    Yes.
5        Q.    Any reason why it took them a few
6    weeks to generate the invoice?
7        A.    Possibly we might have been waiting
8    for the product. That is the only thing I can
9    think of because this was not forecasted product.
10   So in fact you were stealing from the UK
11   production. They may have been short of certain
12   items at that time. Then we wait until it is okay
13   to take them because the UK business, because
14   their forecast would take precedent.
15       Q.    So normally if the product was in
16   stock and you had plenty of it you would expect
17   the invoice to be generated sooner?
18       A.    Yes.
19       Q.    At the bottom of the invoice it is
20   Sue Stephenson who is the signatory?
21       A.    Yes.
22       Q.    So you were not the signatory on
23   invoices like this?
24       A.    No, this is what she put into her
25   system to arrange the shipment. So the

Page 52

1    Confidential - Attorneys' Eyes Only
2    order/invoice would be the documentation that she
3    would put in.
4        Q.    So an invoice like this, I just
5    want to make sure, that an invoice like this is
6    what would actually trigger the shipment to
7    happen?
8        A.    Yes.
9        Q.    So looking at the fax that you
10   sent, K17162, do you know whether you sent this in
11   as a result of receiving the e-mail in the next
12   page there?
13       A.    Yes, this was -- the e-mail was to
14   Liz Matthews, but she has obviously printed it off
15   and given it to me and asked me to arrange
16   shipment.
17       Q.    That is your handwriting at the
18   bottom of K17163?
19       A.    Yes.
20       Q.    Now, the e-mail came from someone
21   named Geri Greto; do you see that?
22       A.    Yes.
23       Q.    Who is Geri Greto?
24       A.    Well, looking at this now she
25   worked for Bill Craig.

Page 53

1    Confidential - Attorneys' Eyes Only
2        Q.    Did you have any contact with her?
3        A.    I do not recall. It is possible
4    that she may have rang me, but I cannot recall at
5    all.
6        Q.    Again, for this shipment to
7    Mr Craig it would have been someone off in the
8    warehouse who actually packed it up and shipped
9    it?
10       A.    Yes.
11       Q.    So you never actually saw these
12   three boxes?
13       A.    No.
14       Q.    Did you get any confirmation that
15   Mr Craig -- sorry, first, that the shipment
16   actually went out?
17       A.    The copy invoice would be my
18   confirmation that it had been arranged.
19       Q.    Did you get any confirmation that
20   he received it?
21       A.    No.
22       Q.    Now, let us move on to the next
23   one. Now we are on K17164, and I will also ask you
24   to look at K17165. This looks like another
25   shipment to Ms Glus; is that right?

14 (Pages 50 to 53)

KEURIG v KRAFT                21 FEBRUARY 2008                DEPSOSITION OF J. APPLETON

Page 54

1       Confidential - Attorneys' Eyes Only
2       A.    Yes.
3       Q.    Now, on K17165, the memo that you
4   got from -- that is the memo that you received
5   from Ms Matthews; is that right?
6       A.    Yes.
7       Q.    And it references a Louis
8   Camilleri; do you see that?
9       A.    Yes.
10      Q.    Have you ever met or spoken with
11  him?
12      A.    No.
13      Q.    Do you know -- it refers here on
14  17176 to one capsule storage unit.
15      A.    Yes.
16      Q.    What is that?
17      A.    That is just a moulded unit that
18  fits at the side of the brewer to hold the
19  capsules.
20      Q.    So that is just to store product
21  prior to it going into the machine?
22      A.    Yes. It is just so it is available
23  there at the side of the machine.
24      Q.    And did you have any knowledge at
25  the time of whether Mr Camilleri had a singles

Page 55

1       Confidential - Attorneys' Eyes Only
2   machine or where it was in his facility and what
3   he was doing with it?
4       A.    No.
5       Q.    Did you ever get any sense of that?
6       A.    Well, I would have assumed the fact
7   that I am shipping him product he had a singles
8   brewer. Because what would he want the product
9   for. The nature of the capsule -- with in cup
10  products you have product in a cup and you can
11  have a particular product and you can tip it in a
12  cup and you can pour hot water on it and you can
13  make a cup of coffee. You cannot do that with a
14  capsule. You have to have the brewer to dispense
15  it.
16      Q.    Other than --
17      A.    Yes --
18      Q.    Did you get any other
19  confirmation --
20      A.    -- no.
21      Q.    -- now, this one indicates -- well,
22  at least in the request to you from Ms Matthews
23  says "charged to cost creditor 6500"?
24      A.    Yes.
25      Q.    What does that mean?

Page 56

1       Confidential - Attorneys' Eyes Only
2       A.    I would assume that that was
3   possibly -- it does not sound like it was a UK
4   costs centre. So I am just wondering whether this
5   was something that Helen or Louis had given Liz to
6   charge it to his cost centre. But whichever it
7   would seem as if we would not, which is why we
8   have gone with the sample budget number.
9       Q.    So you end up the using the same
10  number?
11      A.    Yes. Which makes me think that
12  that might have been an American cost centre which
13  we would not have been able to use.
14      Q.    Okay. Again, this shipment would
15  have been sent by someone that Ms Stephenson
16  contacted --
17      A.    Yes.
18      Q.    -- you did not see the boxes
19  yourself?
20      A.    No.
21      Q.    All these shipments that went out
22  did you make any effort to inspect the product
23  before it went to see exactly what it looked like
24  or anything like that?
25      A.    No.

Page 57

1       Confidential - Attorneys' Eyes Only
2       Q.    Then we have an invoice on K17166,
3   let us see, this is February 13th of 1997; is that
4   right?
5       A.    Yes.
6       Q.    Does that -- can you just confirm,
7   does that go with the...
8       A.    I think that goes with 67, 68 and
9   69.
10      Q.    Okay. So from K17166 through 69
11  these documents refer to one shipment?
12      A.    Yes.
13      Q.    Maybe let us start backwards on
14  K17169; is this the request that you got from
15  Ms Matthews to do another shipment to Ms Glus and
16  Mr Camilleri?
17      A.    Yes.
18      Q.    And then K17168 is your request to
19  Ms Stephenson?
20      A.    Yes.
21      Q.    Now, there are some references here
22  to a Phillip Morris broker, Martin Strauss, with a
23  phone number; do you see those?
24      A.    Yes.
25      Q.    Who was that?

15 (Pages 54 to 57)

KEURIG v KRAFT                21 FEBRUARY 2008              DEPSOSITION OF J. APPLETON

Page 58

1      Confidential - Attorneys' Eyes Only
2      A.    To be perfectly honest I do not
3  know.  I can only assume it is the broker that
4  deals with the clearance of the shipment.
5      Q.    Do you recall speaking with him at
6  all?
7      A.    No.
8      Q.    Then on K17167 a fax from DFDS
9  Transport; can you describe what this is?
10      A.    This looks like confirmation of the
11  flight details.
12      Q.    This would be flight details for
13  the shipment of --
14      A.    For the shipment, yes.
15      Q.    -- so this was a flight that was to
16  occur four days later on February 15th?
17      A.    Yes.
18      Q.    I am sorry, there are two
19  flights --
20      A.    From Amsterdam to New York. It has
21  gone to Amsterdam and then it has gone on to New
22  York.
23      Q.    -- so it was -- I just want to make
24  sure I understand -- it was to fly from the UK to
25  Amsterdam on February 12th?

Page 59

1      Confidential - Attorneys' Eyes Only
2      A.    (Witness nodded).
3      Q.    And then from Amsterdam to New York
4  on the 15th?
5      A.    That looks like the case.
6      Q.    Did you get any confirmation
7  afterwards that it actually went on those flights
8  and arrived safely?
9      A.    No.
10      Q.    Now, on K17166 the signatory at the
11  bottom is a Lindsey Virdee; do you see that?
12      A.    Yes.
13      Q.    Who is Ms Virdee?
14      A.    I think she must have been a
15  different person within the export department. I
16  am not quite sure whether Sue had left by that
17  time and Lindsey took over or whether Sue was
18  still there but Lindsey just took over the
19  shipment.
20      Q.    Do you know if Lindsey is still at
21  the company?
22      A.    I do not believe she is.
23      Q.    Did you know her when she was at
24  the company?
25      A.    Yes.

Page 60

1      Confidential - Attorneys' Eyes Only
2      Q.    Okay. Let us -- almost done with
3  these -- let us move on to K17170.  Does that --
4  are these last two pages 170 and 171 -- do they go
5  together?
6      A.    Yes.
7      Q.    So K17170, is that a memo that you
8  received from Ms Greto?
9      A.    Yes.
10      Q.    Do you recall receiving it?
11      A.    Well, yes, it is my file, so I
12  would have received it.
13      Q.    I know it was in your files, but I
14  said do you recall whether you received this and
15  looking at it do you have a specific memory of it?
16      A.    No.
17      Q.    This is early 1998, correct?
18      A.    This is January 5th 1998.
19      Q.    And then you respond to her on
20  January 12th, the next page?
21      A.    Yes.
22      Q.    It looks like at that time
23  Ms Virdee became the new contact in the export
24  department?
25      A.    I think what happened possibly at

Page 61

1      Confidential - Attorneys' Eyes Only
2  that time was that instead of going through
3  Liz Matthews and then coming through to me to
4  export it looks as if maybe we cut out the middle
5  men, if you like, and requested that Geri go
6  straight to export.
7      Q.    I see. So Ms Virdee -- well, let
8  me make sure I understand -- Ms Virdee was in a
9  different department from Ms Stephenson?
10      A.    No, she was within the export
11  department.
12      Q.    Okay.
13      A.    But instead of Geri sending the fax
14  to Liz, Liz sending the fax to me, me sending the
15  fax to Sue/Lindsey, I think we have asked in
16  future can you go through straight to Lindsey and
17  she will arrange shipment.
18      Q.    Okay. I understand. So at this
19  point did you deal with -- do you have any direct
20  involvement, put it that way, with this new
21  requested shipment, or did it just pass to --
22      A.    No, I would say it passed to
23  Lindsey that particular one.
24      Q.    -- so do you have any idea of what
25  happened after this fax, whether there was

16 (Pages 58 to 61)

KEURIG v KRAFT                21 FEBRUARY 2008            DEPSOSITION OF J. APPLETON

Page 62

1    Confidential - Attorneys' Eyes Only
2  shipment sent or anything like that?
3    A.    No.
4    Q.    All right. We have been going for
5  over an hour. Why don't we take a five minute
6  break.
7         (Off the record at 10.25 am)
8         (On the record at 10.37 am)
9         MR RADER: I have asked the court
10  reporter to mark as Exhibit 2 the document with
11  number K17172.
12       (Exhibit 2 marked for identification)
13  A newspaper article entitled: "Sly spends £1,000
14  on a cup of coffee"; Ms Appleton, does this
15  document look familiar to you?
16    A.    Yes.
17    Q.    Did it come from your file cabinet?
18    A.    No.
19    Q.    Are you the one who located it?
20    A.    No.
21    Q.    How are you familiar with it?
22    A.    Because I remember the buzz at the
23  time in the office that Sly Stallone has -- had --
24  we put a machine, I think it was Shepperton
25  Studios, I am not quite sure, but we put a machine

Page 63

1    Confidential - Attorneys' Eyes Only
2  there for him to use. And I remember him taking
3  it back to the States with him and I remember it
4  being in the paper and the paper would have done
5  the rounds in the office.
6    Q.    So you -- your recollection of this
7  article is from the time -- around the time it was
8  published?
9    A.    Yes.
10    Q.    Have you seen it recently, in the
11  last weeks or months?
12    A.    No.
13    Q.    Shepperton Studios that you
14  mentioned, to your knowledge is that in the UK?
15    A.    Yes.
16    Q.    Do you have -- did you ever
17  participate in shipping any singles cartridges to
18  Mr Stallone in the US?
19    A.    No.
20    Q.    Do you know anybody else at Kraft
21  who did that?
22    A.    No.
23    Q.    Other than this article do you have
24  any other knowledge other than what you read in
25  this article about Mr Stallone's involvement with

Page 64

1    Confidential - Attorneys' Eyes Only
2  singles?
3    A.    No.
4    Q.    The article mentions a voltage
5  issue in the last sentence; do you see that?
6    A.    Yes.
7    Q.    Are you familiar at all with the
8  use of singles brewing machines on US voltage?
9    A.    Yes.
10    Q.    How does that work?
11    A.    There is a lead that fits into the
12  back of the machine with a plug on the end, and it
13  is just a case of putting a different lead in the
14  box. If they are ever shipped to a different
15  country they have a different voltage you just
16  ship them another lead that fits their voltage.
17    Q.    So to your knowledge there should
18  be a way to use these brewers in the US?
19    A.    Yes.
20    Q.    I am going to ask the court
21  reporter to mark Exhibit 3.
22       (Exhibit 3 marked for identification)
23  The documents in Exhibit 3, are you familiar with
24  them?
25    A.    Only the 17249.

Page 65

1    Confidential - Attorneys' Eyes Only
2    Q.    So 17249, which is a fax from you
3  to Geri Greto I assume?
4    A.    Yes.
5    Q.    Did that come --
6    A.    One of the previous documents in
7  here.
8    Q.    -- did that come from your file
9  cabinet?
10    A.    Yes.
11    Q.    I realise a number of pages have
12  been grouped together here, the other pages in
13  this group are not from your file cabinet?
14       MR SCHLITZ: Look carefully at the
15  rest of the pages.
16    A.    Yes, the 249 and 250 look like
17  duplicates. It is exactly the same. And the
18  other one is the original memo from Geri, linked
19  to the fax to Geri saying that Lindsey Virdee is
20  the new contact.
21       MR RADER: Right.
22       THE WITNESS: I have never seen 247
23  and I have never seen 248.
24       BY MR RADER:
25    Q.    Okay. So just focussing for a

17 (Pages 62 to 65)

KEURIG v KRAFT                 21 FEBRUARY 2008                 DEPOSITION OF J. APPLETON

---

Page 78

1    Confidential - Attorneys' Eyes Only
2         BY MR RADER:
3    Q.    So nominally with the document
4    retention and destruction policy that might
5    suggest that the documents would not be around any
6    more but you happened to have kept them?
7    A.    Yes.
8    Q.    Did you go back and look at any
9    archive boxes to see if there were any other
10   documents from this timeframe --
11   A.    No.
12   Q.    -- when you add faxes and the other
13   documents that we have looked at in these ad hoc
14   shipments, as you describe them, did you have any
15   formal record keeping procedure that you were
16   required to go by to produce documents?
17   A.    No.
18   Q.    Do you know whether you kept all of
19   the faxes and documents related to these, or are
20   these just ones that you happened to see in the
21   file?
22   A.    Well, obviously these are the ones
23   that are in the file, but I am not quite sure
24   whether -- you can tell, I think, that there are
25   possibly some missing documents because you

---

Page 79

1    Confidential - Attorneys' Eyes Only
2    have -- you should have a fax and a copy invoice
3    for each of those. But sometimes they did not fax
4    the copy invoice back and I obviously did not
5    follow up.
6    Q.    Do you know Mr Lee Rowan?
7    A.    No.
8    Q.    It is two minutes after 11.00 and I
9    predicted we would be done by 11.00. I do not have
10   any further questions. I just want to thank you
11   for your time and for coming in. If Mr Schlitz
12   wants to ask you any questions he is certainly
13   welcome to do that.
14        THE WITNESS: Thank you.
15        MR SCHLITZ: I have a few
16   questions. First, today Mr Rader has shown you
17   Exhibit 1 and Exhibit 4 and you have testified
18   these are documents in the United States file; is
19   that correct?
20   A.    Oh my United States file, yes,
21   sorry.
22   Q.    This file, is this kept in the
23   ordinary course of your business?
24   A.    Yes.
25   Q.    Did you provide the documents the

---

Page 80

1    Confidential - Attorneys' Eyes Only
2    way that they are kept in that file?
3    A.    Yes.
4    Q.    Now, Mr Rader asked you about
5    whether you got confirmation that certain
6    shipments actually were received, it is part of
7    your responsibilities, did it ever come to your
8    attention that shipments were not received?
9    A.    Yes.
10   Q.    Could you explain that.
11   A.    Well, once you have arranged the
12   shipment because the person at the other end would
13   be expecting them, if they did not arrive there
14   would either be a phone call to say where is the
15   shipment, and I would investigate that with the
16   export department and they would follow that up.
17   Q.    Then what would happen?
18   A.    If -- well, I am assuming they
19   would feed back to me and say give me the details,
20   but none of it is documented with that kind of...
21   Q.    So if there was a problem you would
22   hear about it?
23   A.    Oh, yes.
24   Q.    Okay. Mark this as Defendant's
25   Exhibit 1.

---

Page 81

1    Confidential - Attorneys' Eyes Only
2    (Defendant's Exhibit 1 marked for identification)
3    This is K001746 through K0017467. Would you
4    please look through these four pages first
5    (pause).
6    A.    Okay.
7    Q.    Please look at K001746; is this
8    your handwriting?
9    A.    Yes, it is.
10   Q.    It is dated August 2nd, 1996; is
11   that correct?
12   A.    Yes.
13   Q.    It is from you; is that correct?
14   A.    Yes.
15   Q.    And to Geri Greto; is that correct?
16   A.    Yes.
17   Q.    Can you explain what this document
18   is?
19   A.    This is just me saying to Geri that
20   we have realised that the shipment that she had
21   requested in July had not been sent, apologising
22   and telling them that it was being dispatched that
23   particular day.
24   Q.    And when you say it has been
25   dispatched that particular day, that is something

---

21 (Pages 78 to 81)

# Exhibit 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY