IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>　　　　Plaintiff,<br>v.<br><br>KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and KRAFT FOODS INC.,<br><br>　　　　Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED – PUBLIC VERSION** |

## REPLY IN SUPPORT OF KEURIG'S MOTION *IN LIMINE* NO. 2

                John W. Shaw (No. 3362)
                *jshaw@ycst.com*
                Karen E. Keller (No. 4489)
                *kkeller@ycst.com*
                YOUNG CONAWAY STARGATT & TAYLOR, LLP
                The Brandywine Building
                1000 West Street, 17th Floor
                Wilmington, DE 19801
                (302) 571-6600

                Michael A. Albert
                Michael N. Rader
                WOLF, GREENFIELD & SACKS, P.C.
                600 Atlantic Ave.
                Boston, MA 02210
                (617) 646-8000

                *Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

Testimony from Kraft's technical expert Malcolm Taylor about Kraft's employees' own litigation-driven experiments would be improper under Fed. R. Evid. 702 and 703. Mr. Taylor, who is supposed to be a neutral expert applying sound engineering standards to his engagement in this case, was not present when the experiments were performed, did not speak to the engineers who performed them, and never even saw the test apparatus. Testimony cited in Kraft's opposition only confirms that Mr. Taylor was confused about what Kraft's engineers actually did and would never have relied on their data in his professional work as an engineer.

Kraft's suggestion that Mr. Taylor may nevertheless rely on the Kraft experiments as "confirmation" of his own tests invites legal error. An independent expert is not allowed to lend his credibility to tests performed by a party's own employees for litigation purposes.

I. **Mr. Taylor Did Not Even Understand the Kraft Engineers' Testing.**

Kraft tries to downplay Mr. Taylor's confusion about the Kraft employees' testing. The testimony that Kraft cites, however, only confirms that Mr. Taylor's understanding of that testing is sorely deficient. For example, in the excerpt on page 2 of Kraft's opposition, Mr. Taylor testified that the experiments reflected in Deposition Ex. 13 (Mot. Ex. 3) involved ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓ Mr. Taylor is confused. ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Kraft attempts to deflect Mr. Taylor's ignorance about ▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[1] Keurig's opening brief included Exs. 1-8. Exhibits to this brief begin at Ex. 9.

In response to Mr. Taylor's confusion over which Kraft engineer did the tests reflected in Deposition Ex. 13 (Mot. Ex. 3), Kraft contends that "it is not clear" which of the test results (Mot. Exs. 3-5) was the subject of the question "Who created this document?" Yet the <u>eleven</u> preceding questions all concerned Deposition Ex. 13 alone.[2] (Ex. 10 at 116-118).[3]

## II.    Mr. Taylor's Reliance on the Kraft Engineers' Testing Is Unreasonable.

Kraft attempts to sidestep Mr. Taylor's testimony concerning sound engineering practices (such as receiving all relevant information and meeting other engineers to discuss their results) with a semantic argument that these practices apply only to "designing packages" and not to "testing" them. (Opp. at 3). But Mr. Taylor himself rejected this suggestion:

> Q:    So if somebody working under you was <u>testing a prototype or a product</u>, you'd expect to get all the reports[4] that they generated about that testing?
> A:    Yes, or I'd go and look at it myself.
> Q:    If you had hired an outside company to do some <u>testing of a product or prototype</u>, would you expect to have the opportunity to speak to them directly about their results?
> A:    Absolutely. You would work with them on a day-to-day basis, even to go over there to visit with them. Absolutely.

(Ex. 10 at 45-46) (emphasis added).

On the merits, Kraft does not even attempt to suggest that Mr. Taylor's work in this case satisfies such standards as required for his testimony to pass muster under Rules 702 and 703. See <u>Cummins v. Lyle Industries</u>, 93 F.3d 362, 369-72 (7th Cir. 1996) (expert witnesses must "adhere to the same standards of intellectual rigor" required in their professional work).

---

[2] [redacted]

[3] [redacted]

[4] Kraft withheld Mr. Bentley's report from Mr. Taylor as well as Keurig. (Mot. at 1).

### III. Rules 702 and 703 Do Not Allow Mr. Taylor to Testify that Kraft's Own Tests "Confirm" His Independent Opinion.

Kraft argues (without authority) that Mr. Taylor can testify about the Kraft tests because he considered them "merely to confirm his own" results. (Opp. at 5). To the contrary, Rules 702 and 703 do not permit an expert to package another's analysis as a "confirmation" of his or her own opinion. Mike's Train House, Inc. v. Lionel, LLC, 472 F.3d 398, 409 (6th Cir. 2006) (following the "[o]ther circuits [that] have squarely rejected any argument that Rule 703 extends so far as to allow an expert to testify about the conclusions of other experts"); United States v. Cuong, 18 F.3d 1132, 1143 (4th Cir. 1994) (error to permit expert "to bolster his opinion evidence by testifying that his conclusions…were 'essentially the same' as those of" another).

Kraft tries to distinguish these cases by arguing that Mr. Taylor may rely on the Kraft engineers' "data" so long as he does not reference their "conclusions." (Opp. at 5 n.3). This argument too is bare semantics – Mr. Taylor's expert report focuses on the substance of what the Kraft tests supposedly "establish" about the alleged prior art. (Mot. Ex. 1 at 8).

Kraft's engineers designed and conducted tests intended to support Kraft in this case. (Kraft even asserts work product protection as to the report its engineer wrote about the tests.) Kraft wants to put its litigation-driven tests into evidence through its supposedly neutral expert – who did not even understand them, and whose own testing was limited to a "couple of minutes" "messing around in the kitchen." (Ex. 10 at 99, 107). In essence, Kraft wants its own tests to be "dressed up to look like expert testimony." Hot Wax, Inc. v. Warsaw Chem. Co., 45 F. Supp. 2d 635, 639 (N.D. Ill. 1999). This strategy is unfair and contrary to the rules of evidence.[5]

---

[5] The three sets of tests results (Mot. Exs. 3-5) about which Mr. Taylor proposes to testify are classic hearsay. The appearance of Kraft's engineers at trial (Opp. at 1 n.1) will not change this. Mr. Taylor may not disclose these hearsay exhibits to the jury because their probative value fails to substantially outweigh their prejudicial effect. Rule 703. (Mot. at 5). Kraft has no answer.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*
John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

**CERTIFICATE OF SERVICE**

I, Karen E. Keller, Esquire, hereby certify that on September 2, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
>David E. Moore, Esquire [*dmoore@potteranderson.com*]
>Potter Anderson & Corroon LLP
>Hercules Plaza
>1313 North Market Street, 6th Floor
>Wilmington, Delaware 19801

Additionally, I hereby certify that on September 2, 2008, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

**BY E-MAIL**

>David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
>Baker Botts L.L.P
>The Warner
>1299 Pennsylvania Ave., NW
>Washington, D.C. 20004-2400

>YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
>/s/ *Karen E. Keller*
>John W. Shaw (No 3362) [*jshaw@ycst.com*]
>Adam W. Poff (No. 3990) [*apoff@ycst.com*]
>Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
>The Brandywine Building
>1000 West Street, 17th Floor
>Wilmington, DE 19801
>(302)-571-6600
>
>*Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 9

THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# In The Matter Of:

*KEURIG, INCORPORATED v.*
*KRAFT FOODS GLOBAL, INC*

---

*MALCOLM E. TAYLOR*
*July 3, 2008*

---

# MERRILL LEGAL SOLUTIONS

*101 Arch Street, 3rd Floor*
*Boston, MA 02110*
PH: 617-542-0300 / FAX: 617-338-6075

TAYLOR, MALCOLM E. - Vol. 1

Page 42

1  Q. How does that work? Is it through meetings or memos
2     or what?
3  A. Meetings, e-mails, memos, personal one-to-one, all
4     depending on the urgency or importance of the aspect
5     that you are looking into, and sometimes you have to
6     work with a company on the outside, you know, a
7     supplier of materials.
8  Q. In your experience as lead engineer, did you have
9     people working under you that prototyped devices for
10    you?
11 A. Yes.
12 Q. How would you evaluate the effectiveness of that
13    prototyping?
14 A. Well, depending on the level of prototyping, if it
15    was fairly involved, you might work with a machine
16    company who would ultimately make an automatic
17    machine which would assemble each of the elements in
18    the package, and he would work with you on the
19    development basis or if it's a fairly simple package
20    where you could easily make up a model in the lab,
21    then you do it in-house. That would all depend on
22    the complexity and all the rest of it.
23 Q. So in good engineering practice, does the lead
24    engineer himself examine the prototype or can you

Page 43

1     just rely on the people under you?
2  A. No. He would be involved at every step along the
3     way.
4  Q. So you would personally examine the prototype to see
5     how it worked?
6  A. Because you are developing it, you want to make sure
7     that all the objectives that you are looking at in
8     the design specification are being met. It's okay
9     to have a rough design where you are doing a test
10    rig and, you know, you have a leak here and a leak
11    there. It isn't important. You are looking at the
12    overall concept to make sure the overall concept is
13    working, then as you move along you develop other
14    issues in the process of whatever else you are
15    developing.
16 Q. Do you sometimes get memos from people on the team
17    or from outside consultants or vendors about
18    different parts of the project?
19 A. Once in a while if you are working in an area where
20    you would need a consultant then you might have to
21    hire one, but if it's within our own area of
22    expertise, obviously we wouldn't.
23 Q. But in terms of the work product that goes in along
24    the way in these projects, how does that work? Do

Page 44

1     people write up memos or logbooks about the --
2  A. Yes, yes, yes. I'm sorry. You do have a logbook
3     that you update every -- usually at the end of the
4     day so you know what you've done. If you didn't,
5     you wouldn't have any reliable data at all because
6     as you develop you may have to back up and you may
7     have to go in a different route if you are up
8     against a block somewhere.
9  Q. Are there standards for good engineering practice
10    about how much detail you need in those logs or
11    memos?
12 A. No, not really. It really depends on what your
13    objectives are and how rapidly the whole thing is
14    moving along. You would have timelines all
15    depending on how large the program is altogether,
16    and you'd have an objective to reach each stepping
17    stone, if you like, which would offer you a
18    benchmark on how things are going, and if everything
19    is working as it ought to be, then you maybe have a
20    meeting at that stage and then you move on.
21 Q. As the lead engineer would you expect the people
22    working under you to communicate to you all of the
23    information that they had recorded about the stuff
24    they are working on?

Page 45

1  A. Yes. At least all the relevant information, sure.
2     In other words anything that related to functional
3     operation which was critical, if you like.
4  Q. So if somebody working under you was testing a
5     prototype or a product, you'd expect to get all the
6     reports that they generated about that testing?
7  A. Yes, or I'd go and look at it myself.
8  Q. Would your standards for evaluating written work
9     product be any different when you are dealing with
10    an outside consultant that's not within your own
11    company?
12 A. No. It would be the same, I think.
13 Q. You'd expect the outside people to adhere to the
14    same standards --
15 A. Yes.
16 Q. -- of your own company?
17 A. Absolutely.
18 Q. You'd communicate those standards to them?
19 A. When you say a standard, there really isn't any
20    standard per se of engineering effort, if you like.
21    There are engineering standards involved in design
22    and drawing and symbols and all that stuff. That's
23    a standard, but as far as how you organize your
24    work, how you do your work on a day-to-day basis is

MERRILL LEGAL SOLUTIONS
(617) 542-0039

Page 46

1  usually up to the lead engineer or whatever, you
2  know.
3  Q. If you had hired an outside company to do some
4  testing of a product or prototype, would you expect
5  to have the opportunity to speak to them directly
6  about their results?
7  A. Absolutely. You would work with them on a
8  day-to-day basis, even to go over there to visit
9  with them. Absolutely.
10 Q. So would it be enough to get from them just a
11 written report or a compilation of data or would you
12 need to be able to interact?
13 A. You'd have to interact, yes.
14 Q. Why is that so important?
15 A. Well, if you've got a product that you are
16 developing and you are responsible for making it
17 work, whatever it is, then you want to make sure
18 that the vendor or consultant is in line with what
19 you are thinking.
20 Q. And if they say they've done a test, would you take
21 their word for it --
22 A. No, I wouldn't.
23 Q. -- that it's the right test or would you --
24 A. No. I would visit with them. We'd have a meeting.

Page 47

1  We'd have a look at how they are doing the testing.
2  Q. Okay. Now, I'd like to grab a --
3        MR. SCHLITZ: We've gone for an hour. If
4  you want to go for more, I don't want to go for more
5  than another ten minutes, so if you want it take a
6  break now or you want to --
7        MR. RADER: Let's take a short break.
8  That's fine.
9        (Recess.)
10       (Exhibit 5, Cartridge marked for
11 identification.)
12 BY MR. RADER:
13 Q. Mr. Taylor, we've marked a cartridge as Exhibit 5,
14 and that's a single cartridge; is that correct?
15 A. Yes.
16 Q. When you worked on this case you had a chance to
17 study those?
18 A. Yes.
19 Q. Can you describe in your own words how that
20 cartridge works in its normal operation?
21 A. Yes. The blank at the bottom of the hole on, if you
22 like, the top side is pushed into the cartridge.
23 Water is introduced, runs along the channels on the
24 inside and then into the coffee bed. Water runs up

Page 48

1  through the coffee bed, up through the filter into
2  the chamber which is up above the filter and then up
3  and over into the outlet which is on the opposite
4  end. That's it basically. It's a simple operation.
5  Q. Okay. I'll just try to break it down a little bit.
6  When the cartridge goes into the machine, is it foil
7  up or foil down?
8  A. Foil down.
9  Q. And there is a beveled inlet at the part that goes
10 into the machine first; is that right?
11 A. I've never looked at the singles machine, but I
12 assume it enters in this way.
13 Q. And so on one end of the singles cartridge there
14 is -- it's square, and on the other end it's got
15 like a point to it?
16 A. Yes.
17 Q. And on that end with a point there is a beveled
18 inlet in the hard plastic case?
19 A. Yes.
20 Q. And that's where you are saying the water inlet
21 device punctures through?
22 A. Yes. It pushes out the blank at the bottom of the
23 hole.
24 Q. Did you look at some -- just as an aside, did you

Page 49

1  look at some cartridges -- some singles cartridges
2  that didn't have that blank there?
3  A. Yes, they just have a hole.
4  Q. So in that case the inlet device just goes right
5  into the hole without having to punch out a blank?
6  A. Right.
7  Q. It then introduces the water through that hole into
8  a manifold; is that correct?
9  A. Yes.
10 Q. And then the water feeds through the slots in the
11 manifold into the coffee bed?
12 A. Yes.
13 Q. And then the resulting liquid goes through -- in the
14 orientation when it's brewing it goes up through the
15 filter?
16 A. Right, that's correct.
17 Q. And it travels through a slot over to the outlet; is
18 that correct?
19 A. That's correct.
20 Q. And then it goes down through the outlet?
21 A. Yes, that's correct.
22 Q. And then in the machine there is a piercing device
23 that pierces the foil that covers the outlet?
24 A. Yes.

### Page 98

1  A. Yes.
2  Q. You still have the cartridge in front of you?
3  A. Yes, somewhere. Yep.
4  Q. Do you have a pen in your pocket if I ask you in a
5     moment to simulate what it looked like?
6  A. Yeah.
7  Q. Can you describe in your own words what it was that
8     you did?
9  A. Yes. I mean the only objective was to meet what is
10    in the claim, and that is to provide an inflow of
11    hot water, to run it through and make a beverage out
12    of it -- out through the outlet, obviously, which is
13    what I did because that's all that's in the claims.
14    There is nothing more there.
15 Q. So where did you pierce the foil to make an inlet?
16 A. Well, the inlet was in this area here.
17 Q. So it was sort of in the middle of the coffee bed?
18 A. The bottom, yeah, in the bottom half of the coffee
19    bed.
20 Q. So closer to the outlet nozzle than to the nose of
21    the cartridge?
22 A. Sure, because we had -- yeah, we had some vertical
23    and some over this way too.
24 Q. Who is the "we"?

### Page 99

1  A. Well, I and my wife were messing around with them in
2     the kitchen.
3  Q. Okay.
4  A. It's what we did basically.
5  Q. So she helped you hold them or something?
6  A. Yeah, because it's hot water, so --
7  Q. So one of you -- your wife held the cartridge and
8     you injected it?
9  A. Yes.
10 Q. How many cartridges did you test that way?
11 A. I had about three or four of them.
12 Q. And you tested each one once?
13 A. Yes. I only had a limited number, so yes.
14 Q. So did you pierce all of them in pretty much the
15    same place?
16 A. I think I had one here, another one was maybe
17    halfway up perhaps, and then the outlet I opened up
18    with a pen just to open it up.
19 Q. And did you collect the outflow in a cup or
20    something?
21 A. Yes, in a cup.
22 Q. What did you use to pierce the cartridge?
23 A. The cartridge, it was a hypodermic I used.
24 Q. Hypodermic needle?

### Page 100

1  A. A needle, sure. Much like you would have on any
2     disposable hypodermic.
3  Q. And so was that actuated with your thumb or
4     something?
5  A. Yes, it was hand operated.
6  Q. How much volume did it hold?
7  A. It was enough to fill up the cartridge.
8  Q. To fill up the coffee bed?
9  A. The coffee bed, sorry. Yes.
10 Q. Do you know what the volume was?
11 A. No, not specifically. I just poured enough in there
12    so it would squirt out the outlet.
13 Q. And so how far in did you press the tip of the
14    needle?
15 A. It was maybe halfway into the coffee bed.
16 Q. And then you used your thumb to squeeze it down?
17 A. Yes.
18 Q. And were you regulating the pressure that you used
19    on your thumb?
20 A. No. I just squeezed it in.
21 Q. And how long did it take you to squeeze in the
22    full -- did you do the full -- let me start with
23    this: Did you put the full hypodermic worth of
24    water in there?

### Page 101

1  A. Yes, I did. I emptied it out.
2  Q. You don't know what that volume was but it was the
3     whole thing?
4  A. It was the whole thing. I mean it filled the
5     chamber in there. It was big enough to fill it.
6  Q. How do you know that it filled the chamber?
7  A. Because it squirted out the outlet, otherwise it
8     wouldn't have come out.
9  Q. So it fully saturated the coffee bed?
10 A. You have to have enough in there in order to go up
11    and over, otherwise it won't go up and over and out
12    of the outlet.
13 Q. I see. And how much force did you apply to the
14    hypodermic?
15 A. Just a normal force that you would normally if you
16    injecting yourself with, you know, if you had to
17    have insulin and you were shoving it into yourself,
18    just the normal hand force.
19 Q. And do you know how to quantify that for us?
20 A. A pound or two, probably. It wasn't much.
21 Q. And did it pressurize the coffee bed at all?
22 A. Most probably not.
23 Q. In normal use when you brew a cup of coffee, for
24    example, in a singles machine it pressurizes the

Page 106

1  A. Yeah, it's a disposable.
2  Q. You said you tested three or four cartridges?
3  A. Yes. I didn't have many.
4  Q. In what orientations did you have them?
5  A. I had one upside down in the normal route. I had
6     another one like this as in the test I had at Kraft.
7  Q. How many did you do in each of those positions?
8  A. Two of each probably.
9  Q. And did you take contemporaneous notes of what you
10    were doing?
11 A. No. All I just -- all I wanted was a demonstration.
12    I was putting hot -- I put in hot water through and
13    the beverage I was having out of the other end was
14    brown, so it was obviously absorbing coffee. That's
15    all I have to do because that's all that's in the
16    claim.
17 Q. Did you see any water exiting through the hole where
18    you had pierced?
19 A. No, it wasn't in fact.
20 Q. In any of your experiments?
21 A. No.
22 Q. To your knowledge you didn't actually pressurize the
23    chamber, though?
24 A. No. I mean I didn't because it's not mentioned in

Page 107

1     the claim at all.
2  Q. How long did it take you to do the testing that you
3     did?
4  A. Couple of minutes.
5  Q. Couple of minutes?
6  A. Yeah.
7  Q. How long did it take you to sort of design in your
8     mind what the testing was going to look like?
9  A. It was also minutes.
10 Q. How did you secure the cartridge? Was it your wife
11    holding it?
12 A. Yes.
13 Q. How much liquid did you get out of the outlet?
14 A. Well, it was the excess of the amount of -- over the
15    amount that was left in the chamber obviously, but
16    it wasn't a huge amount because I wasn't aiming at
17    any specific volume.
18 Q. So you didn't measure the volume?
19 A. No, I didn't measure it because it wasn't necessary.
20 Q. Was it a couple of teaspoons?
21 A. Yeah, probably.
22 Q. Did you taste the liquid?
23 A. No, I don't have to because it's not in the claim.
24 Q. Did you smell the liquid?

Page 108

1  A. Yeah, a little bit, and it had a coffee smell.
2  Q. What temperature was the water that you injected?
3  A. It was hot. It was out of a kettle actually, so it
4     was as much as I could hold in the syringe because I
5     didn't have any insulation.
6  Q. Do you know what the temperature was?
7  A. No, I don't. It would have been somewhere in
8     between -- well, it might have been around 150 F
9     maybe.
10 Q. 150 degrees Farenheit?
11 A. F, right.
12 Q. Did you take any photos of the test?
13 A. No, I didn't.
14 Q. What did you do with the cartridges when you were
15    done?
16 A. I threw them out.
17 Q. Then what did you do with the liquid?
18 A. Also dumped it.
19 Q. Did you take any notes on your observations of the
20    test?
21 A. No. Only what is in the report.
22 Q. And how far in advance of preparing the report did
23    you do the test?
24 A. A week, a week or two probably.

Page 109

1  Q. Now, it says in the footnote in your report that you
2     did the hypodermic needle test on a Lambert-type
3     cartridge with the open inlet?
4  A. Right.
5  Q. That was one of the three or four that you did?
6  A. Yes.
7  Q. What orientation did you do that one?
8  A. One that was in the vertical because it's open. I
9     mean actually that was the one I had to have
10    inverted. I could have put something over the hole,
11    but I didn't.
12 Q. So you did that one vertically with the open hole
13    toward the top?
14 A. Upright, yeah.
15 Q. What would normally be the inlet hole?
16 A. Yes, right.
17 Q. And you did that in order to avoid leakage out the
18    hole?
19 A. Yes, because obviously it would leak if I laid it in
20    any other way.
21 Q. If you had pressurized it, would it have leaked
22    notwithstanding that the hole was at the top?
23 A. Well, of course, yes.
24 Q. Was the hypodermic needle normal to the surface of

28 (Pages 106 to 109)

**Page 114**

1  Q. Kraft engineers?
2  A. Yes, right.
3  Q. Actually before I get to that, let me just ask you
4     one more question. Did you try to -- aside from
5     testing the singles cartridges, did you try to
6     create a test product or prototype based on either
7     the '234 Patent or the '130 Patent that you offered
8     opinions on?
9  A. With the water you mean?
10 Q. Did you actually build what was shown in those
11    patents?
12 A. No, I didn't.
13 Q. Okay. So your opinions on those are strictly based
14    on what's written?
15 A. On the drawings, what's actually written, yes,
16    right.
17 Q. Now, on pages 8 and 9 of your report you also talk
18    about some tests that were done by engineers at
19    Kraft; is that right?
20 A. Yes.
21 Q. Were you present when any of those tests were
22    performed?
23 A. No, I was not.
24 Q. Have you spoken with Mr. Bentley or Mr. Rowan or any

**Page 115**

1     other Kraft engineer about those tests?
2  A. No, I did not.
3  Q. How did you find out about those tests?
4  A. I had the information from my counsel.
5  Q. What information was that?
6  A. There was a drawing of the test and the results of
7     the test and the depositions obviously of Rowan and
8     whoever else, Andrew Bentley, right.
9  Q. Now, you understand that they both used a test rig?
10 A. Yeah, I understand that.
11 Q. Have you seen that rig?
12 A. No. Only in picture form.
13 Q. Have you seen pictures of it?
14 A. Well, only what was in the picture with the device
15    in there as well.
16 Q. Let's grab those pages. I have a document that's
17    previously been marked as I believe Exhibit 13. I
18    can't read the handwriting exactly. Then I have
19    Exhibit 91.
20 A. Uh-huh.
21 Q. Then I have Exhibit 202.
22 A. This is all I had.
23 Q. So you've got Exhibits 13, 91 and 202 in front of
24    you. You said that this is all you had?

**Page 116**

1  A. Yes.
2  Q. You didn't have any other pictures of the rig or
3     anything like that?
4  A. No. This is what I remember.
5  Q. So what is your understanding of what's shown in
6     Exhibit 13?
7  A. Well, 13 is just a volume of liquid. That's all
8     that's indicated from different cavities of the
9     housings, I assume, but that's how I took it to
10    read.
11 Q. So what is the -- it says "mold number" on the upper
12    left and then "cavity number." What do those
13    numbers refer to?
14 A. Mold would be a mold for making the housings and
15    because its multi-cavity-type mold, it's really a
16    means of identifying the cartridge itself, the
17    housing anyway.
18 Q. And what's the significance of that information on
19    this chart?
20 A. Well, it's just the amount of Mls that he took out,
21    that he was able to get out or at least the
22    repeatability, I guess. That's all I can get out of
23    it.
24 Q. In other words why are the mold and cavity numbers

**Page 117**

1     listed here? What does that add to this table?
2  A. I'm not sure, to be honest.
3  Q. Okay.
4  A. You know, I understand there were issues, not really
5     issues, but there were questions about alterations
6     and molds over the years and all the rest of it, and
7     I took it that it was part of that.
8  Q. But as you sit here today you don't know
9     specifically why that stuff is listed on this page?
10 A. No. There is not a lot of meaning there because it
11    merely indicates a mold number and cavity number or
12    date or at least a month anyway with a volume in
13    CCs. There is no other data there.
14 Q. So the month and manufacturer, what does that refer
15    to?
16 A. I assume of the cartridge with the coffee in it.
17 Q. And there are some Decembers and Novembers, but do
18    you know what years those were?
19 A. No, I don't.
20 Q. Do you know whether these were the cartridges with
21    the open hole or the closed holes?
22 A. There is no identification.
23 Q. Do you know whether these were singles cartridges or
24    T-discs?

Page 118

1  A. These are singles. I was aware of that.
2  Q. Okay. And then on the right-hand column, the Mls,
3     what does that refer to?
4  A. I assume it's the amount of coffee which they were
5     able or liquid or whatever that they were able to
6     extract out of the rig that they had.
7  Q. Is it the input or the output?
8  A. No. It's output, I think, but they are all within a
9     small amount of each other, so it's insignificant in
10    my mind. They are all essentially the same.
11 Q. Who created this document?
12 A. This I believe was Andrew Bentley, I think.
13 Q. What tests did he do to create this document?
14 A. He had the one which is shown on Exhibit 91.
15 Q. So he used the device that's shown in Exhibit 91?
16 A. I assumed, yes.
17 Q. You say you assumed. Do you know one way or another
18    whether it was that device or a different device
19    that led to the results in Exhibit 13?
20 A. No, because I can't remember, to be honest. I've
21    read such a lot of data and depositions, I can't
22    remember to be honest.
23 Q. Okay. So it could have been a different device that
24    led to these results?

Page 119

1  A. It may well have been. I'm just assuming because I
2     don't remember.
3  Q. Okay. Do you know if these were coffee cartridges
4     or tea cartridges?
5  A. I believe they were coffee cartridges, I think, from
6     what I remember.
7  Q. Do you remember what type of cartridges?
8  A. They were -- I think they used Lambert and Rychiger
9     type of cartridges.
10 Q. And that's for the results in Exhibit 13?
11 A. Yes, and also maybe on 202. Is that what it is?
12    Yeah.
13 Q. And do you know what type of coffee was in the
14    cartridges that were used to get the results in
15    Exhibit 13?
16 A. Only what's on the paper. There is a brand there on
17    202 which they talk about.
18 Q. I see. Now Exhibit 202, is that recording
19    information about the same tests as Exhibit 13?
20 A. I'm assuming it is at this stage because I don't
21    remember as I say.
22 Q. Okay.
23 A. Because on this particular one he's also talking
24    about drink volume.

Page 120

1  Q. I see. Now, in the tests shown in Exhibit 13 do you
2     know were those made -- were those results through
3     same-side piercing or opposite-side piercing?
4  A. I think they were on the same-side piercing.
5  Q. And how was the cartridge oriented in the tests?
6  A. It was vertical.
7  Q. And where was the inlet piercing made in the test
8     for Exhibit 13?
9  A. It was in a number of locations. It's on the
10    drawing here, A, B, C, D, E, I think.
11 Q. So you are referring to the picture in Exhibit 91?
12 A. On 91, sorry, yes.
13 Q. So in the tests that led to Exhibit 13, all the
14    various inlet positions were used that are shown in
15    Exhibit 91?
16 A. I assume so. They were all in the vertical in this
17    test, I think.
18 Q. But in terms of which inlet position was used for
19    each of the tests shown in Exhibit 13, do you know
20    which one or ones it was?
21 A. Well, they have them on that page actually. It
22    indicates on the -- above the drawing.
23 Q. I see. So that the tests that are listed in the
24    table on Exhibit 91 are the same tests that are

Page 121

1     listed in the table on Exhibit 13?
2  A. That's what I'm assuming, yeah, because I didn't
3     have any other information. I mean I had this one
4     obviously which is over the picture which they had.
5  Q. Okay.
6  A. It's obviously measuring the volume out of the
7     different positions or -- well, yeah, the positions
8     of the -- where the inlet was pierced, and they are
9     all in essence the same.
10 Q. Okay.
11 A. The difference is insignificant anyway.
12 Q. Now, to your knowledge did Mr. Bentley taste any of
13    the liquids that he produced with the rig?
14 A. He did not, I don't think, from what I remember.
15 Q. Do you know if anyone else at Kraft, Mr. Rowan or
16    Mr. MacMahon, tasted any of it?
17 A. I don't believe so.
18 Q. Now, can you just describe in your own words how the
19    rig that they used functioned?
20 A. The way I understand it is they had a clamp on the
21    back or plate, if you like, on the back of the
22    cartridge and then another one over the front of it
23    with some holes in it which would indicate the
24    positions of the inlet pierces, if you like, and

Page 122

1     there was a rubber gasket in between the plate on
2     the outside and against the cartridge, so there was
3     a gasket which would eliminate leakage and in
4     between the outer plate with the holes in the
5     cartridge itself, and then it was tightened up by
6     finger load -- finger tensioning, if you like.
7  Q. What do you mean by "finger tensioning"?
8  A. Well, to tighten up the wing nuts.
9  Q. And where was the hot water coming from?
10 A. It was a tube which was introduced in through the
11    rubber which was sandwiched, if you like, in between
12    the outer plate and the cartridge itself.
13 Q. And what was feeding that tube?
14 A. There would be water from the supply, hot water.
15 Q. Do you know what type of supply it was?
16 A. No, I have no recollection other than it was hot
17    water. That's all I remember.
18 Q. Do you know at what pressure the water was fed in?
19 A. No, I don't.
20 Q. And then how was the water -- how did the water exit
21    the cartridge?
22 A. Out through the outlet which is on the other side in
23    this case.
24 Q. What did the piercers for the inlet and the outlet

Page 123

1     look like?
2  A. The piercers, I believe they had used the ones which
3     they use on the existing or off one of the existing
4     piercers on the brewer or one of the brewers where I
5     think on the inlets they had a serrated tube ending
6     which allowed them to pierce, but it made a rather
7     ragged entry hole. I don't think it's what I would
8     have used, but that's all right.
9  Q. So for both the inlet and the outlet they had this
10    serrated item?
11 A. The inlet was a little different, I think. They had
12    one which they use on all the outlets, I think,
13    which is where they cut around most of the periphery
14    with a serrated edge and then they pull it over to
15    one side.
16 Q. I'm sorry. That's for the inlet or the outlet?
17 A. That's the outlet, sorry.
18 Q. So for the outlet they use the same jagged outlet
19    piercers that they used in the singles machine?
20 A. It was different. It was the one they usually use
21    on the outlet, and I think the inlet one -- I don't
22    know. They might have been the same. I'm not sure
23    because I didn't see any indication exactly. I was
24    only looking at the marks in and around the hole.

Page 124

1  Q. I'm sorry. What marks around the hole?
2  A. I had seen somewhere -- it was a drawing, I think.
3     No. It was a picture, and it showed an inlet hole
4     in through the foil and it was a little jagged.
5     It's a little bit like the outlet piercer which they
6     use on the Tassimo, I think.
7  Q. Was it taken from the Tassimo?
8  A. I don't know. I'm not sure if it was. I assumed it
9     was, but I don't know.
10 Q. And with regard to the outlet piercer, was that
11    taken from any machine?
12 A. It may well have been, but I'm not sure again.
13 Q. And who actually made the test rig?
14 A. I believe it was a mix of Bentley and Rowan, Andrew
15    Bentley and Lee Rowan. One of them or the
16    technician who was working with them arrived at a
17    test rig, I guess.
18 Q. So it is a combined effort --
19 A. I think so from what I read, yes.
20 Q. -- between Rowan and Bentley and the technician?
21 A. Yeah, that's what I assumed.
22 Q. You mentioned a rubber pad?
23 A. Yeah. I named it a gasket because that's what it
24    is.

Page 125

1  Q. Where was that located?
2  A. In between the front of the -- it was up against the
3     front of the lid, the foil lid, and under a plate
4     which went on top of it.
5  Q. Okay.
6  A. So it was compressed basically to some degree
7     anyway.
8  Q. So that it was pressing against the foil side of the
9     cartridge?
10 A. Yes.
11 Q. And it was forming a seal around the edge wall of
12    the cartridge?
13 A. It would form around the periphery of the cartridge,
14    yes, and depending on how they went in with the
15    piercer itself, I assume they had a pretty good seal
16    between the piercer and the rubber gasket.
17 Q. Do you know enough about the details of that?
18 A. No, I don't. I really don't because I didn't see
19    it.
20 Q. So you don't --
21 A. I'm just looking at what I read.
22 Q. So you don't know whether that seal formed right
23    around the needle or not?
24 A. No, I don't know. I don't know the detail of that.

32 (Pages 122 to 125)

# EXHIBIT 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY