IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>    Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>    Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED – PUBLIC VERSION** |

# REPLY IN SUPPORT OF KEURIG's MOTION *IN LIMINE* NO. 4

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

Kraft still has provided no explanation for identifying three new witnesses (all Kraft employees) three months after the close of discovery. Deposing these witnesses on the eve of trial would not remedy the prejudice to Keurig if the witnesses were allowed to testify.

I.   **Kraft Provides No Justification for Its Late Disclosure.**

Kraft's three new witnesses pertain to Singles cartridge "production records" that Kraft contends support its public-use invalidity defense – an issue on which it bears the burden of proof. Kraft offers no explanation why it waited until the last two weeks of the ten-month discovery period to produce the production records in the first place. (Mot. at 1). Kraft certainly has not shown substantial justification for delaying until three months after the close of discovery to identify three new witnesses who it claims can provide "greater detail" about the production records than Kraft's originally-identified witness, Mr. Tamblin. Cf. Opp. at 1 (conceding that the public-use issue was an "existing defense that had been extensively discovered").

Mr. Tamblin was deposed on April 2 (the day after discovery closed). He testified that he was not the custodian of the production records. His involvement with production records was limited to the traditional coffee packing business where he was employed. See Tamblin Depo. (Ex. 5)[1] at 55 (Q: Are you the custodian for that data? A: No.").[2] Keurig noted Mr. Tamblin's ignorance in its summary judgment letter opposition, filed April 16. (D.I. 91).[3] Kraft claims that it identified the new witnesses in response to Keurig "challeng[ing] Mr. Tamblin's testimony" (Opp. at 2), but offers no justification for waiting three months after Keurig's filing to do so.

---

[1] Keurig's opening brief included Exs. 1-4. Exhibits to this brief begin at Ex. 5.

[2] ████████████████████████████████████████ It is difficult to understand how Kraft could now contend that Mr. Tamblin is the "current custodian" for this data. (Opp. at 2).

[3] Kraft says that Keurig's challenge occurred "after the close of discovery." (Opp. at 1). Of course it did. The production records were produced on March 18 and Mr. Tamblin was deposed on April 2, the day after discovery closed.

Moreover, Kraft mischaracterizes Keurig's challenge to the production records (and Mr. Tamblin's testimony thereon) as relating to "authenticity." Id. This is wrong. The parties agree that the document is what Mr. Tamblin says it is, see Fed. R. Evid. 901(a) – a copy of the report that he generated from Kraft computer data as it existed in March 2008. Keurig simply maintains that nothing about this document, or Mr. Tamblin's related testimony, contradicts sworn testimony from Kraft's Rule 30(b)(6) designee Mr. MacMahon establishing that the ███████████████████████ Mr. MacMahon testified that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Mr. Tamblin, who was never the custodian of the data and knew nothing about the ███████████ production lines, could not and did not contradict Mr. MacMahon's testimony ███████ ███████ (D.I. 110 at 2). At the close of discovery, all evidence pointed in only one direction – ███████ production did occur during the relevant time period, and the purported production records produced by Kraft were incomplete and unreliable.[5] Kraft says that Keurig's challenge led it to "discover" the three new witnesses, but provides no explanation why it took three months for that discovery to occur regarding a defense that Kraft has pressed since the beginning of the case. All three are Kraft employees working in the same Kraft office complex as Mr. Tamblin and numerous other Kraft personnel who were deposed during two separate trips by counsel to England.

---

[4] Contrary to Kraft's assertion in its opposition brief (at 2), Mr. MacMahon most certainly did testify about "production records." (Ex. 6 at 73-75).

[5] For this reason, Keurig moved in limine to exclude the production records. (D.I. 110).

## II. Keurig Would Be Prejudiced if the New Witnesses Were Permitted to Testify.

Kraft now proposes to introduce the testimony of three additional witnesses to contradict Mr. MacMahon, Kraft's computer personnel, and Mr. Tamblin. With less than two months before trial, it would defy "fundamental fairness" (Opp. at 1) to permit Kraft to re-write the record that Kraft itself created – with its own witnesses – during the discovery period.[6]

Preclusion is the only appropriate remedy because depositions at this late stage would not remedy the prejudice to Keurig. ███████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Fairness would dictate that Keurig have the opportunity to re-depose Mr. MacMahon and to question the computer personnel who ███████████████████████████████████████ ███████ Keurig would also need to retain an expert to scrutinize the computer system suddenly at issue. With discovery having ended five months ago, the final pre-trial order being submitted today, and trial less than two months away, this is neither practical nor reasonable. See Transclean Corp. v. Bridgewood Servs., Inc., 77 F. Supp. 2d 1045, 1064 (D. Minn. 1999) (belated disclosure was not harmless, as the proposed reopening of discovery "would wreak its own distinctive prejudice"), vacated in part on other grounds, 290 F.3d 1364 (Fed. Cir. 2002).

---

[6] Kraft cites Newman v. GHS Osteopathic, Inc., 60 F.3d 153 (3d Cir. 1995) for its argument that that the untimely disclosures were "harmless." (Opp. at 3-4). The Third Circuit's decision suggests nothing of the sort. In Newman, the moving party – an ex-employee alleging discriminatory termination – attempted to preclude the defendant from calling the very supervisors with whom the ex-employee had clashed. Id. at 154-55. He plainly knew their names and had "relevant knowledge" of them "well before trial." Id. at 156. More importantly, the defendant's initial disclosures did identify the witnesses. The plaintiff had unquestionably received at least a cover letter referencing the initial disclosures (if not the initial disclosures themselves) during discovery and, at a minimum, "should have sought the list." Id. By contrast, Kraft identified Mr. Adams, Mr. Brown and Mr. Gage-Smith only well after discovery closed.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on September 2, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on September 2, 2008, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

### BY E-MAIL

> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> /s/ *Karen E. Keller*
> John W. Shaw (No 3362) [*jshaw@ycst.com*]
> Adam W. Poff (No. 3990) [*apoff@ycst.com*]
> Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
> (302)-571-6600
>
> *Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 5

Case 1:07-cv-00017-GMS   Document 144-2   Filed 09/02/2008   Page 1 of 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG INCORPORATED

        Plaintiff      : Civil Action No.
                             : 07-017 GMS
           v

KRAFT FOODS GLOBAL, INC
TASSIMO CORPORATION, and
KRAFT FOODS INC,
        Defendants

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL TAMBLIN

On Wednesday, 2nd April 2008

Commencing at 10.24 am

Taken at:
Baker Botts
41 Lothbury
London
EC2R 7HF
United Kingdom

Reported by: Miss Pamela Henley

KEURIG v KRAFT                   2 APRIL 2007      DEPOSITION OF M. TAMBLIN

Page 54

1           Tamblin - Rader
2      A.   Without looking to see what the
3  pack size is I really could not answer.
4      Q.   Okay. Do you know when the various
5  Lambert and Rychiger lines were installed?
6      A.   No, I do not.
7      Q.   R2 would that be --
8      A.   Rychiger 2.
9      Q.   -- if you could just turn to the
10 second page of the exhibit, if you look at the
11 first three rows you have a shift A on 9/28/1994;
12 do you see that?
13     A.   Yes.
14     Q.   Then you have a shift B on
15 9/29/1994, and then a shift A on that same date;
16 is that -- am I reading that right, that both
17 shift A and shift B worked on that product on 29th
18 September 1994?
19     A.   That is correct, yes.
20     Q.   If there is a gap between days what
21 does that suggest?
22     A.   It could either be a week-end where
23 it would not normally run, or it could be the line
24 was off for maintenance work.
25     Q.   Do you know how the line speeds of

Page 55

1           Tamblin - Rader
2  the Rychiger and Lambert lines compare?
3      A.   I do not know without looking at
4  the information that is in these sheets.
5      Q.   You would look to the sheets for
6  that?
7      A.   Yes.
8      Q.   So the data that your query brought
9  out into the Excel spreadsheet, is it part of your
10 job to manage that data in your current job?
11     A.   No.
12     Q.   Are you custodian for that data?
13     A.   No.
14     Q.   So you just use your query to get
15 it because you were asked to do that?
16     A.   For this particular spreadsheet,
17 yes. But on a weekly basis I use the application
18 to run the efficiency reports which are then sent
19 out to senior management.
20     Q.   Do those efficiency reports include
21 the singles product line?
22     A.   Yes, but it is -- as a line it does
23 not go into individual SKU detail. It would say
24 for this week line 1 should have produced 85 per
25 cent and produced 75.

Page 56

1           Tamblin - Rader
2      Q.   So you would do that for Lambert
3  and Rychiger?
4      A.   It is done by area, so it is done
5  for Maxpax coffee and flexibles.
6      Q.   So all of Maxpax would be lumped
7  together in that?
8      A.   Yes.
9      Q.   You would not be breaking out a
10 particular singles line?
11     A.   Not at all.
12     Q.   Were you ever responsible for
13 managing this particular data at any point in
14 time?
15     A.   Can you explain what you mean by
16 "managing".
17     Q.   At any point in time was it part of
18 your job to be the custodian for this data, to
19 have responsibility for it?
20     A.   Not for Maxpax. Within coffee area
21 when I was coffee production manager it was my
22 responsibility to input the line speeds and so on.
23     Q.   Who asked you to run the query to
24 provide this data?
25     A.   It came from one of our purchasing

Page 57

1           Tamblin - Rader
2  people. It was via John MacMahon.
3      Q.   You know Mr MacMahon?
4      A.   Yes.
5      Q.   How do you know him?
6      A.   We started within a few weeks of
7  each other at Kraft, or General Foods as it was
8  then.
9      Q.   Have you -- over the years have you
10 worked with him?
11     A.   Not in the last 25 years, no.
12     Q.   I think that is it. I am done.
13 Thank you for your time. If Mr Foster wants to
14 ask any questions he can do that.
15          MR FOSTER: Yes, I have a couple of
16 questions. Can you take a look through Exhibit 201
17 and tell me is this the entire amount of data that
18 you generated about Maxpax production?
19     A.   It should be the full year because
20 it is sorted by product code. It certainly looks
21 as if it was. This was the first year so it was
22 not a full year. This was the first year the
23 application was introduced, '94, so it is only a
24 part year.
25     Q.   So this is only a portion of the

15 (Pages 54 to 57)

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY