**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION *IN LIMINE* TO LIMIT EXPERT
TESTIMONY OF DR. ALEXANDER SLOCUM**

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700

Dated:  August 25, 2008
Public Version Dated:  September 2, 2008
880808 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Tel:  302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants
Kraft Foods Global, Inc., Tassimo
Corporation, and Kraft Foods Inc.*

In its response ("Opp'n"), Keurig concedes both that Dr. Slocum is not a coffee expert and that Dr. Slocum did not expressly mention "aspect ratio" in either of his reports. Dr. Slocum, who is admittedly not an expert in the coffee or beverage fields, is not qualified under *Daubert* to provide expert testimony as to whether the prior art Kenco Singles cartridge (the "Singles cartridge") produces a "beverage" and cannot provide a lay opinion under the guise of "expert" testimony. Further, Keurig attempts to equate Dr. Slocum's aspect ratio theory with a single statement regarding burrowing made in his rebuttal report. Slocum Rebuttal Rep. (Ex. 1) at 25. Dr. Slocum's theories of burrowing and aspect ratio, however, are distinct, and, thus, the burrowing statement is not sufficient identification of his aspect ratio theory. Thus, this Court should preclude Dr. Slocum from testifying as to these issues.

## ARGUMENT

### I.     Dr. Slocum's Testimony Related to "Beverage" Should Be Excluded.

As explained in the Defendants' Motion *in Limine* to Preclude the Expert Testimony of Ted Lingle, testimony in which Ted Lingle construes the claim term "beverage" and sets criteria for determining whether a liquid constitutes a "beverage" under his claim construction is inadmissible. Yet, Dr. Slocum has indicated that he is relying on Mr. Lingle's expert opinion. Slocum Depo. Tr. (Ex. 2) at 210:4-6. Dr. Slocum should not be permitted to provide testimony related to or relying upon Mr. Lingle's inadmissible expert opinion. Nor should Keurig be permitted to indirectly provide Mr. Lingle's inadmissible opinions through Dr. Slocum's testimony. Keurig concedes that Dr. Slocum is not a coffee expert. Opp'n at 4. Nevertheless, it continues to seek to offer his opinion, which is based upon his lay palate[1], that the liquid produced by the Singles cartridge is not a "beverage." *Id.*

---

[1] During his deposition, Dr. Slocum asserted that he would offer his lay opinion, relying on his lay palate, at trial whether the liquid produced was a beverage. Ex. 2 at 210:7-211:2.

Further, Dr. Slocum should be precluded from testifying regarding the measurement of the total dissolved solids ("TDS") in liquids produced by the Singles cartridge using the same-side piercing method. The '762 patent does not mention TDS nor has Keurig established that one of ordinary skill in the consumer packaging art, when considering the plain and ordinary meaning of "beverage," would use such measurement. Rather, TDS is one of the criteria set by Mr. Lingle. Second, as Dr. Slocum admitted, Mr. Lingle measured the TDS, not him. Ex. 2 at 113:14-18, 200:24-201:5. Dr. Slocum does not purport to be an expert with regard to TDS measurements or the use of TDS as a criteria to determine what constitutes a "beverage." Thus, there is absolutely no basis for Dr. Slocum's testimony as to Mr. Lingle's TDS measurements.

Further, Dr. Slocum's testimony regarding whether the liquid produced by the Singles cartridge is a "beverage" and regarding the TDS measurements of such liquids plainly fails to satisfy the *Daubert* standard for expert testimony, and cannot be used as a backdoor through which to offer Mr. Lingle's inadmissible opinions. The Supreme Court requires that expert testimony be based on scientific knowledge derived by the scientific method. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 590 (1993). Because he is not an expert in the coffee field, Dr. Slocum's testimony as to whether the liquid produced constitutes "coffee" is nothing more than unsupported speculation. Accordingly, it should be excluded under *Daubert*. Additionally, Dr. Slocum's lay opinion as to whether the liquid produced constitutes "coffee" must be excluded under Rule 701 because Dr. Slocum is testifying as an expert. FED. R. EVID. 701 (stating that lay opinion testimony only is admissible "[i]f the witness is not testifying as an expert"). Therefore, this Court should preclude Dr. Slocum from offering such testimony.

## II. Dr. Slocum's Aspect Ratio Theory Was Not Identified Until His Deposition.

Keurig argues that Dr. Slocum's aspect ratio theory "merely explains his description of the 'burrowing' phenomenon[,]'" which was identified in his rebuttal report. Opp'n at 4.

2

Contrary to Keurig's assertions, the two theories are not the same. Dr. Slocum distinguished the burrowing phenomenon from the aspect ratio theory, stating that the aspect ratio problem existed in the absence of the burrowing phenomenon:

> Q. Mm-hmm. Okay. If you -- if you pierced up here within the manifold, would you have the same problem?
> A. I don't think you'd have the -- well, <u>you wouldn't have the burrowing issue</u>.
> Q. Right.
> A. What you have here now, as I mentioned earlier, this <u>aspect ratio problem</u>. Now you're really severe on your aspect ratio, because your piercing device is on the order of the size of this dimension, but the foil goes way off on the other sides, and the foil -- my experience in playing with these things is you get kind of a trough shape and then the fluid definitely squirts out.

Ex. 2 at 152:25-153:14 (emphasis added). The burrowing issue and the aspect ratio issue are not the same, and it cannot be maintained that the single-sentence reference to burrowing in Dr. Slocum's rebuttal report adequately identifies the aspect ratio theory for purposes of Rule 26. FED. R. CIV. P. 26(a)(2)(B). Further, if an expert fails to identify an issue in his reports, mentioning the undisclosed issue during deposition "does not serve to place . . . [the proffered] testimony within the scope of [the] expert report." *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 237 F.R.D. 106, 113 (D. Del. 2006). Even if the issues were the same, which they clearly are not, Dr. Slocum never mentioned burrowing issue with respect to the '234 Patent in either of his reports, and, therefore, his opinion must be excluded with respect to the '234 Patent.

As Keurig conceded in its opposition, Dr. Slocum did not directly reference the aspect ratio theory in his reports. Instead, Dr. Slocum identified this theory for the first time during his deposition. Thus, Dr. Slocum's testimony as to the aspect ratio theory should be excluded.

## CONCLUSION

For the foregoing reasons, Kraft respectfully requests that the Court grant its Motion *in Limine* to limit Dr. Slocum's expert testimony at trial.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700

By:  /s/ David E. Moore
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 North Market Street
     P.O. Box 951
     Wilmington, DE  19899-0951
     Tel: 302-984-6169
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

Dated:  August 25, 2008
Public Version Dated:  September 2, 2008
880808 / 31118

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 2, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on September 2, 2008, the attached document was Electronically Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: /s/ David E. Moore
    Richard L. Horwitz
    David E. Moore
    Potter Anderson & Corroon LLP
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF DELAWARE
     - - - - - - - - - - - - - - - - - - - - - - - - x
 3   KEURIG, INCORPORATED,
 4                    Plaintiff,
 5        v.
 6   KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
     KRAFT FOODS INC.,
 7
                     Defendants.
 8
     Civil Action No. 07-CV-0017-GMS
 9   - - - - - - - - - - - - - - - - - - - - - - - - x
10
11
12      VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM
13               Wednesday, June 11, 2008
14                9:10 a.m. to 5:00 p.m.
15            WOLF, GREENFIELD & SACKS, P.C.
16                 600 Atlantic Avenue
17                Boston, Massachusetts
18
19        Reporter:  Marianne R. Wharram, CSR/RPR
20
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24             New York, New York 10022
                    212-750-6434
25                   REF: 87765
```

SLOCUM

1
2      A. -- you see on the far right-hand side
3   there's that arrow --
4      Q. Yes.
5      A. -- coming up? So that diameter of that
6   circle is -- that outer perimeter of that circle is
7   what, when the piercer goes through the foil which
8   covers the hole, it keeps moving forward until the
9   -- the little -- I think it's an O-ring, whatever
10  the structure is that pushes -- pushes down hard
11  against that --
12     Q. Right.
13     A. -- and now the seal is formed by pushing
14  hard against the foil, which is backed up by that
15  perimeter of the hard plastic, and that's what
16  forms a seal. I'm not just -- and there are other
17  ways of sealing, but that's the way this particular
18  cartridge allows me to pierce it to accommodate the
19  inflow so I just don't get this violent squirting
20  out ever.
21     Q. Okay. What other ways are there to seal?
22     A. What other ways are there to seal?
23     Q. Yes.
24     A. Well, for example, as I mentioned earlier,
25  the K-cup, which pierces the foil and there is

SLOCUM

1
2   nothing behind it to push against --
3      Q. Right.
4      A. -- so then it has this rubber kind of like
5   an inverted cone type lip seal. And I've designed
6   a lot of seals in the past. I think I could design
7   some O-ring-based systems, so that's my answer.
8      Q. So it's not necessary to have a structure
9   abut against it to create a seal?
10     A. I think -- right. I could seal just like
11  the K-cups do now without having that particular
12  back-up, but this is one way to do it.
13     Q. Could you -- could you seal the Kenco
14  Singles without a hard structure to abut against?
15     A. The reason I'm hesitating is if you look at
16  a K-cup or -- let me point to the patent. The
17  second embodiment, when I push down on the center,
18  if this is a square lid -- the K-cup is a round lid
19  which is a symmetric structure, so when you push on
20  it, you'll get symmetric deformation and the ring
21  is symmetric, and so everything -- you have a good
22  change of every-- actually, it does seal well.
23        When you have a square, when you push
24  on it, you tend to get folds. It's the same reason
25  why it's hard to take a sheet of paper and fold it

SLOCUM

1
2   over a cone. And the more non-square it is, the
3   harder it is, so that's why I can't answer yes or
4   no on that. I -- I'd do my darnedest to try and I
5   think there's probably a pretty good chance I could
6   figure out how to, for example, adopt the Keurig
7   nozzle and seal to work, to seal against the foil
8   of a rectangular shape, for example, shown in the
9   first embodiment.
10     Q. So if I understand you correctly, the
11  absence of a hard surface to abut against is not
12  fatal to the ability to pierce the foil to permit
13  an inflow of liquid?
14     A. I don't -- I think the answer is correct.
15  I don't think the patent requires -- and I actually
16  don't think you have to have -- it depends what
17  pressures you want to do. I don't think you have
18  to have a hard abut.
19     Q. Now, if you would look at -- if you would
20  look at the claim, look at page 3, first element.
21  Said filter element being permeable to liquid to
22  accommodate a flow of the beverage from said first
23  chamber to said second chamber. Do you see that?
24     A. I do.
25     Q. And you opined that that is present; is

SLOCUM

1
2   that correct?
3      A. I do.
4      Q. And what did you do to make this
5   determination?
6      A. Well, I -- I bought a Tassimo machine --
7      Q. Yes.
8      A. -- and I used it.
9      Q. Okay.
10     A. And it made coffee.
11     Q. Well, you say it made coffee. Why do you
12  say it made coffee?
13     A. I drank it.
14     Q. Did you test it?
15     A. You mean with the TDS?
16     Q. Yes.
17     A. No, I did not. And -- okay. And is that
18  the answer as far as --
19     Q. You said and something. What were you
20  going to say?
21     A. Oh, and then I had taken apart the
22  cartridges. Fluid goes in here, hence the coffee.
23  The only way out is through that papery thing. And
24  when it makes coffee, I get a liquid with, you
25  know, some -- coffee has some -- grit is not the

SLOCUM

1
2    A.  I don't know.
3    Q.  Okay.  It is clear -- it says it is clear
4  from context that the laminated foil is intended to
5  cover compartment, 21, only.  The outlet, 37, if
6  covered, would be covered by a separate foil.  What
7  do you mean it's clear from context the laminate
8  foil is intended to cover compartment, 21, only?
9    A.  They only talk about covering the coffee
10  bed region with foil.  I don't have any indication
11  that the teaching says continue the foil and also
12  cover outlet, 37.
13    Q.  Well, doesn't it say, quote, in use, a
14  laminated foil is sealed along the lower edge, 23,
15  of the body portion, and isn't this part of 23,
16  lower edge of the body portion?
17    A.  Well, yes and no.  Sure, you could seal it
18  everywhere as we just said.  I'm not precluded from
19  running one strip of foil everywhere, but no in the
20  context of someone practicing it.  I'm only going
21  to put the foil where I need the foil.  And there's
22  nothing that teaches me that I need the foil over
23  there.  And like, again, the Lambert cartridges,
24  for example, don't use foil.  The Rychiger ones do
25  have a covering, although not foil, so sometimes

SLOCUM

1
2  you do and don't.  This is the outlet, 37, you're
3  talking about, right?
4    Q.  Right.
5    A.  That's what I'm saying.  Sometimes as
6  practiced in the art 37 is covered and sometimes
7  it's not.  And I'm saying 37 as in figuratively,
8  not this particular patent.
9    Q.  Okay.  The -- now, in paragraph -- excuse
10  me.  In paragraph six you say, if you turn to page
11  two, paragraph 6, second sentence, moreover, the
12  lid that is disclosed in the '234 patent is not
13  pierceable to accommodate an inflow of liquid,
14  paren, i.e., capable of being pierced to permit a
15  flow of liquid into, end quote, based on the
16  Court's claim construction to brew a coffee
17  beverage that can be extracted through the same lid
18  as required by the asserted claims.  Do you see
19  that?
20    A.  I do.
21    Q.  Just so I understand, it's not -- you said
22  the lid is not pierceable.  Now, is it -- you say
23  it's not pierceable to accommodate an inflow of
24  liquid.  Is it not capable of being punctured to
25  allow inflow of liquid?  I'm just trying to see

SLOCUM

1
2  where the dispute is.
3    A.  Okay.  I think earlier this morning we did
4  kind of a mapping between the Singles cartridge and
5  this cartridge where I pointed out that on
6  Figure 4, which is the other side, that the
7  castellations on the bottom form essentially the
8  same function as the filter paper.
9    Q.  Right.
10    A.  So I read this in terms again of the
11  function that this cartridge has to do when I read
12  the claim.  So where I think we will have a problem
13  -- there's two problem areas with this design and
14  if we use it with -- using the input thing to punch
15  through the foil here.  The first problem area that
16  we discussed extensively earlier was the issue of
17  do we have a leak or a weep versus a catastrophic
18  failure and I think we addressed that already in
19  terms of all the different possibilities, but
20  making the beverage, then we're going to have the
21  same burrowing issue here as we do the aspect ratio
22  problem I see of injecting water in here directly
23  as opposed to bringing this water in through this
24  encircling manifold.
25    Q.  Mm-hmm.  Okay.  If you -- if you pierced up

SLOCUM

1
2  here within the manifold, would you have the same
3  problem?
4    A.  I don't think you'd have the -- well, you
5  wouldn't have the burrowing issue.
6    Q.  Right.
7    A.  What you have here now, as I mentioned
8  earlier, this aspect ratio problem.  Now you're
9  really severe on your aspect ratio, because your
10  piercing device is on the order of the size of this
11  dimension, but the foil goes way off on the other
12  sides, and the foil -- my experience in playing
13  with these things is you get kind of a trough shape
14  and then the fluid definitely squirts out.
15    Q.  Wouldn't the fluid go along the manifold?
16    A.  No, this is not the fluid squirting out --
17  I mean, the fluid would go along the manifold, but
18  it's very hard to make a -- I was not able to make
19  a seal on this just playing with -- on the Singles
20  cartridges, because the Singles cartridges also
21  have that -- I wish we had one here -- zone on this
22  manifold side that you could pierce way off on the
23  edge.
24    Q.  Yeah, but if you pierced in here, in the
25  center, okay, it would distribute along the

Page 198

SLOCUM

1
2    A.  Yeah, the thing doesn't function unless
3    it's with a brewer.
4    Q.  And it has to have the support of the
5    clamping mechanism, doesn't it?
6    A.  Yeah, you'd have to hold the -- you have to
7    hold the thing in place.
8    Q.  Okay.  Now, paragraph -- okay.  Now, you --
9    if you turn to page 14, paragraph 40, I have tested
10   Singles cartridges under various conditions to
11   evaluate that they meet these claim requirements,
12   and I conclude they do not.  I therefore disagree
13   with Mr. Taylor's conclusion.  What various
14   conditions?
15   A.  Well, let me go to my chart.
16   Q.  Page 21?  No, 23.
17   A.  It was 23 in the other report, I think.
18   Q.  Well, I have it on 23 here.
19   A.  Oh, yes.  Right.  Thank you.  Foil down
20   with plate, foil down with plate with different
21   pressures, then I did up with plate and I did two
22   different pressures, two different runs.  Or excuse
23   me; nominally the same pressure, but two runs, foil
24   up with plate at a low pressure, then vertical, so
25   I did all these different conditions in my table

Page 199

SLOCUM

1
2    here.
3    Q.  Okay.  Looking at tests 6 and 7 --
4    A.  Mm-hmm.
5    Q.  -- you tested at 3.1 PSI and at 15 PSI; is
6    that correct?
7    A.  Correct.
8    Q.  How did you decide on those pressures?
9    A.  What I did was I played with pressure to
10   get a cup of coffee in what was a reasonable time,
11   and if I recall correctly, I asked -- I think the
12   Keurig device uses -- is a low pressure device.
13   It's like around the 3 PSI.  The higher pressure
14   came from -- I believe that was one of the
15   depositions and -- and I think that was actually
16   even higher, like the 20 PSI.  But that -- I can't
17   remember which of the Kraft people said their
18   Tassimo runs around 20 something, but you know, I
19   stepped things up.  You always start low and go
20   higher, and in my -- remember I said earlier I did
21   these preliminary tests to see what would happen,
22   because I wanted to do the actual coffee tests and
23   I wanted to be prepared.  And above 15 PSI, I would
24   typically get violent spurting.  And I did not want
25   to be playing with the hot water where I would get

Page 200

SLOCUM

1
2    violent spurting.
3    Q.  Okay, but what about below 15?
4    A.  I would get spurting, but not typically
5    violent spurting.
6    Q.  At what PSI's?
7    A.  Well, sometimes it would spurt at 3 PSI,
8    sometimes it would weep.
9    Q.  Okay.  I'm sorry.  Sometimes it would spurt
10   at 3 and sometimes it would weep?  Is that what you
11   just said?
12   A.  Yes.
13   Q.  So that indicates that you did more than
14   one test at 3.1 PSI?
15   A.  This is just where I did the total
16   dissolved solids.  I also did tests -- let me see
17   where -- where I just used the cold liquid.
18   Q.  After this report, what did you do?  Did
19   you do any more tests at 3 PSI with a hot liquid?
20   A.  When I did my initial test for set-up, I
21   did 3 PSI and I kept increasing it until I got to
22   15, and then it routinely would spurt and then I
23   was like I'm not going to go any higher.
24   Q.  Go ahead.  I'm sorry.
25   A.  The only tests I did at the low and the

Page 201

SLOCUM

1
2    higher -- you know, the 15, where I actually was
3    able to measure the TDS, that's when I was actually
4    with Mr. Lingle, because he's the person who does
5    those tests.
6    Q.  Okay.  And these were all the tests that
7    you did with Mr. Lingle, or did you do more with
8    Mr. Lingle?
9    A.  There may have been one or two other ones
10   where we were -- and then something went spliff and
11   we wouldn't be able to get a full cup, so I don't
12   know, maybe again as many where we couldn't get a
13   full cup, because it would spurt.  And part of my
14   thing was I needed to make a full cup of coffee in
15   this reasonable-ish time, because I'm playing
16   brewer, and can I actually make this beverage using
17   the Singles cartridge.
18   Q.  So one of the requirements is a full cup,
19   right?
20   A.  When I was not able to get a full cup --
21   Q.  Right.
22   A.  -- yeah, that would be a requirement,
23   because then I had a catastrophic failure.
24   Q.  It's not because you thought that the
25   patent required a full cup?

Page 210

SLOCUM

1   person.  I don't buy espressos.  I'm not really in
2   the mud -- the mud zone.
3       Q.  So is your opinion based on your personal
4   taste, or is it based on what Mr. Lingle told you?
5       A.  Both.
6       Q.  Okay.  And are you going to testify at
7   trial, render an opinion as to whether this
8   resulting beverage in test six, say, was a beverage
9   or not?
10      A.  To my lay palate --
11      Q.  Right.
12      A.  -- it's not.
13      Q.  Okay, but I'm asking you are you going to
14  offer -- render an opinion at trial whether it was
15  a beverage or not?
16      A.  If I'm asked at trial --
17      Q.  Yes.
18      A.  -- was six a beverage or not --
19      Q.  Right.
20      A.  -- I will say to my lay palate it was not.
21      Q.  So you're not an expert on that; is that
22  correct?
23      A.  Right.  That's why I said my lay palate.  I
24  am not an expert on that.  Mr. Lingle is the

Page 211

SLOCUM

1   expert.
2       Q.  Okay.  So one of ordinary skill in the art,
3   if they didn't have Mr. Lingle next to them, would
4   have to rely on their own taste preference; is that
5   correct?
6           MR. RADER:  Objection to form.
7       A.  Yeah, there is -- sorry.
8           MR. RADER:  Go ahead.
9       A.  There they'd get other lay people around,
10  typical consumers, people in the office and say
11  what do you think of this.  I would never design
12  something or release something like this that was
13  just based on my lonesome.  You've got to get some
14  -- some data or have an acknowledged expert who
15  will say -- who does have a lot of experience about
16  what's acceptable.
17      Q.  (BY MR. SCHLITZ)  And if there's data that
18  -- if you were presented with data that says that
19  consumers find acceptable a beverage that is 750
20  TDS, let's say, then you would say okay, that's a
21  beverage?
22          MR. RADER:  Objection to form.
23      A.  Yeah, if -- when you say if I was presented
24  with data that said consumers said, so I'm assuming

Page 212

SLOCUM

1   Mr. -- a Mr. Lingle tells me that if you can
2   consistently brew a better than 750, if that's a
3   beverage, I'm happy to say okay, you're the expert
4   telling me what will sell.
5       Q.  No, I'm saying if you don't have a
6   Mr. Lingle, you'd go to people in the office or
7   you'd rely on data, consumer data?
8       A.  Correct.
9       Q.  And I'm saying if you were presented with
10  consumer data that said that some people find a
11  beverage that has TDS of whatever number I gave
12  you --
13      A.  750.
14      Q.  -- 750, would you then say, well, that's a
15  beverage?
16          MR. RADER:  Objection to form.  Go
17  ahead.
18      A.  I guess so.
19      Q.  (BY MR. SCHLITZ)  Okay.  Now, if you turn
20  to paragraphs 41 and 42 of your opinion, 41 says a
21  Singles cartridge or single-serve beverage
22  cartridge is designed to be inserted into a Singles
23  brewing machine to produce a cup of coffee.
24  Diagram -- the Kraft diagram below shows how the

Page 213

SLOCUM

1   Kenco Singles cartridge works.  And so you
2   considered how the Singles was intended to work; is
3   that correct?
4       A.  Correct.
5       Q.  And it was intended to work in the
6   horizontal position, right?
7       A.  Correct.
8       Q.  Okay.  The Singles cartridge has a
9   generally rectangular hard plastic shell with an
10  opening on one side through which the coffee
11  grounds are introduced during manufacture, and it
12  goes on and you talk -- essentially, you describe
13  its intended use; is that correct?
14      A.  Correct.
15      Q.  What is the significance of its intended
16  use to your formulation of your opinion that the
17  Singles cartridge is not capable of being -- the
18  lid of the Singles cartridge is not pierceable --
19  capable of being pierced to permit an inflow of
20  liquid?
21      A.  Well, I look at the performance of the
22  device, the cartridge, and the way it was intended
23  to be used, and this is what I get out of it.  And
24  then I use it in this modified way that I was