IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>  Plaintiff,<br><br> v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 07-17 (GMS)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>) **PUBLIC VERSION**<br>)<br>)<br>) |

## KRAFT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF TED LINGLE

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants
Kraft Foods Global, Inc., Tassimo
Corporation, and Kraft Foods Inc.*

Dated: August 25, 2008
Public Version Dated: September 2, 2008
880806 / 31118

The basis for Kraft's Motion to Exclude the Testimony of Ted Lingle is simple. Keurig offers his testimony for impermissible purposes – claim construction of the term "beverage" and to impose criteria not specified in the '762 Patent. This is a usurption of the Court's role. Furthermore, far from assisting the jury in its factual determinations as Keurig suggests, Mr. Lingle's testimony would mislead the jury as to the requirements of Claim 1 of the patent.

As Keurig must, it admits the term "beverage" must be given its plain and ordinary meaning in this patent infringement action. If Keurig wanted to offer a different definition of "beverage," it should have done so during *Markman*. *See, e.g., O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (when the parties raise an actual dispute about the scope of claims, the Court must resolve that dispute during claim construction). Keurig does not dispute that it failed to request and obtain a claim construction from this Court on the term "beverage."[1] Rather, Keurig now seeks to have Mr. Lingle provide "expert" testimony as to the ordinary meaning of "beverage." It erroneously contends that the ordinary meaning of "beverage" is a factual question for the jury and that Mr. Lingle will assist the jury in making that "factual" determination. But in actuality Keurig is attempting to have Mr. Lingle give the word "beverage" a specialized meaning and impose criteria for whether a drink meets his claim construction of "beverage."

The ordinary meaning of beverage is clear: a "beverage" is a "liquid for drink; esp. such liquid other than water (as tea, milk, fruit juice, beer) usually prepared (as by flavoring, heating,

---

[1] Keurig claims that it raised the issue of the term beverage in August 2007 in its responses to Kraft's invalidity contentions. Opp'n at 3. That claim is disingenuous. While the word "beverage" appears in the responses, Keurig's discussion concerned whether the lid was pierceable to accommodate an inflow of liquid and an outflow of beverage. Keurig never asserted that Kenco Singles cartridge did not produce a "beverage." Keurig's undermines its position on the same page of its opposition. Right after Keurig claims that in August 2007 it explained that the Kenco Singles cartridges would not work to make a beverage, it then states it was not until January 2008 that it tested the Singles cartridges.

mixing) before being consumed." WEBSTER THIRD NEW INTERNATIONAL DICTIONARY (2002); *see also Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*, 515 F.3d 1331, 1337 (Fed. Cir. 2008) (supporting the use of the customary meaning of claim terms). Absent "expert" testimony, any jury will understand that familiar meaning. But Lingle testified that he believed "beverage" had a meaning different from the ordinary meaning. Lingle Depo. Tr. (Ex. 1) at 64. Dr. Slocum also understood that Lingle proposed a specialized definition of "beverage." Slocum Depo. Tr. (Ex. 2) at 8. Lingle ultimately defined "beverage" as "a brewed liquid (e.g., coffee) of sufficient strength and with adequate flavor and aroma profile so as to be accepted by consumers for purchase and consumption." Lingle Rebuttal Rep. (Ex. 3) at 2. This definition is not even remotely similar to the ordinary meaning of "beverage." Allowing Mr. Lingle to testify will mislead the jury into believing it should use Mr. Lingle's specialized meaning, not the ordinary meaning of "beverage."

Lingle's definition of "beverage" – coupled with a close examination of his rebuttal report – confirms that Keurig is attempting to improperly offer claim construction in the form of expert testimony. In support of his definition, Mr. Lingle cites to a statement about widespread acceptance the prior art had in the marketplace. He is clearly opining on the meaning of "beverage" in light of the specification. And, it is undisputed that construing a claim term in light of the patent specification is the sole province of the court. *See, e.g., O2 Micro*, 521 F.3d at 1360. For this reason alone, Kraft's motion to exclude should be granted.[2]

---

[2] In addition, Lingle's testimony on invalidity and infringement should be excluded. Keurig does not dispute that Lingle lacks the technical expertise in the art of the '762 Patent. Rather, Keurig states only that his "experience in coffee brewing, including as a coffee 'cupper' and renowned cupping trainer" somehow qualifies him to as an expert on the Singles cartridge. The fact that Lingle may be able to differentiate taste and aroma of one cup of coffee from another does not mean that he can opine on issues related to the structures of beverage filter cartridges.

2

Keurig's arguments find little support in the cited cases. *Cordis Corp. v. Medtronic AVE, Inc.* does not support the argument that an expert can construe claim language or that it is a question of fact.[3] *See* 511 F.3d 1157 (Fed. Cir. 2008). If anything, *Cordis* supports Kraft's position that claim construction is a matter of law that is the exclusive province of the courts. There, the Federal Circuit reversed the trial court's claim construction, substituted its own, and rejected AVE's positions that contravened that claim construction. The *Talecris* case is likewise inapposite. *Talecris* does not pertain to whether an expert can usurp the role of the court in claim construction. Rather, it pertains to the issue of indefiniteness, which is a factual issue. *See* 510 F. Supp. 2d 356, 360 (D. Del. 2007).

Lastly, the *Agere* case does not support Keurig's position either, but rather supports Kraft's position. Therein, the court instructed the jury that "to the extent that words are not defined as a matter of law then obviously they have the ordinary meaning that you [the jury] understand the words to mean." 2005 WL 2994702, *11 (E.D. Pa. 2005). The court reviewed the expert's testimony to ensure that his testimony did not offer an impermissible claim construction. *See id.* at *12. This suggests that an expert cannot provide claim construction, even with regard to words that are to be given their ordinary meaning.

## CONCLUSION

For the aforementioned reasons, Kraft's Motion *in Limine* to exclude the testimony of Mr. Ted Lingle should be granted.

---

[3] Furthermore, the *Cordis* panel did not hold that the appropriate methodology for measuring "substantially uniform thickness" is a question of fact. The court stated, "Even if the issue of the proper methodology for measurement should have been treated as a pure question of law, however, we reject AVE's argument that the trial court should have adopted AVE's methodology in determining how the wall thickness should be measured." 511 F.3d at 1168-69.

3

|  | POTTER ANDERSON & CORROON LLP |
|---|---|
| OF COUNSEL | By: /s/ David E. Moore |
|  | Richard L. Horwitz (#2246) |
| David M. Schlitz | David E. Moore (#3983) |
| William S. Foster, Jr. | Hercules Plaza, 6th Floor |
| C. John Brown | 1313 North Market Street |
| BAKER BOTTS L.L.P. | P.O. Box 951 |
| 1299 Pennsylvania Ave., N.W. | Wilmington, DE  19899-0951 |
| Washington, D.C. 20004-2400 | Tel:  302-984-6169 |
| Tel.  202-639-7700 | rhorwitz@potteranderson.com |
|  | dmoore@potteranderson.com |
|  |  |
| Dated:  August 25, 2008 | *Attorneys for Defendants* |
| Public Version Dated:  September 2, 2008 | *Kraft Foods Global, Inc., Tassimo* |
| 880806 / 31118 | *Corporation, and Kraft Foods Inc.* |

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on September 2, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on September 2, 2008, the attached document was Electronically Mailed to the following person(s):

| | |
|---|---|
| John W. Shaw | Michael A. Albert |
| Karen E. Keller | Michael N. Rader |
| Young Conaway Stargatt & Taylor | Laura Topper |
| The Brandywine Building | Gerald B. Hrycyszyn |
| 1000 West Street, 17th Floor | Wolf, Greenfield & Sacks, P.C. |
| P. O. Box 391 | 600 Atlantic Avenue |
| Wilmington, DE 19899-0391 | Boston, MA 02210 |
| jshaw@ycst.com | malbert@wolfgreenfield.com |
| kkeller@ycst.com | mrader@wolfgreenfield.com |
| | ltopper@wolfgreenfield.com |
| | ghrycyszyn@wolfgreenfield.com |

By: /s/ David E. Moore
　　Richard L. Horwitz
　　David E. Moore
　　Potter Anderson & Corroon LLP
　　Hercules Plaza, 6th Floor
　　1313 N. Market Street
　　P.O. Box 951
　　Wilmington, DE 19899-0951
　　(302) 984-6000
　　rhorwitz@potteranderson.com
　　dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF DELAWARE
     -------------------------------------X
 3   KEURIG, INCORPORATED,
 4                              Plaintiff,
 5   VS
 6   KRAFT FOODS GLOBAL, INC., TASSIMO
     CORPORATION, and KRAFT FOODS, INC.,
 7
                                Defendants.
 8
     Civil Action No. 07-CV-0017-GMS
 9   -------------------------------------X
10
11
12           VIDEOTAPED DEPOSITION OF TED R. LINGLE
13                  Friday, June 27, 2008
14                   9:11 a.m. - 2:05 p.m.
15              WOLF, GREENFIELD & SACKS, P.C.
16                    600 Atlantic Avenue
17                Boston, Massachusetts 02210
18
19     Court Reporter:  Loretta Hennessey, RDR, CRR
20
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24               New York, New York 10022
                      212-750-6434
25                    REF: 87840
```

Page 62

```
                LINGLE
 1
 2   it's based on the, my understanding of what the
 3   patent says.
 4       Q.  If you would turn to the first, not the
 5   coverage page but the first page of this rebuttal
 6   report.  Okay.  Are you there?
 7       A.  Uh-huh.
 8       Q.  Okay.  Under "Summary of Opinion," it
 9   says, on the fourth line -- well, let's read the
10   whole thing.  "In my opinion, piercing the foil lid
11   of a Singles cartridge containing ground coffee
12   (like those that Mr. Taylor and the Kraft employees
13   tested) and injecting a quantity of water into the
14   cartridge (as opposed to making use of the
15   pre-molded inlet hole on the side of the cartridge
16   opposite the foil lid)," and this is what I'm
17   interested in, "does not produce a 'beverage' within
18   the meaning of Keurig's '762 patent."  Do you see
19   that?
20       A.  Uh-huh.
21       Q.  You put the word "beverage" in quotations,
22   and you say "'beverage' within the meaning of
23   Keurig's '762 patent."  Do you see that?
24   Does the word "beverage" in Claim 1 of the patent,
25   where it appears, have a special meaning that's
```

Page 63

```
                LINGLE
 1
 2   different than the ordinary and usual meaning of
 3   that word?
 4       A.  I think that is defined in the patent as a
 5   brewed beverage.
 6       Q.  Right.
 7       A.  Okay?  And so I wanted to put the word in
 8   quotes to emphasize that we're using this word,
 9   which could be generic, in a very specific
10   application, and that's brewed beverage.
11       Q.  Okay.
12       A.  Again, brewed coffee beverage.
13       Q.  Wait.  Let's take this in parts.
14       A.  Okay.
15       Q.  You say, so it's not used in its generic
16   sense.  Do you mean its ordinary sense?
17       A.  Ordinary --
18           MR. RADER:  Objection to form.
19       Q.  Excuse me?
20       A.  Ordinary in what those of us who are
21   consumers would interpret that to mean, consumers of
22   a beverage, one that we purchased.
23       Q.  I'm sorry, and this is not your fault, I
24   just didn't understand what you just said.
25       A.  To me the word "beverage" in this
```

Page 64

```
                LINGLE
 1
 2   application, it means one that the average person
 3   would go out on a commercial level and purchase
 4   either for home use or for consumption away from
 5   home.
 6       Q.  Okay.  My question to you is, does
 7   "beverage" have a meaning in the patent that is
 8   different than its ordinary meaning?
 9       A.  I believe it does.
10       Q.  Okay.  What do you believe the ordinary
11   meaning of "beverage" is?
12       A.  The ordinary meaning would be a product
13   that could be either sold or consumed for a person's
14   enjoyment.
15       Q.  So it's --
16       A.  I mean, there would be certain categories
17   I would exclude.  I wouldn't include tap water in
18   the context of a beverage.
19       Q.  So you think the word "beverage" has a
20   commercial, has a commercial connotation?
21       A.  When I read the patent, then I was
22   assuming, my assumption is the average person
23   reading that patent would assume this was a beverage
24   for commercial application.
25       Q.  Okay.  And what is the basis of that
```

Page 65

```
                LINGLE
 1
 2   assumption?
 3       A.  That it basically talked about a brewed
 4   beverage, meaning one that was prepared in a way
 5   that involved controlled strength and controlled
 6   extraction in order to meet some beverage standard,
 7   either tea or coffee or whatever.
 8       Q.  And what is the word -- what is it in the
 9   words "brewed beverage" that to you connotes
10   controlled, some type of controlled standard?
11       A.  That's basically the science of coffee
12   brewing is controlling the extraction, controlling
13   the strength.  It's not a random process, it's a
14   controlled process.
15       Q.  Okay.  And is there anything explicit in
16   the patent that you point to that says it has to be
17   commercially acceptable?
18       A.  In the patent it uses the phrase
19   "widespread acceptance."
20       Q.  Right.
21       A.  Okay?  And when you're reading a patent
22   about a product that's designed to commercially
23   produce a beverage, then I think it's fair to assume
24   that that's the intent of those words.
25       Q.  Okay.  I'm sorry, you just said when
```

# EXHIBIT 2

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF DELAWARE
     - - - - - - - - - - - - - - - - - - - - - - - - - -x
 3   KEURIG, INCORPORATED,
 4                    Plaintiff,
 5        v.
 6   KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
     KRAFT FOODS INC.,
 7
                      Defendants.
 8
     Civil Action No. 07-CV-0017-GMS
 9   - - - - - - - - - - - - - - - - - - - - - - - - - -x
10
11
12       VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM
13                 Wednesday, June 11, 2008
14                  9:10 a.m. to 5:00 p.m.
15             WOLF, GREENFIELD & SACKS, P.C.
16                   600 Atlantic Avenue
17                  Boston, Massachusetts
18
19       Reporter:  Marianne R. Wharram, CSR/RPR
20
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                   REF: 87765
```

Page 6

```
                SLOCUM
 1
 2   performed in this case?
 3       A.  So I was asked as an expert to look at the
 4   patent-in-suit -- excuse me -- and answer whatever
 5   questions I could for them in terms of technically
 6   what is happening in the use of -- for example,
 7   specifically in the expert report, I -- I believe
 8   you have a copy of, these Kenco Singles cartridges
 9   and how they function, and then my report details
10   all the questions I answered and the work I did on
11   them.
12       Q.  Let's break that down a little bit.  When
13   did you start working on this case?
14       A.  Sometime last year.  I -- I don't recall
15   the exact date.
16       Q.  Was it in the winter of last year, the
17   fall, the spring, fall?
18       A.  Well, I believe it was last fall I started
19   the experiments.
20       Q.  You started the experiments, but you said
21   you studied the patent.  When did you study the
22   patent?
23       A.  I don't -- I don't recall the exact date.
24       Q.  Well, I'm not asking you the exact date.
25   I'm asking you the approximate date.
```

Page 7

```
                SLOCUM
 1
 2       A.  It was -- It was last year, I think
 3   fall-ish time.
 4       Q.  And how much time did you spend studying
 5   the patent?
 6       A.  When you say studying the patent, I read it
 7   through, tried to understand all the elements, and
 8   I probably spent on that part -- a wild guess is
 9   maybe a day total in terms of actually just reading
10   the patent and understanding it well.
11       Q.  You say that part.  Is there any other part
12   of your study of the patent?
13       A.  Everything in conjunction with my report,
14   because I would refer back to the patent to
15   understand the terms, you know, the Court's claim
16   construction that was issued.  I had to make sure
17   that when I was looking at, for example, the Kenco
18   Singles cartridges and performing and designing my
19   tests that what I did would be able to address the
20   issues that Mr. Rader asked me to look at.
21       Q.  And in studying the patent, did you come to
22   some conclusions about what the terms in the patent
23   mean?
24       A.  I believe I understand what the terms mean
25   and also what the Court told me in the
```

Page 8

```
                SLOCUM
 1
 2   construction, or claim construction, what different
 3   terms mean.  That's what I have to ultimately abide
 4   by is what is the Court's claim construction.
 5       Q.  In your expert report, you opine about the
 6   meaning of the word beverage; is that correct?
 7           MR. RADER:  Objection to the form.  You
 8   can answer.
 9       A.  Well, my understanding for the term
10   beverage -- because I'm not an expert in that area,
11   I relied -- the Court itself didn't give me an
12   exact definition of what beverage is.  I have to
13   refer back explicitly to that document, but in that
14   respect, I relied on Mr. Lingle, who is an
15   acknowledged expert in the field of coffee
16   beverages.  And then, when I actually ran the
17   various tests in various scenarios, I also, because
18   I'm a fairly avid coffee drinker, would then taste
19   the stuff made by the various ways I did.
20       Q.  (BY MR. SCHLITZ)  But when you read the
21   patent, what was your understanding?  Before --
22   when did you speak to Mr. Lingle?
23       A.  I first met Mr. Lingle a couple of months
24   ago when I did my extensive tests with the hot
25   water to actually attempt to create the beverage.
```

Page 9

```
                SLOCUM
 1
 2   Prior to that time, I had done some preliminary
 3   tests, also using hot water, and I don't recall if
 4   the Court -- I had the claim construction at the
 5   time.  I'm not sure it would have made a difference
 6   at that point, because again, the Court doesn't
 7   define beverage -- and I have to look again -- in
 8   terms of a scientific definition, but prior to
 9   that, my definition, to answer your question, of
10   beverage, if I make -- excuse me -- coffee using a
11   product in the way it's supposed to be used, and
12   then I make coffee with the same product in the way
13   that I was asked to test it, they should taste the
14   same if it's making a beverage, just to my own
15   palate.
16       Q.  So that's your -- that was your definition
17   of beverage, when you read the patent?
18           MR. RADER:  Objection to the form.
19   Mischaracterized, but you can answer.
20       Q.  (BY MR. SCHLITZ)  I don't want to
21   mischaracterize your testimony, Doctor.  I'm just
22   trying to understand.  What you just said is your
23   -- was your understanding of beverage; is that
24   correct?
25       A.  Correct.  You said what was my
```

# EXHIBIT 3

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**