IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>    Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>    Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED –<br>PUBLIC VERSION** |

**PROPOSED JOINT PRETRIAL ORDER**
**Volume I OF II**

| | |
|---|---|
| YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP<br><br>John W. Shaw (No. 3362)<br>Karen E. Keller (No. 4489)<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, DE 19801<br>(302) 571-6600<br>jshaw@ycst.com<br>kkeller@ycst.com<br><br><br>*Attorneys for Plaintiff Keurig, Incorporated*<br><br><br>*Of counsel:*<br><br>Michael A. Albert<br>Michael N. Rader<br>Charles T. Steenburg<br>WOLF, GREENFIELD & SACKS, P.C.<br>600 Atlantic Ave.<br>Boston, MA 02210<br>(617) 646-8000 | POTTER ANDERSON & CORROON LLP<br><br>Richard L. Horwitz (No. 2246)<br>David E. Moore (No. 3983)<br>Hercules Plaza, 6th Floor<br>Wilmington, DE 19899<br>(302) 984-6000<br>rhorwitz@potteranderson.com<br>dmoore@potteranderson.com<br><br><br>*Attorneys for Defendants Kraft Foods Global,<br>Inc., Tassimo Corporation, and Kraft Foods Inc.*<br><br><br>*Of counsel:*<br><br>David M. Schlitz<br>William S. Foster, Jr.<br>C. John Brown<br>BAKER BOTTS LLP<br>1299 Pennsylvania Ave., NW<br>Washington, DC 20004<br>(202) 639-7700 |

This matter having come before the Court at a pretrial conference to be held on September 22, 2008 pursuant to Fed. R. Civ. P. ("Rule") 16, and John W. Shaw and Karen E. Keller of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, DE 19801, (302) 571-6600; as well as Michael A. Albert, Michael N. Rader, and Charles T. Steenburg of Wolf Greenfield & Sacks, P.C., 600 Atlantic Ave., Boston, MA 02210, (617) 646-8000 having appeared as counsel for plaintiff Keurig, Incorporated ("Keurig") and David E. Moore of Potter Anderson & Corroon, LLP, Hercules Plaza, 6th Floor, Wilmington, DE 19899, (302) 984-6000, as well as David M. Schlitz and William S. Foster, Jr. of Baker Botts LLP, 1299 Pennsylvania Ave., NW, Washington, DC 20004, (202) 639-7700 having appeared as counsel for defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft"), the following actions were taken:

(1)     This is an action by Keurig for patent infringement, including a claim for willful infringement, and the jurisdiction of the Court is involved under 28 U.S.C. §§ 1331, 1338. Kraft has filed counterclaims for declaratory judgment of noninfringement and invalidity.[1] Jurisdiction is not disputed with respect to Kraft Foods Global, Inc. and Tassimo Corporation. Keurig seeks damages adequate to compensate for Kraft's alleged infringement of U.S. Patent No. 6,607,762, including prejudgment and post-judgment interest and costs. Keurig also seeks treble damages and attorneys fees. Keurig further seeks permanent injunctive relief. Kraft seeks attorneys fees.

(2)     The following stipulations and statements were submitted and are attached to and made a part of this Order.

---

[1] Kraft has moved for leave to amend its answer and counterclaims to assert inequitable conduct. (D.I. 81). Keurig has opposed Kraft's motion for leave to amend. (D.I. 94).

(a)     A comprehensive stipulation or statement of all uncontested facts, which will become a part of the evidentiary record in the case, and which may be read to the jury by the Court or any party, is attached as Exhibit 1.

(b)     Keurig's statement of the contested issues of fact and law is attached as Exhibit 2. Kraft's statement of the contested issues of fact and law is attached as Exhibit 3.

(c)     The parties' consolidated exhibit list is attached as Exhibit 4, including columns for the parties' objections.  The parties reserve the right to use additional exhibits as needed for impeachment purposes.  In addition, each party reserves the right to use exhibits already listed by the other party in any way consistent with the rules of evidence.

Demonstrative Exhibits: The parties will provide each other with advance copies of demonstrative exhibits no later than 8:00 PM the day before such demonstratives are used.

Kraft plans to use a Kenco Brewer with a rig (DTX040) to brew a beverage using Kenco Singles cartridges produced on both the Lambert and Rychiger lines. Keurig objects to this proposed demonstration for the same reasons that Keurig objects to Kraft offering testimony or documentary evidence regarding the rig apparatus or testing performed thereon.  See Keurig's Motion in Limine No. 1 (D.I. 108, attached as Exhibit 16 to this Pretrial Order).

Opening Statements: The parties will provide notice to one another, by 11:00 PM on Tuesday, October 21, 2008 (i.e., two days before the start of trial), of all exhibits or demonstrative exhibits proposed for use during opening statements.

(d) Lists of names and addresses of the potential witnesses to be called by each party are attached hereto as follows:

(i) Keurig's witness list is attached as Exhibit 5.

(ii) Kraft's witness list is attached as Exhibit 6.

<u>Will Call Witnesses</u>: The parties agree to disclose the identity of each witness to be called from their "Will Call" lists no later than 5:00 PM on the day before the witness is called to the witness stand.

<u>May Call Witnesses</u>: To the extent that witnesses from the parties' "May Call" lists are called to testify as part of the parties' cases-in-chief, the parties agree to disclose the identity of each such witness no less than seven (7) calendar days before the witness is called to the witness stand.

(e) The parties could not agree on a stipulation setting forth the qualifications of each expert witness in such form as could be read to the jury. Accordingly, attached as Exhibit 7 is a document setting forth each party's brief statement as to the qualifications of its own experts

(f) Lists of all depositions, or portions thereof, to be read or played into evidence, and statements of any objections or counter-designations thereto are attached as follows:

(i) Keurig's designations of deposition testimony, Kraft's counter-designations and objections, Keurig's objections to Kraft's counter-designations, and Kraft's responses thereto, are attached as Exhibit 8.

     (ii)    Kraft's designations of deposition testimony, Keurig's counter-designations and objections, Kraft's objections to Keurig's counter-designations, and Keurig's responses thereto, are attached as Exhibit 9.[2]

(g)    An itemized statement of special damages is not applicable to this action.

(h)    Waivers of any claims or defenses that have been abandoned by any party:

<u>Asserted Claims</u>:  Keurig originally asserted infringement of claims 1, 2, 8, 9, and 10 of  the '762 patent.  In the interest of streamlining the trial, however, Keurig is withdrawing all but claim 1.

<u>Defenses</u>:  Kraft no longer asserts its marking defense under 35 U.S.C. § 287(a).

(i)    The parties provide the following:

     (i)    Keurig's Trial Brief is attached as Exhibit 10.

     (ii)    Kraft's Trial Brief is attached as Exhibit 11.

     (iii)    The parties' proposed jury instructions are attached as Exhibit 12.

     (iv)    Keurig's proposed verdict form is attached as Exhibit 13.  Kraft's proposed verdict form is attached as Exhibit 14.

     (v)    The parties' list of the questions they request the Court to ask prospective jurors in accordance with Rule 47(a) and D. Del. LR 47.1(a) is attached as Exhibit 15.

(j)    Not applicable.

(k)    Early in the case the parties discussed the possibility of convening a settlement meeting or mediation but did not do so.  In advance of trial, the parties have agreed to recommence settlement negotiations.

---

[2] Kraft reserves the right to respond to Keurig's objections and object to Keurig's counter-designations by September 8, 2008.  Keurig agrees.

(l)      Discovery closed on April 1, 2008.  (D.I. 34).  <u>Kraft states as follows</u>: Kraft

identified new fact witnesses after the end of fact discovery, but more than three

months prior to trial, and has offered to make these witnesses available for

deposition at a location convenient to Keurig.  <u>Keurig responds</u>:  Kraft's late-

identified witnesses should be excluded for the reasons set forth in Keurig's

Motion *in Limine* No. 4. (D.I. 111, attached as Exhibit 19 to this Pretrial Order).

(m)     All motions *in limine* have now been fully briefed.  The following motions *in*

*limine* have been filed and are attached as exhibits hereto:

Keurig's Motion *in Limine* No. 1 – Motion to Preclude Kraft From Offering
Evidence of its Testing of Singles Cartridges Because Kraft Withheld Key
Information About That Testing (D.I. 108) is attached (together with Kraft's
opposition (D.I. 123) and Keurig's reply (D.I. 131)) as Exhibit 16.

Keurig's Motion *in Limine* No. 2 – Motion to Preclude Kraft's Expert From
Testifying About Kraft's Testing of Singles Cartridges (D.I. 109) is attached
(together with Kraft's opposition (D.I. 120) and Keurig's reply (D.I. 132)) as
Exhibit 17.

Keurig's Motion *in Limine* No. 3 – Motion to Preclude Kraft From Introducing
Purported Production Records and Other Documents Not Qualifying For the
Business Records Hearsay Exception (D.I. 110) is attached (together with Kraft's
opposition (D.I. 121) and Keurig's reply (D.I. 133)) as Exhibit 18.

Keurig's Motion *in Limine* No. 4 – Motion to Preclude Kraft From Calling
Witnesses Identified After the Close of Discovery (D.I. 111) is attached (together
with Kraft's opposition (D.I. 122) and Keurig's reply (D.I. 136) as Exhibit 19.

Keurig's Motion *in Limine* No. 5 – Motion to Preclude Kraft From Relying on
Defenses Identified After the Close of Discovery (D.I. 117) is attached (together
with Kraft's opposition (D.I. 124) and Keurig's reply (D.I. 137) as Exhibit 20.

Kraft's Motion *in Limine* to Limit Expert Testimony of Dr. Alexander Slocum
(D.I. 106) is attached (together with Keurig's opposition (D.I. 118) and Kraft's
reply (D.I. 134)) as Exhibit 21.

Kraft's Motion *in Limine* to Preclude Expert Testimony of Ted Lingle (D.I. 107) is attached (together with Keurig's opposition (D.I. 119) and Kraft's reply (D.I. 135)) as Exhibit 22.

(3)     Trial of this case is expected to take six (6) trial days from October 23-30, 2008.

(4)     This is a jury trial.

(5)     The parties recommend that eight jurors be selected at the commencement of the trial.

(6)     This Order will control the course of the trial and may not be amended except by consent

of the parties and the Court, or by order of the Court to prevent manifest injustice.

(7)     The possibility of settlement of this case was considered by the parties.

_____
UNITED STATES DISTRICT JUDGE

Date: August 25, 2008

| | |
|---|---|
| *Karen E Keller* (signature) | /s/ David E. Moore |
| John W. Shaw (No. 3362) | Richard L. Horwitz (No. 2246) |
| Karen E. Keller (No. 4489) | David E. Moore (No. 3983) |
| YOUNG CONAWAY STARGATT & TAYLOR, LLP | POTTER ANDERSON & CORROON LLP |
| The Brandywine Building | Hercules Plaza, 6th Floor |
| 1000 West Street, 17th Floor | Wilmington, DE 19899 |
| Wilmington, DE 19801 | (302) 984-6000 |
| (302) 571-6600 | rhorwitz@potteranderson.com |
| jshaw@ycst.com | dmoore@potteranderson.com |
| kkeller@ycst.com | |
| | |
| *Attorneys for Plaintiff Keurig, Incorporated* | *Attorneys for Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc.* |
| | |
| *Of counsel:* | *Of counsel:* |
| | |
| Michael A. Albert | David M. Schlitz |
| Michael N. Rader | William S. Foster, Jr. |
| Charles T. Steenburg | C. John Brown |
| WOLF, GREENFIELD & SACKS, P.C. | BAKER BOTTS LLP |
| 600 Atlantic Ave. | 1299 Pennsylvania Ave, NW |
| Boston, MA 02210 | Washington, DC 20004 |
| (617) 646-8000 | (202) 639-7700 |

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>      Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>      Defendants. | Civil Action No. 07-017-GMS<br><br>**CONFIDENTIAL –**<br>**FILED UNDER SEAL** |

## EXHIBIT 1: STIPULATION OF UNCONTESTED FACTS

**THE PARTIES**

1.     Keurig, Incorporated is the plaintiff in this lawsuit and will be referred to throughout as "Keurig."

2.     Keurig is a company organized under the laws of Delaware and has its principal place of business in Massachusetts.

3.     Keurig sells single-serve beverage cartridges called K-Cups in the United States.

4.     Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. are the defendants in this lawsuit and will be referred to throughout as "Kraft."

5.     Kraft Foods Global, Inc. and Tassimo Corporation are Delaware corporations. Kraft Foods Inc. is a Virginia corporation.

**THE '762 PATENT**

6.      On February 18, 2000, Mr. Nicholas Lazaris and Mr. Roderick Beaulieu filed a provisional patent application for a "Beverage Filter Cartridge."

7.      On February 13, 2001, Mr. Lazaris and Mr. Beaulieu filed a non-provisional utility patent application for a "Beverage Filter Cartridge."

8.      That patent application was granted by the United States Patent and Trademark Office, which issued it as U.S. Patent No. 6,607,762 on August 19, 2003.  The patent will be referred to throughout as the '762 patent.

9.      Keurig is the sole owner of the '762 patent.

**THE T-DISC**

10.     In March 2005, Kraft Foods Global, Inc. announced that it planned to begin selling Tassimo single-serve beverage cartridges (called T-Discs) in the United States.

11.     In September 2005, Kraft Foods Global, Inc. began selling T-Discs in the United States.

12.     Some of the T-Discs made and/or sold in the United States contain an internal filter. These T-Discs are accused by Keurig of infringing the '762 patent.  Unless otherwise specified, the term T-Disc refers to a T-Disc with an internal filter.

**STIPULATED DAMAGES BASE**

13.     ███████████████████████████████████████████████

███████████████████████████████████████

Dated:  August 25, 2008

███████████████████████████████████████████████████████

065927.1001

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

        Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

        Defendants.

Civil Action No. 07-017-GMS

## **EXHIBIT 2:  KEURIG'S STATEMENT OF CONTESTED ISSUES OF FACT AND LAW**

**INFRINGEMENT – ISSUE OF FACT FOR THE JURY**

1.     Whether Defendants (collectively "Kraft") infringe claim 1 of U.S. Patent No. 6,607,762 by making, using, offering to sell, and/or selling within the United States Tassimo T-Discs having internal filters, in violation of 35 U.S.C. § 271 (i.e., whether T-Discs having internal filters embody each and every limitation of clam 1 of the '762 patent).

**VALIDITY – ISSUES OF FACT FOR THE JURY**

2.     Whether any single item of prior art identified in Kraft's Invalidity Contentions discloses to one of skill in the art each of the limitations of claim 1 of the '762 patent.

3.     Whether a person of ordinary skill in the art would understand a "Kenco Singles" cartridge to have a lid that is (1) capable of being pierced to permit a flow of liquid into the cartridge to brew a coffee beverage and also (2) capable of being pierced to permit the flow of coffee beverage out of the cartridge.

4.      Whether Kenco Singles cartridges were available to interested members of the public in the United States prior to February 18, 1999, or publicly known in the United States prior to February 18, 2000.

5.      Whether a person of ordinary skill in the art would understand U.S. Patent No. 4,853,234, entitled "Beverage Packages," to disclose a cartridge with a lid having a first section overlying the first chamber of the cartridge and a second section overlying the second chamber of the cartridge.

6.      Whether a person of ordinary skill in the art would understand U.S. Patent No. 4,853,234, entitled "Beverage Packages," to disclose a cartridge with a lid that is (1) capable of being pierced to permit a flow of liquid into the cartridge to brew a coffee beverage and also (2) capable of being pierced to permit the flow of coffee beverage out of the cartridge.

7.      Whether a person of ordinary skill in the art would understand U.S. Patent No, 4,452,130, entitled "Electrical Apparatus Useful to Prepare a Hot Beverage," to disclose a cartridge with a lid that is (1) capable of being pierced to permit a flow of liquid into the cartridge to brew a coffee beverage and also (2) capable of being pierced to permit the flow of coffee beverage out.

**WILLFULNESS – ISSUES OF FACT FOR THE JURY**

8.      Whether Kraft sold T-Discs in the United States despite an objectively high likelihood that doing so would infringe the '762 patent and that the '762 patent was valid.

9.      If such an objectively high risk existed, whether that risk was known to Kraft or so obvious that it should have been known.

**DAMAGES – ISSUE OF FACT FOR THE JURY**

10.      What royalty per T-Disc Keurig and Kraft would have agreed upon in a hypothetical

negotiation that (1) assumed the '762 patent covered the filter T-Disc and was valid and

enforceable; and (2) concluded shortly before Kraft began selling T-Discs in the United States in

September 2005.

**ISSUES FOR THE COURT**

1.      **Enhanced Damages for Willful Infringement** – If the jury determines that Kraft

willfully infringed the '762 patent, whether the damages for which Kraft is liable should be

trebled or increased in such other amount pursuant to 35 U.S.C. § 284 as the Court deems proper

for Kraft's willful infringement.

2.      **Reasonable Attorneys' Fees and Expenses** – Whether this case is exceptional under 35

U.S.C. § 285, entitling Keurig to recover attorneys' fees, expenses, and costs.

3.      **Interest** – If the jury determines that Keurig is entitled to damages, whether Keurig is

entitled to pre-judgment interest, and the amount thereof.

4.      **Permanent Injunction** – If the jury determines that Kraft infringed the '762 patent and

rejects Kraft's invalidity defense, whether a permanent injunction should be issued enjoining

Kraft from further infringement of the '762 patent based on the factors set forth in <u>eBay v.

MercExchange</u>, 547 U.S. 388 (2006).


Dated:  August 25, 2008

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS |

**EXHIBIT 3: KRAFT'S STATEMENT OF CONTESTED ISSUES OF FACT AND LAW**

**KRAFT'S STATEMENT OF ISSUES**
**OF FACT THAT REMAIN TO BE LITIGATED**

Defendants (collectively, "Kraft") respectfully submit the following issues of fact for the jury that remain to be litigated. Should the Court consider any issue identified in this list as an issue of fact is more properly considered as an issue of law, Kraft respectfully requests that it should be so considered. Kraft reserves the right to revise the list as necessary in light of the Court's decisions on any evidentiary motion.

**INVALIDITY**

1.      Whether "Kenco Singles" cartridges were in public use in the United States prior to February 18, 1999.

2.      Whether the Kenco Singles cartridge was known or used by someone in the United States, other than the inventors of the Kenco Singles cartridge, prior to the invention of the subject matter claimed in U.S. Patent No. 6,607,762 ("the '762 Patent").

3.      Whether the Kenco Singles cartridge embodies each and every limitation of claims 1, 2, 8, 9, and 10 of the '762 patent.

4.      Whether the Kenco Singles cartridge has a lid that is (1) capable of being pierced to permit a flow of liquid into and also (2) capable of being pierced to permit a beverage to flow out.

5.      Whether U.S. Patent No. 4,853,234, entitled "Beverage Packages," discloses each and every limitation of claims 1, 2, 8, 9, and 10 of the '762 patent.

6.      Whether Patent No. 4,853,234, entitled "Beverage Packages," discloses a cartridge with a lid having a first section overlying the first chamber of the cartridge and a second section overlying the second chamber of the cartridge.

7.      Whether U.S. Patent No. 4,853,234, entitled "Beverage Packages," discloses a cartridge with a lid that is (1) capable of being pierced to permit a flow of liquid into and also (2) capable of being pierced to permit a beverage to flow out.

8.      Whether claims 1, 2, 8, 9, and 10 of the '762 patent would have been obvious to one of ordinary skill in the art in view of U.S. Patent No. 4,853,234, entitled "Beverage Packages," whether taken alone or in combination with the prior art at the time of the invention.

9.      Whether U.S. Patent No, 4,452,130, entitled "Electrical Apparatus Useful to Prepare a Hot Beverage," discloses each and every limitation of claim 1 of the '762 patent.

10.     Whether U.S. Patent No, 4,452,130, entitled "Electrical Apparatus Useful to Prepare a Hot Beverage," discloses a cartridge with a lid that is (1) capable of being pierced to permit a flow of liquid into and also (2) capable of being pierced to permit a beverage to flow out.

11.     Whether claims 2, 8, 9, and 10 of the '762 patent would have been obvious to one of ordinary skill in the art in view of U.S. Patent No, 4,452,130, entitled "Electrical Apparatus

Useful to Prepare a Hot Beverage," whether taken alone or in combination with the prior art at the time of the invention.

12.    Whether a person of ordinary skill in the art reading the patent application as originally filed would recognize that the patent application described the invention claimed in the claims of the '762 patent.

**UNENFORCEABILITY**

13.    Whether the reasonable Examiner would have considered the Kenco Singles Cartridge material information that Mr. Lazaris had a duty to disclose to the U.S. Patent and Trademark Office ("PTO") during the prosecution of '762 Patent.

14.    If the jury determines that the Kenco Singles Cartridge is material information that Mr. Lazaris had a duty to disclose to the PTO during the prosecution of '762 Patent, whether that material information was withheld with an intent to deceive or mislead the PTO.

<div align="center">

**KRAFT'S STATEMENT OF ISSUES
OF LAW THAT REMAIN TO BE LITIGATED**

</div>

Kraft respectfully submits the following issues of law that remain to be litigated. Should the Court consider any issue identified in this list as an issue of law is more properly considered as an issue of fact, Kraft respectfully requests that it should be so considered. Kraft reserves the right to revise the list as necessary in light of the Court's decisions on any evidentiary motion.

**PERSONAL JURISDICTION AND VENUE**

1.    Whether the Court jurisdiction over Kraft Foods Inc. and whether venue in this judicial district is proper under 28 U.S.C. §§ 1391, 1400 as Kraft Foods Inc. is a holding company that does not make, sell, offer to sell, or import filter T-discs within the United States and Kraft Foods Inc. is not resident of and does not have a principal place of business within this judicial district.

**ENABLEMENT**

1.      Whether the specification of the '762 patent provides sufficient information about the invention claimed in the claims of the '762 patent to allow a person of ordinary skill in the art to make and use the full scope of the invention, including to make and use the claimed invention to produce a beverage, without undue experimentation. *Auto. Tech. Intern., Inc. v. BMW of N. Am., Inc.* 501 F.3d 1274, 1282 (Fed. Cir. 2007).

**INEQUITABLE CONDUCT**

2.      Whether the patent is unenforceable because a person involved in a substantial way with the prosecution of the '762 Patent intentionally failed to comply with the duty of candor and good faith to the U.S. Patent and Trademark Office by failing to disclose the existence of the Kenco Singles cartridge based on the factors set forth in *Cargill Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359 (Fed. Cir. 2007).

**EXCEPTIONAL CASE**

3.      Whether this case is exceptional under 35 U.S.C. § 285, entitling a prevailing party to recover attorneys fees, expenses, and costs.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS<br><br>**CONFIDENTIAL –<br>FILED UNDER SEAL** |

## EXHIBIT 4:  EXHIBIT LISTS

Attached are schedules of Joint Trial Exhibits ("JTX"), Plaintiff's Trial Exhibits ("PTX"), and Defendants' Trial Exhibits ("DTX").  Items originally scheduled on both the PTX and DTX lists have been moved to the JTX list.

Dated: August 25, 2008

PLAINTIFF'S TRIAL EXHIBIT LIST (PTX) -- 8/25/08

| PTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPO EXHIBIT NO | Def.'s Objections |
|---|---|---|---|---|---|---|---|
| 1 | KEU00103534 | KEU00103536 | | 9/27/2001 | | | |
| 2 | KEU00104294 | KEU00104296 | | 7/30/2007 | | | |
| 3 | KEU00104360 | KEU00104362 | | 7/30/2007 | | | |
| 4 | KEU00104348 | KEU00104354 | | 7/26/2002 | | | |
| 5 | KEU00104379 | KEU00104381 | | 7/30/2007 | | | |
| 6 | KEU00104398 | KEU00104400 | | 7/30/2007 | | | |
| 7 | KEU00104417 | KEU00104422 | | 6/12/2002 | | | |
| 8 | KEU00103610 | KEU00103654 | | 7/29/2003 | | | |
| 9 | KEU00103655 | KEU00103672 | | 3/13/2000 | | | |
| 10 | KEU00103607 | KEU00103609 | | 3/13/2000 | | | |
| 11 | KEU00104217 | KEU00104219 | | 7/29/2003 | | | |
| 14 | KEU00104251 | KEU00104273 | | 6/30/2000 | | | |
| 15 | KEU00103721 | KEU00103790 | | 7/22/2003 | | | |
| 17 | KEU00104039 | KEU00104043 | | 5/17/2004 | | | |
| 23 | K 0015295 | K 0015317 | | 9/6/2004 | | | |
| 28 | K 0002994 | K 0003003 | | | | | |
| 29 | K ED 00102986 | K ED 00103043 | | 8/9/2006 | Hansen | PX147 | |
| 30 | SB004354 | SB004405 | | 7/27/2007 | Hansen | PX148 | |
| 31 | KEU00108585 | KEU00108587 | Article   How Elasticity of Demand Affects Total Revenue | | | | Hearsay |
| 32 | KEU00109048 | KEU00109050 | Article   Kraft wakes up to need to push Maxwell House After falling behind to P&G's Folgers boosts spending to $60 million | 5/2/2005 | | | Hearsay |
| 33 | KEU00109051 | KEU00109055 | Article   Kraft's search for the right ingredients | 10/6/2004 | | | Hearsay |
| 34 | KEU00109034 | KEU00109036 | Article   Kraft's Tassimo coffee system aims to sell beans, not the machines; Product key to whether it can innovate and raise prices in other categories | 4/4/2005 | | | Hearsay |
| 35 | KEU00109043 | KEU00109044 | Article   Kraft's Tassimo System set to Land on U.S. Shores | 3/21/2005 | | | Hearsay |
| 36 | KEU00108581 | KEU00108583 | Article   Licensing Economics Review   The Royalty Rate Journal of Intellectual Property | 12/00/2005 | | | |
| 37 | KEU00108588 | KEU00108590 | Article   Litigation Services Handbook, The Role of the Financial Expert (pp. 16 17) | | | | |
| 38 | KEU00109059 | KEU00109060 | Article   One cup machines making it | 12/11/2007 | | | Hearsay |
| 39 | KEU00108977 | KEU00109008 | Article   Q1 2005 Kraft Foods Earnings Conference Call   Final | 4/19/2005 | | | Hearsay |
| 40 | | | Article   Q2 2005 Kraft Food Earnings Conference Call   Final | 8/2/2005 | Deromedi | PX179 | |
| 41 | KEU00109009 | KEU00109033 | Article   Q4 2005 Kraft Food Earnings Conference Call   Final | 2/21/2006 | | | Hearsay |

1

CONFIDENTIAL   ATTORNEYS' EYES ONLY

PLAINTIFF'S TRIAL EXHIBIT LIST (PTX) -- 8/25/08

| PTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPO EXHIBIT NO | Def.'s Objections |
|---|---|---|---|---|---|---|---|
| 42 | KEU00109056 | KEU00109058 | Article    Toronto Star article on Tassimo | 5/13/2006 | | | Hearsay |
| 43 | KEU00108964 | KEU00108976 | Article    Trends in Patent Damages (McGrath and Kedrowski) | | | | Hearsay |
| 44 | KEU00109037 | KEU00109042 | Article    Why this $169 machine matter to Kraft..... | 12/11/2005 | | | Hearsay |
| 45 | | | Article    Pages 7 8 from The Basics of Brewing Coffee (Ex. D to Lingle Expert Report) | | | | Relevance |
| 46 | | | Article    Companies International: Kraft Cooks up Strategic Innovations | 5/17/2005 | | | |
| 47 | K 0003954 | K 0003955 | Article    Is Single Serve Coffee Finally Ready to Brew? | 8/12/2006 | | | Hearsay |
| 48 | | | Article    Kraft Foods at Consumer Analyst Group of New 2006 Conference | 2/21/2006 | | | |
| 49 | KEU00109045 | KEU00109047 | Article    Kraft Foods Debuts Tassimo Hot Beverage System in the U.S. | 3/16/2005 | Deromedi | PX178 | |
| 50 | | | Article    Kraft Looking for Magical Brew: Food giant prepares to unveil its new coffeemaking system, which uses a special machine and packets of java | 2/3/2004 | Deromedi | PX177 | Hearsay |
| 51 | | | Article    Kraft to Double Patent Lawyers | 5/11/2005 | | | |
| 52 | KEU00105172 | KEU00105174 | Article    Ongoing Innovations in Single Cup Strengthen OCS Competitive Stance | 11/1/2006 | | | Hearsay |
| 53 | KEU00105168 | KEU00105171 | Article    Operators and Suppliers Examine Portion Pack Brewing Opportunity | 3/1/2006 | | | Hearsay |
| 56 | K ED 00025867 | K ED 00025869 | Discovery Responses    First Set of Materials Referenced in Kraft's Response to Interrogatory No. 24 | | | | |
| 57 | K ED 00056615 | K ED 00056626 | Discovery Responses    Second Set of Materials Referenced in KFG's Response to Interrogatory No. 24 | | | | |
| 59 | | | Discovery Responses    Defendants' Response to Keurig's First Set of Requests for Admission | 3/31/2008 | | | |
| 61 | K ED 00194464 | K ED 00194465 | | 10/3/2003 | | | |
| 62 | K ED 00019205 | K ED 00019207 | | 10/15/2003 | | | |
| 63 | K0014361 | K0014370 | | 9/14/2001 | Halliday | PX033 | |
| 64 | K0012602 | K0012602 | | 4/18/2001 | Halliday | PX020 | |
| 65 | K ED 00039341 | K ED 00039342 | | 9/6/2005 | | | |
| 66 | K ED 00124285 | K ED 00124286 | | 11/20/2006 | | | |
| 67 | K ED 00055395 | K ED 00055397 | | 8/11/2004 | | | |
| 68 | K ED 00008726 | K ED 00008726 | | 9/22/2004 | | | |
| 70 | K ED 00021141 | K ED 00021141 | | 7/4/2003 | | | |
| 71 | K ED 00115925 | K ED 00115925 | | 9/16/2005 | | | |
| 73 | K ED 00193868 | K ED 193869 | | 5/3/2005 | | | |
| 75 | K ED 00024184 | K ED 00024184 | | 12/17/2005 | | | |
| 76 | K ED 00056553 | K ED 00056554 | | 5/20/2005 | | | |
| 77 | K ED 00039376 | K ED 00039377 | | 9/4/2005 | Lloyd | PX056 | |
| 78 | K ED 00122451 | K ED 00122451 | | 8/19/2005 | Deromedi | PX175 | |
| 79 | KEU00108000 | KEU00108007 | | 1/17/2001 | | | |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

PLAINTIFF'S TRIAL EXHIBIT LIST (PTX) -- 8/25/08

| PTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPO EXHIBIT NO | Def.'s Objections |
|---|---|---|---|---|---|---|---|
| 80 | K ED 00038748 | K ED 00038837 | | 9/14/2005 | Deromedi | PX176 | |
| 81 | K ED 00115671 | K ED 00115672 | | 10/20/2005 | Deromedi | PX183 | |
| 82 | K 0016238 | K 0016238 | | 12/18/2004 | Deromedi | PX180 | |
| 83 | K 0016219 | K 0016220 | | 4/24/2005 | Deromedi | PX182 | |
| 84 | KEU00108530 | KEU00108530 | | 3/7/2006 | | | Hearsay |
| 85 | KEU00108486 | KEU00108486 | | 2/3/2006 | | | Hearsay |
| 86 | K ED 00115593 | K ED 00115595 | | 4/3/2006 | Hansen, Deromedi, Weber | PX149, PX185, PX189 | |
| 88 | K ED 00077218 | K ED 00077235 | | 10/6/2005 | Lloyd | PX067 | |
| 89 | K ED 00116315 | K ED 00116320 | | 6/21/2006 | | | |
| 90 | K ED 00108311 | K ED 00108311 | | 10/30/2007 | Hansen | PX154 | |
| 91 | K ED 00123799 | K ED 00123799 | | 6/29/2006 | Weber | PX195 | |
| 92 | K ED 00040758 | K ED 00040759 | | 8/4/2005 | Deromedi | PX174 | |
| 93 | K ED 00056641 | K ED 00056643 | | 4/6/2005 | Lloyd | PX069 | |
| 94 | K ED 00116807 | K ED 00116830 | | 3/20/2006 | Hansen | PX151 | |
| 95 | K ED 00058094 | K ED 00058097 | | 5/12/2005 | Lloyd | PX063 | |
| 97 | K ED 00122470 | K ED 00122472 | | 9/22/2005 | Hansen | PX152 | |
| 98 | K ED 00025865 | K ED 00025866 | | 4/20/2005 | Waks | PX129 | |
| 99 | K ED 00047914 | K ED 00047916 | | 3/22/2006 | Weber | PX196 | |
| 101 | K 0016214 | K 0016215 | | 6/16/2005 | Deromedi | PX173 | |
| 102 | K ED 00022680 | K ED 00022702 | | 9/6/2004 | Gogia | PX168 | |
| 103 | KEU00018974 | KEU00018974 | | 4/13/2005 | | | Hearsay |
| 104 | K0015976 | K0015976 | | 7/15/2005 | | | |
| 105 | KEU00018945 | KEU00018945 | | 11/28/2005 | | | Hearsay |
| 106 | KEU00034882 | KEU00034883 | | 8/3/2000 | Waks | PX131 | |
| 107 | KEU00032659 | KEU00032660 | | 12/6/2000 | | | |
| 108 | K ED 00025879 | K ED 00025879 | | 4/19/2005 | Waks | PX127 | |
| 109 | | | FRE 1006 Summary    StoneTurn Exhibit 01 from Ratliff Report | | | | |
| 110 | | | FRE 1006 Summary    StoneTurn Exhibit 02 from Ratliff Report | | | | |
| 111 | | | FRE 1006 Summary    StoneTurn Exhibit 03 from Ratliff Report | | | | |
| 112 | | | FRE 1006 Summary    StoneTurn Exhibit 04 from Ratliff Report | | | | |
| 113 | | | FRE 1006 Summary    StoneTurn Exhibit 05 from Ratliff Report | | | | |
| 114 | | | FRE 1006 Summary    StoneTurn Exhibit 06 from Ratliff Report | | | | |
| 115 | | | FRE 1006 Summary    StoneTurn Exhibit 07 from Ratliff Report | | | | |
| 116 | | | FRE 1006 Summary    StoneTurn Exhibit 08 from Ratliff Report | | | | |
| 117 | | | FRE 1006 Summary    StoneTurn Exhibit 09 from Ratliff Report | | | | |
| 118 | | | FRE 1006 Summary    StoneTurn Exhibit 10 from Ratliff Report | | | | |
| 119 | | | FRE 1006 Summary    StoneTurn Exhibit 11 from Ratliff Report | | | | |
| 120 | | | FRE 1006 Summary    StoneTurn Exhibit 12 from Ratliff Report | | | | |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

PLAINTIFF'S TRIAL EXHIBIT LIST (PTX) -- 8/25/08

| PTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPO EXHIBIT NO | Def.'s Objections |
|-----|----------|----------|-------------|------|----------|-----------------|-------------------|
| 121 | | | FRE 1006 Summary   StoneTurn Exhibit 13 (Supplemental)  from Ratliff Report | | | | |
| 122 | | | FRE 1006 Summary   StoneTurn Exhibit 14 from Ratliff Report | | | | |
| 123 | | | FRE 1006 Summary   StoneTurn Exhibit 15 from Ratliff Report | | | | |
| 124 | | | FRE 1006 Summary   StoneTurn Exhibit 16 from Ratliff Report (Supplemental) | | | | |
| 125 | | | FRE 1006 Summary   StoneTurn Workpaper 01 from Ratliff Report | | | | |
| 126 | | | FRE 1006 Summary   StoneTurn Workpaper 02 from Ratliff Report | | | | |
| 127 | | | FRE 1006 Summary   StoneTurn Workpaper 03 from Ratliff Report | | | | |
| 128 | | | FRE 1006 Summary   StoneTurn Workpaper 04 from Ratliff Report | | | | |
| 129 | | | FRE 1006 Summary   StoneTurn Workpaper 05 from Ratliff Report | | | | |
| 130 | | | FRE 1006 Summary   StoneTurn Workpaper 06 from Ratliff Report | | | | |
| 131 | | | FRE 1006 Summary   StoneTurn Workpaper 07 from Ratliff Report | | | | |
| 132 | | | FRE 1006 Summary   StoneTurn Workpaper 08 from Ratliff Report | | | | |
| 133 | | | FRE 1006 Summary   StoneTurn Workpaper 09 from Ratliff Report | | | | |
| 134 | | | FRE 1006 Summary   StoneTurn Workpaper 10 from Ratliff Report | | | | |
| 135 | | | FRE 1006 Summary   StoneTurn Workpaper 11 from Ratliff Report | | | | |
| 136 | | | FRE 1006 Summary   StoneTurn Workpaper 12 from Ratliff Report | | | | |
| 137 | | | FRE 1006 Summary   StoneTurn Workpaper 13 from Ratliff Report | | | | |
| 138 | | | FRE 1006 Summary   StoneTurn Workpaper 14 from Ratliff Report | | | | |
| 139 | | | FRE 1006 Summary   StoneTurn Workpaper 15 from Ratliff Report | | | | |
| 140 | | | FRE 1006 Summary   StoneTurn Workpaper 16 (a c)  from Ratliff Report (Supplemental) | | | | |
| 141 | | | FRE 1006 Summary   Stone Turn Summary Exhibit 10.1 | | | | Foundation (Present with demonstratives) |
| 142 | | | FRE 1006 Summary   Stone Turn Summary Exhibit 10.2 | | | | Foundation (Present with demonstratives) |
| 143 | | | FRE 1006 Summary   Stone Turn Summary Exhibit 10.3 | | | | Foundation (Present with demonstratives) |
| 144 | | | FRE 1006 Summary   Stone Turn Summary Exhibit 13.1 | | | | Foundation (Present with demonstratives) |
| 145 | | | FRE 1006 Summary   Stone Turn Summary Exhibit 20.1 | | | | Foundation (Present with demonstratives) |
| 146 | K 0014413 | K 0014416 | | | | | |
| 147 | K 0014680 | K 0014685 | | | Halliday | PX032 | |
| 148 | K0012049 | K0012235 | | | Halliday | PX039 | |
| 149 | K0011885 | K0012048 | | | Halliday | PX038 | |
| 150 | KEU00108026 | KEU00108027 | | | Lazaris | DX201 | |
| 151 | K 0016125 | K 0016129 | | | Weber | PX198 | |
| 152 | K0012236 | K0012344 | | | Halliday | PX040 | |
| 153 | K0012364 | K0012693 | | | Halliday | PX041 | |
| 154 | | | Patent   European Patent Application No. 04250384.7 | 1/23/2004 | | | |
| 155 | KEU00036208 | KEU00036211 | Patent   Examiner's rejection re Application No. 04250384.7 | 12/2/2004 | | | |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

| PTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPO EXHIBIT NO | Def.'s Objections |
|---|---|---|---|---|---|---|---|
| 156 | KEU00036221 | KEU00036232 | Patent    EP Application Pub. No. 0 272 922 | 12/22/1987 | | | |
| 157 | KEU00036233 | KEU00036244 | Patent    EP Application Pub. No. 0 451 980 | 3/22/1991 | | | |
| 158 | KEU00036212 | KEU00036220 | Patent    Response to examiner's rejection re EP application No. 04250384.7 | 6/9/2005 | | | |
| 159 | | | Patent    Communication of Intent to Grant European patent re Application No. 04250384.7 | 11/17/2005 | | | |
| 160 | KEU00036158 | KEU00036207 | Patent    EP 1 440 913 B1 | 1/23/2004 | | | |
| 161 | | | Patent    File History for GB Pub No. 2397500 | | | | |
| 162 | | | Patent    Patent    PCT International Preliminary Report on Patentability PCT/GB2004/00273 | | | | |
| 163 | | | Patent    Provisional Patent Application for Beverage Filter Cartridge | | Lazaris | DX203 | |
| 164 | | | Patent    International Publication No. WO 01/60220 A1 | 8/23/2001 | Halliday | PX037 | |
| 167 | KEU00109108 | KEU00109113 | Patent    U.S. Patent No. 5,840,189 | 11/24/1998 | | | |
| 168 | | | Patent    U.S. Patent No. 5,325,765 | 7/5/1994 | | | |
| 170 | | | Patent    Application as Filed for U.S. Serial No. 10/763457 | 1/23/2004 | Halliday | PX031 | |
| 171 | | | Patent    Inventors' Oath for U.S. Serial No. 10/763457 | | | | |
| 172 | | | Patent    File History for U.S. Patent No. 7,328,651 | | | | |
| 176 | | | Photograph    Kenco Cartridge Following Slocum/Lingle Kenco Experiment (Lingle Rebuttal Report p. 8) | | | | |
| 177 | | | Photograph    Liquid Obtained from Slocum/Lingle Kenco Experiment 2 (Lingle Rebuttal Report, p. 5) | | | | |
| 178 | | | Photograph    Liquid Obtained from Slocum/Lingle Kenco Experiment 4 (Lingle Rebuttal Report, p. 6) | | | | |
| 179 | | | Photograph    Liquid Obtained from Slocum/Lingle Kenco Experiment 5 (Lingle Rebuttal Report, p. 7) | | | | |
| 180 | | | Photograph    Liquid Obtained from Slocum/Lingle Kenco Experiment 8 (Slocum Rebuttal Report p. 26) | | | | |
| 181 | | | Photograph    Rychiger Experiment before flow (Slocum Rebuttal Report p. 27) | | | | |
| 182 | | | Photograph    Slocum Clamping Apparatus (Slocum Rebuttal Report p. 24) | | | | |
| 183 | | | Photograph    Slocum Experiment    Beverage exiting through inlet hole on Lambert cartridge (Slocum Rebuttal Report p. 20) | | | | |
| 184 | | | Photograph    Lambert Experiment with "hypodermic" piercer (Slocum Rebuttal Report p. 27) | | | | |
| 185 | | | Photograph    Liquid on floor following Slocum experiment (Slocum Rebuttal Report p. 20) | | | | |
| 186 | | | Photograph    Rychiger Experiment during flow (Slocum Rebuttal Report p. 27); | | | | |
| 187 | | | Photograph    Slocum Experiment (Slocum Rebuttal Report p. 23) | | | | |
| 188 | KEU00084315 | KEU00084318 | Photograph    Model of Cartridge | | | | |
| 189 | KEU00084319 | KEU00084324 | Photograph    Model of Cartridge | | | | |
| 190 | KEU00084325 | KEU00084330 | Photograph    Model of Cartridge | | | | |
| 191 | KEU00084331 | KEU00084335 | Photograph    Model of Cartridge | | | | |
| 192 | KEU00084336 | KEU00084339 | Photograph    Model of Cartridge | | | | |
| 194 | | | Physical Exhibit    Kenco Cartridge (Lambert Line) | | Macmahon | PX071 | |
| 195 | | | Physical Exhibit    Kenco Mark II Coffee Cartridge | | Macmahon | PX081 | |
| 196 | | | Physical Exhibit    Kenco Cartridge (Lambert Line) | | Macmahon | PX088 | |
| 197 | | | Physical Exhibit    Kenco Cartridge (Lambert Line) | | Glus | PX101 | |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

PLAINTIFF'S TRIAL EXHIBIT LIST (PTX) -- 8/25/08

| PTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPO EXHIBIT NO | Def.'s Objections |
|---|---|---|---|---|---|---|---|
| 201 | BAN0028 | BAN0028 | Physical Exhibit    Tassimo Cappuccino Foaming Milk Creamer | | | | |
| 202 | BAN0029 | BAN0029 | Physical Exhibit    Tassimo Suchard Hot Chocolate | | | | |
| 203 | BAN0026 | BAN0026 | Physical Exhibit    Tassimo Gevalia Espresso | | | | |
| 204 | BAN0027 | BAN0027 | Physical Exhibit    Tassimo Gevalia Signature Blend Coffee | | | | |
| 205 | BAN0030 | BAN0030 | Physical Exhibit    Tassimo Latte Milk Creamer | | | | |
| 206 | BAN0025 | BAN0025 | Physical Exhibit    Tassimo: Starbucks Coffee House Blend | | | | |
| 207 | | | Physical Exhibit    Ribbon Copy of U.S. Patent No. 6,607,762 | | | | |
| 208 | K ED 00042752 | K ED 00042785 | | 6/14/2005 | Lloyd, Weber | PX054, PX187 | |
| 209 | KEU00105040 | KEU00105044 | | | | | |
| 210 | K 0004619 | K 0004619 | | | | | |
| 212 | K ED 00204633 | K ED 00204635 | | 2/22/2005 | | | |
| 213 | K 0002653 | K 0002721 | | 9/23/2004 | | | |
| 214 | K 0002454 | K 0002544 | | 4/28/2006 | | | |
| 215 | K0011071 | K0011075 | | 11/21/2003 | Halliday | PX026 | |
| 216 | K0013782 | K0013795 | | | Halliday | PX029 | |
| 217 | K ED 00024095 | K ED 00024118 | | 1/5/2006 | | | |
| 219 | K0005067 | K0005153 | | | Lloyd | PX051 | |
| 220 | K0014172 | K0014180 | | 3/9/2001 | Lloyd | PX050 | |
| 221 | K ED 00203796 | K ED 00203836 | | 2/17/2004 | | | |
| 222 | K ED 00195962 | K ED 00196114 | | 10/00/2001 | | | |
| 223 | K ED 00166369 | K ED 00166377 | | 10/18/2006 | | | |
| 224 | K 0013893 | K 0013963 | | | | | |
| 225 | K ED 00194705 | K ED 00194713 | | 11/29/2002 | | | |
| 226 | K 0015729 | K 0015868 | | | | | |
| 230 | K ED 00016714 | K ED 00016998 | | 12/7/2004 | | | |
| 231 | KEU00002921 | KEU00002954 | | 4/14/2005 | | | |
| 232 | BAN 000006 | BAN 000022 | | | | | |
| 233 | K ED 00051374 | K ED 00051440 | | 4/4/2005 | Hansen, Weber | PX143, PX188 | |
| 234 | K ED 00116560 | K ED 00116564 | | | Hansen | PX153 | |
| 236 | K ED 00131164 | K ED 00131179 | | | | | |
| 237 | K0017963 | K0017978 | | 3/9/2005 | Waks | PX126 | |
| 238 | K 0001399 | K 0001404 | | 4/5/2006 | | | |
| 239 | K0017905 | K0017962 | | 6/21/2005 | Waks | PX128 | |
| 240 | K0017776 | K0017835 | | 5/4/2005 | Waks | PX130 | |
| 241 | K 0013990 | K 0013998 | | 2/6/2002 | Lloyd | PX064 | |
| 242 | K ED 00130254 | K ED 00130257 | | 7/8/2004 | | | |
| 244 | K 0001868 | K 0001920 | | 1/1/2006 | Hansen | PX144 | |
| 245 | K0012804 | K0012804 | | | Weber | PX186 | |
| 246 | K 0002783 | K 0002798 | | 5/25/2006 | Lloyd | PX061 | |
| 247 | K ED 00039129 | K ED 00039142 | | 9/15/2006 | Hansen, Weber | PX142, PX193 | |
| 248 | K ED 00046744 | K ED 00046758 | | 2/14/2005 | Hansen | PX141 | |
| 249 | KEU00047059 | KEU00047095 | | 4/6/2005 | | | |
| 250 | BAN000005 | BAN000005 | | | | | |
| 251 | K0011201 | K0011202 | | | Halliday, Weber | PX028, PX199 | |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

PLAINTIFF'S TRIAL EXHIBIT LIST (PTX) -- 8/25/08

| PTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPO EXHIBIT NO | Def.'s Objections |
|---|---|---|---|---|---|---|---|
| 252 | K ED 00026390 | K ED 00026403 | | 01/00/2005 | Lloyd | PX057 | Relevance |
| 253 | K ED 00015084 | K ED 00015089 | | 12/17/2004 | | | |
| 254 | KEU00024111 | KEU00024178 | | 01/00/2006 | | | Hearsay |
| 255 | K0013796 | K0013802 | | 12/4/2001 | Halliday | PX035 | |
| 256 | K ED 00070798 | K ED 00070801 | | | Lloyd | PX058 | |
| 257 | K ED 00010009 | K ED 00010018 | | 4/15/2004 | | | |
| 258 | K ED 00056612 | K ED 00056614 | | 5/19/2005 | Lloyd, Adam | PX068 | |
| 259 | KEU00103179 | KEU00103183 | | 4/6/2006 | | | |
| 260 | KEU00104609 | KEU00104617 | | 1/24/2008 | | | |
| 261 | K0000857 | K0000857 | | 2/27/2000 | Lloyd | PX047 | |
| 262 | K0013981 | K0013989 | | 7/22/2002 | Lloyd | PX052 | |
| 263 | K0013622 | K0013626 | | | Halliday | PX027 | |
| 264 | K ED 00028198 | K ED 00028199 | | 12/14/2005 | | | |
| 266 | K ED 00235086 | K ED 00235092 | | 12/4/2001 | | | |
| 267 | K ED 00106881 | K ED 00106901 | | 11/15/2007 | | | Hearsay |
| 268 | KEU00022573 | KEU00022575 | | 5/6/2003 | | | |
| 269 | K ED 00165276 | K ED 00165278 | | 8/1/2006 | | | |
| 270 | K 0015498 | K 0015500 | | 03/00/2005 | | | |
| 271 | KEU00108591 | KEU00108592 | | 1/8/2008 | | | |
| 272 | K0012953.22 | K0012953.25 | | 4/25/2001 | Halliday | PX021 | |
| 273 | K0012593.19 | K0012593.21 | | 5/14/2001 | Lloyd | PX055 | |
| 274 | K0012629 | K0012644 | | 6/27/2001 | Halliday | PX022 | |
| 275 | K ED 00009099 | K ED 00009099 | | | Halliday | PX024 | |
| 276 | K0011853 | K0011854 | | 4/17/2002 | Halliday | PX036 | |
| 277 | K0012603 | K0012603 | | | Halliday | PX034 | |
| 278 | K ED 00091067 | K ED 00091073 | | 7/5/2006 | | | |
| 280 | K ED 00007044 | K ED 00007045 | | 6/20/2002 | | | |
| 281 | K ED 00193994 | K ED 00193999 | | 1/27/2004 | | | |
| 282 | K0012976 | K0012976 | | 12/3/2001 | Halliday | PX018 | |
| 283 | K0014644 | K0014644 | | 2/5/2001 | Halliday | PX019 | |
| 284 | K 0012759 | K 0012805 | | | | | |
| 286 | K0010105 | K0010107 | | | Halliday | PX025 | |
| 287 | KEU00028830 | KEU00028870 | | 5/15/2007 | | | Hearsay |
| 294 | K ED 00100797 | K ED 00100797 | | | Gogia | PX160 | |
| 297 | K ED 00100798 | K ED 00100798 | | | Gogia | PX163 | |
| 298 | K ED 00100794 | K ED 00100794 | | | Gogia | PX165 | |
| 299 | K ED 00100796 | K ED 00100796 | | | Gogia | PX166 | |
| 300 | K ED 00100795 | K ED 00100795 | | | Gogia | PX157 | |
| 301 | K 0013513 | K 0013513 | | 4/19/2004 | Lloyd | PX065 | |
| 302 | KEU00084373 | KEU00084394 | | | | | |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

PLAINTIFF'S TRIAL EXHIBIT LIST (PTX) -- 8/25/08

| PTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPO EXHIBIT NO | Def.'s Objections |
|---|---|---|---|---|---|---|---|
| 303 | KEU00032652 | KEU00032657 | | 4/21/2000 | | | |
| 306 | KEU00084395 | KEU00084413 | | 1/31/2008 | | | |
| 307 | KEU00107902 | KEU00107914 | | 2/15/2001 | | | |
| 308 | KEU000109170 | KEU000109174 | | 1/10/2008 | | | |
| 309 | K0009688 | K0009700 | | | Lloyd | PX062 | |
| 310 | K ED 00130711 | K ED 00130712 | | 7/15/2005 | | | |
| 311 | | | | | Hansen | PX146 | |
| 312 | K 0010077 | K 0010077 | | 7/4/2005 | Lloyd | PX066 | |
| 313 | KEU00032296 | KEU00032305 | | 6/5/2007 | Lazaris | DX213 | |
| 314 | KEU00109123 | KEU00109125 | | | | | |
| 315 | K ED 00111545 | K ED 00111552 | | 12/10/2004 | Deromedi | PX170 | |
| 316 | K ED 00047654 | K ED 00047659 | | 4/26/2005 | Deromedi | PX171 | |
| 317 | K ED 00060256 | K ED 00060261 | | 5/25/2005 | Deromedi | PX172 | |
| 318 | K ED 00100799 | K ED 00100799 | | | Gogia | PX167 | |
| 319 | K ED 00017539 | K ED 00017544 | | 10/7/2004 | Deromedi | PX169 | |
| 320 | K 0015419 | K0015420 | | | Lloyd | PX060 | |
| 321 | K ED 00108474 | K ED 00108475 | | 9/25/2007 | Weber | PX197 | |
| 322 | KEU00109139 | KEU00109169 | | | | | |
| 323 | KEU00007792 | KEU00007800 | | | | | |
| 324 | KEU00104873 | KEU00104877 | | | | | |
| 325 | KEU00104986 | KEU00104986 | | | | | |
| 326 | KEU00035241 | KEU00035262 | | | | | |
| 327 | KEU00108021 | KEU00108024 | | 2/21/2000 | | | |
| 328 | KEU00027343 | KEU00027346 | | 1/4/2008 | Beaulieu | DX238 | |
| 331 | | | SEC   Kraft Foods, Inc. 10 Q (quarterly period ending 3/31/08) | 3/31/2008 | | | |
| 332 | KEU00108584 | KEU00108584 | Web Page   "About Flavia" | | | | Hearsay |
| 333 | | | Web Page   Diagram of Kenco Coffee Cartridge (from www.kencocoffeecompany.co.uk) | | | | |
| 334 | KEU00109127 | KEU00109138 | Web Page   Tassimo Frequently Asked Questions | | | | Foundation (no indication of Website) |
| 335 | KEU00109126 | KEU00109126 | Web Page   Tassimo Piercing Unit webpage | | | | |

8

CONFIDENTIAL    ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 1 | | | Complaint, Dkt. 1, Jan. 11, 2007 | | | | |
| 2 | | | Answer to Complaint with Jury Demand by Kraft Foods Inc., Dkt. 12, Feb. 28, 2007 | | | | 403; 801/802 |
| 3 | | | Answer to Complaint with Jury Demand, Counterclaim against Keurig Inc. by Tassimo Corp., Dkt. 13, Feb. 28, 2007 | | | | 403; 801/802 |
| 4 | | | Answer to Complaint with Jury Demand, Counterclaim against Keurig Inc. by Kraft Foods Global Inc., Dkt. 14, Feb. 28, 2007 | | | | 403; 801/802 |
| 5 | | | Order Construing the Terms of U.S. Patent No. 6,607,762, Dkt. 53, Jan. 23, 2008 | | | | 402/403 |
| 6 | | | Keurig's Disclosure of Asserted Claims & Infringement Contentions, Dkt. 37, July 27, 2007 | | | | 402/403 |
| 7 | | | Kraft's Joint Invalidity Contentions, Dkt. 39, Aug. 10, 2007 | | | | 403; 801/802 |
| 8 | | | Kraft's Joint Resp to Keurig's Asserted Claims & Infringment Contentions, Dkt. 39, Aug. 10, 2007 | | | | 402/403; 801/802 |
| 9 | | | Keurig's Resp to Kraft's Joint Invalidity Contentions, Dkt. 41, Aug. 31, 2007 | | | | 403; 801/802 |
| 10 | | | Defs Joint Amnd Resp to Keurig Discl of Asserted Claims & Infringement Contentions, Dkt. 52, Jan. 22, 2008 | | | | 402/403; 801/802 |
| 11 | | | Keurig's Initial Disclosures, Dkt. 29, Jul. 6, 2007 | | | | 402/403 |
| 12 | | | Keurig Resp to Kraft 1st Set of Joint Interrogs (Nos 1-16), Dkt. 28, July 5, 2007 | | | | 106, |
| 14 | | | Kraft Foods Resps to Keurig's 1st of Set of Interrogs (Nos 1-17), Dkt. 36, July 16, 2007 | | | | 801/802 |
| 15 | | | Tassimo Resps to Keurig 1st of Set of Interrogs (Nos 1-17), Dkt. 36, July 16, 2007 | | | | 801/802 |
| 16 | | | Keurig Resp to Kraft 2nd Set of Joint Interrogs (Nos 17-24), Dkt. 50, Dec. 7, 2007 | | | | 106, |
| 18 | | | Kraft Foods Resp to Keurig 2nd Set of Interrogs (Nos 18-24), Dkt. 68, Feb. 25, 2008 | | | | 801/802 |
| 19 | | | Tassimo Resp to Keurig 2nd Set of Interrogs (Nos 18-24), Dkt. 68, Feb. 25, 2008 | | | | 801/802 |
| 20 | | | Keurig Resp to Kraft Joint 1st and 2nd Set of Interrogs, Dkt. 79, Apr. 1, 2008 | | | | |
| 22 | | | Kraft Foods Resp to 3rd Set of Interrogs (Nos 25-28), Dkt. 84, Apr. 8, 2008 | | | | 801/802 |
| 23 | | | Tassimo Resp to 3rd Set of Interrogs (Nos 25-28), Dkt. 84, Apr. 8, 2008 | | | | 801/802 |
| 26 | | | U.S. Patent No. 4,853,234 | | | | |
| 27 | | | U.S. Patent No. 5,452,130 | | | | |
| 28 | | | U.S. Patent No. 5,325,765 | | | | |
| 29 | | | U.S. Patent No. 5,840,189 | | | | |
| 31 | | | Kenco Singles Cartridge (Rychiger Line) - Physical sample | | | | |
| 32 | | | Kenco Singles Cartridge (Lambert Line) - Physical sample | | | | |
| 33 | | | Tassimo disc ("T-disc") - Physical sample | | | | |
| 34 | | | Tassimo® Disc Starbucks House Blend - Physical sample | | | | |
| 35 | | | Tassimo® Disc Twinings Earl Grey Tea - Physical sample | | | | |
| 38 | | | Kenco Singles Brewer - Physical sample | | | | |
| 39 | | | Kenco Singles Brewer Component - Physical Sample | 2/22/2008 | Halliday | Pl. Exs. 42 and 43 | |
| 40 | | | Kenco Singles Cartridge Single-Side Test Rig - Physical sample | 3/19/2008 | Bentley | Pl. Ex. 90 | MIL 1 |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 41 | | | Photo of Keurig Model B60 Single Serve Machine Inlet Seal | | | | Reserved |
| 42 | | | Green Mountain Coffee Roasters, Annual Report 2005 | | | | 403; 801/802 |
| 43 | | | Green Mountain Coffee Roasters, Annual Report 2006 | | | | 403; 801/802 |
| 44 | | | Green Mountain Coffee Roasters, Inc. 10-K 2005 | | | | 403; 801/802 |
| 45 | | | Green Mountain Coffee Roasters, Inc. 10-K 2006 | | | | 403; 801/802 |
| 46 | | | Green Mountain Coffee Roasters, Inc. 10-K 2007 | | | | 403; 801/802 |
| 47 | | | Green Mountain Coffee Roasters, Inc. 8-K June 2006 | | | | 403; 801/802 |
| 48 | | | Kraft Foods Inc. Annual Report 2002 | | | | 801/802 |
| 49 | | | Kraft Foods Inc. Annual Report 2003 | | | | 801/802 |
| 50 | | | Kraft Foods Inc. Annual Report 2004 | | | | 801/802 |
| 51 | | | Kraft Foods Inc. Annual Report 2005 | | | | 801/802 |
| 52 | | | Kraft Foods Inc. Annual Report 2006 | | | | 801/802 |
| 53 | | | Kraft Foods Inc. 10-K 2003 | | | | 801/802 |
| 54 | | | Kraft Foods Inc. 10-K 2004 | | | | 801/802 |
| 57 | | | Kraft Foods Inc. 10-K 2007 | | | | 801/802 |
| 58 | K0017222 | K0017223 | Nov. 6, 1996 Letter from Helen Glus to Halliday re: Ordering Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 50 | 801/802 (MIL 3) |
| 59 | K0017221 | | Nov. 7, 1996 Letter from Liz Matthews to Glus re: sending Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 51 | 801/802 (MIL 3) |
| 60 | K0017219 | K0017220 | Feb. 4, 1997 Letter from Helen Glus to Liz Matthews re: Ordering Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 52 | 801/802 (MIL 3) |
| 61 | K0017218 | | Feb. 5, 1997 Letter from Liz Matthews to Glus re: sending Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 53 | 801/802 (MIL 3) |
| 62 | K0017217 | | Feb. 13, 1997 Letter from Liz Matthews to Glus re: sending Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 54 | 801/802 (MIL 3) |
| 63 | K0017216 | | Feb. 13, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 55 | 801/802 (MIL 3) |
| 64 | K0017214 | | Mar. 10, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 56 | 801/802 (MIL 3) |
| 65 | K0017212 | | Mar. 14, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 57 | 801/802 (MIL 3) |
| 66 | K0017204 | K0017206 | May 10, 1997 Letter from Helen Glus to Stephenson re: Ordering Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 58 | 801/802 (MIL 3) |
| 67 | K0017202 | | May 19, 1997 Letter from Caroline Court to Helen Glus re: sending Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 59 | 801/802 (MIL 3) |
| 68 | K0017203 | | May 19, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 60 | 801/802 (MIL 3) |
| 69 | K0017201 | | May 23, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 61 | 801/802 (MIL 3) |
| 70 | K0017199 | | May 30, 1997 Letter from Caroline Court to Helen Glus re: sending Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 62 | 801/802 (MIL 3) |
| 71 | K0017200 | | May 30, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 63 | 801/802 (MIL 3) |
| 72 | K0017197 | K0017198 | Sept. 27, 1997 Letter from Helen Glus to Stephenson re: Ordering Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 64 | 801/802 (MIL 3) |
| 73 | K0017191 | | Oct. 7, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 65 | 801/802 (MIL 3) |
| 74 | K0017196 | | Nov. 17, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 66 | 801/802 (MIL 3) |
| 75 | K0017192 | | Oct. 7, 1997 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 67 | 801/802 (MIL 3) |
| 76 | K0017187 | K0017188 | Feb. 18, 1997 Letter from Helen Glus to Stephenson re: Ordering Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 68 | 801/802 (MIL 3) |
| 77 | K0017186 | | Feb. 27, 1998 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 69 | 801/802 (MIL 3) |
| 78 | K0017189 | | Apr. 3, 1998 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 70 | 801/802 (MIL 3) |
| 79 | K0017182 | K0017182 | Oct. 7, 1998 Letter from Helen Glus to Hubbard re: Ordering Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 71 | 801/802 (MIL 3) |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 80 | K0017181 | | Oct. 20, 1998 Shipping Invoice for Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 72 | 801/802 (MIL 3) |
| 81 | K0017180 | | Oct. 22, 1998 Letter from Helen Glus to Caroline Court re: Ordering Kenco Singles Cartridges | 3/4/2008 | Glus | Def. Ex. 73 | 801/802 (MIL 3) |
| 82 | K0017210 | K0017211 | Apr. 22, 1997 Letter from Helen Glus to Liz Matthews re: Kenco Singles for Michigan | 3/4/2008 | Glus | Pl. Ex. 102 | 801/802 (MIL 3) |
| 83 | K0017384 | K0017390 | Marked Packaging Material Specification - PD-4446, Issue 3 | 2/26/2008 | MacMahon | Def. Ex. 4 | |
| 84 | K0017355 | K0017362 | Packaging Material Specification - ███ Issue 5 | 2/26/2008 | MacMahon | Def. Ex. 8 | |
| 85 | K0017342 | K0017348 | Packaging Material Specification - ███ Issue 6 | 2/26/2008 | MacMahon | Def. Ex. 9 | |
| 86 | K0017349 | K0017354 | Packaging Material Specification - ███ Issue 7 (Note supplemental ".01" pages) | 2/26/2008 | MacMahon | Def. Ex. 10 | |
| 87 | K0017585 | K0017587 | Packaging Material Specification - ███ Issue 3 | 2/26/2008 | MacMahon | Def. Ex. 11 | |
| 88 | K0017588 | K0017590 | Packaging Material Specification - ███ Issue 4 | 2/26/2008 | MacMahon | Def. Ex. 12 | |
| 89 | K0017591 | K0017593 | Packaging Material Specification - ███ Issue 5 | 2/26/2008 | MacMahon | Def. Ex. 13 | |
| 90 | K0017594 | K0017595.01 | Packaging Material Specification - ███ Issue 6 (Note supplemental ".01" pages) | 2/26/2008 | MacMahon | Def. Ex. 14 | |
| 91 | K0017596 | K0017598 | Packaging Material Specification - ███ Issue 8 | 2/26/2008 | MacMahon | Def. Ex. 15 | |
| 92 | K0017561 | K0017568 | Packaging Material Specification - ███ Issue 3 | 2/27/2008 | MacMahon | Def. Ex. 16 | |
| 93 | K0017569 | K0017577 | Packaging Material Specification - ███ Issue 4 | 2/27/2008 | MacMahon | Def. Ex. 17 | |
| 94 | K0017580 | K0017584.01 | Packaging Material Specification - ███ Issue 5 (Note supplemental ".01" pages) | 2/27/2008 | MacMahon | Def. Ex. 18 | |
| 95 | K-D5-2 | K-D5-5 | Packaging Material Specification - ███ Issue 7 | 2/26/2008 | MacMahon | Pl. Ex. 72 | |
| 98 | K0017309 | K0017341 | Packaging Material Specification Drawings - including ███ Issue 1 | 2/26/2008 | MacMahon | Pl. Ex. 76 | |
| 99 | K0017624 | K0017640 | Packaging Material Specification - ███ Issue 2 | 2/26/2008 | MacMahon | Pl. Ex. 77 | |
| 100 | K0017585 | K0017623 | Packaging Material Specification - ███ Issue 3-6 | 2/26/2008 | MacMahon | Pl. Ex. 78 | |
| 101 | K0017662 | K0017686 | Feb. 11, 1994 Facsimile from Stefan Scheuch re: Arnold Schneider re: Sealing Specification for Michigan Capsule Laminate | 2/26/2008 | MacMahon | Pl. Ex. 79 | 801/802 |
| 104 | K-D5-1 | | Kenco Singles capsule brewing experiment using same-side piercing | 2/27/2008 | MacMahon | Pl. Ex. 91 | 801/802; MIL 1 |
| 107 | | | Drawing of Original Singles | 2/27/2008 | MacMahon | Pl. Ex. 94 | 402/403 |
| 110 | | | Kenco Same-Side Piercing Test Cartridge | 2/21/2008 | Rowan | Pl. Ex. 12 | MIL 1 |
| 111 | K0017463 | | Kenco Same-Side Piercing Test Data | 2/21/2008 | Rowan | Pl. Ex. 13 | Hearsay; MIL 1 |
| 112 | | | Kenco Same-Side Piercing Test Cartridge (Lambert 380) - Gold Foil | 2/21/2008 | Rowan | Pl. Ex. 14 | MIL 1 |
| 113 | | | Kenco Same-Side Piercing Test Cartridge | 2/21/2008 | Rowan | Pl. Ex. 15 | MIL 1 |
| 114 | KED00126667 | KED00126676 | Kenco Same-Side Piercing Test Photos | 2/21/2008 | Rowan | Pl. Ex. 16 | MIL 1 |
| 120 | K0017256 | | Sep. 14, 1994 Memo from Bill Craig to Holley and Love re: Michigan Kenco Machine | 3/5/2008 | Greto | Def. Ex. 74 | 801/802 (MIL 3) |
| 121 | K0017254 | K0017255 | Handwritten Notes re: Kenco Singles | 3/5/2008 | Greto | Def. Ex. 75 | 801/802 (MIL 3) |
| 122 | K0017258 | K0017259 | Aug. 29, 1994 Memo from Bill Craig to Holley re: Michigan Kenco Machine | 3/5/2008 | Greto | Def. Ex. 76 | 801/802 (MIL 3) |
| 123 | K0017236 | | Mar. 15, 1995 Shipping Invoice for Kenco Singles Cartridges | 3/5/2008 | Greto | Def. Ex. 77 | 801/802 (MIL 3) |
| 124 | K0017262 | | May 16, 1995 Memo from Bill Craig to Pat Nunn re: Kenco Singles | 3/5/2008 | Greto | Def. Ex. 78 | 801/802 (MIL 3) |
| 125 | K0017241 | | May 16, 1995 Memo from Greto to Nunn re: Kenco Singles Shipment | 3/5/2008 | Greto | Def. Ex. 79 | 801/802 (MIL 3) |
| 126 | K0017240 | | May 18, 1995 Email from Greto to Nunn re: Kenco Singles Shipment | 3/5/2008 | Greto | Def. Ex. 80 | 801/802 (MIL 3) |
| 127 | K0017239 | | Acknowledgement of May 18, 1995 Email from Greto to Nunn re: Kenco Singles Shipment | 3/5/2008 | Greto | Def. Ex. 81 | 801/802 (MIL 3) |
| 128 | K0017239 | | May 31, 1995 Shipping Invoice for Kenco Singles Cartridges | 3/5/2008 | Greto | Def. Ex. 82 | 801/802 (MIL 3) |
| 129 | K0017266 | | Nov. 21 & 22 Email Exchange between Greto and Nunn re: Kenco Singles Shipment | 3/5/2008 | Greto | Def. Ex. 83 | 801/802 (MIL 3) |
| 130 | K0017265 | | Nov. 21, 1995 Email from Nunn to Greto re: Kenco Singles Shipment | 3/5/2008 | Greto | Def. Ex. 84 | 801/802 (MIL 3) |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 131 | K0017269 | | Jun. 24, 1996 Email from Greto to Nunn re: Halliday's Assistant | 3/5/2008 | Greto | Def. Ex. 85 | 801/802 (MIL 3) |
| 132 | K0017270 | | Kenco Coffee Capsules Order form | 3/5/2008 | Greto | Def. Ex. 86 | 801/802 (MIL 3) |
| 133 | K0017253 | | Jun. 27, 1996 Email from Greto to Matthews re: Kenco Singles Shipment | 3/5/2008 | Greto | Def. Ex. 87 | 801/802 (MIL 3) |
| 134 | K0017246 | | Jul. 10, 1996 Facsimile from Appleton to Greto re: Kenco Singles Shipment | 3/5/2008 | Greto | Def. Ex. 88 | 801/802 (MIL 3) |
| 135 | K0017273 | | Aug. 2, 1996 Invoice for Kenco Singles Cartridges | 3/5/2008 | Greto | Def. Ex. 89 | 801/802 (MIL 3) |
| 136 | K0017248 | K0017251 | Mar. 4, 1998 Facsimile from Greto to Virdee re: Kenco Singles | 3/5/2008 | Greto | Def. Ex. 90 | 801/802 (MIL 3) |
| 137 | K0017271 | | May 16, 1995 Memo from Greto to Nunn re: Kenco Singles Shipment | 3/5/2008 | Greto | Pl. Ex. 103 | 801/802 (MIL 3) |
| 138 | K0017307 | K0017308 | Oct. 12, 1999 Email from Greto to Caroline Court re: Kenco Singles Shipment | 3/5/2008 | Greto | Pl. Ex. 104 | 801/802 (MIL 3) |
| 139 | K0017260 | K0017261 | Dec. 11, 1995 Invoice for Kenco Singles Cartridges | 3/5/2008 | Greto | Pl. Ex. 105 | 801/802 (MIL 3) |
| 140 | K0017226 | K0017229 | Aug. 24, 1995 Handwritten notes & Emails re: Kenco Singles Shipment | 3/5/2008 | Greto | Pl. Ex. 106 | 801/802 (MIL 3) |
| 141 | K0017159 | | Aug. 14, 1995 Memo from Halliday to Appleton re: Kenco Singles Shipment | 3/5/2008 | Greto | Pl. Ex. 107 | 801/802 (MIL 3) |
| 142 | K0017252 | K0017253 | Aug. 2, 1996 Invoice for Kenco Singles Cartridges | 3/5/2008 | Greto | Pl. Ex. 108 | 801/802 (MIL 3) |
| 143 | K0017467 | K0017468 | Aug. 2, 1996 Facsimile from Stephenson to Appleton re: Kenco Singles Shipment | 3/5/2008 | Greto | Pl. Ex. 109 | 801/802 (MIL 3) |
| 144 | K0017464 | K0017467 | Aug. 2, 1996 Facsimile & Invoice re: Kenco Singles Shipment | 2/21/2008 | Appleton | Def. Ex. 1 | 801/802 (MIL 3) |
| 145 | K0017156 | K0017171 | Facsimiles, Memos, & Invoices re: Kenco Singles Shipments | 2/21/2008 | Appleton | Pl. Ex. 1 | 801/802 (MIL 3) |
| 146 | K0017172 | | "Sly spends 1,000 on a cup of coffee" | 2/21/2008 | Appleton | Pl. Ex. 2 | 801/802 |
| 147 | K0017247 | K0017251 | Facsimiles from 1998 re: Kenco Singles Shipments | 2/21/2008 | Appleton | Pl. Ex. 3 | 801/802 (MIL 3) |
| 148 | K0017463 | K0017503 | Facsimiles re: Kenco Singles Shipments | 2/21/2008 | Appleton | Pl. Ex. 4 | 403; MIL 1; 801/802 (MIL 3) |
| 150 | K0017369 | K0017373 | Packaging Material Specification - ▇▇▇ Issue 1 | | | | |
| 151 | K0017309 | K0017318 | Packaging Material Specification - ▇▇▇ Issue 1 - Drawings | | | | |
| 152 | K0017507 | K0017508 | Packaging Material Specification - ▇▇▇ Issue 2 (Note supplemental ".01" pages) | | | | |
| 153 | K0017509 | K0017511 | Packaging Material Specification - ▇▇▇ Issue 4 | | | | |
| 154 | K0017512 | K0017513 | Packaging Material Specification - ▇▇▇ Issue 6 (Note supplemental ".01" pages) | | | | |
| 155 | K0017624 | K0017626 | Packaging Material Specification - ▇▇▇ Issue 2 | | | | |
| 156 | K0017627 | K0017629 | Packaging Material Specification - ▇▇▇ Issue 2 | | | | |
| 157 | K0017693 | K0017695 | Packaging Material Specification - ▇▇▇ Issue 2 | | | | |
| 158 | K0017701 | K0017704 | Oct. 20, 2000 Emails re: Kenco Singles Packaging (US Law Compliance) | | | | 801/802 |
| 159 | BAN000001 | BAN000002 | Drawing No. ▇▇▇ -Assembled T-Disc With Lid - Soluble 6 | | | | |
| 160 | BAN000004 | | Drawing No. ▇▇▇ -Assembled T-Disc With Lid - Soluble 5 | | | | |
| 161 | K0000542 | K0000588 | Tassimo HUT Presentation - June 12, 2006 | | | | 801/802 |
| 162 | K0000589 | K0000634 | On-Demand Lessons Learned Presentation - April 2006 | | | | 801/802; Illegible |
| 163 | K0000849 | K0000856 | ▇▇▇ | | | | 801/802 |
| 164 | K0000878 | K0000929 | ▇▇▇ | | | | 402/403 |
| 165 | K0001034 | K0001056 | ▇▇▇ | | | | 801/802 |
| 167 | K0001172 | K0001189 | ▇▇▇ | | | | |
| 168 | K0003012 | K0003029 | ▇▇▇ | | | | 801/802 |
| 169 | K0003358 | K0003449 | ▇▇▇ | | | | 402/403; 801/802 |
| 174 | K0015577 | K0015599 | ▇▇▇ | | | | |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 175 | K0016812 | K0016814 | | | | | 801/802 |
| 176 | K0018142 | K0018209 | | | | | |
| 178 | K0018300 | K0018312 | | | | | 402/403 |
| 179 | KED00009815 | | h | | | | 801/802; Foundation |
| 180 | KED00009816 | KED00009817 | | | | | 801/802; Foundation |
| 181 | KED00022596 | | | | | | 801/802; Foundation |
| 182 | KED00022597 | KED00022630 | | | | | 801/802; Foundation |
| 192 | KED00048862 | KED00048865 | | | | | 801/802 |
| 193 | KED00054654 | KED00054684 | | | | | 801/802 |
| 194 | KED00056644 | KED00056645 | | | | | 801/802 |
| 195 | KED00058113 | KED00058132 | JPMorgan Report - US Food Industry | | | | 801/802 |
| 196 | KED00060340 | KED00060345 | | | | | 801/802 |
| 197 | KED00067391 | KED00067414 | | | | | 402/403; 801/802 |
| 198 | KED00072017 | | | | | | 801/802; Foundation |
| 199 | KED00072018 | KED00072039 | | | | | 801/802; Foundation |
| 200 | KED00074469 | KED00074470 | | | | | 106; 801/802 |
| 202 | KED00085641 | KED00085643 | | | | | 801/802 |
| 204 | KED00102926 | KED00102983 | | | | | |
| 206 | KED00129860 | KED00129861 | Assembled T-disc Without Lid (Big Disc Dry) | | | | |
| 207 | KED00129862 | KED00129863 | -Assembled BIG T-Disc Filter | | | | |
| 208 | KED00129864 | | Drawing No. MSC/T393I--Assembled T-disc Without Lid (Filter Aerated 3) | | | | |
| 209 | KED00129865 | KED00129867 | -Assembled T-Disc Filter Aerated | | | | |
| 210 | KED00129868 | | Drawing No.          -Assembled T-disc Without Lid (Filter 3) | | | | |
| 211 | KED00129869 | KED00129871 | -Assembled T-Disc Filter 4 | | | | |
| 212 | KED00129872 | KED00129881 | -Assembled T-Disc Filter 4 | | | | |
| 213 | KED00129882 | KED00129885 | -Assembled T-Disc Filter Aerated | | | | |
| 214 | KED00129886 | KED00129895 | - Lacquer/Ink/Primer/          Foil- | | | | |
| 215 | KED00129896 | | Jul. 2, 2002 - Packaging Test Report | | | | 402/403; 801/802 |
| 216 | KED00129924 | KED00129925 | -Assembled BIG T-Disc Filter | | | | |
| 217 | KED00135244 | KED00135245 | | | | | 801/802; Untimely production |
| 218 | KED00144885 | KED00144886 | Pictures Tassimo Production facility | | | | Untimely production |
| 219 | KED00146430 | KED00146519 | April 26 Tassimo AR Review and Analysis Presentation - April 11, 2005 | | | | 801/802 |
| 220 | KED00151764 | KED00151765 | Tassimo Key Issues/Optimization Presentation | | | | 801/802; Untimely production |
| 221 | KED00155117 | KED00155135 | Tassimo Presentation | | | | 801/802; Untimely production |
| 222 | KED00162865 | KED00162868 | Global Supply Chain Decomplexity Presentation | | | | 801/802; Untimely production |
| 223 | KED00163236 | KED00163237 | | | | | 403; 801/802; Untimely production |
| 224 | KED00164440 | KED00164474 | | | | | 801/802; Untimely production |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|-----|----------|----------|-------------|--|----------|----------|----------|---------------------|
| 225 | KED00164838 | KED00164875 | | | | | | 801/802; Untimely production |
| 226 | KED00169147 | KED00169148 | Sep. 25, 2007 - Tassimo Update | | | | | 801/802; Untimely production |
| 227 | KED00172225 | KED00172249 | Tassimo Presentation - July 2005 | | | | | 801/802; Untimely production |
| 228 | KED00181511 | | 2005 Sales Data | | | | | |
| 229 | KED00181513 | | 2006 Sales Data | | | | | |
| 230 | KED00181514 | | TASSIMO T-DISCS - ACTUAL 2006 TO MARCH 2008 | | | | | |
| 231 | KED00181517 | | Tassimo DTC Disc Sales (May 2007) | | | | | |
| 232 | KED00181518 | KED00181537 | -Membrane/Die Cut/Tassimo T-disc lid/Dry skus | | | | | 402/403; Untimely production |
| 233 | KEU00000120 | KEU00000126 | Keurig-Tassimo Focus Group Report - May 2005 | | | | | |
| 234 | KEU00000169 | KEU00000171 | | | | | | |
| 235 | KEU00000203 | KEU00000208 | | | | | | |
| 236 | KEU00000285 | KEU00000285 | | | | | | |
| 237 | KEU00001835 | KEU00001863 | | | | | | |
| 238 | KEU00002742 | KEU00002743 | | | | | | 801/802 |
| 239 | KEU00004817 | KEU00004857 | | | | | | |
| 240 | KEU00005502 | KEU00005553 | | | | | | |
| 241 | KEU00005621 | KEU00005680 | | | | | | |
| 242 | KEU00006036 | KEU00006171 | | | | | | |
| 243 | KEU00007445 | KEU00007512 | | | | | | |
| 244 | KEU00008423 | KEU00008427 | | | | | | 403, |
| 245 | KEU00012681 | KEU00012686 | | | | | | Cumulative of DTX 235 |
| 246 | KEU00012842 | KEU00012854 | | | | | | |
| 247 | KEU00012995 | KEU00013091 | | | | | | |
| 248 | KEU00019160 | KEU00019172 | | | | | | |
| 249 | KEU00019664 | | | | | | | Object to description |
| 250 | KEU00020738 | KEU00020739 | | | | | | 402/403 |
| 251 | KEU00020740 | KEU00020747 | | | | | | |
| 252 | KEU00020762 | KEU00020779 | | | | | | 402/403 |
| 253 | KEU00020781 | KEU00020811 | | | | | | 402/403 |
| 254 | KEU00026634 | KEU00026658 | | | | | | |
| 255 | KEU00027097 | KEU0027198 | | | | | | |
| 256 | KEU00027899 | | | | | | | 402/403 |
| 257 | KEU00028628 | | | | | | | Foundation |
| 259 | KEU00030072 | KEU00030073 | | | | | | |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 260 | KEU00031159 | KEU00031163 | | | | | 403; Cumulative of DTX 277 |
| 261 | KEU00031776 | KEU00031777 | | | | | |
| 262 | KEU00032363 | KEU00032366 | | | | | |
| 263 | KEU00032367 | KEU00032408 | | | | | |
| 264 | KEU00032590 | KEU00032618 | | | | | 402/403 |
| 266 | KEU00032684 | KEU00032714 | | | | | 403 (pages 18 and 19) |
| 268 | KEU00034524 | KEU00034525 | | | | | |
| 269 | KEU00035151 | | | | | | 402/403 |
| 270 | KEU00037682 | | | | | | |
| 271 | KEU00046922 | KEU00046937 | | | | | |
| 272 | KEU00047172 | KEU00047192 | | | | | |
| 273 | KEU00049579 | KEU00049596 | | | | | |
| 274 | KEU00049832 | KEU00049841 | | | | | |
| 275 | KEU00050478 | KEU00050522 | | | | | |
| 276 | KEU00077261 | KEU00077267 | | | | | |
| 277 | KEU00084141 | KEU00084147 | | | | | 403, |
| 278 | KEU00084220 | KEU00084235 | | | | | Foundation |
| 280 | KEU00087284 | KEU00087287 | | | | | |
| 281 | KEU00088734 | KEU00089358 | | | | | |
| 282 | KEU00095967 | KEU00095993 | | | | | |
| 283 | KEU00101186 | KEU00101188 | | | | | |
| 284 | KEU00101877 | | | | | | |
| 285 | KEU00102404 | KEU00102405 | | | | | |
| 286 | KEU00102471 | | | | | | |
| 287 | KEU00103220 | KEU00103221 | | | | | 402/403 |
| 294 | KEU00103537 | KEU00103606 | | | | | |
| 295 | KEU00103673 | KEU00103720 | | | | | |
| 297 | KEU00104046 | KEU00104061 | | | | | |
| 298 | KEU00104303 | KEU00104327 | | | | | 402/403 |
| 299 | KEU00104328 | KEU00104329 | | | | | 402/403 |
| 301 | KEU00104514 | KEU00104586 | | | | | 402/403; 801/802 |
| 302 | KEU00107900 | KEU00107901 | | | | | |
| 304 | KEU00030621 | KEU00030623 | | | | | 403, |
| 305 | | | Rule 26 Expert Report of Alan Ratliff, CPA/MPA-JD (April 15, 2008), with Exhibits | | | | |
| 306 | | | First Supplemental Rule 26 Expert Report of Alan Ratliff, CPA/MPA-JD (Jun. 18, 2008), with Exhibits | | | | |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 307 | | | Rule 26(a)(2)(B) Expert Report of Ted Lingle (April 15, 2008), with Exhibits | | | | |
| 308 | | | Rule 26(a)(2)(B) Rebuttal Expert Report of Ted Lingle (May 13, 2008), with Exhibits | | | | |
| 309 | | | Rule 26(a)(2)(B) Expert Report of Prof. Alexander Slocum (April 15, 2008), with Exhibits | | | | |
| 310 | | | Rule 26(a)(2)(B) Rebuttal Expert Report of Prof. Alexander Slocum (May 13, 2008), with Exhibits | | | | |
| 311 | | | Expert Witness Report of Malcolm E. Taylor (April 15, 2008), with Exhibits | | | | 801/802 |
| 312 | | | Rebuttal Expert Witness Report of Malcolm E. Taylor (May 12, 2008), with Exhibits | | | | 801/802 |
| 313 | | | Exhibit 1 to Expert Witness Report of Malcom E. Taylor - CV | | | | 801/802 |
| 314 | | | Exhibit 2 to Expert Witness Report of Malcom E. Taylor - Documents Considered | | | | 801/802 |
| 315 | | | Exhibit 3 to Expert Witness Report of Malcom E. Taylor - Kenco Singles Depiction | | | | 801/802 |
| 316 | | | Exhibit 4 to Expert Witness Report of Malcom E. Taylor - MacMahon Depo | | | | 801/802 |
| 317 | | | Exhibit 5 to Expert Witness Report of Malcom E. Taylor - PD-4439, Issue Nos. 4-7 | | | | |
| 318 | K0017402 | K0017407 | Ex. 5 - Packaging Material Specification - ███ Issue 4 | | | | |
| 319 | K0017355 | K0017362 | Ex. 5 - Packaging Material Specification - ███ Issue 5 | | | | |
| 320 | K0017342 | K0017348 | Ex. 5 - Packaging Material Specification - ███ Issue 6 | | | | |
| 321 | K0017349 | K0017354 | Ex. 5 - Packaging Material Specification - ███ Issue 7 | | | | |
| 322 | | | Exhibit 6 to Expert Witness Report of Malcom E. Taylor - PD-4446, Issue Nos. 3-8 | | | | |
| 323 | K0017585 | K0017587 | Ex. 6 - Packaging Material Specification - ███ Issue 3 | | | | |
| 324 | K0017588 | K0017590 | Ex. 6 - Packaging Material Specification - ███ Issue 4 | | | | |
| 325 | K0017319 | | Ex. 6 - Packaging Material Specification - ███ Issue 4 - Product Diagram | | | | |
| 326 | K0017321 | | Ex. 6 - Packaging Material Specification - ███ Issue 4 - Product Diagram | | | | |
| 327 | K0017591 | K0017593 | Ex. 6 - Packaging Material Specification - ███ Issue 5 | | | | |
| 328 | K0017594 | K0017595.01 | Ex. 6 - Packaging Material Specification - ███ Issue 6 | | | | |
| 329 | K-D5-2 | K-D5-5 | Ex. 6 - Packaging Material Specification - ███ Issue 7 | 2/26/2008 | MacMahon | Pl. Ex. 72 | |
| 330 | K0017596 | K0017598 | Ex. 6 - Packaging Material Specification - ███ Issue 8 | 2/26/2008 | MacMahon | Def. Ex. 15 | |
| 331 | K0017384 | K0017390 | Exhibit 7 to Expert Witness Report of Malcom E. Taylor - Marked Packaging Material Specification - ███ Issue 3 | 2/26/2008 | MacMahon | Def. Ex. 4 | |
| 332 | | | Exhibit 8 to Expert Witness Report of Malcom E. Taylor - Bentley Depo 4/2/08 | | | | 801/802; MIL 1; MIL 2; FRCP 32(c) |
| 333 | K0017986 | K0017986 | Exhibit 9 to Expert Witness Report of Malcom E. Taylor - " 'Lambert Line' Singles cartridge brewing experiment using same-side piercing test rig." | 4/2/2008 | Bentley | Pl. Ex. 202 | 801/802; MIL 1; MIL2 |
| 334 | | | Exhibit 10 to Expert Witness Report of Malcom E. Taylor - Kenco Singles™ Medium Roast Cartridge Production Records | | | | 106; 801/802 (MIL 3) |
| 335 | | | Exhibit 11 to Expert Witness Report of Malcom E. Taylor - Rowan Depo | | | | 801/802; MIL 1; MIL 2; FRCP 32(c) |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|-----|----------|----------|-------------|----------|----------|----------|---------------------|
| 336 | K0017463 | K0017463 | Exhibit 12 to Expert Witness Report of Malcolm E. Taylor - Mould Manufacturing Data | | | | 801/802; MIL 1; MIL 2 |
| 337 | | | Exhibit 13 to Expert Witness Report of Malcolm E. Taylor - Bentley Depo 2/27/08 | | | | 801/802; MIL 1; MIL 2; FRCP 32(c) |
| 338 | K-D5-1 | K-D5-1 | Exhibit 14 to Expert Witness Report of Malcolm E. Taylor - "Kenco Singles capsule brewing experiment using same-side piercing Test Results" | 2/27/2008 | Bentley | Pl. Ex. 91 | 801/802; MIL 1; MIL 2 |
| 339 | | | Exhibit 15 to Expert Witness Report of Malcolm E. Taylor - Halliday Depo | | | | 402/403; 801/802; FRCP 32(c) |
| 340 | K0017705 | K0017710 | Exhibit 16 to Expert Witness Report of Malcolm E. Taylor - Kraft Foods Development Report - Singles Capsule Piercing Force | 2/22/2008 | Halliday | Def. Ex. 3 | 402/403; 801/802 |
| 341 | K0018004 | K0018008 | Exhibit 17 to Expert Witness Report of Malcolm E. Taylor - Packaging Test Report No. 02_026 | | | | 402/403; 801/802 |
| 342 | | | Exhibit 18 to Expert Witness Report of Malcolm E. Taylor - Lazaris Depo | | | | 402/403; FRCP 32(c) |
| 343 | | | Exhibit 19 to Expert Witness Report of Malcolm E. Taylor - U.S. Patent No. 4,853,234 | | | | |
| 344 | | | Exhibit 20 to Expert Witness Report of Malcolm E. Taylor - U.S. Patent No. 6,607,762 | | | | |
| 345 | | | Exhibit 21 to Expert Witness Report of Malcolm E. Taylor - U.S. Patent No. 5,840,189 | | | | |
| 346 | | | Exhibit 22 to Expert Witness Report of Malcolm E. Taylor - Inverted Fig. 1 of '130 Patent | | | | 801/802 |
| 347 | | | Exhibit 23 to Expert Witness Report of Malcolm E. Taylor - U.S. Patent No. 4,452,130 | | | | |
| 348 | | | Exhibit 24 to Expert Witness Report of Malcolm E. Taylor - U.S. Patent No. 5,325,765 | | | | |
| 349 | | | Expert Witness Report of James Malackowski (May 13, 2008), with Exhibits | | | | 801/802 |
| 350 | | | Errata Sheet to Expert Report of James E. Malackowski (Aug. 5, 2008) | | | | 801/802 |
| 351 | | | "The Keurig B130 In-Room Hotel Brewing System" - www.keurig.com/hospitality/b130brewer.asp | | | | |
| 352 | | | "Elite B40 Brewer" - www.keurig.com/B40.asp | | | | |
| 353 | | | Appendix A to Expert Witness Report of James Malackowski - CV of James Malackowski | | | | 801/802 |
| 354 | | | Exhibit 1 to Expert Witness Report of James Malackowski - Summary of Coffee Consumption by Location | | | | |
| 355 | | | Exhibit 2 (Revised) to Expert Witness Report of James Malackowski - Single Serve Beverage System Advertising Spend | | | | |
| 356 | | | Exhibit 3a to Expert Witness Report of James Malackowski - Quarterly Market Share Analysis (All retail channels based on data reported by Keurig) | | | | |
| 357 | | | Exhibit 3b (Revised) to Expert Witness Report of James Malackowski - Quarterly Market Share Data (All retail channels based on data reported by Keurig) | | | | |
| 358 | | | Exhibit 3c to Expert Witness Report of James Malackowski - Summary of Tassimo U.S. Financial Results | | | | |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 359 | | | Exhibit 4 (Revised)  to Expert Witness Report of James Malackowski - Summary of Tassimo U.S. Financial Results | | | | 402/403 |
| 360 | | | Exhibit 5 (Revised)  to Expert Witness Report of James Malackowski - Summary of Keurig At Home North America Financial Results | | | | |
| 361 | | | Exhibit 6 (Revised)  to Expert Witness Report of James Malackowski - Summary of Green Mountain Financial Results(in millions) (1) | | | | 402/403 |
| 362 | | | Exhibit 7 to Expert Witness Report of James Malackowski - Summary of Keurig Roaster Agreements | | | | |
| 363 | | | Exhibit 8 (Revised) to Expert Witness Report of James Malackowski - Summary of Keurig Sliding Scale Royalty Rate Schedules | | | | |
| 364 | | | Exhibit 9 to Expert Witness Report of James Malackowski - Summary of Keurig Brewer Related Agreements | | | | 402/403 |
| 365 | | | Exhibit 10 to Expert Witness Report of James Malackowski - Summary of Keurig Patents (1) | | | | 402/403 |
| 366 | | | Exhibit 11 to Expert Witness Report of James Malackowski - Summary of Kraft Trademark and Supply Agreements | | | | |
| 367 | | | Exhibit 12 to Expert Witness Report of James Malackowski - Conversion of Twinings Royalty Rate from Pence to Dollars | | | | |
| 368 | | | Exhibit 13 to Expert Witness Report of James Malackowski - Summary of Kraft Brewer Related Agreements | | | | 402/403 |
| 369 | | | Exhibit 14 to Expert Witness Report of James Malackowski - Summary of Abstracts Received from Royalty Source | | | | 801/802 |
| 370 | | | Exhibit 15a to Expert Witness Report of James Malackowski - Summary of Tassimo U.S. Forecasts | | | | |
| 371 | | | Exhibit 15b to Expert Witness Report of James Malackowski - Summary of Kraft 9/28/2004 Forecast (Project Ontario-20-A) (1) | | | | |
| 372 | | | Exhibit 15c to Expert Witness Report of James Malackowski - Summary of Kraft 10/15/2004 Forecast (Project Ontario-20-A ) (1) | | | | |
| 373 | | | Exhibit 15d to Expert Witness Report of James Malackowski - Summary of Kraft December 2004 AR Forecast (1) | | | | |
| 374 | | | Exhibit 15e to Expert Witness Report of James Malackowski - Summary of Kraft 2/1/2005 (Base) Forecast (Project Ontario-27-01 (Base)) (1) | | | | |
| 375 | | | Exhibit 15f (Revised)  to Expert Witness Report of James Malackowski - SUMMARY OF KRAFT 2/1/2005 (2x) FORECAST (Project Ontario-27-02 (2x)) (1) | | | | |
| 376 | | | Exhibit 15g to Expert Witness Report of James Malackowski - SUMMARY OF KRAFT APRIL 2005 AR FORECAST (1) | | | | |
| 377 | | | Exhibit 15h to Expert Witness Report of James Malackowski - SUMMARY OF KRAFT 6/17/2005 FORECAST (Project Ontario-32-02-4 ) (1) | | | | |
| 378 | | | Exhibit 15i to Expert Witness Report of James Malackowski - SUMMARY OF KRAFT Q3 2005 FORECAST (Project Ontario-33-06 ) (1) | | | | |
| 379 | | | Exhibit 16a to Expert Witness Report of James Malackowski - SUMMARY OF ROYALTY RATE IMPLIED BY ANALYTICAL APPROACH | | | | 801/802 |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|---|---|---|---|---|---|---|---|
| 380 | | | Exhibit 16b to Expert Witness Report of James Malackowski - CALCULATION OF BEVERAGE DIVISION NET MARGIN PERCENTAGE (1) | | | | |
| 381 | | | Exhibit 16c to Expert Witness Report of James Malackowski - Comparison of Kraft North American Beverage and Snacks & Cereal Division Profitability (1) | | | | |
| 382 | | | Exhibit 17a to Expert Witness Report of James Malackowski - SUMMARY OF TASSIMO FORECAST/ACTUALS FOR THE PERIOD 2004 - 2007 (1) | | | | 402/403 |
| 383 | | | Exhibit 17b to Expert Witness Report of James Malackowski - SUMMARY OF TASSIMO FORECAST/ACTUALS FOR THE PERIOD 2004 - 2014 (1) | | | | 402/403 |
| 384 | | | Exhibit 18 to Expert Witness Report of James Malackowski - CALCULATION OF KRAFT WORLDWIDE REVENUES | | | | |
| 385 | | | Exhibit 19a to Expert Witness Report of James Malackowski - CALCULATION OF TASSIMO NPV BASED ON ALTERNATIVE ROYALTY SCENARIOS (Project Ontario-33-06 - Based on 8% discount rate) | | | | 403; 801/802 |
| 386 | | | Exhibit 19b to Expert Witness Report of James Malackowski - CALCULATION OF TASSIMO NPV BASED ON ALTERNATIVE ROYALTY SCENARIOS (Project Ontario-33-06 - Based on 12% discount rate) | | | | 403; 801/802 |
| 387 | | | Exhibit 19c to Expert Witness Report of James Malackowski - CALCULATION OF TASSIMO NPV BASED ON ALTERNATIVE ROYALTY SCENARIOS (Project Ontario-33-06 - Based on 20% discount rate) | | | | 403; 801/802 |
| 388 | | | Exhibit 19d to Expert Witness Report of James Malackowski - CALCULATION OF ACCUSED T DISC SALES (Project Ontario-33-06) | | | | 403; 801/802 |
| 389 | | | Exhibit 19e to Expert Witness Report of James Malackowski - CALCULATION OF ACCUSED T DISCS AS % OF TOTAL T-DISC SALES (1) | | | | |
| 390 | | | Chart on page 1 of Expert Report of James Malackowski | | | | |
| 391 | | | Chart on page 3 of Expert Report of James Malackowski | | | | |
| 392 | | | Chart on page 6 of Expert Report of James Malackowski | | | | 802/803 |
| 393 | | | Chart on page 7 of Expert Report of James Malackowski | | | | |
| 394 | | | Chart on page 8 of Expert Report of James Malackowski | | | | |
| 395 | | | Chart on page 9 of Expert Report of James Malackowski | | | | |
| 396 | | | Chart on page 10 of Expert Report of James Malackowski | | | | |
| 397 | | | Chart on page 13 of Expert Report of James Malackowski | | | | |
| 398 | | | Chart on page 16 of Expert Report of James Malackowski | | | | 402/403 |
| 399 | | | Chart (first) on page 17 of Expert Report of James Malackowski | | | | 106, |
| 400 | | | Chart (second) on page 17 of Expert Report of James Malackowski | | | | 106, |
| 401 | | | Chart on page 18 of Expert Report of James Malackowski | | | | |
| 402 | | | Chart (first) on page 19 of Expert Report of James Malackowski | | | | |
| 403 | | | Chart (second) on page 19 of Expert Report of James Malackowski | | | | |
| 404 | | | Chart on page 20 of Expert Report of James Malackowski | | | | |
| 405 | | | Chart on page 21 of Expert Report of James Malackowski | | | | |
| 406 | | | Chart on page 22 of Expert Report of James Malackowski | | | | 402/403 |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

DEFENDANTS' TRIAL EXHIBIT LIST (DTX) -- 8/25/08

| DTX | BEGBATES | ENDBATES | DESCRIPTION | DEP DATE | DEPONENT | DEPOEXNO | KEURIG'S OBJECTIONS |
|-----|----------|----------|-------------|----------|----------|----------|---------------------|
| 407 | | | Chart on page 23 of Expert Report of James Malackowski | | | | 402/403; 801/802 |
| 408 | | | Chart on page 24 of Expert Report of James Malackowski | | | | |
| 409 | | | Chart on page 25 of Expert Report of James Malackowski | | | | |
| 410 | | | Chart on page 26 of Expert Report of James Malackowski | | | | 402/403 |
| 411 | | | Chart (first) on page 27 of Expert Report of James Malackowski | | | | 402/403 |
| 412 | | | Chart (second) on page 27 of Expert Report of James Malackowski | | | | 402/403 |
| 413 | | | Chart (first) on page 28 of Expert Report of James Malackowski | | | | |
| 414 | | | Chart (second) on page 28 of Expert Report of James Malackowski | | | | 106, |
| 415 | | | Chart on page 34 of Expert Report of James Malackowski | | | | |
| 416 | | | Chart on page 45 of Expert Report of James Malackowski | | | | 402/403; 801/802 |
| 417 | | | Chart on page 54 of Expert Report of James Malackowski | | | | 402/403; 801/802 |
| 418 | | | Chart on page 55 of Expert Report of James Malackowski | | | | 402/403; 801/802 |
| 419 | | | Chart on page 60 of Expert Report of James Malackowski | | | | 402/403; 801/802 |
| 420 | | | Chart on page 61 of Expert Report of James Malackowski | | | | |
| 421 | | | Chart on page 63 of Expert Report of James Malackowski | | | | 402/403; 801/802 |
| 422 | | | Chart on page 65 of Expert Report of James Malackowski | | | | |
| 423 | | | Chart on page 69 of Expert Report of James Malackowski | | | | |
| 424 | | | Chart on page 85 of Expert Report of James Malackowski | | | | 402/403; 801/802 |
| 426 | | | Keurig Special Edition -  Model B60 Brewer Quick Start Guide | | | | |
| 427 | | | Keurig Special Edition -  Model B60 Brewer Use & Care Guide | | | | |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

JOINT TRIAL EXHIBIT LIST -- 8/25/08

| JTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPOEXNO |
|---|---|---|---|---|---|---|
| JTX001 (PTX227, DTX183) | K ED 00045346 | K ED 00045363 | ██████████████████ | 4/11/2005 | Lloyd | PX049 |
| JTX002 (PTX218, DTX115) | K ED 00045183 | K ED 00045190 | ████████████████████ | 04/00/2005 | Rowan | PX005 |
| JTX003 (PTX228, DTX116) | K0008261 | K0008266 | ███████████████████████ | 3/2/2005 | Rowan | PX006 |
| JTX004 (PTX229, DTX117) | K ED 00074844 | K ED 00074848 | █████████████ | | Rowan | PX007 |
| JTX005 (PTX060, DTX119) | K ED 00016018 | K ED 00016019 | █ ███████████████ | 10/8/2004 | Rowan | PX009 |
| JTX006 (PTX074, DTX108) | K ED 00070908 | K ED 00070909 | ████████████████████████ | 10/10/2005 | Rowan | PX010 |
| JTX007 (PTX072, DTX109) | K ED 00005428 | K ED 00005430 | ████████████████ | 5/14/2007 | Rowan | PX011 |
| JTX008 (PTX211, DTX184) | K ED 00046624 | K ED 00046661 | ████████████████████ █ | 06/00/2004 | Lloyd | PX048 |
| JTX009 (PTX265, DTX149) | K0004713 | K0004733 | ██████████████ | | Lloyd, Hanson, Weber | PX053, PX150, PX191 |
| JTX010 (PTX279, DTX097) | K0017696 | K0017704 | ██████████████████ | 10/11/1999 | Macmahon | PX075 |
| JTX011 (PTX096, DTX102) | K ED 00075814 | K ED 00075814 | ████████████████████████ | 11/30/2006 | Macmahon | PX080 |
| JTX012 (PTX087, DTX205) | K ED 00112343 | K ED 00112356 | █████████████████ | 2/3/2006 | Weber | PX192 |
| JTX013 (PTX243, DTX166) | K0001090 | K0001119 | ██████████████████ | 4/1/2006 | Hansen | PX145 |
| JTX014 (PTX289, DTX185) | K ED 00048282 | K ED 00048282 | ██████████████ | 3/1/2005 | Gogia | PX155 |
| JTX015 (PTX290, DTX186) | K ED 00048283 | K ED 00048283 | ██████████ | 20/05/0000 | Gogia | PX156 |
| JTX016 (PTX292, DTX187) | K ED 00048284 | K ED 00048284 | ████████████████ | 20/06/0000 | Gogia | PX158 |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

JOINT TRIAL EXHIBIT LIST -- 8/25/08

| JTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPOEXNO |
|-----|----------|----------|-------------|------|----------|----------|
| JTX017 (PTX293, DTX188) | K ED 00048285 | K ED 00048285 | ███████████ | 20/06/0000 | Gogia | PX159 |
| JTX018 (PTX295, DTX189) | K ED 00048286 | K ED 00048286 | ███████████ | 20/07/0000 | Gogia | PX161 |
| JTX019 (PTX296, DTX190) | K ED 00048287 | K ED 00048287 | ███████████ | 20/07/0000 | Gogia | PX162 |
| JTX020 (PTX291, DTX191) | K ED 00048288 | K ED 00048288 | ███████████ | 10/1/2005 | Gogia | PX164 |
| JTX021 (PTX304, DTX265) | KEU00032668 | KEU00032676 | ███████████ | 9/29/2000 | Lazaris | DX205 |
| JTX022 (PTX235, DTX267) | KEU00032715 | KEU00032740 | ███████████ | 7/24/2006 | Lazaris | DX234 |
| JTX023 (PTX100, DTX201) | K ED 00083601 | K ED 00083603 | ███████████ | 2/2/2006 | Deromedi, Weber | PX184, PX190 |
| JTX024 (PTX285, DTX203) | K ED 00086854 | K ED 00086967 | ███████████ | 1/26/2006 | | |
| JTX025 | | | | | | |
| JTX026 (PTX166, DTX025) | KEU00036245 | KEU00036336 | ███████████ | 2/13/2001 | | |
| JTX027 (PTX027, DTX177) | K0018279 | K0018299 | ███████████ | | | |
| JTX028 (PTX330, DTX056, DTX303) | KEU00108818 | KEU00108963 | SEC   Kraft Foods, Inc. 10 K (annual period ending 12/31/06) | 12/31/2006 | | |
| JTX029 (PTX025, DTX171) | K0015318 | K0015369 | ███████████ | 12/1/2002 | | |
| JTX030 (PTX024, DTX172) | K0015370 | K0015394 | ███████████ | 5/23/2003 | | |
| JTX031 (PTX026, DTX173) | K0015408 | K0015461 | ███████████ | 4/13/2006 | | |
| JTX032 (PTX022, DTX288) | KEU00103226 | KEU00103274 | ███████████ | 8/13/2003 | | |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

| JTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPOEXNO |
|---|---|---|---|---|---|---|
| JTX033 (PTX020, DTX289) | KEU00103300 | KEU00103362 | ███████████████████████████████ | 8/17/2005 | | |
| JTX034 (PTX019, DTX290) | KEU00103363 | KEU00103423 | ███████████████████████████████ | 11/1/2005 | | |
| JTX035 (PTX018, DTX291) | KEU00103428 | KEU00103474 | ███████████████████████████████ | 7/24/2003 | | |
| JTX036 (PTX016, DTX292) | KEU00103475 | KEU00103493 | ███████████████████████████████ | 10/20/2000 | | |
| JTX037 (PTX012, DTX293) | KEU00103504 | KEU00103530 | ███████████████████████████████ | 12/4/1997 | | |
| JTX038 (PTX013, DTX296) | KEU00103809 | KEU00103826 | ███████████████████████████████ | 6/21/2002 | | |
| JTX039 (PTX021, DTX300) | KEU00104438 | KEU00104467 | ███████████████████████████████ | 6/28/2001 | | |
| JTX040 (PTX193, DTX279) | KEU00084340 | KEU00084345 | ███████████████████████████████ | | | |
| JTX041 (PTX288, DTX170) | K0014549 | K 0014565 | ███████████████████████████████ | 8/5/2001 | | |
| JTX042 (PTX054, DTX013) | | | Discovery Responses    KFG's Responses to Keurig's First Set of Interrogatories | 7/16/2007 | Halliday | PX023 |
| JTX043 (PTX055, DTX017) | | | Discovery Responses    KFG's Responses to Keurig's Second Set of Interrogatories | 2/25/2008 | | |
| JTX044 (PTX058, DTX021) | | | Discovery Responses    KFG's Responses to Keurig's Third Set of Interrogatories | 4/8/2008 | | |
| JTX045 (PTX165, DTX024) | | | Patent    US 6,607,762 | 8/19/2003 | Macmahon | PX073 |
| JTX046 (PTX169, DTX030) | | | Patent    U.S. Patent No. 7,328,651 B2 | 2/12/2008 | Halliday | PX030 |
| JTX047 (PTX198, DTX037) | | | Physical Exhibit    Braun Tassimo Hot Beverage System    TA1200 | | | |
| JTX048 (PTX199, DTX425) | | | Physical Exhibit    Keurig Special Edition Model B60 Brewer | | | |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

| JTX | BEGBATES | ENDBATES | DESCRIPTION | DATE | DEPONENT | DEPOEXNO |
|---|---|---|---|---|---|---|
| JTX049 (PTX200, DTX036) | | | Physical Exhibit    Keurig K cup | | | |
| JTX050 (PTX329, DTX055) | KEU00108681 | KEU00108817 | SEC    Kraft Foods, Inc. 10 K (annual period ending 12/31/05) | 3/10/2006 | | |
| JTX051 (PTX305, DTX096) | K0017413 | K0017462 | ███████████████████ | | Macmahon | PX074 |
| JTX052 (PTX173, DTX103) | | | Patent    European Patent Application Pub. No. 0 334 573 A1 | 3/20/1989 | Bentley | PX089 |
| JTX053 (PTX174, DTX106) | | | Patent    European Patent Application Pub. No. 0 337 615 A1 | 3/20/1989 | Bentley | PX093 |
| JTX054 (PTX175, DTX105) | | | Patent    European Patent Application Pub. No. 0 455 337 A1 | 3/22/1991 | Bentley | PX092 |
| JTX055 (PTX069, DTX118) | K ED 0016047 | K ED 0016049 | ███████████████████ | 9/27/2004 | Rowan | PX008 |

CONFIDENTIAL    ATTORNEYS' EYES ONLY

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>               Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>               Defendants. | Civil Action No. 07-017-GMS |

**EXHIBIT 5:  KEURIG'S WITNESS LIST,
KRAFT'S RESPONSE AND KEURIG'S REPLY**

**WILL CALL LIST**

During its case in chief at trial, Keurig intends to call at least the following witnesses:

**Nicholas Lazaris**
Arthur Rock Center for Entrepreneurship
Harvard Business School
Boston, MA

**Professor Alexander Slocum** (Keurig's Engineering Expert)
Massachusetts Institute of Technology, Room 3-445
77 Massachusetts Avenue
Cambridge, MA 02139-4307

A distinguished professor of mechanical engineering at MIT, Professor Slocum will testify to the subjects set forth in his expert reports and addressed at his deposition, including: (1) Kraft's infringement of the '762 patent; (2) Kraft's anticipation defense; (3) the technical benefits of same-side piercing; and (4) the direct and indirect costs that Kraft would have faced had it desired to create an acceptable design-around product at the time of the hypothetical negotiation with Keurig.

Kraft's Response:  Kraft objects to any testimony as to subjects on which Professor Slocum is unqualified to testify or opine as set forth in Kraft's motion *in limine*.  Kraft also objects to any testimony beyond that contained in Professor Slocum's expert and rebuttal reports.

**Ted Lingle** (Keurig's Coffee Brewing and Cupping Expert)
Executive Director
Coffee Quality Institute
330 Golden Shore, Suite 50
Long Beach, CA 90802

Drawing on his decades of experience in the coffee industry, including as a coffee cupper (taster) and a leading trainer of coffee cuppers, Mr. Lingle will testify to the subjects set forth in his expert reports and addressed at his deposition, including (1) the coffee brewing process; (2) the fact that ground coffee and tea are soluble beverage media as described in claim 1 of Keurig's '762 patent;[1] (3) the benefits of same-side piercing from a customer and industry point of view; and (4) his expert evaluation of the liquid obtained from Mr. Lingle's experiments with Professor Slocum using the Kenco Singles cartridges in a same-side piercing configuration, as well as the nature of the liquid that would be obtained using the cartridges described in U.S. Patent Nos. 4,853,234 and 4,452,130 in a same-side piercing configuration.

Kraft's Response:  Kraft objects to Keurig calling more than one expert witness on each subject. Both Professor Slocum and Mr. Lingle will offer testimony as to Kraft's invalidity defense and their experiments using the Kenco Singles cartridges. Kraft further objects to any testimony as to subjects on which Mr. Lingle is unqualified to testify or opine. Mr. Lingle is not an expert in the single-serve beverage cartridge art, as discussed in detail in Kraft's Motion in Limine. Accordingly, Kraft objects to any testimony or opinion that will be provided by Mr. Lingle on the benefits of same-side piercing from a customer and industry point of view, or on other aspects of the single-serve beverage cartridge art.  Kraft also objects to any testimony in which Mr. Lingle improperly provides constructions of claim terms not adopted by the Court, including the claim term "beverage."  Accordingly, Kraft objects to any testimony that will be provided by Mr. Lingle in which he characterizes the liquid obtained from the Kenco Singles cartridges or the liquid that would be obtained using the cartridges described in U.S. Patent Nos. 4,853,234 and 4,452,130, as a "beverage" using his specialized construction of the claim term "beverage."

Keurig's Reply:  The testimony offered by Keurig's engineering expert, Professor Slocum, and its coffee expert Ted Lingle will not be duplicative.  Mr. Lingle's expertise is in the coffee industry, while Professor Slocum's is in mechanical engineering.  Professor Slocum developed and implemented an experimental setup to test the functionality of the Kenco Singles cartridge when used in the manner Kraft suggests.  Mr. Lingle, an acknowledged coffee expert, directed his testimony to the issue of whether the resulting liquid constituted a coffee beverage – an issue squarely within his field of expertise.  See also Keurig's opposition (D.I. 119) to Kraft's motion *in limine*.

---

[1] Detailed testimony by Mr. Lingle on what constitutes a "soluble beverage medium" may be unnecessary if Kraft stipulates before trial that its accused T-Discs meet this claim limitation.

**Alan Ratliff** (Keurig's Damages Expert)
StoneTurn Group LLP
One Shell Plaza
910 Louisiana Street, Suite 4905
Houston, TX  77002

Mr. Ratliff will testify to the subjects set forth in his expert reports and addressed at his deposition.  His testimony will concern the quantum of damages owed by Kraft to Keurig for Kraft's infringement.

Kraft's Response:  Kraft objects to any testimony beyond that contained in Mr. Ratliff's expert and supplemental reports.  Kraft also objects to any testimony that relies upon the inadmissible opinions of Mr. Ted Lingle regarding the benefits of same side piercing.

Keurig's Reply:  Keurig refers the Court to its opposition (D.I. 119) to Kraft's motion *in limine*.  Notably, Kraft's motion does not even address Mr. Lingle's opinions regarding the benefits of same side piercing.

## MAY CALL LIST

During its case in chief at trial, and/or in its rebuttal case,[2] Keurig may call one or more of the following witnesses (whether live or by deposition):

Kraft's response: Kraft objects to Keurig calling by deposition any witness within Kraft's control to the extent that the witness will be available to testify at trial.

**Janice Appleton**
IM&S Team Leader
Kraft Foods UK
Banbury, United Kingdom

**Roderick Beaulieu**
Ximedica LLC
55 Dupont Drive
Providence, RI 02907

Kraft's response: Kraft objects to Keurig calling this witness by deposition because he is within Keurig's control.

---

[2] Keurig does not concede that it would be appropriate for all of the Kraft fact and expert witnesses on this May Call List to testify at trial.  The Court has not yet ruled on evidentiary issues raised in motions *in limine* or otherwise.  However, Keurig does reserve its right to call any Kraft witness at least in its rebuttal case.

**Andrew Bentley**
Senior Program Leader, Machine Development, Technology Innovation
Kraft Foods UK
Banbury, United Kingdom

**Roger Deromedi**
900 Illinois Rd. E
Lake Forest, IL 60045

**Maurice Gauthier**
Gauthier & Connors LLP
225 Franklin Street
Boston, MA 02110

**Helen Glus**
Altria Group
120 Park Avenue
New York, NY

**Anita Gogia**
Kraft Foods
555 South Broadway
Tarrytown, NY

**Geraldine Greto**
Kraft Foods
555 South Broadway
Tarrytown, NY 10591

**Andrew Halliday**
Kraft Foods UK
Banbury, England

**Lorraine Hansen**
Senior VP and General Manager-Coffee
Kraft Foods North America
555 S. Broadway
Tarrytown, New York, 10591

**Adam Lloyd**
Kraft Foods UK
Banbury, England

**Alistair (John) MacMahon**
Kraft Foods UK
Banbury, England

**Arlene Powers**
Gauthier & Connors LLP
225 Franklin Street
Boston, MA 02110

**Lee Rowan**
Senior Program Leader -  IP and Competitive Surveillance
Kraft Foods UK
Banbury, United Kingdom

**Kevin Sullivan**
Keurig, Incorporated
55 Walkers Brook Drive
Reading, MA 01867

**Richard Sweeney**
Keurig, Incorporated
55 Walkers Brook Drive
Reading, MA  01867

**Michael Tamblin**
Plant Master Data Controller Coordinator
Kraft Foods UK
Banbury, United Kingdom

**Michael Waks**
Kraft Foods
3 Lakes Drive
Northfield, IL

**Hubert Weber**
VP & Managing Director Iberia
Kraft Foods Europe
Madrid, Spain

**John Whoriskey**
Keurig, Incorporated
55 Walkers Brook Drive
Reading, MA  01867

Dated:  August 25, 2008

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 07-cv-00017-GMS** |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | |
| | ) | |
| Defendants | ) | |

## EXHIBIT 6:  KRAFT DEFENDANTS' WITNESS LIST, KEURIG'S RESPONSE, AND AND KRAFT'S REPLY

### WILL CALL LIST

During its case in chief at trial, Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods, Inc. (collectively "Kraft") intend to call at least the following witnesses:

**Helen Glus**
Executive Secretary to Mr. Louis Camilleri, CEO of Altria Group, Inc.
120 Park Avenue
New York, NY, 10017

**William Craig**
1033 Deer Trail
Bourbonnais, IL 60914

**Geraldine A. Greto**
Kraft Foods North America
555 S. Broadway
Tarrytown, New York, 10591

**A. John MacMahon**
Associate Technology Principal
Kraft Foods UK
Banbury, United Kingdom

**Andrew Bentley**
Senior Program Leader, Machine Development, Technology Innovation
Kraft Foods UK
Banbury, United Kingdom

Keurig's Response:  Keurig objects to any testimony from Mr. Bentley concerning Kenco Singles testing that he performed.  Kraft is using work product as both a sword and a shield in an attempt to advance Kraft's invalidity defense while at the same time denying Keurig the most pertinent materials for challenging Kraft's assertions.  Keurig's Motion *In Limine* No. 1 (D.I. 108) further details the basis for Keurig's objection.

*Kraft's Reply*:  Keurig has had a full and fair opportunity to conduct discovery with regard to Mr. Bentley's testing, including deposing him twice and inspecting the testing apparatus.  Kraft produced Mr. Bentley's testing results and did not assert privilege regarding Keurig's questions regarding any facts related to Mr. Bentley's testing or the construction of the testing apparatus.  Keurig's objection is baseless as set forth in Kraft's Opposition to Keurig's Motion *in Limine* No. 1 (D.I. 123).

**Lee Rowan**
Senior Program Leader -  IP and Competitive Surveillance
Kraft Foods UK
Banbury, United Kingdom

Keurig's Response:  Keurig objects to any testimony from Mr. Rowan concerning Kenco Singles testing that he performed.  Kraft is using work product as both a sword and a shield in an attempt to advance Kraft's invalidity defense while at the same time denying Keurig the most pertinent materials for challenging Kraft's assertions.  Keurig's Motion *In Limine* No. 1 (D.I. 108) further details the basis for Keurig's objection.

*Kraft's Reply*:  Keurig has had a full and fair opportunity to conduct discovery with regard to Mr. Rowan's testing, including deposing him and inspecting the testing apparatus.  Kraft supplied all documents created by Mr. Rowan related to his testing of Kenco Singles cartridges and Kraft did not assert privilege regarding Keurig's questions regarding any facts related to Mr. Rowan's testing.  Keurig's objection is baseless as set forth in Kraft' Opposition to Keurig's Motion *in Limine* No. 1 (D.I. 123).

**Mike Gage-Smith**
Work Services Manager
Kraft Foods UK
Banbury, United Kingdom

Keurig's Response:  Keurig objects to Kraft calling Mr. Gage-Smith, who was not listed on Kraft's Initial Disclosures and was never identified by Kraft until months after discovery had closed.  Keurig's Motion *In Limine* No. 4 (D.I. 111) further details the basis for Keurig's objection.

*Kraft's Reply:*  Kraft identified Mr. Gage-Smith almost four months before trial and supplemented its initial disclosures in accordance with Rule 26(e).  Kraft twice offered Keurig an opportunity to depose Mr. Gage-Smith at a place convenient to Keurig.  Kraft's Opposition to Keurig's Motion *in Limine* No. 4 (D.I. 122) further sets forth the basis forpermitting the testimony of Mr. Gage-Smith.

**Roy Adams**
Maxpax Engineer
Kraft Foods UK
Banbury, United Kingdom

Keurig's Response:  Keurig objects to Kraft calling Mr. Adams, who was not listed on Kraft's Initial Disclosures and was never identified by Kraft until months after discovery had closed.  Keurig's Motion *In Limine* No. 4 (D.I. 111) further details the basis for Keurig's objection.

*Kraft's Reply:*  Kraft identified Mr. Adams more than three months before trial and supplemented its initial disclosures in accordance with Rule 26(e).  Also, Kraft twice offered Keurig an opportunity to depose Mr. Adams at a location convenient to Keurig.  Kraft's Opposition to Keurig's Motion *in Limine* No. 4 (D.I. 122) further sets forth the basis for permitting the testimony of Mr. Adams.

**Martin Brown**
Maxpax Engineer
Kraft Foods UK
Banbury, United Kingdom

Keurig's Response:  Keurig objects to Kraft calling Mr. Brown, who was not listed on Kraft's Initial Disclosures and was never identified by Kraft until months after discovery had closed.  Keurig's Motion *In Limine* No. 4 (D.I. 111) further details the basis for Keurig's objection.

*Kraft's Reply:*  Kraft identified Mr. Brown more than three months before trial and supplemented its initial disclosures in accordance with Rule 26(e).  Also, Kraft twice offered Keurig an opportunity to depose Mr. Brown at a location convenient to Keurig.  Kraft' Opposition to Keurig's Motion *in Limine* No. 4 (D.I. 122) further sets forth the basis of permitting the testimony of Mr. Brown.

**Nicholas Lazaris**
Arthur Rock Center for Entrepreneurship
Harvard Business School
Boston, MA

**Maurice Gauthier**
Gauthier & Connors LLP
225 Franklin Street
Boston, MA 02110

**Malcolm E. Taylor**
618 Kearsarge Mountain Road
Warner, NH 03278

An expert in the field of product development, production design, and machine development, with over 40 years of experience as a design engineer, Mr. Taylor will testify to the subjects set forth in his expert reports and addressed at his deposition, including: (1) prior art product and patent that invalidate claim 1 of the '762 Patent; (2) the absence of tangible benefits related to same-side piercing; and (3) the minimal costs that Kraft would have faced in designing around the '762 Patent at the time of the hypothetical negotiation with Keurig.

Keurig's Response:  Keurig objects to any testimony from Mr. Taylor referencing the Kenco Singles testing done by Mr. Andrew Bentley and/or Mr. Lee Rowan.  Keurig's Motion *in Limine* No. 2 (D.I. 109) details the basis for Keurig's objection.  In addition, Keurig objects to any testimony from Mr. Taylor beyond that contained in his Opening Expert Witness Report (April 15, 2008) and Rebuttal Expert Witness Report (May 12, 2008).  In particular, Mr. Taylor should not be permitted to testify regarding invalidity defenses to claim 1 other than those addressed in his April 15, 2008 report.  Kraft's untimely obviousness, enablement, and written description defenses should be precluded for the reasons detailed in Keurig's Motion *in Limine* No. 5 (D.I. 117).

*Kraft's Reply:*  Kraft reserves the right to offer expert testimony in rebuttal to any issue raised by Keurig, including issues related to enablement, written description, and obviousness raised by Keurig's experts as Kraft details in its Opposition to Keurig's Motion *in Limine* No. 5 (D.I. 124).  In addition, Mr. Taylor should be permitted to testify about materials he cited in his Opening Expert Witness Report, including the depositions and testing results of Mr. Bentley and Mr. Rowan, as detailed in Kraft's Oppositions to Keurig's Motions *in Limine* No. 1 (D.I. 123) and No. 2 (D.I. 120).

**James Malackowski**
Ocean Tomo, LLC
200 West Madison
37th Floor
Chicago, IL 60606

Mr. Malackowski will testify to the subjects set forth in his expert report and addressed at his deposition.  His testimony will concern the appropriate reasonable royalty rate that should be awarded to Keurig if the '762 Patent is found to be valid, enforceable, and infringed.

**Keurig's Response**:  Keurig objects to any testimony beyond that contained in Mr. Malackowski's Expert Report (May 13, 2008).

*Kraft's Reply:*  Kraft reserves the right to offer expert testimony in rebuttal to any issue raised by Keurig.

## MAY CALL LIST

During its case in chief at trial, and/or in its rebuttal case, Kraft may call one or more of the following witnesses (whether live or by deposition):

**Roderick Beaulieu**
Ximedica LLC
55 Dupont Drive
Providence, RI 02907

**Keurig's response**:  Keurig objects to Kraft calling Mr. Beaulieu by deposition in the event that Mr. Beaulieu is available to testify at trial.

*Kraft's Reply:*  Kraft reserves the right to call any witness by deposition under appropriate circumstances, such as (1) that the witness is not reasonably available; (2) the testimony is of such a nature that the imposition on the witness to appear at trial would be unduly burdensome, or (3) for other good cause.

**Roger Deromedi**
900 Illinois Rd. E
Lake Forest, IL 60045

**Arlene Powers**
Gauthier & Connors LLP
225 Franklin Street
Boston, MA 02110

**Janice Appleton**
IM&S Team Leader
Kraft Foods UK
Banbury, United Kingdom

**Michael Tamblin**
Plant Master Data Controller Coordinator
Kraft Foods UK
Banbury, United Kingdom

**Hubert Weber**
VP & Managing Director Iberia
Kraft Foods Europe
Madrid, Spain

**Lorraine Hansen**
Senior VP and General Manager-Coffee
Kraft Foods North America
555 S. Broadway
Tarrytown, New York, 10591

**Steven Anderson**
205 Jensen Avenue
Mamaroneck, NY 10543

**Frank Nieli**
Independent Contractor
555 S. Broadway
Tarrytown, NY 10591

**Joel Shipley**
Culbertson Company
182 Brady Ave
Hawthorne, NY 10532

**Jim Vacaro**
Carrier Corporation
Orchard Ridge Corporate Park
Brewster, NY 10509

Keurig's response:  Keurig objects to Kraft calling any witness, including Mr. Anderson, Mr. Nieli, Mr. Shipley or Mr. Vacaro, that Keurig did not depose during the discovery period, given that Kraft's Rule 26(a) disclosures and discovery responses collectively identified more than 30 witnesses.

*Kraft's Reply*: Kraft specifically urged Keurig to depose Mr. Anderson, Mr. Nieli, Mr. Shipley and Mr. Vacaro in a February 1, 2008 letter regarding witnesses who used Kenco Singles cartridges in this country prior to the priority date of the '762 Patent, and these witnesses are specifically identified in Kraft's Rule 26(a) disclosures.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>   Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>   Defendants. | Civil Action No. 07-017-GMS |

## EXHIBIT 7:  STATEMENTS OF EXPERT WITNESSES' QUALIFICATIONS

The parties agree that the following statements of expert witness qualifications are accurate and in such a form as may be read to the jury when the corresponding expert takes the stand.

## I. KEURIG'S EXPERT WITNESSES

### Professor Alexander Slocum, Ph.D.

Dr. Alexander Slocum is a professor of mechanical engineering at the Massachusetts Institute of Technology (known as MIT for short), where he received his Bachelor's, Master's and Ph.D. degrees.  His principal fields of expertise are mechanical engineering, precision engineering, and machine design.  Professor Slocum has written two books and has published more than 150 papers.  He has received numerous awards and honors, including the American Society of Mechanical Engineers Leonardo da Vinci Award, and has been recognized at MIT for his dedication to teaching.

Professor Slocum regularly consults for companies on the development of new products. He is an inventor of more than 70 United States patents. A number of Professor Slocum's inventions have won awards for being among the 100 most significant new technical products of the year. Professor Slocum's current interests include the development of precision machines and instruments including medical devices and sustainable energy generation systems.

**Ted Lingle[1]**

Mr. Lingle has almost four decades of experience in the coffee industry and is currently the Executive Director of the Coffee Quality Institute, a non-profit organization dedicated to improving the quality of coffee and the lives of the people who produce it.

Mr. Lingle previously served for 15 years as the Executive Director of the Specialty Coffee Association of America, a 2500-member trade association that sets quality standards and provides industry training in the areas of coffee processing, roasting, cupping (which means tasting) and brewing. For 20 years Mr. Lingle also served as vice president of marketing for a coffee roasting company and was responsible for establishing quality standards for the company's products as well as training customers and company employees.

---

[1] Kraft objects to the reading of Mr. Lingle's "qualifications" and has filed a motion *in limine* as he is not an expert in the art consumer packaging and, thus, is not qualified to opine on issues related to the infringement or validity of the patent-in-suit, U.S. Patent No. 6,607,762 ("'762 Patent"). Thus, Kraft requests an instruction from the Court that Mr. Lingle in not an expert in the relevant art of the '762 Patent if he is permitted to testify in any capacity.

Keurig disagrees with Kraft for the reasons detailed in its opposition (D.I. 119) to Kraft's motion *in limine*. In particular, the '762 patent technology relates to several distinct arts and therefore must be assessed from the perspective of "the adepts of each." Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1373 (Fed. Cir. 1999).

Mr. Lingle developed the training material for the coffee industry's first certified professional designation for cupping and frequently trains and certifies new coffee cuppers and tasters around the world.

Mr. Lingle has written a number of books that are widely known in the coffee industry, including The Coffee Cupper's Handbook (now in its third edition) and The Coffee Brewing Handbook: A Systematic Guide to Coffee Preparation.

Mr. Lingle graduated from the United States Military Academy with a degree in civil engineering.

**Alan Ratliff, CPA/MPA-JD**

Alan Ratliff is a Certified Public Accountant and a licensed attorney. He holds a bachelor's degree in accounting, a master's degree in accounting and tax, and a law degree, all received with high honors. He has over 120 University hours in accounting, economics and related commercial studies. Since completing his studies, Mr. Ratliff has 20 years of legal, accounting and economic consulting experience including working as a public accountant, a law clerk to a federal judge, an attorney, and the National Practice Leader for Ernst & Young's Intellectual Property Litigation Services.

Mr. Ratliff has previously been qualified as an expert on patent infringement damages in a dozen federal courts across the United States including this Court, the District of Delaware. He has also been appointed by federal judges as an arbitrator in two intellectual property matters and as a Special Master in an international licensing dispute. Mr. Ratliff has served on the business school or law school faculty at three different universities, and delivers lectures and publishes articles several times annually on damages, valuation and expert witness topics including, for

example, at conferences offered by Boston University, Virginia Tech, the American Bar Association, the New York City Bar, the American Intellectual Property Association and the Licensing Executives Society.

Mr. Ratliff has worked on more than 100 patent infringement, patent valuation and license royalty audit projects, and has personally negotiated or directly supported the negotiation of more than three dozen licenses.

## II.     KRAFT'S EXPERT WITNESSES

**Malcolm E. Taylor**

Mr. Taylor has over 40 years of practical real-world experience as a design engineer who is recognized as an expert in the fields of product development, production design, and machine development.  He currently consults with Foster-Miller, Inc. as a Senior Staff Engineer, but also has relationships with other technology and product development companies.  Prior to his retirement from Foster-Miller, he served as a Division Manager, where he acted as a program manager, supervising projects and providing his extensive technical expertise.  Mr. Taylor is listed as inventor or co-inventor on at least 20 U.S. patents

Mr. Taylor's expertise lies in product development and production systems, and in particular, the packaging of products, design and construction of medical devices--both disposable and reusable, and the automatic assembly or processing of multiple parts.  In particular, he has worked on projects related to: consumer packaging design; packaging of food products; troubleshooting problems with foil packaging; cold-formed foil packaging and lid stock with foil layers; injection molded, thermoformed, blow-molded plastics; and automatic assembly and packaging of consumer and medical products.

Mr. Taylor graduated from Liverpool College of Technology in Liverpool, England, in 1957 with a degree in Mechanical Engineering.

**James Malackowski**

James E. Malackowski is the President and Chief Executive Officer of Ocean Tomo, LLC, an integrated Intellectual Capital Merchant Banc® firm providing financial products and services related to Intellectual Property expert testimony, valuation, investments, risk management and transactions.   Ocean Tomo assists clients – corporations, law firms, governments and institutional investors – in realizing Intellectual Capital Equity® value broadly defined.

Mr. Malackowski is a member of the IP Hall of Fame Academy and was recognized in 2007 by *Managing Intellectual Property* magazine as one of the fifty most influential people in intellectual property.  In 2008, Mr. Malackowski was again named as one of the Top 50 IP professionals under the age of 45 in *IP Law & Business*.  Prior to forming Ocean Tomo, he served as a finance and investment advisor working with one of the Nation's oldest investment banks as well as one of Chicago's largest private equity firms.  Mr. Malackowski began his career spending fifteen years as a management consultant and forensic accountant focused on intangible assets.   In this capacity Mr. Malackowski served numerous roles as a founding principal including President and Chief Executive Officer of his firm, growing the practice to the nation's largest before its sale.

Mr. Malackowski has advised clients and counsel on business valuation issues as well as all phases of the technology transfer process.  He has substantial experience as a Board Director for leading technology corporations as well as companies with critical brand management issues. His expertise extends to intangible asset portfolios as well as business segments and complete

entities.  Apart from his own firm, Mr. Malackowski has served in a leadership role with numerous corporate entities, both public and private.  He is a member of the President's Council for the Chicago Museum of Science and Industry and a current Director of Invent Now, Inc., a subsidiary of the National Inventors Hall of Fame where Mr. Malackowski previously served as Trustee.  Mr. Malackowski is Secretary for The Licensing Executives Society International, Inc. He is a Past President of The Licensing Executives Society USA and Canada, Inc. and a former Director of the International Intellectual Property Institute as well as a prior Resident Advisor for the U.S. Department of Commerce and U.S. Information Agency on matters relating to intellectual capital.

On more than thirty occasions, Mr. Malackowski has served as an expert in Federal Court on questions relating to intellectual property economics, including the subject of business valuation and the impact of advertising programs.  As an inventor, Mr. Malackowski has ten issued U.S. patents and an even larger number of pending applications.  He is an Adjunct Instructor at the University of Notre Dame Mendoza College of Business where he was a Summa Cum Laude graduate majoring in accountancy and philosophy.  Mr. Malackowski is a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois.

Dated:   August 25, 2008

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KEURIG, INCORPORATED,<br><br>        Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>        Defendants. | Civil Action No. 07-017-GMS |

**EXHIBIT 8:  KEURIG'S DEPOSITION DESIGNATIONS,
KRAFT'S OBJECTIONS AND COUNTER-DESIGNATIONS, AND
KEURIG'S RESPONSES AND OBJECTIONS TO THE COUNTER-DESIGNATIONS**

Plaintiff Keurig, Inc. ("Keurig") makes the deposition designations listed in the tables below.  Certain segments of designated testimony may be used in Keurig's case-in-chief, whereas others are included only because they may be necessary for Keurig's rebuttal case.  Therefore, Keurig does not concede that a particular excerpt of testimony listed below can or should be read or played into evidence.

In response to Keurig's deposition designations, Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft") make objections and counter-designations, also listed in the tables below.

In response to Kraft's counter-designations, Keurig makes objections and reply-designations, further listed in the tables below.

Dated: August 25, 2008

# TABLE OF CONTENTS

ANDREW BENTLEY (2/27/08) ................................................................................................. 1

ANDREW BENTLEY (4/2/08) ................................................................................................... 1

ROGER DEROMEDI (3/31/08) ................................................................................................. 1

ANITA GOGIA (3/27/08) .......................................................................................................... 3

ANDREW HALLIDAY (2/22/08) .............................................................................................. 4

LORRAINE HANSEN (3/26/08) ............................................................................................... 8

ADAM LLOYD (2/25/08) ........................................................................................................ 11

ALISTAIR JOHN MACMAHON (2/26/08) ............................................................................ 13

ALISTAIR JOHN MACMAHON (2/27/08) ............................................................................ 16

LEE ROWAN (2/21/08) ........................................................................................................... 16

MICHAEL WAKS (3/20/08) .................................................................................................... 16

HUBERT WEBER (4/1/08) ...................................................................................................... 18

# ANDREW BENTLEY (2/27/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [4:19] - [5:9] | | | | |
| [5:25] - [6:3] | | | | |
| [7:25] - [8:14] | 8:15-23 | | | |
| [9:22] - [11:13] | | | | |
| [11:14] - [13:16] | | Relevance | | |
| [13:17] - [13:19] | | | | |
| [14:9] - [14:23] | | | | |
| [15:19] - [16:6] | 16:7-9 | | | |
| [17:14] - [17:21] | | | | |
| [18:22] - [22:25] | | | | |
| [23:2] - [23:18] | 23:19-25:7 | | | |
| [25:8] - [25:19] | | | | |
| [50:23] - [51:5] | | | | |
| [53:23] - [54:11] | | | | |
| [55:18] - [56:19] | 56:20-23 | | | |
| [56:24] - [58:23] | 58:24-59:7 | | Motion in Limine No. 1 (D.I. 108) | |
| [59:11] - [63:15] | 63:16-19 | | | |
| [78:20] - [79:10] | | | | |

# ANDREW BENTLEY (4/2/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [21:18] - [22:7] | 20:16-21:18; 22:13-20 | | Motion in Limine No. 1 (D.I. 108) | |

# ROGER DEROMEDI (3/31/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [15:20] - [16:1] | | | | |
| [18:6] - [18:14] | | | | |
| [20:11] - [21:1] | 21:2-14 | | | |
| [24:6] - [25:11] | 25:12-14 | | | |
| [25:15] - [25:22] | 25:23-26:2 | | | |
| [27:5] - [28:6] | 28:7-8 | | | |
| [28:7] - [28:13] | 28:14-18 | | | |
| [28:19] - [29:4] | | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [29:18] - [29:21] | | | | |
| [30:6] - [30:23] | | | | |
| [32:22] - [34:1] | 31:16-32:21 | | | |
| [34:13] - [34:18] | | | | |
| [35:10] - [36:1] | | | | |
| [38:19] - [39:2] | 36:23-38:18 | | | |
| [40:2] - [40:7] | | | | |
| [40:9] - [40:24] | 41:1-5 | | | |
| [41:11] - [41:19] | 41:6-10 | | | |
| [42:14] - [43:14] | 43:15-44:12 | | | |
| [44:13] - [45:7] | | | | |
| [45:9] - [45:14] | 45:15-22 | | | |
| [46:4] - [46:17] | 46:18-47:21 | | | |
| [47:22] - [48:12] | 48:13-18 | | | |
| [48:19] - [49:3] | | | | |
| [49:11] - [49:17] | | | | |
| [52:14] - [52:17] | | | | |
| [52:22] - [53:24] | | | | |
| [60:8] - [60:11] | | 60:8-11 (relevance) | | |
| [61:8] - [62:6] | | 61:8-11; 61:13; 61:21; 62:4-5 (relevance) | | |
| [62:11] - [63:6] | | 62:11-14; 62:20-22;62:24-63:2 (relevance) | | |
| [63:15] - [63:21] | | 63:15-17; 63:19-20 (hearsay) | | |
| [65:4] - [65:12] | 64:20-65:3 | 65:4-9 (hearsay) | | |
| [65:22] - [66:4] | 65:17-21 | | | |
| [66:14] - [66:19] | | | | |
| [67:3] - [67:20] | | 67:3-5; 67:7-10 (relevance) | | |
| [69:2] - [69:5] | | | | |
| [69:11] - [69:18] | | | | |
| [70:3] - [70:11] | 70:12-71:5 | | | |
| [73:11] - [73:18] | | | | |
| [74:4] - [75:2] | | | | |
| [76:11] - [77:1] | | | | |
| [77:3] - [77:14] | | | | |
| [79:4] - [79:23] | | | | |
| [83:5] - [84:1] | | | | |
| [87:12] - [87:17] | | | | |
| [91:16] - [92:21] | | | | |
| [92:24] - [93:6] | | | | |
| [93:12] - [93:18] | | 93:12-14; 93:16- | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| | | 17 (relevance) | | |
| [94:5] - [94:12] | | 94:5-6; 94:8; 94:10 (relevance) | | |
| [96:10] - [97:4] | | | | |
| [99:9] - [100:6] | | | | |
| [101:6] - [102:19] | | | | |
| [104:14] - [104:18] | 104:19-105:2 | | | |
| [105:3] - [105:12] | | | | |
| [105:23] - [106:2] | 106:3-10 | | | |
| [120:13] - [120:16] | | | | |

## ANITA GOGIA (3/27/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [4:13] - [4:19] | | | | |
| [5:18] - [6:17] | | 6:18-19 (form, ambiguous) | | |
| [6:20] - [7:14] | | | | |
| [10:13] - [12:3] | | | | |
| [12:9] - [13:3] | | | | |
| [13:4] - [13:17] | | | | |
| [14:4] - [16:24] | | 17:1-3 (outside 30(b)(6)) | | |
| [17:4] - [18:4] | | 18:5-7 (outside 30(b)(6)) | | |
| [18:8] - [18:12] | | 18:13-15 (outside 30(b)(6)) | | |
| [18:16] - [19:10] | | | | |
| [19:21] - [33:22] | | 33:23-24 (assumes facts not in evidence) | | |
| [34:1] - [54:3] | | | | |
| [54:11] - [65:11] | | 65:11 (outside 30(b)(6)) | | |
| [65:14] - [75:12] | | 75:13-14 (lack of foundation) | | |
| [75:15] - [76:2] | | | | |
| [76:10] - [79:3] | | 79:4-6 (outside 30(b)(6)) | | |
| [79:7] - [89:3] | | | | |
| [89:15] - [103:16] | | | | |
| [104:1] - [106:8] | | | | |
| [106:15] - [115:14] | | 115:15-16 (outside 30(b)(6)) | | |

3

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [190:11] - [190:13] | 190:10 | | | |
| [116:8] - [167:2] | | | | |
| [167:15] - [190:7] | | 190:8-9 (assumes facts not in evidence) | | |
| [115:17] - [116:5] | | 116:6-7 (outside 30(b)(6)) | | |

## ANDREW HALLIDAY (2/22/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [5:6] - [5:13] | | | | |
| [6:19] - [6:21] | | | | |
| [6:25] - [7:21] | 7:22-8:19 | | | |
| [11:10] - [13:9] | 10:16-25 11:2-9 13:10-12 | | | |
| [15:25] - [16:21] | 14:8-12 | | | |
| [17:2] - [18:15] | | 17:22-25 (lack of foundation) | | |
| [18:20] - [19:4] | | 18:22-24 (hearsay) | | |
| [19:5] - [23:21] | 23:22-27:11 | | | |
| [27:12] - [27:17] | | | | |
| [27:18] - [29:3] | | 28:16-18; 28:20-22; 28:24-25 (hearsay) | | |
| [29:17] - [30:9] | 31:16-32:23 | | | 32:24-33:2 |
| [34:13] - [34:25] | | | | |
| [35:13] - [36:12] | 35:1-25  36:13-20 | | | |
| [41:10] - [41:14] | | | | |
| [41:21] - [42:4] | | | | |
| [42:10] - [42:13] | | 42:10-13 (vague, relevance) | | |
| [42:16] - [42:25] | | | | |
| [43:7] - [43:12] | | 43:10-12 (vague, form) | | |
| [43:14] - [43:21] | | 43:18-21 (vague, form) | | |
| [43:23] - [44:2] | | | | |
| [44:4] - [44:22] | | | | |
| [45:7] - [45:12] | | | | |
| [45:17] - [46:15] | | | | |
| [50:6] - [52:14] | | | | |
| [54:8] - [55:4] | | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [58:2] - [58:10] | | | | |
| [58:15] - [62:24] | | | | |
| [64:16] - [64:22] | | | | |
| [64:23] - [65:7] | | | | |
| [65:11] - [67:8] | | | | |
| [67:16] - [67:25] | | | | |
| [73:21] - [74:10] | | | | |
| [75:15] - [75:21] | | | | |
| [76:5] - [76:8] | 76:22-25 | 76:5-8 (lack of foundation) | | |
| [77:4] - [77:7] | | | | |
| [78:6] - [78:20] | | 78:6-9; 78:17-19 (lack of foundation) | | |
| [80:2] - [80:7] | | 80:2-7 (lack of foundation) | | |
| [80:9] | | | | |
| [80:10] - [80:15] | | 80:13-15 (lack of foundation) | | |
| [80:17] - [81:2] | | 80:19-81:2 (lack of foundation) | | |
| [81:4] - [81:7] | | 81:6-7 (lack of foundation) | | |
| [81:9] - [81:15] | | 81:11-15 (lack of foundation) | | |
| [81:17] | | | | |
| [81:19] - [81:20] | | 81:19-20 (lack of foundation) | | |
| [81:22] - [82:8] | | 81:24; 82:3-4; 82:6-8 (lack of foundation) | | |
| [82:10] | | | | |
| [82:12] - [82:18] | | 82:12-18 (lack of foundation) | | |
| [82:20] - [83:10] | | 82:22; 83:2-3; 83:5-6: 83:8-10 (lack of foundation) | | |
| [83:12] | | | | |
| [83:14] - [83:18] | | 83:14-15 (lack of foundation) | | |
| [84:22] - [85:7] | | 84:22-85:3; 85:5-7 (lack of foundation) | | |
| [85:9] | | | | |
| [85:11] - [85:18] | | 85:11-12; 85:14-18 (lack of foundation) | | |
| [85:20] | | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [85:22] - [86:3] | | 85:22; 85:24-86:3 (lack of foundation) | | |
| [86:5] | | | | |
| [86:7] - [86:13] | | 86:7-10; 86:12-13 (lack of foundation) | | |
| [86:15] - [86:22] | | 86:20-21 (lack of foundation) | | |
| [87:5] - [87:11] | | 87:5-9; 87:11 (lack of foundation) | | |
| [87:13] - [87:16] | | | | |
| [88:19] - [88:22] | | 88:19-22 (lack of foundation) | | |
| [88:24] - [89:3] | | | | |
| [92:18] - [92:25] | | 92:18-22 (lack of foundation) | | |
| [93:7] - [93:9] | | 93:7-8 (lack of foundation) | | |
| [93:12] - [95:12] | | 93:12-16; 93:18-20; 93:22-23; 93:25-94:4; 94:6; 94:15-17; 94:19-21; 94:24-25; 95:3-6; 95:8-12 (lack of foundation) | | |
| [95:14] | | | | |
| [95:17] - [95:20] | | | | |
| [95:24] - [96:3] | | | | |
| [96:9] - [97:9] | 97:10-16 | | | |
| [97:17] - [98:19] | | | | |
| [99:3] - [99:12] | | 99:5-12 (calls for legal conclusion) | | |
| [99:14] | | | | |
| [99:16] - [99:23] | | 99:16-19; 99:21-23 (calls for legal conclusion) | | |
| [99:25] - [104:6] | | 100:4-5; 100:11-13; 100:19-25; 101:3-4; 101:9-11; 101:13-16; 101:19-21; 101:23-24; 102:8-11; 102:13-14; 102:16-18; 102:22-25; 103:3; 103:6-9; 103:11-15; 103:17-18; | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| | | 103:20-24; 104:2-3; 104:6 (calls for legal conclusion) | | |
| [104:8] - [105:12] | | 104:10-14; 104:17-20; 105:3-7; 105:9-10 (calls for legal conclusion) | | |
| [105:25] - [106:11] | | 105:25-106:3; 106:5-11 (calls for expert opinion) | | |
| [106:14] | | | | |
| [106:16] - [107:10] | | | | |
| [110:8] - [110:16] | | | | |
| [110:17] - [110:23] | | | | |
| [111:2] - [111:24] | | 111:20-24 (calls for legal conclusion) | | |
| [112:5] - [113:23] | | 113:16-23 (lack of foundation, calls for legal conclusion) | | |
| [114:2] - [114:14] | | 114:8-14 (lack of foundation, calls for legal conclusion) | | |
| [114:19] - [114:21] | | | | |
| [115:9] - [116:6] | | 115:14-18; 115:21-24; 116:2-6 (calls for legal conclusion) | | |
| [116:9] - [116:13] | | 116:12-13 (calls for legal conclusion) | | |
| [116:17] - [116:18] | | | | |
| [118:3] - [119:17] | | 118:9-12; 118:14-17; 118:19-21; 118:23-25; 119:14-17 (calls for legal conclusion) | | |
| [119:19] - [119:20] | | | | |
| [125:12] - [125:21] | | | | |
| [126:10] - [126:12] | | 126:10-12 (relevance) | | |
| [126:14] - [126:17] | | 126:16 (relevance) | | |
| [126:18] - [127:22] | 127:23-128:11 | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [131:18] - [133:3] | | | | |
| [133:6] - [133:9] | | 133:8 (calls for legal opinion) | | |
| [133:10] - [133:14] | | | | |
| [133:18] - [133:25] | | | | |
| [134:2] - [134:20] | 134:21-25  135:2-25 | | | 136:2-4 |
| [136:5] - [136:7] | | | | |
| [136:9] - [136:16] | | | | |
| [136:19] - [137:3] | 136:19-25 | | | |
| [137:4] - [138:22] | | | | |
| [138:23] - [138:25] | | | | |
| [139:14] - [139:16] | | | | |
| [141:6] - [141:12] | | | | |
| [141:15] - [141:20] | | | | |
| [141:22] - [142:6] | | | | |
| [142:13] - [143:6] | 144:22-25 | | | |
| [145:6] - [145:13] | 145:2-5 | | | |
| [145:25] - [146:18] | 146:19-25 | | | |
| [147:10] - [147:16] | 147:2-9 | | | |
| [150:20] - [152:2] | | | | |
| [155:10] - [158:7] | | | | |
| [158:11] - [158:22] | | | | |
| [176:18] - [180:19] | | 176:18-180:19 (not deposition testimony; statements by counsel) | | |

## LORRAINE HANSEN (3/26/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [4:7] - [4:13] | | | | |
| [5:13] - [6:19] | | | | |
| [7:2] - [7:17] | | | | |
| [7:18] - [8:4] | | | | |
| [12:23] - [13:10] | | | | |
| [13:23] - [14:7] | 17:19-24; 18:1-5 | | Fairness does not require contemporaneous consideration of identified counter-designations. | |
| [18:15] - [19:6] | | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [28:24] - [29:22] | 30:10-19 | | | 30:5-9 |
| [31:11] - [32:4] | | | | |
| [37:11] - [39:2] | | 39:3 (ambiguous) | | |
| [39:4] - [41:17] | | | | |
| [41:22] - [42:13] | 43:5-44:15; 45:10-15; 46:10-24; 48:8-49:15; 51:23-53:9; 56:15-57:24 | | Fairness does not require contemporaneous consideration of 56:15-57:24 counter-designation. | 50:2-17; 51:7-16 |
| [58:1] - [58:7] | 58:8-19 | | | |
| [61:4] - [61:15] | 59:18-61:3; 61:16-65:7 | | | |
| [65:8] - [65:23] | 67:1-9; 68:14-24 | | | |
| [69:23] - [70:11] | 70:20-71:5 | | | |
| [81:1] - [81:9] | | 71:6-13 (lack of foundation, outside 30(b)(6)); 78:8-10 (lack of foundation) | | |
| [88:8] - [88:20] | | 88:21 (ambiguous) | | |
| [88:22] | | 88:23 (ambiguous) | | |
| [88:24] - [89:16] | | | | |
| [90:21] - [91:7] | | | | |
| [91:8] - [91:16] | | 91:17-20 (asked and answered; improper characterization of document) | | |
| [91:21] - [93:5] | | | | |
| [96:10] - [97:8] | 96:4-5; 97:9-98:4 | 96:6-9 (lack of foundation) | | |
| [98:9] - [98:19] | | | | |
| [98:20] - [99:17] | 102:5-12 | | | |
| [102:20] - [103:3] | | 103:4-6 (ambiguous) | | |
| [103:7] - [103:13] | | | | |
| [104:1] - [105:16] | | | | |
| [106:11] - [108:16] | | | | |
| [113:15] - [113:23] | 113:24-115:17; 116:16-117:7; 121:2-122:5 | | | 121:1 |
| [122:6] - [122:19] | | | | |
| [124:19] - [130:3] | 130:13-131:6; 132:9-134:2 | | | |
| [134:3] - [134:19] | | 134:20 (ambiguous, | | |

9

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| | | asked and answered) | | |
| [134:21] - [136:6] | | | | |
| [136:10] - [137:8] | 138:3-9 | | Fairness does not require contemporaneous consideration of counter-designation. Partial answer to unrelated question. | 138:20-22; 139:1-13 |
| [142:14] - [149:18] | | 149:19-20 (improper characterization) | | |
| [149:21] - [152:4] | | | | |
| [152:16] - [153:4] | | 153:5-9 (irrelevant, outside 30(b)(6)) | | |
| [153:10] - [157:11] | | 153:5-9 (irrelevant, outside 30(b)(6)) | | |
| [157:14] - [159:9] | | | | |
| [159:12] - [167:20] | | | | |
| [167:23] - [171:6] | | 171:7 (ambiguous) | | |
| [171:8] - [171:13] | | | | |
| [172:8] - [173:4] | 173:7 | 173:5-6 (calls for speculation) | | |
| [173:8] - [173:10] | | | | |
| [173:13] - [175:1] | | 175:2-3 (improper characterization) | | |
| [175:4] - [177:4] | | | | |
| [177:6] - [177:10] | | | | |
| [177:12] - [179:8] | | | | |
| [180:21] - [180:23] | | | | |
| [182:17] - [182:23] | | 182:24 (ambiguous) | | |
| [183:1] - [183:16] | | | | |
| [183:17] - [189:24] | | | | |
| [190:8] - [190:22] | 191:20-1925 | | | |
| [192:6] - [192:8] | | 192:9-11 (lack of foundation) | | |
| [192:12] - [192:18] | 193:11-195:5 | 192:9-11 (lack of foundation) | | |
| [195:6] - [195:22] | | 195:23 (asked and answered) | | |
| [195:24] - [196:3] | 196:4-197:11 | | | |
| [200:14] - [201:3] | | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [201:6] - [201:13] | | | | |
| [201:15] - [201:16] | | | | |
| [201:19] - [202:10] | 202:11-203:18 | | | |
| [203:19] - [209:5] | 214:14-23 | | | 214:24-215:1 |
| [215:2] - [215:13] | 216:15-217:4 | | | |
| [219:10] - [219:15] | | | | |
| [223:18] - [223:21] | | 223:22-24 (lack of foundation) | | |
| [225:11] - [226:5] | 235:21-236:5; 236:10-18; 241:13-19 | 223:22-24 (lack of foundation) | Fairness does not require contemporaneous consideration of counter-designations. | |

## ADAM LLOYD (2/25/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [5:2] - [5:11] | | | | |
| [6:6] - [6:12] | | | | |
| [6:21] - [6:25] | | | | |
| [7:10] - [7:18] | 7:19-8:11 | | | |
| [8:12] - [8:21] | | | | |
| [10:12] - [10:20] | 10:21-11:3 | | | |
| [11:19] - [12:7] | | | | |
| [12:15] - [12:25] | | | | |
| [13:2] - [14:2] | | | | |
| [14:3] - [16:12] | | | | |
| [16:22] - [17:8] | 17:9-22 | | | |
| [21:12] - [22:18] | | | | |
| [24:2] - [25:7] | | | | |
| [25:18] - [28:6] | | | | |
| [28:7] - [28:21] | | | | |
| [33:13] - [37:10] | | | | |
| [38:17] - [46:7] | | | | |
| [46:8] - [49:19] | | Foundation; Att'y Discussion at 46:8-13 | | |
| [50:5] - [51:18] | | | | |
| [51:20] - [57:11] | | Relevance (European presentation) | | |
| [57:13] - [57:15] | | | | |
| [57:17] - [57:19] | | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [57:21] - [59:7] | 59:8-13; 59:15-16 | | | |
| [59:18] - [60:4] | | | | |
| [60:10] - [62:10] | | | | |
| [62:23] - [63:22] | | | | |
| [63:23] - [64:22] | | | | |
| [64:24] | | | | |
| [65:2] - [65:7] | | | | |
| [65:9] - [65:15] | | | | |
| [65:19] - [66:5] | 66:6-9 | Foundation Hearsay | | |
| [66:13] - [67:4] | | | | |
| [67:6] - [69:2] | 70:13-15 | | | |
| [70:19] - [71:7] | | | | |
| [73:17] - [74:3] | | Foundation | | |
| [81:4] - [81:22] | | Att'y Discussion | | |
| [82:6] - [82:11] | | | | |
| [82:19] - [83:16] | | | | |
| [83:19] - [84:20] | | | | |
| [85:2] - [87:5] | | | | |
| [87:6] - [87:21] | | | | |
| [87:25] - [88:23] | 88:24-89:10 | | | |
| [90:2] - [92:4] | | | | |
| [92:6] | | | | |
| [94:12] - [96:18] | | Foundation | | |
| [97:20] - [98:9] | | | | |
| [98:18] - [102:16] | | | | |
| [102:25] - [103:21] | | | | |
| [104:12] - [107:4] | 107:5-7 | | | |
| [107:8] - [107:12] | | | | |
| [107:13] - [107:22] | | | | |
| [107:25] - [112:4] | | Foundation | | |
| [112:9] - [112:22] | | | | |
| [112:23] - [113:7] | | | | |
| [113:10] - [113:11] | | | | |
| [113:14] - [113:25] | | Foundation | | |
| [118:2] - [118:8] | | | | |
| [118:19] - [119:9] | | | | |
| [121:24] - [122:7] | 122:11-124:8 | | | |
| [125:7] - [125:11] | | | | |
| [125:23] - [126:3] | | | | |
| [128:8] - [128:11] | | | | |
| [128:14] - [128:23] | | | | |
| [132:4] - [134:12] | 134:13-16 | | | |
| [134:16] - [140:25] | | | | |
| [141:7] - [143:24] | 146:19-25; 147:2-4; | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| | 147:6 | | | |
| [147:8] - [147:13] | | | | |
| [147:16] | | | | |
| [147:18] - [148:19] | | | | |
| [148:21] - [148:23] | | | | |
| [148:24] - [149:16] | | | | |
| [149:19] - [149:23] | | | | |
| [154:21] - [154:25] | | Foundation; Hearsay | | |
| [155:17] - [156:4] | | Relevance; Hearsay | | |
| [161:3] - [161:12] | 161:14-17; 161:19-22 | | | |
| [166:10] - [166:23] | | | | |
| [166:25] - [167:15] | 167:21-25 | | | |
| [168:2] - [168:7] | | | | |
| [168:8] - [171:6] | | Foundation | | |
| [171:7] - [172:4] | | | | |
| [176:20] - [177:25] | | | | |
| [179:7] - [179:11] | | | | |
| [179:13] - [181:7] | | Foundation | | |
| [181:11] - [181:15] | | | | |
| [183:7] - [187:14] | | | | |
| [190:16] - [192:12] | | | | |

## ALISTAIR JOHN MACMAHON (2/26/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [5:6] - [5:13] | | | | |
| [6:7] - [7:10] | | | | |
| [8:22] - [13:10] | 13:11-16; 13:19-23 | | | |
| [13:24] - [17:9] | 17:10-13 | | | |
| [19:2] - [22:10] | 22:11-16 | | | |
| [22:22] - [27:2] | 27:3-7 | | | |
| [27:8] - [28:5] | 32:8-11 | | | |
| [35:12] - [38:6] | 41:17-25; 42:1-18; 43:6-17; 44:14-45:17; 46:2-11; 54:4-11; 55:7-15; 58:11-59:17 | | | |
| [60:15] - [60:24] | 62:25-63:14; 65:6-21 | | | |
| [67:13] - [68:11] | 68:12-23 | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [69:3] - [75:5] | | | | |
| [75:6] - [81:11] | 81:17-84:4 | 81:7-10 (lack of foundation) | | |
| [85:3] - [85:22] | | | | |
| [89:4] - [89:8] | | | | |
| [89:9] - [93:10] | | | | |
| [93:11] - [99:7] | | | | |
| [99:10] - [101:12] | | 100:15-18; 101:4-8; 101:10-12 (calls for opinion) | | |
| [101:15] - [102:3] | 102:4-6; 102:8-9 | 101:15-18; 102:2 (calls for opinion) | | |
| [104:23] - [106:15] | 106:16-107:3; 111:14-18; 111:24-113:25; 119:11-120:6 | | Fairness does not require contemporaneous consideration of counter-designations. | 111:6-13 |
| [120:16] - [121:8] | 121:23-122:25 | | | |
| [123:12] - [123:24] | | 123:12-15; 123:17-18 (hearsay) | | |
| [124:3] - [124:22] | | 124:3-6 (outside 30(b)(6)) | | |
| [126:9] - [128:22] | | | | |
| [129:11] - [129:16] | | | | |
| [129:19] | | | | |
| [129:21] - [130:2] | | | | |
| [130:4] | | | | |
| [134:2] - [134:15] | | | | |
| [134:16] - [135:6] | | 134:16-23 (hypothetical, calls for opinion); 134:25-135:6 (calls for opinion) | | |
| [135:9] - [136:16] | | 136:12-16 (calls for opinion) | | |
| [136:19] - [137:16] | | 137:9-12; 137:13-16 (calls for opinion) | | |
| [137:24] - [138:18] | 138:19-139:14; 139:16-23; 139:25-140:2 | 138:16-17 (calls for legal conclusion) | | |
| [144:18] - [144:24] | | | | |
| [144:25] - [145:12] | 153:10-154:24; 155:16-157:11; 159:1-7 163:20-164:5 | 144:25-145:3 (calls for speculation) | Fairness does not require contemporaneous consideration of counter- | 158:21-25 |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| | | | designations. | |
| [165:23] - [166:3] | | | | |
| [169:4] - [170:6] | | | | |
| [170:7] - [172:7] | 179:16-24; 181:13-182:23; 184:19-185:20; 190:22-191:16; 192:22-195:13; 195:22-196:25; 197:16-200:13; 201:8-202:25; 203: 9-204:3; 204:11-206:16; 206:21-209:8; 209:11-214:16; 214:19-219:16; 220:8-229:15 | | Fairness does not require contemporaneous consideration of counter-designations.<br><br>Leading (193:11-195:13; 195:22-196:25; 198:9-20; 203:9-18; 215:24-216:13; 222:16-19; 227:3-14)<br><br>Calls for opinion testimony (194:4-11; 214:10-16; 221:2-4: 226:18-21; 227:15-229:15) | |
| [232:20] - [234:9] | 234:11-236:19 | | Fairness does not require contemporaneous consideration of counter-designations.<br><br>Leading (235:20-236:19) | |

## ALISTAIR JOHN MACMAHON (2/27/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [4:6] - [8:24] | 8:25-9:6 | | | |
| [9:13] - [17:4] | | Legal opinion | | |
| [17:7] - [17:20] | | | | |
| [18:4] - [19:20] | | | | |
| [19:22] - [22:6] | | | | |
| [22:7] - [23:3] | | | | |
| [30:19] - [31:13] | 31:14-19 | | | |
| [38:23] - [43:2] | 43:3-44:3 | | | |
| [44:4] - [46:16] | | | | |

## LEE ROWAN (2/21/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [4:6] - [4:13] | | | | |
| [5:12] - [7:15] | 7:15-8:19 | | | |
| [8:20] - [9:2] | | | | |
| [16:12] - [17:25] | | | | |
| [46:18] - [46:23] | 46:24-47:16; 47:18-21; 47:23-48:3; 48:5; 48:7-8 | | | |
| [48:9] - [49:2] | 49:4-5; 49:7-8 | | | |
| [49:10] - [49:14] | | | | |
| [49:16] - [49:21] | | | | |
| [49:24] - [49:25] | | | | |
| [50:4] - [50:13] | | | | |
| [50:16] - [50:17] | | | | |
| [50:19] - [51:22] | 51:23-52:7 | | | |
| [55:18] - [58:15] | | Foundation | | |
| [110:22] - [111:10] | 109:18-110:21 | Relevance | Motion in Limine No. 1 (D.I. 108) | |
| [111:23] - [112:18] | 112:19-113:8 | | Motion in Limine No. 1 (D.I. 108) | |

## MICHAEL WAKS (3/20/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [5:7] - [5:11] | | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [7:20] - [8:24] | | | | |
| [11:10] - [11:24] | | | | |
| [13:16] - [13:20] | | 13:21-23 (assumes facts not in evidence) | | |
| [13:24] - [14:1] | | | | |
| [18:7] - [18:11] | | 18:12-13 (vague) | | |
| [18:14] - [20:8] | | | | |
| [20:9] - [20:18] | | | | |
| [21:11] - [21:14] | | 21:15-16 (vague) | | |
| [21:17] - [22:5] | 22:6-16 | | | |
| [22:17] - [22:20] | | 22:21-22 (compound) | | |
| [22:23] | 22:24-26:1 | | | |
| [27:11] - [27:13] | 22:16 | 27:14-15 (compound) | | |
| [27:17] - [28:4] | | | | |
| [29:18] - [32:17] | | 32:18-20 (assumes facts not in evidence) | | |
| [32:21] - [33:1] | | | | |
| [33:5] - [36:5] | | 36:6-8 (mischaracterization) | | |
| [36:9] - [37:9] | 37:10-23 | | | 37:24-38:12 |
| [38:13] - [40:8] | | | | |
| [42:8] - [43:7] | | | | |
| [43:13] - [44:22] | 45:14-46:13 | | | |
| [46:14] - [46:23] | | | | |
| [47:18] - [50:8] | 50:9-20; 51:15-52:1 | | | |
| [52:5] - [54:13] | 52:2-4 | | | |
| [54:22] - [54:24] | | 55:1-4 (calls for attorney-client privileged information) | | |
| [55:5] - [55:18] | | 55:19-22 (calls for attorney-client privileged information) | | |
| [55:23] - [56:7] | | | | |
| [56:18] - [57:5] | 57:6-14; 58:9-13 | | | |
| [58:14] - [60:12] | | 60:13-14 (vague) | | |
| [60:16] - [60:21] | 60:22-65:7 | | | |
| [66:11] - [67:15] | | 67:16-17 (vague) | | |
| [67:18] - [68:21] | | | | |
| [70:3] - [74:17] | | | | |
| [74:18] - [78:15] | | | | |
| [78:17] | | | | |

17

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [78:20] - [79:9] | 79:10-80:14 | | | |
| [80:15] - [82:5] | 82:6-16 | | | |
| [82:17] - [82:20] | 82:21-83:3 | | | |
| [83:11] - [83:20] | | | | |
| [85:15] - [86:16] | | | | |
| [88:4] - [89:15] | | | | |
| [90:21] - [92:23] | | | | |
| [94:21] - [95:21] | | | | |
| [96:16] - [101:1] | | | | |
| [102:14] - [102:22] | | | | |

## HUBERT WEBER (4/1/08)

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [4:6] - [4:13] | | | | |
| [5:13] - [7:2] | | | | |
| [9:22] - [10:18] | | | | |
| [10:22] - [10:23] | | | | |
| [11:2] - [11:16] | | | | |
| [12:18] - [14:4] | | 14:5 (vague) | | |
| [14:7] - [14:20] | | | | |
| [15:8] - [16:13] | | | | |
| [16:16] - [16:24] | | 16:25-17:2 (ambiguous) | | |
| [17:3] - [17:21] | | 17:22 (compound) | | |
| [17:23] | | | | |
| [17:25] - [18:19] | | | | |
| [19:3] - [19:21] | | | | |
| [19:22] - [20:18] | 20:19-21:21 | | | |
| [21:23] - [22:4] | | 22:5 (vague) | | |
| [22:6] - [22:22] | | | | |
| [23:6] - [23:21] | | | | |
| [24:15] - [25:11] | | 25:12-13 (compound) | | |
| [25:15] - [26:17] | | 26:18 (vague) | | |
| [26:19] - [26:21] | 26:23-35 | | | |
| [27:14] - [32:4] | 32:5-33:6 | | | |
| [33:7] - [33:9] | | | | |
| [33:12] - [33:24] | 34:1 | 33:25 (vague) | | |
| [34:2] - [36:11] | | | | |
| [36:12] - [37:6] | | 37:7-8 (calls for hearsay) | | |
| [37:9] - [37:12] | | hearsay | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| [38:13] - [40:15] | 38:2-11 | | | |
| [40:21] - [41:23] | | | | |
| [44:4] - [44:6] | | 44:7 (compound) | | |
| [44:8] - [44:17] | | | | |
| [47:7] - [49:23] | 49:24-50:6; 50:21-51:2 | | | |
| [51:6] - [51:15] | 54:13-58:19 | | | |
| [58:20] - [60:12] | 60:13-61:15 | | | |
| [61:16] - [63:20] | | | | |
| [63:21] - [64:17] | 64:18-22 | | | |
| [64:23] - [66:22] | | 66:23-24 (best evidence/document speaks for itself) | | |
| [66:25] | | best evidence/document speaks for itself | | |
| [67:3] - [67:11] | | 67:12 (calls for hearsay) | | |
| [67:13] - [67:15] | | hearsay | | |
| [67:17] - [67:24] | | | | |
| [67:25] - [68:20] | | | | |
| [68:21] - [71:16] | | | | |
| [71:17] - [72:25] | | 73:2 (vague, compound) | | |
| [73:3] | | | | |
| [73:5] - [74:5] | 74:6-75:19 | | | |
| [75:20] - [76:25] | | | | |
| [77:9] - [79:8] | | 79:9 (compound, vague) | | |
| [79:10] - [80:2] | | | | |
| [80:10] - [83:4] | | | | |
| [83:5] - [85:12] | | | | |
| [85:13] - [86:3] | 86:4-18 | | | |
| [86:19] - [91:21] | 91:22-93:3 | | | |
| [93:4] - [99:13] | | | | |
| [99:14] - [101:2] | | 101:3 (vague) | | |
| [101:4] - [103:3] | | | | |
| [104:5] - [107:10] | | | | |
| [107:11] - [109:15] | 109:16-110:18 | | | |
| [114:3] - [120:13] | | | | |
| [121:4] - [124:8] | | 124:9-10 (lack of foundation) | | |
| [124:11] | | | | |
| [124:13] - [127:7] | | 127:8 (lack of foundation) | | |
| [127:9] - [127:13] | | | | |
| [128:16] - [139:15] | 139:16-140:24; | | | |

| PL.'S DESIGNATIONS | DEF.'S COUNTER-DESIGNATIONS | DEF.'S OBJECTIONS | PL.'S OBJECTIONS TO DEF.'S COUNTERS | PL.'S REPLY DESIGNATIONS |
|---|---|---|---|---|
| | 141:2-5 | | | |
| [141:17] - [143:19] | | 143:20 (vague) | | |
| [143:21] - [145:18] | | | | |
| [145:25] - [146:5] | | | | |
| [146:8] - [153:1] | | 153:2 (irrelevant) | | |
| [153:3] - [157:6] | | irrelevant (153:3-11) | | |
| [157:9] - [160:16] | 160:17-161:10 | | | |
| [161:11] - [161:23] | | | | |
| [162:9] - [162:20] | | | | |
| [162:21] - [163:14] | 163:15-16 | | | |
| [164:17] - [166:19] | | 166:20 (vague) | | |
| [166:21] - [168:10] | | 168:11-12 (calls for speculation) | | |
| [168:13] - [172:3] | | 172:4-5 (lack of foundation) | | |
| [172:7] - [172:24] | | 172:25 (lack of foundation) | | |
| [173:2] - [174:11] | | | | |
| [174:16] - [177:25] | 178:2-16; 179:4-12, 22-25; 180:11-181:11; 182:14-25 | | Fairness does not require contemporaneous consideration of counter-designations 180:11-181:11 and 182:14-25. | 179:13-21; 180:2-10 |
| [185:5] - [186:11] | | | | |
| [187:17] - [187:20] | | | | |
| [188:6] - [188:22] | 188:23-191:7 | | Fairness does not require contemporaneous consideration of counter-designations | |
| [191:8] - [192:3] | | | | |

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS |

## EXHIBIT 9:  KRAFT'S DEPOSITION DESIGNATIONS AND KEURIG'S OBJECTIONS AND COUNTER-DESIGNATIONS

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft") make the deposition designations listed in the tables below.  Kraft does not concede that a particular excerpt of testimony listed below can or should be read or played into evidence.

In response to Kraft's deposition designations, Plaintiff Keurig, Inc. ("Keurig") makes objections and counter-designations, also listed in the tables below.  The parties agree that Kraft will have until September 8, 2008 to respond and/or object to Keurig's objections and counter-designations.

Dated: August 25, 2008

## TABLE OF CONTENTS

JANICE APPLETON (2/21/08) ................................................................................... 1-2

RODERICK H. BEAULIEU (3/14/08) ........................................................................ 3-6

ROGER DEROMEDI (3/31/08) ....................................................................................7

MAURICE E. GAUTHIER (3/28/08) ......................................................................... 7-8

NICHOLAS G. LAZARIS 30(b)(6) TESTIMONY (3/12/08) ................................... 9-10

NICHOLAS G. LAZARIS PERSONAL TESTIMONY (3/12/08).......................... 11-14

NICHOLAS G. LAZARIS 30(b)(6) TESTIMONY (3/13/08) .......................................15

ARLENE J. POWERS (3/28/08) ..................................................................................16

**JANICE APPLETON (2/21/08)**

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 5:14-7:3 | | 5:12-13; 7:4-8:5; 11:6-20 | |
| 18:8-19:17 | | 14:15-18:6; 19:18-20:6 | |
| 22:15-23:24 | | 21:23-21:25 | |
| 23:25-24:5 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 24:14-25:3 | Relevance.  Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 25:5-26:25 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 27:12-30:8 | | | |
| 31:5-35:2 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 35:11-36:7 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 34:16-35:10 | |
| 36:15-37:20 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 36:8-14 | |
| 39:1-21 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 37:21-38:25; 39:22-40:10 | |
| 40:16-25 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 41:1-15 | |
| 41:16-42:25 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 43:1-16 | |
| 43:17-44:24 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 45:15-21 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 45:22-46:24 | |
| 46:25-47:14 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 47:15-17 | |
| 50:14-52:25 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 53:1-53:5 | |
| 53:6-10 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 53:11-53:12 | |
| 53:14-18 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 53:19-21 | |
| 53:22-55:15 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 55:21-56:17 | Hearsay.  <u>See</u> Keurig's Motion in Limine No. 3 (D.I. 110). | 56:18-25 | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| | Lack of personal knowledge (56:2-56:13) | | |
| 57:1-58:14 | Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | 59:6-9 | |
| 59:10-61:11 | Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 62:13-16 | Relevance. Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | 62:17-20 | |
| 62:21-63:9 | Relevance. Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | 63:10-64:3 | |
| 64:7-19 | Relevance. Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | 64:4-6 | |
| 64:22-65:13 | Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 65:16-20 | Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | 66:21-66:10 | |
| 66:14-18 | Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 67:11-68:10 | Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | | |
| 70:22-71:13 | | 70:8-11 | |
| 73:22-75:25 | | 72:4-10; 73:17-21 | |
| 79:15-81:17 | Hearsay (80:24-81:17). See Keurig's Motion in Limine No. 3 (D.I. 110). | 77:7-24; 78:3-79:5 | |
| 81:1-25 | Hearsay. See Keurig's Motion in Limine No. 3 (D.I. 110). | | |

**RODERICK H. BEAULIEU (03/14/08)**

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 5:19-20 | | | |
| 6:6 | | | |
| 6:11-23 | | | |
| 12:6-8 | | | |
| 12:13-13:14 | | 12:9-12; 13:15-18 | |
| 14:3-15:2 | | | |
| 16:10-17:15 | | | |
| 19:11-24 | | | |
| 20:18-21:3 | | 19:25-20:17 | |
| 22:23-23:11 | | 20:25-22:22 | |
| 23:21-25 | | | |
| 24:6-26:19 | | | |
| 27:16-18 | | | |
| 31:2-34:11 | | | |
| 37:17-38:18 | Relevance (37:17)  Mischaracterizes document; assumes facts not in evidence (38:16-18) | | |
| 38:20-39:15 | Mischaracterizes document; assumes facts not in evidence (38:20)  Vague (39:15) | | |
| 39:17-40:5 | Vague (39:17-40:3)  Form, relevance (40:4-5) | | |
| 40:10-46:16 | Form, ambiguous (44:7-12, 46:14-16) | | |
| 46:18 | Ambiguous | | |
| 49:3-50:21 | Improper characterization (50:21) | | |
| 50:23-51:8 | Improper characterization (50:23-24) | | |
| 51:24-53:8 | Vague; assumes facts not in evidence (53:7-8) | | |
| 53:10-55:12 | Vague, assumes facts not in evidence (53:10-14) | 55:13-23 | |
| 55:24-56:2 | | | |
| 56:4-15 | Ambiguous, improper | | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| | characterization (56:12-15) | | |
| 56:21-57:18 | Ambiguous, improper characterization (56:21-22) | | |
| 58:10-59:9 | Vague, ambiguous time frame (59:7-9) | | |
| 59:11-60:2 | Vague, ambiguous time frame (59:11) | | |
| 60:17-61:9 | | | |
| 61:16-21 | Improper characterization (61:20-21) | | |
| 61:23-63:10 | Improper characterization (61:23-62:5)<br><br>Form; vague (63:9-10) | | |
| 63:12-16 | Form; vague | | |
| 63:18-64:6 | Form; vague (63:18-19; 64:5-6) | | |
| 64:9-13 | Form; vague | | |
| 64:15-65:2 | Form; vague | | |
| 65:4-11 | Form, vague, mischaracterizes prior testimony | | |
| 65:13-16 | Form, vague, mischaracterizes prior testimony (65:13)<br><br>Vague, relevance (65:14-16) | | |
| 65:18-66:23 | Vague, relevance (65:18-24)<br><br>Unfair prejudice (66:4-7; 66:12-17)<br><br>Form; vague (66:22-23) | | |
| 66:25-66:4 | Form; vague | | |
| 67:6-16 | | | |
| 67:21-68:18 | | | |
| 68:21 | | | |
| 69:5-16 | Ambiguous (69:16) | | |
| 69:18-70:11 | Ambiguous (69:18-19) | | |
| 70:19-71:24 | | | |
| 72:10-73:2 | | | |
| 73:11-74:3 | Form, mischaracterizes prior testimony, assumes facts not | | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| | in evidence (74:1-3) | | |
| 74:5-14 | Form, mischaracterizes prior testimony (74:5) | | |
| 75:25-77:8 | | | |
| 78:6-19 | | | |
| 78:23-79:17 | | | |
| 80:5-13 | | | |
| 80:24-81:11 | Vague, ambiguous (81:9-11) | | |
| 81:13-19 | Vague, ambiguous | | |
| 81:21 | Vague, ambiguous | | |
| 82:24-83:9 | | | |
| 83:20-84:6 | | | |
| 84:13-85:9 | | | |
| 85:11-21 | | | |
| 85:25-93:5 | Mischaracterizes prior testimony (93:3-5) | | |
| 93:8-16 | Mischaracterizes prior testimony | | |
| 93:18-96:24 | Mischaracterizes prior testimony (93:18-94:12)<br><br>Hypothetical, assumes facts not in evidence, calls for speculation (95:25-96:5) | | |
| 97:16-24 | Foundation, assumes facts not in evidence, mischaracterizes prior testimony (97:24) | | |
| 98:1-8 | Foundation, assumes facts not in evidence, mischaracterizes prior testimony | | |
| 100:16-102:24 | Vague; asked and answered (102:22-24) | | |
| 103:3-9 | Vague; asked and answered | | |
| 103:18-25 | Asked and answered | | |
| 104:4-5 | Asked and answered | | |
| 104:21-105:15 | | | |
| 105:17-20 | Form | | |
| 105:23-107:7 | Form | | |
| 111:4-14 | Form; ambiguous (111:11-14) | | |
| 111:17-112:6 | Form; ambiguous (111:17) | | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| | Form, assumes facts not in evidence (112:3-6) | | |
| 112:9-12 | Form, improper characterization, assumes facts not in evidence | | |
| 115:7-117:16 | | | |
| 117:22-119:5 | Relevance, unfair prejudice (118:7-119:5)<br><br>Asked and answered (119:3-5) | | |
| 119:8-12 | Relevance; unfair prejudice; asked and answered | | |
| 119:15-120:12 | Relevance; unfair prejudice; asked and answered (119:15-120:7) | | |
| 120:17-121:17 | | | |
| 121:21-122:10 | | | |
| 122:17-123:6 | Relevance, unfair prejudice (122:17-22) | | |
| 125:19-126:12 | | | |

**ROGER DEROMEDI (03/31/08)**

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 26:7-26:14 | | | |
| 31:16-32:21 | | | |
| 54:3-54:22 | | | |
| 67:21-69:1 | | 69:2-70:11 | |
| 71:6-72:5 | | | |
| 73:11-73:18 | | | |
| 75:3-76:7 | | 76:8-77:1 | |
| 80:12-83:4 | Relevance | | |
| 108:17-109:4 | Hearsay | | |
| 109:13-111:3 | Form, leading | | |
| 111:5-112:19 | Leading (111:12-112:19) | | |
| 112:22-113:21 | Hearsay | 113:22 | |
| 116:21-117:2 | Hearsay | | |
| 117:8-120:9 | Hearsay<br><br>Leading, compound, argumentative (119:1-10)<br><br>Leading (119:11-120:9) | 120:12-16 | |

**MAURICE E. GAUTHIER (3/28/08)**

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 8:9-9:23 | Relevance | | |
| 10:12-21 | Relevance | | |
| 11:12-13:12 | Relevance | | |
| 13:16-15:11 | Relevance<br><br>Unfair prejudice (13:16-14:5) | | |
| 15:16-18:21 | Relevance | | |
| 19:15-20:10 | Relevance | | |
| 20:21-21:11 | Relevance | | |
| 21:20-22:14 | Relevance<br><br>Form, improper characterization (22:3-14) | | |
| 22:17-23:24 | Relevance | | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| | Form, improper characterization (22:17-23:4) | | |
| 24:3-6 | Relevance, ambiguous | | |
| 24:8-26:15 | Relevance<br><br>Form (26:14-15) | | |
| 26:18-22 | Relevance, form, argumentative | | |
| 26:24-27:3 | Relevance, form, argumentative | | |
| 27:15-28:6 | Relevance | | |

**NICHOLAS G. LAZARIS – 30(b)(6) TESTIMONY (3/12/08)**

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 6:13-21 | Exhibit 206 – Hearsay, unfair prejudice, assuming facts not in evidence | | |
| 6:24-7:7 | | | |
| 7:10-13 | | | |
| 8:9-24 | | | |
| 9:13-10:5 | | | |
| 14:21-16:4 | Form, vague, improper characterization (15:25-16:4) | 11:6-14:20 | |
| 16:8-13 | Form, vague, improper characterization | 16:15-17 | |
| 16:23-19:5 | | | |
| 19:9-20:16 | | | |
| 21:1-8 | | | |
| 21:18-22:9 | | | |
| 22:13-19 | | | |
| 22:24-28:15 | Improper characterization (22:17-23:7) | | |
| 28:22-29:2 | Compound, improper characterization | | |
| 29:4-10 | Compound, improper characterization (29:4-6) | | |
| 31:22-32:2 | | | |
| 32:7-17 | Improper characterization (32:9-14) | | |
| 32:20 | | | |
| 32:25-33:3 | | | |
| 33:8-36:25 | | 37:1-13 | |
| 38:1-2 | | 37:24-25; 38:3-8 | |
| 38:17-19 | | | |
| 38:21-39:15 | | | |
| 40:3-4 | Ambiguous, compound | 39:16-40:2 | |
| 40:9-41:4 | Assumes facts not in evidence (41:2-4) | 40:6-7 | |
| 41:10-42:10 | Assumes facts not in evidence | | |
| 42:18-20 | | 42:11-17 | |
| 42:22-43:4 | | | |
| 44:6-9 | Form, vague | | |
| 44:11-45:2 | Form, vague | | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 45:5-13 | | | |
| 45:16-47:10 | | | |
| 49:1-51:21 | | | |
| 52:3-54:12 | | | |
| 55:9-21 | | | |
| 55:23-58:2 | | | |
| 66:14-24 | Improper characterization of prior testimony | | |
| 67:1-18 | | | |

**NICHOLAS G. LAZARIS – PERSONAL TESTIMONY (3/12/08)**

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 5:11-7:19 | Exhibit 200 – Hearsay, unfair prejudice, assuming facts not in evidence<br><br>Irrelevant and prejudicial attorney colloquy (6:2-7:13) | | |
| 8:7-9:25 | | | |
| 10:8-11:20 | Unfair prejudice, assuming facts not in evidence<br><br>Relevance (10:8-17) | | |
| 11:23-13:20 | Unfair prejudice, assuming facts not in evidence<br><br>Relevance (13:15-20) | | |
| 42:19-43:4 | | | |
| 43:8-44:24 | | | |
| 45:5-46:8 | 403 – Mr. Lazaris is no longer president of Keurig, and it would be needlessly confusing and prejudicial to play testimony that was true at the time but not true presently. | | |
| 47:5-14 | | 46:9-47:4; 47:15-48:3 | |
| 48:4-21 | 403 – Mr. Lazaris is no longer president of Keurig, and it would be needlessly confusing and prejudicial to play testimony that was true at the time but not true presently. (48:4-7 and 48:15-21) | | |
| 49:18-20 | | | |
| 53:17-25 | | | |
| 55:11-15 | Form, compound | | |
| 55:18-57:14 | Form, compound (55:18-20) | | |
| 61:5-66:11 | Ambiguous, calls for a legal conclusion (66:10-11) | 66:20-23; 67:7-10; 68:22-25 | |
| 66:20-23 | Calls for a legal conclusion | 61:5-66:11; 67:7-10; 68:22-25 | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 67:7-10 | Calls for a legal conclusion | 61:5-66:11; 66:20-23; 68:22-25 | |
| 68:22-69:21 | Calls for a legal conclusion<br><br>Relevance, unfair prejudice (69:13-21) | 61:5-66:11; 66:20-23; 67:7-10 | |
| 71:22-72:13 | Relevance, unfair prejudice, calls for a legal conclusion | 61:5-66:11; 66:20-23; 67:7-10; 68:22-69:21 | |
| 72:23-73:2 | | 73:4 | |
| 73:5-8 | Relevance, unfair prejudice (69:13-21) | 72:23-73:4 | |
| 73:11-15 | | 72:23-73:4 | |
| 73:22-74:7 | | 72:23-73:4 | |
| 74:15-78:6 | Calls for a legal conclusion (74:15-18)<br><br>Mischaracterizing previous testimony. (78:4-6) | 78:16-79:13 | |
| 79:14-80:12 | | | |
| 80:15-24 | | | |
| 81:4-83:5 | Form; unfair prejudice (83:2-5) | | |
| 83:9-84:16 | | | |
| 85:3-4 | | 85:5-86:2 | |
| 85:10-86:13 | Form, ambiguous (86:9-13) | 84:22-85:9 | |
| 86:15-87:2 | Form, ambiguous | | |
| 87:5-7 | Form, ambiguous | | |
| 87:9-15 | Form, ambiguous (87:9-12)<br><br>Calls for a legal conclusion. (87:13-15) | | |
| 87:22-88:10 | Calls for a legal conclusion. (87:22; 88:6-10) | | |
| 88:12-15 | Calls for a legal conclusion. | | |
| 88:25-89:10 | | | |
| 89:24-90:16 | | | |
| 90:18-91:9 | | | |
| 91:11-92:10 | | | |
| 93:3-7 | | | |
| 93:23-94:17 | | | |
| 94:25-95:4 | Relevance | | |
| 99:1-100:17 | | | |
| 100:23-102:22 | | | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 105:15-106:14 | Vague, incomplete question (106:14) | | |
| 106:19-109:16 | Vague, cumulative (106:19)<br><br>Vague, ambiguous, assumes facts not in evidence [want to be careful in light of banbury depos, however] (109:14-16) | | |
| 109:18-110:23 | Vague, ambiguous, assumes facts not in evidence [want to be careful in light of banbury depos, however] (109:18-20)<br><br>Vague, ambiguous, assumes facts not in evidence [want to be careful in light of banbury depos, however] (110:22-23) | | |
| 110:25-111:16 | Vague, ambiguous, assumes facts not in evidence [want to be careful in light of banbury depos, however] (110:25-111:4)<br><br>Vague, ambiguous, incomplete hypothetical, calls for expert testimony (111:13-16) | | |
| 111:20-21 | | | |
| 112:8-114:9 | Vague, ambiguous, incomplete hypothetical, calls for expert testimony (112:8-9) | 111:22-112:7 | |
| 115:12-25 | | | |
| 116:6-10 | | | |
| 116:12-19 | | | |
| 117:5-119:7 | | | |
| 119:19-120:13 | Form, assuming facts not in evidence (120:3-13) | | |
| 120:19-25 | Form, assuming facts not in evidence (120:19-20) | | |
| 128:3-22 | Cumulative (128:20-22) | | |
| 129:5-130:11 | Cumulative (129:5-6) | | |

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| | Vague, ambiguous, compound (130:9-11) | | |
| 130:13-131:5 | Vague, ambiguous, compound (130:13-15) | | |
| 131:7-132:4 | | | |
| 132:25-133:16 | | | |
| 133:18-135:12 | | | |
| 135:14-17 | | | |
| 135:25-136:8 | | | |
| 136:14-139:9 | Vague (139:7-9) | | |
| 139:11-14 | Vague (139:11) Cumulative; asked and answered (139:12-14) | | |
| 139:17-19 | Cumulative; asked and answered | | |
| 140:17-145:5 | | | |
| 150:16-153:25 | Hearsay (152:14-18) | | |
| 154:16-155:14 | Compound; assuming facts not in evidence (155:12-14) | | |
| 155:16 | Compound; assuming facts not in evidence | | |
| 156:11-159:2 | Form (158:15-23) | 159:3-12, 159:24-161:23 | |
| 161:24-168:14 | | | |
| 168:21-170:8 | Form (170:3-8) | | |
| 170:10-172:22 | | | |
| 172:24-173:5 | | | |
| 173:19-174:14 | Relevance | | |
| 175:8-15 | | 175:18-177:15 | |
| 177:16-24 | | 178:9-15 | |
| 179:4-9 | Question calls for disclosure of attorney-client privileged communications (179:8-9) | | |
| 181:1-9 | Relevance | 180:7-181:9 | |

**NICHOLAS G. LAZARIS 30(b)(6) TESTIMONY (3/13/08)**

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 79:1-80:9 | | | |
| 80:14-18 | Exhibit 214 contains inadmissible hearsay | | |
| 82:5-83:15 | The material discussed is inadmissible hearsay (82:5-83:5)<br><br>Mischaracterizes previous testimony (83:14-15) | | |
| 83:17-24 | Mischaracterizes previous testimony (83:17-21)<br><br>Compound (83:22-25) | | |
| 84:1-8 | Compound | | |
| 84:24-85:23 | | 84:9-23 | |
| 86:8-87:10 | Hearsay (86:16-87:10) | | |
| 89:12-90:11 | Assumes facts not in evidence, improper characterization (90:8-11) | | |
| 90:14-91:23 | Assumes facts not in evidence, improper characterization. (90:14-24) | | |
| 94:17:95:25 | | | |
| 96:25:97:3 | Vague, ambiguous | | |
| 97:5-19 | Vague, ambiguous (97:5-8) | | |
| 100:24-102:24 | | | |
| 130:6-132:24 | | | |
| 166:12-168:18 | Relevance (168:16-18) | | |
| 181:10-182:2 | Relevance | | |
| 183:13-184:13 | | | |
| 184:18-185:6 | | | |
| 187:25-188:22 | | | |
| 191:7-22 | | | |
| 191:25-192:14 | | | |
| 192:18-196:25 | | | |
| 197:23-202:12 | | | |

**ARLENE J. POWERS (3/28/2008)**

| Kraft's Designations | Keurig's Objections | Keurig's Counter-Designations | Kraft's Objections |
|---|---|---|---|
| 5:23-7:13 | Relevance | | |
| 7:20-9:18 | Relevance | | |
| 10:13-12:23 | Relevance | | |
| 13:25-14:6 | Relevance, Hypothetical question, Suggests facts not in evidence | | |
| 14:12-21 | Relevance, Hypothetical question, Suggests facts not in evidence | | |
| 16:1-22 | Relevance | | |
| 15:19-25 | Relevance | | |

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

<table>
<tr><td>
KEURIG, INCORPORATED,<br><br>
   Plaintiff,<br><br>
v.<br><br>
KRAFT FOODS GLOBAL, INC.,<br>
TASSIMO CORPORATION, and<br>
KRAFT FOODS INC.,<br><br>
   Defendants.
</td><td>
Civil Action No. 07-017-GMS<br><br>
**CONFIDENTIAL – FILED UNDER SEAL<br>
ATTORNEYS' EYES ONLY**
</td></tr>
</table>

## EXHIBIT 10:  TRIAL BRIEF OF PLAINTIFF KEURIG

<table>
<tr><td>
*Of counsel:*<br><br>
Michael A. Albert<br>
Michael N. Rader<br>
Charles T. Steenburg<br>
WOLF, GREENFIELD & SACKS, P.C.<br>
600 Atlantic Ave.<br>
Boston, MA 02210<br>
(617) 646-8000
</td><td>
YOUNG CONAWAY STARGATT &<br>
TAYLOR, LLP<br><br>
John W. Shaw (No. 3362)<br>
Karen E. Keller (No. 4489)<br>
The Brandywine Building<br>
1000 West Street, 17th Floor<br>
Wilmington, DE 19801<br>
(302) 571-6600<br>
jshaw@ycst.com<br>
kkeller@ycst.com<br><br>
*Attorneys for Plaintiff Keurig, Incorporated*
</td></tr>
</table>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ii-iii

I.      NATURE OF THE CASE ..................................................................................1

        A.      Keurig and the '762 Patent ....................................................................1

        B.      Kraft and the Tassimo / T-Disc System................................................2

II.     CONTESTED FACTS THAT THE EVIDENCE WILL ESTABLISH............................4

III.    KEURIG'S THEORY OF LIABILITY..............................................................5

        A.      Infringement............................................................................................5

        B.      Willful Infringement ..............................................................................6

IV.     KEURIG'S THEORY OF DAMAGES AND OTHER RELIEF REQUESTED................7

        A.      Damages for Sales Occurring Before the Jury Verdict............................7

        B.      Damages for Sales Occurring After the Jury Verdict ............................8

        C.      Injunctive Relief......................................................................................8

V.      KRAFT'S AFFIRMATIVE DEFENSES AND COUNTERCLAIMS................................8

        A.      Non-Infringement ..................................................................................8

        B.      Invalidity ................................................................................................9

VI.     MATTERS REQUIRING RESOLUTION BEFORE OR DURING TRIAL ...................13

VII.    ANTICIPATED MOTIONS ............................................................................14

## TABLE OF AUTHORITIES

**Cases**

Amado v. Microsoft Corp.,
    517 F.3d 1353 (Fed. Cir. 2008)....................................................................8

Astrazeneca AB v. Mutual Pharm. Co., Inc.,
    278 F. Supp. 2d 491 (E.D. Pa. 2003).........................................................10

eBay v. MercExchange,
    547 U.S. 388 (2006).....................................................................................8

Georgia-Pacific Corp. v. United States Plywood Corp.,
    318 F. Supp. 1116 (S.D.N.Y. 1970).............................................................7

Haberman v. Gerber Prods. Co.,
    236 Fed. Appx. 592 (Fed. Cir. 2007).........................................................9

ISCO Int'l, Inc. v. Conductus, Inc.,
    C.A. No. 01-487-GMS, 2003 WL 279561 (D. Del. Feb. 10, 2003) ..................10

LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.,
    275 F.3d 1347 (Fed. Cir. 2001).....................................................................5

Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.,
    C.A. No. 98-80-SLR, 2005 WL 67085 (D. Del. Jan. 5, 2005) ...........................11

Mycogen Plant Science v. Monsanto Co.,
    243 F.3d 1316, 1324 (Fed. Cir. 2001)........................................................11

In re Seagate Tech.,
    497 F.3d 1360 (Fed. Cir. 2007) (en banc)....................................................6

Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,
    279 F.3d 1357, (Fed. Cir. 2002)...................................................................9

Telemac Cellular Corp. v. Topp Telecom, Inc.,
    247 F.3d 1316, (Fed. Cir. 2001)..................................................................11

Transclean Corp. v. Bridgewood Servs., Inc.,
    290 F.3d 1364, (Fed. Cir. 2002).................................................................10

Woodland Trust v. Flowertree Nursery, Inc.,
    148 F.3d 1368 (Fed. Cir. 1998)..................................................................12

DB02:7175111.1

065927.1001

**Statutes**

35 U.S.C. § 102................................................................................................12, 14

35 U.S.C. § 271.......................................................................................................5

35 U.S.C. § 282.......................................................................................................9

35 U.S.C. § 284....................................................................................................7, 8

35 U.S.C. § 285.......................................................................................................8

DB02:7175111.1

065927.1001

## I.    NATURE OF THE CASE

This is an action for Kraft's infringement of claim 1 of Keurig's U.S. Patent No. 6,398,762.[1]  The '762 patent covers a pioneering single-serve beverage cartridge design.  As discussed below, the trial will focus on (1) Keurig's proof of infringement by Kraft; (2) Kraft's invalidity arguments; (3) the appropriate level of reasonable royalty damages to compensate Keurig for Kraft's infringement; and (4) willfulness.

### A.    **Keurig and the '762 Patent**

Keurig is a pioneer and leading manufacturer of single-serve brewing systems, which provide freshly brewed coffee and other beverages one cup at a time (a faster and more convenient alternative to traditional drip brewing).  Single-serve products had been offered before, but struggled to achieve a foothold in the market.  Founded in 1992, Keurig set out to develop technology that would finally fulfill the promise of single-serve brewing.

Keurig created and popularized a system in which a brewing machine brews a beverage inside an individual coffee cartridge that includes an internal filter.  Keurig's brewers and the associated cartridges, marketed under the name "K-Cup," offer consumers a previously unavailable level of quality and convenience.  Keurig surmounted numerous technological hurdles in developing the K-Cup system and as a result holds a number of patents.

Rather than manufacturing K-Cups itself, Keurig adopted a business plan based on licensing its intellectual property.  Keurig negotiated agreements with a select number of high-end coffee roasters (e.g., Green Mountain, Newman's Own, Timothy's and others), which license Keurig's technology and package and sell K-Cups filled with their coffee.  These roasters pay Keurig a royalty of between 6.1 and 6.6 cents per K-Cup.

---

[1] Keurig originally asserted several other '762 patent claims.  In the interest of streamlining the trial, however, Keurig is trying only claim 1.

A technology innovation company at its core, Keurig was not content with this initial success and began to develop additional cartridge designs to solve an array of challenges in the industry. For example, conventional single-serve cartridges are pierced on one side through a foil lid to inject water, and on the opposite side through a hard plastic cup to collect the brewed coffee. The outlet puncture through the hard plastic requires a sturdy metal needle and can cause buckling of the cartridge wall, resulting in problems such as unwanted sprays of hot liquid.

To solve these problems, Keurig's inventors conceived of, designed and patented a cartridge that can be pierced to form an inlet and an outlet on the <u>same</u> side of the cartridge, through the foil lid rather than the plastic cup. This "same-side piercing" concept provides an array of important benefits, including improved cartridge performance as well as simplification of the corresponding brewer design – allowing the brewer to be smaller, more durable, less expensive and easier to clean.

While Keurig's existing infrastructure and sales of K-Cup brewers precluded an immediate switch to the same-side piercing design, Keurig did take the necessary steps to protect its intellectual property by obtaining the '762 patent.

**B.**    <u>Kraft and the Tassimo / T-Disc System</u>

Before it commercialized the products at issue here, Kraft lacked a single-serve-cartridge product that it felt it could sell successfully in the United States. Unlike Keurig, Kraft did not have a large installed "brewer base" that would preclude a switch to innovative new technology.

Kraft realized that it was critical to gain a foothold in the nascent single-serve market if it wanted to maintain, let alone expand, its coffee business. Kraft accordingly developed and launched its Tassimo line of single-serve coffee brewers, together with the "T-Disc" cartridges – which use Keurig's patented single-side piercing technology.

- 2 -

Designed to be an integrated, global brand, Tassimo debuted in France in 2004, where it was ultimately recognized as the product of the year. Successful launches elsewhere in Europe followed, leading Kraft to accelerate capital expenditures and anticipate strong sales in the United States, where Kraft began selling in the Fall of 2005. Roger Deromedi, Kraft's Chief Executive Officer at the time, embraced Tassimo as his signature initiative and touted it ███

███████████

At the same time, Kraft was well aware of Keurig's technology, including the '762 patent. 

In the end, however, Kraft ██████████████ launched Tassimo in the United States in direct competition with Keurig – and without a license to the '762 patent. Faced with Kraft's unauthorized use of Keurig's technology, Keurig filed the present lawsuit.

- 3 -

## II.  CONTESTED FACTS THAT THE EVIDENCE WILL ESTABLISH

1.    Tassimo T-Discs having an internal filter[2] infringe claim 1 of the '762 patent.

2.    Before the '762 patent, no one had even considered, let alone implemented, same-side piercing beverage cartridge technology.

3.    None of Kraft's alleged prior art discloses, either expressly or inherently, each of the limitations of claim 1 of the '762 patent.  The Kenco Singles cartridge, on which Kraft relies most heavily, is designed for opposite-side piercing and does not work with same-side piercing because (1) the piercing often leads to catastrophic failure of the lid; and (2) any liquid that exits the cartridge is foul-tasting and does not constitute a beverage.

4.    In any event, Singles cartridges were not in public use in the United States as of February 18, 1999, or publicly known in the United States as of February 18, 2000.

5.    Even the non-public Singles cartridges that Kraft had in the United States at the time had a hole in the cartridge body, making them incapable of being pierced through the foil side to permit inflow and outflow.[3]

6.    Kraft's infringement of the '762 patent was willful.

7.    In a hypothetical negotiation concluded in September 2005 (when Kraft began selling T-Discs in the United States), the parties would have agreed to a license under which Kraft paid Keurig at least 5.1 cents per T-Disc.

---

[2] Kraft sells two basic types of T-Discs – those with a filter (which contain coffee or tea) and those without a filter (which contain milk or hot chocolate).  Only the filter T-Discs are accused of infringement.  Accordingly, unless stated otherwise, the word "T-Disc" in this brief refers to filter T-Discs.

[3] If liquid were injected through the foil, liquid would exit through the hole on the other side of the cartridge rather than exiting through the foil as required by the claim.

## III.  KEURIG'S THEORY OF LIABILITY

Keurig will prove that Kraft infringes claim 1 of the '762 patent by making and/or selling

T-Discs in the United States.[4]  On January 23, 2008, the Court construed a number of claim

terms and phrases and rejected all of the interpretations that Kraft had proposed to support its

non-infringement contentions.  See Markman Order (D.I. 53).

### A.    Infringement

Keurig will prove Kraft's infringement of claim 1 of the '762 patent through, among

other sources of evidence, the testimony of expert witnesses Professor Alexander Slocum and

Mr. Ted Lingle, the testimony of '762 patent inventor and former Keurig CEO Mr. Nicholas

Lazaris, and admissions from Kraft's own witnesses and documents.  Keurig will show that each

limitation of the '762 patent, as construed by the Court, is met by the T-Disc.  LNP Eng'g

Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347, 1353 (Fed. Cir. 2001).  This showing

will be straightforward given the Court's claim construction, Kraft's responses to Keurig's

Requests for Admission, and the testimony of Kraft's witnesses and Keurig's experts.

Professor Slocum, an expert in mechanical engineering, will testify that, as required by

claim 1, the T-Disc is divided by the filter into first and second chambers, with a lid overlying

both chambers.  He will also testify that the T-Disc utilizes the claimed same-side piercing

approach; its lid is piercable to accommodate an inflow of water into the first chamber (where it

infuses with the beverage medium before it passes through the permeable filter into the second

chamber), and piercable to accommodate an outflow of brewed beverage.  Professor Slocum's

analysis is expected to reference Kraft's own documents and illustrations.

---

[4] Some T-Discs made in the United States are sold abroad.  Some T-Discs made abroad are sold
in the United States.  Both categories of T-Discs infringe.  35 U.S.C. § 271.  The parties agree on
the number of T-Discs to be included in the damages base.

Mr. Lingle, a coffee expert with decades of industry experience who currently serves as Executive Director of the Coffee Quality Institute, will testify that the coffee and tea contained in Kraft's T-Discs comprise "soluble beverage media"[5] as set forth in claim 1.

Kraft has identified no rebuttal expert testimony regarding claim 1. At most, Kraft apparently plans to present lay witness testimony to the effect that the coffee contained in T-Discs does not comprise a "soluble beverage medium." There are fundamental flaws with such an argument, however – indeed, Kraft's technical expert Malcolm Taylor disagrees with it.

**B.    Willful Infringement**

Keurig will rely on Kraft documents as well as testimony from Keurig and Kraft personnel to establish that Kraft's infringement of the '762 patent was willful. The evidence will show that (1) Kraft made and sold T-Discs in the United States despite an objectively high likelihood that doing so would infringe the '762 patent; and (2) that risk was either known to Kraft or so obvious that it should have been known. In re Seagate Tech., 497 F.3d 1360 (Fed. Cir. 2007) (en banc). Kraft admits that it became aware of the '762 patent shortly after it issued.



---

[5] The specific testimony summarized herein accounts for a portion of the opinions that Professor Slocum and Mr. Lingle detailed in their Rule 26(a)(2)(B) expert reports and explained at their depositions. Keurig reserves the right to present testimony from its experts that is not specifically detailed herein.

DB02:7175111.1                                                                065927.1001

As discussed in more detail below, Kraft's invalidity theories are litigation-driven and never formed (nor could they have formed) the basis for a good-faith belief that Kraft was entitled to sell the accused products.  Notably, Kraft sought – and in some cases obtained – its own patent claims on the accused T-Disc that are strikingly similar in language and scope to claim 1 of the '762 patent (including the "piercable to accommodate an inflow" phraseology), despite Kraft's knowledge of the very prior art that Kraft now contends anticipates claim 1 of the '762 patent.[6]  Plainly, Kraft never believed that this prior art would anticipate such claims.

Moreover, Kraft highlighted its own "same side piercing" patent (containing the claims that it apparently copied from Keurig) as one of the "critical patents" for the Tassimo system and prepared invention disclosures highlighting the benefits of the same-side piercing invention over the prior art.  The invalidity arguments that Kraft now advances directly contradict the positions that Kraft took during its own patent prosecution efforts, as well as Kraft's internal communications and subsequent admissions regarding same-side piercing.

## IV.    KEURIG'S THEORY OF DAMAGES AND OTHER RELIEF REQUESTED

### A.    <u>Damages for Sales Occurring Before the Jury Verdict</u>

Keurig's damages expert Alan Ratliff, JD-CPA will testify that Keurig is entitled to no less than a reasonable royalty for past infringement of the '762 patent pursuant to 35 U.S.C. § 284 and <u>Georgia-Pacific Corp. v. United States Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Keurig will also rely on various documents and the testimony of additional witnesses (including Professor Slocum and Mr. Lingle) to establish certain factual predicates for Mr. Ratliff's analysis (e.g., the benefits that the patented technology offers over the prior art).

---

[6] Kraft bases its invalidity defense on its own Kenco Singles cartridge product (the prior art status of which Keurig disputes as already noted) and a prior art patent describing an early version of the Kenco Singles cartridge.

The evidence will show that Keurig is due reasonable royalty damages of at least $.051 for each infringing T-Disc. Based on anticipated sales through October 2008, Keurig anticipates that compensatory damages will total at least ███████ (not including pre-judgment interest, which Keurig will separately ask the Court to award). Keurig reserves the right to revise this number based on updated Kraft sales figures received before trial.

Because of Kraft's willful infringement, Keurig will request that the Court treble the damages and award Keurig its attorneys fees. 35 U.S.C. §§ 284-285.

### B.      Damages for Sales Occurring After the Jury Verdict

Keurig will request an accounting of Kraft's infringing sales, if any, following the jury verdict but before entry of an injunction. The jury should not be asked to determine a royalty rate for post-verdict sales. See Amado v. Microsoft Corp., 517 F.3d 1353 (Fed. Cir. 2008).

### C.      Injunctive Relief

Keurig will also ask the Court to enjoin Kraft from further infringement of the '762 patent. At trial, Keurig will present evidence establishing (1) the irreparable injury that Kraft's infringement has caused (and continues to cause) Keurig; (2) the inadequacy of monetary remedies; (3) the balance of hardships tilting in Keurig's favor; and (4) the public interest favoring injunctive relief. eBay v. MercExchange, 547 U.S. 388 (2006).

## V.      KRAFT'S AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

### A.      Non-Infringement

Kraft infringes claim 1 of the '762 patent as discussed in Section III(A) above. Kraft has identified no rebuttal expert testimony. At most, Kraft may present lay witness testimony to the effect that the coffee contained in the T-Discs does not comprise a "soluble beverage medium" as set forth in claim 1. As already noted, however, Kraft's own expert disagrees.

- 8 -

Kraft also may attempt to rely on purported similarities between the T-Disc and the Singles cartridge to suggest that the '762 patent cannot be both valid and infringed. There are, however, important differences between the T-Disc and Singles structures. Moreover, there is no "practicing the prior art" defense to patent infringement. E.g., Tate Access Floors, Inc. v. Interface Architectural Resources, Inc., 279 F.3d 1357, 1365-69 (Fed. Cir. 2002). As a matter of law, Kraft's invalidity and non-infringement defenses must stand or fall on their own.

## B.  Invalidity

The '762 patent is presumed valid. 35 U.S.C. § 282. Kraft will be unable to rebut this presumption with clear and convincing evidence as required. It will be undisputed at trial that Keurig's inventors were the first to conceive and implement same-side piercing technology.

Kraft's invalidity defense will focus on Singles cartridges that were designed for conventional opposite-side piercing, but which Kraft will contend could have operated in a same-side piercing mode instead, if one attached a special apparatus or "jig" to the cartridge before connecting it to a brewer. There are a host of problems with Kraft's hindsight-driven approach.

For one, the cartridges simply are not pierceable to accommodate an inflow and an outflow through the foil side. Indeed, Kraft itself successfully explained this to the European Patent Office in prosecuting patent claims, for the accused T-Disc, that it apparently modeled after Keurig's '762 patent claims. Kraft's position at trial will be opposite to what it told the European Patent Office. Cf. Haberman v. Gerber Prods. Co., 236 Fed. Appx. 592, 598 (Fed. Cir. 2007) (reversing invalidity of claim requiring capability of performing a function, where the defendant had earlier represented to the Patent Office that the same prior art was not capable of performing that function). At trial, Kraft's engineers will likewise be forced to concede, based on their deposition testimony, that Singles cartridges are not capable of same-side piercing.

- 9 -

While Kraft employees developed a special apparatus to accompany the Singles cartridges in an effort to pierce those cartridges through the foil side to form an inlet and an outlet for purposes of this case, the resultant evidence is inadequate to prove invalidity.

Professor Slocum will explain that the Kraft testing fails to show pierceability to accommodate an inflow and outflow, and that the tests were not performed under real-world conditions. Professor Slocum's own tests demonstrated numerous difficulties in attempting to brew a beverage with same-side piercing of Singles cartridges. Transclean Corp. v. Bridgewood Servs., Inc., 290 F.3d 1364, 1373 (Fed. Cir. 2002) ("Although it is possible that the [prior art] could under some circumstances ... effectively equalize the flow rates [the claimed functional limitation], it is also possible for that not to be the case. Because anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation ... the [prior art] cannot inherently anticipate.") (emphasis original).

Moreover, the Kraft testing was carried out in secret (subject to a protective order) and especially for the litigation. Even if Kraft's results had shown pierceability to accommodate an inflow and an outflow through the foil side of Singles cartridges (which was not the case), a person of ordinary skill in the art, without access to Kraft's tests, still would not regard those cartridges as embodying the claimed feature. See Astrazeneca AB v. Mutual Pharm. Co., Inc., 278 F. Supp. 2d 491, 515 (E.D. Pa. 2003) (experiments performed by defendants' experts for purposes of the litigation and subject to the court's protective order were insufficient to demonstrate the claimed feature to those of skill in the art); ISCO Int'l, Inc. v. Conductus, Inc., C.A. No. 01-487-GMS, 2003 WL 279561, at *5 (D. Del. Feb. 10, 2003) (denying motion for summary judgment of anticipation where defendant had "presented no evidence as to whether someone skilled in the art would perceive" the relevant feature in the prior art) (emphasis added);

- 10 -

<u>Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.</u>, C.A. No. 98-80-SLR, 2005 WL 67085, at *9 (D. Del. Jan. 5, 2005) (granting summary judgment of no anticipation where the claimed device had to be "capable of being compressed onto a balloon catheter" and the prior art was a self-expanding stent not designed for such compression that had to be held in a compressed state by a separate sheath device: "There is nothing inherent in the properties of the Gianturco stent that <u>would lead one of ordinary skill in the art to believe</u> that such a stent could be used as anything other than a self-expanding stent.") (emphasis added).

There is yet another flaw in Kraft's testing: the special apparatus that Kraft designed to mate with the Singles cartridge constitutes an impermissible modification of the cartridge, for subsequent use with a brewer. Kraft's experiments therefore do not establish that the Singles cartridge itself meets the Keurig claim limitations. See <u>Telemac Cellular Corp. v. Topp Telecom, Inc.</u>, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement."); <u>Mycogen Plant Science v. Monsanto Co.</u>, 243 F.3d 1316, 1324 (Fed. Cir. 2001) ("The tests for infringement and anticipation are very similar, and that which would literally infringe if later in time anticipates if earlier."). Kraft does not and cannot suggest that its apparatus existed before the time of Keurig's invention – let alone that people used it together with Singles cartridges. On the contrary, Kraft concedes that <u>it designed the apparatus for the specific purpose of this litigation</u> (i.e., in an attempt to invalidate Keurig's patent).[7]

---

[7] Kraft refused to disclose the report that its engineer Andrew Bentley prepared at the time that he built the apparatus and began his testing. This report would have been the best source of information to challenge the conclusions that Mr. Bentley and Mr. Rowan (who did further tests using Mr. Bentley's apparatus) reached. Keurig accordingly filed a motion <i>in limine</i> (D.I. 108) to preclude Kraft from offering evidence about the apparatus or any tests performed on it.

In Professor Slocum's tests of the Kenco Singles cartridges under <u>realistic</u> same-side piercing conditions (i.e., without Kraft's specially-designed apparatus), whatever water did make it through the foil and into the cartridge simply burrowed a hole through the coffee grounds rather than infusing with them to form a beverage. This led to a foul-tasting liquid that Professor Slocum did not regard as a beverage. Keurig's coffee expert Mr. Lingle evaluated the liquid and will likewise testify, based on both objective factors (e.g., measurement of total dissolved solids) and subjective factors (e.g., flavor, aroma, texture) that the liquid produced through same-side piercing simply is not a beverage. Even the color was wrong (light brown instead of black).[8]

Furthermore, there is a separate threshold problem with Kraft's "Singles" anticipation theory, as Kraft cannot carry its burden to prove by clear and convincing evidence that the product was in "public" use within the meaning of 35 U.S.C. § 102 as a result of alleged shipments to private, secured office facilities. <u>Woodland Trust v. Flowertree Nursery, Inc.</u>, 148 F.3d 1368, 1371 (Fed. Cir. 1998) (to constitute prior art, third party use must be "available to the public"). Even if <u>some</u> sort of Singles cartridges did qualify as prior art, Kraft cannot prove by clear and convincing evidence that those cartridges were of the variety on which Kraft has focused its defense (namely, those produced on the "Rychiger" production line). The evidence shows that many cartridges produced during the relevant time period were made on the "Lambert" production lines.[9] Lambert line cartridges have a hole in the cartridge body through which liquid would escape (rather than exiting through the foil) if water were injected through the foil. Lambert line cartridges therefore plainly do not anticipate claim 1 of the '762 patent.

---

[8] Notably, Kraft did not preserve any evidence (even photographs) of the liquid produced in the experiments its engineers conducted with their "jig."

[9] Kraft has fragmentary production records showing that certain types of cartridges were produced on Rychiger lines. Kraft's engineer testified at deposition, however, that such cartridges were also produced on Lambert lines during the relevant time period, and that relevant Lambert line production records have since been destroyed.

Kraft advances parallel anticipation theories with respect to two patents that issued before Keurig's invention, but these theories suffer from the same fatal flaws as Kraft's arguments regarding Singles. Both patents disclose beverage cartridges designed for conventional opposite-side piercing and say nothing about same-side piercing. What is more, one of the patents is the U.S. equivalent of the prior art European patent that Kraft argued, before the European Patent Office, is incapable of single-side piercing.

In addition, this same prior art patent fails to disclose a cartridge with a <u>single</u> lid having a first section overlying the first chamber of the cartridge (i.e., the portion into which the water would be injected and the beverage brewed) and a second section overlying the second chamber (i.e., the portion into which the brewed beverage flows after passing through the filter but before being collected in the cup) as required by claim 1 of the '762 patent. Rather, the patent describes a cartridge with <u>separate</u> pieces of foil over the first and second chambers. The jury will hear two Kraft engineers – who are inventors on the patent – so testify at trial.

## VI.    MATTERS REQUIRING RESOLUTION BEFORE OR DURING TRIAL

The parties are aware of other disputed or unclear matters requiring procedural or substantive resolution prior to trial. These include (but may not be limited to) those set forth in the other papers submitted with the Joint Pretrial Order.

For example, after the deadline for adding inequitable conduct contentions, Kraft requested leave to amend its answer to add an inequitable conduct defense and counterclaim. Kraft's motion should be denied for the reasons detailed in Keurig's opposition (D.I. 94).[10]

---

[10] If the Court were to grant Kraft's motion for leave to amend, Keurig would request that the matter of inequitable conduct be reserved for the Court rather than the jury.

Also, on August 11, 2008 (more than four months after the close of discovery), Kraft for the first time disclosed its intent to assert obviousness, written description and enablement invalidity defenses to claim 1 even though no such theories are disclosed in Kraft's Invalidity Contentions, interrogatory responses, or expert reports. To this day, Kraft has not articulated the factual basis for its untimely defenses. The Court should exclude them for the reasons detailed in Keurig's Motion *in Limine* No. 5 (D.I. 117).

## VII.   ANTICIPATED MOTIONS

Based on the Court's disposition of the pending motions *in limine*,[11] the legal theories discussed herein, and subject to the evidence presented at trial, Keurig anticipates that it may move for judgment as a matter of law that:

1.   Kraft's T-Discs directly infringe claim 1 of the '762 patent;

2.   Kenco Singles cartridges do not constitute prior art under 35 U.S.C. § 102;

3.   Kenco Singles cartridges do not anticipate claim 1 of the '762 patent;

4.   U.S. Patent No. 4,853,234 does not anticipate claim 1 of the '762 patent;

5.   U.S. Patent No. 4,452,130 does not anticipate claim 1 of the '762 patent;

<div style="text-align:right">

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*[signature]*

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

</div>

---

[11] Were the Court to grant Kraft's motion to add an inequitable conduct defense, Keurig would anticipate a JMOL motion on that issue. Were the Court to deny Keurig's Motion *in Limine* No. 5, Keurig would anticipate JMOL motions on obviousness, written description and enablement.

DB02:7175111.1                                                                065927.1001

OF COUNSEL:

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

Dated: August 25, 2008                    *Attorneys for Plaintiff Keurig, Incorporated*

- 15 -

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | |
| | ) | |
| Defendants. | ) | |

## EXHIBIT 11: KRAFT'S TRIAL BRIEF

<table>
<tr>
<td>

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700


Dated:  August 25, 2008

</td>
<td>

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Tel:  302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants
Kraft Foods Global, Inc., Tassimo
Corporation, and Kraft Foods Inc.*

</td>
</tr>
</table>

## INTRODUCTION

Defendants-Counterclaimants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft"), by counsel, submit this trial brief pursuant to the Court's direction. Plaintiff Keurig, Incorporated ("Keurig") contends that Kraft infringes claim 1 of U.S. Patent No. 6,607,762 ("the '762 Patent"). The issues at trial concern the infringement of claim 1, the validity of claims 1, 2, 8, 9, and 10, and the unenforceability of the '762 Patent due to inequitable conduct. The parties will also try the issue of damages if claim 1 of the '762 patent is found not invalid and infringed.

## I.      NATURE OF THE CASE

Keurig sued Kraft for infringement of the '762 Patent. Keurig initially asserted claims 1, 2, 8, 9, and 10, but now only asserts claim 1 of the '762 Patent. Kraft has counterclaimed against Keurig, asserting that the '762 Patent is invalid for being either anticipated or rendered obvious in view of public use of the invention and certain prior art references. Kraft also contends that the '762 Patent is invalid for failure to meet the written description and enablement requirements of 35 U.S.C. § 112. Kraft also claims that '762 Patent is unenforceable due to inequitable conduct.

### A.      '762 Patent

The '762 Patent is directed to the structure of a beverage filter cartridge. In particular, the alleged innovation of the '762 Patent is a cartridge that includes a lid having a section overlying a chamber for storing a soluble beverage medium and another section overlying an outlet chamber from which the brewed beverage can exit the cartridge. Moreover, the lid is "piercable" (*i.e.*, capable of being pierced) to both permit a liquid to flow into the storage chamber and permit a beverage to flow out of the outlet chamber. Claim 1 is an apparatus claim, and, thus, is only directed to the structure of a beverage filter cartridge and not its method of use.

**B.     Accused Product**

Kraft Foods Global, Inc. and Tassimo Corporation sell beverage cartridges called Tassimo Discs or T-discs.  Some T-discs have a wet beverage medium such as milk or chocolate, which are not at issue in this suit.  Other T-discs include a dry beverage medium, like roast and ground coffee or tea, and these T-discs include a filter, and, thus, are accused of infringement by Keurig.  The suit is not directed any brewer used with the T-discs, only the filter T-discs themselves.

## II.  CONTESTED FACTS THAT KRAFT WILL ESTABLISH

1.      That the T-disc does not infringe claim 1 of the '762 Patent.

2.      That claim 1 is anticipated by the prior art.

3.      That it would have been obvious to one of ordinary skill in the art to use a single lid to close the access opening of the cartridge disclosed U.S. Patent No. 4,853,234.

4.      That the Kenco Singles beverage filter cartridge was in use and known by others in this country prior to the alleged invention date of the '762 Patent

5.      That the Kenco Singles beverage filter cartridge was in public use in the United States prior to February 18, 1999.

6.      That the Applicants for the '762 Patent failed to enable or provide a sufficient written description of the beverage filter cartridge recited in claim 1.

7.      That the Applicants for the '762 Patent withheld material information during the prosecution of the '762 Patent with an intent to deceive or mislead the U.S. Patent and Trademark Office.

8.      That Kraft Foods Inc. is a holding company that does not make, sell, offer for sale, or import accused T-discs within the District of Delaware, or the United States.

9.    That Keurig is not entitled to damages in the amount claimed.

10.    That Kraft did not willfully infringe.

11.    This is an exceptional case, entitling Kraft to recover attorneys' fees.

## III.  KRAFT'S DEFENSES AND COUNTERCLAIMS

### A.    T-Discs do not infringe Claim of the '762 Patent

To prove infringement of the '762 Patent, Keurig must establish that each and every element of claim 1 of the '762 Patent is present in the T-disc.  Keurig has the burden on infringement.  In view of Keurig's application of the limitations of claim 1 with regard to the prior art Kenco Single cartridge, Keurig cannot possibly prove infringement of claim 1.

### B.    Claim 1 is Anticipated by the Prior Art

Under 35 U.S.C. § 102, a patent claim is invalid if each and every limitation of that claim is found in a single prior art reference or product.  Claim 1 of the '762 Patent is a structural claim that is not a limited to a particular method or manner of use.  Rather, claim 1 simply recites a cartridge including a single lid having a first lid section overlying a first chamber for storing a beverage and having a second lid section a second chamber from which a beverage may exit the container.  The first lid section is simply capable of being pierced to permit an inflow of liquid into the first chamber and the second lid section is merely capable of being pierced to permit a beverage to flow out of the first chamber.  Kraft asserts three pieces of prior art that include or disclose a lid overlying the first and section chambers that is capable of being pierced at a first lid section to permit a liquid to flow into and a second lid section to permit a beverage to flow out:  the Kenco Singles cartridge; U.S. Patent No. 4,853,234 to Bentley *et al.*, and U.S. Patent No. 4,452,130 to Klein.

C.    **Claim 1 is Obvious in View Of The '234 Patent.**

In the rebuttal expert report of Dr. Alexander Slocum, Keurig for the first time argues that U.S. Patent No. 4,853,234 ("the '234 Patent") does not disclose a "lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber."    While Kraft maintains that the '234 Patent discloses a single lid overlying the first and second chambers, this limitation of claim 1 cannot serve as a basis of patentability.    A patent claim is invalid as obvious under 35 U.S.C. § 103, if its subject matter would have been obvious to a person of ordinary skill in the art at the time of the invention.    *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 134 (2007).    Prior to the alleged invention of the '762 Patent, a single lid for closing an access opening was well know in the art, as shown by the Kenco Singles cartridge, U.S. Patent No. 4,452,130 to Klein, and the prior art discussed in the "Description of the Prior Art" of the '762 Patent, and U.S. Patent Nos. 5,325,765 and 5,840,189 ("the container is closed by an impermeable yieldably piercable lid comprising a laminate of metallic foil and plastic.").    Moreover, Kraft's technical expert will give testimony proving that a design engineer would use a single lid with the cartridge illustrated in the '234 Patent.    Thus, even assuming that the '234 Patent does not disclose a single lid closing the cartridge, the '234 patent, whether alone or in combination with the aforementioned prior art, renders claim 1 invalid as obvious.

D.    **The Kenco Singles Cartridge is Prior Art to the '762 Patent**

The Kenco Singles cartridge is prior art under 35 U.S.C. §§ 102(a), (b).    First, Kraft will demonstrate that the Kenco Single cartridge was in continuous public use in the United States from 1997 to up until the filing of the provisional application from which the '762 Patent claims priority.    Next, Kraft will show that Mr. Nicholas Lazaris, a named inventor of the '762 Patent,

was in possession of a Kenco Single cartridge, and had inspected its external and internal structure prior to the alleged invention of claim 1 of the '762 Patent.

Kraft will prove that Kenco Single cartridges have been shipped to the United States for use since 1997. Keurig will attempt to argue that the use of Kenco Singles cartridges was not public because such cartridges were used within Kraft's offices. But that is not the law. A public use is one that is by a person other than the inventor under no limitation, restriction, or obligation of confidentiality. *A. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1362, 1267 (Fed. Cir. 2008). Kenco Singles brewers and cartridges were sent to the United States for use by Kraft's employees, including William Craig, Geraldine Greto, and Helen Glus, as well as visitors to Kraft's offices. These employees will testify that they regularly used Kenco Singles cartridges from 1997 to 2000, and did so with no obligation of confidentiality. In fact, Mr. Craig showed the cartridges to visitors to demonstrate Kraft's technological capabilities, and Ms. Glus saw visitors using the Kenco Singles cartridges. The evidence makes clear that, as a matter of law, the Kenco Singles cartridge is prior art under 35 U.S.C. §§ 102(a) and (b).

Moreover, under 35 U.S.C. § 102(a), a patent is invalid if the invention was known or used by others in this country before the invention thereof by the applicant for patent. Here, the "invention" in a 102(a) analysis is the Kenco Singles cartridge, not the '762 Patent. When deposed, Mr. Lazaris indicated that prior to his alleged conception of the invention of the '762 Patent, he had inspected the structure of a Kenco Singles cartridge. He dissembled the cartridge to inspect its internal structure and knew that it a had a thin foil lid that was capable of being pierced and overlay both the coffee storage chamber and the outlet chamber from which the brewed beverage exits the cartridge. Keurig will argue that Mr. Lazaris did not know of the Kenco Single cartridges because he did not think it was designed for same-side piercing. But

claim 1 is not a method claim, and, thus, does not cover a method of use. Instead, claim 1 is an apparatus claim, and Mr. Lazaris clearly knew that the Kenco Singles cartridge he inspected included structures that correspond to each and every limitation of claim 1.

E.    **The '762 Patent Fails to Satisfy the Enablement and Written Description Requirements.**

In a desperate attempt to avoid Kraft's invalidating prior art, Kraft has presented expert testimony, if accepted as true, renders claim 1 of the '762 Patent *per se* invalid. A patent "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." *See* 35 U.S.C. § 112. But Dr. Slocum, in his rebuttal report, argued that Kraft's asserted prior art is not anticipatory because it does not include "a support structure against which to press a gasket or other device to form a seal." This feature is not only absent from the claims, but also not discussed anywhere in the '762 Patent. Realizing that his initial opinion invalidates claim 1, Dr. Slocum proffered his alternative aspect-ratio theory at deposition and opined that the first embodiment was inoperable. Again, the '762 Patent is silent with regard to aspect ratios of the cartridge, and, thus, the original disclosure fails to meet the written description requirement because it discloses only the allegedly inoperable first embodiment. In addition, Keurig presents the testimony of Ted Lingle asserting that Kraft's prior art does not produce a beverage based on its taste and aroma. Besides the limitation being an unpatentable statement of intended use, the '762 Patent does not support the specialized definition of beverage from Mr. Lingle's opinion. In addition, Mr. Lingle testified that a person of ordinary skill in the art would not know if a beverage filter cartridge produces a beverage until consulting with a beverage expert, thereby invalidating the patent as a matter of law. Kraft is compelled to bring defenses these under 35 U.S.C. § 112 in response to Keurig's reliance on contrived expert

opinion that is not supported in any way by the specification of the '762 Patent, and if accepted as true, renders claim 1 invalid.

**F.      The '762 Patent is Unenforceable for Inequitable Conduct**

Failing to disclose material information to the PTO with an intent to deceive the PTO during the prosecution of an application for a patent will render the patent unenforceable for inequitable conduct. *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 913 (Fed. Cir. 2007). Material information is not required to invalidate the patent. *Id.* Rather, the determination of materiality is objective, *i.e.*, what a *reasonable examiner* would have considered important in deciding whether to allow a patent application. *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1316 (Fed. Cir. 2006). Intent to deceive may be inferred from the surrounding facts, and, the more material the reference, the less that must be shown to support a finding of inequitable conduct. *Impax Labs. v, Aventis Pharms. Inc.*, 468 F.3d 1366, 1375 (Fed. Cir. 2006).

Mr. Lazaris has admitted that he knew of and studied the Kenco Single cartridge prior to the alleged conception of his invention. The specification describes the disadvantages of forming an outlet through the relatively rigid plastic container as opposed to the foil laminate lid of the prior art Keurig patents. Patentability of the '762 Patent was premised primarily on having a relatively easier to pierce foil lid overlying the outlet chamber, but Mr. Lazaris failed to disclose to the PTO the only piece of prior art, the Kenco Singles cartridge, that he was aware of that included a foil lid overlying the outlet chamber. In view of the high materiality of the Kenco Singles cartridge, weighing materiality and intent establishes inequitable conduct, and renders the '762 Patent unenforceable.

G.    **The Court Lacks Personal Jurisdiction over Kraft Foods Inc.**

In its complaint, Keurig alleges that the Court has personal jurisdiction over Kraft Foods Inc. because it is engaged in the sale of products that are accused of infringement. Kraft Foods Inc. denied this contention and further denied that venue in the District of Delaware was proper under 28 U.S.C. §§ 1391, 1400. Kraft Foods Inc. does not make, sell, offer for sale, or import filter T-discs. Kraft does not dispute jurisdiction or venue with regard to Kraft Foods Global, Inc. or Tassimo Corporation.

H.    **Lack of Willful Infringement**

To prove willful infringement, Keurig must prove by clear and convincing evidence that it is highly probable that, prior to the filing date of the complaint, the alleged infringer acted with reckless disregard of claim 1 of the '762 Patent. *In re Seagate Tech., L.LC.*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). Keurig will not be able to produce testimony or evidence to satisfy this burden.

I.    **Entitlement to Attorneys' Fees**

If Kraft receives judgment in its favor, then it will seek an award of attorneys' fees under 35 U.S.C. § 285. Kraft believes this case is exceptional because Keurig prosecuted this case despite clear evidence that the inventor of the '762 Patent withheld such invalidating prior art from the PTO during the prosecution of the '762 Patent, thereby rendering it unenforceable.

IV.    **DAMAGES IN THE EVENT LIABILITY IS ESTABLISHED**

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ Keurig's damages opinion improperly relies on Keurig's existing license agreements which provide its roasting partners with rights and benefits that extend well beyond those conveyed in the hypothetical negotiation. In an attempt to support its damages opinion, Keurig selectively and improperly relies on certain evidence from the record of the case while choosing to ignore other

- 8 -

contradictory evidence. Additionally, Keurig's damages opinion rests on an improper measure of Kraft's profitability which fails to take into account the significant financial investment required by Kraft to develop and launch the Tassimo business, the costs associated with operating the Tassimo business on an ongoing basis, and the impact of its royalty opinion on the overall financial results of the Tassimo business. Also, in addition to ignoring many of the financial costs incurred by Kraft, Keurig's damages opinion also fails to properly consider the limited benefits associated with Kraft taking a license to the '762 patent and Kraft's contributions to developing the single serve market in general and the Tassimo business more specifically.

In comparison, Kraft's reasonable royalty damages opinion of $0.005 per T Disc is based in part on a proper analysis of Keurig's existing license agreements. Kraft's opinion considers the relative applicability of the agreements to the hypothetical negotiation based on an analysis of the information contained in Keurig's existing license agreements and other information contained in the record of the case. Kraft's opinion also considers the costs that would be relevant to the determination of a reasonable royalty and the impact of that royalty on both parties to the hypothetical negotiation. Finally, Kraft's damages opinion considers both the limited benefits associated with taking a license to the '762 patent and the contributions made by Kraft to growing the single serve market in general and the Tassimo business more specifically.

## V.    ANTICIPATED MOTIONS FOR DIRECTED VERDICT

Kraft anticipates that it will seek judgment as a matter of law that:

1.    The Court lacks jurisdiction over Kraft Foods, Inc.

2.    Claim 1 is invalid over the prior art.

3.    Claim 1 is invalid for failure to comply with the enablement and written

description requirements of 35 U.S.C § 112.

4.    The '762 Patent is unenforceable based on inequitable conduct.

5.    Kraft has not willfully infringed the '762 Patent.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700

Dated:  August 25, 2008
879794 / 31118

By:  _/s/ David E. Moore_____
         Richard L. Horwitz (#2246)
         David E. Moore (#3983)
         Hercules Plaza, 6th Floor
         1313 North Market Street
         P.O. Box 951
         Wilmington, DE  19899-0951
         Tel:  302-984-6169
         rhorwitz@potteranderson.com
         dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

       Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

       Defendants.

Civil Action No. 07-017-GMS

**EXHIBIT 12:  PARTIES' PROPOSED JURY INSTRUCTIONS**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY JURY INSTRUCTIONS ...................................................................1

1.1    Introduction.................................................................................................1

1.2    The Parties and Their Contentions.............................................................2

1.3    Duties of the Jury .......................................................................................5

1.4    Evidence......................................................................................................6

1.5    Credibility of Witnesses – Weighing Conflicting Testimony..................8

1.6    Burden of Proof..........................................................................................9

1.7    General Guidance Regarding Patents ......................................................12

        A.    Constitutional Basis for Patent Grant ...........................................12

        B.    Exclusionary Right and Term of a Patent.....................................12

        C.    The Parts of a Patent .....................................................................12

        D.    Summary of the Patent Issues .......................................................14

1.8    Conduct of the Jury...................................................................................17

1.9    Course of the Trial ...................................................................................19

1.10   Trial Schedule ...........................................................................................20

1.11   Glossary of Patent Terms.........................................................................21

GENERAL JURY INSTRUCTIONS ......................................................................23

2.1    Introduction...............................................................................................23

2.2    Evidence Defined......................................................................................25

2.3    Direct and Circumstantial Evidence ........................................................26

2.4    Consideration of Evidence........................................................................27

2.5    Statements of Counsel..............................................................................28

2.6     Credibility of Witnesses..................................................................................29

2.7     Expert Testimony..........................................................................................31

2.8     Number of Witnesses.....................................................................................32

2.9     Burden of Proof.............................................................................................33

3.0     Summary of the Issues ..................................................................................36

CLAIM CONSTRUCTION...................................................................................................38

4.1     Claim Construction – Generally ...................................................................38

4.2     Claim Construction for the Case ...................................................................39

INFRINGEMENT...................................................................................................................40

4.3     Infringement – Generally..............................................................................40

4.4     Infringement – Knowledge of Patent or Intent to Infringe Is Immaterial..............43

4.5     Infringement – Comparison of Products to Claims ................................................44

4.6     Infringement of Open-Ended or "Comprising" Claims ........................................45

4.7A    (Keurig's Proposal)
        Infringement Despite Defendant's Improvements or Patents on Improvements...46

4.7B    (Kraft's Proposed Sequence)
        Willful Infringement .........................................................................................47

INVALIDITY .........................................................................................................................50

5.1     Summary of Invalidity Defense....................................................................50

5.2     Presumption of Validity.................................................................................53

ANTICITPATION ..................................................................................................................54

6.1     Prior Art Defined ...........................................................................................54

6.2     Anticipation....................................................................................................55

6.3     Prior Public Use .............................................................................................61

6.4     Prior Public Knowledge .................................................................66

6.5     [Disputed title] ..............................................................................68

6.6     No Practicing the Prior Art Defense ..............................................70

OBVIOUSNESS ..................................................................................................71

7.1     Obviousness – Generally ...............................................................71

7.2     Scope and Content of the Prior Art ...............................................73

7.3     Difference Between the Claims and the Prior Art ..........................74

7.4     Level of Ordinary Skill ..................................................................76

8.0     Enablement .................................................................................................78

9.0     Written Description Requirement ...............................................................80

UNENFORCEABILITY ......................................................................................82

10.1    Inequitable Conduct – Generally ..................................................82

10.2    Materiality .....................................................................................84

10.3    Intent to Deceive or Mislead .........................................................85

10.4    Balancing of Materiality and Intent ..............................................87

DAMAGES ..........................................................................................................88

11.1    Damages – Generally ....................................................................88

11.2    Reasonable Royalty – Definition ..................................................91

11.3    Reasonable Royalty – Relevant Factors .......................................94

11.4    Reasonable Royalty – Timing .......................................................97

12.0    (Keurig's Proposed Sequence)  Willful Infringement ...............................99

DELIBERATIONS AND VERDICT ................................................................102

13.1    Introduction .................................................................................102

13.2    Duty to Deliberate .................................................................................104

13.3    Court Has No Opinion ..........................................................................105

# PRELIMINARY JURY INSTRUCTIONS[1]

## 1.1     Introduction  [AGREED][2]

Members of the jury: Now that you have been sworn, I am going to give you some

preliminary instructions to guide you in your participation in the trial.

These instructions will give you some general rules and guidance that might apply to any

civil case.  However, because this is a patent trial which will deal with subject matter that is not

within the everyday experience of most of us, I will also give you some additional preliminary

instructions regarding patents to assist you in discharging your duties as jurors.

---

[1] Unless otherwise noted, all proposed preliminary instructions are based on the Court' model, downloaded from http://www.ded.uscourts.gov/GMSmain.htm.

[2] The parties have met and conferred to find common ground on jury instructions when possible. In cases where the parties agreed, a single joint jury instruction is provided and marked as AGREED.

**1.2    The Parties and Their Contentions  [DISPUTED]**

**Keurig's Proposed Instruction**

Before I begin with those instructions, however, allow me to give you an overview of who the parties are and what each party contends.

You may recall that during the process that led to your selection as jurors, I advised you that this is a civil action for patent infringement arising under the patent laws of the United States.

The parties in this case are the plaintiff Keurig, Incorporated and the defendants, Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc.  I will refer collectively to the defendants as "Kraft."

The dispute between the parties relates to the manufacture and sale of cartridges used with brewing machines to make single servings of coffee or other beverages.  Kraft markets such cartridges using the name Tassimo and calls its cartridges T-Discs.  During the trial, the parties will offer testimony to familiarize you with this technology.

Keurig owns United States Patent No. 6,607,762, which it alleges that Kraft infringes. Because patent numbers are so long, patents are usually referred to by their last three digits. Therefore, Keurig's Patent No. 6,607,762 is called simply "the '762 patent."  Keurig contends that Kraft makes, uses, sells, and offers for sale beverage cartridges called T-Discs that infringe Keurig's '762 patent and that such infringement is willful.   Keurig seeks damages for Kraft's alleged infringement.  I, and the attorneys and witnesses, may refer to the T-Disc as the "accused product."  An "accused product" simply means a product that Keurig asserts infringes its patent.

Persons or companies sued for allegedly infringing a patent can deny infringement.  They can also defend a charge of infringement by proving the patent is invalid.  In this case, Kraft

denies that it infringes Keurig's patent and asserts what are called affirmative defenses to the

charges of infringement.  I will tell you more about infringement in a few minutes.  I will instruct

you as to defenses to a charge of infringement and possible damages resulting from a finding of

infringement in my instructions to you at the close of the evidence.

### Kraft's Objections

Keurig's instruction omits any reference to Kraft's defense with regard to the
unenforceability of the '762 Patent due to inequitable conduct, for which Kraft has moved to
amend its pleadings.  Keurig also refers to brewing machines, which are not claimed, or even
described, in the '762 Patent, and, thus, are not accused of infringement and, thus, should not be
included in an instruction related to the parties' contentions.

### Kraft's Proposed Instruction

Before I begin with those instructions, however, allow me to give you an overview of

who the parties are and what each party contends.

You may recall that during the process that led to your selection as jurors, I advised you

that this is a civil action for patent infringement arising under the patent laws of the United

States.

The parties in this case are the plaintiff Keurig, Incorporated and the defendants, Kraft

Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc.  I will refer collectively to the

defendants as "Kraft."

The dispute between the parties relates to the manufacture and sale of beverage cartridges

used to make single servings of coffee or other beverages. During the trial, the parties will offer

testimony to familiarize you with this technology.

Keurig owns United States Patent No. 6,607,762, which it alleges that Kraft infringes.

Because patent numbers are so long, patents are usually referred to by their last three digits.

Therefore, Keurig's Patent No. 6,607,762 is called simply "the '762 patent."  Keurig contends

that Kraft makes, uses, sells, and offers for sale beverage cartridges called T-Discs that infringe

Keurig's '762 patent and that such infringement is willful.   Keurig seeks damages for Kraft's

alleged infringement.

Keurig does not contend that all of the claims of the '762 Patent are infringed by Kraft.  Instead,

Keurig asserts that only claim 1 is infringed.  This may be called the "asserted claim." I, and the

attorneys and witnesses, may refer to the T-Disc as the "accused product."  An "accused

product" simply means a product that Keurig asserts infringes its patent. You, of course, will

determine whether or not the accused product infringes the asserted claim of Keurig's patent.

Persons or companies sued for allegedly infringing a patent can deny infringement.  They

can also defend a charge of infringement by proving the patent is invalid or unenforceable.  In

this case, Kraft denies that it infringes Keurig's patent and contends that Keurig's '762 patent is

invalid and unenforceable.  I will tell you more about infringement in a few minutes.  I will

instruct you as to the invalidity and unenforceability defenses in my instructions to you at the

close of the evidence.

## **Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it references Kraft's contention
that the '762 patent is unenforceable.  Kraft's answer does not plead an inequitable conduct
defense, and Kraft's belated motion for leave to amend its complaint to add such a defense
should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

**1.3     Duties of the Jury  [AGREED]**

So, let me begin with those general rules that will govern the discharge of your duties as jurors in this case.  It will be your duty to find from the evidence what the facts are.  You and you alone will be the judges of the facts.  You will then have to apply to those facts the law as I will give it to you both during these preliminary instructions and at the close of the evidence.  You must follow that law whether you agree with it or not.  In addition to instructing you about the law, at the close of the evidence, I will provide you with instructions as to what the terms of claim 1 of the Keurig patent mean.  Again, of course, you are bound by your oath as jurors to follow these and all the instructions that I give you, even if you personally disagree with them.  All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way. Also, do not let anything that I may say or do during the course of the trial influence you.  Nothing that I may say or do is intended to indicate, or should be taken by you as indicating, what your verdict should be.

**1.4     Evidence  [AGREED]**

The evidence from which you will find the facts will consist of the testimony of witnesses (the testimony of witnesses consist of the answers of the witnesses to questions posed by the attorneys or the court – you may not ask questions).  Evidence will also consist of documents and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that I may instruct you to find.  Certain things are not evidence and must not be considered by you. I will list them for you now:

(1)     Statements, arguments, and questions by lawyers are not evidence.

(2)     Objections to questions are not evidence.  Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence.  You should not be influenced by the objection or by the court's ruling on it.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other.  If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

(3)     Testimony that the court has excluded or told you to disregard is not evidence and must not be considered.

(4)     Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence: direct and circumstantial.  Direct evidence is direct proof of a fact, such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  As a general rule, the law makes no

distinction between these two types of evidence, but simply requires that you find facts from all the evidence in the case, whether direct or circumstantial or a combination of the two.

**1.5     Credibility of Witnesses – Weighing Conflicting Testimony  [AGREED]**

You are the sole judges of each witness's credibility.  You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all.  But if you can't do this, then it is your duty and privilege to believe the testimony that, in your judgment, is most believable and disregard any testimony that, in your judgment, is not believable.  This instruction applies to the testimony of all witnesses, including expert witnesses.

**1.6      Burden of Proof  [DISPUTED]**

<u>**Keurig's Proposed Instruction**</u>

As I have already told you, in this case, Keurig is the owner of the '762 patent, which it contends Kraft infringes.  Keurig, therefore, has the burden of proving infringement by what is called a preponderance of the evidence.  That means Keurig has to produce evidence which, considered in the light of all the facts, leads you to believe that what the patent owner alleges is more likely true than not.  To put it differently, if you were to put Keurig's and Kraft's evidence on opposite sides of a scale, the evidence supporting Keurig's allegations would have to make the scale tip somewhat on its side.  If Keurig fails to meet this burden, the verdict must be for Kraft.  Keurig must also prove its damages by a preponderance of the evidence.

In this case, Kraft asserts that Keurig's patents are invalid.  A patent, however, is presumed to be valid.  Accordingly, the party challenging the patent has the burden of proving that it is invalid by clear and convincing evidence.  Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.  Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

Keurig also contends that Kraft willfully infringed the patents in suit.  Keurig must prove willful infringement by clear and convincing evidence.

Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt.  That requirement does not apply to a civil case; therefore, you should put it out of your mind.

**Kraft's Objections**

Keurig discusses willful infringement separately from infringement, which deviates from the practice in this district, and does so at the end of the instruction in a manner that prejudices Kraft. Keurig's instruction comments on the presumption of validity, which is unnecessary and redundant considering the jury is already informed that the burden of proof for invalidity is clear and convincing evidence. Additional discussion of the presumption would further prejudice Kraft in view of its already high burden of proof.

**Kraft's Proposed Instruction**

As I have already told you, in this case, Keurig is the owner of the '762 patent, which it contends Kraft infringes. Keurig, therefore, has the burden of proving infringement by what is called a preponderance of the evidence. That means Keurig has to produce evidence which, considered in the light of all the facts, leads you to believe that what the patent owner alleges is more likely true than not. To put it differently, if you were to put Keurig's and Kraft's evidence on opposite sides of a scale, the evidence supporting Keurig's allegations would have to make the scale tip somewhat on its side. If Keurig fails to meet this burden, the verdict must be for Kraft. Keurig must also prove its damages by a preponderance of the evidence.

In this case, Keurig also contends that Kraft willfully infringed the patent in suit. Keurig must prove willful infringement by clear and convincing evidence. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

Kraft asserts that Keurig's patents are invalid. Accordingly, Kraft has the burden of proving that it is invalid by clear and convincing evidence.

Kraft also asserts that Keurig's patents are unenforceable. Kraft must prove unenforceability by clear and convincing evidence.

- 10 -

Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt.  That requirement does not apply to a civil case; therefore, you should put it out of your mind.

## Keurig's Objections

Keurig objects to Kraft's proposed instruction because it references Kraft's contention that the '762 patent is unenforceable.  Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

Keurig also objects to Kraft's proposed instruction because it fails to inform the jury of the statutory presumption that Keurig's patent is valid.  35 U.S.C. § 282.  The Court's standard patent pretrial instruction regarding the burden of proof includes the presumption of validity, as do both the 1993 and 2004 versions of the Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware.  While Kraft is asserting alleged prior art that was not considered by the Patent office, the presumption of validity still applies as a matter of law.  E.g., Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1375 (Fed. Cir. 1986) (reversing district court decision finding patent invalid).

Keurig also objects to Kraft's proposed instruction because it addresses willful infringement prior to patent validity.  As the Federal Circuit has held, willful infringement requires a showing that the defendant acted despite an objectively high likelihood that its actions infringed a valid patent.  In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc).  The court also stated that "[a] substantial question about invalidity or infringement is likely sufficient...to avoid...a charge of willfulness."  Id. at 1374.  The Court should therefore instruct the jury about patent validity before willfulness.

**1.7    General Guidance Regarding Patents[3]  [ONE PART DISPUTED]**

*The parties agree that the following portion of Instruction 1.7 should be given:*

I will now give you a general overview of what a patent is and how one is obtained.

A.    Constitutional Basis for Patent Grant

The United States Constitution, Article I, Section 8, grants the Congress of the United States the power to enact laws "to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

B.    Exclusionary Right and Term of a Patent

The United States Patent and Trademark Office is responsible for reviewing patent applications and granting patents. Once the "Patent Office" or "PTO" has issued a patent, the patent owner has the right to exclude others from making, using, selling, or offering for sale the invention throughout the United States for the length of the patent term. A person who, without the patent owner's authority makes, uses, sells, or offers to sell a product that is covered by one or more claims of a valid patent, infringes the patent.

C.    The Parts of a Patent

I will next briefly describe the parts of a patent and some of the procedures followed by those attempting to obtain patents. Many of the terms in this description are contained in a "Glossary of Patent Terms," which I will give to you along with a copy of these preliminary instructions. Feel free to refer to the Glossary throughout the trial.

---

[3] Keurig proposes that the jury be shown the "Introduction to the Patent System" video prepared by the Federal Judicial Center. If this video is shown, the Court may be able to streamline the preliminary instructions that relate to patent issues. At this time, Kraft is considering whether showing the video is appropriate, and will discuss this issue with Keurig's counsel at a later time.

For an invention to be patentable, it must be new, useful, and, at the time the invention was made, must not have been obvious to a person having ordinary skill in the art to which the subject matter pertains.  Under the patent laws, the United States Patent and Trademark Office examines patent applications and issues patents.  A person applying for a patent must include a number of items in his or her application, including: (1) a detailed description of the invention in terms sufficiently full, clear, concise and exact to enable any person skilled in the art to which the invention pertains to be able to make and use the invention; (2) a disclosure of the best mode of carrying out the invention known to the inventor at the time of filing; and (3) one or more claims.

The application includes a written description of the invention called a "specification" and may include drawings that illustrate the invention.  The specification concludes with one or more claims that particularly and distinctly define the subject matter that the inventor regards as his or her invention.  When a patent application is received at the Patent and Trademark Office, it is assigned to an examiner, who examines the application, including the claims, to determine whether the application complies with the requirements of the U.S. patent laws.  The examiner reviews the prior work of others in the form of voluminous files of patents and publications.  This type of material is called "prior art."  Prior art is generally technical information and knowledge that was known to the public either before the invention by the applicant or more than one year before the filing date of the application.  Documents found in the search of prior art are called "references."  In conducting the search of prior art, the examiner notes in writing on the file the classes or subclasses of art searched.  The compilation of the papers concerning the proceedings before the Patent Office is called the "prosecution history," "file wrapper," or "file history."  The PTO does not have its own laboratories or testing facilities.

The examiner may "reject" the application claims if he or she believes that they describe inventions that are not patentable in light of the prior art, or because the patent specification does not adequately describe the claimed inventions.  The applicant may then amend the claims to respond to the examiner's rejections.  If, after reviewing the prior art maintained at the PTO, the examiner concludes that the claims presented by the applicant define the applicant's claimed invention over the most relevant known prior art in a manner that is patentable and that the patent meets the other requirements for patentability, the application is granted as a U.S. patent.

**_The parties dispute the following portion of Instruction 1.7:_**

**<u>Keurig's Proposed Instruction</u>**

D.     <u>Summary of the Patent Issues</u>

In this case, you must decide several things according to the instructions that I will give you at the end of the trial.  Those instructions will repeat this summary and will provide more detail.  One thing you will need not decide is the meaning of the patent claims.  That is one of my jobs – to explain to you what the patent claims mean.  By the way, the word "claims" is a term of art and I will instruct you on its meaning at trial's end.  Meanwhile, you will find a definition in the glossary attached to these preliminary instructions.  In this case, only claim 1 of Keurig's '762 patent is at issue.  In essence, you must decide:

(1)     Whether Keurig has proven by a preponderance of the evidence that the Kraft accused products – T-Discs with internal filters – infringe claim 1 of Keurig's '762 patent;

(2)     Whether Kraft has proven by clear and convincing evidence that claim 1 of Keurig's '762 patent is invalid;

(3)      If you find that claim 1 of Keurig's '762 patent is valid and infringed, what

amount of infringement damages Keurig has proven by a preponderance of the evidence; and

(4)      If you find that claim 1 of Keurig's '762 patent is valid and infringed, whether

Keurig has proven, by clear and convincing evidence, that any infringement by Kraft was willful.

## Kraft's Objections

Keurig's instruction omits any reference to Kraft's defense with regard to the
unenforceability of the '762 Patent due to inequitable conduct, for which Kraft has moved to
amend its pleadings.  Keurig also omits any reference to Kraft's obviousness, enablement, or
written description defenses that were raised in response to issues raised for the first time by
Keurig's technical experts.

## Kraft's Proposed Instruction

D.      Summary of the Patent Issues

In this case, you must decide several things according to the instructions that I will give

you at the end of the trial.  Those instructions will repeat this summary and will provide more

detail.  One thing you will need not decide is the meaning of the patent claims.  That is one of

my jobs – to explain to you what the patent claims mean.  By the way, the word "claims" is a

term of art and I will instruct you on its meaning at trial's end.  Meanwhile, you will find a

definition in the glossary attached to these preliminary instructions.  In this case, only claim 1 of

Keurig's '762 patent is at issue.  In essence, you must decide:

(1)      Whether Keurig has proven by a preponderance of the evidence that the Kraft

accused products infringe claim 1 of Keurig's '762 patent;

(2)      Whether Kraft has proven by clear and convincing evidence that claim 1 of

Keurig's '762 patent is invalid due to anticipation, obviousness, failure to enable, or failure to

satisfy the written description requirement;

(3)     Whether Kraft has proven by clear and convincing evidence that Keurig's '762

patent is unenforceable;

(4)     If you find that claim 1 of Keurig's '762 patent is valid and infringed, what

amount of infringement damages Keurig has proven by a preponderance of the evidence; and

(5)     If you find that claim 1 of Keurig's '762 patent is valid and infringed, whether

Keurig has proven, by clear and convincing evidence, that any infringement by Kraft was willful.


**<u>Keurig's Objections</u>**

Keurig objects to Kraft's proposed instruction because it references enforceability, written description, enablement and obviousness defenses.

Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

Likewise, Kraft did not disclose its intention to argue the issues of written description or enablement, or obviousness of claim 1, until more than four months after the close of discovery. Moreover, Kraft <u>still</u> has not disclosed the factual basis for those belated defenses. Kraft's written description, enablement and obviousness defenses should accordingly be precluded as explained in Keurig's Motion *in Limine* No. 5 (D.I. 117).

**1.8      Conduct of the Jury  [AGREED]**

Now, a few words about your conduct as jurors.

First, I instruct you that during the trial you are not to discuss the case with anyone or permit anyone to discuss it with you.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about this case.  If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, remember it is because they are not supposed to talk with you nor you with them.  In this way, any unwarranted and unnecessary suspicion about your fairness can be avoided.  If anyone should try to talk to you about it, bring it to the court's attention promptly.

Second, do not read or listen to anything touching on this case in any way.

Third, do not try to do any research or make any investigation about the case on your own.

Finally, do not form any opinion until all the evidence is in.  Keep an open mind until you start your deliberations at the end of the case.

During the trial, I will permit you to take notes.  A word of caution is in order.  There is always a tendency to attach undue importance to matters which one has written down.  Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented.  Therefore, you are instructed that your notes are only a tool to aid your own individual memory and you should not compare your notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.  Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in

this case.  So, if you do take notes, leave them in your seat at the end of the day, and my Deputy will collect them and return them to your seat the next day.  And, remember that they are for your own personal use.

I will give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and decision.

**1.9     Course of the Trial  [AGREED]**

This trial, like most jury trials, comes in seven stages or phases. We have already been through the first phase, which was to select you as jurors. The remaining stages are:

(2)     These preliminary instructions to you;

(3)     Opening statements by the lawyers which are intended to explain to you what each side intends to prove and are offered to help you follow the evidence. The lawyers are not required to make opening statements at this time or they may defer this opening until it is their turn to present evidence.

(4)     The presentation of the evidence which will include live witnesses and may also include previously recorded testimony, as well as documents and things;

(5)     My final instructions on the law to you;

(6)     The closing arguments of the lawyers which will be offered to help you make your determination; and, finally,

(7)     Your deliberations where you will evaluate and discuss the evidence among yourselves and determine the outcome of the case.

Please keep in mind that evidence is often introduced somewhat piecemeal. So, as the evidence comes in, you as jurors need to keep an open mind.

We will begin shortly, but first I want to outline the anticipated schedule of the trial.

**1.10    Trial Schedule  [AGREED]**

Though you have heard me say this during the voir dire, I want to again outline the

schedule I expect to maintain during the course of this trial.  This case is expected to take six (6)

days to try.  We will normally begin the day at 9:00 A.M. promptly.  We will go until 1:00 P.M.

and, after a one hour break for lunch, we will continue from 2:00 P.M. to 4:30 P.M.  There will

be a fifteen minute break at 11:00 A.M. and another fifteen minute break at 3:15 P.M.  The only

significant exception to this schedule may occur when the case is submitted to you for your

deliberations.  On that day, the proceedings might last beyond 5:00 P.M.  We will post a copy of

this schedule for the your convenience in the jury deliberation room.

**1.11    Glossary of Patent Terms  [AGREED]**

<u>Applicants</u> – The named inventors who are applying for the patent.

<u>Assignment</u> – Transfer of ownership rights in a patent or patent application from one person or company to another.

<u>Claims</u> – The part of a patent that defines the invention.  These are found at the end of the patent specification in the form of numbered paragraphs.

<u>Disclosure of Invention</u> – The part of the patent specification that explains how the invention works and usually includes one or more drawings.

<u>File Wrapper, File History or Prosecution History</u> – The written record of proceedings in the United States Patent and Trademark Office ("Patent Office" or "PTO"), including the original patent application and later rejections, responses to the rejections and other communications between the Patent Office and the applicant.

<u>Ordinary Skill in the Art</u> – The level of experience, education, and/or training generally possessed by those individuals who work in the area of the invention at the time of the invention.

<u>Patent Application</u> – The initial papers filed in the Patent Office by an applicant.  These typically include a specification, drawings, claims and the oath (Declaration) of the applicant.

<u>Patent Examiners</u> – Personnel employed by the Patent Office having expertise in various technical areas who review (examine) patent applications to determine whether the claims of a patent application are patentable and whether the disclosure adequately describes the invention.

<u>Prior Art</u> – Any information that is used to describe public, technical knowledge prior to the invention by the applicant or more than a year prior to the filing of his/her application.

<u>Prior Art References</u> – Any item of prior art (publication, patent or product) used to determine patentability.

<u>Specification</u> – The part of the patent application or patent that describes the invention, and may include drawings. The specification does not define the invention, only the claims do.

<u>Authority</u>:  "Ordinary skill in the art" definition based on the Glossary of Patent Terms in the 2008 Model Patent Jury Instructions prepared by the American Intellectual Property Law Association ("2008 AIPLA Model Instructions").

## GENERAL JURY INSTRUCTIONS

**2.1     Introduction  [AGREED]**

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

Each of you has been provided a copy of these instructions.  You may read along as I deliver them if you prefer, however, I would encourage you to focus your attention on me while the instructions are being read.  You will be able to take your copies with you into your deliberations and refer to them at that time, if necessary.

I will start by explaining your duties and the general rules that apply in every civil case.

Then I will explain some rules that you must use in evaluating particular testimony and evidence.

I will explain the positions of the parties and the law you will apply in this case.

Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

Members of the jury, it is important that you bear in mind the distinction between your duties and my duties.  You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  You are the sole judges of the facts.  It is your judgment, and your judgment alone, to determine what the facts are, and nothing I have said or done during this trial was meant to influence your decisions about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, by a preponderance of the evidence, the defendants are liable for patent infringement.

Now, as far as my duty is concerned, I have the duty of advising you about the law that you should apply to the facts as you find them. You are not to consider whether the principles I state to you are sound or whether they accord with your own views about policy. You are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. You must accept them despite how you feel about their wisdom. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

<u>Authority</u>: Miscellaneous Jury Instructions (GMS) ("Introduction"), downloaded from
http://www.ded.uscourts.gov/GMSmain.htm

**2.2      Evidence Defined  [AGREED]**

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations to which the lawyers agreed.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts.  Their questions and objections are not evidence.  My legal rulings are not evidence.  My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions the lawyers asked.  I may also have ruled that you could not see some of the exhibits that the lawyers wanted you to see.  You must completely ignore all of these things.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.  Make your decision based only on the evidence, as I have defined it here, and nothing else.


Authority:  Miscellaneous Jury Instructions (GMS) ("Evidence Defined").

**2.3    Direct and Circumstantial Evidence  [AGREED]**

You have heard the terms direct and circumstantial evidence.

Direct evidence is evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact.  If a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is a chain of circumstances that indirectly proves a fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better than the other.  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

Authority:  Miscellaneous Jury Instructions (GMS) ("Direct and Circumstantial Evidence").

**2.4     Consideration of Evidence  [AGREED]**

You should use your common sense in weighing the evidence.  Consider it in light of

your everyday experience with people and events, and give it whatever weight you believe it

deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you

are free to reach that conclusion.


<u>Authority</u>: Miscellaneous Jury Instructions (GMS) ("Consideration of Evidence").

**2.5     Statements of Counsel  [AGREED]**

A further word about statements and arguments of counsel.  The attorneys' statements and arguments are not evidence.  Instead, their statements and arguments are intended to help you review the evidence presented.  If you remember the evidence differently from the attorneys, you should rely on your own recollection.

The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law.  An attorney may argue all reasonable conclusions from evidence in the record.  It is not proper, however, for an attorney to state an opinion as to the true or falsity of any testimony or evidence.  What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence that an attorney has offered during opening or closing statements, or at any other time during the course of the trial.

Authority:  Miscellaneous Jury Instructions (GMS) ("Statements of Counsel").

**2.6     Credibility of Witnesses  [AGREED]**

You are the sole judges of each witness's credibility.  You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all.  But if you can't do this, then it is your duty and privilege to believe the testimony that, in your judgment, is most believable and disregard any testimony that, in your judgment, is not believable.  In determining the weight to give to the testimony of a witness, you should ask yourself whether there is evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he or she gave at trial.  You have the right to distrust such witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.  If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

This instruction applies to all witnesses.

<u>Authority</u>: Miscellaneous Jury Instructions (GMS) ("Credibility of Witnesses").

**2.7      Expert Testimony  [AGREED]**

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business.  This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.

Authority:  Miscellaneous Jury Instructions (GMS) ("Expert Testimony").

**2.8    Number of Witnesses  [AGREED]**

One more point about the witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

<u>Authority</u>:  Miscellaneous Jury Instructions (GMS) ("Number of Witnesses").

**2.9      Burden of Proof  [DISPUTED]**

<u>**Keurig's Proposed Instruction**</u>

This is a civil case in which Keurig is charging Kraft with patent infringement.  Keurig has the burden of proving patent infringement by what is called a preponderance of the evidence. That means Keurig has to produce evidence which, when considered in light of all of the facts, leads you to believe that what Keurig claims is more likely true than not.  To put it differently, if you were to put Keurig's and Kraft's evidence on the opposite sides of a scale, the evidence supporting Keurig's claims would have to make the scales tip somewhat on its side.

In this case, Kraft is urging that Keurig's patent is invalid.  A patent, however, is presumed to be valid.  Accordingly, Kraft has the burden of proving that the patent-in-suit is invalid by clear and convincing evidence.  Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.  Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

In addition, Keurig must prove its claim of willful infringement by clear and convincing evidence and not by a preponderance of the evidence, the standard that applies to Keurig's underlying infringement claim in this case.

Those of you who are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt."  That burden does not apply in a civil case and you should, therefore, put it out of your mind in considering whether or not Keurig or Kraft have met their burdens of proof.

<u>Authority</u>:  1993 Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware ("1993 Delaware Instructions") § 1.3.

**Kraft's Objections**

Keurig's instruction omits any reference to Kraft's defense with regard to the unenforceability of the '762 Patent due to inequitable conduct, for which Kraft has moved to amend its pleadings. Keurig discusses willful infringement separately from infringement, which deviates from the practice in this district, and does so at the end of the instruction in a manner that prejudices Kraft. Keurig's instruction comments on the presumption of validity, which is unnecessary and redundant considering the jury is already informed that the burden of proof for invalidity is clear and convincing evidence. Additional discussion of the presumption would further prejudice Kraft in view of its already high burden of proof.

**Kraft's Proposed Instruction**

This is a civil case in which Keurig is charging Kraft with patent infringement. Kraft denies this charge. Keurig has the burden of proving patent infringement by a preponderance of the evidence. That means Keurig has to produce evidence which, when considered in light of all of the facts, leads you to believe that what Keurig claims is more likely true than not. To put it differently, if you were to put Keurig's and Kraft's evidence on the opposite sides of a scale, the evidence supporting Keurig's claims would have to make the scales tip somewhat on its side.

In addition, Keurig must prove its claim of willful infringement by clear and convincing evidence and not by a preponderance of the evidence, the standard that applies to Keurig's underlying infringement claim in this case. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

In this case, Kraft asserts that Keurig's patent is invalid. The party challenging the patent has the burden of proving by clear and convincing evidence that the patent is invalid.

Kraft also asserts that Keurig's patent is unenforceable. Kraft must prove its claim of unenforceability by clear and convincing evidence.

Those of you who are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt." That burden does not apply in a civil case and you should, therefore, put it out of your mind in considering whether or not Keurig or Kraft have met their burdens of proof.

Authority: 1993 Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware ("1993 Delaware Instructions") § 1.3.

**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it references Kraft's contention that the '762 patent is unenforceable. Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

Keurig also objects to Kraft's proposed instruction because it fails to inform the jury of the statutory presumption that Keurig's patent is valid. 35 U.S.C. § 282. The Court's standard patent pretrial instruction regarding the burden of proof includes the presumption of validity, as do both the 1993 and 2004 versions of the Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware. While Kraft is asserting alleged prior art that was not considered by the Patent office, the presumption of validity still applies as a matter of law. E.g., Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1375 (Fed. Cir. 1986) (reversing district court decision finding patent invalid).

Keurig also objects to Kraft's proposed instruction because it addresses willful infringement prior to patent validity. As the Federal Circuit has held, willful infringement requires a showing that the defendant acted despite an objectively high likelihood that its actions infringed a valid patent. In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). The court also stated that "[a] substantial question about invalidity or infringement is likely sufficient...to avoid...a charge of willfulness." Id. at 1374. The Court should therefore instruct the jury about patent validity before willfulness.

**3.0     Summary of the Issues  [DISPUTED]**

**Keurig's Proposed Instruction**

I will now summarize the issues that you must decide and for which I will provide

instructions to guide your deliberations. You must decide the following four main issues:

(1)     Whether Keurig has proven by a preponderance of the evidence that the Kraft

accused products – T-Discs with internal filters – infringe claim 1 of Keurig's '762 patent;

(2)     Whether Kraft has proven by clear and convincing evidence that claim 1 of

Keurig's '762 patent is invalid;

(3)     If you find that claim 1 of Keurig's '762 patent is valid and infringed, what

amount of infringement damages Keurig has proven by a preponderance of the evidence; and

(4)     If you find that claim 1 of Keurig's '762 patent is valid and infringed, whether

Keurig has proven, by clear and convincing evidence, that any infringement by Kraft was willful.

Authority:  2008 AIPLA Model Instructions § 1.

**Kraft's Objections**

Keurig's instruction omits any reference to Kraft's defense with regard to the
unenforceability of the '762 Patent due to inequitable conduct, for which Kraft has moved to
amend its pleadings.  Keurig also omits any reference to Kraft's obviousness, enablement, or
written description defenses that were raised in response to issues raised for the first time by
Keurig's technical experts.

**Kraft's Proposed Instruction**

I will now summarize the issues that you must decide and for which I will provide

instructions to guide your deliberations. You must decide the following four main issues:

(1)     Whether Keurig has proven by a preponderance of the evidence that the Kraft

accused products infringe claim 1 of Keurig's '762 patent;

(2)      Whether Kraft has proven by clear and convincing evidence that claim 1 of Keurig's '762 patent is invalid due to anticipation, obviousness, failure to enable, or failure to satisfy the written description requirement;

(3)      Whether Kraft has proven by clear and convincing evidence that claim 1 of Keurig's '762 patent is unenforceable;

(4)      If you find that claim 1 of Keurig's '762 patent is valid, enforceable and infringed, what amount of infringement damages Keurig has proven by a preponderance of the evidence; and

(5)      If you find that claim 1 of Keurig's '762 patent is valid, enforceable and infringed, whether Keurig has proven, by clear and convincing evidence, that Kraft's infringement, if any, was willful.

<u>Authority</u>:  2008 AIPLA Model Instructions § 1.

## **Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it references enforceability, written description, enablement and obviousness defenses.

Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

Likewise, Kraft did not disclose its intention to argue the issues of written description or enablement, or obviousness of claim 1, until more than four months after the close of discovery. Moreover, Kraft <u>still</u> has not disclosed the factual basis for those belated defenses.  Kraft's written description, enablement and obviousness defenses should accordingly be precluded as explained in Keurig's Motion *in Limine* No. 5 (D.I. 117).

**CLAIM CONSTRUCTION**

**4.1      Claim Construction – Generally  [AGREED]**

Before you decide whether Kraft has infringed claim 1 of Keurig's '762 patent or

whether that claim 1 of Keurig's '762 patent is invalid, you will have to understand the claim.

The patent claims are numbered sentences at the end of the patent.

As I mentioned earlier, only claim 1 of the '762 patent is involved here.  It begins at

column 4, line 61 of the '762 patent, which is exhibit ____ in evidence.  The claims are intended

to define, in words, the boundaries of the invention.  Only the claims of the patent can be

infringed.  Neither the written description, nor the drawings of a patent can be infringed.  You

must use the same claim meaning for both your decision on infringement and your decision on

invalidity.


<u>Authority</u>:  2008 AIPLA Model Instructions § 2.0.

**4.2    Claim Construction for the Case  [AGREED]**

It is my job as judge to provide to you the meaning of any claim language that must be interpreted.  You must accept the meanings I give you and use them when you decide whether any claim of the patent has been infringed and whether any claim is invalid.  I will now tell you the meanings of the following words and groups of words from the patent claims.

The term "first and second chambers" is construed to mean, with regard to the first chamber, "the part of the cartridge into which the liquid is introduced and through which it flows before reaching the filter," and, with regard to the second chamber, "the part of the cartridge out of which the beverage flows after having passed through the filter."

The term "piercable to accommodate an inflow of liquid" is construed to mean "capable of being pierced to permit a flow of liquid into."

The term "piercable to accommodate an outflow of the beverage" is construed to mean "capable of being pierced to permit a beverage to flow out."[4]

You should give the rest of the words in the claims their ordinary meaning in the context of the patent specification and prosecution history.

Authority:  2008 AIPLA Model Instructions § 2.1; Order Construing the Terms of U.S. Patent No. 6,607,762 (D.I. 53).

---

[4] The Court did not adopt either of the party's claim construction in total. Therefore, the parties reserve their rights to challenge the Court's claim construction on appeal.

**INFRINGEMENT**

**4.3     Infringement – Generally  [DISPUTED]**

**Keurig's Proposed Instruction**

Question 1 of the Verdict Form reads as follows:  Has Keurig proven, by a preponderance of the evidence, that Kraft has infringed claim 1 of Keurig's U.S. Patent No. 6,607,762?

I will now instruct you as to the rules you must follow when deciding whether Keurig has proven that Kraft infringed claim 1 of the '762 patent.

Patent law gives the owner of a valid patent the right to exclude others from importing, making, using, offering to sell, or selling the patented invention within the United States during the term of the patent.  Any person or business entity that has engaged in any of those acts without the patent owner's permission infringes the patent.  Here, Keurig alleges that Kraft T-Discs with internal filters infringe claim 1 of Keurig's '762 patent.

You have heard evidence about both Keurig's commercial product and Kraft's accused T-Disc product.  However, in deciding the issue of infringement you may not compare Kraft's accused filter T-Disc product to Keurig's commercial product.  Rather, you must compare Kraft's accused T-Disc product to the claims of the '762 patent when making your decision regarding infringement.


Authority:  2008 AIPLA Model Instructions § 3.0.

**Kraft's Objections**

Contrary to this Court's practice, Keurig attempts to incorporate the language of the verdict form into the instruction.  Kraft offers an instruction that is consistent with the law and comports with the practice in this Court, and is based on a jury instruction adopted by the Court earlier this year in another matter.

**Kraft's Proposed Instruction**

Patent law gives the owner of a valid patent the right to exclude others from importing, making, using, offering to sell, or selling the patented invention within the United States during the term of the patent. Any person or business entity that has engaged in any of those acts without the patent owner's permission infringes the patent. Here, Keurig alleges that Kraft T-Discs with internal filters infringe claim 1 of Keurig's '762 patent.

In order to infringe a patent claim, a product must include each and every limitation or element of the claim. If an accused product omits even a single element recited in a patent claim, then you must find that the accused product has not infringed the claim. If, however, an accused product includes each and every element of a claim, then you must find that the accused product infringed that claim.

You have heard evidence about both Keurig's commercial product and Kraft's accused T-Disc product. However, in deciding the issue of infringement you may not compare Kraft's accused filter T-Disc product to Keurig's commercial product. Rather, you must compare Kraft's accused T-Disc product to the claims of the '762 patent when making your decision regarding infringement.

Authority: 2008 AIPLA Model Instructions § 3.0; GMS instruction from *Finjan Software, Ltd. v. Secure Computing Corp.* (No. 16).

**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it does not refer to the relevant question of the verdict form. By distributing the verdict form before the jury instructions and then referring to specific questions at the beginning of the Court's discussion of the relevant law, Keurig's proposal makes it easier for jurors to understand and apply the Court's instructions.

Keurig further objects to Kraft's proposed instruction because the paragraph beginning "In order to infringe" is duplicative of Instruction 4.5 ("Infringement – Comparison of Products to Claims"). Details regarding the "all-elements" requirement are inappropriate to include in an instruction concerning infringement "generally." Indeed, Jury Instruction No. 14 ("Patent

Infringement Generally – Direct Infringement") in the <u>Finjan</u> instructions cited by Kraft does <u>not</u> address the issue.

**4.4     Infringement – Knowledge of Patent or Intent to Infringe Is Immaterial  [AGREED]**

In this case, Keurig asserts that Kraft has infringed the '762 patent.  Kraft would be liable for infringing Keurig's patent if you find that Keurig has proven that it is more likely than not that Kraft has made, used, offered to sell, or sold the invention defined in claim 1 of the '762 patent.

Someone can infringe a patent without knowing that what they are doing is an infringement of the patent.  They also may infringe a patent even though they believe in good faith that what they are doing is not an infringement of any patent.

Authority:  2008 AIPLA Model Instructions § 3.1.  References to "direct" infringement in this instruction and all subsequent instructions have been removed for clarity, as "indirect" infringement (inducement and contributory infringement) is not at issue in this case.

**4.5     Infringement – Comparison of Products to Claims  [AGREED]**

To determine infringement, you must compare the accused T-Disc with claim 1 of the '762 patent, using my instructions as to the meaning of relevant claim terms.

A patent claim is infringed only if Kraft's accused T-Disc includes each and every element in that patent claim.  If Kraft's T-Disc does not contain one or more elements recited in a claim, Kraft does not infringe that claim.

The accused T-Disc should be compared to the invention described in claim 1 of the '762 patent, not to Keurig's preferred or commercial embodiment of the claimed invention.  The same element of the accused T-Disc may satisfy more than one element of a claim.


Authority:  2008 AIPLA Model Instructions § 3.2.

**4.6     Infringement of Open-Ended or "Comprising" Claims  [AGREED]**

The preamble to claim 1 uses the phrase "a beverage filter cartridge comprising."  The word "comprising" means "including the following but not excluding others."  If you find that Kraft's accused T-Discs include all of the elements in claim 1, the fact that the T-Discs might include additional components would not avoid infringement of a claim that uses "comprising" language.

Authority:  2008 AIPLA Model Instructions § 3.7.

**4.7A    (Keurig's Proposal) – Infringement Despite Defendant's Improvements or Patents on Improvements [DISPUTED]**

**Keurig's Proposed Instruction**

Kraft has presented evidence that its accused T-Discs embody separate inventions of Kraft that have themselves been patented.  This fact is irrelevant to the question whether the T-Disc infringes one or more of the '762 patent claims.  The test for infringement remains as I have instructed you – if you find Kraft's accused T-Discs include all of the elements of claim 1 of the '762 patent, then that claim is infringed by Kraft's product, despite Kraft's improvements.

Authority:  2004 Proposed Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware ("2004 Proposed Delaware Instructions") § 3.6.

**Kraft's Objections**

Kraft objects to this instruction as unnecessary as it is ***Keurig*** that is relying on Kraft's European patents on the T-disc, and the prosecution histories thereof, for its case in chief.  In addition, this instruction is redundant with instruction 4.5 that already instructs the jury to compare the accused product with the asserted claim.

**Kraft's Proposed Instruction**

Kraft does not propose an instruction regarding improvements.

**Keurig's Objections**

It is important for the Court to instruct the jury that improvements are irrelevant to the question of infringement so long as the T-Disc includes all of the elements of claim 1.  Kraft's discovery responses and expert reports evidence an intent to argue that innovations allegedly unrelated to same-side piercing drive consumer demand for the T-Disc and related Tassimo brewer.  Without an instruction regarding improvements, there is a substantial risk the jury might incorrectly conclude that innovation by Kraft also constitutes a defense to infringement.

**4.7B    (Kraft's Proposed Sequence) – Willful Infringement [DISPUTED]**

<u>**Keurig's Proposed Instruction**</u>

Question 4 of the Verdict Form reads as follows:  Has Keurig proven, by clear and convincing evidence, that any infringement of Keurig's U.S. Patent No. 6,607,762 was willful?

I will now instruct you as to the rules you must follow when deciding the issue of willful infringement.

If you find by a preponderance of the evidence that Kraft infringed Keurig's '762 patent, then you must further determine if this infringement was willful.  Willfulness must be proved by clear and convincing evidence showing that:

1.    Kraft was aware of Keurig's patent;

2.    Kraft acted despite an objectively high likelihood that its actions infringed a valid patent; and

3.    This objectively high likelihood of infringement was either known to Kraft or so obvious that it should have been known to Kraft.

In making the determination as to willfulness, you must consider the totality of the circumstances.  The totality of the circumstances comprises a number of factors, which include, but are not limited to

(1)    whether Kraft intentionally copied the claimed invention or a product covered by Keurig's patent;

(2)    whether Kraft presented a substantial defense to infringement, including the defense that the patent is invalid;

(3)     whether Kraft made a good faith effort to avoid infringing the patent, for example remedial action upon learning of the patent by ceasing infringing activity or attempting to design around the patent; and

(4)     whether a fair and reasonable competitor would have secured legal advice or a professional legal opinion that would clear it of the alleged infringement.  However, the absence of an opinion of counsel does not require you to find willfulness.

Authority:  2008 AIPLA Model Instructions § 13; In re Seagate Tech., LLC, 497 F.3d 1360 (Fed. Cir. 2007) (en banc); Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc., 06-438-GMS Final Jury Instruction (D. Del. June 11, 2008) § 4.6.

## **Kraft's Objections**

Contrary to this Court's practice, Keurig attempts to incorporate the language of the verdict form into the instruction.  Kraft offers an instruction that is consistent with the law and comports with the practice in this Court, and is based on a jury instruction adopted by the Court earlier this year in another matter.  Moreover, contrary to the practice of this Court, Keurig attempts to have the willful instruction read at the end, and not with the instructions related to infringement.  Moreover, factors (3) and (4) are contrary to In re Seagate, which reversed Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380 (Fed. Cir. 1983), and eliminated the affirmative duty of due care.  Keurig improperly attempts to create an inference of willful of infringement by discussing Kraft's reliance on opinion of counsel.  The AIPLA jury instructions that Keurig relies upon notes that an instruction regarding "[w]hether the Defendant relied on competent legal advice," is appropriate when the defendant relies on a legal opinion as a defense to an allegation of willful infringement.  "[I]t is inappropriate to draw an adverse inference that undisclosed legal advice for which attorney-client privilege is claimed was unfavorable . . . [and] it is [also] inappropriate to draw a similar adverse inference from failure to consult counsel."  *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1347 (Fed. Cir. 2004) (*en banc*).

## **Kraft's Proposed Instruction**

If you find by a preponderance of the evidence that Kraft infringed Keurig's '762 patent, then you must further determine if this infringement was willful.  Willfulness must be proved by clear and convincing evidence showing that:

1.     Kraft was aware of Keurig's patent;

2.      Kraft acted despite an objectively high likelihood that its actions infringed a valid

patent; and

3.      This objectively high likelihood of infringement was either known to Kraft or so

obvious that it should have been known to Kraft.

In making the determination as to willfulness, you must consider the totality of the

circumstances.  The totality of the circumstances comprises a number of factors, which include,

but are not limited to

(1)      whether Kraft intentionally copied the claimed invention or a product covered by

Keurig's patent; and

(2)      whether Kraft presented a substantial defense to infringement, including the

defense that the patent is invalid.

Authority:  2008 AIPLA Model Instructions § 13; *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (*en banc*); *Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc.*, 06-438-GMS Final Jury Instruction (D. Del. June 11, 2008) § 4.6.

## <u>Keurig's Objections</u>

Keurig objects to Kraft's proposed instruction because it omits any explanation that the jury can consider (1) whether Kraft made a good faith effort to avoid infringing Keurig's patent and (2) whether a fair and reasonable competitor in Kraft's position would have secured legal advice or a professional legal opinion that would clear it of the alleged infringement.  Both of these considerations are relevant to the <u>Seagate</u> objective recklessness standard  and are noted in this Court's <u>Elan</u> instructions, on which Kraft's proposal is nominally based.

**INVALIDITY**

**5.1     Summary of Invalidity Defense  [DISPUTED]**

**Keurig's Proposed Instruction**

Question 2 of the Verdict Form reads as follows: Has Kraft proven, by clear and

convincing evidence, that claim 1 of Keurig's U.S. Patent No. 6,607,762 is invalid?

I will now instruct you as to the rules you must follow when answering Question 2 of the

Verdict Form and deciding whether Kraft has proven that claim 1 of the '762 patent is invalid.

Authority: 2008 AIPLA Model Instructions § 4.

**Kraft's Objections**

Contrary to this Court's practice, Keurig attempts to incorporate the language of the
verdict form into the instruction.  Kraft offers an instruction that is consistent with the law and
comports with the practice in this Court, and is based on a jury instruction adopted by the Court
earlier this year in another matter.  Keurig also omits any reference to Kraft's obviousness,
enablement, or written description defenses that were raised in response to issues raised for the
first time by Keurig's technical experts.

**Kraft's Proposed Instruction**

Only a valid patent may be infringed.  For a patent to be valid, the invention claimed in

the patent must be new, useful and nonobvious.  A patent cannot take away from people their

right to use what was known or what would have been obvious at the time the invention was

made.  The terms "new," "useful," and "nonobvious" have special meanings under the patent

laws.

The invention must also be adequately described.  In return for the right to exclude other

from making, using, selling, or offering for sale the claimed invention, the patent owner must

provide the public with a complete description of the invention, in the patent, and how to make

and use it.

Kraft contends that claim 1 of Keurig's 762 Patent is invalid. Kraft must prove by clear and convincing evidence that this claim is invalid. Kraft contends that claim 1 is invalid for the following reasons:

(1)    Kraft developed the Kenco Singles® beverage cartridge which anticipates the asserted claim of the '762 Patent and was in public use in the United States prior to the Feb. 18, 2000 date of invention of the '762 patent;

(2)    U.S. Patent No. 4,853,234 ("the '234 Patent") to Bentley et al. anticipates the asserted claim of the '762 Patent;

(3)    U.S. Patent No. 4,452,130 ("the '130 Patent") to Klein anticipates the asserted claim of the '762 Patent;

(4)    the claimed invention was obvious in light of the prior art;

(5)    the specification failed to enable those in the field to make and use the claimed invention; and

(6)    the specification failed to provide an adequate written description of each and every limitation of claim 1 of the '762 patent.

I will now instruct you as to the rules you must follow in deciding whether Kraft has proven that claim 1 of the '762 patent is invalid.

Authority: 2008 AIPLA Model Instructions § 4; GMS instruction from *Finjan Software, Ltd. v. Secure Computing Corp.* (No. 20).


**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it does not refer to the relevant question of the verdict form. By distributing the verdict form before the jury instructions and then referring to specific questions at the beginning of the Court's discussion of the relevant law, Keurig's proposal makes it easier for jurors to understand and apply the Court's instructions.

Keurig objects to Kraft's proposed instruction because it references written description, enablement and obviousness defenses. Kraft did not disclose its intention to argue the issues of written description or enablement, or obviousness of claim 1, until more than four months after the close of discovery. Moreover, Kraft still has not disclosed the factual basis for those belated defenses. Kraft's written description, enablement and obviousness defenses should accordingly be precluded as explained in Keurig's Motion *in Limine* No. 5 (D.I. 117).

**5.2     Presumption of Validity  [DISPUTED]**

**Keurig's Proposed Instruction**

The granting of a patent by the Patent Office carries with it the presumption that the patent's subject matter is new, useful and constitutes an advance that was not, at the time the invention was made, obvious to one of ordinary skill in the art.  The law presumes, in the absence of clear and convincing evidence to the contrary, that the Patent Office acted correctly in issuing the patent.  Nevertheless, once the validity of a patent has been put at issue, it is the responsibility of the jury to review what the Patent Office has done consistent with these instructions on the law.

Authority:  2004 Proposed Delaware Instructions § 4.1; Glaxo Group Ltd. v. Teva Pharmaceuticals USA, Inc., C.A. No. 02-219-GMS, 2004 WL 1875017, at *18 (D. Del. Aug. 20, 2004)  ("Anticipation is a question of fact that is shown only by rigorous proof.").

**Kraft's Objections**

Kraft respectfully submits that a separate instruction regarding the presumption of invalidity is redundant and unnecessary as the Court already instructs the jury that the burden of proof for invalidity is clear and convincing evidence.  Additional discussion of the presumption would further prejudice Kraft in view of its already high burden of proof.

**Kraft's Proposed Instruction**

Kraft does not propose an instruction on the presumption of validity.

**Keurig's Objections**

Keurig's patent is entitled to a statutory presumption of validity.  35 U.S.C. § 282. Keurig therefore objects to Kraft's proposal that the Court not offer an instruction on the presumption of validity.  Both the 1993 and 2004 versions of the Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware include the presumption of validity.  While Kraft is asserting alleged prior art that was not considered by the Patent office, the presumption of validity still applies as a matter of law.  E.g., Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1375 (Fed. Cir. 1986) (reversing district court decision finding patent invalid).

## ANTICIPATION

**6.1    Prior Art Defined  [AGREED]**

Generally speaking, prior art includes any of the following items received into evidence during trial:

1.    any product that was publicly known or used by others in the United States before the patented invention was made;

2.    patents that issued more than one year before the subject patent was filed, or before the invention described in the patent was made; and

3.    any product that was in public use or on sale in the United States more than one year before the patent was filed.

In this case, Kraft contends that the following items are prior art:

The Kenco Singles Cartridge;

U.S. Patent No. 4,452,130; and

U.S. Patent No. 4,853,234.

**6.2    Anticipation  [DISPUTED]**

<u>**Keurig's Proposed Instruction**</u>

A person cannot obtain a patent if someone else already has made an identical invention. Simply put, the invention must be new.  An invention that is not new or novel is said to be "anticipated by the prior art."  Under the U.S. patent laws, an invention that is "anticipated" is not entitled to patent protection.  To prove anticipation, Kraft must prove with clear and convincing evidence that the claimed invention is not new.

In this case, Kraft contends that the invention of claim 1 of Keurig's '762 patent was embodied in a product – the Kenco Singles Medium Roast Cartridge – that Kraft contends was in public use in the United States more than one year before Keurig filed its patent application.

Kraft also contends that the invention of claim 1 of Keurig's '762 patent was described in U.S. Patent Nos. 4,452,130 and 4,853,234, which issued more than one year before Keurig filed its patent application.

To anticipate a claim, each and every element in the claim must be present in a single item of prior art.  You may not combine two or more items of prior art to prove anticipation.  In determining whether every one of the elements of the claimed invention is found in the prior product or patent, you should take into account what a person of ordinary skill in the art would have understood from his or her examination of the particular product or patent.

In determining whether the single item of prior art anticipates a patent claim, you should take into consideration not only what is expressly disclosed in the particular item of prior product or patent, but also what inherently resulted from its practice.  This is called "inherency."  A party claiming inherency must prove it by clear and convincing evidence.  To establish inherency, the

evidence must make clear ~~either~~[5] that the prior art necessarily resulted in the missing descriptive matter and that it would be so recognized by a person of ordinary skill in the art ~~at the time the patent application was filed~~.  It is not required, however, that the person of ordinary skill would have recognized the inherent disclosure <u>at the time the patent application was filed</u>.  Thus, the prior use of the patented invention that was unrecognized and unappreciated <u>at the time the patent application was filed</u> can still be an invalidating anticipation, <u>but only</u> <u>if one of ordinary skill in the art would later recognize the inherent feature</u>.  <u>Authority</u>: (1) in view of (2), (3), (4), (5), (6), and (7).[6]

Inherent anticipation requires that all claim elements and functional properties be a necessary and inevitable consequence of practicing the invention in the prior art under normal conditions.  The possibility that prior art could be modified to achieve the elements and functional properties of a claim does not prove that the prior art itself anticipates the claim. <u>Authority</u>: (4), (8) and (9).

You must keep these requirements in mind and apply them to each kind of anticipation you consider in this case.  There are additional requirements that apply to the particular categories of anticipation that Kraft contends apply in this case.  I will now instruct you about those.

---

[5] The word "either" in the AIPLA model instruction appears to be a typographical error.

[6] Added material is underlined, deleted material has been struck.  The two subject sentences of the AIPLA model instruction contradicted one another on the subject of whether "recognition" of an inherent property in the prior art is required for anticipation.  The <u>Schering</u> case and its progeny, including multiple decisions of this Court cited in the Authority section, make clear that recognition of the inherent property <u>is</u> required, but need not be shown at the time the patent application was filed.  In other words, the recognition need not, itself, be part of the prior art.

Authority:

(1)  2008 AIPLA Model Instructions § 6.0.

(2)  <u>Schering Corp. v. Geneva Pharms., Inc.</u>, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (holding that "[r]ecognition by a person of ordinary skill in the art before the critical date of the … patent is not required to show anticipation by inherency" where the evidence shows "<u>later recognition of the inherent characteristics</u> of the prior art"; "[I]nherency, like anticipation itself, requires a determination of the meaning of the prior art.  Thus, a court may consult artisans of ordinary skill to ascertain their understanding about subject matter disclosed by the prior art, including features inherent in the prior art.  A court may resolve factual questions about the subject matter in the prior art by examining the reference through the eyes of a person of ordinary skill in the art.") (emphasis added).

(3)  <u>Astrazeneca AB v. Mutual Pharm. Co., Inc.</u>, 278 F. Supp. 2d 491, 515 (E.D. Pa. 2003) (denying motion for summary judgment of anticipation due to lack of evidence that those of ordinary skill in the art would recognize the allegedly inherent characteristic of the prior art even after the fact; citing <u>Schering</u> for the proposition that inherency requires evidence of at least "'<u>later recognition</u>' of the inherent characteristics of the prior art" by those of skill in the art; and concluding that experiments performed by the defendants' experts for purposes of the litigation, which were subject to a protective order and not known to others in the field, were insufficient to demonstrate later recognition; in fact, unlike the defendants' experts, "another person of ordinary skill in the art would not have approached [the prior art] with the possibility of [the claimed] function already in mind") (emphasis added).

(4)  <u>Glaxo Group Ltd. v. Teva Pharms. USA, Inc.</u>, C.A. No. 02-219-GMS, 2004 WL 1875017, at *19 (D. Del. Aug. 20, 2004) ("[A]lthough <u>past</u> recognition of the inherent feature is not necessary, the court may <u>still evaluate the opinions of those skilled in the art to determine the scope of the prior art reference</u> ... Although inherent anticipation does not require the element [or functional property] to be present each and every time, it does require the result to be a necessary and inevitable consequence of practicing the invention claimed in the prior art <u>under normal conditions</u>.") (emphasis added).

(5)  <u>ISCO Int'l, Inc. v. Conductus, Inc.</u>, C.A. No. 01-487-GMS, 2003 WL 279561, at *5 (D. Del. Feb. 10, 2003) (denying defendant's motion for summary judgment of anticipation where defendant had "presented no evidence as to <u>whether someone skilled in the art would perceive</u>" the allegedly inherent disclosure in the prior art) (emphasis added).

(6)  <u>Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.</u>, C.A. No. 98-80-SLR, 2005 WL 67085, at *8-9 (D. Del. Jan. 5, 2005) (granting summary judgment of no anticipation where the claimed device had to be "capable of being compressed onto a balloon catheter" and the prior art was a self-expending stent not designed for such compression that had to be held in a compressed state by a separate sheath device: "There is nothing inherent in the properties of the Gianturco stent that <u>would lead one of ordinary skill in the art to believe</u> that such a stent could be used as anything other than a self-expanding stent.") (emphasis added).

(7)  Topliff v. Topliff, 145 U.S. 156, 161 (1892) (patent for pressure equalization device not anticipated by prior art with a similar structure; the prior art "approached very near the idea of an equalizer; but this idea did not apparently dawn on them, nor was there anything in their patent which would have suggested it to a mechanic of ordinary intelligence, unless he were examining it for that purpose.  It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions.") (emphasis added).

(8)  Transclean Corp. v. Bridgewood Servs., Inc., 290 F.3d 1364, 1373 (Fed. Cir. 2002) ("Although it is possible that the [prior art] could under some circumstances … effectively equalize the flow rates [the claimed functional limitation], it is also possible for that not to be the case.  Because anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation … the [prior art] cannot inherently anticipate.") (emphasis original).

(9)  Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself to support a finding of infringement."); Mycogen Plant Science v. Monsanto Co., 243 F.3d 1316, 1324 (Fed. Cir. 2001) ("The tests for infringement and anticipation are very similar, and that which would literally infringe if later in time anticipates if earlier.").

## Kraft's Objections

Keurig attempts to confuse the jury with an overlong instruction relying on nine different cases hoping to support its inherency arguments for features and methods of use that are not even claimed in the '762 Patent.  Kraft is not making any inherency arguments.  The prior art asserted by Kraft embodies or disclose a lid capable of being pierced pursuant to the Court's claim construction.  Kraft provides a straightforward, simple instruction that states the basic law of anticipation, i.e., "each and every element in the claim must be present in a single item of prior art."

## Kraft's Proposed Instruction

A person cannot obtain a patent if someone else already has made an identical invention.

Simply put, the invention must be new.  An invention that is not new or novel is said to be

"anticipated by the prior art."  Under the U.S. patent laws, an invention that is "anticipated" is

not entitled to patent protection.  To prove anticipation, Kraft must prove with clear and

convincing evidence that the claimed invention is not new.

In this case, Kraft contends that the invention of claim 1 of Keurig's '762 patent is anticipated. First, Kraft contends that the invention of claim 1 of Keurig's '762 patent was embodied in a product – the Kenco Singles Cartridge – that Kraft contends was in public use in the United States more than one year before Keurig filed its patent application. Further, Kraft contends the Kenco Singles Cartridge was publicly known and used by others in the United States before the invention of claim 1 of Keurig's '762 patent was made.

Kraft also contends that the invention of claim 1 of Keurig's '762 patent was described in U.S. Patent Nos. 4,452,130 and 4,853,234, which issued more than one year before Keurig filed its patent application.

To anticipate a claim, each and every element in the claim must be present in a single item of prior art. You may not combine two or more items of prior art to prove anticipation. In determining whether every one of the elements of the claimed invention is found in the prior product or patent, you should take into account what a person of ordinary skill in the art would have understood from his or her examination of the particular product or patent.

You must keep these requirements in mind and apply them to each kind of anticipation you consider in this case. There are additional requirements that apply to the particular categories of anticipation that Kraft contends apply in this case. I will now instruct you about those.

<u>Authority:</u>

2008 AIPLA Model Instructions § 6.0.

**<u>Keurig's Objections</u>**

Keurig objects to Kraft's proposed instruction because it omits any discussion of the law governing inherent anticipation, which is a critical issue in this case given the admissions by Kraft's own witnesses that the references on which Kraft relies do not expressly disclose the

concept of same-side piercing, the key feature distinguishing Keurig's patent from the prior art. Kraft's instruction also fails to explain that modifying an allegedly prior art device (e.g., the Kenco Singles cartridge) so that it satisfies all the elements and functional requirements of a claim is insufficient to prove anticipation.

## 6.3    Prior Public Use  [DISPUTED]

**Keurig's Proposed Instruction**

Kraft contends that claim 1 of Keurig's '762 patent is anticipated because the invention defined in that claim was publicly used in the United States more than one year before Keurig filed its patent application on February 18, 2000.

A patent claim is invalid if the invention defined in that claim was publicly used by anyone in the United States more than one year before the effective filing date of the subject patent application.  An invention is publicly used if it is used by the inventor or by a person who is not under any limitation, restriction, or obligation of secrecy to the inventor.  The absence of affirmative steps to conceal is evidence of a public use.  However, secret use by a third party is not public.  <u>Authority</u>: (1).

In other words, when the prior use was by someone other than the patent applicant, the patent is valid unless the prior use was accessible to the public and, in particular, to that segment of the public most likely to make use of its contents.  Availability to employees of a particular company or entity (such as Kraft, for example) does not necessarily mean availability to the public.  <u>Authority</u>: (2), (3), (4), (5) and (6).

The absence of a formal confidentiality or secrecy agreement does not necessarily mean that a prior use was public.  Instead, you must consider the circumstances as a whole, including standard operating practices as well as any informal norms or expectations of secrecy.  <u>Authority</u>: (5), (6) and (7).

The public use must have occurred in the United States.  Public use elsewhere in the world is irrelevant to the question of whether or not a United States patent is valid.  Accordingly,

evidence that Kenco Singles cartridges were sold and publicly used in Europe cannot form the basis for a finding that Keurig's '762 patent is invalid.  <u>Authority</u>: (8) and (9).

Oral testimony regarding prior public use does not alone constitute the necessary clear and convincing evidence of patent invalidity.  The testimony must instead be corroborated by some other form of evidence.  <u>Authority</u>: (10).

<u>Authority</u>:

(1)  2008 AIPLA Model Instructions § 6.2.

(2)  1993 Delaware Instructions § 4.7 ("Secret non-public use by other than the inventor, however, is not an invalidating public use.  Thus, a patent is not invalidated if the particular device, composition or process if used by someone other than the inventor, under circumstances where it is not made accessible to the public.").

(3)  2004 Proposed Delaware Instructions § 4.5 ("It is not necessary that the prior art has been available to every member of the public.  It must have been available, without restriction, to that segment of the public mostly likely to make use of the prior art's contents.").

(4)  <u>Woodland Trust v. Flowertree Nursery, Inc.</u>, 148 F.3d 1368, 1371 (Fed. Cir. 1998) ("[W]hen an asserted prior use is not that of the applicant, § 102(b) is not a bar when that prior use or knowledge is not available to the public.").

(5)  <u>Black & Decker, Inc. v. Robert Bosch Tool Corp.</u>, 476 F. Supp. 2d 887, 894 (N.D. Ill. 2007) (granting motion for judgment as a matter of law that use by government of alleged prior art radio was not a public use; radios had been sold under a government restriction and were not available to the public)

(6)  <u>System Management Arts Inc. v. Avesta Techs. Inc.</u>, 54 U.S.P.Q. 2d 1239, 1246 (S.D.N.Y. 2000) ("[T]he mere fact that Delphi materials were accessible to Morgan Stanley employees other than the IT Group, or were stored on a common drive or server without restriction, would not suffice to satisfy Section 102(a) or (b).  The availability of such information *within* Morgan Stanley, after all, indicates nothing about the availability of information concerning Delphi to those outside of Morgan Stanley, or to the 'public' at large.").

(7)  <u>Bernhardt, L.L.C. v. Collezione Europa USA, Inc.</u>, 386 F.3d 1371, 1381 (Fed. Cir. 2004) (vacating district court's finding of invalidity based on prior public use despite absence of confidentiality agreement: "Bernhardt presented additional testimony by Collett that Pre-Market was not open to the public, that the identification of attendees was checked against a list of authorized names both by building security and later at a reception desk near the showroom, that

attendees were escorted through the showroom, and that attendees were not permitted to make written notes or take photographs inside the showroom.").

(8) 35 U.S.C. § 102(b) ("A person shall be entitled to a patent unless … (b) the invention was … in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.") (emphasis added).

(9) SmithKline Beecham Corp. v. Apotex Corp., 286 F. Supp. 2d 925, 937-38 (N.D. Ill. 2001) (granting summary judgment that patent was not invalidated by prior public use: "[I]t is well settled that use in a country other than the United States, without accompanying publication or foreign patent, cannot operate to invalidate an issued American patent.").

(10)  Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 737-38 (Fed. Cir. 2002) (reversing jury verdict of anticipation despite public use testimony from six witnesses: "Generally, oral testimony of prior public use must be corroborated in order to invalidate a patent.").

### Kraft's Objections

Again, Keurig proffers another overlong instruction, this time citing 10 different cases, which is plainly designed to confuse the jury.  Furthermore, Keurig has included the basis of its arguments, which not only misstate the law, but would have the Court articulate Keurig's arguments on its behalf.  Kraft has proffered a clear and concise instruction based on the AIPLA model jury instructions and a similar instruction adopted by the Court earlier this year, and accurately reflects the law of public use.

### Kraft's Proposed Instruction

Kraft contends that claim 1 of Keurig's '762 patent is anticipated because the invention defined in that claims was publicly used in the United States more than one year before Keurig filed its patent application on February 18, 2000, and was publicly used by others in the United States before it was invented by the patentee.

A patent claim is invalid if the invention defined in that claim was publicly used by a person other than the patentee in the United States before it was invented by the patentee, or if the invention defined in that claim was publicly used by anyone in the United States more than one year before the effective filing date of the subject patent application.  An invention is publicly used if it is used by the inventor or by a person who is not under any limitation,

restriction, or obligation of secrecy to the inventor.  The absence of affirmative steps to conceal is evidence of a public use.  However, secret use by a third party is not public.  <u>Authority</u>: (1).

A prior public use by another may anticipate a patent claim, even if the use was accidental or was not appreciated by the other person.  Thus, a prior public use may anticipate an invention even if the user did not intend to use the invention, or even realize he or she had done so.

<u>Authority</u>:

(1)  2008 AIPLA Model Instructions § 6.2.

(2)  GMS instruction from *Finjan Software, Ltd. v. Secure Computing Corp.* (No. 23).


**<u>Keurig's Objections</u>**

Keurig objects to Kraft's proposed instruction because it omits critical legal guidance needed for the jury to make a proper determination whether the alleged use of Kenco Singles cartridges in Kraft's offices was secret for the purposes of 35 U.S.C. § 102(b).  Such "third-party" public use cases are unusual, and the applicable law is not addressed in the baseline AIPLA Model Instructions.

Keurig also objects to Kraft's proposed instruction because it fails to explain that oral testimony does not alone constitute the "clear and convincing" evidence required to invalidate a patent claim.  The legal standards applicable to oral testimony are important to include because Kraft's evidence of alleged prior public use centers on testimony from interested witnesses.  Kraft's omission invites therefore legal error.  <u>E.g.</u>, <u>Juicy Whip, Inc. v. Orange Bang, Inc.</u>, 292 F.3d 728, 738–40 (Fed. Cir. 2002) (reversing jury verdict of invalidity for public use based on the uncorroborated oral testimony of six witnesses); <u>Woodland Trust v. Flowertree Nursery, Inc.</u>, 148 F.3d 1368, 1370 (Fed. Cir. 1998) (reversing finding of anticipation based on uncorroborated oral testimony of prior use).

Keurig also objects to Kraft's proposed instruction because it does not inform the jury that public use in foreign countries is irrelevant to a patent's validity.  <u>E.g.</u>, <u>In re Hilmer</u>, 359 F.2d 859, 878 (C.C.P.A. 1966); <u>Reeves Bros., Inc. v. U.S. Laminating Corp.</u>, 282 F. Supp. 118, 130 (E.D.N.Y. 1968), <u>judgment aff'd</u>, 417 F.2d 869 (2d Cir. 1969) ("[W]hat is publicly known or used but not printed in a foreign country is not a bar to an American patent.").  Keurig expects Kraft to present testimony that its Kenco Singles cartridge was used in Europe prior to the '762 patent's critical date.  Absent an appropriate instruction, the jury might incorrectly assume that such foreign use was prior art.

Keurig also objects to Kraft's proposed instruction because it incorporates a statement regarding "accidental" and unappreciated anticipation even though Kraft's proposed anticipation instruction (§ 6.2) omits any discussion of the requirements for proving inherent anticipation, and the law of inherent anticipation is included in the AIPLA Model Instructions on which Kraft's proposal is nominally based.  In other words, Kraft seeks the benefit of an instruction regarding inherency issues, without instructing the jury on the legal hurdles to such a defense.

**6.4    Prior Public Knowledge  [DISPUTED]**

**Keurig's Proposed Instruction**

Kraft contends that claim 1 of the '762 patent was anticipated because the invention defined in that claim was publicly known by the inventors or others in the United States before it was invented by the inventors.

A patent claim is invalid if the invention defined in that claim was publicly known by the inventors or by others in the United States before it was invented by the named inventors, Nicholas Lazaris and Roderick Beaulieu.  You are instructed that date of the invention of the '762 Patent is February 18, 2000.

For public knowledge to anticipate a patent claim, the knowledge must be sufficient to enable one with ordinary skill in the art to practice the invention.

Authority:

2008 AIPLA Model Instructions § 6.1; 3M v. Chemque, Inc., 303 F.3d 1294, 1301, 1306 (Fed. Cir. 2002) (reversing jury verdict of anticipation for lack of substantial evidence supporting finding that distributed samples were enabling: "For prior art to anticipate under 35 U.S.C. § 102(a) because it is 'known,' the knowledge must be publicly accessible, and it must be sufficient to enable one with ordinary skill in the art to practice the invention….Noticeably absent from the record is testimony or evidence about what disclosure was actually sent with the samples, let alone whether it was enabling.") (internal citations omitted).

**Kraft's Objections**

The enablement instruction is a red herring designed to confuse the jury as enablement of a prior art reference is a question of law for the Court.  3M, 303 F.3d at 1301.  In addition, the 3M decision was specific to the facts of the case where possession of samples of a two part chemical composition would not necessarily enable one of ordinary skill in the art to practice the claimed invention of encapsulating a signal transmission device with a dielectric encapsulant with specific chemical properties.  Id. at 1298.  Keurig once again goes well beyond the AIPLA instructions or the instructions adopted by this Court.

**Kraft's Proposed Instruction**

Kraft contends that the '762 patent was anticipated because the invention defined the asserted claims was publicly known by the inventors or others in the United States before it was invented by the inventors.

A patent claim is invalid if the invention defined in that claim was publicly known by the inventors or by others in the United States before it was invented by the named inventors, Nicholas Lazaris and Roderick Beaulieu. You are instructed that date of the invention of the '762 Patent is February 18, 2000.

Authority:

2008 AIPLA Model Instructions § 6.1.

**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it omits the black-letter law that "public knowledge" must be enabling in order to anticipate. See 3M v. Chemque, Inc., 303 F.3d 1294, 1301, 1306 (Fed. Cir. 2002) (reversing jury verdict of anticipation).

**6.5     Prior Patent or Printed Publication  [DISPUTED]**

**Keurig's Proposed Instruction**

Kraft contends that claim 1 of '762 patent was anticipated because the invention defined in that claim was patented by others more than one year before Mr. Lazaris and Mr. Beaulieu filed their United States patent application on February 18, 2000.  A patent claim is invalid if the invention defined by that claim was patented in the United States or a foreign country more than one year before Mr. Lazaris and Mr. Beaulieu filed their United States patent application.  To show anticipation of the patented invention, Kraft must show by clear and convincing evidence that before February 18, 1999, someone patented an invention that included all of the elements of claim 1 of the '762 patent.

<u>Authority</u>: 2008 AIPLA Model Instructions § 6.7.

**Kraft's Objections**

Kraft objects to Keurig's proposed instruction as misleading as Kraft does not contend that the same invention was previously patented in the prior art patents asserted by Kraft. Instead, Kraft contends that its asserted prior art patents disclose each and every limitation of claim 1 of the '762 Patent.  Thus, the AIPLA "Printed Publication" jury instruction is more appropriate and reflects Kraft's actual invalidity defense.  Moreover, Kraft notes that the AIPLA Printed Publication instruction states that, "An issued patent is a printed publication," which further demonstrates that the "Printed Publication" jury instruction should be used.  Keurig cannot dictate Kraft's invalidity defense.

**Kraft's Proposed Instruction**

Kraft contends that claim 1 of Keurig's '762 patent was anticipated because the invention defined in that claim was described in a printed publication more than one year before the patentees filed the U.S. patent application on February 18, 2000.

A patent claim is invalid if the invention defined by that claim was described in a printed publication more than one year prior to the filing date of the U.S. application.

A printed publication must be reasonably accessible to those members of the public who would be interested in its contents. It is not necessary that the printed publication be available to every member of the public. The information must, however, have been maintained in some form, such as printed pages. An issued patent is a printed publication. A published patent application is a printed publication as of its publication date.

For a printed publication to anticipate a patent claim, it must, when read by a person of ordinary skill in the art, expressly or inherently disclose each element of the claimed invention to the reader. The disclosure must be complete enough to enable one of ordinary skill in the art to practice the invention without undue experimentation. In determining whether the disclosure is enabling, you should take into account what would have been within the knowledge of a person of ordinary skill in the art one year before the application for the '762 patent was filed, and you may consider evidence that sheds light on the knowledge such a person would have had.

Authority:

2008 AIPLA Model Instructions § 6.5.

## **Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it unnecessarily introduces the concept of a "printed publication" other than a prior art patent when no such printed publications are at issue in this case. Accordingly,. Kraft's instruction risks confusing the jury with irrelevant information. The prior art status of U.S. Patent Nos. 4,853,234 and 4,452,130 is not disputed, and AIPLA Model Instruction § 6.7 ("Prior Patent") is a more appropriate instruction since both of these references are prior patents.

Keurig also objects because Kraft's proposed instruction references the concept of inherency in a perfunctory manner without explaining the specific nature of the accused infringer's burden for proving inherent anticipation. AIPLA instruction § 6.5 was plainly designed to refer back to the inherency section of AIPLA instruction § 6.0, which Kraft's proposed Anticipation instruction omits.

**6.6     No Practicing the Prior Art Defense  [DISPUTED]**
**Keurig's Proposed Instruction**

As I have explained, patent infringement and patent validity are two entirely separate

questions.  It is not enough for Kraft to argue that it cannot be liable because the products that it

sells now are similar to products or descriptions in the prior art.

Authority:  Koito Mfg. Co. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1153 (Fed. Cir. 2004)
("[T]his court has made clear that there is no 'practicing the prior art' defense to literal
infringement."); Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357,
1366 (Fed. Cir. 2002) ("Implicit in Spectramed's argument is that Baxter, in order to establish
literal infringement, must prove by a preponderance of the evidence that Spectramed's accused
devices embody all the limitations in the asserted claims, and in addition, Spectramed's accused
devices must not be an adoption of the combined teachings of the prior art. This is not a correct
statement of the law governing patent infringement….[L]iteral infringement is determined by
construing the claims and comparing them to the accused device, not by comparing the accused
device to the prior art."); Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1583 (Fed.
Cir. 1995).

## Kraft's Objections

Kraft objects to this instruction as redundant since the jury is already instructed to
compare claim 1 to the accused T-disc.  Moreover, Keurig provides no basis for providing an
instruction that is not included in the Court's model instruction, or any accepted model
instructions, such as AIPLA, ABA, or the Federal Circuit Bar Association.  In addition, this
instruction would prejudice Kraft because a belief that it is practicing the prior art is a valid
defense to Keurig's claim for willful infringement.

## Kraft's Proposed Instruction

Kraft does not propose an instruction relating to practicing the prior art.

## Keurig's Objections

Kraft contends that the accused products (filter T-Discs) are similar in design to Kenco
Singles cartridges, which Kraft alleges to constitute prior art.  Kraft responded to many of
Keurig's requests for admission by alleging that "[t]o the same extent that the Kenco Singles
Cartridge includes [a particular element of claim 1 of the '762 patent], the T-DISC likewise
includes [that same element]."  In short, Kraft is poised to assert an impermissible "practicing the
prior art" defense.  The jury should therefore be instructed that infringement and invalidity are
two separate inquiries and that "practicing the prior art" is not a defense as a matter of law.  This
is a basic principle that the Federal Circuit has repeatedly reaffirmed.  E.g., In re Omeprazole
Patent Litigation, -- F.3d --, 2008 WL 3852096, *14 (Fed. Cir. Aug. 20, 2008) ("It is well
established…that 'practicing the prior art' is not a defense to infringement.").

**OBVIOUSNESS**

**7.1     Obviousness – Generally  [DISPUTED]**

**Kraft's Proposed Instruction**

Kraft contends that claim 1 of Keurig's '762 patent is invalid because the claimed invention(s) is "obvious."

A claimed invention is invalid as "obvious" if it would have been obvious to a person of ordinary skill in the art of the claimed invention at the time the invention was made.  The issue is not whether the claimed invention would be obvious to you as a layman, to me as a judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the art at the time it was made.  In many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle.  Obviousness may be shown by considering more than one item of prior art.

The following factors must be evaluated to determine whether Kraft has established that the claimed invention is obvious:

(1).     the scope and content of the prior art relied upon by Kraft;

(2).     the difference or differences, if any, between each claim of Keurig's '762 patent that Kraft contends is obvious and the prior art;

(3).     the level of ordinary skill in the art at the time the invention of Keurig's '762 patent was made; and

(4).     additional considerations, if any, that indicate that the invention was obvious or not obvious.

Each of these factors must be evaluated, although they may be analyzed in any order, and you must perform a separate analysis for each of the claims.  Kraft bears the burden of proving obviousness by clear and convincing evidence.

I will now explain each of the four factors in more detail.

Authority:

GMS instruction from *Linear Technology Corp. v. Monolithic Power Systems, Inc.* (No. 4.2).

**Keurig's Objections**

Kraft objects to Kraft's proposed instruction because Kraft did not disclose its intention to argue the issue of obviousness of claim 1 until more than four months after the close of discovery.  Moreover, Kraft still has not disclosed the factual basis for this belated defense.  Kraft's obviousness defense should accordingly be precluded as explained in Keurig's Motion *in Limine* No. 5 (D.I. 117).

Keurig also objects to the sentences referencing "multiple patents" and "more than one item of prior art."  Kraft has never disclosed any combination of references that allegedly render any claim of Keurig's patent obvious.

Keurig further objects to the reference to "each claim of Keurig's '762 patent that Kraft contends is obvious."  Claim 1 of the '762 patent is the only claim at issue.

Keurig also objects to Kraft's obviousness instructions because Kraft omits any instruction regarding the relevance of secondary indicia.  E.g., GMS instruction No. 4.2 (Factors Indicating Non-Obviousness) from Linear Technology Corp.  Likewise, Kraft's obviousness instructions omit the requirement that the jury not rely on hindsight.  E.g., GMS instruction No. 4.8 (Obviousness – Hindsight) from Linear Technology Corp.  In the event that the Court were to deny Keurig's Motion *in Limine* No. 5, Keurig reserves the right to raise additional objections to Kraft's instruction and/or to propose an alternative version thereof.

**7.2    Scope and Content of the Prior Art  [DISPUTED]**

<u>Kraft's Proposed Instruction</u>

The prior art that you considered previously for anticipation purposes is also prior art for obviousness purposes.

You must determine what is the prior art that may be considered in determining whether the asserted claim of Keurig's '762 patent is obvious.  A prior art reference may be considered if it discloses information designed to solve the same problem faced by the inventors or if the reference discloses information that has obvious uses beyond its main purpose that a person of ordinary skill in the art would reasonably examine to solve the same problem faced by the inventor.

<u>Authority</u>:

GMS instruction from *Linear Technology Corp. v. Monolithic Power Systems, Inc.* (No. 4.3).

<u>**Keurig's Objections**</u>

Kraft objects to Kraft's proposed instruction because Kraft did not disclose its intention to argue the issue of obviousness of claim 1 until more than four months after the close of discovery.  Moreover, Kraft <u>still</u> has not disclosed the factual basis for this belated defense.  Kraft's obviousness defense should accordingly be precluded as explained in Keurig's Motion *in Limine* No. 5 (D.I. 117).

Keurig further objects to the first sentence of the proposed instruction, which could improperly suggest to the jury that the Court endorses Kraft's position that Kenco Singles Cartridges constitute prior art.  This is a disputed question of fact.  The Court's <u>Linear Technology Corp</u>. instruction did not include such a sentence.

Keurig also objects to Kraft's obviousness instructions because Kraft omits any instruction regarding the relevance of secondary indicia.  <u>E.g.</u>, GMS instruction No. 4.2 (Factors Indicating Non-Obviousness) from <u>Linear Technology Corp.</u>  Likewise, Kraft's obviousness instructions omit the requirement that the jury not rely on hindsight.  <u>E.g.</u>, GMS instruction No. 4.8 (Obviousness – Hindsight) from <u>Linear Technology Corp.</u>  In the event that the Court were to deny Keurig's Motion *in Limine* No. 5, Keurig reserves the right to raise additional objections to Kraft's instruction and/or to propose an alternative version thereof.

**7.3     Difference Between the Claims and the Prior Art  [DISPUTED]**

**Kraft's Proposed Instruction**

You should analyze whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art at the time of the invention.  Your analysis must determine the impact, if any, of any such differences on the obviousness or non-obviousness of the invention as a whole and not merely some portion of it.

In analyzing the relevance of the difference between the claimed invention and the prior art, you do not need to look for precise teaching in the prior art directed to the subject matter of the claimed invention.  You may take into account the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention.  For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more likely that the claim was obvious. On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

A claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art.  Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does.  The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of the problem to be solved, market demand, or common sense.

Authority:

GMS instruction from *Linear Technology Corp. v. Monolithic Power Systems, Inc.* (No. 4.4).

**Keurig's Objections**

Kraft objects to Kraft's proposed instruction because Kraft did not disclose its intention to argue the issue of obviousness of claim 1 until more than four months after the close of discovery.  Moreover, Kraft <u>still</u> has not disclosed the factual basis for this belated defense.  Kraft's obviousness defense should accordingly be precluded as explained in Keurig's Motion *in Limine* No. 5 (D.I. 117).

Keurig also objects to Kraft's obviousness instructions because Kraft omits any instruction regarding the relevance of secondary indicia.  <u>E.g.</u>, GMS instruction No. 4.2 (Factors Indicating Non-Obviousness) from <u>Linear Technology Corp.</u>  Likewise, Kraft's obviousness instructions omit the requirement that the jury not rely on hindsight.  <u>E.g.</u>, GMS instruction No. 4.8 (Obviousness – Hindsight) from <u>Linear Technology Corp.</u>  In the event that the Court were to deny Keurig's Motion *in Limine* No. 5, Keurig reserves the right to raise additional objections to Kraft's instruction and/or to propose an alternative version thereof.

### 7.4    Level of Ordinary Skill  [DISPUTED]

**Kraft's Proposed Instruction**

The determination of whether a claimed invention is obvious is based on the perspective of a person of ordinary skill in the beverage cartridge field.  The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant.  The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems.

When determining the level of ordinary skill in the art, you should consider all the evidence submitted by the parties, including evidence of:

•        the level of education and experience of persons actively working in the field at the time of the invention, including the inventor;

•        the types of problems encountered in the art at the time of the invention; and

•        the sophistication of the technology in the art at the time of the invention, including the rapidity with which innovations were made in the art at the time of the invention.

Authority:  GMS instruction from *Linear Technology Corp. v. Monolithic Power Systems, Inc.* (No. 4.5).

**Keurig's Objections**

Kraft objects to Kraft's proposed instruction because Kraft did not disclose its intention to argue the issue of obviousness of claim 1 until more than four months after the close of discovery.  Moreover, Kraft <u>still</u> has not disclosed the factual basis for this belated defense.  Kraft's obviousness defense should accordingly be precluded as explained in Keurig's Motion *in Limine* No. 5 (D.I. 117).

Keurig also objects to Kraft's obviousness instructions because Kraft omits any instruction regarding the relevance of secondary indicia.  <u>E.g.</u>, GMS instruction No. 4.2 (Factors Indicating Non-Obviousness) from <u>Linear Technology Corp.</u>  Likewise, Kraft's obviousness instructions omit the requirement that the jury not rely on hindsight.  <u>E.g.</u>, GMS instruction No. 4.8 (Obviousness – Hindsight) from <u>Linear Technology Corp.</u>  In the event that the Court were to

deny Keurig's Motion *in Limine* No. 5, Keurig reserves the right to raise additional objections to Kraft's instruction and/or to propose an alternative version thereof.

Keurig further objects to Kraft's proposed instruction because it incorrectly suggests that the '762 patent has a single "inventor."

**8.0     Enablement  [DISPUTED]**

<u>**Kraft's Proposed Instruction**</u>

The written description set forth in a patent must disclose sufficient information to enable or teach one skilled in the field of the invention to make and use the full scope of the claimed invention. This requirement is known as the enablement requirement.  If a patent claim is not enabled, it is invalid.

A patent is enabling if its disclosure is sufficient to enable a person of ordinary skill in the art to make and use the claimed invention without undue experimentation.  In considering whether the written description of a patent satisfies the enablement requirement, you must keep in mind that patents are written for persons of skill in the field of the invention.  Thus, a patent need not expressly state information that skilled persons would be likely to know or could obtain.  Kraft bears the burden of establishing lack of enablement by clear and convincing evidence.

Kraft contends that claim 1 of Keurig's '762 patent is invalid for lack of enablement. The fact that some experimentation may be required for a skilled person to practice the claimed invention does not mean that a patent's written description does not meet the enablement requirement.  Factors that you may consider in determining whether the written description would require undue experimentation include: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art and (8) the breadth of the claims.

<u>Authority</u>

2008 AIPLA Model Instructions § 8.0.

**<u>Keurig's Objections</u>**

Kraft objects to Kraft's proposed instruction because Kraft did not disclose its intention to argue the issue of enablement until more than four months after the close of discovery. Moreover, Kraft <u>still</u> has not disclosed the factual basis for this belated defense. Kraft's enablement defense should accordingly be precluded as explained in Keurig's Motion *in Limine* No. 5 (D.I. 117). If Keurig's motion is denied, Keurig reserves the right to raise additional objections to Kraft's proposed enablement instruction.

**9.0    Written Description Requirement  [DISPUTED]**

<u>**Kraft's Proposed Instruction**</u>

A patent must contain a written description of the product claimed in the patent.  The written description requirement helps to ensure that the patent applicant actually invented the claimed subject matter.  To satisfy the written description requirement, the patent must describe each and every limitation of a patent claim, in sufficient detail, although the exact words found in the claim need not be used.  The written description requirement is satisfied if a person of ordinary skill in the field reading the patent application as originally filed would recognize that the patent application described the invention as finally claimed in the patent.  It is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the full scope of the invention.

Kraft contends that claim 1 of Keurig's '762 patent is invalid for failure to satisfy the written description requirement.  Kraft bears the burden of establishing lack of written description by clear and convincing evidence.

If you find that Kraft has proved that it is highly probable that Keurig's '762 patent does not contain a written description of the invention covered by any of these claims, then you must find that the claim is invalid.

<u>Authority</u>:

2008 AIPLA Model Instructions § 9.0.

<u>**Keurig's Objections**</u>

Kraft objects to Kraft's proposed instruction because Kraft did not disclose its intention to argue the issue of written description until more than four months after the close of discovery. Moreover, Kraft <u>still</u> has not disclosed the factual basis for this belated defense.  Kraft's written description defense should accordingly be precluded as explained in Keurig's Motion *in Limine*

No. 5 (D.I. 117).  If Keurig's motion is denied, Keurig reserves the right to raise additional objections to Kraft's proposed written description instruction.

**UNENFORCEABILITY**

**10.1    Inequitable Conduct – Generally  [DISPUTED]**

<u>**Kraft's Proposed Instruction**</u>

Kraft alleges that Keurig's '762 patent is unenforceable due to inequitable conduct.  Kraft contends that Keurig may not enforce its '762 patent against Kraft because Keurig engaged in inequitable conduct before the Patent and Trademark Office during prosecution of its '762 patent.

Applicants for a patent have a duty to prosecute patent applications in the Patent and Trademark Office with candor, good faith, and honesty.  This duty of candor and good faith extends to all inventors named on a patent application, all patent attorneys and patent agents involved in preparing and prosecuting the application, and every other person involved in a substantial way with the prosecution of the patent application.  An intentional failure to meet this duty of candor and good faith is referred to as "inequitable conduct."

In this case, Kraft asserts that one of the named inventors of Keurig's '762 patent, Mr. Lazaris, who is also President of Keurig, knew of, obtained, and studied Kenco Singles Cartridges prior to his conception of the subject matter covered by the '762 patent.  Mr. Lazaris failed to disclose the existence of this piece of prior art to the Patent and Trademark Office.

Kraft must prove inequitable conduct by clear and convincing evidence. To determine whether Keurig's '762 patent was obtained through inequitable conduct, you must determine whether a person having this duty of candor and good faith withheld information, that was material to the examination of the patent application, and that this individual or individuals acted with an intent to deceive or mislead the PTO.

Authority:

2008 AIPLA Model Instructions § 11.0.

**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it is based on Kraft's contention that the '762 patent is unenforceable.  Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

Keurig also objects to Kraft's proposed instruction because "[i]nequitable conduct is an equitable issue committed to the discretion of the trial court," Flex-Rest, LLC v. Steelcase, Inc., 455 F.3d 1351, 1357 (Fed. Cir. 2006), and soliciting an advisory opinion from the jury would unduly prejudice Keurig given the nature of the allegations against Mr. Lazaris.  Kraft requests the Court to inform the jury that Mr. Lazaris "is President of Keurig."  This statement is inaccurate.  Mr. Lazaris left Keurig months ago to take a position at Harvard Business School.  More importantly, however, Kraft's proposed statement is completely irrelevant.  Mr. Lazaris's former position at Keurig has no bearing on Kraft's inequitable conduct allegations, which appear calculated to unfairly discredit Mr. Lazaris and Keurig in the jury's eyes.

Keurig further objects to Kraft's declarative sentence that "Mr. Lazaris failed to disclose the existence of this piece of prior art to the Patent and Trademark Office."

In the event that Kraft's motion to amend is granted, Keurig reserves the right to raise additional objections to Kraft's proposed inequitable conduct instructions and/or to propose alternative instructions.

**10.2    Materiality  [DISPUTED]**

**Kraft's Proposed Instruction**

Kraft contends that the Kenco Singles Cartridge is information known to a person with the duty of good faith and candor and was withheld from the Patent and Trademark Office during the prosecution of Keurig's '762 patent.  If you find that a person with this duty of good faith and candor withheld information when applying for Keurig's '762 patent, you must determine whether that information was material information.

Information is material if it establishes, either alone or in combination with other information, that a claim of the patent application would more likely than not fail to meet one of the requirements for a patent.  Information is also material if it refutes or is inconsistent with the information provided to the Patent and Trademark Office or arguments made by the applicant to persuade the Patent and Trademark Office that the invention is entitled to patent protection.  Information that is "cumulative" of, or adds little to, other information the examiner already had is not material.

Authority:

2008 AIPLA Model Instructions § 11.1.

**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it is based on Kraft's contention that the '762 patent is unenforceable.  Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

In the event that Kraft's motion to amend is granted, Keurig reserves the right to raise additional objections to Kraft's proposed inequitable conduct instructions and/or to propose alternative instructions.

**10.3    Intent to Deceive or Mislead  [DISPUTED]**

**Kraft's Proposed Instruction**

Kraft contends that material information was withheld from the Patent and Trademark Office with an intent to deceive or mislead the Patent and Trademark Office. If you determine that material information was withheld from the Patent and Trademark Office, you must next determine whether this was done with an intent to deceive or mislead the Patent and Trademark Office.  Intent to deceive the Patent and Trademark Office may be found from direct evidence. Such direct evidence is rare, however, and as a result, the law allows deceptive intent to be inferred from the facts and surrounding circumstances.

When a patentee has knowingly misrepresented a material fact or submitted false material information, and when the natural consequence of those intentional acts would be that to deceive the Patent and Trademark Office, an inference that the patentee intended to deceive may be appropriate. Simple negligence is insufficient for a holding of inequitable conduct.

In determining whether or not there was intent to deceive or mislead the Patent and Trademark Office, you should consider the totality of the circumstances, including the nature of the conduct and evidence of the absence or presence of good faith.

Authority:  2008 AIPLA Model Instructions § 11.2.

**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it is based on Kraft's contention that the '762 patent is unenforceable.  Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

Keurig also objects to the second paragraph of Kraft's proposed instruction, which is bracketed in the AIPLA model and would not be applicable here even if the Court allowed Kraft's motion for leave to amend.  Kraft's proposed amended answer does not allege that Mr. Lazaris knowingly misrepresented a material fact.

In the event that Kraft's motion to amend is granted, Keurig reserves the right to raise additional objections to Kraft's proposed inequitable conduct instructions and/or to propose alternative instructions.

**10.4     Balancing of Materiality and Intent  [DISPUTED]**

<u>**Kraft's Proposed Instruction**</u>

If Kraft has proven by clear and convincing evidence that information was withheld by a person with the duty of good faith and candor, you must then balance the degree of materiality and the degree of intent to deceive or mislead the Patent and Trademark Office to determine whether or not the evidence is sufficient to establish clearly and convincingly that there was inequitable conduct committed in the prosecution of Keurig's '762 patent. Where the materiality of the withheld information is high, the showing of intent needed to establish inequitable conduct is proportionally less.  Likewise, when the showing of intent is high, the showing of materiality may be proportionally less.

<u>Authority</u>:

2008 AIPLA Model Instructions § 11.3.

<u>**Keurig's Objections**</u>

Keurig objects to Kraft's proposed instruction because it is based on Kraft's contention that the '762 patent is unenforceable.  Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

In the event that Kraft's motion to amend is granted, Keurig reserves the right to raise additional objections to Kraft's proposed inequitable conduct instructions and/or to propose alternative instructions.

**DAMAGES**

**11.1    Damages – Generally  [DISPUTED]**

<u>**Keurig's Proposed Instruction**</u>

Question 3 of the Verdict Form reads as follows: Indicate the amount of damages that will compensate Keurig for Kraft's infringement from September 2005 through October 2008.

I will now instruct you as to the rules you must follow when deciding the issue of damages.

If you find that the accused T-Discs infringe claim 1 of Keurig's '762 patent, and that claim 1 is valid, you must determine the amount of damages to be awarded Keurig for Kraft's past infringement.  On the other hand, if you find that claim 1 of the '762 patent is either invalid or is not infringed, then you need not address damages in your deliberations.

If you need to determine damages, the amount of those damages must be adequate to compensate Keurig for Kraft's past infringement.  Your damage award should put Keurig in approximately the financial position it would have been in had the infringement not occurred; but, in no event may the damage award be less than a reasonable royalty.  You may not add anything to the amount of damages to punish the accused infringer or to set an example.

Keurig must prove each element of its damages by a preponderance of the evidence.

The fact that I am instructing you as to the proper measure of damages should not be construed as intimating any view of this Court as to which party is entitled to prevail in this case. Instructions as to the measure of damages are given for your guidance in the event you find the evidence in favor of Keurig.

<u>Authority</u>:  2008 AIPLA Model Instructions § 12.0.

**Kraft's Objections**

Contrary to this Court's practice, Keurig attempts to incorporate the language of the verdict form into the instruction. Kraft offers an instruction that is consistent with the law and comports with the practice in this Court, and is based on a jury instruction adopted by the Court earlier this year in another matter.

**Kraft's Proposed Instruction**

I have now instructed you as to the law governing patent infringement. If you find that Kraft infringes claim 1 of Keurig's '762 patent, and that claim 1 is not invalid, you must determine the amount of damages, if any, to be awarded Keurig for the infringement. On the other hand, if you find that claim 1 of the '762 patent is either invalid, unenforceable, or is not infringed, then you need not address damages in your deliberations. The amount of those damages must be adequate to compensate Keurig for the infringement. Your damage award should put Keurig in approximately the financial position it would have been in had the infringement not occurred; but, in no event may the damage award be less than a reasonable royalty. You may not add anything to the amount of damages to punish the accused infringer or to set an example.

Keurig must prove each element of its damages by a preponderance of the evidence.

The fact that I am instructing you as to the proper measure of damages should not be construed as intimating any view of this Court as to which party is entitled to prevail in this case. Instructions as to the measure of damages are given for your guidance in the event you find the evidence in favor of Keurig.

**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it is based on Kraft's contention that the '762 patent is unenforceable. Kraft's answer does not plead an inequitable conduct defense, and Kraft's belated motion for leave to amend its complaint to add such a defense should be denied for the reasons described in Keurig's opposition (D.I. 94) to that motion.

Keurig also objects to Kraft's proposed instruction because it does not refer to the relevant question of the verdict form. By distributing the verdict form before the jury instructions and then referring to specific questions at the beginning of the Court's discussion of the relevant law, Keurig's proposal makes it easier for jurors to understand and apply the Court's instructions.

Keurig also also objects to Kraft's proposed instruction because it fails to explain that the jury is to decide damages for past acts of infringement only. The jury is not being asked to decide the appropriate royalty rate for any post-verdict acts of infringement, and it would indeed be inappropriate to apply the reasonable royalty found by the jury to post-verdict acts of infringement. Amado v. Microsoft Corp., 517 F.3d 1353, 1361-62 (Fed. Cir. 2008) ("The jury's award of $0.04 per unit was based on Microsoft's infringing conduct that took place prior to the verdict. There is a fundamental difference, however, between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement.").

**11.2    Reasonable Royalty** – **Definition  [DISPUTED]**

**Keurig's Proposed Instruction**

The applicable form of damages in the case you have just heard and the form of damages that Keurig asserts it is entitled to for Kraft's infringement is called a "reasonable royalty." Generally, the patent laws define a reasonable royalty as the reasonable amount that someone wanting to use the patented invention should expect to pay to the patent owner and the owner should expect to receive.  A reasonable royalty is the minimum amount of damages that a patent owner may recover for infringement.

A royalty is a payment made to the owner of a patent by a non-owner in exchange for rights to make, use, or sell the claimed invention.  A reasonable royalty is the royalty that would have resulted from a hypothetical negotiation between the patent owner and a company in the position of Kraft taking place just before the infringement began.  You should also assume that both parties to that negotiation understood the patent to be valid and infringed and were willing to enter into a license.

Damages in the form of a reasonable royalty are not limited by evidence of any design-around cost that Kraft could have incurred to avoid infringement altogether.  Likewise, it is not relevant to the question of damages whether Kraft benefited from, realized profits from or even lost money as a result of the acts of infringement.  The only issue is the amount of the reasonable royalty that Keurig should receive to compensate it for Kraft's infringement.

Authority:  2008 AIPLA Model Instructions §§ 12.2 and 12.15; Mars Inc. v. Coin Acceptors, Inc., 527 F.3d 1359 (Fed. Cir. 2008) (rejecting, as a matter of law, infringer's argument that a reasonable royalty must be capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative); Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc., 06-438-GMS Final Jury Instruction (D. Del. June 11, 2008) § 7.2 ("It is not relevant to the question of damages whether Abraxis benefited from, realized profits from or even lost money as a result

of the acts of infringement … The only issue is the amount of the reasonable royalty which Elan should receive to compensate it for Abraxis's infringement."); 1993 Delaware Instructions § 6.1; Monsanto Co. v. Ralph, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (rejecting infringer's argument that "a reasonable royalty deduced through a hypothetical negotiation process can never be set so high that no rational self-interested wealth-maximizing infringer acting *ex ante* would ever have agreed to it.").

## Kraft's Objections

Kraft again objects to Keurig's attempt to have the Court articulate Keurig's arguments through the use of jury instruction. Keurig will have an opportunity to present its damages case through its expert, Alan Ratliff. Again, Kraft proffers a clear and concise jury instruction that informs the jury with respect to the law of damages, and is modeled after a jury instruction adopted by the Court earlier this year in another matter.

## Kraft's Proposed Instruction

The patent law specifically provides that the amount of damages that Kraft must pay Keurig for infringing Keurig's patent may not be less than a reasonable royalty. A reasonable royalty is not necessarily the actual measure of damages, but is merely the floor below which damages should not fall.

A royalty is a payment made to the owner of a patent by a non-owner in exchange for rights to make, use, or sell the claimed invention. A reasonable royalty is the royalty that would have resulted from a hypothetical negotiation between the patent owner and a company in the position of Kraft taking place just before the infringement began. You should also assume that both parties to that negotiation understood the patent to be valid and infringed and were willing to enter into a license.

Authority: 2008 AIPLA Model Instructions §§ 12.2 and 12.15; ; GMS instruction from *Finjan Software, Ltd. v. Secure Computing Corp.* (Nos. 30 & 31).

## Keurig's Objections

Keurig objects to Kraft's proposed instruction because the sentence asserting that a reasonable royalty is "not necessarily the actual measure of damages, but is merely the floor below which damages should not fall" is irrelevant and unfairly prejudicial, wrongly suggesting

to the jury that it may be appropriate to award Keurig only a portion of the damages to which the jury believes Keurig would actually be entitled.

Keurig further objects to Kraft's proposed instruction because it omits any explanation that (1) reasonable royalty damages are not necessarily limited by design-around costs; and (2) the <u>actual</u> benefit that Kraft gained from its infringement is irrelevant.  The first issue is central to the case because Kraft alleges that it could have developed a non-infringing alternative product at less than the  reasonable royalty damages calculated by Keurig's damages expert. The second issue is also critical because Kraft's damages expert relies heavily on the theory that the Tassimo product line has not achieved the profitability that Kraft projected prior to launch. Both principles are firmly supported in the authorities that Keurig has cited.

**11.3**   **Reasonable Royalty – Relevant Factors**  **[AGREED]**

In determining the value of a reasonable royalty, you may consider evidence on any of the following factors:

1.      Any royalties received by Keurig for the licensing of the '762 patent to unrelated parties at arms-length, proving or tending to prove an established royalty.

2.      The rates paid by Kraft to license other patents comparable to the '762 patent.

3.      The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4.      Keurig's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5.      The commercial relationship between Keurig and Kraft, such as whether or not they are competitors in the same territory in the same line of business.

6.      The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.

7.      The duration of the '762 patent and the term of the license.

8.      The established profitability of the product made under the '762 patent; its commercial success; and its current popularity – that is to say, the foreseeable profitability that the licensee would have anticipated at the time of a hypothetical negotiation from which it would have calculated the royalty it would have been willing to pay.

9.    The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10.    The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11.    The extent to which Kraft has made use of the invention; and any evidence that shows the value of that use.

12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.    The portion of the realizable Kraft profit attributable to the same-side piercing innovation as opposed to unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14.    The opinion testimony of qualified experts.

15.    The amount that a licensor (Keurig) and a licensee (Kraft) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

16.    Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

<u>Authority</u>:  2008 AIPLA Model Instructions § 12.16; 1993 Delaware Instructions § 6.11

**11.4    Reasonable Royalty** – **Timing  [DISPUTED]**

**Keurig's Proposed Instruction**

Although the relevant date for the hypothetical reasonable royalty negotiation is just before the infringement began, you may consider in your determination of reasonable royalty damages any actual profits by Kraft after that time and any commercial success of the patented invention in the form of sales of the patented or infringing products after that time.  You may only consider this information, however, if it was foreseeable at the time that the infringement began.

To put it another way, you have heard evidence of things that happened after the infringing sales first began.  That evidence can be considered only to the extent that that evidence aids in you assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits Kraft made may aid you in determining the anticipated profits at the time of the hypothetical negotiation, you may not limit or increase the royalty based on the actual profits Kraft made.  Therefore, a determination of a reasonably royalty should in no way be based upon or limited by the evidence you have heard as to of the actual profits Kraft made through its infringing activities.

Authority:  First paragraph from 2008 AIPLA Model Instructions § 12.17 (2008).  Second paragraph from Federal Circuit Bar Association Model Instructions § 6.7 (2008); State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989) ("There is no rule that a royalty be no higher than the infringer's net profit margin."). See also Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1555 (Fed.Cir.1995) (en banc).

**Kraft's Objections**

Repeating its objection of instruction 11.1, Kraft objects to Keurig's attempt to have the Court articulate Keurig's arguments through the use of jury instructions.  Keurig will have an opportunity to present its damages case through its expert, Alan Ratliff.  Once again, Kraft proffers a clear and concise jury instruction that informs the jury with respect to the law of

damages, and is modeled after a jury instruction adopted by the Court earlier this year in another matter.

**Kraft's Proposed Instruction**

Although the relevant date for the hypothetical reasonable royalty negotiation is just before the infringement began, you may consider in your determination of reasonable royalty damages any actual profits by Kraft after that time and any commercial success of the patented invention in the form of sales of the patented or infringing products after that time. You may only consider this information, however, if it was foreseeable at the time that the infringement began.

Authority:  2008 AIPLA Model Instructions § 12.17 (2008); GMS instruction from *Finjan Software, Ltd. v. Secure Computing Corp.* (Nos. 33).).

**Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it omits important guidance as to when it is proper or improper to consider evidence of events that happened after the end of the hypothetical negotiation (i.e., after the infringing sales first began). A thorough instruction is important in this case because Kraft's damages expert relies heavily on actual sales results as a justification for the low royalty rate that he proposes.

**12.0    Willful Infringement  [DISPUTED]**

**Keurig's Proposed Instruction**

Question 4 of the Verdict Form reads as follows:  Has Keurig proven, by clear and convincing evidence, that any infringement of Keurig's U.S. Patent No. 6,607,762 was willful?

I will now instruct you as to the rules you must follow when deciding the issue of willful infringement.

If you find by a preponderance of the evidence that Kraft infringed Keurig's '762 patent, then you must further determine if this infringement was willful.  Willfulness must be proved by clear and convincing evidence showing that:

4.    Kraft was aware of Keurig's patent;

5.    Kraft acted despite an objectively high likelihood that its actions infringed a valid patent; and

6.    This objectively high likelihood of infringement was either known to Kraft or so obvious that it should have been known to Kraft.

In making the determination as to willfulness, you must consider the totality of the circumstances.  The totality of the circumstances comprises a number of factors, which include, but are not limited to

(1)    whether Kraft intentionally copied the claimed invention or a product covered by Keurig's patent;

(2)    whether Kraft presented a substantial defense to infringement, including the defense that the patent is invalid;

(3)    whether Kraft made a good faith effort to avoid infringing the patent, for example remedial action upon learning of the patent by ceasing infringing activity or attempting to design around the patent; and

(4)    whether a fair and reasonable competitor would have secured legal advice or a professional legal opinion that would clear it of the alleged infringement.  However, the absence of an opinion of counsel does not require you to find willfulness.

Authority:  2008 AIPLA Model Instructions § 13; In re Seagate Tech., LLC, 497 F.3d 1360 (Fed. Cir. 2007) (en banc); Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc., 06-438-GMS Final Jury Instruction (D. Del. June 11, 2008) § 4.6.

### Kraft's Objections

Contrary to this Court's practice, Keurig attempts to incorporate the language of the verdict form into the instruction.  Kraft offers an instruction that is consistent with the law and comports with the practice in this Court, and is based on a jury instruction adopted by the Court earlier this year in another matter.  Moreover, contrary to the practice of this Court, Keurig attempts to have the willful instruction read at the end, and not with the instructions related to infringement.  Moreover, factors (3) and (4) are contrary to In re Seagate, which reversed Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380 (Fed. Cir. 1983) and eliminated the affirmative duty of due care.  Keurig improperly attempts to create an inference of willful of infringement by discussing Kraft's reliance on opinion of counsel.  The AIPLA jury instructions that Keurig relies upon notes that an instruction regarding "[w]hether the Defendant relied on competent legal advice," is appropriate when the defendant relies on a legal opinion as a defense to an allegation of willful infringement.  "[I]t is inappropriate to draw an adverse inference that undisclosed legal advice for which attorney-client privilege is claimed was unfavorable . . . [and] it is [also] inappropriate to draw a similar adverse inference from failure to consult counsel."  *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1347 (Fed. Cir. 2004) (en banc).

### Kraft's Proposed Instruction

If you find by a preponderance of the evidence that Kraft infringed Keurig's '762 patent, then you must further determine if this infringement was willful.  Willfulness must be proved by clear and convincing evidence showing that:

1.    Kraft was aware of Keurig's patent;

2.      Kraft acted despite an objectively high likelihood that its actions infringed a valid

patent; and

3.      This objectively high likelihood of infringement was either known to Kraft or so

obvious that it should have been known to Kraft.

In making the determination as to willfulness, you must consider the totality of the

circumstances.  The totality of the circumstances comprises a number of factors, which include,

but are not limited to

(1)      whether Kraft intentionally copied the claimed invention or a product covered by

Keurig's patent; and

(2)      whether Kraft presented a substantial defense to infringement, including the

defense that the patent is invalid.

Authority:  2008 AIPLA Model Instructions § 13; *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed.
Cir. 2007) (*en banc*); *Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc.*, 06-438-GMS Final Jury
Instruction (D. Del. June 11, 2008) § 4.6.

### **Keurig's Objections**

Keurig objects to Kraft's proposed instruction because it omits any explanation that the
jury can consider (1) whether Kraft made a good faith effort to avoid infringing Keurig's patent
and (2) whether a fair and reasonable competitor in Kraft's position would have secured legal
advice or a professional legal opinion that would clear it of the alleged infringement.  Both of
these considerations are relevant to the <u>Seagate</u> objective recklessness standard  and are noted in
this Court's <u>Elan</u> instructions, on which Kraft's proposal is nominally based.

# DELIBERATIONS AND VERDICT

## 13.1    Introduction  [AGREED]

Once you adjourn to the jury room, the first thing I recommend you do is select a foreperson.  How you conduct your deliberations is up to you.  But, however you conduct those deliberations, please remember that your verdict must represent the considered judgment of each juror.

It is your duty, as jurors, to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so without violence to your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because the opinion of your fellow jurors, or forth the purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges – judges of the facts, not me.  Your sole interest is to seek the truth from the evidence in that case.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

A form of verdict has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.  You will then return to the courtroom, your foreperson will give the form to my Deputy Clerk and your verdict shall be announced.  It is proper to add the caution that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find.  What the verdict shall be is your sole and exclusive duty and responsibility.

That concludes the part of my instructions explaining the rules for considering the testimony and evidence. Now let me finish up by explaining how you may communicate questions or messages to the court.

Once you start deliberating, do not talk to the Jury Officer, to my Deputy Clerk, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the Jury Officer. The question will be given to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages are normally sent to me through the foreperson, who by custom of this court is juror Number 1.

One more thing about messages. Do not ever write down or tell anyone else how you stand on your votes. For example, do not write down or tell anyone else that you are split 6-2, or 4-4, or whatever your vote happens to be. That should stay secret until you are finished. Let me finish by repeating something I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in favor of either party. You must decide the case yourselves based on the evidence presented.

Authority:

GMS instruction from *Linear Technology Corp. v. Monolithic Power Systems, Inc.* (No. 5.1).

**13.2**    **Duty to Deliberate**  **[AGREED]**

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach a unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.

Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that -- your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.


Authority:

GMS instruction from *Linear Technology Corp. v. Monolithic Power Systems, Inc.* (No. 5.2).

**13.3**    **Court Has no Opinion**  [AGREED]

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in favor of either party.  You must decide the case yourselves based on the evidence presented.


Authority**:**

GMS instruction from *Linear Technology Corp. v. Monolithic Power Systems, Inc.* (No. 5.3).


Dated: August 25, 2008

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS |

## **EXHIBIT 13:  KEURIG'S PROPOSED VERDICT FORM**

Submitted: August 25, 2008

1463553.1

**Question 1:**    Has Keurig proven, by a preponderance of the evidence, that Kraft has infringed claim 1 of Keurig's U.S. Patent No. 6,607,762?

| YES (for Keurig) | NO (for Kraft) |
|---|---|
|  |  |

**Question 2:**    Has Kraft proven, by clear and convincing evidence, that claim 1 of Keurig's U.S. Patent No. 6,607,762 is invalid?  Check NO (for Keurig) or YES (for Kraft):

| NO (for Keurig) | YES (for Kraft) |
|---|---|
|  |  |

**ANSWER QUESTIONS 3 AND 4 BELOW IF YOU HAVE FOUND CLAIM 1 OF KEURIG'S PATENT BOTH INFRINGED AND VALID (I.E., IF YOU DECIDED THE ABOVE QUESTIONS IN KEURIG'S FAVOR):**

**Question 3:**    Indicate the amount of damages that will compensate Keurig for Kraft's infringement from September 2005 through October 2008:

_____ Dollars
                         (Words)

_____ Dollars
                         (Numbers)

**Question 4:**    Has Keurig proven, by clear and convincing evidence, that any infringement of Keurig's U.S. Patent No. 6,607,762 was willful?

| YES (for Keurig) | NO (for Kraft) |
|---|---|
|  |  |

Date: October _____, 2008

_____
Signature of Jury Foreperson

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

      Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

      Defendants.

Civil Action No. 07-017-GMS

## EXHIBIT 14: KRAFT'S PROPOSED VERDICT FORM

**Question 1:**　Has Keurig proven, by a preponderance of the evidence, that Kraft has infringed claim 1 of Keurig's U.S. Patent No. 6,607,762? Check YES (for Keurig) or NO (for Kraft):

| YES (for Keurig) | NO (for Kraft) |
|---|---|
|  |  |

**PLEASE PROCEED TO QUESTION 2**

**Question 2:** Has Kraft proven, by clear and convincing evidence, that claim 1 of Keurig's U.S. Patent No. 6,607,762 is invalid due to anticipation, obviousness, failure to enable, or failure to satisfy the written description requirement?  Check NO (for Keurig) or YES (for Kraft):

| NO (for Keurig) | YES (for Kraft) |
|---|---|
|  |  |

**<u>PLEASE PROCEED TO QUESTION 3</u>**

**Question 3:**  Has Kraft proven that claim 1 of Keurig's U.S. Patent No. 6,607,762 is unenforceable due to inequitable conduct?  Check NO (for Keurig) or YES (for Kraft):

| NO (for Keurig) | YES (for Kraft) |
|---|---|
|  |  |

**<u>PLEASE PROCEED TO QUESTION 4</u>**

**ANSWER QUESTIONS 4 AND 5 BELOW IF YOU HAVE FOUND CLAIM 1 OF KEURIG'S PATENT INFRINGED, ENFORCEABLE AND NOT INVALID (I.E., IF YOU DECIDED THE ABOVE QUESTIONS IN KEURIG'S FAVOR):**

**Question 4:** Has Keurig proven, by clear and convincing evidence, that any infringement of Keurig's U.S. Patent No. 6,607,762 was willful? Check YES (for Keurig) or NO (for Kraft):

| YES (for Keurig) | NO (for Kraft) |
|---|---|
|  |  |

**PLEASE PROCEED TO QUESTION 6**

**Question 5:**    Indicate the amount of damages that will compensate Keurig for Kraft's infringement from September 2005 through October 2008:

_____ Dollars
                        (Words)

_____ Dollars
                        (Numbers)

Date: October _____, 2008

_____
Signature of Jury Foreperson

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS |

## EXHIBIT 15:  PROPOSED VOIR DIRE QUESTIONS

The parties request that the Court read the following general description and ask the following questions of prospective jurors:

## I.    PRELIMINARIES

Good morning, ladies and gentlemen.  I am about to ask you a series of questions that we call voir dire.  The purpose of the voir dire examination is:

(a)    to enable the court to determine whether or not any prospective juror should be excused for cause; and

(b)    to enable counsel for the parties to exercise their individual judgment with respect to peremptory challenges – that is, challenges for which counsel need not give a reason.

- **Staff introduced**
- **Panel Sworn**

If any of you would answer "yes" to any of these questions, I would ask you to stand up and, upon being recognized by me, to state your number. At the end of the questions, I will ask those who have responded "yes" to any of the questions to come to sidebar (that is, up to the bench next to me) with counsel for the parties to discuss your answers.

This case is expected to take 6 days to try. The schedule that I expect to maintain over those 6 days will be as follows: We will normally begin the day at 9:00 a.m. promptly. We will go until 1:00 p.m. and, after a one hour break for lunch, from 2:00 p.m. to 4:30 p.m. There will be a fifteen minute break at 11:00 a.m. and another fifteen minute break at 3:15 p.m. One exception to this schedule may occur when the case is submitted to those of you who are selected to serve as jurors for your deliberation. On that day, the proceedings might last beyond 4:30 p.m. We will post a copy of this schedule for the jury's convenience in the jury deliberation room.

1.    Does the length of this trial or the schedule contemplated by the court present a special problem to you?

## II.    DESCRIPTION OF THE CASE

This case is an action for patent infringement. The plaintiff in this case is a company called Keurig, Incorporated. I will refer to it as Keurig. The defendants in this case are Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. I will refer to them collectively as Kraft. Kraft sells single-serve coffee and tea cartridges called T-Discs under the name Tassimo. Keurig accuses Kraft of infringing Keurig's patent by selling these T-Discs. Keurig seeks damages for Kraft's infringement. Kraft denies that it infringes Keurig's patent and contends that Keurig's patent is invalid.

2.      Prior to this morning, had you heard or read anything about this case?

3.      Prior to this morning, had you heard of the Tassimo or T-Disc products?

4.      Have you or any member of your immediate family ever been employed by Keurig or

Kraft?

5.      Have you or any member of your immediate family ever been employed by any other

company involved in the food or beverage business?

6.      Have you or any member of your immediate family ever owned stock or had any

financial interest in Keurig or Kraft?

7.      Have you or any member of your immediate family ever had a business relationship with

Keurig or Kraft?

8.      Have you or any member of your immediate family ever had a business relationship with

any other company involved in the food or beverage business?

9.      Have you or any member of your immediate family had any positive or negative

experience with products manufactured and/or sold by Keurig or Kraft?

10.     The inventors listed in Keurig's patent are Nicholas Lazaris and Rick Beaulieu.  Do any

of you know, or know of, Mr. Lazaris or Mr. Beaulieu?

11.     Attorneys John Shaw, Karen Keller, Michael Albert, Michael Rader, and Charles

Steenburg represent Keurig.  Do you know, or know of, these lawyers or any other lawyer at the

law firms of Wolf, Greenfield & Sacks, P.C. or Young Conaway Stargatt and Taylor, LLP?

12.     Attorneys Richard Horwitz, David Moore, David Schlitz, and Bill Foster represent Kraft.

Do you know, or know of, these lawyers or any other lawyer at the law firms of Potter Anderson

& Corroon or Baker Botts?

13.    The witnesses in this case will be: [read witness lists]. Do you know, or know of, any of these witnesses?

## III.    RELEVANT PRIOR EXPERIENCES

14.    Have you served as a juror in a criminal or civil case or as a member of a grand jury in either federal or state court?

15.    Have you or has anyone in your immediate family ever participated in a lawsuit as a party or in any other capacity such as a plaintiff, defendant, or witness?

16.    Have you ever studied law?

17.    Have you ever worked for a law firm?

18.    Do you have any hearing or visual impairment or suffer from any medical or emotional condition that may affect your ability to give full attention to all of the evidence at this trial?

## IV.    PATENTS AND THE SUBJECT MATTER OF THE LITIGATION

19.    Do you have specialized knowledge, training or experience in engineering?

20.    Do you have specialized knowledge, training or experience in the food and beverage industry?

21.    Do you have specialized knowledge, training or experience in the coffee industry?

22.    Have you or anyone that you know ever invented or tried to invent something?

23.    Have you or anyone that you know ever applied for or obtained a patent?

24.    Are you employed by, or otherwise associated with, a company that owns one or more patents?

25.    Are you employed by, or otherwise associated with, a company that has been involved in a patent infringement lawsuit?

26.    Have you heard, read, or seen anything recently about the patent system?

27.    Have you ever had an experience with patents or the patent system that has resulted in feelings that might keep you from being a fair and impartial juror?

28.    Have you or anyone that you know ever been employed by the United States Patent and Trademark Office, otherwise known as the PTO?

**V.    WRAP-UP**

29.    If you are selected to sit on this case, is there anything that would prevent you from rendering a verdict based solely on the evidence presented at the trial and in the context of the law as I will give it to you in my instructions, disregarding any other ideas, notions, or beliefs about the law you may have or that you may have encountered in reaching your verdict?

30.    Having heard the questions put to you by the court, does any other reason suggest itself to you as to why you could not sit on this jury and render a fair verdict based on the evidence presented to you and in the context of the court's instructions to you on the law?

Dated:  August 25, 2008

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>      Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>      Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED –<br>PUBLIC VERSION** |

**KEURIG'S MOTION *IN LIMINE* NO. 1 – MOTION TO PRECLUDE KRAFT FROM
OFFERING EVIDENCE OF ITS TESTING OF SINGLES CARTRIDGES
<u>BECAUSE KRAFT WITHHELD KEY INFORMATION ABOUT THAT TESTING</u>**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

Kraft should be precluded from offering evidence of its testing of Kenco Singles cartridges (which Kraft alleges constitute prior art[1]) because Kraft withheld discovery into that testing based on an assertion of work product.



Keurig (and likewise the trier of fact) cannot fairly evaluate Kraft's experimental setup and results. Kraft's selective waiver impermissibly uses its claim of privilege as both a sword and a shield. The appropriate remedy is exclusion of any evidence and testimony about the Kraft testing.

## I.    BACKGROUND

In January 2008, Kraft disclosed that its UK employee Lee Rowan had performed testing of Kenco Singles cartridges to determine if they met the '762 patent claim limitations. Kraft agreed to make Mr. Rowan available for deposition in England.



---

[1] Keurig disputes whether Kenco Singles cartridges are prior art to Keurig's '762 patent. Moreover, even if they were prior art, the Singles cartridges would not anticipate the '762 patent. Indeed, Kraft's Director of Technology for Global Coffee conceded that Singles cartridges are not piercable through the foil lid to accommodate an inflow as required by claim 1 of the patent. Kraft itself took the same position before the European Patent Office. See D.I. 91 at 2-5.



DB02:7054184.1

065927.1001

Subsequently, in mid-March 2008, Mr. Bentley conducted an additional round of testing



## II.   ARGUMENT

### A.   Andrew Bentley's Tests Should Be Excluded.

Cf. Belmont

Textile Mach. Co. v. Superba, S.A., 48 F. Supp. 2d 521, 523 (W.D.N.C. 1999) ("How can

Belmont – or the trier of fact for that matter – analyze Superba's reliance upon the advice of

counsel without reference to the circumstances surrounding the issuance of the advice...?").

- 3 -

Under these circumstances, the appropriate remedy is exclusion of all evidence about Mr. Bentley's testing. <u>Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.</u>, 259 F.3d 1186, 1196 (9th Cir. 2001) ("[W]here the party claiming privilege during discovery wants to testify at the time of trial, the court may ban that party from testifying on the matters claimed to be privileged."); <u>Mobil Oil Corp. v. Amoco Chem. Corp.</u>, 779 F. Supp. 1429, 1485 n.43 (D. Del. 1999) (granting motion *in limine* to exclude evidence of an opinion of counsel in a patent case due to a partial waiver by the defendant: "The Court finds that Amoco's failure to clearly waive the privilege before the close of discovery prevented Mobil from taking any appropriate discovery regarding the opinions or from ascertaining that all of the documents relating to the opinions had been produced.").[2]  Kraft cannot have it both ways – ███



**B.     Mr. Rowan's Tests Using Mr. Bentley's Apparatus Are Likewise**
<u>**Tainted by Kraft's Selective Disclosure and Should Be Excluded.**</u>

It would likewise be unfairly prejudicial for Kraft to present testimony about Mr. Rowan's tests, ███

---

[2] ███ <u>Columbia</u>, 259 F.3d at 1196 (affirming exclusion of proffered testimony despite opposing party's offer to "make himself available for deposition on [the relevant] issue.").



See Mobil,

779 F. Supp. at 1485 n.43 (reliance on evidence is improper where assertion of privilege bars the

opposing party from inspecting any underlying documents related to that evidence).

## III.    CONCLUSION

For the above reasons, Keurig requests that Kraft be precluded from introducing any

evidence of the testing performed by its engineers on Kenco Singles cartridges.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

- 6 -

# EXHIBITS 1-6
## REDACTED IN THEIR ENTIRETY

## RULE 7.1.1 CERTIFICATION

I hereby certify that counsel for Plaintiff has complied with Rule 7.1.1 of the Local Rules

of Civil Practice and Procedure of the United States District Court for the District of Delaware.


/s/ *Adam W. Poff*
Adam W. Poff (No. 3990)

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 11, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>
> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on August 11, 2008, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

### BY E-MAIL

>
> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

>
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> /s/ *Karen E. Keller*
> _____
> John W. Shaw (No 3362)  [*jshaw@ycst.com*]
> Adam W. Poff (No. 3990) [*apoff@ycst.com*]
> Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
> (302)-571-6600
>
> *Attorneys for Plaintiff Keurig, Incorporated*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,          )
                                )
    Plaintiff,             )
                                )
    v.                     )    C.A. No. 07-17 (GMS)
                                )
KRAFT FOODS GLOBAL, INC.,       )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and        )
KRAFT FOODS INC.,               )    **PUBLIC VERSION**
                                )
    Defendants.            )

## DEFENDANTS' OPPOSITION TO KEURIG'S MOTION *IN LIMINE* NO.1

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: August 15, 2008
Public Version Dated: August 22, 2008
878767 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

## BACKGROUND

Kraft opposes Keurig's motion *in limine* to preclude Kraft from offering any evidence of its testing of the Kenco Singles Cartridges ("Singles Cartridges").[1] Keurig's motion must be denied as it received more than adequate opportunity to discover the surrounding circumstances and substance of Kraft's tests, and, in fact, took full advantage of the discovery opportunities it received. Keurig's counsel claims to have declined to accept a partial waiver of work product privilege. Yet, Keurig extensively deposed Andrew Bentley on the design and construction of the testing apparatus and on the Singles Cartridge testing results. Keurig also inspected the testing apparatus and received the full results from the tests. Simply put, there is no risk of surprise or unfairness, and, therefore, no prejudice, in allowing Kraft to offer evidence of its testing of the Singles Cartridges.

## ARGUMENT

### I.   Evidence of Mr. Bentley's Testing Should Not Be Excluded.

█████████████████████████████████████████████████

█████ Keurig concludes, relying on three cases that pertain to attorney client privilege, that the proper remedy is exclusion of all evidence of Kraft's testing of the Singles Cartridges, including Mr. Bentley's first and second tests. *Id.*

    To the contrary, Keurig will not be prejudiced if Kraft offers evidence of Mr. Bentley's testing. Keurig engaged in extensive discovery of the circumstances and substance of the testing. Keurig deposed Mr. Bentley twice, on February 27, 2008, and again on April 2, 2008. During

---

[1] Kraft maintains that the Singles cartridges constitute prior art to Keurig's '762 Patent. Kraft intends to establish at trial that the Singles cartridges embody each and every limitation, and, thus, anticipate, claim 1 of the '762 Patent.

the first deposition, despite Keurig's counsel's assertion that he declined a partial waiver of work product privilege, Keurig's counsel took over 25 pages of testimony about the design and construction of the testing apparatus, the testing methodology used, and the test results from the report. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For example:



▮▮▮▮▮▮▮▮▮ Keurig's counsel also fully deposed Mr. Bentley on the design of the apparatus:





Kraft's counsel did not object to any questions from Keurig's counsel about the Singles Cartridge testing on the basis of privilege. Further, Keurig's counsel inspected the actual apparatus that Mr. Bentley used. *See* Bentley Depo. Tr., April 2, 2008 (Ex. 3) at 25:20-26:4. With respect to Mr. Bentley's second round of testing, the tests were conducted independently from the first round, and in no way depended upon Mr. Bentley's report. On April 2, 2008, Keurig deposed Mr. Bentley after the second test; the entirety of that deposition focused on Mr. Bentley's tests. Ex. 3 at 4-30.

Unlike the defendant in *Columbia*, who offered "at the eleventh hour, to make himself available for deposition" and the defendant in *Mobil Oil*, who waived privilege immediately before the pretrial conference, Kraft never used the work product privilege to prevent Keurig from engaging in discovery of Kraft's testing during the discovery period. *Columbia Pictures Television, Inc., v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001); *Mobil Oil Corp. v. Amoco Chem. Corp.*, 779 F. Supp. 1429, 1485 n.43 (D. Del. 1991). Instead, Kraft fully cooperated with Keurig's extensive discovery of its testing. Furthermore, unlike the defendants in the cases cited above, Kraft is not attempting to rely at trial on documents it has not produced, *i.e.*, the report itself. Accordingly, it cannot be said that Kraft has used work

- 3 -

product as both a sword and a shield. *See, e.g., Frontier Refining v. Gorman-Rupp*, 136 F.3d 695, 704 (10th Cir. 1998) (finding that a defendant did not use work product privilege as a sword where the defendant did not rely on the protected evidence to prove or to respond to any claim). The cases cited by Keurig do not support finding prejudice and excluding underlying facts merely because a party has asserted work product privilege as to one document, especially where there has been extensive discovery of the underlying facts. As clearly shown in all four of its motions *in limine*, Keurig wants to have its cake and eat it too by attempting to exclude damaging evidence after taking full discovery of such evidence under the guise of "prejudice."

Further, Kraft's counsel <u>never</u> stated that Andrew Bentley would not testify at trial. Keurig should not have assumed from the discussion of work product privilege that Mr. Bentley would not testify at trial. The work product doctrine protects only "documents and tangible things." Fed. R. Civ. P. 26(b)(3). The assertion of work product privilege as to one of Mr. Bentley's documents does not completely bar him from testifying at trial.

Through the depositions, the inspection of the apparatus, and the documents produced, Keurig engaged in extensive discovery regarding the surrounding circumstances and substance of the testing. This discovery enables Keurig to pursue vigorous cross-examination of Kraft witnesses concerning the testing. Moreover, Keurig's technical experts cited in their rebuttal reports both Bentley's testimony and the results from the Singles Cartridge testing. Accordingly, there is no need to "fashion remedies to prevent unfair surprise and unfairness." *Columbia Pictures*, 259 F.3d at 1196. Therefore, this Court should deny Keurig's request that it exclude evidence of Kraft's testing.[2]

---

[2] If the Court would find an *in camera* inspection of Andrew Bentley's report helpful in deciding this motion, Kraft is willing to provide the report for such inspection. The report has been withheld solely for purposes of preserving work product privilege.

**II.**   **Evidence of Mr. Rowan's Testing of the Singles Cartridges Should Not Be Excluded.**

Kraft has never asserted work product privilege with respect to any document created by Mr. Rowan. But Keurig argues that because of Kraft's assertion of privilege with respect to Mr. Bentley's report, Keurig would be prejudiced if Kraft presented evidence of Mr. Rowan's testing. Mot. at 4.

Mr. Rowan's testing was conducted independently from that of Mr. Bentley's testing. Rowan Depo. (Ex. 4) at 75:17-22, 77:11-13. In no respect does Mr. Bentley's report regarding his initial testing "underlie" Mr. Rowan's testing as he did not construct the testing apparatus. Instead, Mr. Rowan's testing focused on the cartridges because the '762 Patent discloses cartridges, not a brewer or brewing method, and, thus, the apparatus is largely irrelevant. Nonetheless, Keurig has inspected the testing apparatus, received photographs of the apparatus in use, and has twice deposed Mr. Bentley, the maker of the apparatus. Keurig has had full opportunity to engage in discovery as to the design and construction of the apparatus. Further, Keurig deposed Mr. Rowan on this issue. *Id.* at 64-110.

Keurig should not be allowed to prevent Kraft from presenting evidence of Mr. Rowan's testing because of an alleged, tenuous relationship between Mr. Bentley's report and Mr. Rowan's testing. Mr. Rowan's test of the Singles Cartridges is independent of Mr. Bentley's report. Accordingly, there is no basis upon which to exclude evidence of Mr. Rowan's test.

<div align="center">CONCLUSION</div>

For the above reasons, Kraft requests that Keurig's motion *in limine* to preclude Kraft from offering any evidence of its testing of the Kenco Singles Cartridges be denied.

<div align="center">- 5 -</div>

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 15, 2008
Public Version Dated: August 22, 2008
8787467 / 31118

By: _/s/ David E. Moore_____
      Richard L. Horwitz (#2246)
      David E. Moore (#3983)
      Hercules Plaza, 6th Floor
      1313 North Market Street
      P.O. Box 951
      Wilmington, DE 19899-0951
      Tel: 302-984-6169
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 22, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on August 22, 2008, the attached document was Electronically

Mailed to the following person(s):

| | |
|---|---|
| John W. Shaw | Michael A. Albert |
| Karen E. Keller | Michael N. Rader |
| Young Conaway Stargatt & Taylor | Laura Topper |
| The Brandywine Building | Gerald B. Hrycyszyn |
| 1000 West Street, 17th Floor | Wolf, Greenfield & Sacks, P.C. |
| P. O. Box 391 | 600 Atlantic Avenue |
| Wilmington, DE 19899-0391 | Boston, MA 02210 |
| jshaw@ycst.com | malbert@wolfgreenfield.com |
| kkeller@ycst.com | mrader@wolfgreenfield.com |
| | ltopper@wolfgreenfield.com |
| | ghrycyszyn@wolfgreenfield.com |

By: _/s/ David E. Moore_
      Richard L. Horwitz
      David E. Moore
      Potter Anderson & Corroon LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

805682 / 31118

# Exhibit 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 2

**Kenco Singles capsule brewing experiment using same-side piercing**

### Test results

| Test # (position) | Sample | Beverage Volume /ml | Water Temp./ °C | Soluble Solids/ % |
|---|---|---|---|---|
| 1 (A&C) | 1 | 170 | 94 | 0.54 |
| | 2 | 165 | 93 | 0.51 |
| | 3 | 165 | 93 | 0.55 |
| 2 (B) | 1 | 165 | 93 | 0.74 |
| | 2 | 160 | 93 | 0.79 |
| | 3 | 165 | 93 | 0.79 |
| 3 (D) | 1 | 165 | 93 | 0.86 |
| | 2 | 165 | 93 | 0.85 |
| | 3 | 165 | 93 | 0.85 |
| 4 (E) | 1 | 160 | 93 | 0.89 |
| | 2 | 160 | 93 | 0.89 |
| | 3 | 160 | 93 | 0.89 |



Inlet piercer positions



K- DS- 1

**THIS PAGE HAS BEEN REDACTED FROM THIS EXHIBIT**

**THIS PAGE HAS BEEN REDACTED FROM THIS EXHIBIT**

# Exhibit 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 4

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>         Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>         Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED – PUBLIC VERSION** |

## <u>REPLY IN SUPPORT OF KEURIG'S MOTION *IN LIMINE* NO. 1</u>

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

████████████████████████████████████████████

████████████████ This is a classic case of a party trying to use work product as both a sword (to prove a defense) and a shield (to limit Keurig's ability to challenge it). Kraft argues that it allowed Keurig to take some discovery from Mr. Bentley. But that only reinforces the impermissible selectivity of Kraft's disclosure. Excluding all the tainted evidence (i.e., testing on Mr. Bentley's apparatus by both Mr. Bentley and Mr. Rowan) is the only just remedy.[1]

████████████████████████████████████████████

████████████████ Kraft now contends that it "never stated that Andrew Bentley would not testify at trial." (Opp. at 4). ██████████████████████

██████████████████████████████ Mr. Bentley may take the stand, but he should not be allowed to testify about his Singles apparatus or testing.

## II.     Kraft's Tactics Deny Keurig the Most Pertinent Cross-Examination Material and Exemplify the Impermissible Use of Work Product as Both a Sword and a Shield.

The prohibition on selective waiver precludes Mr. Bentley from testifying about his Singles apparatus and testing – ██████████████████████

████████████████████████████████████████████

---

[1] Kraft recently informed Keurig that it intends to perform additional testing on Mr. Bentley's apparatus in court during trial. Kraft should be prohibited from doing so for the same reasons.

Kraft cannot use work product as a sword to bolster its invalidity defense, and at the same time as a shield, denying Keurig access to the most pertinent material for challenging the proffered testimony. In <u>United States v. Nobles</u>, 422 U.S. 225 (1975), the Supreme Court affirmed exclusion of testimony from an investigator regarding witness statements because the defendant had refused to turn over the investigator's original report concerning his interviews. <u>Id.</u> at 241 (holding that the sanction "merely prevented respondent from presenting to the jury a partial view of the credibility issue by adducing the investigator's testimony and thereafter refusing to disclose the contemporaneous report that might offer further critical insights").

Kraft's argument that it "is not attempting to rely at trial on…the report itself" (Opp. at 3) is not true. ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████ <u>E.g.</u>, <u>Applera Corp. v. MJ Research Inc.</u>, 303 F. Supp. 2d 141 (D. Conn. 2004) (granting motion *in limine* to preclude testimony because accused infringer did not fully disclose opinion's substance).[3]

---

[2] ████████████████████████████████████████████████████████████████
████████████████████ See <u>Granite Partners, L.P. v. Bear Stearns & Co.</u>, 184 F.R.D. 49, 55 (S.D.N.Y. 1999) ("[T]he issue of waiver rests not on whether a privileged document is introduced into evidence, but rather whether the party's use of the document is unfair and inconsistent with the privilege."). Testimony from Mr. Bentley or Mr. Rowan about their testing would place "the accuracy of [their] data and the validity of [their] analyses at issue." <u>Id.</u> The jury would need to decide, for example, whether the apparatus was an appropriate basis for the testing in the first place. ████████████████████████████████████████████
██████████████████████████████████

[3] Kraft's argument that the "assertion of work product privilege as to one of Mr. Bentley's documents does not <u>completely</u> bar him from testifying at trial" (Opp. at 4) (emphasis added) begs the question of what the bar ought to be. The bar should apply to <u>any testimony about the apparatus or testing performed thereon</u>.

The lone case that Kraft cites, <u>Frontier Refining, Inc. v. Gorman-Rupp Co.</u>, 136 F.3d 695 (10th Cir. 1998), supports Keurig. <u>Frontier</u> turned on the plaintiff's decision <u>not</u> to rely on the work product "in any manner" for its claims or defenses. <u>Id.</u> at 704. Here, by contrast, Kraft plans to rely on Mr. Bentley's work product apparatus and testing (and Mr. Rowan's use of the same apparatus) to bolster its invalidity defense. Kraft cannot do so after having denied Keurig access to the full report that Mr. Bentley wrote. <u>Id.</u> ("[A] litigant cannot use the work product doctrine as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion.").

## III.    **Mr. Rowan's Testimony is Inseparable From Mr. Bentley's Work.**

Kraft attempts to preserve Mr. Rowan's testimony on the theory that his testing was "conducted independently" from Mr. Bentley's. (Opp. at 5). Yet Kraft concedes that: (1) Mr. Bentley built the testing apparatus alone; and (2) the apparatus is a subject of the report, all but one page of which Kraft withheld. Kraft chose to withhold the report, and precluded any follow-up discovery during the discovery period or through the present. Kraft thus made it impossible for Keurig to prepare a fair rebuttal to trial testimony about use of the Bentley apparatus (whether offered by Mr. Bentley or Mr. Rowan).[4] The only effective remedy is exclusion.

## IV.    **Conclusion**

For the above reasons, Keurig's Motion *in Limine* No. 1 (D.I. 108) should be granted.

---

[4] For example, Keurig is handicapped in questioning either Mr. Bentley <u>or</u> Mr. Rowan to challenge whether the apparatus was an appropriate basis for the testing in the first place. If the jury were to conclude that attaching the apparatus to a cartridge in essence is a modification of the cartridge, then the results would be irrelevant to Kraft's anticipation case. <u>See</u> Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself to support a finding of infringement."); <u>Mycogen Plant Science v. Monsanto Co.</u>, 243 F.3d 1316, 1324 (Fed. Cir. 2001) ("The tests for infringement and anticipation are very similar, and that which would literally infringe if later in time anticipates if earlier.").

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on September 2, 2008, a true and

correct copy of the foregoing document was electronically filed with the Clerk of the Court using

CM/ECF which will send notification that such filing is available for viewing and downloading to

the following counsel of record:

> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on September 2, 2008, copies of the foregoing

document were served by e-mail on the above-listed counsel of record and on the following non-

registered participants in the manner indicated below:

### BY E-MAIL

> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

> /s/ *Karen E. Keller*
> John W. Shaw (No 3362) [*jshaw@ycst.com*]
> Adam W. Poff (No. 3990) [*apoff@ycst.com*]
> Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
> (302)-571-6600

> *Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED –**<br>**PUBLIC VERSION** |

## KEURIG'S MOTION *IN LIMINE* NO. 2 – MOTION TO PRECLUDE KRAFT'S EXPERT FROM TESTIFYING ABOUT KRAFT'S TESTING OF SINGLES CARTRIDGES

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

Kraft's technical expert Malcolm Taylor should be precluded, under Fed. R. Evid. 702 and 703, from relying on or testifying about experiments that Kraft's employees performed on Kenco Singles cartridges (which Kraft alleges constitute prior art[1]). Mr. Taylor's purported reliance on the Kraft testing does not meet his own criteria for sound engineering practice. Moreover, it would be unfairly prejudicial to Keurig if Kraft's ostensibly neutral expert were permitted to lend his credibility to testing carried out by Kraft's own employees for litigation purposes.[2] The Third Circuit does not allow experts to bolster the credibility of a party's own litigation-driven experimental data by putting a stamp of independent expertise on it.

## I.    BACKGROUND

Mr. Taylor intends to testify that Kenco Singles cartridges embody every element of claim 1 of the patent-in-suit. See Taylor Report (Ex. 1) at 3. He bases his opinion on his "own assessment," including tests that he personally performed, but also proposes to testify that tests carried out by Kraft employees Andrew Bentley and Lee Rowan (in which Mr. Taylor had no involvement) likewise prove the point. See id. at 8-9; Taylor Depo. (Ex. 2) at 173-174.

Mr. Taylor never saw the Kraft testing apparatus, never met with Mr. Bentley or Mr. Rowan, and never even discussed the tests with them by phone. ███████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

---

[1] Keurig disputes whether Kenco Singles cartridges are prior art to Keurig's '762 patent. Moreover, even if they were prior art, the Singles cartridges would not anticipate the '762 patent as Kraft itself has admitted. See Keurig's Motion in Limine No. 1 at 1 n.1 and D.I. 91 at 2-5.

[2] Separately, in its Motion in Limine No. 1, Keurig moves to preclude Kraft's employees from describing their testing ███████████████████ This motion sets forth independent reasons why Mr. Taylor should be precluded from relying on or testifying about the Kraft employees' testing.

Because of the limited information he was provided, Mr. Taylor has little understanding of what the Kraft engineers actually did. For example, Mr. Taylor testified that he thought Mr. Bentley performed the tests reflected in the data sheet marked as Deposition Exhibit 13 (Exhibit 3 hereto), see id. at 118, ███████████████████████████████████ Mr. Taylor assumed that the needles used to pierce the cartridge foil in the Kraft tests came from an existing brewer (Ex. 2 at 123), ████████████████████████████████████ ████████████████ Most significantly, Mr. Taylor admitted that he did not even know whether or not the data he reviewed were generated using the Kraft apparatus. (Ex. 2 at 118-119).

Mr. Taylor's own admissions about what constitute sound engineering practices in this field demonstrate that the Kraft testing, and his review thereof, do not constitute trustworthy methods that an expert might reasonably rely upon in forming a sound conclusion.

According to Mr. Taylor, a competent engineer should be "involved at every step along the way" of such testing, reviewing the work that other engineers on an engineering team are doing "on a daily basis." Id. at 41-43. But here, he did not. In particular, he would expect to receive "all the relevant information" from those performing tests. Id. at 44-45. But in this case, as previously noted, Mr. Bentley's report was withheld from Mr. Taylor (as well as from Keurig). Mr. Taylor emphasized the importance of working together in-person with the test engineers. Id. A competent engineer, he conceded, would not accept others' test results sight unseen, but instead would require personal contact and an opportunity to "look at how they are doing the testing." Id. at 46-47. Merely receiving a written report or compilation of data would not be adequate. Id.[3] In this case, however, Mr. Taylor did not meet any of these standards.

---

[3] In the past, Mr. Taylor followed his own guidelines for sound engineering practice when doing non-litigation consulting for Kraft. He held an in-person meeting and conferred with Kraft's engineers by telephone. Id. at 7-11.

II.     **ARGUMENT**

A.     **Mr. Taylor Should Be Precluded from Testifying About Kraft's Testing Because Experts in the Field Would Not Reasonably Rely on Such Data.**

Fed. R. Evid. 702 and 703 bar Mr. Taylor from testifying about the Kraft employees' testing, as Mr. Taylor's own admissions confirm that a reasonable engineer in Mr. Taylor's position would not rely on such data. Mr. Taylor had no involvement in the testing, was provided with extremely limited information about it, and ultimately came away from his "review" with considerable confusion about the facts.

In other words, trial testimony from Mr. Taylor regarding the Kraft testing would not be "the product of reliable principles and methods." Fed. R. Evid. 702. Nor do the three pages of results and corresponding deposition testimony constitute data "of a type reasonably relied up by experts" in the field. Fed. R. Evid. 703. The Court conducts an "independent evaluation" of whether these standards are met based on the evidentiary record, In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 748 (3d Cir. 1994), and Mr. Taylor's own description of ordinary engineering practice confirms that any testimony from him regarding Kraft's testing would not pass muster. See Cummins v. Lyle Indus., 93 F.3d 362, 369-72 (7th Cir. 1996) (affirming exclusion of expert testimony based on information that experts in the field would not reasonably rely upon: "Rule 702 is designed to ensure that, when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work.").

The situation here mirrors In re TMI Litigation, 193 F.3d 613 (3d Cir. 1999), in which the Third Circuit affirmed exclusion of a doctor's expert opinion because it was based on summary sheets of self-reported patient medical data, prepared (like the Kraft testing apparatus and data) by the plaintiff for use in the litigation. Id. at 698. The court ruled that the physician should have examined the patients herself, or at least should have reviewed their full medical files. Id.

-3-

Here, Kraft did not even provide Mr. Taylor with a copy of Mr. Bentley's report – something

Mr. Taylor conceded that he would have been interested in seeing. (Ex. 2 at 132). The limited

information that Kraft's lawyers did provide to Mr. Taylor (three isolated pages and deposition

transcripts) plainly is not the sort of data on which an engineer would ever rely to reach a reliable

real-world conclusion, as Mr. Taylor admits.

The Third Circuit likewise affirmed the exclusion of a defendant's expert because he had

relied on documents prepared by the defendant, yet "could not identify the source or basis of"

those documents. Montgomery County v. Microvote Corp., 320 F.3d 440, 448-49 (3d Cir.

2003). The same is true here. Kraft gave Mr. Taylor three isolated pages of results, and he

admitted at deposition to being unfamiliar with their origin, to the point that he was unsure

whether or not they in fact reflect tests performed with Kraft's apparatus. (Ex. 2 at 118-119).

Under these circumstances, any testimony from Mr. Taylor about the Kraft testing would

be nothing more than "statements from [Kraft] employees dressed up to look like expert

testimony. As such, it is inadmissible." Hot Wax, Inc. v. Warsaw Chem. Co., 45 F. Supp. 2d

635, 639 (N.D. Ill. 1999). While Mr. Taylor can describe his own testing, he should not be

allowed to bolster his testimony by referencing the opinions of others – let alone the work of

interested lay witnesses like the Kraft employees. Mike's Train House v. Lionel, LLC, 472 F.3d

398, 409 (6th Cir. 2006); TMI, 193 F.3d at 706 (calling such a tactic "the intellectual equivalent

of having the left hand put the rabbit into the hat so it can be pulled out by the right hand").

Mr. Taylor's departure from his usual engineering practice is particularly unreasonable

here ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

However, "reports specifically prepared for purposes of litigation are not, by definition, 'of a type reasonably relied upon by experts in the particular field.'" United States v. Cuong, 18 F.3d 1132, 1143 (4th Cir. 1994); see also Soden v. Freightliner Corp., 714 F.2d 498, 503 (5th Cir. 1983) (noting that expert opinions relying on information "prepared strictly in anticipation of litigation … properly signal a trial judge to make a critical review of their bases").  Reliance by Mr. Taylor on litigation-driven testing by Kraft employees – testing with which Mr. Taylor has only a rudimentary familiarity in any event – would improperly lend his neutrality and credibility to that testing, which would unfairly prejudice Keurig and confuse the jury.

> B.     **The Probative Value of Kraft's Testing Does Not Substantially Outweigh Its Prejudicial Effect on Keurig.**

Mr. Taylor should be precluded from discussing the results described in Kraft's three one-page summaries (Exs. 3, 4, 5) for the additional reason that these documents are otherwise inadmissible hearsay and their probative value does not substantially outweigh their prejudicial effect.  Rule 703 "clearly establishes a presumption against disclosure to the jury of otherwise inadmissible evidence." Pineda v. Ford Motor Co., 520 F.3d 237, 247 n.14 (3d Cir. 2008); see also Turner v. Burlington N. Santa Fe R.R. Co., 338 F.3d 1058, 1062 (9th Cir. 2003) (precluding expert testimony based on third-party lab report that was otherwise inadmissible hearsay).  There is little probative value to Mr. Taylor opining on the Kraft tests since he concedes that his opinion does not depend on them.  (Ex. 2 at 174).  By contrast, the prejudice to Keurig would be palpable if Kraft were permitted to mask the litigation bias inherent in data generated by Kraft's own employees by introducing that testing through an outside expert.

## III.    CONCLUSION

Keurig asks the Court to preclude Kraft's technical expert Mr. Taylor from relying on or testifying about experiments that Kraft's own employees performed on Kenco Singles cartridges.

-5-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

               Plaintiff,

      v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

             Defendants.

C.A. No. 07-17 (GMS)
**CONFIDENTIAL--ATTORNEYS'
EYES ONLY**

**JURY TRIAL DEMANDED**

**<u>EXPERT WITNESS REPORT OF MALCOLM E. TAYLOR</u>**

I.    *Curriculum Vitae* **of Malcolm E. Taylor**

I, Malcolm E. Taylor, have been informed that I should expect to testify on behalf of defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc., as an expert witness. My *curriculum vitae*, which is summarized below, is attached as Exhibit 1.

I am a resident of the state of New Hampshire; I reside at 618 Kearsarge Mountain Road, Warner, NH 03278.

I was educated at Liverpool College of Technology in Liverpool, United Kingdom, where I earned a B.S. in Mechanical Engineering in 1957.

I was employed for 28 years with Foster-Miller, Inc. ("FMI"), a technology and product development company. Currently, I am semi-retired and work as a Senior Staff Engineer with FMI on a consulting basis, but I also have relationships with other technology development companies. Prior to my retirement from FMI, I served as a Division Manager where I acted as a program manager, supervising projects and providing my technical expertise. My expertise lies primarily in product development and production systems, and in particular, the packaging of products, design/build of medical devices - disposable and reusable, and the automatic assembly or processing of multiple parts. For example, I worked on projects related to consumer packaging design; packaging and retort of food products; investigating problems with foil packaging; cold-formed foil packaging and lid stock with foil layers; injection molded, thermoformed, blow-molded plastics; adding gas barriers to permeable materials; and automatic assembly and packaging of consumer and medical products.

I am recognized as an expert in the field of product development, production design, and machine development, with over 40 years of experience as a design engineer. I am listed as inventor or co-inventor on at least 20 U.S. patents. I have not served as an expert witness in the previous 4 years, either at a trial or by deposition. Prior to my retirement, I was a longtime

member of both the American Society of Mechanical Engineers and the British Institution of Mechanical Engineers. My consulting fee for this case is $350 per hour.

## II.  Scope of Expert Representation

I have been informed that Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (the "Kraft Defendants") have been accused by the plaintiff, Keurig, Incorporated ("Keurig"), of infringing claims 1, 2, 8, 9 and 10 ("asserted claims") of U.S. Pat. No. 6,607,762 ("the '762 Patent"). I have been retained by the law firm of Baker Botts L.L.P. on behalf of the Kraft Defendants to formulate and render my independent opinion regarding whether the elements in the asserted claims are embodied or disclosed in certain prior art. I was told that I may be asked to provide a rebuttal report relating Keurig's infringement allegations. I have also been told that I will be asked to testify at trial.

## III.  Summary of Opinions

In my opinion, the Kenco Singles™ Cartridge, and more specifically the Kenco Singles™ Medium Roast Cartridge, embodies each and every limitation of claims 1, 2, 8, 9 and 10 of the '762 Patent. Furthermore, U.S. Patent No. 4,853,234 to Bentley *et al.* discloses each and every limitation of claims 1, 2, 8, 9 and 10 of the '762 Patent. In addition, U.S. Patent No. 4,452,130 to Klein discloses each and every limitation of claim 1 of the '762 Patent, and can be combined with the teachings of references in the consumer packaging field, which were available prior to the filing of the '762 Patent, with regard to the additional limitations described in claims 2, 8, 9 and 10 of the '762 Patent. The disclosure of both the '234 and '130 Patents would permit a person of ordinary skill in the consumer packaging field to construct the beverage filter cartridges illustrated in those patents.

3

My opinions with regard to the '762 Patent are based upon, among other things, my review of the '762 Patent; the Court's Order Construing the Terms of the '762 Patent of January 23, 2008; prior art cited during the prosecution of the '762 Patent; the Tassimo® disc ("T-disc"); the Kenco Singles™ Cartridge, and in particular the Kenco Singles™ Medium Roast Cartridge; U.S. Patent No. 4,853,234 ("the '234 Patent") to Bentley *et al.* entitled "Beverage Packages;" U.S. Patent No. 4,452,130 ("the '130 Patent") to Klein entitled "Electrical Apparatus Useful to Prepare a Hot Beverage;" certain deposition testimony and exhibits to depositions; and other documents and information, as well as my professional knowledge and experience.

I have attached a list of the documents and information I considered as Exhibit 2.

The specific reasons for my opinions follow below.

## IV.    The '762 Patent

### A    Person of Ordinary Skill

I have been asked to render an opinion as to what would be the qualifications of a person of ordinary skill in the art of the '762 Patent as of December 1999. The "art" at issue in the '762 Patent is consumer packaging. In December 1999, a person of ordinary skill in this art would have had a bachelor of science degree in materials science, package/packaging engineering, or mechanical engineering with at least two years relevant design experience in consumer packaging. Such a person would be familiar with materials used in consumer packaging, as well as the physical properties of such materials, and the production techniques used to fabricate consumer packaging.

### B    Prior Art Applied to Asserted Claims of '762 Patent

I was asked whether the elements of claims 1, 2, 8, 9 and 10 of the '762 Patent are embodied by the Kenco Singles™ Cartridge and disclosed by the '234 and '130 Patents. Below,

I have outlined my analysis for my conclusions with regard to each of the asserted claims of the '762 Patent. For claim 1, I broke down my analysis on a limitation by limitation basis.

These are the elements of claims 1 and 10[1] of the '762 Patent that I was looking for in the prior art I evaluated:

A beverage filter cartridge comprising:

(a) an outer container having an access opening;

(b) a [planar] filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers;

(c) a soluble beverage medium stored in said first chamber; and

(d) a lid closing said access opening, [said lid and said outer container being impermeable to liquids and gases,]

(e) said lid having a first section overlying said first chamber and a second section overlying said second chamber,

(f) the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage,

(g) said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and

(h) the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge

1.      Kenco Singles™ Medium Roast Cartridge

My analysis is based on my physical inspection of the Kenco Singles™ Medium Roast Cartridge ("Kenco Cartridge") where I removed the laminate foil lid and inspected its internal

---

[1]  Claim 10 differs from claim 1 in that claim 10 recites a "planar" filter element and that the lid and outer container are "impermeable to liquids and gases." These additional limitations of claim 10 are included in brackets.

structure. Exhibit 3 illustrates where the limitations of claim 1 of the '762 Patent are present in the Kenco Cartridge. I have reviewed the specifications of the Kenco Cartridge manufactured on the Rychiger line, and the Cartridge, in all material respects has remained unchanged since January 1995. MacMahon Depo. Tr. (Ex. 4) 208-18; PD 4439, Issue Nos. 4-7 (Ex. 5);. In addition, I have reviewed the specification for the foil laminate lid of the Kenco Cartridge, and the lid material is the same since November 1995. MacMahon Depo. Tr. (Ex. 4) 218-29; PD 4446, Issue Nos. 3-8 (Ex. 6). My analysis of the '762 Patent in view of my physical inspection of the Kenco Cartridge is as follows:

a.     Independent Claim 1

**(a) an outer container having an access opening:**

Upon observation and inspection of the Kenco Cartridge, it is my opinion that it includes an injection molded container having an access opening. This is also seen in drawings of the container manufactured on the Rychiger line. Defs.' Ex. 4 (PD 4439, Issue No. 3 marked by John MacMahon) (Ex. 7); PD4439 (Ex. 5).

**(b) a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers;**

I was told to use the Court's definition of first and second chambers. Using the Court's definition, upon observation and inspection of the Kenco Cartridge, upon observation and inspection of a partially assembled Kenco Cartridge, and upon review of the relevant detailed drawings and specifications, it is my opinion that the assembled filter element subdivides the container interior into first and second chambers. MacMahon Depo. Tr. 217-19 (Ex. 4).

6

**(c)  a soluble beverage medium stored in said first chamber; and**

Whole coffee beans and whole tea leaves are of themselves not soluble.  Nevertheless,

when coffee beans are ground into small particles (approximately a millimeter or less) and tea

leaves are cut into small flakes, water soluble components of the beans and leaves are exposed.

These water soluble components can be leached or extracted out of bean grounds and tea by

means of flowing, suitably hot, water.  Thus, "soluble beverage medium" describes ground

coffee beans and/or cut tea leaves.  The liquor derived from the beverage extraction will be a mix

of beverage solids and water.  Upon inspection and observation, ground coffee is stored in the

first chamber (coffee storage chamber) of the Kenco Cartridge.

**(d)  a lid closing said access opening,**

Upon inspection and observation of the Kenco Cartridge, it includes an unprinted foil

laminate lid that provides a complete closure of the access opening.  This is also seen in the

specification for the lid.  PD 4446 (Ex. 6), Issue Nos. 4-6.

**(e)  said lid having a first section overlying said first chamber and a second section**
**overlying said second chamber,**

Upon observation and inspection of the completed Kenco Cartridge, upon observation

and inspection of a partially assembled Kenco Cartridge, and upon review of the relevant

detailed drawings and specifications, it is my opinion that the foil laminate lid has a first section

which overlies a first chamber and also has a second section which overlies a second chamber,

namely the coffee storage chamber and the liquid outlet chamber.  Assembled Cartridge (Ex. 3);

PD 4446 (Ex. 6), Issue Nos. 4-6.

**(f)  the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage,**

The foil laminate lid is formed of a 60μ layer of polypropylene, a 9μ layer of aluminum, and a 12μ layer of polyester.  PD 4446.  Based on my many years of experience with consumer packaging materials, and upon observation and inspection, I know that a lid of this material and thickness is capable of being pierced to permit a flow of liquid into the coffee storage chamber.

Flexible aluminum foils have been employed for many years in the medical industry and the food industry where high barrier to water vapor and gas loss/gain is important.  Foils have been provided where it is necessary to easily gain access to containers by peeling, tearing, piercing, or breaking, and have been incorporated into laminates with plastics and papers to provide different properties.  Thicker foils have been used for cold forming structures, thinner foils, with no real structural strength, have been used for purely barrier purposes.

The lid of the Kenco Cartridge is an example of a thin lid that closes an opening, provides barrier to water vapor and gas, and is easily pierced.  Piercing tubes of several different configurations could be employed to easily pierce the foil lamination and allow unrestricted water flow into the first chamber.  The foil laminate used for the Kenco Cartridge's lid is easily pierced since the 12μ polyester layer is merely there to protect the 9μ aluminum layer.  The main resistance to piercing, therefore, is the 60μ layer of polypropylene, which being somewhat stretchy, can be easily pierced by anything approaching a semi-sharp edge.

It is readily apparent that the first section of the lid is capable of being pierced to permit a flow of liquid into the coffee storage chamber.  This was confirmed by tests on the Kenco Cartridges carried out by Messrs. Andrew Bentley and Lee Rowan establishing that the first section of the lid is piercable to accommodate an inflow of liquid into the first chamber for

8

infusion with the beverage medium to produce a beverage.[2]  Mr. Rowan tested twenty Kenco

Singles™ Medium Roast Cartridges manufactured on the Rychiger lines.  In his tests, he pierced

the laminated foil lid sections overlying both the coffee storage and liquid outlet chambers with

inlet and outlet needles, respectively.  Hot water flowed through the inlet needle into the coffee

storage chamber and infused the coffee grounds.  The coffee liquor flowed through the filter into

the liquid outlet chamber and flowed out of the Kenco Cartridge through the outlet needle.

Rowan Depo. Tr. (Ex. 11) 122, 124; Pl.'s Ex. 13 (Ex. 12).  Separately, Mr. Bentley, tested twelve

Kenco Cartridges manufactured on the Rychiger lines.  Mr. Bentley's tests were identical to Mr.

Rowan, except that the lid was pierced at a number of location over the coffee storage chamber.

First Bentley Depo. Tr. (Ex. 13) 43-45; Pl.'s Exhibit 91 (Ex. 14).

Moreover, I performed my own test with a hypodermic needle to brew a beverage using a

Kenco Cartridge.  First, I pierced the foil lid over the liquid outlet with a sharp object.  Next,

using a hypodermic needle filled with hot water, I injected the hot water directly into the coffee

storage chamber through the overlying foil.  When injecting the hot water, I held the Kenco

Cartridge in a vertical position as shown in Figure 5 of the '762 Patent.  I then saw coffee liquor

exit the Cartridge through the outlet hole.[3]  This result is consistent with the tests performed by

Messrs. Rowan and Bentley.  Thus, it is clear that the lid of the Kenco Cartridge is capable of

being pierced to permit a flow of liquid into the coffee storage chamber.

---

[2]  I was shown a second Kenco Cartridge, Gevalia French Vanilla, where the top inlet hole was open, but was
otherwise identical to the Kenco Singles™ Medium Roast Cartridge that I inspected.  This open hole did not change
the piercability of the foil laminate lid nor did it affect the flow of the beverage through the container, as
demonstrated by my own test with a hypodermic needle and the tests on these open-inlet cartridges performed by
Mr. Bentley.  Second Bentley Depo. Tr. (Ex. 8) 4-8; Pl.'s Ex. 202 (Ex. 9).  Nevertheless, I have been shown
production records that clearly demonstrate that all Kenco Singles™ Medium Roast Cartridges produced from
November 1996 through 1998 have a closed top inlet hole.  Kenco Singles™ Medium Roast Cartridge Production
Records (Ex. 10).

[3]  I also performed the test on a Cartridge with the open top inlet hole, and the results were identical.

**(g)  said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and**

Upon observation and inspection of a partially assembled cartridge, based on my years of personal experience with disposable device filters and the confirming tests carried out by Messrs. Bentley and Rowan, I am of the opinion that the filter element is permeable to liquid and will accommodate a flow of beverage from the first chamber into the second chamber.  It would be clear to a person of ordinary skill in the consumer packaging field  that the Kenco Cartridge's filter is permeable because a liquid beverage passes through the outlet and yet holds back the coffee grounds. In my personal test, only coffee liquor exited the outlet hole, and I did not observe any coffee grounds.

**(h)  the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge.**

In light of my opinion expressed with regard to the piercability of the first section of the lid, and confirming tests carried out by Messrs. Bentley and Rowan, it is also my opinion that the second section of the lid laminate is piercable to accommodate an outflow of beverage from the second chamber to the exterior of the cartridge.  The foil laminate used for the cartridge lid covers the entire access opening, including both the coffee storage and liquid outlet chambers. Thus, as discussed above, the foil laminate lid can be easily pierced by anything approaching a semi-sharp edge.  This was confirmed by my personal test, where the lid over the outlet was easily pierced and coffee liquor flowed out of the resulting hole.  Thus, it is clear that the lid section above the liquid outlet is capable of being pierced to permit the beverage passing through the filter to flow out of the Kenco Cartridge.

# EXHIBIT 2

# In The Matter Of:

*KEURIG, INCORPORATEDv.*
*KRAFT FOODS GLOBAL, INC*

_____

## *MALCOLM E. TAYLOR*
*July 3, 2008*

_____

## *MERRILL LEGAL SOLUTIONS*

### *101 Arch Street, 3rd Floor*
### *Boston, MA 02110*
*PH: 617-542-0300 / FAX: 617-338-6075*

**TAYLOR, MALCOLM E. - Vol. 1**

Page 6

1  Q. My name is Mike Rader. My colleague is Charlie
2     Steenburg. I'm going to be asking you some
3     questions today obviously.
4        Have you had your deposition taken before?
5  A. No.
6  Q. Have you ever served as an expert witness in
7     litigation before?
8  A. No.
9  Q. Do you understand that whenever I ask a question,
10    you need to answer verbally?
11 A. Yes.
12 Q. And we'll try to go quickly given the timing, but if
13    you do need to take a break, will you just let me
14    know?
15 A. Sure.
16    MR. SCHLITZ: Every hour or so I'm going
17    to insist we take a break. It's tiresome and
18    tedious to be asked questions, so we will take a
19    break along the way.
20    BY MR. RADER:
21 Q. Do you understand that if Mr. Schlitz makes an
22    objection to a question that I ask you, you still
23    need to answer the question?
24 A. Yes.

Page 7

1  Q. Prior to working on this case, did you ever do any
2     work for Kraft?
3  A. Yes.
4  Q. Can you describe that work?
5  A. Yes. I, along with others in FMI which is where I
6     used to work which is Foster-Miller, we had worked
7     in '06 on the Tassimo device.
8  Q. What was the nature of your work on Tassimo?
9  A. We were doing some conceptual work on the design.
10    It was really an advanced design to -- actually, on
11    one hand improve some things on it. Others were to
12    incorporate maybe the milk, for example, into the
13    package.
14 Q. Were you working on the cartridges or the brewer?
15 A. On the cartridges. We were not involved with the
16    brewer at all.
17 Q. Do I understand correctly Foster-Miller was hired as
18    some kind of consultant to Kraft?
19 A. Yes, that's fine. Yes, we were.
20 Q. You were an employee of Foster-Miller at the time.
21    Are you since retired?
22 A. I'm semi-retired, but I am retired from FMI.
23 Q. FMI is Foster-Miller, Inc.?
24 A. Yes, right.

Page 8

1  Q. Do you still do any work with FMI?
2  A. Yes, I do on a consulting basis.
3  Q. Are you still doing any work for FMI that relates to
4     Kraft?
5  A. Not at this moment.
6  Q. How recently were you doing work at FMI that related
7     to Kraft?
8  A. It was '06 -- 2006.
9  Q. How long did that project last?
10 A. It lasted for about six months, I think.
11 Q. All during 2006?
12 A. Yes, in the early part.
13 Q. And more specifically what were you working on with
14    regard to the T-disc cartridge?
15 A. We were looking at a number of concepts for
16    improving the construction. One aim was to reduce
17    the costs. We were looking at options in the
18    barrier issues. We were looking at issues in
19    structure which would make it easier in assembly and
20    basically areas like that. I think we had about six
21    concepts all together.
22 Q. What do you mean when you say six concepts?
23 A. Six ideas, if you like.
24 Q. Six parts of the project?

Page 9

1  A. No, no. These were different design ideas, if you
2     like, which may be made into a design on its own had
3     we gone ahead with them. As it happened we didn't
4     go ahead with them. They were offered as concepts
5     which is really ideas, and they were left at that
6     stage at Kraft, I believe, after the middle of '06.
7  Q. So are you saying that Kraft decided not to
8     implement any of the suggestions that you made?
9  A. Yes. I believe so, yes.
10 Q. How did the consulting engagement with Kraft get
11    started?
12 A. It was started through Ed Goldman most likely who is
13    over marketing and over the group basically within
14    FMI. We have done work in other departments within
15    Kraft, so we knew individuals at Kraft, not
16    specifically in England, but in other areas over
17    here in the U.S.
18 Q. What other work had you done for Kraft in the past?
19 A. The other work involved working the cheese area up
20    in the Chicago area, I think. We had done several
21    things up there, but nothing else in the coffee
22    area.
23 Q. And during what time period did you do work in the
24    cheese area for Kraft?

3 (Pages 6 to 9)

1  A. That would have been probably around 2000-ish. I'm
2     not sure exactly the date. I can't remember.
3  Q. That's fine. Aside from the cheese work that you
4     did and the work that you did in '06 on the T-disc,
5     was there anything else that you've done for Kraft
6     over the years?
7  A. No, not that I can remember.
8  Q. Were you the person that Kraft approached for the
9     T-disc project or was there somebody else in the
10    company?
11 A. It would have been Ed Goldman who is the VP of our
12    group basically.
13 Q. And how did you end up getting assigned to that
14    project?
15 A. Mainly because I was a senior engineer and because I
16    have a lot of experience and background in
17    disposable packages in working in the medical
18    industry amongst other things and other companies on
19    and off over the years, some of which are in the
20    coffee industry, not specifically in this area, but
21    overall related to coffee in some way or another.
22 Q. Did you work with any engineers at Kraft during the
23    T-disc project?
24 A. Yes. Mostly based in England.

1  Q. Who are those engineers?
2  A. The only one I can remember is Lee Rowan, I think.
3     I don't remember the other guys to be honest.
4  Q. Does the name John MacMahon ring a bell?
5  A. Not from that time. I have read his deposition of
6     course, but no, I don't recollect that name at the
7     time.
8  Q. Did you have any contact with Andrew Halliday
9     regarding the T-disc?
10 A. Not that I can remember anyway.
11 Q. What about Andrew Bentley?
12 A. No, I don't remember their names at all. There
13    were -- you know, we had met with only one or two
14    individuals who were over with us in the U.S., and
15    to be really honest, I'm not even sure who they were
16    right now. I don't think it was Lee.
17 Q. During that T-disc project that you did, did you
18    travel to the U.K. to their facility?
19 A. No, we didn't.
20 Q. You had a meeting in the U.S.?
21 A. We had a meeting in the U.S. We had a meeting on
22    the phone with them at one stage when we had all the
23    concepts together, so we had a conference with them
24    on the phone.

1  Q. Did your work on the T-disc relate in any way to the
2     pierceability of the lid?
3  A. No.
4  Q. Did it relate to the fluid flow in the cartridge at
5     all?
6  A. No. No, it did not.
7  Q. You mentioned barrier issues. What was that about?
8  A. Oh, it was on the overall container. We were
9     looking at options of making a design which would
10    largely improve the barrier.
11 Q. Just in general what kinds of options were you
12    looking at?
13 A. We were looking at fillers in the propylene. We had
14    also looked at coatings as well as a barrier. They
15    are both viable, so --
16 Q. During that consulting engagement did you become
17    aware of the singles cartridge technology?
18 A. No, we did not.
19 Q. So was the first time that you became aware of the
20    singles cartridge technology in connection with your
21    consulting for this case?
22 A. With this case, right.
23 Q. Had you ever seen it or used it in your life before?
24 A. No, I had not.

1         MR. RADER: Just to read into the record,
2     so far I've marked three exhibits; No. 1, entitled
3     Expert Witness Report of Malcolm Taylor; No. 2,
4     Rebuttal Expert Witness Report of Malcolm Taylor;
5     and No. 3, List of Documents and Information
6     Considered.
7  Q. Are Nos. 1 and 2, are those the two expert
8     reports --
9  A. Yes.
10 Q. -- that you prepared?
11 A. Yes.
12        MR. SCHLITZ: Let me just say, so that the
13    record is clear, wait for him to finish his question
14    and then you can answer because otherwise it's
15    difficult for the court reporter.
16    BY MR. RADER:
17 Q. No. 3, is that the list of -- we took No. 3, by the
18    way, from your rebuttal report. Is that the list of
19    everything that you reviewed?
20 A. It looks like it is. I haven't looked at it. Yes,
21    it is.
22 Q. Okay.
23 A. Yes.
24 Q. So Exhibits 1 and 2, these two reports, is it fair

Page 38

1   his CV, Professor Slocum would be unable to do that?
2 A. I don't think he has background to understand,
3   mainly because he doesn't have the experience. I'm
4   not saying he isn't able to understand at all, but
5   he doesn't have the experience. That's really all
6   I'm saying. He could learn it, I'm sure.
7 Q. If it turned out that he had enough experience to do
8   that, would you change your opinion about whether he
9   was one of skill in the art?
10 A. No, because I still believe you need experience in
11   all the processes which are used in packaging design
12   and also assembly in the way of machinery, et
13   cetera.
14 Q. You didn't talk to Professor Slocum in the course of
15   your work on the case, did you?
16 A. No, I have not.
17 Q. Did you review his publications?
18 A. No. There was a long list of them, and I didn't
19   review them.
20 Q. Did you look at the patents that he is an inventor
21   on?
22 A. I looked at them in title only, but that's all.
23 Q. You didn't pull the patents themselves?
24 A. No, I did not. I'm sure he is a bright guy.

Page 39

1 Q. So I guess my question is, how did you conclude that
2   he wasn't one of skill in the art without having
3   done any of that investigation, finding out whether
4   he has the skills you've been describing?
5 A. We have many PhDs in FMI. I have worked with many
6   of them in materials, and I've worked with others in
7   mechanical engineering. I've known professors at
8   MIT over the years because I have worked with them
9   at specific times, and I know well enough that if
10   you are an academic 80 percent of the time, you are
11   not, No. 1, a design engineer and, No. 2, a
12   not really an experienced packaging engineer.
13 Q. So you are assuming that he doesn't have those
14   skills or spend much of his time in those things; is
15   that fair to say?
16 A. Exactly.
17 Q. If that assumption turned out to be wrong, would you
18   revisit your conclusion?
19 A. If it was proven at any time, sure.
20 Q. Now, in the field of consumer packaging, let's call
21   it, what does one of skill in the art in that field
22   ordinarily do at a company?
23 A. Well, he would be involved in designing packages for
24   a specific use, whether it's for packaging a liquid,

Page 40

1   a solid, powders, whether it's for packaging a
2   protection around a device in the medical industry,
3   whether it's around a drug, and all these elements,
4   whether it's pills or liquids or powders, have been
5   packaged in flexible packaging over the years which
6   have needed a barrier all the way around, not only
7   in the lid, but in the base all the way around.
8   Some packages out there are made out of aluminum
9   entirely.
10 Q. Does a consumer packaging engineer -- in your
11   experience, do people like that work on teams? Do
12   they work alone? How does that work?
13 A. If you are working in a larger company, they more
14   often would work as a team, less as an individual.
15   If you are working for an R&D company like FMI, one
16   normally works in small groups where you'd have a
17   lead engineer and a designer. You would work maybe
18   with somebody else on graphics or somebody involved
19   in the user interface.
20 Q. So is it commonplace to split up projects into
21   pieces that different members of the team would do?
22 A. Yes. Once everybody is aware of the overall
23   objective, if you like, sure, that would be normal.
24 Q. And how do you then fit those pieces together?

Page 41

1 A. Well, it's up to the lead engineer to keep overall
2   control on the project as a whole, and he would
3   supervise individuals who are looking after graphics
4   and individuals in materials, on looking ahead at
5   how you would make it in the long run, and
6   production, what machinery is available, whether
7   it's available as is or whether you have to design
8   and build machinery on a specialty basis.
9 Q. And have you been a lead engineer on those kind of
10   teams?
11 A. Yes, I have.
12 Q. In the consumer packaging area?
13 A. I have. Yes, I have.
14 Q. In the contents of, you know -- I know you
15   distinguish between consulting companies and product
16   companies, but in the context of a company like
17   Kraft or Keurig, it would be more of the team
18   concept?
19 A. Yes. It would be, yes.
20 Q. And does the lead engineer have to evaluate the work
21   that's done by the people working under him on the
22   team?
23 A. Yes, he does usually on a daily basis all depending
24   on the urgency of the project.

11 (Pages 38 to 41)

Page 42

1  Q. How does that work?  Is it through meetings or memos
2     or what?
3  A. Meetings, e-mails, memos, personal one-to-one, all
4     depending on the urgency or importance of the aspect
5     that you are looking into, and sometimes you have to
6     work with a company on the outside, you know, a
7     supplier of materials.
8  Q. In your experience as lead engineer, did you have
9     people working under you that prototyped devices for
10    you?
11 A. Yes.
12 Q. How would you evaluate the effectiveness of that
13    prototyping?
14 A. Well, depending on the level of prototyping, if it
15    was fairly involved, you might work with a machine
16    company who would ultimately make an automatic
17    machine which would assemble each of the elements in
18    the package, and he would work with you on the
19    development basis or if it's a fairly simple package
20    where you could easily make up a model in the lab,
21    then you do it in-house.  That would all depend on
22    the complexity and all the rest of it.
23 Q. So in good engineering practice, does the lead
24    engineer himself examine the prototype or can you

Page 43

1     just rely on the people under you?
2  A. No.  He would be involved at every step along the
3     way.
4  Q. So you would personally examine the prototype to see
5     how it worked?
6  A. Because you are developing it, you want to make sure
7     that all the objectives that you are looking at in
8     the design specification are being met.  It's okay
9     to have a rough design where you are doing a test
10    rig and, you know, you have a leak here and a leak
11    there.  It isn't important.  You are looking at the
12    overall concept to make sure the overall concept is
13    working, then as you move along you develop other
14    issues in the process of whatever else you are
15    developing.
16 Q. Do you sometimes get memos from people on the team
17    or from outside consultants or vendors about
18    different parts of the project?
19 A. Once in a while if you are working in an area where
20    you would need a consultant then you might have to
21    hire one, but if it's within our own area of
22    expertise, obviously we wouldn't.
23 Q. But in terms of the work product that goes in along
24    the way in these projects, how does that work?  Do

Page 44

1     people write up memos or logbooks about the --
2  A. Yes, yes, yes.  I'm sorry.  You do have a logbook
3     that you update every -- usually at the end of the
4     day so you know what you've done.  If you didn't,
5     you wouldn't have any reliable data at all because
6     as you develop you may have to back up and you may
7     have to go in a different route if you are up
8     against a block somewhere.
9  Q. Are there standards for good engineering practice
10    about how much detail you need in those logs or
11    memos?
12 A. No, not really.  It really depends on what your
13    objectives are and how rapidly the whole thing is
14    moving along.  You would have timelines all
15    depending on how large the program is altogether,
16    and you'd have an objective to reach each stepping
17    stone, if you like, which would offer you a
18    benchmark on how things are going, and if everything
19    is working as it ought to be, then you maybe have a
20    meeting at that stage and you move on.
21 Q. As the lead engineer would you expect the people
22    working under you to communicate to you all of the
23    information that they had recorded about the stuff
24    they are working on?

Page 45

1  A. Yes.  At least all the relevant information, sure.
2     In other words anything that related to functional
3     operation which was critical, if you like.
4  Q. So if somebody working under you was testing a
5     prototype or a product, you'd expect to get all the
6     reports that they generated about that testing?
7  A. Yes, or I'd go and look at it myself.
8  Q. Would your standards for evaluating written work
9     product be any different when you are dealing with
10    an outside consultant that's not within your own
11    company?
12 A. No.  It would be the same, I think.
13 Q. You'd expect the outside people to adhere to the
14    same standards --
15 A. Yes.
16 Q. -- of your own company?
17 A. Absolutely.
18 Q. You'd communicate those standards to them?
19 A. When you say a standard, there really isn't any
20    standard per se of engineering effort, if you like.
21    There are engineering standards involved in design
22    and drawing and symbols and all that stuff.  That's
23    a standard, but as far as how you organize your
24    work, how you do your work on a day-to-day basis is

12 (Pages 42 to 45)

Page 46

1 usually up to the lead engineer or whatever, you
2 know.
3 Q. If you had hired an outside company to do some
4 testing of a product or prototype, would you expect
5 to have the opportunity to speak to them directly
6 about their results?
7 A. Absolutely. You would work with them on a
8 day-to-day basis, even to go over there to visit
9 with them. Absolutely.
10 Q. So would it be enough to get from them just a
11 written report or a compilation of data or would you
12 need to be able to interact?
13 A. You'd have to interact, yes.
14 Q. Why is that so important?
15 A. Well, if you've got a product that you are
16 developing and you are responsible for making it
17 work, whatever it is, then you want to make sure
18 that the vendor or consultant is in line with what
19 you are thinking.
20 Q. And if they say they've done a test, would you take
21 their word for it --
22 A. No, I wouldn't.
23 Q. -- that it's the right test or would you --
24 A. No. I would visit with them. We'd have a meeting.

Page 47

1 We'd have a look at how they are doing the testing.
2 Q. Okay. Now, I'd like to grab a --
3    MR. SCHLITZ: We've gone for an hour. If
4 you want to go for more, I don't want to go for more
5 than another ten minutes, so if you want it take a
6 break now or you want to --
7    MR. RADER: Let's take a short break.
8 That's fine.
9    (Recess.)
10    (Exhibit 5, Cartridge marked for
11    identification.)
12 BY MR. RADER:
13 Q. Mr. Taylor, we've marked a cartridge as Exhibit 5,
14 and that's a single cartridge; is that correct?
15 A. Yes.
16 Q. When you worked on this case you had a chance to
17 study those?
18 A. Yes.
19 Q. Can you describe in your own words how that
20 cartridge works in its normal operation?
21 A. Yes. The blank at the bottom of the hole on, if you
22 like, the top side is pushed into the cartridge.
23 Water is introduced, runs along the channels on the
24 inside and then into the coffee bed. Water runs up

Page 48

1 through the coffee bed, up through the filter into
2 the chamber which is up above the filter and then up
3 and over into the outlet which is on the opposite
4 end. That's it basically. It's a simple operation.
5 Q. Okay. I'll just try to break it down a little bit.
6 When the cartridge goes into the machine, is it foil
7 up or foil down?
8 A. Foil down.
9 Q. And there is a beveled inlet at the part that goes
10 into the machine first; is that right?
11 A. I've never looked at the singles machine, but I
12 assume it enters in this way.
13 Q. And so on one end of the singles cartridge there
14 is -- it's square, and on the other end it's got
15 like a point to it?
16 A. Yes.
17 Q. And on that end with a point there is a beveled
18 inlet in the hard plastic case?
19 A. Yes.
20 Q. And that's where you are saying the water inlet
21 device punctures through?
22 A. Yes. It pushes out the blank at the bottom of the
23 hole.
24 Q. Did you look at some -- just as an aside, did you

Page 49

1 look at some cartridges -- some singles cartridges
2 that didn't have that blank there?
3 A. Yes, they just have a hole.
4 Q. So in that case the inlet device just goes right
5 into the hole without having to punch out a blank?
6 A. Right.
7 Q. It then introduces the water through that hole into
8 a manifold; is that correct?
9 A. Yes.
10 Q. And then the water feeds through the slots in the
11 manifold into the coffee bed?
12 A. Yes.
13 Q. And then the resulting liquid goes through -- in the
14 orientation when it's brewing it goes up through the
15 filter?
16 A. Right, that's correct.
17 Q. And it travels through a slot over to the outlet; is
18 that correct?
19 A. That's correct.
20 Q. And then it goes down through the outlet?
21 A. Yes, that's correct.
22 Q. And then in the machine there is a piercing device
23 that pierces the foil that covers the outlet?
24 A. Yes.

13 (Pages 46 to 49)

Page 114

1　Q. Kraft engineers?
2　A. Yes, right.
3　Q. Actually before I get to that, let me just ask you
4　　one more question. Did you try to -- aside from
5　　testing the singles cartridges, did you try to
6　　create a test product or prototype based on either
7　　the '234 Patent or the '130 Patent that you offered
8　　opinions on?
9　A. With the water you mean?
10　Q. Did you actually build what was shown in those
11　　patents?
12　A. No, I didn't.
13　Q. Okay. So your opinions on those are strictly based
14　　on what's written?
15　A. On the drawings, what's actually written, yes,
16　　right.
17　Q. Now, on pages 8 and 9 of your report you also talk
18　　about some tests that were done by engineers at
19　　Kraft; is that right?
20　A. Yes.
21　Q. Were you present when any of those tests were
22　　performed?
23　A. No, I was not.
24　Q. Have you spoken with Mr. Bentley or Mr. Rowan or any

Page 115

1　　other Kraft engineer about those tests?
2　A. No, I did not.
3　Q. How did you find out about those tests?
4　A. I had the information from my counsel.
5　Q. What information was that?
6　A. There was a drawing of the test and the results of
7　　the test and the depositions obviously of Rowan and
8　　whoever else, Andrew Bentley, right.
9　Q. Now, you understand that they both used a test rig?
10　A. Yeah, I understand that.
11　Q. Have you seen that rig?
12　A. No. Only in picture form.
13　Q. Have you seen pictures of it?
14　A. Well, only what was in the picture with the device
15　　in there as well.
16　Q. Let's grab those pages. I have a document that's
17　　previously been marked as I believe Exhibit 13. I
18　　can't read the handwriting exactly. Then I have
19　　Exhibit 91.
20　A. Uh-huh.
21　Q. Then I have Exhibit 202.
22　A. This is all I had.
23　Q. So you've got Exhibits 13, 91 and 202 in front of
24　　you. You said that this is all you had?

Page 116

1　A. Yes.
2　Q. You didn't have any other pictures of the rig or
3　　anything like that?
4　A. No. This is what I remember.
5　Q. So what is your understanding of what's shown in
6　　Exhibit 13?
7　A. Well, 13 is just a volume of liquid. That's all
8　　that's indicated from different cavities of the
9　　housings, I assume, but that's how I took it to
10　　read.
11　Q. So what is the -- it says "mold number" on the upper
12　　left and then "cavity number." What do those
13　　numbers refer to?
14　A. Mold would be a mold for making the housings and
15　　because its multi-cavity-type mold, it's really a
16　　means of identifying the cartridge itself, the
17　　housing anyway.
18　Q. And what's the significance of that information on
19　　this chart?
20　A. Well, it's just the amount of Mls that he took out,
21　　that he was able to get out or at least the
22　　repeatability, I guess. That's all I can get out of
23　　it.
24　Q. In other words why are the mold and cavity numbers

Page 117

1　　listed here? What does that add to this table?
2　A. I'm not sure, to be honest.
3　Q. Okay.
4　A. You know, I understand there were issues, not really
5　　issues, but there were questions about alterations
6　　and molds over the years and all the rest of it, and
7　　I took it that it was part of that.
8　Q. But as you sit here today you don't know
9　　specifically why that stuff is listed on this page?
10　A. No. There is not a lot of meaning there because it
11　　merely indicates a mold number and cavity number or
12　　date or at least a month anyway with a volume in
13　　CCs. There is no other data there.
14　Q. So the month and manufacturer, what does that refer
15　　to?
16　A. I assume of the cartridge with the coffee in it.
17　Q. And there are some Decembers and Novembers, but do
18　　you know what years those were?
19　A. No, I don't.
20　Q. Do you know whether these were the cartridges with
21　　the open hole or the closed holes?
22　A. There is no identification.
23　Q. Do you know whether these were singles cartridges or
24　　T-discs?

MERRILL LEGAL SOLUTIONS
(617) 542-0039

Page 118

1   A. These are singles. I was aware of that.
2   Q. Okay. And then on the right-hand column, the Mls,
3      what does that refer to?
4   A. I assume it's the amount of coffee which they were
5      able or liquid or whatever that they were able to
6      extract out of the rig that they had.
7   Q. Is it the input or the output?
8   A. No. It's output, I think, but they are all within a
9      small amount of each other, so it's insignificant in
10     my mind. They are all essentially the same.
11  Q. Who created this document?
12  A. This I believe was Andrew Bentley, I think.
13  Q. What tests did he do to create this document?
14  A. He had the one which is shown on Exhibit 91.
15  Q. So he used the device that's shown in Exhibit 91?
16  A. I assumed, yes.
17  Q. You say you assumed. Do you know one way or another
18     whether it was that device or a different device
19     that led to the results in Exhibit 13?
20  A. No, because I can't remember, to be honest. I've
21     read such a lot of data and depositions, I can't
22     remember to be honest.
23  Q. Okay. So it could have been a different device that
24     led to these results?

Page 119

1   A. It may well have been. I'm just assuming because I
2      don't remember.
3   Q. Okay. Do you know if these were coffee cartridges
4      or tea cartridges?
5   A. I believe they were coffee cartridges, I think, from
6      what I remember.
7   Q. Do you remember what type of cartridges?
8   A. They were -- I think they used Lambert and Rychiger
9      type of cartridges.
10  Q. And that's for the results in Exhibit 13?
11  A. Yes, and also maybe on 202. Is that what it is?
12     Yeah.
13  Q. And do you know what type of coffee was in the
14     cartridges that were used to get the results in
15     Exhibit 13?
16  A. Only what's on the paper. There is a brand there on
17     202 which they talk about.
18  Q. I see. Now Exhibit 202, is that recording
19     information about the same tests as Exhibit 13?
20  A. I'm assuming it is at this stage because I don't
21     remember as I say.
22  Q. Okay.
23  A. Because on this particular one he's also talking
24     about drink volume.

Page 120

1   Q. I see. Now, in the tests shown in Exhibit 13 do you
2      know were those made -- were those results through
3      same-side piercing or opposite-side piercing?
4   A. I think they were on the same-side piercing.
5   Q. And how was the cartridge oriented in the tests?
6   A. It was vertical.
7   Q. And where was the inlet piercing made in the test
8      for Exhibit 13?
9   A. It was in a number of locations. It's on the
10     drawing here, A, B, C, D, E, I think.
11  Q. So you are referring to the picture in Exhibit 91?
12  A. On 91, sorry, yes.
13  Q. So in the tests that led to Exhibit 13, all the
14     various inlet positions were used that are shown in
15     Exhibit 91?
16  A. I assume so. They were all in the vertical in this
17     test, I think.
18  Q. But in terms of which inlet position was used for
19     each of the tests shown in Exhibit 13, do you know
20     which one or ones it was?
21  A. Well, they have them on that page actually. It
22     indicates on the -- above the drawing.
23  Q. I see. So that the tests that are listed in the
24     table on Exhibit 91 are the same tests that are

Page 121

1      listed in the table on Exhibit 13?
2   A. That's what I'm assuming, yeah, because I didn't
3      have any other information. I mean I had this one
4      obviously which is over the picture which they had.
5   Q. Okay.
6   A. It's obviously measuring the volume out of the
7      different positions or -- well, yeah, the positions
8      of the -- where the inlet was pierced, and they are
9      all in essence the same.
10  Q. Okay.
11  A. The difference is insignificant anyway.
12  Q. Now, to your knowledge did Mr. Bentley taste any of
13     the liquids that he produced with the rig?
14  A. He did not, I don't think, from what I remember.
15  Q. Do you know if anyone else at Kraft, Mr. Rowan or
16     Mr. MacMahon, tasted any of it?
17  A. I don't believe so.
18  Q. Now, can you just describe in your own words how the
19     rig that they used functioned?
20  A. The way I understand it is they had a clamp on the
21     back or plate, if you like, on the back of the
22     cartridge and then another one over the front of it
23     with some holes in it which would indicate the
24     positions of the inlet pierces, if you like, and

31 (Pages 118 to 121)

Page 122

1   there was a rubber gasket in between the plate on
2   the outside and against the cartridge, so there was
3   a gasket which would eliminate leakage and in
4   between the outer plate with the holes in the
5   cartridge itself, and then it was tightened up by
6   finger load -- finger tensioning, if you like.
7   Q.  What do you mean by "finger tensioning"?
8   A.  Well, to tighten up the wing nuts.
9   Q.  And where was the hot water coming from?
10  A.  It was a tube which was introduced in through the
11  rubber which was sandwiched, if you like, in between
12  the outer plate and the cartridge itself.
13  Q.  And what was feeding that tube?
14  A.  There would be water from the supply, hot water.
15  Q.  Do you know what type of supply it was?
16  A.  No, I have no recollection other than it was hot
17  water.  That's all I remember.
18  Q.  Do you know at what pressure the water was fed in?
19  A.  No, I don't.
20  Q.  And then how was the water -- how did the water exit
21  the cartridge?
22  A.  Out through the outlet which is on the other side in
23  this case.
24  Q.  What did the piercers for the inlet and the outlet

Page 123

1   look like?
2   A.  The piercers, I believe they had used the ones which
3   they use on the existing or off one of the existing
4   piercers on the brewer or one of the brewers where I
5   think on the inlets they had a serrated tube ending
6   which allowed them to pierce, but it made a rather
7   ragged entry hole.  I don't think it's what I would
8   have used, but that's all right.
9   Q.  So for both the inlet and the outlet they had this
10  serrated item?
11  A.  The inlet was a little different, I think.  They had
12  one which they use on all the outlets, I think,
13  which is where they cut around most of the periphery
14  with a serrated edge and then they pull it over to
15  one side.
16  Q.  I'm sorry.  That's for the inlet or the outlet?
17  A.  That's the outlet, sorry.
18  Q.  So for the outlet they use the same jagged outlet
19  piercers that they used in the singles machine?
20  A.  It was different.  It was the one they usually use
21  on the outlet, and I think the inlet one -- I don't
22  know.  They might have been the same.  I'm not sure
23  because I didn't see any indication exactly.  I was
24  only looking at the marks in and around the hole.

Page 124

1   Q.  I'm sorry.  What marks around the hole?
2   A.  I had seen somewhere -- it was a drawing, I think.
3   No.  It was a picture, and it showed an inlet hole
4   in through the foil and it was a little jagged.
5   It's a little bit like the outlet piercer which they
6   use on the Tassimo, I think.
7   Q.  Was it taken from the Tassimo?
8   A.  I don't know.  I'm not sure if it was.  I assumed it
9   was, but I don't know.
10  Q.  And with regard to the outlet piercer, was that
11  taken from any machine?
12  A.  It may well have been, but I'm not sure again.
13  Q.  And who actually made the test rig?
14  A.  I believe it was a mix of Bentley and Rowan, Andrew
15  Bentley and Lee Rowan.  One of them or the
16  technician who was working with them arrived at a
17  test rig, I guess.
18  Q.  So it is a combined effort --
19  A.  I think so from what I read, yes.
20  Q.  -- between Rowan and Bentley and the technician?
21  A.  Yeah, that's what I assumed.
22  Q.  You mentioned a rubber pad?
23  A.  Yeah.  I named it a gasket because that's what it
24  is.

Page 125

1   Q.  Where was that located?
2   A.  In between the front of the -- it was up against the
3   front of the lid, the foil lid, and under a plate
4   which went on top of it.
5   Q.  Okay.
6   A.  So it was compressed basically to some degree
7   anyway.
8   Q.  So that it was pressing against the foil side of the
9   cartridge?
10  A.  Yes.
11  Q.  And it was forming a seal around the edge wall of
12  the cartridge?
13  A.  It would form around the periphery of the cartridge,
14  yes, and depending on how they went in with the
15  piercer itself, I assume they had a pretty good seal
16  between the piercer and the rubber gasket.
17  Q.  Do you know enough about the details of that?
18  A.  No, I don't.  I really don't because I didn't see
19  it.
20  Q.  So you don't --
21  A.  I'm just looking at what I read.
22  Q.  So you don't know whether that seal formed right
23  around the needle or not?
24  A.  No, I don't.  I don't know the detail of that.

32 (Pages 122 to 125)

Page 130

1    leakage or spillage in the Kraft rig that they were
2    using?
3    A. I have no idea. I really don't know.
4    Q. So if they did have spillage as you've been
5    describing, would their tests --
6        MR. SCHLITZ: Objection. Misrepresents
7    his testimony.
8    BY MR. RADER:
9    Q. If they did have some spillage under the gasket or
10   whatever, would their tests have shown the cartridge
11   accommodating an inflow?
12   A. I mean I don't think they were really -- you know,
13   any test you make up isn't going to be perfect in
14   any -- it isn't really meant to. It's got a
15   product.
16   Q. Right.
17   A. One might expect leakage anyway, so to use that as a
18   benchmark is probably not reasonable. I mean I
19   would design it so it did not leak and then say,
20   Okay, it's not a benchmark. To say, you know, if
21   it's leaking is it a benchmark, I don't think so.
22   Q. Well, I guess my question was a little different.
23   If you are getting spillage even under a gasket,
24   would you consider that a demonstration of the

Page 131

1    cartridge accommodating an inflow?
2    A. Yeah, I think so because it's contained.
3    Q. So as long as it's contained?
4    A. That's all that matters, sure. It isn't the ideal
5    but it's contained.
6    Q. So now if you were designing an apparatus to test
7    out the same-side piercing technique with the
8    singles cartridges, would you want to verify the
9    results that you saw from Kraft in these three
10   documents?
11   A. No.
12   Q. Why not?
13   A. I'd rather design my own which would work better.
14   That's all.
15   Q. So you wouldn't rely on another party, you would
16   want to do your own?
17   A. Use my own, sure.
18   Q. Other than these three documents, Exhibit 13, 91 and
19   202, did you get any other documentation of any kind
20   of tests that the Kraft engineers did?
21   A. No, that's about it.
22   Q. Did you see a report -- again, other than these
23   three pages, did you see any other report prepared
24   by Mr. Bentley, for example?

Page 132

1    A. No, not that I can recollect anyway.
2    Q. If Mr. Bentley had prepared a report about the
3    testing that he did, is that something you'd want to
4    see?
5    A. I'd be interested, but it's not critical.
6    Q. Well, I guess you don't know what's in it, but --
7    A. I would be interested, but --
8    Q. Not knowing what's in it, is it possible that there
9    might be some information in that report that would
10   be important to you formulating your opinions?
11   A. I don't think so.
12   Q. Why do you say that?
13   A. Just because in my expert opinion what they had was
14   a rough test, and I wouldn't have used the
15   methodology which they did use, so anything I arrive
16   up with would be different, and I don't think there
17   is anything novel in what they did which would end
18   up outside of what I would learn if I did my own
19   test rig.
20   Q. And the test rig that you described that you might
21   use, did you actually go ahead and make any of
22   those?
23   A. I could if I wanted. I haven't.
24   Q. Okay. But in connection with your work on the case,

Page 133

1    you haven't done any of that?
2    A. No, I haven't done any other testing, no.
3    Q. Okay.
4        MR. SCHLITZ: Will you be taking a break?
5        MR. RADER: Why don't we take a couple of
6    minutes?
7        (Recess.)
8        (Exhibit 12, Patent 4,853,234 marked for
9    identification.)
10   BY MR. RADER:
11   Q. Mr. Taylor, I've now placed in front of you
12   Exhibit 12 which is a copy of the '234 Patent that
13   you studied; is that correct?
14   A. Right, yes.
15   Q. Can you begin by just describing in your own words
16   how this cartridge is described as operating, and
17   I'm referring to the embodiment that's shown on the
18   front page of the patent?
19   A. Yes, the main one, sure. Well, the water would come
20   up from the bottom and this is designed to run along
21   the manifold pathways in through castellations into
22   the coffee bed. This design has a gross filter for
23   holding back larger particles which are formed with
24   a lid on the top which is another foil lid, so it's

34 (Pages 130 to 133)

| | |
|---|---|
| Page 170 | Page 172 |

Page 170

1  that there were records from a Lambert line that had
2  been destroyed in the past?
3  A. Yeah, I think so.
4  Q. So you obviously didn't have those destroyed records
5  in front of you, right?
6  A. No, I didn't.
7  Q. So you don't know whether those destroyed records
8  show medium roast being manufactured on Lambert
9  lines?
10 A. No, I really don't know.
11 Q. So you can't really say with any degree of
12 confidence today that during that time period there
13 was no medium roast manufactured on Lambert lines
14 for which records have been destroyed?
15 A. I'm assuming, but I don't know, right.
16 Q. In your opinion is the ground coffee in a singles
17 cartridge a soluble beverage medium?
18 A. Yes, because solubility -- under the action of hot
19 water, it would take up coffee solids, and therefore
20 it's water soluble.
21 Q. Is your opinion the same for the ground coffee in
22 T-discs?
23 A. Yes, I believe so. I mean the rates are different,
24 but --

Page 171

1  Q. You talk in your report about permeability of
2  cartridges?
3  A. Right.
4  Q. And do you recall talking about surface areas and
5  wall thicknesses --
6  A. Yes.
7  Q. -- of cartridges?
8  A. Yes.
9  Q. Did you do any independent testing of your own on
10 the surface area or wall thickness?
11 A. Yes, I did actually. I did some measurement on the
12 walls to -- of each cartridge, actually.
13 Q. What measurement did you do?
14 A. Well, the singles is about 022 thick in thousandths
15 of an inch. The T-disc was between 18 and 20
16 thousandths, of that order.
17 Q. So you used a caliper to measure those?
18 A. Yes.
19 Q. So there was a slight difference in the thickness?
20 A. Yes, thinner on the T-disc.
21 Q. What about surface area? Did you do any
22 calculation?
23 A. Surface area is bigger because it's a diameter and
24 you actually have more surface area.

Page 172

1  Q. Did you run those numbers?
2  A. No, I didn't. I made some rough measurements and it
3  looks larger. I didn't run it. I mean I had read
4  that somebody else had done it, so --
5  Q. But you yourself didn't actually do the calculation?
6  A. Not on that. I did on the wall thickness.
7  Q. Okay. What does frusto-conical mean?
8  A. That's a good question. As I understand it it's a
9  cone with the top removed -- with the point removed.
10 If you have a cone and you cut it short, what's
11 remaining is a frusto-conical shape, if you like.
12 Q. Now, as part of your work on the case I understand
13 you reviewed certain deposition transcripts?
14 A. Yes, right.
15 Q. And those included Kraft engineers as well as some
16 Keurig personnel?
17 A. Only one I think from Keurig and that was
18 Mr. Lazaris, I think.
19 Q. Okay. And you didn't follow up and have
20 conversations with any of the people whose
21 transcripts you read to sort of evaluate what they
22 were saying?
23 A. No, I haven't.
24 Q. Is it fair to say that in doing your analysis you

Page 173

1  had to assume that everything you were reading in
2  those transcripts was accurate?
3  A. Yeah. That's the only thing I had, yes.
4  Q. So in doing your analysis for purposes of this case,
5  you couldn't -- given that you weren't actually
6  talking to these people, you couldn't dismiss
7  anything they were saying in their transcripts; is
8  that true?
9  A. I only had -- the only thing I had to rely on were
10 the transcripts. Yeah, that's all I had.
11     MR. RADER: Okay. I thank you very much
12 for coming down today. I'm done asking questions.
13 I know Mr. Schlitz has a few questions for you so
14 we'll turn it over to him.
15     MR. SCHLITZ: I'm going to take a break to
16 figure out what I want to ask him.
17     (Recess.)
18 EXAMINATION BY MR. SCHLITZ:
19 Q. Mr. Taylor, I have a few questions that I would like
20 to ask you to clarify some of your statements
21 because I think that some of Mr. Rader's questions
22 were misleading and unfair. I'd like the record to
23 be clear on this.
24     MR. RADER: Objection. Misleading.

44 (Pages 170 to 173)

Page 174

1    BY MR. SCHLITZ:
2    Q. If you would turn to page 3 of your report, your
3       expert report?
4    A. Page 3?
5    Q. Yes, please, under summary of opinions; do you see
6       that?
7    A. Yes.
8    Q. The first two lines you say, "In my opinion the
9       Kenco's Singles Cartridge, and more specifically the
10      Kenco Singles Medium Roast Cartridge, embodies each
11      and every limitation of claims 1, 2, 8, 9 and 10 of
12      the '762 Patent"; do you see that?
13   A. Yes.
14   Q. Is that opinion based upon or dependent upon
15      Mr. Bentley's and/or Mr. Rowan's test?
16   A. No.
17   Q. What is that based on?
18   A. Based on my own assessment of each of the elements
19      in the patent.
20   Q. Okay. But do you believe that Mr. Rowan and
21      Mr. Bentley's test and test results are sufficient
22      to prove that each element of these claims is
23      satisfied?
24   A. Yes.

Page 175

1    Q. Okay. Now, Mr. Rader asked you whether you believed
2       that -- he asked you whether the '234 Patent to
3       Bentley described same-side piercing; do you
4       remember that?
5    A. Yes.
6    Q. And you answered no; do you remember that?
7    A. Yes.
8    Q. What did you mean did it describe same-side
9       piercing?
10   A. What I meant, I think it was capable of same-side
11      piercing even though it isn't actually described,
12      but it's obviously capable because it has foil on
13      one side and non-foil on the other.
14   Q. But when you say describe it, whether it describes
15      it, did you mean that it doesn't discuss same-side
16      piercing?
17   A. Yes. That's what I meant, yeah.
18   Q. But in your opinion does the '234 Patent show a
19      structure that is capable of same-side piercing?
20   A. Yes. That's what I've said, right.
21   Q. Okay. Now, similarly he asked you some questions
22      whether the '234 Patent -- the structure in the '234
23      Patent is designed for same-side piercing; do you
24      remember that?

Page 176

1    A. Yes.
2    Q. And I believe you said no?
3    A. Right.
4    Q. But is the structure disclosed or shown in the '234
5       Patent capable of same-side piercing?
6    A. Yes, absolutely.
7    Q. And is it capable of -- is the lid section overlying
8       the first chamber where the coffee grounds are
9       stored or beverage is being stored capable of being
10      pierced to permit an inflow of liquid?
11   A. Yes, absolutely.
12   Q. Now, you talked about -- he asked you some questions
13      that elicited the response that it would be designed
14      to seal; do you remember that?
15   A. Yes, I think so.
16   Q. You kept talking about "it." When you were
17      responding to those questions, what was the "it"
18      that you were referring to?
19          MR. RADER: Objection to form. You can
20      answer.
21   A. It was --
22          MR. RADER: You don't need my permission,
23      but --
24   A. Well, I was referring to the brewer. It isn't the

Page 177

1    package because the package is a passive device.
2    The only thing that can introduce any action is a
3    brewer. I mean if you didn't have that, you
4    wouldn't have anything.
5    Q. So all of those questions he asked you about what
6       you would design to create sealing, were you talking
7       about the cartridge or were you talking about the
8       brewer?
9    A. No. I was talking about the brewer and if I had to
10      design and build a test rig which had to do with
11      brewing rather than anything else, yeah.
12   Q. Do you have any doubt that with a test rig or a
13      brewer that is properly designed for success, as
14      opposed to being designed for failure, that the
15      Kenco Singles Cartridge meets all of the elements of
16      the assorted claims?
17   A. Yes, absolutely.
18   Q. Now, if you would take Taylor Exhibit 12 -- before
19      we go to Exhibit 12, let me ask you, as a design
20      engineer if given the cartridge -- the Kenco Singles
21      Cartridge and asked to design a piercing mechanism
22      as part of a brewer for that to work in --
23   A. Okay.
24   Q. -- would you design it for success?

45 (Pages 174 to 177)

# EXHIBITS 3-8

## REDACTED IN THEIR ENTIRETY

## **RULE 7.1.1 CERTIFICATION**

I hereby certify that counsel for Plaintiff has complied with Rule 7.1.1 of the Local Rules

of Civil Practice and Procedure of the United States District Court for the District of Delaware.


/s/ *Adam W. Poff*
Adam W. Poff (No. 3990)

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 11, 2008, a true and correct

copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
David E. Moore, Esquire [*dmoore@potteranderson.com*]
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

Additionally, I hereby certify that on August 11, 2008, copies of the foregoing

document were served by e-mail on the above-listed counsel of record and on the following non-

registered participants in the manner indicated below:

### BY E-MAIL

David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
John W. Shaw (No 3362)  [*jshaw@ycst.com*]
Adam W. Poff (No. 3990) [*apoff@ycst.com*]
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,                )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )        C.A. No. 07-17 (GMS)
                                     )
KRAFT FOODS GLOBAL, INC.,            )        **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and             )
KRAFT FOODS INC.,                    )        **PUBLIC VERSION**
                                     )
        Defendants.                  )

## DEFENDANTS' OPPOSITION TO KEURIG'S MOTION *IN LIMINE* NO. 2

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 15, 2008
Public Version Dated: August 22, 2008
878762 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

Defendants Kraft Foods Global Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft") oppose Plaintiff, Keurig, Inc.'s ("Keurig") Motion *in Limine* No. 2 to preclude Kraft's expert, Malcolm Taylor, "from relying on or testifying about experiments that Kraft's employees performed on Kenco Singles cartridges." Keurig's argument, that experts would not reasonably rely on the testing of Kenco Singles Cartridges ("Singles Cartridge"), is based on misstatements of both Mr. Taylor's testimony and the relevant law. As such, Keurig's Motion should be denied.

Kraft will introduce evidence at trial that the Singles Cartridge embodies each and every element of asserted claim 1 of U.S. Patent No. 6,607,762 ("the '762 Patent"). Kraft will further introduce evidence that the Singles Cartridge was both: (1) in the possession of the inventor of the '762 Patent; and (2) in public use in the United States prior to filing date of the '762 Patent. In response, Keurig has attempted to prevent Kraft from introducing fact evidence of Singles shipments to the United States (Keurig's Motions *in Limine* Nos. 3 and 4). Moreover, Keurig submits its Motion *in Limine* No. 2, as well as its first Motion *in Limine*, to exclude fact evidence of Kraft's tests demonstrating that the Singles Cartridge includes all the elements of claim 1 of the '762 Patent. These motions are just part and parcel of Keurig's strategy to mischaracterize unfavorable evidence as "prejudicial" and escape the inevitable finding that the Singles Cartridge anticipates the sole asserted claim of the '762 Patent.[1]

## ARGUMENT

### I. Mr. Taylor Was Not Confused About The Singles Cartridge Tests

Keurig's assertion that Mr. Taylor was confused or ignorant of the Singles Cartridge testing is based on selective quotations of Mr. Taylor's deposition.

---

[1] Both Mr. Rowan and Mr. Bentley intend to testify at trial regarding the data from their tests based upon their personal knowledge. Thus, such data is not hearsay as Keurig suggests. Mot. at 5.

███████████████ But the deposition testimony shows that Mr. Taylor was actually presented with three Exhibits when he was asked "Who created this document?" and answered that he believed it was Mr. Bentley. Mot. at 2 (citing Taylor Depo. Tr. (Pl.'s Mot. Ex. 2) at 118); *Id.* at 115 ("So you've got Exhibits 13, 91 and 202 in front of you."). From the record it is not clear which document the question was referring to. ██████████████

████████████████████████████████

Keurig argues that Mr. Taylor did not know whether the data he reviewed was generated using the Kraft apparatus. Mot. at 2. But the deposition testimony clearly reveals that, while Mr. Taylor couldn't remember whether it was the *exact same* device used to run the tests, the test device was a Kraft-designed rig as pictured:

> Q. So he used the device that's shown in Exhibit 91?
> A. I assumed, yes.
> ...
> Q. And where was the inlet piercing made in the test for Exhibit 13?
> A. It was in a number of locations. It's on the drawing here, A, B, C, D, E, I think.

Pl.'s Mot. Ex. 2 at 120 (discussing photos of the Kraft rig); Pl.'s Depo. Ex. 91 (Pl.'s Mot. Ex. 4). Finally, although Mr. Taylor did think that the needles used in Kraft's tests came from an existing brewer (Mot. at 2), it is because the needles were machined to have the same dimensions and be "very similar" to the needles in an existing brewer. Bentley Depo. Tr. (Ex. 1) at 13:3-20.

Mr. Taylor was not confused by or ignorant of the tests performed by Mr. Bentley and Mr. Rowan. Mr. Taylor was provided with three sets of test results and the transcripts from Keurig's lengthy depositions of Mr. Bentley and Mr. Rowan.[2] Pl.'s Mot. Ex 2 at 115:3-8. As

---

[2] As such, Keurig's citation and reliance on *Montgomery County v. Microvote Corp,* 320 F.3d 440 (3rd Cir. 2003), discussing an expert's opinion based on a document he did not know the source, identity, or method of generation of, is wholly misplaced. Mot. at 4.

such, and as indicated in his report, Mr. Taylor simply used the tests to confirm his evaluation of the piercability of the Singles Cartridge. Pl. Mot. Ex. 1 at 8-10.

## II. Mr. Taylor's Testimony Is Unrelated to Determination Of Reasonable Reliance

Keurig asserts that "Mr. Taylor's own admissions about what constitute sound engineering practices . . . demonstrate that the Kraft testing, and his review thereof, do not constitute trustworthy methods." Mot. at 2. Here, as before, Keurig's assertions are supported only by out-of-context quotes from Mr. Taylor's deposition. For example, Keurig claims Mr. Taylor stated that a competent engineer should "review[] the work that other engineers on an engineering team are doing 'on a daily basis.'" *Id.* Mr. Taylor's actual deposition testimony reveals that the urgency of the project dictates the frequency of review:

> Q. And does the lead engineer have to evaluate the work that's done by the people working under him on the team?
> A. Yes, he does usually on a daily basis all depending on the urgency of the project.
> Q. How does that work? Is it through meetings or memos or what?
> A. Meetings, e-mails, memos, personal one-to-one, all depending on the urgency or importance of the aspect that you are looking into, and sometimes you have to work with a company on the outside, you know, a supplier of materials.

Pl.'s Mot. Ex. 2 at 41:20-42:7 (emphases added).

Most importantly, Mr. Taylor's testimony was in response to questions about his commercial work in "designing packages for a specific use." *Id.* at 39:20-40:9. Neither Mr. Taylor, Mr. Bentley, nor Mr. Rowan were designing commercial consumer packaging; the Singles Cartridge was a pre-existing product that merely needed to be tested for piercability. Taylor Depo. Tr. (Ex. 2) at 178:11-179:3. In any event, in response to questioning about engineering standards, Mr. Taylor clearly stated:

> When you say a standard, there really isn't any standard per se of engineering effort, if you like. There are engineering standards involved in design and drawing and symbols and all that stuff. That's a standard, but as far as how you

organize your work, how you do your work on a day-to-day basis is usually up to the lead engineer or whatever, you know.

Pl.'s Mot. Ex. 2 at 45:19-46:2. Further, when asked whether he keeps notes in a lab notebook when testing a product, Mr. Taylor stated:

It all depends at what stage you do that. In other words you can rig up a rough test to figure out if the idea works or not. On that you don't need any notes really. You would then maybe make up another test rig which would have a lot more bells and whistles on it, if you like, and you would take notes under those conditions, but on just a rough shot test, no. You just have to have observations and you remember them.

Ex. 2 at 112:20-113:4.

### III. Mr. Taylor's Consideration Of Singles Cartridge Testing Was Reasonable

Keurig's motion does not question the accuracy of the test results that Mr. Taylor considers. Indeed, Keurig has had the opportunity to depose both Mr. Bentley and Mr. Rowan (Pl.'s Mot. Exs. 6 & 7) and will have the opportunity to cross examine one or both of Mr. Bentley and Mr. Rowan at trial when they are on the witness stand and demonstrate the test in open court. Keurig's argument is based solely upon the fact that Mr. Taylor has looked to test results provided by Kraft's employees to validate his own inspection and test results. In this regard, Keurig has cited to no binding authority to indicate that reliance on Kraft's tests is *per se* unreasonable under Rule 703. On the contrary, Keurig's cases are readily distinguishable.

Keurig asserts that the instant case "mirrors *In re TMI Litigation*," which pertains to the reliance of an immunologist on self-reported data of patients. Mot. at 3. Specifically, the report detailed her opinion that blood samples from individuals exposed to ionizing radiation from nuclear weapons testing exhibited immune system depression. *In re TMI Litigation*, 193 F.3d 613, 696 (3d Cir. 1999). But her report also stated that "it is undoubtedly necessary to carry out a dynamic examination of all persons" to determine whether exposure to radiation was the cause. *Id.* When challenged, the expert ruled out any other causes of immune system depression based

-4-

solely on self-reported medical data. *Id.* at 696-97. The panel noted that "[t]here is nothing improper about a medical report prepared solely for litigation. . . . . However, a physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms." *Id.* at 698 (citations omitted). Thus, the expert "should have either reviewed her study subjects' medical and hospital records or examined the subjects herself." *Id.*

Mr. Taylor's report makes clear that his consideration of the tests performed by Andrew Bentley and Lee Rowan merely *confirmed* his own investigation and tests.[3] To form his opinion, Mr. Taylor considered the materials and thicknesses of the lid components ($60\mu$ of polypropylene, $9\mu$ of aluminum, and $12\mu$ of polyester) as well as the Singles Cartridge's internal structure. Pl. Mot. Ex. 1 at 8-9. Mr. Taylor also performed his own tests by piercing the foil at a first location to inject water and at a second location to witness outflow of "coffee liquor." *Id.* at 9. Mr. Taylor considered the tests by Kraft employees merely to confirm his own. *Id.* ("This was confirmed by tests on the Kenco Cartridges carried out by Messrs. Andrew Bentley and Lee Rowan"). As in *TMI*, there is nothing improper about Kraft preparing a test solely for the purpose of litigation. Because Mr. Taylor does not rely solely upon those tests, he refers to them simply to confirm his evaluation of the Singles Cartridge, his reliance is not misplaced.[4]

## CONCLUSION

For the above reasons, Kraft requests that Keurig's motion *in limine* to preclude Kraft from offering any evidence of its testing of the Kenco Singles Cartridges be denied.

---

[3] Unlike in *Mike's Train House v. Lionel, LLC*, 472 F.3d 398 (6th Cir. 2006) and *U.S. v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994), Mr. Taylor does not intend to testify as to the opinions or conclusions of Mr. Bentley or Mr. Rowan, but merely to the fact that the data they collected confirms his own tests and investigation.

[4] Likewise, Keurig's citation of *Hot Wax, Inc. v. Warsaw Chem. Co.* is inapposite because the expert's opinion in that case was "premised entirely on out-of-court statements from unnamed [ ] employees." 45 F. Supp. 2d 635, 639 (N.D. Ill. 1999).

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 15, 2008
Public Version Dated: August 22, 2008
8787462 / 31118

By: /s/ David E. Moore
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    Tel: 302-984-6169
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 22, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on August 22, 2008, the attached document was Electronically Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: /s/ David E. Moore
    Richard L. Horwitz
    David E. Moore
    Potter Anderson & Corroon LLP
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

# In The Matter Of:

*KEURIG, INCORPORATED v.*
*KRAFT FOODS GLOBAL, INC*

---

*MALCOLM E. TAYLOR*
*July 3, 2008*

---

# MERRILL LEGAL SOLUTIONS
**101 Arch Street, 3rd Floor**
**Boston, MA 02110**
PH: 617-542-0300 / FAX: 617-338-6075

TAYLOR, MALCOLM E. - Vol. 1

| | 110 | | 112 |
|---|---|---|---|
| 1 | the foil? | 1 | Q. Was your hypodermic syringe or needle test a |
| 2 | A. Yes, it was. | 2 | realistic test of whether that foil is pierceable to |
| 3 | Q. Now, I just want to go back to something that I | 3 | accommodate an inflow under the sort of real world |
| 4 | asked you before and clarify. | 4 | conditions of brewing a cup of coffee? |
| 5 | A. Sure. | 5 | MR. SCHLITZ: Objection to form. |
| 6 | Q. I believe you testified that you don't know the | 6 | A. That's actually within the terms of the patent and |
| 7 | exact pressure at which the singles cartridges | 7 | its claim. I thought it was adequate because it's a |
| 8 | ordinarily operate, but -- | 8 | package design. It's not a process design. |
| 9 | A. No. | 9 | Q. Just back to my question, though, within the real |
| 10 | Q. -- are you aware that the coffee bed is pressurized | 10 | world conditions of brewing a cup of coffee, do you |
| 11 | to some degree in the normal operation? | 11 | think that your test was a realistic representation |
| 12 | A. Yes, I'm aware. I mean it has to be in order to get | 12 | for that? |
| 13 | the water up through the filter and up over into the | 13 | A. No. It was a test. It's not a real world making of |
| 14 | outlet. | 14 | a cup of coffee. |
| 15 | Q. Although you said you were able to do that even | 15 | Q. Now, ordinarily -- I think we talked a little bit |
| 16 | without pressurizing it? | 16 | about this before in your work at Foster-Miller. |
| 17 | A. Well, only -- well, there is some pressure obviously | 17 | Ordinarily when you are testing a product or a |
| 18 | from the needle -- | 18 | prototype, would you ordinarily take notes in a lab |
| 19 | Q. Okay. | 19 | notebook or something? |
| 20 | A. -- into the coffee bed, but it's -- you don't need | 20 | A. Not necessarily. It all depends at what stage you |
| 21 | much if the rate of flow is low. If you had a high | 21 | do that. In other words you can rig up a rough test |
| 22 | flow, you'd need a much higher pressure I'm sure. | 22 | to figure out if the idea works or not. On that you |
| 23 | Q. Okay. And in order to make a whole cup of coffee | 23 | don't need any notes really. You would then maybe |
| 24 | under normal conditions -- | 24 | make up another test rig which would have a lot more |

| | 111 | | 113 |
|---|---|---|---|
| 1 | A. You'd need a lot more water. | 1 | bells and whistles on it, if you like, and you would |
| 2 | Q. You need more water and -- | 2 | take notes under those conditions, but on just a |
| 3 | A. And a much bigger syringe, one or the other. | 3 | rough shot test, no. You just have to have |
| 4 | Q. And you need a higher pressure to make that cup of | 4 | observations and you remember them. |
| 5 | coffee than what you used in your test? | 5 | Q. So in your work as an engineer if you were doing a |
| 6 | A. I really don't think so because if you regulate the | 6 | test that was going to be the test you were going to |
| 7 | water flow into it, as long as you have enough hot | 7 | rely upon for your design or your analysis, is that |
| 8 | water, you could squeeze enough in there from the | 8 | the type of thing you would take notes on and -- |
| 9 | barrel. Say you had an inch and a half down in the | 9 | A. Yes. |
| 10 | a barrel, you could fill it easily and have enough | 10 | Q. -- take pictures of? |
| 11 | over maybe to fill a cup, sure. You know, there is | 11 | A. Yes, you would of course. |
| 12 | no specification anywhere in either patent actually. | 12 | Q. Okay. So that the experiments you did here with the |
| 13 | There is nothing. | 13 | hypodermic needle, they wouldn't meet the standard |
| 14 | Q. You would agree with me that Claim 1 of the Keurig | 14 | that you would apply to the kind of test that you |
| 15 | Patent does require that the cartridge be capable of | 15 | would rely on in your engineering analysis; is that |
| 16 | producing a beverage, whatever that means, right? | 16 | fair to say? |
| 17 | MR. SCHLITZ: Objection. You are asking | 17 | A. No. It was just an initial test in order to meet |
| 18 | for a legal conclusion. | 18 | the needs of the claim. That's all. There wasn't |
| 19 | BY MR. RADER: | 19 | any other intent. |
| 20 | Q. Well, you read the claims, right? | 20 | Q. All right. Now, let me ask you, in your report on |
| 21 | A. Yeah. It just means make a beverage, whatever that | 21 | pages 8 to 9 of your report you also talked about |
| 22 | means. There isn't any definition. | 22 | some tests done by Keurig engineers; is that right? |
| 23 | Q. And you are not here to opine on that? | 23 | MR. SCHLITZ: Keurig or Kraft? |
| 24 | A. No. I'm not, no. | 24 | MR. RADER: Sorry. My slip. |

**MERRILL LEGAL SOLUTIONS**
**(617) 542-0039**

**178**

1  A. Of course.

2  Q. Would you design it -- if in your first design you

3     had some kind of failure, would you then just accept

4     that or would you then make changes to achieve

5     success?

6  A. You would design around them. That's what you do.

7  Q. That's what design engineers do?

8  A. That's what they do, yeah, absolutely.

9       MR. RADER: Objection.

10  A. Sure.

11  Q. In Professor Slocum's report he criticizes

12     Mr. Bentley and Mr. Rowan because they used a test

13     rig that he said was designed for experimental

14     purposes to achieve success; do you have any opinion

15     about that statement?

16       MR. RADER: Objection to form.

17  A. It was only designed to prove piercing. That's all.

18     That was the intent, that it was achievable through

19     the foil.

20  Q. But do you see -- as a design engineer and someone

21     who's been project leader, do you see any problem

22     with designing a rig that would achieve success?

23  A. No. No, I don't. As I mentioned earlier on, you

24     would look at the issues in front of you and you

**179**

1     would design around them. I mean that's what you

2     use and your experience to design a rig that works,

3     if you like.

4  Q. Now, if you turn to Taylor Exhibit 12?

5  A. What was that again?

6  Q. This is the '234 Patent.

7  A. Oh, okay.

8  Q. Now, if you turn to column 7?

9  A. Okay.

10  Q. Starting with line 17 it says, "In use a laminated

11     foil is sealed both along the upper edge 22 of the

12     body portion and the lower edge 23 of the body

13     portion"; do you see that?

14  A. Yes.

15  Q. Now, if you turn to figure 5, do you see the 23, the

16     ledge that is 23?

17  A. Yes.

18  Q. Does that go around the whole cartridge?

19  A. Yes, it does.

20  Q. And is the language that I just read to you in this

21     figure 5 where you see 23 goes around the whole

22     cartridge, is that the basis of your belief -- your

23     opinion that this discloses a structure that has a

24     single lid?

**180**

1  A. Yes.

2       MR. RADER: Objection. Leading.

3  A. Yes, it is.

4  Q. Does the fact that Mr. Rader questioned you at

5     length about statements that Mr. Bentley and

6     Mr. MacMahon expressed about the commercial product,

7     do those statements in any way change your view that

8     this lid -- ledge 23 goes the whole way around?

9  A. No, it doesn't. That's what I indicated earlier.

10     This is my independent -- as a design engineer it

11     runs all the way around. It's designed for one lid.

12  Q. And your opinion is based on reading the '234

13     Patent; is that correct?

14  A. Yes.

15  Q. And your opinion is not based on reading

16     Mr. MacMahon or Mr. Bentley's deposition; is that

17     correct?

18  A. That's correct.

19  Q. Let's assume for the sake of argument in this case

20     that the commercial embodiment of the Mark II had

21     two lids, would that change your opinion as to what

22     the '234 Patent shows?

23  A. No, it wouldn't.

24       MR. SCHLITZ: Okay. I have no other

**181**

1     questions.

2     FURTHER EXAMINATION BY MR. RADER:

3  Q. Just to wrap up on that one point. Mr. Taylor, you

4     also saw the testimony of Mr. MacMahon and

5     Mr. Bentley about the patent itself, right?

6  A. Yes, I did.

7  Q. And based on that, can you say with any degree of

8     certainty that the interpretation that this patent

9     describes the two foils is an invalid

10     interpretation?

11  A. I think it's invalid, yeah.

12  Q. Can you say that to a reasonable degree of

13     certainty, though?

14  A. Yes, I can, just from my experience. That's all.

15  Q. But again, Mr. Taylor, as I think we established at

16     the end of your testimony, since you didn't speak

17     with Mr. MacMahon or Mr. Bentley you have to take

18     their statements at deposition as true for purposes

19     of your analysis, don't you?

20  A. That's all I could do.

21  Q. And given that fact, don't you have to at least

22     allow for the possibility in your analysis that the

23     '234 Patent describes two lids instead of one?

24  A. You know my own opinion is I don't see it. That's

46 (Pages 178 to 181)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 15, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on August 15, 2008, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: /s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

805682 / 31118

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KEURIG, INCORPORATED,<br><br>　　　　Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>　　　　Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED – PUBLIC VERSION** |

## <u>REPLY IN SUPPORT OF KEURIG'S MOTION *IN LIMINE* NO. 2</u>

<div style="margin-left:40%">

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

</div>

Dated: August 25, 2008

Testimony from Kraft's technical expert Malcolm Taylor about Kraft's employees' own litigation-driven experiments would be improper under Fed. R. Evid. 702 and 703. Mr. Taylor, who is supposed to be a neutral expert applying sound engineering standards to his engagement in this case, was not present when the experiments were performed, did not speak to the engineers who performed them, and never even saw the test apparatus. Testimony cited in Kraft's opposition only confirms that Mr. Taylor was confused about what Kraft's engineers actually did and would never have relied on their data in his professional work as an engineer.

Kraft's suggestion that Mr. Taylor may nevertheless rely on the Kraft experiments as "confirmation" of his own tests invites legal error. An independent expert is not allowed to lend his credibility to tests performed by a party's own employees for litigation purposes.

## I.    Mr. Taylor Did Not Even Understand the Kraft Engineers' Testing.

Kraft tries to downplay Mr. Taylor's confusion about the Kraft employees' testing. The testimony that Kraft cites, however, only confirms that Mr. Taylor's understanding of that testing is sorely deficient. For example, in the excerpt on page 2 of Kraft's opposition, Mr. Taylor testified that the experiments reflected in Deposition Ex. 13 (Mot. Ex. 3) involved ███████ ██████████████████████ Mr. Taylor is confused. ████████████████████████████

████████████████████████████████████████████████

Kraft attempts to deflect Mr. Taylor's ignorance about ███████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████

---

[1] Keurig's opening brief included Exs. 1-8. Exhibits to this brief begin at Ex. 9.

In response to Mr. Taylor's confusion over which Kraft engineer did the tests reflected in Deposition Ex. 13 (Mot. Ex. 3), Kraft contends that "it is not clear" which of the test results (Mot. Exs. 3-5) was the subject of the question "Who created this document?"  Yet the <u>eleven</u> preceding questions all concerned Deposition Ex. 13 alone.[2]  (Ex. 10 at 116-118).[3]

## II.    <u>Mr. Taylor's Reliance on the Kraft Engineers' Testing Is Unreasonable</u>.

Kraft attempts to sidestep Mr. Taylor's testimony concerning sound engineering practices (such as receiving all relevant information and meeting other engineers to discuss their results) with a semantic argument that these practices apply only to "designing packages" and not to "testing" them.  (Opp. at 3).  But Mr. Taylor himself rejected this suggestion:

> Q:    So if somebody working under you was <u>testing a prototype or a product</u>, you'd expect to get all the reports[4] that they generated about that testing?
>
> A:    Yes, or I'd go and look at it myself.
>
> Q:    If you had hired an outside company to do some <u>testing of a product or prototype</u>, would you expect to have the opportunity to speak to them directly about their results?
>
> A:    Absolutely.  You would work with them on a day-to-day basis, even to go over there to visit with them.  Absolutely.

(Ex. 10 at 45-46) (emphasis added).

On the merits, Kraft does not even attempt to suggest that Mr. Taylor's work in this case satisfies such standards as required for his testimony to pass muster under Rules 702 and 703. See <u>Cummins v. Lyle Industries</u>, 93 F.3d 362, 369-72 (7th Cir. 1996) (expert witnesses must "adhere to the same standards of intellectual rigor" required in their professional work).

---

[2] ████████████████████████████████████████████████

████████████████████████████████████████████████

[4] Kraft withheld Mr. Bentley's report from Mr. Taylor as well as Keurig.  (Mot. at 1).

**III.    Rules 702 and 703 Do Not Allow Mr. Taylor to Testify that**
**Kraft's Own Tests "Confirm" His Independent Opinion.**

Kraft argues (without authority) that Mr. Taylor can testify about the Kraft tests because

he considered them "merely to confirm his own" results.  (Opp. at 5).  To the contrary, Rules 702

and 703 do not permit an expert to package another's analysis as a "confirmation" of his or her

own opinion.  Mike's Train House, Inc. v. Lionel, LLC, 472 F.3d 398, 409 (6th Cir. 2006)

(following the "[o]ther circuits [that] have squarely rejected any argument that Rule 703 extends

so far as to allow an expert to testify about the conclusions of other experts"); United States v.

Cuong, 18 F.3d 1132, 1143 (4th Cir. 1994) (error to permit expert "to bolster his opinion

evidence by testifying that his conclusions...were 'essentially the same' as those of" another).

Kraft tries to distinguish these cases by arguing that Mr. Taylor may rely on the Kraft

engineers' "data" so long as he does not reference their "conclusions."  (Opp. at 5 n.3).  This

argument too is bare semantics – Mr. Taylor's expert report focuses on the substance of what the

Kraft tests supposedly "establish" about the alleged prior art.  (Mot. Ex. 1 at 8).

Kraft's engineers designed and conducted tests intended to support Kraft in this case.

(Kraft even asserts work product protection as to the report its engineer wrote about the tests.)

Kraft wants to put its litigation-driven tests into evidence through its supposedly neutral expert –

who did not even understand them, and whose own testing was limited to a "couple of minutes"

"messing around in the kitchen." (Ex. 10 at 99, 107).  In essence, Kraft wants its own tests to be

"dressed up to look like expert testimony." Hot Wax, Inc. v. Warsaw Chem. Co., 45 F. Supp. 2d

635, 639 (N.D. Ill. 1999).  This strategy is unfair and contrary to the rules of evidence.[5]

---

[5] The three sets of tests results (Mot. Exs. 3-5) about which Mr. Taylor proposes to testify are
classic hearsay.  The appearance of Kraft's engineers at trial (Opp. at 1 n.1) will not change this.
Mr. Taylor may not disclose these hearsay exhibits to the jury because their probative value fails
to substantially outweigh their prejudicial effect.  Rule 703. (Mot. at 5).  Kraft has no answer.

Young Conaway Stargatt & Taylor, LLP

_Karen E. Keller_

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# In The Matter Of:

*KEURIG, INCORPORATEDv.*
*KRAFT FOODS GLOBAL, INC*

---

*MALCOLM E. TAYLOR*
*July 3, 2008*

---

# MERRILL LEGAL SOLUTIONS
## 101 Arch Street, 3rd Floor
## Boston, MA 02110
*PH: 617-542-0300 / FAX: 617-338-6075*

**TAYLOR, MALCOLM E. - Vol. 1**

Page 42

1   Q. How does that work? Is it through meetings or memos
2      or what?
3   A. Meetings, e-mails, memos, personal one-to-one, all
4      depending on the urgency or importance of the aspect
5      that you are looking into, and sometimes you have to
6      work with a company on the outside, you know, a
7      supplier of materials.
8   Q. In your experience as lead engineer, did you have
9      people working under you that prototyped devices for
10     you?
11  A. Yes.
12  Q. How would you evaluate the effectiveness of that
13     prototyping?
14  A. Well, depending on the level of prototyping, if it
15     was fairly involved, you might work with a machine
16     company who would ultimately make an automatic
17     machine which would assemble each of the elements in
18     the package, and he would work with you on the
19     development basis or if it's a fairly simple package
20     where you could easily make up a model in the lab,
21     then you do it in-house. That would all depend on
22     the complexity and all the rest of it.
23  Q. So in good engineering practice, does the lead
24     engineer himself examine the prototype or can you

Page 43

1      just rely on the people under you?
2   A. No. He would be involved at every step along the
3      way.
4   Q. So you would personally examine the prototype to see
5      how it worked?
6   A. Because you are developing it, you want to make sure
7      that all the objectives that you are looking at in
8      the design specification are being met. It's okay
9      to have a rough design where you are doing a test
10     rig and, you know, you have a leak here and a leak
11     there. It isn't important. You are looking at the
12     overall concept to make sure the overall concept is
13     working, then as you move along you develop other
14     issues in the process of whatever else you are
15     developing.
16  Q. Do you sometimes get memos from people on the team
17     or from outside consultants or vendors about
18     different parts of the project?
19  A. Once in a while if you are working in an area where
20     you would need a consultant then you might have to
21     hire one, but if it's within our own area of
22     expertise, obviously we wouldn't.
23  Q. But in terms of the work product that goes in along
24     the way in these projects, how does that work? Do

Page 44

1      people write up memos or logbooks about the --
2   A. Yes, yes, yes. I'm sorry. You do have a logbook
3      that you update every -- usually at the end of the
4      day so you know what you've done. If you didn't,
5      you wouldn't have any reliable data at all because
6      as you develop you may have to back up and you may
7      have to go in a different route if you are up
8      against a block somewhere.
9   Q. Are there standards for good engineering practice
10     about how much detail you need in those logs or
11     memos?
12  A. No, not really. It really depends on what your
13     objectives are and how rapidly the whole thing is
14     moving along. You would have timelines all
15     depending on how large the program is altogether,
16     and you'd have an objective to reach each stepping
17     stone, if you like, which would offer you a
18     benchmark on how things are going, and if everything
19     is working as it ought to be, then you maybe have a
20     meeting at that stage and then you move on.
21  Q. As the lead engineer would you expect the people
22     working under you to communicate to you all of the
23     information that they had recorded about the stuff
24     they are working on?

Page 45

1   A. Yes. At least all the relevant information, sure.
2      In other words anything that related to functional
3      operation which was critical, if you like.
4   Q. So if somebody working under you was testing a
5      prototype or a product, you'd expect to get all the
6      reports that they generated about that testing?
7   A. Yes, or I'd go and look at it myself.
8   Q. Would your standards for evaluating written work
9      product be any different when you are dealing with
10     an outside consultant that's not within your own
11     company?
12  A. No. It would be the same, I think.
13  Q. You'd expect the outside people to adhere to the
14     same standards --
15  A. Yes.
16  Q. -- of your own company?
17  A. Absolutely.
18  Q. You'd communicate those standards to them?
19  A. When you say a standard, there really isn't any
20     standard per se of engineering effort, if you like.
21     There are engineering standards involved in design
22     and drawing and symbols and all that stuff. That's
23     a standard, but as far as how you organize your
24     work, how you do your work on a day-to-day basis is

12  (Pages 42 to 45)

Page 46

1    usually up to the lead engineer or whatever, you
2    know.
3    Q.  If you had hired an outside company to do some
4    testing of a product or prototype, would you expect
5    to have the opportunity to speak to them directly
6    about their results?
7    A.  Absolutely.  You would work with them on a
8    day-to-day basis, even to go over there to visit
9    with them.  Absolutely.
10   Q.  So would it be enough to get from them just a
11   written report or a compilation of data or would you
12   need to be able to interact?
13   A.  You'd have to interact, yes.
14   Q.  Why is that so important?
15   A.  Well, if you've got a product that you are
16   developing and you are responsible for making it
17   work, whatever it is, then you want to make sure
18   that the vendor or consultant is in line with what
19   you are thinking.
20   Q.  And if they say they've done a test, would you take
21   their word for it --
22   A.  No, I wouldn't.
23   Q.  -- that it's the right test or would you --
24   A.  No.  I would visit with them.  We'd have a meeting.

Page 47

1    We'd have a look at how they are doing the testing.
2    Q.  Okay.  Now, I'd like to grab a --
3        MR. SCHLITZ:  We've gone for an hour.  If
4    you want to go for more, I don't want to go for more
5    than another ten minutes, so if you want it take a
6    break now or you want to --
7        MR. RADER:  Let's take a short break.
8    That's fine.
9        (Recess.)
10       (Exhibit 5, Cartridge marked for
11   identification.)
12   BY MR. RADER:
13   Q.  Mr. Taylor, we've marked a cartridge as Exhibit 5,
14   and that's a single cartridge; is that correct?
15   A.  Yes.
16   Q.  When you worked on this case you had a chance to
17   study those?
18   A.  Yes.
19   Q.  Can you describe in your own words how that
20   cartridge works in its normal operation?
21   A.  Yes.  The blank at the bottom of the hole on, if you
22   like, the top side is pushed into the cartridge.
23   Water is introduced, runs along the channels on the
24   inside and then into the coffee bed.  Water runs up

Page 48

1    through the coffee bed, up through the filter into
2    the chamber which is up above the filter and then up
3    and over into the outlet which is on the opposite
4    end.  That's it basically.  It's a simple operation.
5    Q.  Okay.  I'll just try to break it down a little bit.
6    When the cartridge goes into the machine, is it foil
7    up or foil down?
8    A.  Foil down.
9    Q.  And there is a beveled inlet at the part that goes
10   into the machine first; is that right?
11   A.  I've never looked at the singles machine, but I
12   assume it enters in this way.
13   Q.  And so on one end of the singles cartridge there
14   is -- it's square, and on the other end it's got
15   like a point to it?
16   A.  Yes.
17   Q.  And on that end with a point there is a beveled
18   inlet in the hard plastic case?
19   A.  Yes.
20   Q.  And that's where you are saying the water inlet
21   device punctures through?
22   A.  Yes.  It pushes out the blank at the bottom of the
23   hole.
24   Q.  Did you look at some -- just as an aside, did you

Page 49

1    look at some cartridges -- some singles cartridges
2    that didn't have that blank there?
3    A.  Yes, they just have a hole.
4    Q.  So in that case the inlet device just goes right
5    into the hole without having to punch out a blank?
6    A.  Right.
7    Q.  It then introduces the water through that hole into
8    a manifold; is that correct?
9    A.  Yes.
10   Q.  And then the water feeds through the slots in the
11   manifold into the coffee bed?
12   A.  Yes.
13   Q.  And then the resulting liquid goes through -- in the
14   orientation when it's brewing it goes up through the
15   filter?
16   A.  Right, that's correct.
17   Q.  And it travels through a slot over to the outlet; is
18   that correct?
19   A.  That's correct.
20   Q.  And then it goes down through the outlet?
21   A.  Yes, that's correct.
22   Q.  And then in the machine there is a piercing device
23   that pierces the foil that covers the outlet?
24   A.  Yes.

13 (Pages 46 to 49)

Page 98

1  A. Yes.
2  Q. You still have the cartridge in front of you?
3  A. Yes, somewhere. Yep.
4  Q. Do you have a pen in your pocket if I ask you in a
5     moment to simulate what it looked like?
6  A. Yeah.
7  Q. Can you describe in your own words what it was that
8     you did?
9  A. Yes. I mean the only objective was to meet what is
10    in the claim, and that is to provide an inflow of
11    hot water, to run it through and make a beverage out
12    of it -- out through the outlet, obviously, which is
13    what I did because that's all that's in the claims.
14    There is nothing more there.
15 Q. So where did you pierce the foil to make an inlet?
16 A. Well, the inlet was in this area here.
17 Q. So it was sort of in the middle of the coffee bed?
18 A. The bottom, yeah, in the bottom half of the coffee
19    bed.
20 Q. So closer to the outlet nozzle than to the nose of
21    the cartridge?
22 A. Sure, because we had -- yeah, we had some vertical
23    and some over this way too.
24 Q. Who is the "we"?

Page 99

1  A. Well, I and my wife were messing around with them in
2     the kitchen.
3  Q. Okay.
4  A. It's what we did basically.
5  Q. So she helped you hold them or something?
6  A. Yeah, because it's hot water, so --
7  Q. So one of you -- your wife held the cartridge and
8     you injected it?
9  A. Yes.
10 Q. How many cartridges did you test that way?
11 A. I had about three or four of them.
12 Q. And you tested each one once?
13 A. Yes. I only had a limited number, so yes.
14 Q. So did you pierce all of them in pretty much the
15    same place?
16 A. I think I had one here, another one was maybe
17    halfway up perhaps, and then the outlet I opened up
18    with a pen just to open it up.
19 Q. And did you collect the outflow in a cup or
20    something?
21 A. Yes, in a cup.
22 Q. What did you use to pierce the cartridge?
23 A. The cartridge, it was a hypodermic I used.
24 Q. Hypodermic needle?

Page 100

1  A. A needle, sure. Much like you would have on any
2     disposable hypodermic.
3  Q. And so was that actuated with your thumb or
4     something?
5  A. Yes, it was hand operated.
6  Q. How much volume did it hold?
7  A. It was enough to fill up the cartridge.
8  Q. To fill up the coffee bed?
9  A. The coffee bed, sorry. Yes.
10 Q. Do you know what the volume was?
11 A. No, not specifically. I just poured enough in there
12    so it would squirt out the outlet.
13 Q. And so how far in did you press the tip of the
14    needle?
15 A. It was maybe halfway into the coffee bed.
16 Q. And then you used your thumb to squeeze it down?
17 A. Yes.
18 Q. And were you regulating the pressure that you used
19    on your thumb?
20 A. No. I just squeezed it in.
21 Q. And how long did it take you to squeeze in the
22    full -- did you do the full -- let me start with
23    this: Did you put the full hypodermic worth of
24    water in there?

Page 101

1  A. Yes, I did. I emptied it out.
2  Q. You don't know what that volume was but it was the
3     whole thing?
4  A. It was the whole thing. I mean it filled the
5     chamber in there. It was big enough to fill it.
6  Q. How do you know that it filled the chamber?
7  A. Because it squirted out the outlet, otherwise it
8     wouldn't have come out.
9  Q. So it fully saturated the coffee bed?
10 A. You have to have enough in there in order to go up
11    and over, otherwise it won't go up and over out
12    of the outlet.
13 Q. I see. And how much force did you apply to the
14    hypodermic?
15 A. Just a normal force that you would normally if you
16    injecting yourself with, you know, if you had to
17    have insulin and you were shoving it into yourself,
18    just the normal hand force.
19 Q. And do you know how to quantify that for us?
20 A. A pound or two, probably. It wasn't much.
21 Q. And did it pressurize the coffee bed at all?
22 A. Most probably not.
23 Q. In normal use when you brew a cup of coffee, for
24    example, in a singles machine it pressurizes the

26 (Pages 98 to 101)

Page 106

1  A. Yeah, it's a disposable.
2  Q. You said you tested three or four cartridges?
3  A. Yes. I didn't have many.
4  Q. In what orientations did you have them?
5  A. I had one upside down in the normal route. I had
6     another one like this as in the test I had at Kraft.
7  Q. How many did you do in each of those positions?
8  A. Two of each probably.
9  Q. And did you take contemporaneous notes of what you
10    were doing?
11  A. No. All I just -- all I wanted was a demonstration.
12    I was putting hot -- I put in hot water through and
13    the beverage I was having out of the other end was
14    brown, so it was obviously absorbing coffee. That's
15    all I have to do because that's all that's in the
16    claim.
17  Q. Did you see any water exiting through the hole where
18    you had pierced?
19  A. No, it wasn't in fact.
20  Q. In any of your experiments?
21  A. No.
22  Q. To your knowledge you didn't actually pressurize the
23    chamber, though?
24  A. No. I mean I didn't because it's not mentioned in

Page 107

1     the claim at all.
2  Q. How long did it take you to do the testing that you
3     did?
4  A. Couple of minutes.
5  Q. Couple of minutes?
6  A. Yeah.
7  Q. How long did it take you to sort of design in your
8     mind what the testing was going to look like?
9  A. It was also minutes.
10  Q. How did you secure the cartridge? Was it your wife
11    holding it?
12  A. Yes.
13  Q. How much liquid did you get out of the outlet?
14  A. Well, it was the excess of the amount of -- over the
15    amount that was left in the chamber obviously, but
16    it wasn't a huge amount because I wasn't aiming at
17    any specific volume.
18  Q. So you didn't measure the volume?
19  A. No, I didn't measure it because it wasn't necessary.
20  Q. Was it a couple of teaspoons?
21  A. Yeah, probably.
22  Q. Did you taste the liquid?
23  A. No, I don't have to because it's not in the claim.
24  Q. Did you smell the liquid?

Page 108

1  A. Yeah, a little bit, and it had a coffee smell.
2  Q. What temperature was the water that you injected?
3  A. It was hot. It was out of a kettle actually, so it
4     was as much as I could hold in the syringe because I
5     didn't have any insulation.
6  Q. Do you know what the temperature was?
7  A. No, I don't. It would have been somewhere in
8     between -- well, it might have been around 150 F
9     maybe.
10  Q. 150 degrees Farenheit?
11  A. F, right.
12  Q. Did you take any photos of the test?
13  A. No, I didn't.
14  Q. What did you do with the cartridges when you were
15    done?
16  A. I threw them out.
17  Q. Then what did you do with the liquid?
18  A. Also dumped it.
19  Q. Did you take any notes on your observations of the
20    test?
21  A. No. Only what is in the report.
22  Q. And how far in advance of preparing the report did
23    you do the test?
24  A. A week, a week or two probably.

Page 109

1  Q. Now, it says in the footnote in your report that you
2     did the hypodermic needle test on a Lambert-type
3     cartridge with the open inlet?
4  A. Right.
5  Q. That was one of the three or four that you did?
6  A. Yes.
7  Q. What orientation did you do that one?
8  A. One that was in the vertical because it's open. I
9     mean actually that was the one I had to have
10    inverted. I could have put something over the hole,
11    but I didn't.
12  Q. So you did that one vertically with the open hole
13    toward the top?
14  A. Upright, yeah.
15  Q. What would normally be the inlet hole?
16  A. Yes, right.
17  Q. And you did that in order to avoid leakage out the
18    hole?
19  A. Yes, because obviously it would leak if I laid it in
20    any other way.
21  Q. If you had pressurized it, would it have leaked
22    notwithstanding that the hole was at the top?
23  A. Well, of course, yes.
24  Q. Was the hypodermic needle normal to the surface of

28 (Pages 106 to 109)

Page 114

1   Q. Kraft engineers?
2   A. Yes, right.
3   Q. Actually before I get to that, let me just ask you
4      one more question. Did you try to -- aside from
5      testing the singles cartridges, did you try to
6      create a test product or prototype based on either
7      the '234 Patent or the '130 Patent that you offered
8      opinions on?
9   A. With the water you mean?
10  Q. Did you actually build what was shown in those
11     patents?
12  A. No, I didn't.
13  Q. Okay. So your opinions on those are strictly based
14     on what's written?
15  A. On the drawings, what's actually written, yes,
16     right.
17  Q. Now, on pages 8 and 9 of your report you also talk
18     about some tests that were done by engineers at
19     Kraft; is that right?
20  A. Yes.
21  Q. Were you present when any of those tests were
22     performed?
23  A. No, I was not.
24  Q. Have you spoken with Mr. Bentley or Mr. Rowan or any

Page 115

1      other Kraft engineer about those tests?
2   A. No, I did not.
3   Q. How did you find out about those tests?
4   A. I had the information from my counsel.
5   Q. What information was that?
6   A. There was a drawing of the test and the results of
7      the test and the depositions obviously of Rowan and
8      whoever else, Andrew Bentley, right.
9   Q. Now, you understand that they both used a test rig?
10  A. Yeah, I understand that.
11  Q. Have you seen that rig?
12  A. No. Only in picture form.
13  Q. Have you seen pictures of it?
14  A. Well, only what was in the picture with the device
15     in there as well.
16  Q. Let's grab those pages. I have a document that's
17     previously been marked as I believe Exhibit 13. I
18     can't read the handwriting exactly. Then I have
19     Exhibit 91.
20  A. Uh-huh.
21  Q. Then I have Exhibit 202.
22  A. This is all I had.
23  Q. So you've got Exhibits 13, 91 and 202 in front of
24     you. You said that this is all you had?

Page 116

1   A. Yes.
2   Q. You didn't have any other pictures of the rig or
3      anything like that?
4   A. No. This is what I remember.
5   Q. So what is your understanding of what's shown in
6      Exhibit 13?
7   A. Well, 13 is just a volume of liquid. That's all
8      that's indicated from different cavities of the
9      housings, I assume, but that's how I took it to
10     read.
11  Q. So what is the -- it says "mold number" on the upper
12     left and then "cavity number." What do those
13     numbers refer to?
14  A. Mold would be a mold for making the housings and
15     because its multi-cavity-type mold, it's really a
16     means of identifying the cartridge itself, the
17     housing anyway.
18  Q. And what's the significance of that information on
19     this chart?
20  A. Well, it's just the amount of Mls that he took out,
21     that he was able to get out or at least the
22     repeatability, I guess. That's all I can get out of
23     it.
24  Q. In other words why are the mold and cavity numbers

Page 117

1      listed here? What does that add to this table?
2   A. I'm not sure, to be honest.
3   Q. Okay.
4   A. You know, I understand there were issues, not really
5      issues, but there were questions about alterations
6      and molds over the years and all the rest of it, and
7      I took it that it was part of that.
8   Q. But as you sit here today you don't know
9      specifically why that stuff is listed on this page?
10  A. No. There is not a lot of meaning there because it
11     merely indicates a mold number and cavity number or
12     date or at least a month anyway with a volume in
13     CCs. There is no other data there.
14  Q. So the month and manufacturer, what does that refer
15     to?
16  A. I assume of the cartridge with the coffee in it.
17  Q. And there are some Decembers and Novembers, but do
18     you know what years those were?
19  A. No, I don't.
20  Q. Do you know whether these were the cartridges with
21     the open hole or the closed holes?
22  A. There is no identification.
23  Q. Do you know whether these were singles cartridges or
24     T-discs?

30 (Pages 114 to 117)

Page 118

1  A. These are singles. I was aware of that.
2  Q. Okay. And then on the right-hand column, the Mls,
3     what does that refer to?
4  A. I assume it's the amount of coffee which they were
5     able or liquid or whatever that they were able to
6     extract out of the rig that they had.
7  Q. Is it the input or the output?
8  A. No. It's output, I think, but they are all within a
9     small amount of each other, so it's insignificant in
10    my mind. They are all essentially the same.
11 Q. Who created this document?
12 A. This I believe was Andrew Bentley, I think.
13 Q. What tests did he do to create this document?
14 A. He had the one which is shown in Exhibit 91.
15 Q. So he used the device that's shown in Exhibit 91?
16 A. I assumed, yes.
17 Q. You say you assumed. Do you know one way or another
18    whether it was that device or a different device
19    that led to the results in Exhibit 13?
20 A. No, because I can't remember, to be honest. I've
21    read such a lot of data and depositions, I can't
22    remember to be honest.
23 Q. Okay. So it could have been a different device that
24    led to these results?

Page 119

1  A. It may well have been. I'm just assuming because I
2     don't remember.
3  Q. Okay. Do you know if these were coffee cartridges
4     or tea cartridges?
5  A. I believe they were coffee cartridges, I think, from
6     what I remember.
7  Q. Do you remember what type of cartridges?
8  A. They were -- I think they used Lambert and Rychiger
9     type of cartridges.
10 Q. And that's for the results in Exhibit 13?
11 A. Yes, and also maybe on 202. Is that what it is?
12    Yeah.
13 Q. And do you know what type of coffee was in the
14    cartridges that were used to get the results in
15    Exhibit 13?
16 A. Only what's on the paper. There is a brand there on
17    202 which they talk about.
18 Q. I see. Now Exhibit 202, is that recording
19    information about the same tests as Exhibit 13?
20 A. I'm assuming it is at this stage because I don't
21    remember as I say.
22 Q. Okay.
23 A. Because on this particular one he's also talking
24    about drink volume.

Page 120

1  Q. I see. Now, in the tests shown in Exhibit 13 do you
2     know were those made -- were those results through
3     same-side piercing or opposite-side piercing?
4  A. I think they were on the same-side piercing.
5  Q. And how was the cartridge oriented in the tests?
6  A. It was vertical.
7  Q. And where was the inlet piercing made in the test
8     for Exhibit 13?
9  A. It was in a number of locations. It's on the
10    drawing here, A, B, C, D, E, I think.
11 Q. So you are referring to the picture in Exhibit 91?
12 A. On 91, sorry, yes.
13 Q. So in the tests that led to Exhibit 13, all the
14    various inlet positions were used that are shown in
15    Exhibit 91?
16 A. I assume so. They were all in the vertical in this
17    test, I think.
18 Q. But in terms of which inlet position was used for
19    each of the tests shown in Exhibit 13, do you know
20    which one or ones it was?
21 A. Well, they have them on that page actually. It
22    indicates on the -- above the drawing.
23 Q. I see. So that the tests that are listed in the
24    table on Exhibit 91 are the same tests that are

Page 121

1     listed in the table on Exhibit 13?
2  A. That's what I'm assuming, yeah, because I didn't
3     have any other information. I mean I had this one
4     obviously which is over the picture which they had.
5  Q. Okay.
6  A. It's obviously measuring the volume out of the
7     different positions or -- well, yeah, the positions
8     of the -- where the inlet was pierced, and they are
9     all in essence the same.
10 Q. Okay.
11 A. The difference is insignificant anyway.
12 Q. Now, to your knowledge did Mr. Bentley taste any of
13    the liquids that he produced with the rig?
14 A. He did not, I don't think, from what I remember.
15 Q. Do you know if anyone else at Kraft, Mr. Rowan or
16    Mr. MacMahon, tasted any of it?
17 A. I don't believe so.
18 Q. Now, can you just describe in your own words how the
19    rig that they used functioned?
20 A. The way I understand it is they had a clamp on the
21    back or plate, if you like, on the back of the
22    cartridge and then another one over the front of it
23    with some holes in it which would indicate the
24    positions of the inlet pierces, if you like, and

31 (Pages 118 to 121)

Page 122

1    there was a rubber gasket in between the plate on
2    the outside and against the cartridge, so there was
3    a gasket which would eliminate leakage and in
4    between the outer plate with the holes in the
5    cartridge itself, and then it was tightened up by
6    finger load -- finger tensioning, if you like.
7    Q. What do you mean by "finger tensioning"?
8    A. Well, to tighten up the wing nuts.
9    Q. And where was the hot water coming from?
10   A. It was a tube which was introduced in through the
11   rubber which was sandwiched, if you like, in between
12   the outer plate and the cartridge itself.
13   Q. And what was feeding that tube?
14   A. There would be water from the supply, hot water.
15   Q. Do you know what type of supply it was?
16   A. No, I have no recollection other than it was hot
17   water. That's all I remember.
18   Q. Do you know at what pressure the water was fed in?
19   A. No, I don't.
20   Q. And then how was the water -- how did the water exit
21   the cartridge?
22   A. Out through the outlet which is on the other side in
23   this case.
24   Q. What did the piercers for the inlet and the outlet

Page 123

1    look like?
2    A. The piercers, I believe they had used the ones which
3    they use on the existing or off one of the existing
4    piercers on the brewer or one of the brewers where I
5    think on the inlets they had a serrated tube ending
6    which allowed them to pierce, but it made a rather
7    ragged entry hole. I don't think it's what I would
8    have used, but that's all right.
9    Q. So for both the inlet and the outlet they had this
10   serrated item?
11   A. The inlet was a little different, I think. They had
12   one which they use on all the outlets, I think,
13   which is where they cut around most of the periphery
14   with a serrated edge and then they pull it over to
15   one side.
16   Q. I'm sorry. That's for the inlet or the outlet?
17   A. That's the outlet, sorry.
18   Q. So for the outlet they use the same jagged outlet
19   piercers that they used in the singles machine?
20   A. It was different. It was the one they usually use
21   on the outlet, and I think the inlet one -- I don't
22   know. They might have been the same. I'm not sure
23   because I didn't see any indication exactly. I was
24   only looking at the marks in and around the hole.

Page 124

1    Q. I'm sorry. What marks around the hole?
2    A. I had seen somewhere -- it was a drawing, I think.
3    No. It was a picture, and it showed an inlet hole
4    in through the foil and it was a little jagged.
5    It's a little bit like the outlet piercer which they
6    use on the Tassimo, I think.
7    Q. Was it taken from the Tassimo?
8    A. I don't know. I'm not sure if it was. I assumed it
9    was, but I don't know.
10   Q. And with regard to the outlet piercer, was that
11   taken from any machine?
12   A. It may well have been, but I'm not sure again.
13   Q. And who actually made the test rig?
14   A. I believe it was a mix of Bentley and Rowan, Andrew
15   Bentley and Lee Rowan. One of them or the
16   technician who was working with them arrived at a
17   test rig, I guess.
18   Q. So it is a combined effort --
19   A. I think so from what I read, yes.
20   Q. -- between Rowan and Bentley and the technician?
21   A. Yeah, that's what I assumed.
22   Q. You mentioned a rubber pad?
23   A. Yeah. I named it a gasket because that's what it
24   is.

Page 125

1    Q. Where was that located?
2    A. In between the front of the -- it was up against the
3    front of the lid, the foil lid, and under a plate
4    which went on top of it.
5    Q. Okay.
6    A. So it was compressed basically to some degree
7    anyway.
8    Q. So that it was pressing against the foil side of the
9    cartridge?
10   A. Yes.
11   Q. And it was forming a seal around the edge wall of
12   the cartridge?
13   A. It would form around the periphery of the cartridge,
14   yes, and depending on how they went in with the
15   piercer itself, I assume they had a pretty good seal
16   between the piercer and the rubber gasket.
17   Q. Do you know enough about the details of that?
18   A. No, I don't. I really don't because I didn't see
19   it.
20   Q. So you don't --
21   A. I'm just looking at what I read.
22   Q. So you don't know whether that seal formed right
23   around the needle or not?
24   A. No, I don't know. I don't know the detail of that.

32  (Pages 122 to 125)

# EXHIBIT 11

THIS EXHIBIT HAS BEEN
REDACTED IN ITS
ENTIRETY

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on September 2, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on September 2, 2008, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

### BY E-MAIL

> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
John W. Shaw (No 3362)  [*jshaw@ycst.com*]
Adam W. Poff (No. 3990) [*apoff@ycst.com*]
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*