IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>      Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>      Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED –**<br>**PUBLIC VERSION** |

## PROPOSED JOINT PRETRIAL ORDER
### Volume II OF II

| YOUNG CONAWAY STARGATT & TAYLOR, LLP | POTTER ANDERSON & CORROON LLP |
|---|---|
| John W. Shaw (No. 3362)<br>Karen E. Keller (No. 4489)<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, DE 19801<br>(302) 571-6600<br>jshaw@ycst.com<br>kkeller@ycst.com | Richard L. Horwitz (No. 2246)<br>David E. Moore (No. 3983)<br>Hercules Plaza, 6th Floor<br>Wilmington, DE 19899<br>(302) 984-6000<br>rhorwitz@potteranderson.com<br>dmoore@potteranderson.com |
| *Attorneys for Plaintiff Keurig, Incorporated* | *Attorneys for Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc.* |
| *Of counsel:* | *Of counsel:* |
| Michael A. Albert<br>Michael N. Rader<br>Charles T. Steenburg<br>WOLF, GREENFIELD & SACKS, P.C.<br>600 Atlantic Ave.<br>Boston, MA 02210<br>(617) 646-8000 | David M. Schlitz<br>William S. Foster, Jr.<br>C. John Brown<br>BAKER BOTTS LLP<br>1299 Pennsylvania Ave., NW<br>Washington, DC 20004<br>(202) 639-7700 |

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>  Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>  Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED –<br>PUBLIC VERSION** |

**KEURIG'S MOTION *IN LIMINE* NO. 3 – MOTION TO PRECLUDE KRAFT FROM
INTRODUCING PURPORTED PRODUCTION RECORDS AND OTHER DOCUMENTS
NOT QUALIFYING FOR THE BUSINESS RECORDS HEARSAY EXCEPTION**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

Keurig requests an order prohibiting Kraft from introducing (1) purported production records for Kenco Singles cartridges and (2) various faxes and other documents from Kraft employees Janice Appleton, Helen Glus, and Geraldine Greto ostensibly related to *ad hoc* shipments of Kenco Singles cartridges from England to the United States. The documents are classic examples of hearsay, and no exception is applicable.

The deposition of Michael Tamblin, who generated the production records for purposes of this litigation, revealed that he knows nothing about the underlying record-keeping procedures. He therefore is unable to lay the necessary foundation for the document as a business record under Fed. R. Evid. 803. For their part, Ms. Appleton, Ms. Glus, and Ms. Greto admit that they did not maintain Kenco Singles shipping documents (let alone complete sets of such documents) in the ordinary course of their business duties. They instead <u>selectively</u> preserved certain documents, without being able to identify a business-related reason. Their documents therefore do not qualify as business records either.

## I.    BACKGROUND

Kraft alleges that the Kenco Singles Medium Roast cartridges anticipate Keurig's '762 patent. Before that allegation could even be assessed on its merits, Kraft would as a threshold matter need to establish that Medium Roast cartridges were in public use in the United States prior to February 18, 1999 (the priority date of the '762 patent). See 35 U.S.C. § 102(b). Kraft produced copes of facsimile transmissions and other documents retained by Ms. Appleton (in England) and Ms. Glus and Ms. Greto (in the United States) in an attempt to corroborate their testimony that Ms. Glus and Ms. Greto worked with Ms. Appleton to obtain supplies of Kenco Singles cartridges for use in two of Kraft's U.S. offices. Examples of the documents in question are attached hereto as Exhibit 1.

Kraft has two types of production lines at its Banbury, England facility – lines built by the Lambert company that produce cartridges with an open inlet, and lines built by the Rychiger company that produce cartridges with a sealed inlet. In its public use defense, Kraft seeks to rely on the Rychiger cartridges with the sealed inlet, and therefore bears the burden of proving by clear and convincing evidence that Singles cartridges used in the United States at the relevant time were made on the Rychiger line. Kraft has focused its strategy on Singles cartridges of the Medium Roast variety, proceeding under the theory that all of the Medium Roast cartridges manufactured during the relevant time period came off the Rychiger line.



Kraft produced purported "production records" that do not reflect any production of Medium Roast Singles cartridges on Lambert lines between November 1996 and December 1998.



In any event, Kraft designated one of its UK employees, Michael Tamblin, to testify about the production records, and Keurig deposed him in England on April 2, 2008. Mr. Tamblin testified that while he ran the query that generated the production report for purposes of the litigation, he was unfamiliar with the underlying data or how it had been recorded.

## II.    ARGUMENT

### A.    The Documents Are Inadmissible Hearsay.

The production record is classic hearsay under Fed. R. Evid. 801(c), as Kraft seeks to use it as evidence of what it purportedly states – i.e., that all Singles production from November 1996 to December 1998 occurred on Rychiger Lines rather than Lambert lines.

The Appleton, Glus, and Greto documents are also hearsay because Kraft would offer them to corroborate the witnesses' testimony. Cf. Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1172 n.10 (Fed. Cir. 2006) (documents offered to corroborate inventor's testimony are hearsay and must qualify under an exception to be admissible); Chen v. Bouchard, 347 F.3d 1299, 1308 (Fed. Cir. 2003) (affirming exclusion of corroborating documents in patent case).

### B.    The Business Records Exception Does Not Apply.

The "business records" hearsay exception does not apply to the production records or the Appleton, Glus, and Greto documents because, as discussed below, none of those witnesses can lay the necessary foundation. In both cases, moreover, the surrounding circumstances "indicate lack of trustworthiness" in that the records are incomplete and therefore unreliable.

#### 1.    Kraft Cannot Satisfy the Foundation Requirement.

To introduce the documents as business records under Fed. R. Evid. 803(6), Kraft would have to present foundation testimony from "the custodian or other qualified witness" that (1) the documents' creators had the personal knowledge necessary to make accurate statements; (2) they recorded the statements contemporaneously with the actions that were the subject thereof; (3) they made the records in the regular course of their business activity; and (4) such records were regularly kept by the business. United States v. Pelullo, 964 F.2d 193, 200-202 (3d Cir. 1992) (district court erred in admitting hearsay documents without adequate Rule 803(6) foundation).

- 3 -

Mr. Tamblin's testimony would not satisfy any of the foundational requirements for the production records. He has never entered Singles production data, nor is he familiar with the circumstances under which others do so. Indeed, a number of the columns in the production spreadsheet are a mystery to him; he simply does not know their significance. See Tamblin Depo. (Ex. 3) at 16, 26, 41-42. Mr. Tamblin does not even know the difference between Rychiger and Lambert production lines – undercutting the very reason why Kraft desires to introduce these records in the first place. Id. at 12. Kraft's attempt to admit the production records on Mr. Tamblin's testimony thus invites legal error. United States v. Riley, 236 F.3d 982, 984-85 (8th Cir. 2001) (requiring new trial because hearsay evidence was introduced without a witness who had personal knowledge of how the records were prepared or maintained); Kolmes v. World Fibers Corp., 107 F.3d 1534, 1543-44 (Fed. Cir. 1997) (exclusion of documents proper where witness "failed to testify concerning the record-keeping process").

For similar reasons, the partial records retained by Ms. Appleton, Ms. Glus, and Ms. Greto fail to qualify as business records because they were not regularly kept in the ordinary course of business. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████

Ms. Greto likewise collected data "on [her] own" and not at the request of her superior, and Ms. Glus emphasized that retaining records regarding Kenco Singles orders "wasn't part of [her] business duties." Rather, the records were "just something [that she] kept just for [her]self." See Greto Depo. (Ex. 5) at 94; Glus Depo. (Ex. 6) at 97-98. See United States v. Ferber, 966 F. Supp. 90, 98 (D. Mass. 1997) (records were inadmissible because there was no evidence that employer "required [them] to be maintained").

2.    <u>**The Documents Are Incomplete and Untrustworthy**</u>.

Even if Kraft <u>were</u> able to satisfy the threshold requirements under Fed. R. Evid. 803(6),

the Court should still exclude the documents in question because the circumstances "indicate

lack of trustworthiness." Sworn admissions confirm that the documents are incomplete.

 Such gaps render the records

untrustworthy; the omissions deny the jury a full understanding of the context of the shipments

and supposed "public use" in the United States.

III.    **CONCLUSION**

For the above reasons, Kraft should be precluded from offering into evidence the Kenco

Singles production records (Bates Range K-ED-00126677-129858) or the documents

purportedly corroborating testimony from Ms. Appleton, Ms. Glus or Ms. Greto regarding

alleged shipments of Kenco Singles cartridges to the United States (Bates Range K0017156-

17308 and K0017464-17502).

DB02:7054260.1                                                                                    065927.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
apoff@ycst.com
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

065927.1001

# EXHIBIT 1



# M E M O R A N D U M

January 6, 1998

**TO:**    Janice Appleton    **AT:**  KJS Maxpax International, Banbury, UK
                            **Fax:**  8-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-273152 / **Tel:** 44-1295-223471

**FROM:**  Geri Greto    **AT:**  KF Coffee & Cereal Technology, Tarrytown, NY
                        **Fax:**  914-335-4367 / **Tel:** 914-335-4350

**SUBJECT:**  <u>KENCO COFFEE CARTRIDGES</u>

Hi Janice - are you still the contact person to arrange for shipment of Kenco Cartridges; I found a correspondence between you and I of July, '96?

I am the administrator for Bill Craig, Technology Director, and we would like to order the following for the Kenco Machine in our pantry:

One Case of Each:

    Hot Chocolate
    Espresso
    Cappuccino
    Earl Grey Tea

When you get an opportunity, could you let me know if you can handle this or if I should be contacting someone else.

Thank you - regards,

*Geri*

Maxpax

06 JAN '98 16:39                            914 335 4367        PAGE.01

K  0017170

## Glus, Helen

**From:**      Glus, Helen
**Sent:**      Thursday, October 22, 1998 5:37 PM
**To:**        Court, Caroline (KJS-UK)
**Subject:**   RE: Flight details
**Importance:** High


*Caroline,*

*Thanks for the notice of shipment.  Our stock arrived today.  One thing, though, instead of three boxes of Cappuccino, we received three boxes of Fine Leaf Tea.  We will keep them as we are eager to try something new, but could you arrange for shipment of the Cappuccino as well.  I can't let down the people who can't get through the day without a cup of Cappuccino!*

*Many thanks and kind regards,*

*Helen Glus*

**From:**      Court, Caroline (KJS-UK)
**Sent:**      Thursday, October 15, 1998 1:30 PM
**To:**        Glus, Helen
**Subject:**   Flight details

Helen
Flight details for your shipment of Singles is as follows:
Flight No. UA797 from London Heathrow to JFK 16.10.98
ETA New York - 21.05 16.10.98
MAWB No. 016-3483 4520

Best Regards

Caroline

K  0017180

# Kraft Jacobs Suchard

## Maxpax International
## Facsimile Transmission

To:          Helen Glus

cc:

From:        Liz Matthews, Secretary to Doug Halliday

Page 1 of:   1
             if you receive illegible pages, please call: +44 1295 223400
             or fax: +44 1295 223540

Date:        07/11/96

Subject:

Further to your letter to Doug, I am arranging for the requested product to be sent to you ASAP along with a capsule storage unit (branded Kenco) which Mr Camilleri requested.

I will contact you again shortly to let you know when and how the products will arrive.

When you need more supplies, please contact me on the telephone/fax number above, and I will arrange to get them sent.

Regards.


*Liz Matthews*

**Liz Matthews**



**Maxpax International**
**Kraft Jacobs Suchard Limited**
**Banbury**
**Oxon OX16 7QU**
**UK**

K  0017221

## Greto, Geri (MS Mail)

| | |
|---|---|
| From: | Greto, Geri (MS Mail) |
| To: | Nunn, Pat |
| Subject: | KENCO SINGLES CARTRIDGES |
| Date: | Thursday, May 18, 1995 11:10AM |
| Priority: | High |

Project Michigan is a great success here - and our supply is dwindling!

When you get an opportunity, could you ship us the following:

FLAVOR            # OF CARTONS



Hot Chocolate          2
Medium Roast          2
Dark Roast            1
Light Roast           1
Decaf Roast           3
Hot Cappuccino        2
Earl Grey Tea         2

Thank you in advance for your attention to our request,

Geri

P. S.        I tried to send this message to you by Fax, but I keep getting a line failure - is your
fax # 44-295-258015 ?

*[handwritten notes]*
5/31
Audit from Pat
- Yes rec'd E-mail
but couldn't reply back
- she passed it
on to Cadco and
people and
they are
shipping out.

K  0017240

**Greto, Geri (MS Mail)**

| | |
|---|---|
| **From:** | Greto, Geri (MS Mail) |
| **To:** | Nunn, Pat |
| **Subject:** | Kenco Singles |
| **Date:** | Monday, June 24, 1996 3:45PM |

*6/26 forwarded to (MS Mail)*

Hi Pat, how are you?

It is time for me to order more cartridges, but I do realize that I keep contacting you, but that I really should be contacting Doug Halliday's assistant. Back in February I made a notation by his name that his secretary's name was Liz, but I do not know her last name or her fax number. Could you please forward this info to me.

Thanks so much for your help,

Geri

Page 1

K   0017269

# EXHIBIT 2

THIS EXHIBIT HAS BEEN
REDACTED IN ITS
ENTIRETY

# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____ :

KEURIG INCORPORATED                :
                                   :
              Plaintiff            :  Civil Action No.
                                   :  07-017 GMS
                    v              :
                                   :
KRAFT FOODS GLOBAL, INC            :
TASSIMO CORPORATION, and           :
KRAFT FOODS INC,                   :
              Defendants           :
_____ :


VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL TAMBLIN

On Wednesday, 2nd April 2008


Commencing at 10.24 am


Taken at:
Baker Botts
41 Lothbury
London
EC2R 7HF
United Kingdom




Reported by: Miss Pamela Henley

Page 10

Tamblin - Rader

1
2       A.    Six to eight months.  He is about
3  to finish.  It was only an assignment.
4       Q.    Someone else will replace him?
5       A.    Yes.
6       Q.    Prior to him you do not recall the
7  name of the person who did that?
8       A.    Prior to him it was a guy called
9  Paul Watts.
10      Q.    How long was he there?
11      A.    Four years, five years, perhaps.
12      Q.    Is the job of Mr Watts and
13 Mr Caiger -- is that analogous to what you do for
14 the other products?
15      A.    No, because they are based on days
16 as opposed to being a shift manager.
17      Q.    What is the difference?
18      A.    The difference mainly is that in
19 the Maxpax facility the day role was to do the
20 planning of the labour as I understood it, and the
21 actual running of the lines was assigned to what
22 they called team leaders who were really the line
23 technicians.
24      Q.    I see. So Mr Watts and Mr Caiger
25 their job would be to manage the labour, but not

Page 11

Tamblin - Rader

1
2  the lines themselves?
3       A.    That is right.
4       Q.    Do you know who the team leaders
5  have been over the years?
6       A.    I really do not know.  I have never
7  had any involvement over there.
8       Q.    Okay. In your facility it is
9  different because you...
10      A.    You had a manager on each shift
11 because it was a bigger operation.
12      Q.    So you essentially fill the roles
13 of both managing the labour and the lines
14 themselves?
15      A.    Yes.
16      Q.    So in your current job as
17 production manager and coffee packing --
18      A.    That is not my current job.
19      Q.    -- oh, sorry, that was your prior
20 job?
21      A.    Yes.
22      Q.    As the plant master data control
23 co-ordinator, your current job, that job does
24 encompass data for singles cartridges?
25      A.    Only the input in to make the

Page 12

Tamblin - Rader

1
2  recipe, yes.
3       Q.    When you say the recipe you mean
4  all the things --
5       A.    That make up the final SKU. Yes.
6       Q.    -- so in what -- in your current
7  job do you work in the same building as the
8  singles production lines?
9       A.    No.
10      Q.    Do you go over there at all?
11      A.    Very, very infrequently.  The last
12 time I went over was probably nine months ago.
13      Q.    Are you familiar with the Lambert
14 and Rychiger packing lines for singles cartridges?
15      A.    No, not at all.
16      Q.    Do you know how many packaging
17 lines there are for singles cartridges?
18      A.    I think it is four, but I am not
19 sure.
20      Q.    Do you how many lanes they each
21 have?
22      A.    No, not at all on that, no.
23      Q.    On the singles lines over the years
24 do you know what their procedures have been for
25 moving crews to different lines if they have

Page 13

Tamblin - Rader

1
2  breakdowns?
3       A.    I have no idea. As I say I have
4  never been involved in that department.  I really
5  do not know how it was managed.
6       Q.    Okay. The court reporter before you
7  came in marked what we are calling Exhibit 201,
8  which is a partial printout of some of the data
9  that we received.  The total data was several
10 thousand pages so I decided not to print out the
11 entire thing, but this is taken from the very
12 beginning of the 1994 section of the data.  Does
13 this document look familiar to you?
14      (Exhibit 201 marked for identification)
15      A.    Yes, I think it is from the Excel
16 spreadsheet I provided.
17      Q.    Tell me about the Excel spread
18 sheet that you provided?
19      A.    What do you want to know? That data
20 is taken by a query and imported into Excel from
21 the -- what is now called our productivity server
22 which retains all this information.
23      Q.    What is the productivity server?
24      A.    It is for each area we have, as I
25 said, a coffee area, a Maxpax area, a flexibles

MARTEN WALSH CHERER LTD  12-14 NEW FETTER LANE        LONDON EC4A 1AG
TEL: 020 7936 6000    E-MAIL: info@martenwalshcherer.com  FAX: 020 7427 0093

KEURIG v KRAFT                2 APRIL 2007      DEPOSITION OF M. TAMBLIN

Page 14

Tamblin - Rader

1        Tamblin - Rader
2    area. At one time we did have an R&G, which was
3    roast and ground coffee but that has been sold.
4    But for each area every shift the information
5    would be input into this system to record what we
6    have produced against what SKU.
7        Q.    So is there a terminal at each
8    production line?  Is that how it works?
9        A.    No, it is a server which is linked
10   to the computers in the production offices.  So
11   there would have been one in coffee packing where
12   I worked.  Obviously one in flexibles packing, one
13   in Maxpax.  There was also one in R&G when it
14   existed.  But as I say that has now been sold off.
15       Q.    Is Maxpax the -- another name for
16   the singles production area?
17       A.    That is where the singles occurs,
18   yes.  The original Maxpax business was an
19   in-cup --
20       Q.    I see.
21       A.    -- business.
22       Q.    So when you say "Maxpax" you are
23   referring to singles nowadays?
24       A.    It still produces in-cup as well so
25   it is just the building in which it produces

Page 15

1    everything, in-cup and the singles.
2        Q.    So when you say "Maxpax" you are
3    talking about that building?
4        A.    Yes, the Maxpax business.  That is
5    what it refers to.
6        Q.    So there is a computer in that
7    Maxpax building that links up to the productivity
8    servers?
9        A.    Yes.
10       Q.    And that computer has software on
11   it that allows you to enter this kind of data?
12       A.    That is correct.
13       Q.    That data gets stored on a central
14   server?
15       A.    Yes.
16       Q.    Where is that server?
17       A.    It is located in Banbury.
18       Q.    There is -- in each of the
19   production buildings there is a computer like
20   that?
21       A.    Yes.
22       Q.    So in -- there was one in the
23   coffee packing facility where you worked?
24       A.    That is correct, yes.

Page 16

1        Tamblin - Rader
2        Q.    Did you enter data on that
3    computer?
4        A.    On the coffee packing, yes.
5        Q.    Were you -- when you were the
6    production manager through 2005 was it your job to
7    enter data into that computer?
8        A.    That is correct, yes, for my shift.
9        Q.    How many shifts were there?
10       A.    In coffee packing there is three
11   shifts; a morning shift, an afternoon shift and a
12   night shift.  So each manager would be responsible
13   for entering their own information.
14       Q.    You never entered singles data like
15   what we have in Exhibit 201 into their computer?
16       A.    No.
17       Q.    Were you ever present when anyone
18   entered data into that computer?
19       A.    Not at all, no. As I say it is a
20   different building entirely.
21       Q.    Is it the same software or
22   different software?
23       A.    Same software, yes.
24       Q.    Now, what is the purpose of
25   entering the data into that productivity server?

Page 17

1        Tamblin - Rader
2        A.    To provide a record.  It is normal
3    business practice at Kraft to record what each
4    shift has produced against each SKU.
5        Q.    In the facility where you were
6    working in coffee packing as the shift supervisor
7    was it your responsibility to do that?
8        A.    Yes.
9        Q.    For each of the three shifts it was
10   the shift supervisor who did that?
11       A.    That is correct.
12       Q.    Did anyone else ever enter the data
13   on that facility besides the shift supervisors?
14       A.    No.
15       Q.    What would have happened if you
16   were sick one day or on vacation --
17       A.    There would be cover provided and
18   then that shift manager would have entered the
19   information.
20       Q.    -- okay. What happens to that data
21   after it goes into the productivity server? Is it
22   used for anything?
23       A.    It is used to generate reports
24   internally, so we can track things like is the
25   line running efficiently, how much labour is

MARTEN WALSH CHERER LTD 12-14 NEW FETTER LANE        LONDON EC4A 1AG
TEL: 020 7936 6000   E-MAIL: info@martenwalshcherer.com  FAX: 020 7427 0093

KEURIG v KRAFT                2 APRIL 2007       DEPOSITION OF M. TAMBLIN

Page 26

Tamblin - Rader

1
2       Q.    How would the data at the end of
3  the day -- when you were working in coffee packing
4  when did you enter the data; at the end of the
5  day?
6       A.    End of the shift.  End of the
7  working shift.
8       Q.    Do you know when the singles folks
9  entered the data in the Maxpax building?
10      A.    I do not know.
11      Q.    At the time of the shift when you
12  entered the data did you also have a line code and
13  a line number to enter?
14      A.    Yes.
15      Q.    How would you decide -- I assume
16  you would decide the line code based on which line
17  was running?
18      A.    That is correct.  Yes.
19      Q.    How would you decide what to put in
20  for the line number?
21      A.    Because the SKU is linked to that
22  line number within the computer programme itself.
23      Q.    So that field is populated
24  automatically?
25      A.    Yes.

Page 27

Tamblin - Rader

1
2       Q.    The programme, were there like drop
3  down menus for data, or are you typing all the
4  data in?
5       A.    You would start off by typing the
6  shift date, and what shift you were; mornings,
7  afternoons or nights.  But, essentially, after
8  that it was all drop down.
9       Q.    So it was all -- you were just
10  choosing from a menu --
11      A.    Apart from the product code. Once
12  you put the product code you had to enter,
13  everything else after that was drop down choice
14  from a menu.
15      Q.    -- so you entered the product code
16  and would the description automatically pop up?
17      A.    That is right.
18      Q.    And then the line code, would you
19  have to choose that?
20      A.    Not if it was unique to that line.
21  That would be automatically populated.
22      Q.    But on the singles side are the
23  particular products unique to specific lines?
24      A.    I really do not know.
25      Q.    In the work that you were doing

Page 28

Tamblin - Rader

1
2  your product was unique to specific lines?
3       A.    That is correct, yes.
4       Q.    What would happen if a line broke
5  down and you were going to manufacture the product
6  on a different line?
7       A.    You could not physically do that.
8  Each line was specific to a jar size.
9       Q.    So if one of your lines broke down
10  you would have to wait until it was fixed?
11      A.    Or move the crew to a different
12  line and produce a different SKU.
13      Q.    So if you wanted to produce that
14  same SKU --
15      A.    You would have to wait.
16      BY MR FOSTER:
17      Q.    Just for the record, Mr Tamblin,
18  are you speaking about the coffee business --
19      A.    This is --
20      Q.    -- or are you speaking of the
21  singles business?
22      A.    -- no, I am purely talking about
23  coffee here.
24      BY MR RADER:
25      Q.    When you were working in the --

Page 29

Tamblin - Rader

1
2       A.    The coffee production business.
3       Q.    -- okay.  You do not know whether
4  the various lines in the singles side would
5  support the same product?
6       A.    No, I do not, no.
7       Q.    So you do not know whether the line
8  code would have popped up automatically or whether
9  they would have to choose that from a menu?
10      A.    No, I would not know.
11      Q.    Then in your experience working on
12  the coffee side the line number, would that pop up
13  automatically, or would you have to choose that --
14      A.    That would coffee, yes, because,
15  again, it is unique.
16      Q.    -- do you know whether it would for
17  singles?
18      A.    Again, I would not know.
19      Q.    And the next column "CONT"; do you
20  know what that means?
21      A.    That was whether the line ran
22  continually.  So an eight hour shift whether it
23  was crewed to run for eight hours or whether you
24  part crewed it and then people had their meal
25  break. So the option was a yes or a no which was

8 (Pages 26 to 29)

Page 38

Tamblin - Rader

1          Tamblin - Rader
2   should have M for the area?
3      A.   Should do, yes.
4      Q.   And then in column M, the shift;
5   what does that refer to?
6      A.   That refers to the shift that has
7   produced that SKU, or that A shift, B shift or N
8   for nights.
9      Q.   So A is morning?
10     A.   They rotated. So A shift would do a
11  morning shift one week, an afternoon shift the
12  next, but they were always A shift, and B shift
13  were the reverse.
14     Q.   The people on that team would
15  either be part of A or B?
16     A.   Yes.
17     Q.   Then column N, the quarter, what
18  does that refer to?
19     A.   It is the business year spread up
20  into four quarters.
21     Q.   Is that field automatically
22  populated?
23     A.   No, again, it is a choice, but it
24  is from a drop down.
25     Q.   So it did not follow automatically

Page 39

1          Tamblin - Rader
2   from the date that was entered?
3      A.   No.
4      Q.   And then the week number, column O?
5      A.   Each quarter had 13 weeks so that
6   would refer to the week of that particular
7   quarter.
8      Q.   So when you were doing this for
9   coffee you were always aware of what week you were
10  in?
11     A.   Yes.
12     Q.   The shift hours column; what is
13  that?
14     A.   That is the length of the shift.
15  So eight hours would say it is an eight hour
16  shift.
17     Q.   The length of a typical shift in
18  coffee was how long?
19     A.   Eight hours.
20     Q.   That includes --
21     A.   On double days.  Night shift was
22  eight hours, apart from Friday where it was ten
23  hours.
24     Q.   -- do you know what the shift
25  lengths were over in singles?

Page 40

1          Tamblin - Rader
2      A.   Exactly the same across the whole
3   site. Singles, Maxpax, flexibles and coffee.
4      Q.   Column Q, EFF; what is that?
5      A.   That is the efficiency.  So that
6   would be the efficiency that that SKU was produced
7   at.
8      Q.   How is that number calculated?
9      A.   That is calculated from the
10  programme.
11     Q.   What does it represent?
12     A.   For the amount of time that that
13  particular SKU was booked then it calculates that
14  efficiency based on what the standard line speed
15  is.
16     Q.   So it is calculating it based on
17  how many cases came out?
18     A.   How many cases came out, yes.
19     Q.   On the second page in row 2, the
20  efficiency is 37, just over 37; do you see that?
21     A.   Yes.
22     Q.   What does that mean; is that 37 per
23  cent of something?
24     A.   It was 37 per cent of what the line
25  was rated at for the time that the SKU was booked.

Page 41

1          Tamblin - Rader
2   Which would refer back to the front sheet where it
3   was five and a half hours, produced 49 cases.
4      Q.   So in theory the line should have
5   been able to produce more?
6      A.   Looking at that figure, yes.
7      Q.   Were the shifts compared with A and
8   B for efficiency, that kind of thing?
9      A.   It certainly was in coffee, yes.
10  That was one of the reasons why I was doing this
11  type of analysis.
12     Q.   I see, okay. What about the next
13  column, detail?
14     A.   I really do not know what that is.
15  That was never an input.
16     Q.   Flipping to the next page, the next
17  column has at the "top EFF"; what is that?
18     A.   Again, I do not know what that is,
19  what that is referring to.
20     Q.   Do you know what the "BOT EFF" is?
21     A.   No, I do not know that either.
22     Q.   Column U "UNITS_CASE"; do you know
23  what that is?
24     A.   That would refer to the number of
25  individual units that go into the case.  So the

11 (Pages 38 to 41)

Page 42

Tamblin - Rader

1
2 top one it would be 160.
3     Q.    So 160 singles cartridges in a
4 case --
5     A.    Case.
6     Q.    -- then 375 in-cups in a case? The
7 lemon drink?
8     A.    Yes, that would be the in-cups,
9 yes.
10     Q.    What is column V, the conversion?
11     A.    I am really not sure what that
12 conversion refers to.
13     Q.    What about column W, the "PHYS_KG"?
14     A.    That would be the physical weight
15 of the case.
16     Q.    Over in coffee did you actually
17 weigh the case?
18     A.    They were standard weights because
19 of the configuration.
20     Q.    So that was not data that you had
21 to enter?
22     A.    No, not at all.
23     Q.    Was that true, if you know, on the
24 singles side?
25     A.    I do not know, but, again, it was

Page 43

Tamblin - Rader

1
2 written exactly the same so I would have thought
3 they would not have to.
4     Q.    What about the next column,
5 component?
6     A.    That refers to what was our
7 desserts business.  A code could be a component or
8 not a component.  An example which I can only give
9 from a desserts business is we produce sachets
10 which would then go into the final SKU so that
11 sachet would be a component, it would not be the
12 final SKU.  It was a way of tracking how efficient
13 it was.  So it should all be N for no.  Again, I
14 do not understand what the zero is.
15     Q.    I am sorry, one more time, what
16 would it mean to call something a component?
17     A.    If it was going to be used in
18 another pack which eventually became the final
19 SKU.
20     Q.    It did not have its own SKU number
21 if it was part -- it would go into something which
22 had a SKU number?
23     A.    Correct.
24     Q.    So you would think that on singles
25 and in-cup it would all be no?

Page 44

Tamblin - Rader

1
2     A.    That is what I would have thought,
3 yes.
4     Q.    Do you think those are a mistake in
5 that column?
6     A.    I think they probably are.
7 Because, again, that is not something that is
8 entered by the manager. That should be within the
9 programme.
10     Q.    So for the rows that have the O
11 instead of the N for the component would you trust
12 the rest of the data on those rows?
13     A.    Yes, looking at it I would say that
14 would be accurate, yes.
15     Q.    Any idea how the Os could have
16 gotten in there?
17     A.    No, I really do not know.
18     Q.    Column Y, the line speed; what does
19 that refer to?
20     A.    Speed of the line and units per
21 minute.
22     Q.    Is that the actual speed or the
23 theoretical speed?
24     A.    That is the theoretical.
25     Q.    Let us go on to the next page.

Page 45

Tamblin - Rader

1
2 Column Z, "STD_CREW"; what is that?
3     A.    Sorry, which page are we on now?
4     Q.    It is going to be the fourth page.
5 Column Z?
6     A.    Oh, standard crew.
7     Q.    What does that refer to?
8     A.    That would be what the ideal
9 crewing would be.
10     Q.    And if it is not a whole number
11 like the 4.6 on that page what does that mean?
12     A.    That means that one operator would
13 be doing something else for a portion of the time.
14     Q.    I see. Then the double AA column
15 "LINE DESC"; what is that?
16     A.    That is the line description for
17 each of the lines in that area.
18     Q.    So Lambert 3, Lambert 1, those B
19 lines that produced singles cartridges?
20     A.    Yes.
21     Q.    If it says line 3, line 7 it would
22 be producing in-cup?
23     A.    That is correct.
24     Q.    How does that compare to column C,
25 the line code? Is that the same information?

MARTEN WALSH CHERER LTD 12-14 NEW FETTER LANE        LONDON EC4A 1AG
TEL: 020 7936 6000    E-MAIL: info@martenwalshcherer.com    FAX: 020 7427 0093

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

```
 1   UNITED STATES DISTRICT COURT
 2   DISTRICT OF DELAWARE
     --------------------------------------------X
 3   KEURIG, INCORPORATED,
 4                        Plaintiff,
     -against-
 5
     KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION &
 6   KRAFT FOODS, INC.,
 7                        Defendants.
     --------------------------------------------X
 8
 9
                              555 South Broadway
10                            Tarrytown, New York  10591
11
                              March 5th, 2008
12                            2:00 p.m.
13
14
15           Videotaped Deposition of the Defendant,
16   by: GERALDINE A. GRETO, held pursuant to Court
17   Order, at the above time and place, before Notary
18   Public of the State of New York.
19
20
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                  REF: 86864
```

GRETO

1
2    Q    Keurig's counsel asked you about
3  feedback from users of the cartridges. Do you
4  remember that?
5    A    Right.
6    Q    Are you aware of that?
7    A    Uh-huh.
8    Q    And you said you collected it and
9  gave it to your boss; is that right?
10    A    Right.
11    Q    Did your boss ask you to collect
12  that data?
13    A    No, I just did it because I
14  counted all the cartridges and I just did it on my
15  own.
16    Q    But he didn't -- but there was no
17  -- was there any form that he asked you to fill out
18  and collect information?
19    A    No.
20    Q    Was there any -- did he ask you to
21  survey your co-workers?
22    A    No.
23    Q    Okay now, earlier Keurig's counsel
24  asked you about the Kenco Singles capsule.  He
25  showed you this Gevalia capsule, but he asked you

GRETO

1
2  about the Kenco Singles capsule and he asked you,
3  was there always a hole. Do you remember that?
4    A    Yes.
5    Q    And you answered yes, there was a
6  hole; is that right?
7    A    Yes.
8    Q    Do you know if that hole was
9  always open in the sense that there was no lid or
10  foil in the hole?
11    A    I'm thinking you could see foil in
12  the hole. I think I remember that. It wasn't open.
13         MR. HRYCYSZN:  I object to the
14      sigh from opposing counsel.
15         MR. SCHLITZ: I mean, I'm just
16      trying to think.  That is fine.  I'm
17      very happy with that answer.  So there
18      is no sigh. Okay --
19    Q    Well, let me ask you one more
20  question.  In answering Keurig's counsel's
21  questions, did you mean to say that this hole was
22  always open?
23    A    I can't recall.
24    Q    Okay.  Do you recall that
25  sometimes it may have had foil?

GRETO

1
2    A    Right.
3         MR. HRYCYSZN:  Objection,
4      leading.
5         MR. SCHLITZ:  Okay, that's what
6      she said, I have no further questions.
7         MR. HRYCYSZN:   I do have a
8      couple of quick follow-up questions
9      based on the testimony here.
10  EXAMINATION BY MR. HRYCYSZN:
11    Q    Ms. Greto, do you know if Mr.
12  Craig had asked anybody else to gather feedback
13  regarding the use of Kenco Singles cartridges at the
14  White Plains office or at the Tarrytown office?
15    A    No.
16    Q    So you don't know if he had?
17    A    He didn't and --
18    Q    So you know for certain that he
19  had not asked anybody else.  Is that what you're
20  saying?
21    A    If they used it?  I don't
22  understand what your question is.
23    Q    Let me go ahead and rephrase my
24  question. Do you know for a fact, that Mr. Craig did
25  not ask anybody else other than yourself, to collect

GRETO

1
2  feedback regarding the use of the Kenco Singles
3  cartridges, at either the White Plains office or at
4  the Tarrytown office?
5    A    He didn't ask anyone else to
6  collect feedback.  He didn't ask me to collect
7  feedback.
8    Q    How do you know that?
9    A    Because he didn't ask me.  I just
10  did it.
11    Q    Okay, but how do you know he
12  didn't ask anybody else who worked under him?
13    A    I don't know of him asking anyone
14  then, I guess.
15    Q    So he could have asked somebody
16  else to collect that information; is that correct?
17         MR. SCHLITZ:  Objection.
18      Speculation.  You're calling for
19      speculation.
20    Q    Can you answer the question?
21    A    Well, the way you're putting it,
22  he could have.  Unless I'm standing there with him,
23  I guess he could have.  But I don't know of any, of
24  him ever doing that.
25         MR. HRYCYSZN:   No further

# EXHIBIT 6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------X

KEURIG, INC.,

                    Plaintiff,

    – against –

KRAFT FOODS GLOBAL, TASSIMO CORPORATION,
KRAFT FOODS INTERNATIONAL,

                    Defendants.

C.A. NO. 07–17 GMS

------------------------------------------X

                120 Park Avenue
                New York, New York

                March 4, 2008
                2:00 P.M.

    Examination Before Trial of HELEN GLUS,

pursuant to Notice, taken by and before Renee

S. Harris, a Notary Public and Shorthand

Reporter of the State of New York.

      ELLEN GRAUER COURT REPORTING CO. LLC
       126 East 56th Street, Fifth Floor
         New York, New York 10022
            212–750–6434
            REF: 86800

Page 94

```
1            GLUS
2      A.  Correct.
3          MR. HRYCYSZYN:  I think that's
4   probably all I've got, but if you want
5   to take a break and I'll just look
6   through some stuff and make sure.
7          (SHORT BREAK TAKEN.)
8      Q.  Ms. Glus, you earlier said that
9   there might be identification of some
10  visitors to the 22nd floor of the 120 Park
11  Avenue location identified in Mr. Camilleri
12  calm's calendar; do you recall that?
13     A.  Yes.
14     Q.  Do you know if Mr. Camilleri still
15  has his calendar from '95, '96, '97, '98, '99
16  or 2000?
17     A.  We'd have to check.  I couldn't say
18  for certainty.
19     Q.  So sitting here today, you're not
20  sure if he has them?
21     A.  I'm not positive.
22     Q.  Have you spoken to Mr. Camilleri
23  about the subject matter of this deposition
24  today?
25     A.  Yes.
```

Page 95

```
1            GLUS
2      Q.  Did you speak to Mr. Camilleri in
3   particular about visitors of non-Kraft,
4   non-Philip Morris employees who might have
5   had access to the brewer?
6      A.  No.
7      Q.  Sitting here today, can you identify
8   any other person who might know of non-Kraft
9   employees who had access to the brewer on the
10  22nd floor of the 120 Park Avenue location?
11     A.  I would say maybe family of
12  employees.  I mean, I know for myself, I
13  can't say with certainty, but I know for
14  myself, my children have visited many times,
15  even back then.
16     So it's possible when they came to see
17  me at the office that they went in and they
18  saw it or made something for themselves.
19  That's just an automatic easy one to think
20  of.
21     Q.  Let me make sure I understand.  But
22  you're not specifically -- but you don't
23  remember sitting here today that any member
24  of your family did, in fact, go in and use
25  the Kenco brewer with a Kenco singles
```

Page 96

```
1            GLUS
2   cartridge some time between '95 and 2000; is
3   that correct?
4      A.  No, I can't say with certainty.
5      Q.  And perhaps my question wasn't
6   clear.  Can you identify anybody who could
7   specifically identify any non-Kraft employee
8   who would have used the Kenco brewer here at
9   the 120 Park Avenue location between '96 and
10  2000?
11     A.  Not at this moment, no.
12         MR. HRYCYSZYN:  That's all I've
13  got.
14         MR. SCHLITZ:  Just a few follow-up
15  questions.
16  EXAMINATION BY
17  MR. SCHLITZ:
18     Q.  Ms. Glus, is there a conference room
19  opposite the kitchen that Mr. Camilleri used?
20     A.  Pretty much opposite, just a smidge
21  off, yes.
22     Q.  And the times when visitors were
23  waiting for Mr. Camilleri, did you ever take
24  any of them into the kitchen?
25     A.  Yes.
```

Page 97

```
1            GLUS
2      Q.  And did they use the machine?
3      A.  Yes, usually what would happen is
4   they were sitting by his office, which was
5   near the kitchen.  If he wasn't ready, I
6   would say:  Do you want to go in this
7   conference room.
8      They would say yes, and would you like
9   some coffee, and especially when we used the
10  Kenco machine, because there were so many
11  varieties, it was just easier to bring them
12  in and say, which would you like.
13     Q.  And to get to the bathroom, do you
14  have to pass by the kitchen?
15     A.  Yes.
16     Q.  Last question.  Early in your
17  deposition, you testified that you kept a
18  file and that the documents that we have
19  shown you today came out of that file; is
20  that correct?
21     A.  Yes.
22     Q.  Does that file include every
23  document you ever received with regard to the
24  orders of the Kenco singles?
25     A.  Probably most definitely not.
```

Page 98

GLUS

1
2    Q.   And why is that?
3    A.   Because I'm sometimes lazy and I
4  don't file everything.  I file what I think I
5  need to.  It wasn't -- as we talked about, it
6  wasn't part of my business duties.  So it was
7  just something I kept just for my own self to
8  say, okay, I ordered it and to follow up,
9  didn't come, but not because I had to keep it
10  like expenses.  It was just if I was lazy or
11  not.
12      MR. SCHLITZ:  That's all the
13  questions.
14      MR. HRYCYSZYN:  Thank you.
15
16
17      (TIME NOTED:  3:55 P.M.)
18
19
20
21
22
23
24
25

Page 100

1    C E R T I F I C A T E
2
3  STATE OF NEW YORK   )
4              :
5  COUNTY OF NEW YORK )
6
7    I, RENEE S. HARRIS, Shorthand
8  Reporter and a Notary Public within and for
9  the State of New York, do hereby certify:
10      That the witness whose examination
11  is hereinbefore set forth was duly sworn and
12  that such an examination is a true record of
13  the testimony given by such a witness.
14      I further certify that I am not
15  related to any of these parties to this
16  action by blood or marriage, and that I am
17  not in any way interested in the outcome of
18  this matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand this      day
21  of         , 2008.
22
23      ---------------------
             RENEE S. HARRIS
24
25

Page 99

1    A C K N O W L E D G M E N T
2
3  STATE OF NEW YORK       )
4              :
5  COUNTY OF NEW YORK       )
6
7    I, HELEN GLUS, hereby certify that
8  I have read the transcript of my testimony
9  taken under oath in my deposition of MARCH 4,
10  2008; that the transcript is a true, complete
11  and correct record of my testimony, and that
12  the answers on the record as given by me are
13  true and correct.
14
15
      ----------------------
16        HELEN GLUS
17
18
19  Signed and subscribed to before me
20  this_____ day of _____ , 2008.
21
22
23  _____
24  Notary Public, State of New York
25

Page 101

1      ***ERRATA***
2  ELLEN GRAUER COURT REPORTING CO. LLC
     126 East 56th Street, Fifth Floor
3        New York, New York 10022
           212-750-6434
4
   OF CASE:  KEURIG V. KRAFT
5  DATE OF DEPOSITION:  MARCH 4, 2008
   NAME OF WITNESS:  HELEN GLUS
6
7  PAGE LINE FROM     TO      REASON
8  __|__|_____|_____|_____|
9  __|__|_____|_____|_____|
10 __|__|_____|_____|_____|
11 __|__|_____|_____|_____|
12 __|__|_____|_____|_____|
13 __|__|_____|_____|_____|
14 __|__|_____|_____|_____|
15 __|__|_____|_____|_____|
16 __|__|_____|_____|_____|
17 __|__|_____|_____|_____|
18 __|__|_____|_____|_____|
19 __|__|_____|_____|_____|
20 __|__|_____|_____|_____|
21 __|__|_____|_____|_____|
22      _____
23
   Subscribed and sworn before me
24 this ___ day of _____, 2008.
   _____
25

## <u>RULE 7.1.1 CERTIFICATION</u>

I hereby certify that counsel for Plaintiff has complied with Rule 7.1.1 of the Local Rules

of Civil Practice and Procedure of the United States District Court for the District of Delaware.


/s/ *Adam W. Poff*                            
Adam W. Poff (No. 3990)

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, Esquire, hereby certify that on August 11, 2008, a true and correct

copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on August 11, 2008, copies of the foregoing

document were served by e-mail on the above-listed counsel of record and on the following non-

registered participants in the manner indicated below:

### <u>BY E-MAIL</u>

> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

> /s/ *Karen E. Keller*
> John W. Shaw (No 3362)  [*jshaw@ycst.com*]
> Adam W. Poff (No. 3990) [*apoff@ycst.com*]
> Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
> (302)-571-6600

> *Attorneys for Plaintiff Keurig, Incorporated*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED, )
)
    Plaintiff, )
)
    v. )   C.A. No. 07-17 (GMS)
)
KRAFT FOODS GLOBAL, INC., )   **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and )
KRAFT FOODS INC., )   **PUBLIC VERSION**
)
    Defendants. )

## DEFENDANTS' OPPOSITION TO KEURIG'S MOTION *IN LIMINE* NO. 3

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: August 15, 2008
Public Version Dated: August 22, 2008
878744 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft"), by counsel, hereby file this opposition to Keurig's Motion *in Limine* No. 3. Plaintiff Keurig, Incorporated ("Keurig") seeks to exclude evidence at trial regarding production records and other documents they asked for during the course of litigation, which Kraft produced prior to the close of discovery. Keurig's Motion should be denied for two reasons. First, Keurig's Motion should be denied because Keurig asserts baseless grounds for exclusion of this highly-relevant and probative evidence for which an appropriate foundation has been laid. Second, not until such evidence is actually offered at trial will the Court be in a position to even consider excluding the evidence.

## ARGUMENT

Keurig seeks to exclude two classes of business records produced during discovery by Kraft that show the public use of Kraft's products anticipates Keurig's '762 patent: (1) documents retained by Kraft employees Janice Appleton, Helen Glus, and Geraldine Greto ("shipping documents") that show Kraft's Kenco Singles cartridges ("Singles Cartridges") were shipped to the United States for consumption on multiple occasions prior to February 18, 1999; and (2) ████████ production records ("production records")[1] ████████████████

Keurig seeks to evade the issue of whether its patent is invalid by moving the Court to exclude documentary evidence that demonstrates the public use of Singles Cartridges. Keurig seeks to exclude both classes of documentary evidence on the same grounds – that each is hearsay not subject to any exception and that each is untrustworthy. Keurig is wrong and wastes this Court's time by citing the Federal Circuit's decisions in *Medichem* and *Chen*, which have

---

[1]   As a courtesy, Kraft also provided Keurig with a native Excel version of the production records.

nothing to do with Rule 803 or business records, but instead relate to corroborating inventor testimony that is presumed to be unreliable. Mot. at 3.

As an initial matter, Keurig's Motion does not even contend that the evidence it seeks to exclude is not relevant or probative. Indeed such a contention would border on the frivolous. The relevance of the business records at issue is significant as they prove that the '762 Patent is invalid due to prior use of Singles Cartridges in this country. *See* 35 U.S.C. §§ 102(a), (b). Stated another way, when the documents are introduced, Keurig's case evaporates. The shipping documents demonstrate, without question, that Singles Cartridges were circulated for use in the United States as early as 1995. Janice Appleton, Helen Glus, and Geraldine Greto are all Kraft employees who testified at length during deposition about the documents in question. And all three witnesses testified at deposition to their own personal knowledge that Singles cartridges were in public use in the United States prior to February 18, 1999. *See, e.g.*, Greto Depo. Tr. (Ex. 1) 19:22–20:15; Glus Depo. Tr. (Ex. 2) at 11:23–14:21; Appleton Depo. Tr. (Ex. 3) 41:16– 42:9. Moreover, Ms. Glus and Ms. Greto will be available at trial.

With respect to the production documents, the analysis is the same.[2] Kraft produced the documents promptly upon their discovery in March 2008. Because all counsel were previously scheduled to be in England for Keurig's depositions of Mr. Hubert Weber and Mr. Andrew Bentley, Kraft also made the production records' custodian, Michael Tamblin, available to testify about those records. At deposition, Tamblin's testimony demonstrated that Kraft's regular practice was to keep production records for the Singles business. That evidence, and the

---

[2] Contrary to Keurig's assertion, Kraft's case is not limited to the Kraft Kenco Medium Roast Singles Cartridges ████████████████. Although, Kraft focused on those cartridges solely for purposes of summary judgment, Kraft asserts that all varieties Singles cartridges listed on the shipping documents █████████████████ anticipate the '762 Patent.

2

Appleton, Glus, Greto documents, are highly relevant and probative of the invalidity of the '762 patent.

Further, the hearsay exclusionary rule does not apply to either the shipping documents or to the production records because they <u>clearly</u> admissible under the business records exception set forth in Fed. R. Evid. 803(6). Contrary to Keurig's assertion, Kraft can satisfy the foundation requirements of Rule 803(6) for both the shipping documents and for the production documents. In fact, a close examination of the depositions of Appleton, Glus, and Greto demonstrates that an appropriate foundation was laid for the admissibility of the documents.[3] *See e.g.*, Ex. 1 at 8:13–28:22; Ex. 2 at 29:4–30:14; Ex. 3 at 23:21–62:3. Each witness testified from her own personal knowledge. *See, e.g.*, Ex. 1 at 9:2–10:15; 26:11–28:22; Ex. 2 at 20:19–21:18; 25:24–26:14; Ex. 3 at 23:21–25:8; 64:20–65:10; *see also United States v. Console*, 13 F.3d 641, 658 (3d Cir. 1993) (Documents created from personal knowledge "provide sufficient indicia of trustworthiness to satisfy the business record exception."). And each testified that the files from which the documents came were regularly kept in the ordinary course of their responsibilities as employees of Kraft. Ex. 1 at 8:14–9:5; Ex. 2 at 17:4–17:17; Ex. 3 at 79:15–80:3. Finally, there is no suggestion that the shipping documents were created for purposes of this litigation.

The same is true for the production records. An appropriate foundation was laid at deposition for the admissibility of the documents. As described above, because counsel were scheduled to be in England for two of Keurig's depositions, Kraft offered Michael Tamblin to testify on short notice because he was the plant master data-controller working on ▮▮▮▮

---

[3]  Moreover, any communications from Appleton, Glus, and Greto are admissible as present sense impressions and were authenticated as such at deposition  In addition, the shipping documents are admissible under Fed. R. Evid. 807 because: (1) the relevance of these shipping documents are not contested, (2) Keurig has had sufficient opportunity to address these documents in advance of trial, and (3) they are more probative than any other evidence that could be obtained by reasonable efforts for events that took place a decade ago.

computer system that generated the records, Tamblin Depo. Tr. (Ex. 4) at 5:21–23, and prior to 2005, Tamblin was the production manager who was familiar with data entry into the computer. *Id.* at 16:5-8. Tamblin, the custodian of the production records, was questioned by Keurig's counsel at length regarding the production records and his personal involvement in generating and producing the documents. *Id.* at 18:14–16. And again, there is no suggestion that the production records were created for purposes of litigation; Tamblin testified from personal knowledge that production records were regularly kept in the ordinary course of Kraft's business. *Id.* at 16:24–17:4.[4]

To the extent, as Keurig claims, Tamblin couldn't recall certain details about the production documents, that does not mean the documents are inadmissible. Rule 803(6) does not require that the custodian to have created the records but instead that the custodian be familiar with the system from which they were generated. *United States v. Pellulo*, 964 F.2d 193, 201 (3d Cir. 1992). Mr. Tamblin requested Kraft's IT personnel to generate a program that could query the ▓▓▓▓ production database to create the records in question. Ex. 4 at 18:14-19:21. Furthermore, Mr. Tamblin used the system personally in his prior role as a production manager with a different division ▓▓▓▓, which includes the Singles business. *Id.* at 14:22-16:4. Any perceived deficiencies in testimony goes to the weight of the evidence, and should be evaluated by a jury. Keurig had ample opportunity to depose Tamblin and will have further opportunity to explore his testimony at trial. But the production documents are admissible as business records.

Similarly, Keurig's final argument that the documents should not be admitted because they are "incomplete and untrustworthy" is unpersuasive. Mot. At 5. Rule 803(6) declares that

---

[4] Notably, in a contemporaneous motion *in limine*, Keurig is also seeking to exclude the testimony of witnesses that can also authenticate the production records – and in greater detail.

business records are admissible "unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). Neither is present here, Keurig's misleading citations to *Medichem* and *Chen* notwithstanding. As described above, the sources of the documents – Appleton, Glus, Greto, and Tamblin all testified and were questioned at length by Keurig's counsel regarding the production records and each's personal involvement in generating, maintaining, and producing the documents. Once again, Keurig's counsel had the opportunity to question them on any deficiency in their testimony or in the production of documents, which goes to the weight of the evidence, not its admissibility.

CONCLUSION

For the foregoing reasons, Keurig's Motion should be denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

By: */s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Dated: August 15, 2008
Public Version Dated: August 22, 2008
878744 / 31118

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on August 22, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on August 22, 2008, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: /s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

805682 / 31118

# Exhibit 1

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF DELAWARE

   ---------------------------------------------X

3  KEURIG, INCORPORATED,

4                         Plaintiff,

   -against-

5

   KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION &

6  KRAFT FOODS, INC.,

7                         Defendants.

   ---------------------------------------------X

8

9

                         555 South Broadway

10                        Tarrytown, New York  10591

11

                         March 5th, 2008

12                        2:00 p.m.

13

14

15         Videotaped Deposition of the Defendant,

16  by: GERALDINE A. GRETO, held pursuant to Court

17  Order, at the above time and place, before Notary

18  Public of the State of New York.

19

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC

           126 East 56th Street, Fifth Floor

24              New York, New York 10022

                    212-750-6434

25                  REF: 86864

Page 2

```
 1   A P P E A R A N C E S :
 2
 3     WOLF, GREENFIELD & SACKS, P.C.
 4        Attorneys for the Plaintiff
 5        600 Atlantic Avenue
          Boston, Massachusetts 02210-2206
 6
       BY:   GERALD B. HRYCYSZYN, ESQUIRE
 7
 8
 9     BAKER BOTTS, LLP
10        Attorneys for the Defendants
11        1299 Pennsylvania Avenue NW
          Washington, DC 20004
12
       BY:   DAVID SCHLITZ, ESQUIRE
13
14
15     THOMAS MARCOUX, ESQUIRE
16        Senior Patent Counsel
          Kraft Foods
17
          555 South Broadway
18        Tarrytown, New York 10591
19
20
21   ALSO PRESENT:
22        FRED ESPOSITO, Videographer
23
24
25
```

Page 3

```
 1   ----------------- I N D E X -----------------
 2   WITNESS      EXAMINATION BY     PAGE
 3   GERALDINE A. GRETO    MR. SCHLITZ      7
 4
 5   ------------- E X H I B I T S -------------
 6   DEFENDANT'S DESCRIPTION          PAGE
 7   Exhibit 74   Document Bates stamped K0017256    9
 8   Exhibit 75   Document Bates stamped K0017254   13
 9   Exhibit 76   Document Bates stamped
                    K0017258-259          22
10
     Exhibit 77   Document Bates stamped K0017236   25
11
     Exhibit 78   Document Bates stamped K0017262   26
12
     Exhibit 79   Document Bates stamped K0017241   29
13
     Exhibit 80   Document Bates stamped K0017240   30
14
     Exhibit 81   Document Bates stamped K0017239   32
15
     Exhibit 82   Document Bates stamped
16                  K0017238-251          32
17   Exhibit 83   Document Bates stamped K0017266   35
18   Exhibit 84   Document Bates stamped K0017265   36
19   Exhibit 85   Document Bates stamped K0017269   37
20   Exhibit 86   Document Bates stamped K0017272   38
21   Exhibit 87   Document Bates stamped K0017253   40
22   Exhibit 88   Document Bates stamped K0017246   42
23   Exhibit 89   Document Bates stamped K0017273   43
24   Exhibit 90   Document Bates stamped K0017248   46
25
```

Page 4

```
 1   -------------- E X H I B I T S (Cont'd) --------------
 2   PLAINTIFF'S DESCRIPTION          PAGE
 3   Exhibit 103  Document Bates stamped K0017271   73
 4   Exhibit 104  Document Bates stamped
                    K00170307-8          74
 5
     Exhibit 105  Document Bates stamped
 6                  K0017260-261         81
 7   Exhibit 106  Document Bates stamped
                    K0017226-229         84
 8
     Exhibit 107  Document Bates stamped K0017159  84
 9
     Exhibit 108  Document Bates stamped
10                  K0017252-253         86
11   Exhibit 109  Document Bates stamped
                    K0017467-468         88
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              FEDERAL STIPULATIONS
 2
 3        IT IS HEREBY STIPULATED AND AGREED, by
 4   and between the attorneys for the respective parties
 5   herein, that the sealing and filing of the within
 6   deposition be waived; that such deposition may be
 7   signed and sworn to before any officer authorized to
 8   administer an oath, with the same force and effect
 9   as if signed and sworn to before the officer before
10   whom said deposition is taken.
11        IT IS FURTHER STIPULATED AND AGREED,
12   that all objections, except as to form, are reserved
13   to the time of trial.
14
15
16
17
18
19
20
21
22
23
24
25
```

| Page 6 | Page 8 |
|---|---|
| 1 PROCEEDINGS<br>2 * * * *<br>3 VIDEOGRAPHER: This is tape one.<br>4 We're now on the record at 2:00 p.m.,<br>5 Wednesday, March 5th, 2008.<br>6 This is the opening of the<br>7 deposition of Geraldine A. Greto, in<br>8 the matter of Keurig, Incorporated<br>9 versus Kraft Foods. This deposition is<br>10 being held at Kraft Foods.<br>11 The court reporter is Lisa Regen,<br>12 with Ellen Grauer Court Reporting. I'm<br>13 the legal videographer, Fred Esposito<br>14 with Ellen Grauer. Counsel, please<br>15 introduce themselves.<br>16 MR. SCHLITZ: My name is David<br>17 Schlitz from the law firm of Baker<br>18 Botts. And I represent the Kraft<br>19 defendants.<br>20 MR. HRYCYSZN: Gerry Hrycyszn<br>21 with Wolf Greenfield. I represent<br>22 Keurig, Incorporated.<br>23 MR. MARCOUX: Thomas Marcoux. I'm<br>24 in-house counsel at Kraft Foods.<br>25 VIDEOGRAPHER: Will the court | 1 GRETO<br>2 Q Is that White Plains in the State<br>3 of New York?<br>4 A Yes, White Plains, New York.<br>5 Q And for whom did you work?<br>6 A Bill Craig.<br>7 Q Now, did there come a time in<br>8 1994, when there was a Kenco Singles Machine at<br>9 White Plains?<br>10 A Yes.<br>11 Q Do you know approximately when in<br>12 1994?<br>13 A I think it was September.<br>14 Q Okay, now did you keep a file with<br>15 regard to the Kenco Singles Machine and Kenco<br>16 Singles Cartridges?<br>17 A Yes.<br>18 Q Where did you keep that file?<br>19 A In the file drawer, right next to<br>20 my chair where I sit.<br>21 Q And you did so as part of your<br>22 work?<br>23 A Is it part of my work?<br>24 Q Yes.<br>25 A Yes. |

| Page 7 | Page 9 |
|---|---|
| 1 reporter please swear in the witness?<br>2 GERALDINE A. GRETO,<br>3 having been duly sworn by Notary<br>4 Public Lisa Regen, upon examination,<br>5 testified as follows:<br>6 THE REPORTER: Please state your<br>7 full name and address for the record.<br>8 THE WITNESS: Geraldine A. Greto,<br>9 65 Arthur Court, Port Chester, New York<br>10 10573.<br>11 EXAMINATION BY<br>12 MR. SCHLITZ:<br>13 Q Ms. Greto, I know that you're<br>14 nervous about this deposition. Just relax and<br>15 listen to the questions. Just answer the questions<br>16 to the best of your knowledge. And if you want to<br>17 take a break at any time, feel free to do so. If<br>18 you want some water, just let us know.<br>19 In 1994, by whom were you<br>20 employed?<br>21 A Kraft Foods.<br>22 Q And at what Kraft Foods location<br>23 were you employed?<br>24 A White Plains. | 1 GRETO<br>2 Q Did you provide the contents of<br>3 that file to Kraft's attorney for production in this<br>4 case?<br>5 A Yes.<br>6 MR. SCHLITZ: This would be<br>7 Defendant's Exhibit 74.<br>8 (Whereupon Defendant's Exhibit 74<br>9 - document Bates stamped K0017256 was<br>10 marked for identification.)<br>11 Q Ms. Greto, I'd ask you to take a<br>12 moment to look at the document.<br>13 A Yes.<br>14 Q Is this one of the documents that<br>15 came out of the file we just mentioned?<br>16 A Yes.<br>17 Q Now, it's dated September 14th,<br>18 1994; is that correct?<br>19 A Uh-huh.<br>20 Q And at the bottom -- it is in<br>21 memorandum form. It says, from Bill Craig.<br>22 Do you see that?<br>23 A Yes.<br>24 Q And it says, at GF White Plains.<br>25 What is GF White Plains? |

3 (Pages 6 to 9)

GRETO

1
2     A     General Foods.
3     Q     Okay, I'm sorry, go ahead.  You
4  were going to say something?
5     A     We were General Foods before we
6  were Kraft.
7     Q     And where it says thanks, it says
8  Bill/GG?
9     A     Right.
10     Q     Is GG your initials?
11     A     That's me; right.
12     Q     So did you prepare this document?
13     A     Yes.
14     Q     And did you sign it?
15     A     Yes.
16     Q     Now, it says -- first of all, you
17  see that above the line, there is a little coffee
18  cup with steam coming out?
19     A     Yeah.
20     Q     Can you tell me what that is?
21     A     It's a coffee cup with steam
22  coming out of it.  And I -- that is my format, my
23  template I use for when I do memos.  And because we
24  were in Maxwell House Coffee, I used to put it on
25  all my little memos, not just that one, all of them.

GRETO

1
2     Q     And in the body of the memo it
3  says, "We received the Michigan machine."  Do you
4  see that?
5     A     Right.
6     Q     Do you know what the reference to
7  the Michigan machine is?
8     A     It's the Kenco machine because it
9  was the Michigan project, or Project Michigan they
10  called it.
11     Q     It says, "It works great.
12  Everybody loves it."
13     A     Right.
14     Q     When you say, "everybody loves it"
15  what did that mean?
16     A     Everybody who drank the coffee and
17  used it.
18     Q     And when you say everybody that
19  drank the coffee and used it, who was using the
20  Kenco Singles machine and Kenco cartridges?
21     A     All the employees in our area and
22  whoever else came to visit.  Any repair people or --
23  it was out there for anyone to use.
24     Q     Now, there is I believe a set of
25  initials.  And then it says "9:16 a.m." Do you see

GRETO

1
2  that?
3     A     When I send a fax, I always note,
4  you know, it went through.
5     Q     Now, when you say everybody loves
6  it, were you among the people who were using it?
7     A     Oh, yes.
8     Q     And when you were using the Kenco
9  machines, were you also using the Kenco Singles
10  capsules?
11     A     Yes.
12     Q     And when you used the Kenco
13  Singles capsules, did you use them in between
14  September 14, 1994, and the end of December 31st,
15  nineteen -- during 1994?
16     A     Yes.
17     Q     Okay, and amongst the capsules you
18  used, did you use capsules for coffee?
19     A     Yes.
20     Q     And when you used the capsules for
21  coffee, do you remember what flavor you used?
22     A     I used the medium.
23     Q     Is that the medium roast?
24     A     Medium roast, yes.
25     Q     Did you use the Kenco Singles

GRETO

1
2  coffee capsules in '95, 1995?
3     A     Yes.
4     Q     Did you -- same question for '96?
5     A     Yes.
6     Q     Same question for '97?
7     A     Yes.
8     Q     And the same question for '98?
9     A     Yes.
10          MR. SCHLITZ:  Now, would you mark
11  this?
12          (Whereupon Defendant's Exhibit
13          75 - document Bates stamped K0017254
14          was marked for identification.)
15     Q     Now, I would ask you to take a
16  moment and look at -- we have put in front of you
17  Defendant's Exhibit 75, which has the Bates numbers
18  K0017254, and K0017255.
19          If you would take the time to look
20  at those two pages and tell me after you have done
21  so.
22     A     Tell me -- tell you what it says?
23     Q     No, just tell me you have looked
24  at it and you're ready to answer questions.
25     A     You can ask me questions.

Page 14

GRETO

1
2    Q    First of all, is this one of the
3    documents that came out of the file that you kept --
4    A    Yes.
5    Q    -- with regard to Kenco Singles.
6    Now, looking at this, whose handwriting is this?
7    A    Mine.
8    Q    And at the top of the page it
9    says, "eight bags in each case, twenty cartridges in
10   each bag." Can you explain what that means?
11   A    When you got a case, there is
12   eight bags in it. And each of the bags contained
13   twenty cartridges.
14   Q    Well, is this something that you
15   looked at and counted, and then wrote down on this
16   page?
17   A    Well, yes, I counted them, yes.
18   So that I would know how many we have.
19   Q    Now, then it says, "received
20   machine 9/2/1994." Is that September 2nd, 1994?
21   A    Yes.
22   Q    And so, if you look back at
23   Defendant's Exhibit 74, the first exhibit in front
24   of you?
25   A    Uh-huh.

Page 15

GRETO

1
2    Q    And then look at 75, it says you
3    received the machine on September 2nd, '94. And
4    then you wrote this memo on September, twelve days
5    later?
6    A    Right.
7    Q    Saying that you actually received
8    the Michigan machine?
9    A    Right.
10   Q    Now, then you come down right
11   below that. And it says "W/six cases of coffee,
12   three cases of tea, one case of hot chocolate." Do
13   you see that?
14   A    Yes.
15   Q    Okay, so let's take that first.
16   What does it mean, "W/six cases"?
17   A    The word with, W is with, slash,
18   so with the machine. I recall that this means that
19   they sent also the capsules, the cartridges, coffee,
20   tea and hot chocolate.
21   Q    Okay, now, and then under bags,
22   you have, "We have four cases." And above you had
23   said that each case had eight. So six times eight
24   is forty-eight. So that is why -- that is the
25   forty-eight; is that correct?

Page 16

GRETO

1
2    A    Right.
3    Q    Then you said that each bag had
4    twenty cartridges. So we take forty-eight times
5    twenty and you got nine sixty; is that correct?
6    A    Right.
7    Q    Now, then we come down a little
8    bit. And we have, you see where it says 3/21/1995?
9    A    Yes.
10   Q    Is that March 21st, 1995?
11   A    Yes.
12   Q    Can you explain what you have here
13   between for March 21st, 1995?
14   A    It would mean to me that they did
15   not include the flavors espresso and cappi. And my
16   boss said, let's try that. Let's get some. And
17   that's what I did.
18   Q    Okay, now cappi, is that
19   capuccino?
20   A    Yes.
21   Q    Now, then we have these lines.
22   And then you have 6/95. You see that?
23   A    Right.
24   Q    Is that June '95?
25   A    Yes.

Page 17

GRETO

1
2    Q    Okay, and I can't -- I'm having a
3    little hard time. It says, ordered something
4    received -- what does that mean?
5    A    Ordered then received. So the
6    following in parenthesis cases.
7    Q    So you you're now listing below
8    that cases that you actually received?
9    A    Yes.
10   Q    And you have the number of cases.
11   You have the flavor. Then a little bit you have a
12   bags, number of cartridges then you have something,
13   already had from previous cartridges some numbers;
14   is that right? Do you see that?
15   A    Yes.
16   Q    So let's take two lines down, with
17   medium roast. You order and received two cases of
18   medium roast; is that correct?
19   A    Yes.
20   Q    And based on your previous count,
21   since each case had eight bags, you listed here,
22   sixteen bags of medium roast; is that right?
23   A    Uh-huh, yes.
24   Q    And that would mean that you got
25   three hundred, since each bag had twenty cartridges,

5 (Pages 14 to 17)

Page 18

```
                    GRETO
1
2   you had three twenty cartridges; right?
3        A    Yes.
4        Q    You already had from previous
5   cartridges you have eighty in stock; is that
6   correct?
7        A    Yes.
8        Q    Okay, and since each case has a
9   hundred and sixty, you had used by this point June,
10  '95, you used at least eighty; is that correct, of
11  the medium roast?
12       A    Yes, that's correct.
13       Q    Now, if you turn to the next page,
14  0017255, you see at the top, it says, "had as of"
15  and then six. It seems like you have inserted a
16  number five there?
17       A    Yes, I think I realized I should
18  have put the date. And that means the fifth, I
19  think.
20       Q    So June 5th, 1995?
21       A    Uh-huh.
22       Q    And so, when you look at the
23  front page where you say 6/95, you had ordered and
24  received as of six -- June 5th, 1995, these --
25       A    What I asked for.
```

Page 19

```
                    GRETO
1
2        Q    -- right. Okay. Now, the Kenco
3   Singles machine in White Plains, where was it kept?
4        A    In the pantry, where the
5   refrigerator is, and the sink, and the counter is
6   and that.
7        Q    And you may have already answered
8   this, but who had access to that pantry?
9        A    All the employees, plus any
10  visitors that came to visit, plus any repair men
11  that came to visit, and in the evening, the cleaning
12  people.
13       Q    And were the Kenco Singles
14  cartridges out in the open?
15       A    Yes. I used to put them in a
16  little basket, variety.
17       Q    You used to?
18       A    Yes.
19       Q    Stating the obvious, it was not --
20  they were not in a locked drawer?
21       A    No, it was not locked.
22       Q    And they weren't -- and was there
23  any attempt to keep the Singles cartridges secret in
24  any way?
25       A    No.
```

Page 20

```
                    GRETO
1
2        Q    Was the kitchen or pantry locked?
3        A    No.
4        Q    And in fact, as you said, the
5   cleaning crew could come in at night and have access
6   to them?
7        A    Certainly.
8        Q    Any visitors could have access?
9        A    Yes, they could.
10       Q    And in fact, all the employees?
11       A    Yes.
12       Q    And you have testified that you
13  personally used the coffee cartridges in '94,
14  '95,'96, '97 and '98?
15       A    Right.
16       Q    Now, when you -- at any time,
17  during that period, '94, to '98, were you under any
18  obligation of secrecy or confidentiality with regard
19  to the Kraft Kenco Singles coffee cartridges?
20       A    No.
21       Q    And again, I apologize, stating
22  the obvious. But were you under any obligation of
23  secrecy or confidentiality with regard to those
24  cartridges to a company called Keurig?
25       A    No.
```

Page 21

```
                    GRETO
1
2        Q    There are two inventors named with
3   regard to the patent in suit, a Mr. Lazarus and a
4   Mr. Bolio. First of all, have you ever heard of
5   these two people?
6        A    No.
7        Q    Okay, were you under any
8   obligation of confidentiality of secrecy to these
9   two people --
10       A    No.
11       Q    -- with regard to the Kraft
12  cartridges?
13       A    No.
14       Q    Did you ever see others use -- you
15  have testified that you personally used the Kraft
16  singles cartridges for coffee. Were you under any
17  other obligation to others -- excuse me, did you
18  ever see others use the Kraft singles cartridges?
19       A    Yes.
20       Q    Can you identify anybody that you
21  saw?
22       A    My co-employees, whatever area I
23  was working in. Jennifer Guthrie, Debbie
24  Robastelli, Bill Craig.
25       Q    Bill Craig, you saw Mr. Craig use
```

6 (Pages 18 to 21)

Page 22

```
 1                    GRETO
 2    them?
 3         A    Yes.
 4            (Whereupon Defendant's Exhibit 76
 5         - document Bates stamped K0017258 was
 6         marked for identification.)
 7         Q    Ms. Greto, if you first take the
 8    time to look at Defendant's Exhibit 76, which is
 9    K0017259, and 0017258.
10         A    Yes.
11         Q    Do you see that?
12         A    Yes.
13         Q    First, at the bottom of this, it
14    says Bill/GG. Are those your initials?
15         A    That's me.
16         Q    So did you prepare this document
17    and sign it?
18         A    Yes.
19         Q    And did this document come out of
20    your files?
21         A    Yes.
22         Q    It says, "Ted, I'd like to get a
23    Michigan machine here in the United States for
24    demonstration purposes."
25         A    Right.
```

Page 23

```
 1                    GRETO
 2         Q    Do you know what that means, "for
 3    demonstration purposes?"
 4         A    We weren't going to sell or
 5    anything. We were just going to use it.
 6         Q    Right, but did --
 7         A    For us.
 8         Q    -- did Mr. Craig demonstrate the
 9    machine and show it to visitors?
10         A    Yes.
11         Q    Now, this page it says, May 16 --
12    excuse, me. It says the May 16, 1994 document says
13    "How can I buy one and have it converted to run on
14    one ten volts as a plug in unit and receive it in
15    Tarrytown?" Do you see that?
16         A    Yes.
17         Q    Then if you turn to the next page,
18    which is dated August 29, 1994. You see that?
19         A    Right.
20         Q    Again it says Bill/GG. Are those
21    your initials?
22         A    Yes, it is.
23         Q    Did you prepare this document?
24         A    Yes, I did.
25         Q    Did you sign it?
```

Page 24

```
 1                    GRETO
 2         A    Yes.
 3         Q    The second paragraph says, "Is
 4    there a problem with modifying this machine and
 5    sending me one in White Plains (rather than
 6    Tarrytown as previously requested)." You see that?
 7         A    Yes.
 8         Q    So in fact, this is the machine
 9    that we spoke about earlier. It was delivered to
10    White Plains, not Tarrytown; is that correct?
11         A    Yes.
12         Q    Now, and I believe you just
13    answered this. But I need to make sure. In fact,
14    you saw -- did you ever see Mr. Craig demonstrate
15    this machine to visitors?
16         A    I don't know if I was actually
17    there watching him demonstrate it. But I know
18    whoever came to visit him, he took them to the
19    pantry, and let's have a cup of coffee. Look at
20    this great machine.
21            (Whereupon Defendant's Exhibit
22         77 - document Bates stamped K0017236
23         was marked for identification.)
24         Q    I show you Defendant's Exhibit
25    77. Did this come out of your files?
```

Page 25

```
 1                    GRETO
 2         A    Yes.
 3         Q    There is some handwritten notes on
 4    there. Can you identify whose handwriting that is?
 5         A    That's mine.
 6         Q    Can you read them and explain them
 7    to us?
 8         A    "3/17 received only one box of
 9    espresso, no inside said will forward one more and
10    two cappi ASAP." And then I wrote, "3/20 received
11    one espresso and one cappi." This is the way I'm
12    interpreting, and still need one more cappi. That
13    is not what it says. But that is what I'm
14    interpreting.
15         Q    Okay, you said it's not what is
16    says?
17         A    Well, it's still nees.
18         Q    Yes, still need one cappi?
19         A    Still need one cappi.
20         Q    But in fact, these are your
21    contemporaneous notes saying that on March 17th, you
22    did receive a box of espresso; is that right?
23         A    Yes.
24         Q    And on March 20th, you received
25    one box of espresso and one box of capuccino. Is
```

Page 26

GRETO

1
2 that correct?
3      A    Yes.
4      Q    And then, if you go down to this
5 document, it is -- they were being sent to White
6 Plains, New York; is that correct?
7      A    Yes.
8          (Whereupon Defendant's Exhibit 78
9      - document Bates stamped K0017241 was
10     marked for identification.)
11     Q    Okay, I show you Defendant's
12 Exhibit 77, which is K0017262.  Is this a document
13 that came out of your files?
14     A    Yes.
15     Q    And it is dated what?
16     A    May 16th, 1995.
17     Q    And it's to a Pat Nunn.  Do you
18 know who Pat Nunn is?
19     A    She was the secretary at Kraft,
20 Jacobs Suchard, in Banbury that I mostly or KJS,
21 whatever you want to call it.  And she was kind of
22 like my contemporary.  She worked for the research
23 and development person over there.
24     Q    Now, it says from, and then where
25 the highlighting it, but can you --

Page 27

GRETO

1
2      A    That is me because that means that
3 is my file copy.  And I highlight it.  One went to
4 Bill.  I always put it in his thing to show him that
5 I did it.
6      Q    And again, cross out says at KF
7 White Plains?
8      A    Now, we became Kraft, GF to KF.
9      Q    KF means Kraft Foods?
10     A    Right.
11     Q    And then White Plains is the
12 location?
13     A    Correct.
14     Q    And that is in New York State;
15 right?
16     A    New York, White Plains, New York.
17     Q    Now, first line of the text says,
18 "Project Michigan is a great success here.  And our
19 supply is dwindling."  What do you mean, our supply
20 is dwindling?
21     A    Everybody loved to use that
22 machine.  And we were running out of cartridges, so
23 I had to keep ordering them.
24     Q    And then you have in handwriting,
25 it say, "one carton equals eight bags, equals twenty

Page 28

GRETO

1
2 cartridges per bag, which equals a hundred and sixty
3 cartridges."  You see that?
4      A    Right.
5      Q    So, that is something you counted
6 and noted?
7      A    Right.
8      Q    So, if you go down, and we see,
9 medium roast, it says cartons, two.  So this, here
10 you're ordering two cartons; is that right?
11     A    Right.
12     Q    Half/bag you had forty -- you had
13 four bags in stock; is that right?
14     A    Yes.
15     Q    And thus you had eighty
16 cartridges; is that right?
17     A    Right.
18     Q    And since one carton has eight
19 bags and a hundred sixty cartridges, from this you
20 know that the users had used at least eighty of the
21 medium roast cartridges; is that correct?
22     A    That's correct.
23          (Whereupon Defendant's Exhibit 79
24     - document Bates stamped K0017241 was
25     marked for identification.)

Page 29

GRETO

1
2      Q    Now, this is dated May 16th,
3 1995, okay.  Then I'm going to show you the next
4 document, Defendant's 79.  This is also dated May
5 16th, 1995.  You see at the top?
6      A    Yes.
7      Q    And it's from you; is that
8 correct?
9      A    Yes.
10     Q    Can you see decipher this for me
11 and tell me what it says?
12     A    I think it's saying that this fax
13 that I sent, this as the cover sheet, didn't go
14 through.  I kept having a problem.
15     Q    Okay?
16     A    Try again.
17     Q    So you -- the fax that you had
18 tried to send for Defendant's Exhibit 77, hadn't
19 gone through; right?
20     A    That's what this says, yes.
21     Q    So then, now I take it from that,
22 you monitored.  You didn't just send these things.
23 You monitored if they went through, et cetera; is
24 that right?
25     A    I always followed up, yes.

# Exhibit 2

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF DELAWARE
     -----------------------------------------X
 3   KEURIG, INC.,
 4                              Plaintiff,
 5        - against -
 6   KRAFT FOODS GLOBAL, TASSIMO CORPORATION,
     KRAFT FOODS INTERNATIONAL,
 7
                              Defendants.
 8
     C.A. NO. 07-17 GMS
 9   -----------------------------------------X
10
11                        120 Park Avenue
                          New York, New York
12
13
                          March 4, 2008
14                        2:00 P.M.
15
16        Examination Before Trial of HELEN GLUS,
17   pursuant to Notice, taken by and before Renee
18   S. Harris, a Notary Public and Shorthand
19   Reporter of the State of New York.
20
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24             New York, New York 10022
                   212-750-6434
25                  REF: 86800
```

Page 2

```
 1   A P P E A R A N C E S :
 2
 3      BAKER BOTTS
 4         Attorneys for Defendants
 5         1299 Pennsylvania Ave, NW
 6         Washington, DC 20004
 7      BY:  DAVID M. SCHLITZ, ESQ.
 8
 9
10      WOLF GREENFIELD
11         Attorneys for Plaintiffs
12         600 Atlantic Avenue
13         Boston, Massachusetts 02210
14      BY:  GERALD HRYCYSZYN, ESQ.
15      ALSO PRESENT:  CLINTON HALLMAN, KRAFT
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   --------------- I N D E X ---------------
 2   WITNESS          EXAMINATION BY      PAGE
 3   HELEN GLUS        MR. SCHLITZ          6
 4
 5
 6   --------------- E X H I B I T S ---------------
 7   DEFENDANT'S   DESCRIPTION           PAGE
 8   Exhibit 50    K001722-23       18
 9   Exhibit 51    K001721          20
10   Exhibit 52    K0017219         20
11   Exhibit 53    K0017218         24
12   Exhibit 54    K0017217         26
13   Exhibit 55    K0017216         26
14   Exhibit 56    K0017214         29
15   Exhibit 57    K0017212         30
16   Exhibit 58    K0017204         32
17   Exhibit 59    K0017202         33
18   Exhibit 60    K0017203         34
19   Exhibit 61    K0017201         37
20   Exhibit 62    K0017199         37
21   Exhibit 63    K0017200         37
22   Exhibit 64    K0017197         39
23   Exhibit 65    K0017191         41
24   Exhibit 66    K0017196         42
25   Exhibit 67    K0017192         43
```

Page 4

```
 1   ---------- E X H I B I T S (Cont'd) ----------
 2   DEFENDANT'S   DESCRIPTION           PAGE
 3   Exhibit 68    K0017187         45
 4   Exhibit 69    K0017186         46
 5   Exhibit 70    K0017189         47
 6   Exhibit 71    K0017182         49
 7   Exhibit 72    K0017181         50
 8   Exhibit 73    K0017180         51
 9   PLAINTIFF'S                    PAGE
10   Exhibit 101   Coffee pack      63
11   Exhibit 102   K0017210         66
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1        S T I P U L A T I O N S
 2
 3        IT IS HEREBY STIPULATED AND AGREED
 4   by and between the attorneys for the
 5   respective parties herein, that filing,
 6   sealing and certification be and the
 7   same are hereby waived.
 8        IT IS FURTHER STIPULATED AND
 9   AGREED that all objections, except as to
10   the form of the question, shall be
11   reserved to the time of the trial.
12        IT IS FURTHER STIPULATED AND
13   AGREED that the within deposition may be
14   signed and sworn to before any officer
15   authorized to administer an oath, with
16   the same force and effect as if signed
17   and sworn to before the Court.
18
19
20
21
22
23
24
25
```

Page 6

1  H E L E N  G L U S, having first been duly
2  sworn by a Notary Public for and within the
3  State of New York, upon being examined,
4  testified as follows:
5
6  EXAMINATION BY
7  MR. SCHLITZ:
8      Q.  Please state your name for the
9  record.
10     A.  Helen Glus.  123 Mamaroneck Avenue,
11  Mamaroneck, New York, 10543.
12     Q.  I'm going to have to ask you to
13  speak up a little bit so we can all hear.
14     Mrs. Glus, who do you currently work
15  for?
16     A.  Louis Camilleri, chairman and CEO of
17  Altria Group, Inc.
18     Q.  Did you ever work for Kraft Foods?
19     A.  Yes, the international division.
20     Q.  Okay.  And can you tell me the dates
21  that you worked for Kraft Foods?
22     A.  Mr. Camilleri was transferred there
23  on December '95, and we stayed there till
24  August '96.
25     Q.  And you say "there"; where is there?

Page 7

1                  GLUS
2      A.  The Rye Brook office of Kraft Foods
3  International.
4      Q.  And is that in New York State?
5      A.  Westchester.
6      Q.  Westchester, New York State?
7      A.  Mm-hmm.
8      Q.  And when you arrived at the offices
9  of Kraft Foods International Rye Brook, was
10  there a single-serve beverage machine there?
11     A.  Yes, there was.
12     Q.  Do you know what brand it was?
13     A.  We referred to it as the Kenco
14  machine.
15     Q.  Where was the Kenco machine that
16  you're referring to, where was that in the
17  building?
18     A.  On the seventh -- on my half of the
19  seventh floor in the kitchen.
20     Q.  Who had access to that machine?
21     A.  Everyone.
22     Q.  Everyone, meaning?
23     A.  Everyone who worked on that floor
24  who came to that floor, visited that floor.
25     Q.  Now did you personally have access

Page 8

1                  GLUS
2  to it?
3      A.  Yes.
4      Q.  We've talked about there was a Kenco
5  singles machine.  Were there capsules for use
6  with the Kenco singles machine at the same
7  location?
8      A.  Yes.
9      Q.  Did you personally use those Kenco
10  singles capsules?
11     A.  Yes.
12     Q.  How often did you use them?
13     A.  Every day, seven times a day, at
14  least three times a day.
15     Q.  And you mentioned that you arrived
16  in December '95, there already was a machine;
17  and did you start using it in December of
18  '95?
19     A.  Yes.
20     Q.  And did you continue to use it
21  through August '96?
22     A.  Yes.
23     Q.  Let me ask the question first, and
24  wait if you would, please.
25     Did you ever see anyone else use the

Page 9

1                  GLUS
2  Kenco singles capsules?
3      A.  Yes.
4      Q.  Now I'm going to ask you to dig way
5  back, and I appreciate we're talking about
6  December '95.  But do you remember the
7  flavors of beverage that you used of the
8  singles -- of the Kenco's singles cartridges
9  that you used?
10     A.  Tea, medium roast.  Those are the
11  two I used.
12     Q.  Okay.  And again, I understand it's
13  been a while, but can you describe the
14  appearance of the Kenco's singles cartridge
15  that you started to use in December of 1995?
16     A.  Can I use my hands?
17     Q.  Yes.
18     A.  It's about that long, about that
19  wide, square (indicating).  I don't remember
20  if the top, the part that you inserted, was
21  more rounded or maybe came more to a point.
22  Each one had a different label on the front
23  for what the product was.
24     Q.  And do you remember what the bottom
25  looked like?

## Page 10

GLUS

1             GLUS
2    A.  The foil, but that's all I remember.
3    Q.  And recently, have you seen the
4  Kenco's singles cartridge?
5    A.  Yes.
6    Q.  How recently?
7    A.  A month ago.
8    Q.  And was there any difference in the
9  appearance of what you saw a month ago from
10  what you --
11    A.  To me they looked exactly the same.
12    Q.  When you say "they," meaning what
13  you started to use in December '95?
14    A.  Yes.
15    Q.  Now, with regard to the Kenco's
16  singles cartridges that you were using from
17  December 1995 to August 1996, in Rye Brook --
18  we're going to separate the two times:  One
19  is Rye Brook and one is here in Park Avenue.
20    Were you under any obligation of
21  confidentiality or secrecy with anyone with
22  regard to the Kenco's singles cartridges?
23    A.  No.
24    Q.  To your knowledge were the other
25  uses under any obligation of confidentiality

## Page 11

GLUS

1             GLUS
2  or secrecy to anyone with regard to the
3  Kenco's singles cartridges?
4    A.  No.
5    Q.  More specifically, were you under
6  any obligation of confidentiality or secrecy
7  to a company called Keurig, the inventor,
8  employees of Keurig?
9    A.  No.
10    Q.  Were you free to show the cartridges
11  to anyone you wanted to show them to?
12    A.  Yes.
13    Q.  Now, after August 1996, did you
14  change companies that you worked for?
15    A.  Yes, Mr. Camilleri was given a new
16  position, senior vice president and chief
17  financial officer for Philip Morris
18  Companies, Inc., so we moved back to 120
19  Park.
20    Q.  And when you moved back -- when was
21  that?
22    A.  If I can look, August '96.
23    Q.  In August '96, when you arrived at
24  120 Park Avenue, on the floor that you worked
25  on, was there a Kenco's singles machine?

## Page 12

GLUS

1             GLUS
2    A.  No.
3    Q.  Thereafter, was there a Kenco's
4  single machine?
5    A.  Yes.
6    Q.  Do you know how soon thereafter?
7    A.  Within months.
8    Q.  Okay.  And were you responsible for
9  ordering that machine?
10    A.  I was in the loop, but I believe it
11  was a phone call between my boss and I
12  believe Ronny Bell, but he told him that he
13  wanted a machine shipped here.
14    Q.  And when the machine arrived, did
15  there also arrive Kenco's singles cartridges
16  for use in the machine?
17    A.  Yes, there was an initial supply
18  delivery.
19    Q.  Where was that machine located?
20    A.  In the kitchen area on this floor.
21    Q.  "This floor" being --
22    A.  The 22nd floor.
23    Q.  The 22nd floor.  That kitchen area,
24  who had access to it?
25    A.  Everybody -- everybody.  It's for

## Page 13

GLUS

1             GLUS
2  the purpose of the people on this floor, but
3  for everybody who came on the floor.
4    Q.  That would be other employees of
5  Kraft in the building -- excuse me, of
6  employers in the building?
7    A.  Yes.
8    Q.  Visitors to the building?
9    A.  Yes.
10    Q.  And I asked you about the machine,
11  were there capsules, Kenco's singles
12  capsules, for use within that machine in the
13  same location?
14    A.  Yes.
15    Q.  And were they out in public view?
16    A.  Yes, they were in a storage kind of
17  view.
18    Q.  Okay.  Now, in 1996, did you ever
19  personally use the Kenco's singles capsules?
20    A.  Yes.
21    Q.  Again, how often?
22    A.  At least three times a day.
23    Q.  In 1997, did you use the Kenco's
24  singles capsules?
25    A.  Yes.

Page 14

GLUS

1
2   Q.  In 1998?
3   A.  Yes.
4   Q.  And in 1999?
5   A.  Yes.
6   Q.  Now, did you ever see others use the
7   Kenco's singles cartridges in 1996?
8   A.  Yes.
9   Q.  In 1997?
10  A.  Yes.
11  Q.  In 1998?
12  A.  Yes.
13  Q.  In 1999?
14  A.  Yes.
15  Q.  And can you -- and I know this is a
16  difficult question, but can you remember
17  anybody that else that used them?
18  A.  All my coworkers on the floor at the
19  time, definitely.  Other people who would
20  come up for meetings, outsiders who came for
21  meetings.  Everybody used it.
22  Q.  When you say "outsiders" that came
23  to meetings, to your knowledge did any
24  visitors, non-Kraft employees, ever view and
25  use the Kenco's singles machine?

Page 15

GLUS

1
2   A.  Yes.
3   Q.  Can you describe under which
4   circumstances that might have happened?
5   A.  Well, they would visit Mr.
6   Camilleri.  If you knew the layout of the
7   floor, Mr. Camilleri's office at the time was
8   by the kitchen, and his conference room was
9   opposite the kitchen.
10  So if people were there to meet with him
11  and he wasn't available, I would say:  Do you
12  want to go to conference room; would you like
13  coffee; we would go along the way.  We had
14  such a variety, so you would ask them what
15  they want.
16  Q.  Now, we talked about each of the
17  years '97, '98, '99, your personal use of the
18  Kenco's singles capsules, do you remember
19  what flavors you used?
20  A.  I used medium roast or regular tea.
21  Q.  Now, at any time in '96, '97, '98,
22  '99, were you under any obligation of
23  confidentiality or secrecy with regard to the
24  Kenco's singles cartridges and the use of
25  them?

Page 16

GLUS

1
2   A.  No.
3   Q.  Did anyone ever say to you:  Helen,
4   you're free to use these cartridges, but you
5   can't tell anybody about the cartridges?
6   A.  No.
7   Q.  Were your coworkers under any
8   obligation of confidentiality or secrecy with
9   regard to the use of Kenco's singles?
10  A.  No.
11  Q.  This may seem obvious, but were you
12  under any obligation of confidentiality or
13  secrecy with regard to the Kenco's singles
14  cartridges -- did you have any obligation of
15  confidentiality or secrecy to Keurig?
16  A.  No.
17  Q.  Did you have any obligation of
18  confidentiality or secrecy to a Mr. Lazarus,
19  who is one of the inventors of the patent
20  suit?
21  A.  No.
22  Q.  What about to his co-inventor?
23  A.  I don't know who these people are,
24  no.
25  Q.  But you didn't have any obligation

Page 17

GLUS

1
2   of confidentiality or secrecy?
3   A.  No.
4   Q.  Now did there come a time when you
5   were responsible for ordering the Kenco's
6   singles cartridges for use in the machine on
7   the 22nd floor?
8   A.  Yes.
9   Q.  Okay.  Now did you keep a file with
10  regard to those orders?
11  A.  Yes.
12  Q.  And where did you keep that file?
13  A.  In my desk drawer.
14  Q.  Did you provide copies of the
15  documents in that file to Kraft's attorneys
16  in this case to be produced in this case?
17  A.  Yes.
18  Q.  Okay.  I'm going to show you some
19  documents, if you would please hand this to
20  the court reporter.  Now,
21  I don't know what the last defense
22  exhibit is in Banbury, but I know it was
23  certainly not up to 50.
24  So let's mark this defendant's exhibit
25  50.

5 (Pages 14 to 17)

Page 18

```
 1              GLUS
 2      (A DOCUMENT WAS RECEIVED AND MARKED
 3      DEFENDANT'S EXHIBIT 50,
 4      IN EVIDENCE, AS OF THIS DATE.)
 5      Q.  Can you take a second to look at the
 6  document?
 7      A.  Yes.
 8      Q.  Can you describe what this document
 9  is?
10      A.  It's a fax to me from Mr. Halliday
11  just saying how happy we were with the
12  machine and asking for more boxes of product.
13      Q.  Now, first of all, did this document
14  come out of your file?
15      A.  Yes, it did.
16      Q.  At the top there is a Philip Morris
17  letterhead.  Is this the letterhead that
18  you --
19      A.  At the time it was my standard fax
20  cover sheet.
21      Q.  Okay.  And this is dated November 6,
22  1996; is that right?
23      A.  That's right.
24      Q.  Do you have any reason to believe
25  this was not sent about November 6, 1996?
```

Page 19

```
 1              GLUS
 2      A.  It was sent.
 3      Q.  Okay.  Now, you say it was sent.
 4  Now you look at the next page, K0017223; what
 5  is this page?
 6      A.  That's the transmission report from
 7  the fax machine.
 8      Q.  So this show that is it was --
 9      A.  That it went through; that the
10  transmission was okay.
11      Q.  Now, looking at the message itself,
12  it says, "Dear Mr. Halliday, I don't know if
13  Lewis mentioned it in his phone call, but the
14  machine is a big success."
15      What do you mean, a big success?
16      A.  That everyone on the machine thought
17  it was the greatest thing since sliced bread.
18      Q.  "Everyone on the machine," everyone
19  on the --
20      A.  Everyone on the floor.
21      Q.  "So much so that we are ready to
22  re-order certain items after a short time."
23      What do you mean reorder certain items
24  after a short time?
25      A.  Well, I believe it came -- as I
```

Page 20

```
 1              GLUS
 2  said, we got an initial supply, but it was
 3  going like crazy.  So I had to reorder more
 4  stock.
 5      Q.  When you say were "going like
 6  crazy," what do you mean, going like crazy?
 7      A.  People were using it all day long.
 8      Q.  Now, it says: "I'd appreciate it if
 9  you could arrange for the following favorites
10  to be sent to us on 120 Park Avenue."  And
11  you list Kenco traditional leaf tee, Kenco
12  medium roast, Kenco's espresso.  Were these
13  the favorite flavors?
14      A.  At the time they were the favorites,
15  the bestest-selling.
16      (A DOCUMENT WAS RECEIVED AND MARKED
17      DEFENDANT'S EXHIBIT 51,
18      IN EVIDENCE, AS OF THIS DATE.)
19      Q.  Okay.  Now I'm going to show you a
20  next document, Defendant's Exhibit 51.  At
21  the bottom right-hand corner, litigation
22  number we call Bates Nos. 2321; what is this
23  document?
24      A.  This appears to me to be a letter
25  from Liz Matthews saying she is sending the
```

Page 21

```
 1              GLUS
 2  product along with the capsule storage unit
 3  and that she would let me know when the
 4  products were going to arrive and to let her
 5  know when I needed more.
 6      Q.  And this is dated November 7, 1996;
 7  is that correct?
 8      A.  That's correct.
 9      Q.  Which if you look at Defendant's
10  Exhibit 50 is one day after you requested the
11  product; is that correct?
12      A.  Yes.
13      Q.  And this facsimile is addressed to
14  you; is that correct?
15      A.  That's correct.
16      Q.  And did this facsimile come out of
17  your files?
18      A.  Yes, it did.
19      Q.  Now, when you made orders, did you
20  stay on top of whether they are delivered or
21  not?
22      A.  I tried to.
23      Q.  And if you made an order and it
24  didn't come, did you do anything?
25      A.  I'm sure I would have e-mailed them
```

Page 22

GLUS

1  
2 or called them.  
3     Q. So you have no reason to believe  
4 that this wasn't --  
5     A. Well, I know it came because I would  
6 have had a lot of people to answer to if it  
7 didn't. So I know when I ordered, I got a  
8 product.  
9     (A DOCUMENT WAS RECEIVED AND MARKED  
10     DEFENDANT'S EXHIBIT 52,  
11     IN EVIDENCE, AS OF THIS DATE.)  
12     Q. Now, handing you -- if you would  
13 look at Defendant's Exhibit 52 which is  
14 K0017219 through K0017220, would you tell me  
15 what these documents are?  
16     A. Again another fax to Ms. Matthews  
17 asking for more product.  
18     As I said, the earlier one where we had  
19 just those three items, the choices expanded.  
20 So we needed more, another cartridge, another  
21 storage unit to hold all the cartridges, so I  
22 asked for another one of those. And then  
23 there was a question about billing that  
24 Mr. Kepler had.  
25     Q. Now it says here: "I was told it  

Page 23

GLUS

1  
2 might be helpful for you to indicate on the  
3 shipping documents and the name and phone  
4 number of our broker, which is Martin  
5 Strauss."  
6     Do you see that?  
7     A. Yes.  
8     Q. Is that correct that you were the  
9 international broker for bringing things into  
10 customs to Martin Strauss?  
11     A. Yes, it was.  
12     Q. Now, the next page which is 220,  
13 what is this?  
14     A. Again, it's a fax transmission  
15 sheet.  
16     Q. Now, where you say: "Dear Liz," and  
17 it says, "it's that time again."  
18     What do you mean, "it's that time  
19 again?"  
20     A. I always took -- time for me to be a  
21 pest and order more product.  
22     Q. And again, I apologize. It may seem  
23 obvious, but why are you ordering more  
24 product?  
25     A. Because we were running out and we  

Page 24

GLUS

1  
2 didn't have enough.  
3     Q. When you say "we were running out,"  
4 would people have used -- when you look at  
5 the previous exhibit, which is dated November  
6 6, 1996, you had ordered nine boxes of  
7 cartridges.  
8     A. Right.  
9     Q. Now, this is three months later,  
10 February 4, 1996; so almost three months  
11 later.  
12     Had people been using the cartridges and  
13 the nine boxes that you had received?  
14     A. Yes.  
15     Q. Here you are requesting 16 more  
16 boxes; is that correct?  
17     A. That's right.  
18     (A DOCUMENT WAS RECEIVED AND MARKED  
19     DEFENDANT'S EXHIBIT 53,  
20     IN EVIDENCE, AS OF THIS DATE.)  
21     Q. Show you Defendant's Exhibit 53,  
22 K0017218, can you tell me what this is?  
23     A. This is Liz's reply to me from the  
24 previous exhibit saying that the arrangements  
25 for the product and the storage unit were  

Page 25

GLUS

1  
2 being made; two of them were out of stock;  
3 and that we weren't going to be billed.  
4     Q. Okay. So it says: "We are making  
5 arrangements for the product and capsules of  
6 the storage unit to be sent to you. There  
7 may be some delay in getting the carte  
8 noire," c-a-r-t-e, and then n-o-i-r-e, and  
9 then the Kronung, K-r-o-n-u-n-g, products.  
10     Do you see that?  
11     A. Yes.  
12     Q. Now, if you look at the dates,  
13 Defendant's Exhibit 52 and Defendant's  
14 Exhibit 53. Defendant's Exhibit 52 where  
15 you've ordered the 16 boxes dated February 4,  
16 1997, and this is dated, what?  
17     A. February 5, 1997.  
18     Q. So a day later?  
19     A. Yes.  
20     Q. So you ordered them on February 4  
21 and you got a reply on February 5, that they  
22 were being sent to you?  
23     A. Yes.  
24     (A DOCUMENT WAS RECEIVED AND MARKED  
25     DEFENDANT'S EXHIBIT 54,

Page 26

```
1              GLUS
2        IN EVIDENCE, AS OF THIS DATE.)
3        Q.  Can you tell me what this is,
4    Defendant's Exhibit 54, which is K0017217;
5    what is this document?
6        A.  It's a fax from Liz Matthews telling
7    me that the products listed were being sent
8    to me on February 15; plus the capsule
9    storage unit and the flight details and the
10   other two products were going to be produced
11   and dispatched the following week.
12       Q.  Okay.  And did this document come
13   from your files?
14       A.  Yes, it did.
15       (A DOCUMENT WAS RECEIVED AND MARKED
16       DEFENDANT'S EXHIBIT 55,
17       IN EVIDENCE, AS OF THIS DATE.)
18       Q.  Please look at Defendant's Exhibit
19   55 which is K0017216.  Do you see that?
20       A.  Yes, I do.
21       Q.  First of all, did this document come
22   from your files?
23       A.  Yes, it did.
24       Q.  Can you tell me what this document
25   is?
```

Page 27

```
1              GLUS
2        A.  I don't really know what officially
3    this document is called.  I don't know if
4    it's a bill of lading or an invoice; I don't
5    know.
6        Q.  If you look at the date, it is dated
7    February 13, 1997; is that correct?
8        A.  Yes.
9        Q.  And if you look at the date of the
10   previous exhibit, Defendant's Exhibit 54,
11   that's likewise dated February 13, 1997; is
12   that correct?
13       A.  Yes.
14       Q.  Now, if you look at the previous
15   exhibit, it has one box of medium -- it says:
16   "The following product is being dispatched
17   from the U.K. on Saturday, 15 February."  It
18   says one box of medium roast; do you see
19   that?
20       A.  Yes.
21       Q.  From Defendant's Exhibit 55, do you
22   see medium roast coffee, quantity, what is
23   that?
24       A.  One.
25       Q.  And on Defense Exhibit 51, it says
```

Page 28

```
1              GLUS
2    two boxes of dark roast, and you see on
3    Defendant's Exhibit 55, it says dark roast
4    coffee; what is the quantity?
5        A.  Two.
6        Q.  And then on Defendant's Exhibit 54,
7    it says two boxes of traditional tea, and on
8    Defendant's Exhibit 55, it says traditional
9    tea; how many, the quantity?
10       A.  Two.
11       Q.  And then on defendant's 54, it says
12   two boxes of earl gray tea, and then on
13   Defendant's Exhibit 55, it says earl gray
14   tea; what quantity?
15       A.  Two.
16       Q.  Then we go to cappuccino, three
17   boxes; and boxes of cappuccino on
18   Defendant's Exhibit 55, we have how many
19   boxes?
20       A.  Three.
21       Q.  Defendant's Exhibit 54, we have two
22   boxes of espresso; and Defendant's Exhibit
23   55, we have espresso, how many?
24       A.  Two.
25       (A DOCUMENT WAS RECEIVED AND MARKED
```

Page 29

```
1              GLUS
2        DEFENDANT'S EXHIBIT 56,
3        IN EVIDENCE, AS OF THIS DATE.)
4        Q.  Now, show you Defendant's Exhibit
5    56, which is K0017214.
6        Do you have that in front of you?
7        A.  Yes.
8        Q.  Did this come out of your files?
9        A.  Yes.
10       Q.  Now, is this addressed to you?
11       A.  Yes.
12       Q.  And this is dated March 10, 1997; is
13   that correct?
14       A.  Yes.
15       Q.  And it is a bill for two types of
16   Kenco singles cartridges; can you read what
17   they are?
18       A.  French dark coffee and Kronung.
19       Q.  Now, if you look, go back to
20   Defendant's Exhibit 54 -- excuse me.  Just go
21   back to Defendant's Exhibit 52, the bottom of
22   the list of order, you have two boxes of
23   carte noire?
24       A.  Yes.
25       Q.  And two boxes of Kronung; is that
```

Page 30

GLUS

1  right?
2     A.  Yes.
3     Q.  Now, if you then go to Defendant's
4  Exhibit 54, can you tell us what Ms. Matthews
5  told you in this document?
6     A.  That they were being produced
7  tomorrow, the 14th of February, and that they
8  will be dispatched by DHL early the next
9  week.
10    Q.  So now going to Defendant's Exhibit
11 56, does this reflect that those two flavors
12 were dispatched to you?
13    A.  Yes.
14    (A DOCUMENT WAS RECEIVED AND MARKED
15    DEFENDANT'S EXHIBIT 57,
16    IN EVIDENCE, AS OF THIS DATE.)
17    Q.  Now, I'm going to show you
18 Defendant's Exhibit 57, which is K0017212.
19 And can you tell me what -- first, did this
20 document come from your files?
21    A.  Yes.
22    Q.  And midway about a third down, it
23 says: "Attention, Helen Glus."
24    Do you see that?
25

Page 31

GLUS

1     A.  Yes.
2     Q.  Is that you?
3     A.  Yes.
4     Q.  Okay.  At the top, it says: "Martin
5  Strauss, Air Freight Corp.," do you see that?
6     A.  Yes.
7     Q.  Do you know who Martin Strauss, Air
8  Freight Corp. is?
9     A.  It was our broker.
10    Q.  And do you know what this document
11 is?
12    A.  I want to say like the bill of
13 lading, but I'm not really positive.
14    Q.  Okay.  But if you see, if you go
15 back and look at Exhibit 54, do you see that?
16    A.  Yes.
17    Q.  And it says flight details as
18 follows, and it has the -- what airline is
19 this being sent on?
20    A.  United.
21    Q.  And this bill of lading from Martin
22 Strauss Air Freight, what airline was this
23 being sent on?
24    A.  United.
25

Page 32

GLUS

1     Q.  And to whose attention?
2     A.  Mine.
3     (A DOCUMENT WAS RECEIVED AND MARKED
4     DEFENDANT'S EXHIBIT 58,
5     IN EVIDENCE, AS OF THIS DATE.)
6     Q.  Now, I show you Defendant's Exhibit
7  58, which is K0017204, through K0017206.
8     A.  Okay.
9     Q.  Can you tell us me, first of all,
10 did this document come out of your files?
11    A.  Yes.
12    Q.  Now below it says: "Kind regards,
13 Helen."  Is that you?
14    A.  Yes.
15    Q.  So did you send this?
16    A.  Yes, I did.
17    Q.  And what is this document?
18    A.  Another request for product.
19    Q.  Okay.  If you would look back to
20 Defendant's Exhibit 54 -- excuse me,
21 Defendant's Exhibit 52, it's dated February
22 4, 1997, and you said there were 16 boxes
23 ordered; correct?
24    A.  Yes.
25

Page 33

GLUS

1     Q.  Okay.  This is roughly a little over
2  three months later; what's the date of this?
3     A.  No.  What is the date?
4     Q.  May 13th.
5     A.  And May 13th, you were ordering 18
6  more boxes; is that correct?
7     A.  Yes.
8     Q.  Why would you have ordered 18 boxes
9  of capsules three months later?
10    A.  Because our supply was running low.
11    Q.  And when you say your supply was
12 running low, is that because people were
13 using them?
14    A.  Yes.
15    Q.  Including yourself?
16    A.  Absolutely.
17    (A DOCUMENT WAS RECEIVED AND MARKED
18    DEFENDANT'S EXHIBIT 59,
19    IN EVIDENCE, AS OF THIS DATE.)
20    Q.  If you look at Defendant's Exhibit
21 59, which is K0017202, first of all, did this
22 document come from your files?
23    A.  Yes.
24
25

# Exhibit 3

Page 1

```
 1
 2
                IN THE UNITED STATES DISTRICT COURT
 3               FOR THE DISTRICT OF DELAWARE

 4      ──────────────────────────────────── :
        KEURIG INCORPORATED                  :
 5                                           :
                         Plaintiff   : Civil Action No.
 6                                   : 07-017 GMS
                            v        :
 7                                   :
        KRAFT FOODS GLOBAL, INC      :
 8      TASSIMO CORPORATION, and     :
        KRAFT FOODS INC,             :
 9                       Defendants  :
        ──────────────────────────────────── :

10
11          VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
12                            OF
13                      JANICE APPLETON
14           On Thursday, 21st February 2008
15
                    Commencing at 9.12 am
16
                         Taken at:
17          Best Western Banbury House Hotel
                       Oxford Road
18                       Banbury
                       Oxfordshire
19                       OX16 9AH
                     United Kingdom
20
21
22
23
24      Reported by: Miss Pamela Henley
25
```

KEURIG v KRAFT                    21 FEBRUARY 2008                    DEPSOSITION OF J. APPLETON

Page 2

1
2         A P P E A R A N C E S
3
4
5
6    On behalf of the Plaintiff:
7         Wolf, Greenfield & Sacks, PC
8         600 Atlantic Avenue
9         Boston, MA 02210
10        BY:  Michael N Rader
11
12   On behalf of the Defendants:
13        Baker Botts LLP
14        The Warner
15        1299 Pennsylvania Avenue
16        NW Washington, DC 2004-2400
17        BY: DAVID SCHLITZ
18
19   Court Reporter:
20
21        Pamela Henley
22        Marten Walsh Cherer Limited
23        6th Floor
24        12-14 New Fetter Lane
25        London EC4A 1LT

Page 3

1
2         I N D E X
3    DEPONENT
4    Janice Appleton
5    Examination:              Page No:
6    Direct Examination by Mr Rader      4
7    _____
8         EXHIBIT INDEX
9
10   Number              Page No:
11   1                      23
12   2                      62
13   3                      64
14   4                      66
15   Defendant's
16   1                      81
17
18
19
20
21
22
23
24
25

Page 4

1         Confidential - Attorneys' Eyes Only
2              JANICE APPLETON
3         having been duly sworn
4    was examined and did testify as follows
5         DIRECT EXAMINATION:
6    BY MR RADER:  Good morning, Ms Appleton. My name
7    is Mike Rader and we met briefly off the record.
8    Just a couple of preliminaries before I ask you
9    some questions; have you ever had your deposition
10   taken before?
11       A.    No.
12       Q.    A couple of preliminaries then.
13   First, I think you know this, but I will just need
14   to ask you to make sure you answer all my
15   questions verbally rather than, for example,
16   nodding your head so that the court reporter can
17   get down your answers, okay?
18       A.    Yes.
19       Q.    Now, Mr Schlitz probably told you
20   this, but I want to make sure you understand, if
21   he objects to a question that I ask you unless he
22   for some reason instructs you not to answer it do
23   you understand that notwithstanding the objection
24   you will still need to provide a response?
25       A.    I do.

Page 5

1         Confidential - Attorneys' Eyes Only
2         Q.    Okay. And last if at any point you
3    need to take a break, run to the bathroom or get
4    something to drink will you let me know?
5         A.    Yes, I will.
6         Q.    Are you feeling all right today and
7    ready and prepared to give your best testimony?
8         A.    Yes, I am fine, thank you.
9         Q.    I do not expect this to take too
10   long, I think an hour or maybe two should be
11   enough.
12             Ms Appleton, are you a current
13   Kraft employee?
14       A.    Yes, I am.
15       Q.    At what Kraft facility do you work?
16       A.    I work in the Banbury office of
17   Kraft.
18       Q.    What is the full name of your
19   employers?  Is it just Kraft or is it some other
20   name?
21       A.    Just Kraft Foods.
22       Q.    How long have you worked at Kraft
23   Foods?
24       A.    20 years permanently and nearly 21
25   because I worked nine months as a temporary

2 (Pages 2 to 5)

KEURIG v KRAFT                    21 FEBRUARY 2008                    DEPSOSITION OF J. APPLETON

---

Page 22

Confidential - Attorneys' Eyes Only
1
2    Q.    You mentioned that you had some
3    responsibility, again we are still on the
4    purchasing of the system rolls, you mentioned you
5    had some responsibility in the distribution or
6    shipping area; is that of the singles machines?
7    A.    Yes.
8    Q.    And not the cartridges?
9    A.    We tended to utilise as far as
10   France, Germany and Spain were concerned if we did
11   not have full truck loads they would either put
12   the request to ship the equipment if that was not
13   a full trip load, I would ask them to utilise with
14   product if they had any to shift.
15   Q.    By "product" you mean the
16   cartridges?
17   A.    Yes.
18   Q.    Then would you then actually
19   co-ordinate them getting the product? Did your
20   role extend any further beyond that in terms of
21   the cartridges?
22   A.    Not as far as France, Germany and
23   Spain.
24   Q.    What about any other countries?
25   A.    The USA.

---

Page 23

Confidential - Attorneys' Eyes Only
1
2    Q.    What was your role with regard to
3    singles cartridges in the US?
4    A.    Reference some of the documents it
5    came through the vending director's secretary, a
6    request for me to ship some product.
7    Q.    Was that a regular part of your job
8    or just something that you did to help her out?
9    A.    I suppose it was not within the
10   normal procedure, so it was -- I would not say it
11   was not my job to do it, but I would not say it
12   was the normal way that we shipped product coming
13   through me.
14   Q.    My understanding from reviewing the
15   documents, and I will put them in front of you in
16   a second, but my understanding is that when you
17   made those shipments to the US there was no
18   payments in return for those; is that right?
19   A.    I think some of them were free of
20   charge. I am not quite sure if all of them were.
21   Q.    We will look at those in
22   particular. Let us start doing that now actually.
23   I am going to ask the court reporter to mark this
24   as Plaintiff's Exhibit 1.
25   (Exhibit 1 marked for identification)

---

Page 24

Confidential - Attorneys' Eyes Only
1
2    Ms Appleton, you have Exhibit 1 in front of you
3    and I will just point out what we call litigation
4    numbers or Bates numbers in the lower right-hand
5    corner from K17156 through K17171
6    MR SCHLITZ:    Excuse me. I object.
7    This is a compilation of documents that were
8    provided. This is not a single document.
9    MR RADER:    Correct. It is a
10   compilation.
11   MR SCHLITZ:    So you are making this
12   as an exhibit a compilation?
13   MR RADER:    Yes.
14   MR SCHLITZ:    I want it to be
15   understood that some of these documents may not be
16   whole. Some of them -- the way that she kept them
17   in her files. We provided to you stapled the way
18   they were kept in the files.
19   MR RADER:    Just for your
20   information, Mr Schlitz, the reason I chose this
21   group is because by e-mail dated February 14th,
22   2008 your colleague, Mr Foster, represented to us
23   that this specific group of documents came from
24   Ms Appleton's files, and I want to ask her about
25   that. Rather than marking every single page. I

---

Page 25

Confidential - Attorneys' Eyes Only
1
2    thought it would be convenient.
3    MR SCHLITZ:    Okay.
4    By MR RADER:
5    Q.    So, Ms Appleton, I will just start
6    on the first page; is this document on the first
7    page a document that is familiar to you?
8    A.    Yes.
9    Q.    In your own words can you describe
10   what this document is?
11   A.    This is a fax from my predecessor,
12   Martina Clausing, to our export department to
13   arrange shipment of brewer and some cup stacks,
14   some capsules.
15   Q.    So when you say "your predecessor"
16   you are referring to in the position of purchasing
17   and assisting?
18   A.    She was the one who was on
19   maternity leave.
20   Q.    And so you took over from her some
21   time in 1995?
22   A.    1995.
23   Q.    Now, just to make sure I understand
24   the date correctly, this is December 1st 1994,
25   this fax?

---

7 (Pages 22 to 25)

MARTEN WALSH CHERER LTD              12-14 NEW FETTER LANE              LONDON EC4A 1AG
TEL: 020 7936 6000              E-MAIL: info@martenwalshcherer.com              FAX: 020 7427 0093

KEURIG v KRAFT                 21 FEBRUARY 2008                 DEPSOSITION OF J. APPLETON

Page 26

1      Confidential - Attorneys' Eyes Only
2      A.    Yes.
3      Q.    We do it differently in the States.
4      A.    Yes, you do.
5      Q.    Now, my understanding, at least
6  from counsel, is that this document came from
7  files that were described as being your files; is
8  that correct?
9      A.    Yes, that is correct.
10     Q.    Now, obviously, this is not a
11  document that you created, right?
12     A.    No.
13     Q.    It is -- it was created and sent at
14  a time when you were not yet in the position we
15  have been speaking about, right?
16     A.    Yes.
17     Q.    So can you just describe what --
18  where you located this document?
19     A.    In my filing cabinet that I
20  inherited from my predecessor.
21     Q.    Where is that filing cabinet
22  located?
23     A.    At the side of my desk.
24     Q.    That is obviously in your office in
25  the Banbury facility?

Page 27

1      Confidential - Attorneys' Eyes Only
2      A.    Well, it is open plan. I do not
3  have an office.
4      Q.    Is that -- I think that is what we
5  referred as cubicles; do you use that word?
6      A.    We refer to it as open plan because
7  we are not partitioned off at all. The --
8      MR SCHLITZ:  Just desks. It is a
9  big room.
10     A.    Desks within an area.
11     BY MR RADER:
12     Q.    And next to your desk you have a
13  filing cabinet and that is where you found the
14  documents?
15     A.    Yes.
16     Q.    Was it inside a file that was
17  labelled in any way?
18     A.    It is in the hangers that you put
19  in there and it is filed USA.
20     Q.    So the file just says "USA"?
21     A.    Yes.
22     Q.    Can you just describe, broadly, in
23  that filing cabinet, and this may seem like a very
24  detailed set of questions, but what types of
25  documents are in that filing cabinet, in general?

Page 28

1      Confidential - Attorneys' Eyes Only
2      A.    In that particular drawer it is --
3  each of the files is a country. So wherever I
4  have shipped to, or had any dealings with any
5  country then there is the country's name on each
6  of those files.
7      Q.    You say it is things that you have
8  shipped to a country; is it just singles
9  cartridges or other things that you may have
10  shipped at --
11     A.    Other things.
12     Q.    -- is that a system, a filing
13  system that you inherited from Ms Clausing?
14     A.    I suppose, yes, and I have put my
15  own spin on it, I suppose.
16     Q.    How so?
17     A.    Well, I am not sure she kept every
18  country. I do not know whether she kept them in
19  the format that I keep them in.
20     Q.    Do you recall what it looked like
21  when you inherited it from her?
22     A.    No, I am afraid I do not.
23     Q.    Was there a USA file at the time
24  you took over the --
25     A.    Oh, yes, there has always been a

Page 29

1      Confidential - Attorneys' Eyes Only
2  USA file.
3      Q.    -- now, it says here at the top of
4  the page "Kraft Jacobs Suchard", did I pronounce
5  that correctly?
6      A.    Jacobs.
7      Q.    What is that?
8      A.    Jabobs is the German coffee, as
9  Kenco is UK Jacobs is German.
10     Q.    Is that -- I take it this is...
11     A.    That is what the company was called
12  at one time.
13     Q.    So was Ms Clausing an employee of
14  Kraft Jacobs Suchard?
15     A.    Yes. As was I.
16     Q.    So even though you were located in
17  the UK technically at the time you were in the
18  planning and logistics division you were an
19  employee of the German --
20     A.    No, that was just the name of the
21  company at the time. We started off as General
22  Foods. Then we had a name change, I think it was
23  as we -- as the company obtained certain other
24  companies like Suchard that was the name that we
25  had at the time, Kraft Jacobs Suchard and then we

8 (Pages 26 to 29)

Page 30

1    Confidential - Attorneys' Eyes Only
2  became Kraft Foods.
3      Q.    -- and then below that it says
4  Maxpax International; what does that refer to?
5      A.    That is what the -- half of the
6  away from home business was called at the time,
7  Maxpax. It was simply known as Maxpax. And that
8  is the in cup and the singles side.
9      Q.    Is that the programme that you
10 referred to earlier where they get the machine for
11 free?
12     A.    No, Maxpax was the logo that the
13 vending machines, the input vending machines were
14 known as. They were quite innovative at the time
15 that they were created, the Maxpax machines,
16 because of the -- how it produced the cup of
17 coffee, which was in cup. The product was in the
18 cup and the water filled it.
19          Previous to that most vending
20 machines had a tube that the coffee came down and
21 sometimes you could get half a cup of coffee and
22 half a cup of soup, whichever you had, and that
23 was the way vending machines worked. So Maxpax was
24 the company that created the -- this particular
25 type of vending machine.

Page 31

1    Confidential - Attorneys' Eyes Only
2      Q.    I see, okay. And you are referring
3  to the in cup vending machine?
4      A.    Yes.
5      Q.    Who is Sue Stephenson?
6      A.    Sue Stephenson was a person that
7  worked in our export department at the time and
8  she was responsible for shipping.
9      Q.    What about Caroline Walley?
10     A.    She also worked there. I am
11 assuming that as it went to both of them I am not
12 quite sure whether Caroline may have been on
13 maternity leave at that time or whether she had
14 just come back, hence Sue or Caroline.
15     Q.    And since they are sending a fax my
16 assumption would that be these people are working
17 at a different facility; is that right?
18     A.    They are in the same office block,
19 but possibly on a different floor.
20     Q.    So is this the precursor to e-mail?
21     A.    Yes, very much so.
22     Q.    Send a fax to someone working on
23 another floor?
24     A.    Yes.
25     Q.    When you say they were in shipping,

Page 32

1    Confidential - Attorneys' Eyes Only
2  are they the people who would actually take
3  whatever the item is, put it in a box, get it to
4  the --
5      A.    No, they would liaise with
6  transport agencies.
7      Q.    -- so in this kind of situation who
8  would actually go get the thing to be shipped, the
9  singles cartridges or whatever, put it in a box
10 and ship it; who would actually do that physical
11 labour?
12     A.    The capsules in the box would be
13 done by the factory because they are produced and
14 created as finished goods in a box and they would
15 sit in our finished goods warehouse on the Banbury
16 site. The machines would be in our distribution
17 warehouse, which at this time was possibly
18 Hatfield in Hertfordshire, and so an order would
19 be put on the system to arrange the shipment, and
20 the guy in the warehouse would pick that order and
21 it would be loaded on to a container, the
22 transport company would go in and collect.
23     Q.    So in a situation like the one we
24 have been talking about, where an order was placed
25 for a certain amount of product to be sent to the

Page 33

1    Confidential - Attorneys' Eyes Only
2  United States, would it be Ms Stephenson and
3  Ms Walley who would communicate to someone in the
4  warehouse what needed to be sent? Is that how it
5  would work?
6      A.    Yes, they would liaise with the
7  transport agency and possibly the warehouse. In
8  actual fact at this time I think we would have had
9  a certain amount of product in the warehouses, the
10 distribution warehouses, and that would be --
11 depending on where the deliveries needed to go
12 post code wise as to how many boxes or cases of
13 that product would be in the warehouse.
14          A little bit the same as the
15 equipment where we need to ensure that we have a
16 sufficient amount of machines to cover our
17 forecasts then they would need to ensure that they
18 had a sufficient amount of cases of equipment to
19 go out to the customers.
20     Q.    So let me ask you a couple more
21 questions about this document. In the middle of
22 the page in the listing of product to be shipped
23 there is a reference and it says one Spanish
24 brewer; do you see that?
25     A.    Yes.

KEURIG v KRAFT                    21 FEBRUARY 2008                    DEPSOSITION OF J. APPLETON

Page 34

1       Confidential - Attorneys' Eyes Only
2    Q.    What does that refer to?
3    A.    That is a singles brewer with
4 Spanish branding.
5    Q.    Were there other types of branding
6 as well at the time?
7    A.    UK branding, French branding,
8 German branding.
9    Q.    Do you have any idea why a Spanish
10 brewer was chosen here?
11   A.    Possibly because we had one in
12 stock.
13   Q.    Were the machines, to your
14 knowledge, any different, or was it just --
15   A.    No, it is just branding.
16   Q.    -- okay. Then there is a list of
17 one case each of various types of coffee; do you
18 see that?
19   A.    Yes.
20   Q.    I assume those are cases of singles
21 cartridges?
22   A.    Yes.
23   Q.    And they are supposed to go to a
24 Mr David Yuile; did I pronounce that right?
25   A.    I do not know. I do not know the

Page 35

1       Confidential - Attorneys' Eyes Only
2 man.
3       MR SCHLITZ:  You did pronounce it
4 right
5       BY MR RADER:
6    Q.    Did you ever have any contact with
7 Mr Yuile?
8    A.    No.
9    Q.    Never spoken with him?
10   A.    No.
11   Q.    Then below that it says the items
12 are to be sent free of charge; do you have any
13 idea why that was so?
14   A.    No, not really. They were put
15 against a sample budget number which shows below.
16   Q.    Do you know why Ms Clausing did
17 that?
18   A.    Well, when she passed that on to me
19 all she said was this was how we ship this kind of
20 thing. The sample budget number I think belonged
21 to the vending director. So I think you had to
22 pay for the goods from the factory so you could
23 not have goods from the factory free of charge so
24 although we were sending them to the USA free of
25 charge they had to be charged from the factory

Page 36

1       Confidential - Attorneys' Eyes Only
2 against something and that was the vending
3 director's sample budget number.
4    Q.    So you would have to -- sort of on
5 an ad hoc basis have some way of accounting it
6 within a company?
7    A.    Yes.
8    Q.    Now, do you have any idea why
9 Mr Yuile was getting a free brewer and free
10 singles cartridges?
11   A.    No.
12   Q.    Ms Clausing did not tell you when
13 she transferred the job to you --
14   A.    No.
15   Q.    -- and the cases of singles
16 cartridges and the brewer that were -- let me see.
17 Let me back up for a minute. Do you know whether
18 the singles cartridges that Ms Clausing requested
19 here were ever actually sent to Mr Yuile?
20   A.    Well, the fact that we have put the
21 request to Sue one assumes that if he did not
22 receive them he would have requested that and
23 followed it up because he was obviously expecting
24 them.
25   Q.    Now, you were not in the position

Page 37

1       Confidential - Attorneys' Eyes Only
2 at that time where he would have contacted you
3 about that, right?
4    A.    No.
5    Q.    So do you have any -- did you find
6 in your files any documents that confirmed that
7 this shipment actually went?
8    A.    No.
9    Q.    Did you find any notes from
10 Ms Clausing or any other documents at all that
11 would corroborate that he received the shipment?
12   A.    No.
13   Q.    Now, if the cartridges were
14 shipped, the singles cartridges that are listed
15 here, they would have been inside a case; is that
16 right?
17   A.    Yes.
18   Q.    In other words, one case each of
19 these different types?
20   A.    Yes.
21   Q.    What do those cases look like? Was
22 it cardboard?
23   A.    Cardboard cases. Yes. The capsules
24 are in like a kind of laminate sleeve, and then
25 there are so many sleeves in a box. I am not

MARTEN WALSH CHERER LTD              12-14 NEW FETTER LANE              LONDON EC4A 1AG
TEL: 020 7936 6000            E-MAIL: info@martenwalshcherer.com            FAX: 020 7427 0093

KEURIG v KRAFT                    21 FEBRUARY 2008                    DEPSOSITION OF J. APPLETON

---

Page 38

1     Confidential - Attorneys' Eyes Only
2   quite sure of the number.
3       Q.    But the term "case" would refer to
4   the box?
5       A.    Yes.
6       Q.    Okay. And that box is sealed up at
7   the factory?
8       A.    In the factory, yes.
9       Q.    Did you -- well, obviously, you
10  were not in the position, but just to confirm, did
11  you ever actually see the cases that would have
12  been sent to Mr Yuile?
13      A.    No.
14      Q.    Would Ms Clausing have actually
15  seen those cases and seen the box that was being
16  shipped --
17      A.    No.
18      Q.    -- would Ms Stephenson and
19  Ms Walley have actually seen the shipment itself?
20      A.    No.
21      Q.    So the only person who would have
22  seen what was shipped would have been the person
23  at the factory?
24      A.    The man who would pick the shipment
25  at the distribution warehouse.

---

Page 39

1     Confidential - Attorneys' Eyes Only
2       Q.    Okay.
3       A.    The man produces them at the
4   factory, they are in cases. Those cases get
5   shipped on a regular basis to the distribution
6   warehouses, and this shipment would have been
7   arranged with the distribution warehouse with a
8   transport company to come in and collect a pallet.
9   If you see at the side there it has one pallet, so
10  the brewer, and one each of those cases would have
11  been picked and strapped to a pallet and then the
12  transport agency would come in and collect that
13  pallet.
14      Q.    So somehow Ms Stephenson and
15  Ms Walley would have communicated to that person?
16      A.    Yes.
17      Q.    Do you know whether that type of
18  thing was done by fax or by phone?
19      A.    I do not. I do not know their
20  order system and I do not know whether it works
21  the same as it works now.
22      Q.    Was it the same at a later time
23  when you were making these sorts of requests, was
24  it a similar kind of procedure where you would
25  place a request to someone else who would get the

---

Page 40

1     Confidential - Attorneys' Eyes Only
2   product shipped?
3       A.    Yes.
4       Q.    In all the cases where you placed
5   these types of requests you never actually saw the
6   boxes that were shipped?
7       A.    No.
8       Q.    You did not take them to DHL of
9   FedEx or something like that?
10      A.    No.
11            THE COURT REPORTER: Would you wait
12  until Mr Rader has finished his question before
13  you answer.
14            THE WITNESS: Sorry.
15            BY MR RADER:
16      Q.    The next page is K17157. Is this
17  another page that you inherited from Ms Clausing?
18      A.    Yes. That is the request from Andy
19  Wiggins to ship the first page.
20      Q.    Now, I am sorry, I may have asked
21  you, but who is Andy Wiggins?
22      A.    He was, I am not quite sure what
23  his title was, but he worked in equipment
24  development at that time. It was called equipment
25  development.

---

Page 41

1     Confidential - Attorneys' Eyes Only
2       Q.    Do you have any idea why he placed
3   this request with Ms Clausing?
4       A.    No, I do not.
5       Q.    Did Ms Clausing ever come back from
6   maternity leave?
7       A.    No.
8       Q.    So she is not with the company now?
9       A.    No.
10      Q.    Do you know if Mr Wiggins is at the
11  company now?
12      A.    No.
13      Q.    I should phrase that again so it is
14  not confusing. Is Mr Wiggins at the company now?
15      A.    No.
16      Q.    My fault. Now, the next page is
17  K17518. Can you describe what this document is?
18      A.    This is a fax, again to
19  Sue Stephenson, to arrange a shipment to the USA.
20      Q.    So this would have proceeded in a
21  similar fashion where she would have made
22  arrangements with someone in shipping?
23      A.    Yes.
24      Q.    And the date here is August 14th
25  1995?

---

11 (Pages 38 to 41)

MARTEN WALSH CHERER LTD           12-14 NEW FETTER LANE           LONDON EC4A 1AG
TEL: 020 7936 6000           E-MAIL: info@martenwalshcherer.com           FAX: 020 7427 0093

KEURIG v KRAFT                  21 FEBRUARY 2008                  DEPOSITION OF J. APPLETON

---

Page 42

1    Confidential - Attorneys' Eyes Only
2        A.   Yes.
3        Q.   It says here -- is this your
4    handwriting, by the way?
5        A.   It is, yes.
6        Q.   It says here the shipment was to
7    arrive no later than Wednesday, August 23rd 1995;
8    do you see that?
9        A.   Yes.
10       Q.   Why was that?
11       A.   That was the request that I had
12   from the following page.
13       Q.   Okay. So the next page, that is
14   K17159, is that a request that you got from
15   Doug Halliday?
16       A.   Yes.
17       Q.   Who was Doug Halliday?
18       A.   He was the vending director for
19   Maxpax International at that time.
20       Q.   And he asked you to make a delivery
21   to Mr Craig in New York?
22       A.   Yes.
23       Q.   Who was Mr Craig?
24       A.   Group Research Director Maxwell
25   House Division.

---

Page 43

1    Confidential - Attorneys' Eyes Only
2        Q.   Did you ever meet Mr Craig?
3        A.   No.
4        Q.   Talk to him on the phone?
5        A.   No.
6        Q.   Any contact with him?
7        A.   No.
8        Q.   Did Mr Halliday explain why the
9    product was to be shipped to Mr Craig?
10       A.   No.
11       Q.   Did he tell you what Mr Craig was
12   going to do with the product?
13       A.   No.
14       Q.   Did he tell you if Mr Craig had a
15   singles machine somewhere in his facility?
16       A.   No.
17       Q.   Now in Mr Halliday's memo to you he
18   did not tell you how to make that intracompany
19   charge, did he?
20       A.   No.
21       Q.   You charged it against the same
22   sample budget number?
23       A.   Yes.
24       Q.   How did you decide to do that?
25       A.   Because that is what I was

---

Page 44

1    Confidential - Attorneys' Eyes Only
2    previously instructed by my predecessor that this
3    is how we dealt with this kind of thing.
4        Q.   When you say "this kind of thing" I
5    want to make sure I understand because all of
6    these documents centre around a certain set of
7    circumstances where you are sending some product
8    to the United States. When you say "this kind of
9    thing" is there any kind of name that you would
10   put to this activity within your business?
11       A.   Possibly I would just refer to them
12   as ad hoc shipments, you know, on request.
13       Q.   Meaning it was not part of any
14   regular programme, but just something you did if
15   you happened to get a request?
16       A.   Yes.
17       Q.   Now, for this August 14th 1995
18   order did you receive any confirmation from
19   Ms Stephenson or from shipping that the shipment
20   was actually sent?
21       A.   No, it does not look like it.
22       Q.   Did you receive any confirmation
23   from Mr Craig that he received it?
24       A.   No.
25       Q.   Did he get anything from -- well,

---

Page 45

1    Confidential - Attorneys' Eyes Only
2    let me back up. Do you know which shipping
3    service you used?
4        A.   No, I do not on this occasion. It
5    does normally say on the invoice if we do receive
6    a copy of the invoice. But I have written on the
7    bottom to Sue Stephenson: "Can you please advise
8    shipment departure and arrival times" simply
9    because this one was going airfreight. So I would
10   assume that I would have received that possibly --
11   could have been by e-mail, which I have not kept.
12       Q.   Do you have any recollection as you
13   sit here today of getting that confirmation?
14       A.   No.
15       Q.   Okay. Let us move on to the next
16   one, K17160. This is another fax from you to
17   Ms Stephenson dated April 2nd, 1996?
18       A.   Yes.
19       Q.   This was for a shipment to a Ms
20   Helen Glus; is that right?
21       A.   Yes.
22       Q.   Who is Ms Glus?
23       A.   I am not quite sure what her title
24   was actually.
25       Q.   Did you have occasion to speak with

---

12 (Pages 42 to 45)

KEURIG v KRAFT                    21 FEBRUARY 2008              DEPOSITION OF J. APPLETON

Page 46

1       Confidential - Attorneys' Eyes Only
2   her directly?
3       A.   No.
4       Q.   Or meet with her?
5       A.   No.
6       Q.   Do you know why -- on this occasion
7   do you know who requested that you make the
8   shipment to Ms Glus?
9       A.   I would say Liz Matthews again who
10  was Doug Halliday's secretary because I have put
11  at the bottom there: "Can you let me know details
12  to pass to Liz Matthews".
13      Q.   Okay. Do you recall the
14  conversation with Ms Matthews about this?
15      A.   No.
16      Q.   I realise it was a long time ago.
17      A.   Yes.
18      Q.   Do you recall if she told you why
19  this shipment was being made?
20      A.   No.
21      Q.   Did she tell you anything about
22  whether Ms Glus had a singles machine or where it
23  was or how she was using it?
24      A.   No.
25      Q.   Again, the actual cases -- let me

Page 47

1       Confidential - Attorneys' Eyes Only
2   back up for a second. It says "3 cases of" and
3   then there is an identification number; do you see
4   that?
5       A.   Yes.
6       Q.   Does that refer to a particular
7   flavour of singles cartridges?
8       A.   It is medium roast.
9       Q.   So you recognise these numbers?
10      A.   Yes.
11      Q.   And, again, those cases would have
12  been shipped by someone that Ms Stephenson
13  contacted?
14      A.   Yes.
15      Q.   You did not see the box or anything
16  like that?
17      A.   No.
18      Q.   Back at the time in 1995, '96 in
19  your office where you worked did you have a
20  singles brewer?
21      A.   I think we have our vending
22  equipment on the landing of each floor for the use
23  of all of the people on each floor.
24      Q.   Did you have that -- do you recall
25  whether you had at the time, '95/96?

Page 48

1       Confidential - Attorneys' Eyes Only
2       A.   I do not recall at all what we had.
3       Q.   Do you nowadays, let us talk about
4   nowadays.
5       A.   Yes.
6       Q.   Do you drink singles coffee?
7       A.   No, I drink singles tea.
8       Q.   Okay. Have you ever drunk singles
9   coffee?
10      A.   Yes.
11      Q.   So you are a coffee drinker?
12      A.   Occasionally, yes.
13      Q.   Do you recall when was the first
14  time that you had occasion to drink a cup of
15  singles brew coffee?
16      A.   It would have been probably at the
17  launch of the singles brewer in the UK. I do not
18  know what date that was, to be honest.
19      Q.   Do you recall when you first got a
20  singles machine on the landing or anywhere else at
21  the office that you used?
22      A.   No, I do not recall at all.
23      Q.   I do not think it is part of your
24  job description, but I just need to confirm a
25  couple of things; do you have any involvement at

Page 49

1       Confidential - Attorneys' Eyes Only
2   all with design of cartridge products?
3       A.   No.
4       Q.   Over the years at Kraft have you
5   ever been involved with engineering or technical
6   design for singles cartridges for example?
7       A.   No.
8       Q.   Have you ever studied the technical
9   features of singles cartridges?
10      A.   No. Only from an interest point of
11  view, how does it work.
12      Q.   In terms of -- when you say how
13  does it work, can you flesh that out a little bit
14  more?
15      A.   Well, I think it was -- I did a
16  factory visit and saw the capsules being produced
17  and so you see the tea going in and the little
18  channel round the outside that the water goes
19  round and then it punctures and the water floods
20  in and brews through.
21      Q.   So did you ever take a singles
22  cartridge in your hand and carefully study it for
23  any product features or technical aspects or
24  anything like that?
25      A.   Only as a matter of interest,

13 (Pages 46 to 49)

Page 50

1    Confidential - Attorneys' Eyes Only
2  peeling the top off to see how it works.
3      Q.    Are you familiar at all with
4  changes to the design of the singles cartridge
5  over time or anything like that?
6      A.    No.
7      Q.    When you use a singles cartridge
8  today or when you have used them to insert them
9  into a machine did you study them at all, or were
10  you mainly interested in putting it in a machine
11  to make a cup of coffee?
12      A.    Mainly interested in a cup of tea
13  or a cup of coffee.
14      Q.    Let us go on to the next page,
15  which is K17161, and let us see, now this is --
16  can you just describe what this document is?
17      A.    This is a copy of the invoice
18  relating to the following page where I have
19  requested a shipment.
20      Q.    Okay, so this -- I see it. So this
21  invoice is dated August 2nd 1996?
22      A.    Yes.
23      Q.    And you placed a request on the
24  next page, K17161?
25      A.    Yes.

Page 51

1    Confidential - Attorneys' Eyes Only
2      Q.    Placed a request on July 10, 1996,
3  right?
4      A.    Yes.
5      Q.    Any reason why it took them a few
6  weeks to generate the invoice?
7      A.    Possibly we might have been waiting
8  for the product. That is the only thing I can
9  think of because this was not forecasted product.
10  So in fact you were stealing from the UK
11  production. They may have been short of certain
12  items at that time. Then we wait until it is okay
13  to take them because the UK business, because
14  their forecast would take precedent.
15      Q.    So normally if the product was in
16  stock and you had plenty of it you would expect
17  the invoice to be generated sooner?
18      A.    Yes.
19      Q.    At the bottom of the invoice it is
20  Sue Stephenson who is the signatory?
21      A.    Yes.
22      Q.    So you were not the signatory on
23  invoices like this?
24      A.    No, this is what she put into her
25  system to arrange the shipment. So the

Page 52

1    Confidential - Attorneys' Eyes Only
2  order/invoice would be the documentation that she
3  would put in.
4      Q.    So an invoice like this, I just
5  want to make sure, that an invoice like this is
6  what would actually trigger the shipment to
7  happen?
8      A.    Yes.
9      Q.    So looking at the fax that you
10  sent, K17162, do you know whether you sent this in
11  as a result of receiving the e-mail in the next
12  page there?
13      A.    Yes, this was -- the e-mail was to
14  Liz Matthews, but she has obviously printed it off
15  and given it to me and asked me to arrange
16  shipment.
17      Q.    That is your handwriting at the
18  bottom of K17163?
19      A.    Yes.
20      Q.    Now, the e-mail came from someone
21  named Geri Greto; do you see that?
22      A.    Yes.
23      Q.    Who is Geri Greto?
24      A.    Well, looking at this now she
25  worked for Bill Craig.

Page 53

1    Confidential - Attorneys' Eyes Only
2      Q.    Did you have any contact with her?
3      A.    I do not recall. It is possible
4  that she may have rang me, but I cannot recall at
5  all.
6      Q.    Again, for this shipment to
7  Mr Craig it would have been someone off in the
8  warehouse who actually packed it up and shipped
9  it?
10      A.    Yes.
11      Q.    So you never actually saw these
12  three boxes?
13      A.    No.
14      Q.    Did you get any confirmation that
15  Mr Craig -- sorry, first, that the shipment
16  actually went out?
17      A.    The copy invoice would be my
18  confirmation that it had been arranged.
19      Q.    Did you get any confirmation that
20  he received it?
21      A.    No.
22      Q.    Now, let us move on to the next
23  one. Now we are on K17164, and I will also ask you
24  to look at K17165. This looks like another
25  shipment to Ms Glus; is that right?

14 (Pages 50 to 53)

KEURIG v KRAFT                    21 FEBRUARY 2008                    DEPOSITION OF J. APPLETON

Page 54

1    Confidential - Attorneys' Eyes Only
2    A.    Yes.
3    Q.    Now, on K17165, the memo that you
4    got from -- that is the memo that you received
5    from Ms Matthews; is that right?
6    A.    Yes.
7    Q.    And it references a Louis
8    Camilleri; do you see that?
9    A.    Yes.
10   Q.    Have you ever met or spoken with
11   him?
12   A.    No.
13   Q.    Do you know -- it refers here on
14   17176 to one capsule storage unit.
15   A.    Yes.
16   Q.    What is that?
17   A.    That is just a moulded unit that
18   fits at the side of the brewer to hold the
19   capsules.
20   Q.    So that is just to store product
21   prior to it going into the machine?
22   A.    Yes. It is just so it is available
23   there at the side of the machine.
24   Q.    And did you have any knowledge at
25   the time of whether Mr Camilleri had a singles

Page 55

1    Confidential - Attorneys' Eyes Only
2    machine or where it was in his facility and what
3    he was doing with it?
4    A.    No.
5    Q.    Did you ever get any sense of that?
6    A.    Well, I would have assumed the fact
7    that I am shipping him product he had a singles
8    brewer. Because what would he want the product
9    for. The nature of the capsule -- with in cup
10   products you have product in a cup and you can
11   have a particular product and you can tip it in a
12   cup and you can pour hot water on it and you can
13   make a cup of coffee. You cannot do that with a
14   capsule. You have to have the brewer to dispense
15   it.
16   Q.    Other than --
17   A.    Yes --
18   Q.    Did you get any other
19   confirmation --
20   A.    -- no.
21   Q.    -- now, this one indicates -- well,
22   at least in the request to you from Ms Matthews
23   says "charged to cost creditor 6500"?
24   A.    Yes.
25   Q.    What does that mean?

Page 56

1    Confidential - Attorneys' Eyes Only
2    A.    I would assume that that was
3    possibly -- it does not sound like it was a UK
4    costs centre. So I am just wondering whether this
5    was something that Helen or Louis had given Liz to
6    charge it to his cost centre. But whichever it
7    would seem as if we would not, which is why we
8    have gone with the sample budget number.
9    Q.    So you end up the using the same
10   number?
11   A.    Yes. Which makes me think that
12   that might have been an American cost centre which
13   we would not have been able to use.
14   Q.    Okay. Again, this shipment would
15   have been sent by someone that Ms Stephenson
16   contacted --
17   A.    Yes.
18   Q.    -- you did not see the boxes
19   yourself?
20   A.    No.
21   Q.    All these shipments that went out
22   did you make any effort to inspect the product
23   before it went to see exactly what it looked like
24   or anything like that?
25   A.    No.

Page 57

1    Confidential - Attorneys' Eyes Only
2    Q.    Then we have an invoice on K17166,
3    let us see, this is February 13th of 1997; is that
4    right?
5    A.    Yes.
6    Q.    Does that -- can you just confirm,
7    does that go with the...
8    A.    I think that goes with 67, 68 and
9    69.
10   Q.    Okay. So from K17166 through 69
11   these documents refer to one shipment?
12   A.    Yes.
13   Q.    Maybe let us start backwards on
14   K17169; is this the request that you got from
15   Ms Matthews to do another shipment to Ms Glus and
16   Mr Camilleri?
17   A.    Yes.
18   Q.    And then K17168 is your request to
19   Ms Stephenson?
20   A.    Yes.
21   Q.    Now, there are some references here
22   to a Phillip Morris broker, Martin Strauss, with a
23   phone number; do you see those?
24   A.    Yes.
25   Q.    Who was that?

15 (Pages 54 to 57)

MARTEN WALSH CHERER LTD              12-14 NEW FETTER LANE              LONDON EC4A 1AG
TEL: 020 7936 6000              E-MAIL: info@martenwalshcherer.com              FAX: 020 7427 0093

Page 58

Confidential - Attorneys' Eyes Only
1
2      A.    To be perfectly honest I do not
3  know. I can only assume it is the broker that
4  deals with the clearance of the shipment.
5      Q.    Do you recall speaking with him at
6  all?
7      A.    No.
8      Q.    Then on K17167 a fax from DFDS
9  Transport; can you describe what this is?
10     A.    This looks like confirmation of the
11 flight details.
12     Q.    This would be flight details for
13 the shipment of --
14     A.    For the shipment, yes.
15     Q.    -- so this was a flight that was to
16 occur four days later on February 15th?
17     A.    Yes.
18     Q.    I am sorry, there are two
19 flights --
20     A.    From Amsterdam to New York. It has
21 gone to Amsterdam and then it has gone on to New
22 York.
23     Q.    -- so it was -- I just want to make
24 sure I understand -- it was to fly from the UK to
25 Amsterdam on February 12th?

Page 59

Confidential - Attorneys' Eyes Only
1
2      A.    (Witness nodded).
3      Q.    And then from Amsterdam to New York
4  on the 15th?
5      A.    That looks like the case.
6      Q.    Did you get any confirmation
7  afterwards that it actually went on those flights
8  and arrived safely?
9      A.    No.
10     Q.    Now, on K17166 the signatory at the
11 bottom is a Lindsey Virdee; do you see that?
12     A.    Yes.
13     Q.    Who is Ms Virdee?
14     A.    I think she must have been a
15 different person within the export department. I
16 am not quite sure whether Sue had left by that
17 time and Lindsey took over or whether Sue was
18 still there but Lindsey just took over the
19 shipment.
20     Q.    Do you know if Lindsey is still at
21 the company?
22     A.    I do not believe she is.
23     Q.    Did you know her when she was at
24 the company?
25     A.    Yes.

Page 60

Confidential - Attorneys' Eyes Only
1
2      Q.    Okay. Let us -- almost done with
3  these -- let us move on to K17170. Does that --
4  are these last two pages 170 and 171 -- do they go
5  together?
6      A.    Yes.
7      Q.    So K17170, is that a memo that you
8  received from Ms Greto?
9      A.    Yes.
10     Q.    Do you recall receiving it?
11     A.    Well, yes, it is my file, so I
12 would have received it.
13     Q.    I know it was in your files, but I
14 said do you recall whether you received this and
15 looking at it do you have a specific memory of it?
16     A.    No.
17     Q.    This is early 1998, correct?
18     A.    This is January 5th 1998.
19     Q.    And then you respond to her on
20 January 12th, the next page?
21     A.    Yes.
22     Q.    It looks like at that time
23 Ms Virdee became the new contact in the export
24 department?
25     A.    I think what happened possibly at

Page 61

Confidential - Attorneys' Eyes Only
1
2  that time was that instead of going through
3  Liz Matthews and then coming through to me to
4  export it looks as if maybe we cut out the middle
5  men, if you like, and requested that Geri go
6  straight to export.
7      Q.    I see. So Ms Virdee -- well, let
8  me make sure I understand -- Ms Virdee was in a
9  different department from Ms Stephenson?
10     A.    No, she was within the export
11 department.
12     Q.    Okay.
13     A.    But instead of Geri sending the fax
14 to Liz, Liz sending the fax to me, me sending the
15 fax to Sue/Lindsey, I think we have asked in
16 future can you go through straight to Lindsey and
17 she will arrange shipment.
18     Q.    Okay. I understand. So at this
19 point did you deal with -- do you have any direct
20 involvement, put it that way, with this new
21 requested shipment, or did it just pass to --
22     A.    No, I would say it passed to
23 Lindsey that particular one.
24     Q.    -- so do you have any idea of what
25 happened after this fax, whether there was

16 (Pages 58 to 61)

Page 62

```
1           Confidential - Attorneys' Eyes Only
2    shipment sent or anything like that?
3         A.    No.
4         Q.    All right. We have been going for
5    over an hour. Why don't we take a five minute
6    break.
7            (Off the record at 10.25 am)
8            (On the record at 10.37 am)
9            MR RADER: I have asked the court
10   reporter to mark as Exhibit 2 the document with
11   number K17172.
12           (Exhibit 2 marked for identification)
13   A newspaper article entitled: "Sly spends £1,000
14   on a cup of coffee"; Ms Appleton, does this
15   document look familiar to you?
16        A.    Yes.
17        Q.    Did it come from your file cabinet?
18        A.    No.
19        Q.    Are you the one who located it?
20        A.    No.
21        Q.    How are you familiar with it?
22        A.    Because I remember the buzz at the
23   time in the office that Sly Stallone has -- had --
24   we put a machine, I think it was Shepperton
25   Studios, I am not quite sure, but we put a machine
```

Page 63

```
1           Confidential - Attorneys' Eyes Only
2    there for him to use. And I remember him taking
3    it back to the States with him and I remember it
4    being in the paper and the paper would have done
5    the rounds in the office.
6         Q.    So you -- your recollection of this
7    article is from the time -- around the time it was
8    published?
9         A.    Yes.
10        Q.    Have you seen it recently, in the
11   last weeks or months?
12        A.    No.
13        Q.    Shepperton Studios that you
14   mentioned, to your knowledge is that in the UK?
15        A.    Yes.
16        Q.    Do you have -- did you ever
17   participate in shipping any singles cartridges to
18   Mr Stallone in the US?
19        A.    No.
20        Q.    Do you know anybody else at Kraft
21   who did that?
22        A.    No.
23        Q.    Other than this article do you have
24   any other knowledge other than what you read in
25   this article about Mr Stallone's involvement with
```

Page 64

```
1           Confidential - Attorneys' Eyes Only
2    singles?
3         A.    No.
4         Q.    The article mentions a voltage
5    issue in the last sentence; do you see that?
6         A.    Yes.
7         Q.    Are you familiar at all with the
8    use of singles brewing machines on US voltage?
9         A.    Yes.
10        Q.    How does that work?
11        A.    There is a lead that fits into the
12   back of the machine with a plug on the end, and it
13   is just a case of putting a different lead in the
14   box. If they are ever shipped to a different
15   country they have a different voltage you just
16   ship them another lead that fits their voltage.
17        Q.    So to your knowledge there should
18   be a way to use these brewers in the US?
19        A.    Yes.
20        Q.    I am going to ask the court
21   reporter to mark Exhibit 3.
22           (Exhibit 3 marked for identification)
23   The documents in Exhibit 3, are you familiar with
24   them?
25        A.    Only the 17249.
```

Page 65

```
1           Confidential - Attorneys' Eyes Only
2         Q.    So 17249, which is a fax from you
3    to Geri Greto I assume?
4         A.    Yes.
5         Q.    Did that come --
6         A.    One of the previous documents in
7    here.
8         Q.    -- did that come from your file
9    cabinet?
10        A.    Yes.
11        Q.    I realise a number of pages have
12   been grouped together here, the other pages in
13   this group are not from your file cabinet?
14           MR SCHLITZ: Look carefully at the
15   rest of the pages.
16        A.    Yes, the 249 and 250 look like
17   duplicates. It is exactly the same. And the
18   other one is the original memo from Geri, linked
19   to the fax to Geri saying that Lindsey Virdee is
20   the new contact.
21           MR RADER: Right.
22           THE WITNESS: I have never seen 247
23   and I have never seen 248.
24           BY MR RADER:
25        Q.    Okay. So just focussing for a
```

17 (Pages 62 to 65)

Page 78

1      Confidential - Attorneys' Eyes Only
2          BY MR RADER:
3      Q.    So nominally with the document
4  retention and destruction policy that might
5  suggest that the documents would not be around any
6  more but you happened to have kept them?
7      A.    Yes.
8      Q.    Did you go back and look at any
9  archive boxes to see if there were any other
10 documents from this timeframe --
11     A.    No.
12     Q.    -- when you add faxes and the other
13 documents that we have looked at in these ad hoc
14 shipments, as you describe them, did you have any
15 formal record keeping procedure that you were
16 required to go by to produce documents?
17     A.    No.
18     Q.    Do you know whether you kept all of
19 the faxes and documents related to these, or are
20 these just ones that you happened to see in the
21 file?
22     A.    Well, obviously these are the ones
23 that are in the file, but I am not quite sure
24 whether -- you can tell, I think, that there are
25 possibly some missing documents because you

Page 79

1      Confidential - Attorneys' Eyes Only
2  have -- you should have a fax and a copy invoice
3  for each of those. But sometimes they did not fax
4  the copy invoice back and I obviously did not
5  follow up.
6      Q.    Do you know Mr Lee Rowan?
7      A.    No.
8      Q.    It is two minutes after 11.00 and I
9  predicted we would be done by 11.00. I do not have
10 any further questions. I just want to thank you
11 for your time and for coming in. If Mr Schlitz
12 wants to ask you any questions he is certainly
13 welcome to do that.
14         THE WITNESS: Thank you.
15         MR SCHLITZ: I have a few
16 questions. First, today Mr Rader has shown you
17 Exhibit 1 and Exhibit 4 and you have testified
18 these are documents in the United States file; is
19 that correct?
20     A.    Oh my United States file, yes,
21 sorry.
22     Q.    This file, is this kept in the
23 ordinary course of your business?
24     A.    Yes.
25     Q.    Did you provide the documents the

Page 80

1      Confidential - Attorneys' Eyes Only
2  way that they are kept in that file?
3      A.    Yes.
4      Q.    Now, Mr Rader asked you about
5  whether you got confirmation that certain
6  shipments actually were received, it is part of
7  your responsibilities, did it ever come to your
8  attention that shipments were not received?
9      A.    Yes.
10     Q.    Could you explain that.
11     A.    Well, once you have arranged the
12 shipment because the person at the other end would
13 be expecting them, if they did not arrive there
14 would either be a phone call to say where is the
15 shipment, and I would investigate that with the
16 export department and they would follow that up.
17     Q.    Then what would happen?
18     A.    If -- well, I am assuming they
19 would feed back to me and say give me the details,
20 but none of it is documented with that kind of...
21     Q.    So if there was a problem you would
22 hear about it?
23     A.    Oh, yes.
24     Q.    Okay. Mark this as Defendant's
25 Exhibit 1.

Page 81

1      Confidential - Attorneys' Eyes Only
2  (Defendant's Exhibit 1 marked for identification)
3  This is K001746 through K0017467. Would you
4  please look through these four pages first
5  (pause).
6      A.    Okay.
7      Q.    Please look at K001746; is this
8  your handwriting?
9      A.    Yes, it is.
10     Q.    It is dated August 2nd, 1996; is
11 that correct?
12     A.    Yes.
13     Q.    It is from you; is that correct?
14     A.    Yes.
15     Q.    And to Geri Greto; is that correct?
16     A.    Yes.
17     Q.    Can you explain what this document
18 is?
19     A.    This is just me saying to Geri that
20 we have realised that the shipment that she had
21 requested in July had not been sent, apologising
22 and telling them that it was being dispatched that
23 particular day.
24     Q.    And when you say it has been
25 dispatched that particular day, that is something

21 (Pages 78 to 81)

# Exhibit 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED – PUBLIC VERSION** |

## REPLY IN SUPPORT OF KEURIG'S MOTION *IN LIMINE* NO. 3

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

Kraft does not contest that its production records and the other documents at issue are hearsay,[1] such that to be admissible they must qualify under a hearsay exception. Kraft fails to show that it can lay the foundation for a business records exception. Kraft's remaining argument, that the Court must wait until trial to decide the matter, is wrong as a matter of law.[2]

## I. The Kraft Witnesses' Deposition Testimony Establishes that They Cannot Provide the Necessary Foundation for a Business Records Exception.

Kraft has no substantive response to the Tamblin, Appleton, Greto, and Glus deposition excerpts cited by Keurig. (Mot. at 4). These witnesses' depositions clearly established that they cannot lay the foundation necessary for a business records hearsay exception under the Third Circuit's binding Pellulo decision and a plethora of additional persuasive authorities such as Riley and Ferber. Indeed, Kraft does not even attempt to address the cases cited by Keurig.

### A.    Mr. Tamblin Is Unaware How the Production Records Were Created.

Kraft has no response to the central fact that Mr. Tamblin neither entered the production records, nor is he familiar with the circumstances under which others did so. (Mot. at 4). Indeed, Kraft admits that he worked for "a different division" of the company. (Opp. at 4). Contrary to Kraft's representation, id., he is not the custodian of the records.[3] (Ex. 7 at 55).[4]

---

[1] Keurig cited the Federal Circuit's Medichem and Chen decisions for this principle. (Mot. at 3). Kraft oddly says the citations "waste this Court's time" but does not disagree with the principle that a document offered to corroborate a witness's testimony is hearsay (and must therefore fall under an exception to the hearsay rule in order to be admissible). And, contrary to Kraft's contention (Opp. at 1-2), Chen did expressly address the business records exception, holding that the lower tribunal had "properly concluded…that [the] notebooks do not fall within the business records exception." Chen v. Bouchard, 347 F.3d 1299, 1308 (Fed. Cir. 2003).

[2] Kraft also says that the documents are "highly relevant." The possible relevance of a document is immaterial, however, to whether or not it qualifies for a hearsay exception under Rule 803.

[3] Kraft's suggestion that other witnesses can "authenticate" the production records is irrelevant. E.g., Eolas Techs., Inc. v. Microsoft Corp., 270 F. Supp. 2d 997, 1001 (N.D. Ill. 2003) ([A]uthenticity does not guarantee admissibility" as a business record under Rule 803(6).).

[4] Keurig's opening brief included Exs. 1-6. Exhibits to this brief begin at Ex. 7.

Kraft cites testimony from Mr. Tamblin supposedly establishing that "production records were regularly kept in the ordinary course of Kraft's business." (Opp. at 4). Even assuming this is true, it has nothing to do with the actual record-keeping process, about which Mr. Tamblin admitted he is ignorant. Similarly, Kraft's selection of Mr. Tamblin to generate the spreadsheet from Kraft's stored records for purposes of this case (Opp. at 3-4), is legally irrelevant. In short, Mr. Tamblin's admissions confirm that he cannot satisfy Rule 803(6)'s foundation requirements. E.g., Kolmes v. World Fibers Corp., 107 F.3d 1534, 1543 (Fed. Cir. 1997) (witness "failed to testify concerning the record-keeping process").

**B.     Ms. Appleton, Ms. Greto, and Ms. Glus Had No Duty to Retain Singles Files.**

Kraft's argument that Ms. Appleton, Ms. Greto, and Ms. Glus "testified from [their] personal knowledge" (Opp. at 3) is irrelevant. Their admissions that they had no duty to retain Singles records (Mot. at 4) are dispositive. The Console case cited by Kraft did not concern this prong of Rule 803(6), and Kraft ignores Ferber (Mot. at 4), which did. See also City of Long Beach v. Standard Oil Co. of Cal., 46 F.3d 929, 937 (9th Cir. 1995) (no showing that notes "were made pursuant to company procedures"); Rambus, Inc. v. Infineon Techs. AG, 348 F. Supp. 2d 698, 705-06 (E.D. Va. 2004) ( "[T]he fact that an employee 'routinely' takes meeting notes and keeps them, is quite different than whether a company policy directs the employee to do so.").

Kraft cites deposition snippets in which Kraft's counsel asked jargon-filled questions (such as whether witnesses kept files "in the ordinary course of business"). These self-serving exchanges cannot overcome the witnesses' admissions that their duties did not include retaining records about Singles shipments. (Mot. at 4). The substance of a witness's testimony controls over perfunctory answers to formulaic questions. See Long Beach, 46 F.3d at 937 (affirming exclusion despite testimony that witness created notes "in the normal course of business").

**C.    Kraft Offers No Reason to Introduce Undisputedly Fragmentary Records.**

Given that the witnesses had no duty to retain records, it is no surprise that the documents

they produced are fragmentary.  Kraft ignores the gaps even while trying to deflect Keurig's

explanation (Mot. at 5) that the supposed shipping records are incomplete and untrustworthy

under Rule 803(6).  Kraft likewise fails to address █████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████   E.g.,

Colan v. Cutler-Hammer, Inc., 812 F.2d 357, 365 n.14 (7th Cir. 1987) (business records

exception does not apply to "incomplete" notes).

**II.    Applicability of Rule 803(6) is a Preliminary Question for the Court Alone.**

Kraft's remaining argument is that that the Court cannot resolve Keurig's motion at this

stage because any shortcomings in the testimony of the Kraft witnesses "go to the weight of the

evidence, and should be evaluated by a jury."  (Opp. at 1, 4-5).  Kraft is wrong.  The

admissibility of documents as business records[5] presents a  threshold question under Fed. R.

Evid. 104(a) and is a matter for the Court alone.  See In re Fine Paper Antitrust Litigation, 751

F.2d 562, 597 (3d Cir. 1984) (reversing decision: "[T]he court made no Rule 104(a) finding as to

the preconditions of admissibility of the Kohn letters as business records....").  Courts

accordingly can and do grant motions in limine after concluding that the business records

exception is inapplicable.  E.g., United States v. Anderson, Crim. No. 05-249, 2006 WL 5159191

(D. Minn. May 19, 2006).  That is exactly what the Court should do here.

---

[5] Kraft's passing reference to additional hearsay exceptions in a footnote (Opp. at 3 n.3) is
insufficient.  John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir.
1997) (argument made in passing in a footnote deemed waived).  For example, Kraft does not
cite any testimony to suggest that the writings were "contemporaneous" with the events
described.  See United States v. Mitchell, 145 F.3d 572, 577 (3d Cir. 1998) (improper admission
of note as present sense impression because note was not contemporaneous).

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

# EXHIBIT 7

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

KEURIG INCORPORATED          :
                             :
            Plaintiff        :   Civil Action No.
                             :   07-017 GMS
              v              :
                             :
KRAFT FOODS GLOBAL, INC      :
TASSIMO CORPORATION, and     :
KRAFT FOODS INC,             :
            Defendants       :
_____:

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL TAMBLIN

On Wednesday, 2nd April 2008

Commencing at 10.24 am

Taken at:
Baker Botts
41 Lothbury
London
EC2R 7HF
United Kingdom

Reported by: Miss Pamela Henley

MARTEN WALSH CHERER LTD 12-14 NEW FETTER LANE      LONDON EC4A 1AG
TEL: 020 7936 6000   E-MAIL: info@martenwalshcherer.com   FAX: 020 7427 0093

KEURIG v KRAFT                 2 APRIL 2007      DEPOSITION OF M. TAMBLIN

Page 54

Tamblin - Rader

1
2      A.    Without looking to see what the
3  pack size is I really could not answer.
4      Q.    Okay. Do you know when the various
5  Lambert and Rychiger lines were installed?
6      A.    No, I do not.
7      Q.    R2 would that be --
8      A.    Rychiger 2.
9      Q.    -- if you could just turn to the
10  second page of the exhibit, if you look at the
11  first three rows you have a shift A on 9/28/1994;
12  do you see that?
13      A.    Yes.
14      Q.    Then you have a shift B on
15  9/29/1994, and then a shift A on that same date;
16  is that -- am I reading that right, that both
17  shift A and shift B worked on that product on 29th
18  September 1994?
19      A.    That is correct, yes.
20      Q.    If there is a gap between days what
21  does that suggest?
22      A.    It could either be a week-end where
23  it would not normally run, or it could be the line
24  was off for maintenance work.
25      Q.    Do you know how the line speeds of

Page 55

Tamblin - Rader

1
2  the Rychiger and Lambert lines compare?
3      A.    I do not know without looking at
4  the information that is in these sheets.
5      Q.    You would look to the sheets for
6  that?
7      A.    Yes.
8      Q.    So the data that your query brought
9  out into the Excel spreadsheet, is it part of your
10  job to manage that data in your current job?
11      A.    No.
12      Q.    Are you custodian for that data?
13      A.    No.
14      Q.    So you just use your query to get
15  it because you were asked to do that?
16      A.    For this particular spreadsheet,
17  yes. But on a weekly basis I use the application
18  to run the efficiency reports which are then sent
19  out to senior management.
20      Q.    Do those efficiency reports include
21  the singles product line?
22      A.    Yes, but it is -- as a line it does
23  not go into individual SKU detail. It would say
24  for this week line 1 should have produced 85 per
25  cent and produced 75.

Page 56

Tamblin - Rader

1
2      Q.    So you would do that for Lambert
3  and Rychiger?
4      A.    It is done by area, so it is done
5  for Maxpax coffee and flexibles.
6      Q.    So all of Maxpax would be lumped
7  together in that?
8      A.    Yes.
9      Q.    You would not be breaking out a
10  particular singles line?
11      A.    Not at all.
12      Q.    Were you ever responsible for
13  managing this particular data at any point in
14  time?
15      A.    Can you explain what you mean by
16  "managing".
17      Q.    At any point in time was it part of
18  your job to be the custodian for this data, to
19  have responsibility for it?
20      A.    Not for Maxpax. Within coffee area
21  when I was coffee production manager it was my
22  responsibility to input the line speeds and so on.
23      Q.    Who asked you to run the query to
24  provide this data?
25      A.    It came from one of our purchasing

Page 57

Tamblin - Rader

1
2  people. It was via John MacMahon.
3      Q.    You know Mr MacMahon?
4      A.    Yes.
5      Q.    How do you know him?
6      A.    We started within a few weeks of
7  each other at Kraft, or General Foods as it was
8  then.
9      Q.    Have you -- over the years have you
10  worked with him?
11      A.    Not in the last 25 years, no.
12      Q.    I think that is it. I am done.
13  Thank you for your time. If Mr Foster wants to
14  ask any questions he can do that.
15      MR FOSTER: Yes, I have a couple of
16  questions. Can you take a look through Exhibit 201
17  and tell me is this the entire amount of data that
18  you generated about Maxpax production?
19      A.    It should be the full year because
20  it is sorted by product code. It certainly looks
21  as if it was. This was the first year so it was
22  not a full year. This was the first year the
23  application was introduced, '94, so it is only a
24  part year.
25      Q.    So this is only a portion of the

15 (Pages 54 to 57)

## CERTIFICATE OF SERVICE

        I, Karen E. Keller, Esquire, hereby certify that on September 2, 2008, a true and

correct copy of the foregoing document was electronically filed with the Clerk of the Court using

CM/ECF which will send notification that such filing is available for viewing and downloading to

the following counsel of record:

        Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
        David E. Moore, Esquire [*dmoore@potteranderson.com*]
        Potter Anderson & Corroon LLP
        Hercules Plaza
        1313 North Market Street, 6th Floor
        Wilmington, Delaware 19801

        Additionally, I hereby certify that on September 2, 2008, copies of the foregoing

document were served by e-mail on the above-listed counsel of record and on the following non-

registered participants in the manner indicated below:

## BY E-MAIL

        David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
        Baker Botts L.L.P
        The Warner
        1299 Pennsylvania Ave., NW
        Washington, D.C. 20004-2400

        YOUNG CONAWAY STARGATT & TAYLOR, LLP

        */s/ Karen E. Keller*
        John W. Shaw (No 3362)  [*jshaw@ycst.com*]
        Adam W. Poff (No. 3990) [*apoff@ycst.com*]
        Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, DE 19801
        (302)-571-6600

        *Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>      Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>      Defendants. | Civil Action No. 07-017-GMS |

**KEURIG's MOTION *IN LIMINE* NO. 4 – MOTION TO PRECLUDE KRAFT FROM CALLING WITNESSES IDENTIFIED AFTER THE CLOSE OF DISCOVERY**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

Kraft should be prohibited from calling witnesses not identified before the close of discovery. In July 2008, three months after discovery closed, Kraft served "Amended Initial Disclosures" identifying, for the first time, three new Kraft employees that it wishes to call at trial. Their testimony would relate to production records for Kenco Singles cartridges, which Kraft argues invalidate the patent-in-suit for prior "public use" under 35 U.S.C. § 102(b).[1] Yet Kraft already identified a witness on this subject during discovery, and Keurig's counsel traveled to England to depose him. It is too late, and too prejudicial to Keurig, for Kraft to add witnesses now – particularly its own employees, whom it has no justification for failing to timely identify.

## I.     BACKGROUND

Kraft produced a 3,181-page set of production records to Keurig on March 18, 2008, just before the April 1 close of discovery. Kraft then identified its UK employee Michael Tamblin as the person who would testify about those records, and agreed to make him available for deposition in England on April 2 (a day after the close of discovery).

As discussed in Keurig's Motion *in Limine* No. 3, Mr. Tamblin turned out to be unfamiliar with the relevant recordkeeping procedures and thus unable to lay the foundation for the production records to be admissible. Nevertheless, Kraft took no further action until July 2008, three months after discovery closed (and shortly before the first major pretrial deadline), when it suddenly served its "Second Amended Initial Disclosures" and "Third Amended Initial Disclosures," identifying three new witnesses – all Kraft employees located in England – who supposedly have "information regarding the production records of Kenco Singles™ Cartridges." (Exs. 1, 2 – identifying new witnesses Mike Gage-Smith, Martin Brown and Roy Adams).

---

[1] Keurig disputes whether Kenco Singles cartridges are prior art to Keurig's '762 patent. Moreover, even if they were prior art, the Singles cartridges would not anticipate the '762 patent as Kraft itself has admitted. See Keurig's Motion *in Limine* No. 1 at 1 n.1 and D.I. 91 at 2-5.

Upon receiving the amended disclosures, Keurig reminded Kraft that it was in the final phases of preparing its voluminous pre-trial papers and requested confirmation that Kraft would not attempt to offer the newly-disclosed witnesses at trial. (Exhibit 3). Kraft did not agree and instead proposed to make the witnesses available for deposition. Kraft offered no explanation or justification, however, for the lateness of its amended disclosures. (Exhibit 4).

Having waited until the eleventh hour of discovery to produce the production records, and having already required Keurig's counsel to depose its designated witness on those records (Mr. Tamblin) after the close of discovery (in England), it is too late now for Kraft to start over, let alone to proffer three additional witnesses on a subject that has long been closed. Kraft has not shown good cause for having delayed until three months after the close of discovery, particularly as the new witnesses are all Kraft employees within Kraft's own control.

By the time Kraft served its belated disclosures, Keurig was actively preparing for trial, now looming near on the horizon. Pursuant to the Scheduling Order (D.I. 34), Keurig was required to serve (and has served) Kraft with voluminous draft materials for the Final Pretrial Order (trial exhibit list, deposition designations, proposed jury instructions, statements of disputed and undisputed facts, and a host of other documents) on July 25, 2008. Next, Keurig has a series of deadlines for briefing on motions *in limine*, the final pre-trial package that is coming due to the Court, and a host of other trial preparation activities (not to mention commitments in other cases). Kraft's offer to make the belatedly-identified witnesses available for a series of depositions would only add to, rather than ameliorate, the unfair prejudice to Keurig from Kraft's late disclosure.

## II.    ARGUMENT

The belatedly identified witnesses should be excluded.  Fed. R. Civ. P. 37(c)(1) provides

for the automatic exclusion of any witness not identified when required under Rule 26(a).  Sears,

Roebuck & Co. v. Goldstone & Sudalter, 128 F.3d 10, 18 n.7 (1st Cir. 1997) (affirming district

court's decision to strike affidavit from witness whose identity had not been disclosed in the

party's initial disclosures "at the outset of the litigation"); see also 6 Moore's Federal Practice §

26.22[4][a][ii] ("The potential penalty for failure to provide identifying information in the initial

disclosure is exclusion of the witness, no matter how innocuous his or her evidence might be.").

Rule 37(c) applies unless the failure to disclose was substantially justified or harmless,

neither of which is true here.  See Nicholas v. Penn. State Univ., 227 F.3d 133, 148 (3d Cir.

2000) (affirming exclusion and noting four factors to consider: "(1) the prejudice or surprise of

the party against whom the excluded evidence would have been admitted; (2) the ability of the

party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the

orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness

in failing to comply with a court order or discovery obligation").

Kraft has articulated no justification for waiting until three months after the close of

discovery – and after the deposition (in a distant location) of the original witness it chose to

designate on this issue – to identify more witnesses about the production records.  See Praxair,

Inc. v. ATMI, Inc., 445 F. Supp. 2d 460, 469 n.11 (D. Del. 2006) ("ATMI had almost a year of

discovery to … respond to Praxair's discovery requests. To have allowed ATMI to add [the

belated material] at the close of discovery…would have turned the trial process on its head by

rewarding the party who ignores the court's rulings and orders, and disadvantaging the party who

has complied with such.").

Kraft's offer of more depositions would not obviate the prejudice to Keurig given the lateness of the disclosure. E.g., Finch v. Hercules, C.A. No. 92-251, 1995 WL 785100, at *16-17 (D. Del. Dec. 22, 1995) (excluding late-identified witnesses: "[T]he Court is unwilling to disrupt defendant's trial preparation with having to notice five deponents and coordinate schedules. It would be unfair to penalize defendant and in effect reward plaintiff's noncompliance.").

Moreover, even with late depositions, Keurig would still be denied the ability take follow-up discovery in light of the new witnesses' testimony since the discovery period has closed. Even Kraft proposes no remedy for this prejudice. See Callaway Golf Co. v. Acushnet Co., 523 F. Supp. 2d 388, 401 (D. Del. 2007) (declining to consider declaration produced "after the close of fact and expert discovery" from witness who "was not listed in defendant's initial disclosures or interrogatory responses as a potential witness in this case"); Lyman v. St. Jude Med. S.C., Inc., C.A. 05-122, 2008 WL 2224352, at *7-8 (E.D. Wis. May 27, 2008) (granting motion to preclude defendant from calling four witnesses not named in initial disclosures: "None of these witnesses were deposed during discovery in this case."); Johnson v. Saks Fifth Ave. TX, LP, C.A. No. 05-1237, 2007 WL 781946, at *15 (S.D. Tex. Mar. 9, 2007) (failure to disclose witness in initial disclosures was not harmless, as the opposing party had not been afforded "the opportunity to depose [the witness] before the end of the discovery period"); Depew v. ShopKo Stores, Inc., C.A. 03-0539, 2006 WL 47357, at *3 (D. Idaho Jan. 6, 2006) (excluding testimony of witnesses identified in updated initial disclosure two months before trial: "Because the disclosure came after the close of discovery, it would be harmful for that reason."). Keurig already traveled to England to depose Kraft's original designee on the production records, Mr. Tamblin. Allowing Kraft to designate three more witnesses on the same issue at this late stage of the case would prejudice Keurig without substantial justification.

- 4 -

## III.    CONCLUSION

For the above reasons, Kraft should be precluded from calling witnesses that it did not

identify before the close of discovery.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
John W. Shaw (No. 3362)
*jshaw@ycst.com*
Adam W. Poff (No. 3990)
*apoff@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 4, 2008

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | |
| | ) | |
| Defendants. | ) | |

**KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, AND KRAFT FOODS
INC.'S SECOND AMENDED INITIAL DISCLOSURES**

Pursuant to Fed. R. Civ. P. 26(e), Defendants Kraft Foods Global, Inc., Tassimo

Corporation, and Kraft Foods Inc. (collectively, "the Kraft Defendants"), by and through its

undersigned counsel, hereby amends its initial disclosures.

The following disclosures are made without waiver of any objections to the

disclosure of material or information, including, without limitation, any objections to the

disclosure of material or information which is protected from disclosure by the attorney-client

privilege or the attorney work product doctrine, or any other applicable privilege, any objections

based on lack of relevance, any objections based on the fact that the documents or information

requested are confidential, that the proposed discovery would be unreasonably cumulative or

duplicative or more easily obtainable from some other source more convenient, less burdensome

or less expensive, or that the burden or expense of the proposed discovery outweighs its likely

benefit. In addition, these disclosures are based on information reasonably available to the Kraft

Defendants at this time. The Kraft Defendants reserve the right to further supplement or amend

its disclosures when and as appropriate in light of further investigation and discovery.

(A)    **The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information;**

     1.    Adam Lloyd is Director of Technology, Brew Systems, Global Technology and Quality for Kraft Foods Global, Inc. Mr. Lloyd is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433. Mr. Lloyd has information regarding the development of the TASSIMO® T-DISC beverage filter cartridge.

     2.    Andrew Halliday is Senior Associate Principal Engineer, Global Coffee Technology for Kraft Foods Global, Inc. Mr. Halliday is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433. Mr. Halliday has information regarding prior art and technical information regarding TASSIMO® T-DISC beverage filter cartridges.

     3.    Andrew Bentley is Senior Program Leader, Machine Development, Technology Innovation for Kraft Foods Global, Inc. Mr. Bentley is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433. Mr. Bentley has information regarding the prior art and technical information regarding the field of beverage filter cartridges.

     4.    James Ferguson is Technical Services Manager, Technical Service Centre for Kraft Foods Global, Inc. Mr. Ferguson is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433. Mr. Ferguson has information regarding beverage filter cartridge systems in public use to the priority date of the Patent-in-Suit.

     5.    William Craig is a retired Kraft employee. Mr. Craig's address is 1033 Deer Trail, Bourbonnais, IL 60914. Mr. Craig has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

2

6.     Victor Passarelli, former Building Operations Manager, Rye Brook, Altria Corporate Services.  Mr. Passarelli is based at Altria Group, Inc., 120 Park Avenue, New York, NY, 10017, (917) 663-4000.  Mr. Passarelli has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

7.     Helen Glus, Administrative Assistant to Louis C. Camilleri, CEO of Altria, Group, Inc.  Ms. Glus is based at Altria Group, Inc., 120 Park Avenue, New York, NY, 10017, (917) 663-4000.  Ms. Glus has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

8.     Sylvester Stallone, film actor.  Mr. Stallone can be reached through his counsel Ralph Brescia at Bloom Hergott Diemer Rosenthal LaViolette & Feldman, LLP, 150 South Rodeo Drive , Third Floor, Beverly Hills, CA 90212, (310) 859-6800.  Mr. Stallone has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

9.     Alistair J. MacMahon, Associate Technology Principal for Kraft Foods Global, Inc.  Mr. MacMahon is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.  Mr. MacMahon has technical information regarding Kenco Singles™ beverage filter cartridges and the field of beverage filter cartridges.

10.     Geraldine A. Greto is a Kraft Foods employee based at 555 S. Broadway, Tarrytown, NY 10591, (914) 425-2500.  Ms. Greto has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

3

11.    Steven Anderson is a former engineer for Phillip Morris Corporate Services.  Mr. Anderson's address is 205 Jensen Avenue, Mamaroneck, NY 10543.  Mr. Anderson has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

12.    Joel Shipley is a contractor with Culbertson Company who performed work at Kraft Food's former offices in Rye Brook, NY.  Mr. Shipley is based at Culbertson Company's offices at 182 Brady Ave, Hawthorne, NY 10532, (914) 345-5959.  Mr. Shipley has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

13.    Jim Vacaro is a contractor with Carrier Corporation who performed work at Kraft Food's former offices in Rye Brook, NY.  Mr. Vacaro is based at Carrier Corpoartion's offices at Orchard Ridge Corporate Park, Brewster, NY 10509, (845) 276-2950. Mr. Vacaro has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

14.    Frank Nieli is an independent contractor at Kraft Food's offices located at 555 S. Broadway, Tarrytown, NY 10591, (914) 425-2500.  Mr Nieli has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

15.    David Yuile is a former employee of Pepsi Cola International.  Mr. Yuile is with AAPT, Level 23, 680 St. George Street, NSW, 2000 AUSTRALIA, (+61) 2-9009-9009. Mr. Yuile has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

4

16.    Mike Gage-Smith, Work Services Manager for Kraft Foods Global, Inc. Mr. Gage-Smith is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.   Mr. Gage-Smith has information regarding the production records of Kenco Singles™ Cartridges.

**(B)    a copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment;**

(a)    Technical documents and electronically stored information ("ESI") relating to TASSIMO® T-DISC beverage filter cartridges.  These documents are located at the offices of Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, United Kingdom, on servers managed by Electronic Data Systems Corporation in the United Kingdom, and at the offices of Baker Botts L.L.P., 1299 Pennsylvania Ave., NW; Washington, DC 20004.

(b)    Documents and ESI related to the sales or manufacture of TASSIMO® T-DISC beverage filter cartridges in the United States.  These documents are located at the offices of Kraft Global Foods, Inc., 555 S. Broadway, Tarrytown, New York 10591, on servers managed by Electronic Data Systems Corporation in the United States, and at the offices of Baker Botts L.L.P., 1299 Pennsylvania Ave., NW; Washington, D.C. 20004.

(c)    Prior art.  These documents and things are located at the offices of Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, United Kingdom, at the offices of Kraft Global Foods, Inc., 555 S. Broadway, Tarrytown, New York 10591, and at the offices of Baker Botts L.L.P., 1299 Pennsylvania Ave., NW; Washington, D.C. 20004.

(d)    The Patent-in-Suit and the file history of the Patent-in-Suit.   These documents are located at the offices of Baker Botts L.L.P., 1299 Pennsylvania Ave., NW; Washington, D.C. 20004.

**(C)**     **a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered; and**

Not applicable to Defendants.

**(D)**     **for inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

The Kraft Defendants are not aware of any such agreements.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: June 30, 2008
872212 / 31118

By: _/s/ David E. Moore_____
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on June 30, 2008, a true and correct copy of the

within document was caused to be served on the attorney of record at the following addresses as

indicated:

## VIA HAND DELIVERY & ELECTRONIC MAIL

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com
kkeller@ycst.com

## VIA ELECTRONIC MAIL

Michael A. Albert
Michael N. Rader
Laura Topper
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com

                          /s/ David E. Moore
                          David E. Moore

799719 / 31118

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | |
| | ) | |
| Defendants. | ) | |

**KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, AND
KRAFT FOODS INC.'S THIRD AMENDED INITIAL DISCLOSURES**

Pursuant to Fed. R. Civ. P. 26(e), Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively, "the Kraft Defendants"), by and through its undersigned counsel, hereby amends its initial disclosures.

The following disclosures are made without waiver of any objections to the disclosure of material or information, including, without limitation, any objections to the disclosure of material or information which is protected from disclosure by the attorney-client privilege or the attorney work product doctrine, or any other applicable privilege, any objections based on lack of relevance, any objections based on the fact that the documents or information requested are confidential, that the proposed discovery would be unreasonably cumulative or duplicative or more easily obtainable from some other source more convenient, less burdensome or less expensive, or that the burden or expense of the proposed discovery outweighs its likely benefit. In addition, these disclosures are based on information reasonably available to the Kraft Defendants at this time. The Kraft Defendants reserve the right to further supplement or amend its disclosures when and as appropriate in light of further investigation and discovery.

(A)   **The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information;**

1.    Adam Lloyd is Director of Technology, Brew Systems, Global Technology and Quality for Kraft Foods Global, Inc.  Mr. Lloyd is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.  Mr. Lloyd has information regarding the development of the TASSIMO® T-DISC beverage filter cartridge.

2.    Andrew Halliday is Senior Associate Principal Engineer, Global Coffee Technology for Kraft Foods Global, Inc.  Mr. Halliday is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.  Mr. Halliday has information regarding the prior art and technical information regarding TASSIMO® T-DISC beverage filter cartridges.

3.    Andrew Bentley is Senior Program Leader, Machine Development, Technology Innovation for Kraft Foods Global, Inc.  Mr. Bentley is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.  Mr. Bentley has information regarding the prior art and technical information regarding the field of beverage filter cartridges.

4.    James Ferguson is Technical Services Manager, Technical Service Centre for Kraft Foods Global, Inc.  Mr. Ferguson is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.  Mr. Ferguson has information regarding beverage filter cartridge systems in public use to the priority date of the Patent-in-Suit.

5.    William Craig is a retired Kraft employee.  Mr. Craig's address is 1033 Deer Trail, Bourbonnais, IL 60914.  Mr. Craig has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

2

6.    Victor Passarelli, former Building Operations Manager, Rye Brook, Altria Corporate Services. Mr. Passarelli is based at Altria Group, Inc., 120 Park Avenue, New York, NY, 10017, (917) 663-4000. Mr. Passarelli has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

7.    Helen Glus, Administrative Assistant to Louis C. Camilleri, CEO of Altria, Group, Inc. Ms. Glus is based at Altria Group, Inc., 120 Park Avenue, New York, NY, 10017, (917) 663-4000. Ms. Glus has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

8.    Sylvester Stallone, film actor. Mr. Stallone can be reached through his counsel Ralph Brescia at Bloom Hergott Diemer Rosenthal LaViolette & Feldman, LLP, 150 South Rodeo Drive , Third Floor, Beverly Hills, CA 90212, (310) 859-6800. Mr. Stallone has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

9.    Alistair J. MacMahon, Associate Technology Principal for Kraft Foods Global, Inc. Mr. MacMahon is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433. Mr. MacMahon has technical information regarding Kenco Singles™ beverage filter cartridges and the field of beverage filter cartridges.

10.    Geraldine A. Greto is a Kraft Foods employee based at 555 S. Broadway, Tarrytown, NY 10591, (914) 425-2500. Ms. Greto has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

3

11.     Steven Anderson is a former engineer for Phillip Morris Corporate Services.  Mr. Anderson's address is 205 Jensen Avenue, Mamaroneck, NY 10543.  Mr. Anderson has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

12.     Joel Shipley is a contractor with Culbertson Company who performed work at Kraft Food's former offices in Rye Brook, NY.  Mr. Shipley is based at Culbertson Company's offices at 182 Brady Ave, Hawthorne, NY 10532, (914) 345-5959.  Mr. Shipley has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

13.     Jim Vacaro is a contractor with Carrier Corporation who performed work at Kraft Food's former offices in Rye Brook, NY.  Mr. Vacaro is based at Carrier Corpoartion's offices at Orchard Ridge Corporate Park, Brewster, NY 10509, (845) 276-2950. Mr. Vacaro has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

14.     Frank Nieli is an independent contractor at Kraft Food's offices located at 555 S. Broadway, Tarrytown, NY 10591, (914) 425-2500.  Mr Nieli has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

15.     David Yuile is a former employee of Pepsi Cola International.  Mr. Yuile is with AAPT, Level 23, 680 St. George Street, NSW, 2000 AUSTRALIA, (+61) 2-9009-9009.  Mr. Yuile has information regarding a beverage filter cartridge system in public use prior to the priority date of the Patent-in-Suit.

4

16.     Mike Gage-Smith, Work Services Manager for Kraft Foods Global, Inc. Mr. Gage-Smith is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.  Mr. Gage-Smith has information regarding the production records of Kenco Singles™ Cartridges.

17.     Martin Brown, Maxpax Engineer for Kraft Foods Global, Inc.  Mr. Brown is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.  Mr. Brown has information regarding the production records of Kenco Singles™ Cartridges.

18.     Roy Adams , Maxpax Engineer for Kraft Foods Global, Inc.  Mr. Adams is based at Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, (+44) 1295-264433.  Mr. Adams has information regarding the production records of Kenco Singles™ Cartridges.

**(B)     A copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment;**

(a)     Technical documents and electronically stored information ("ESI") relating to TASSIMO® T-DISC beverage filter cartridges.  These documents are located at the offices of Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, United Kingdom, on servers managed by Electronic Data Systems Corporation in the United Kingdom, and at the offices of Baker Botts L.L.P., 1299 Pennsylvania Ave., NW; Washington, DC 20004.

(b)     Documents and ESI related to the sales or manufacture of TASSIMO® T-DISC beverage filter cartridges in the United States.  These documents are located at the offices of Kraft Global Foods, Inc., 555 S. Broadway, Tarrytown, New York 10591, on servers

managed by Electronic Data Systems Corporation in the United States, and at the offices of Baker Botts L.L.P., 1299 Pennsylvania Ave., NW; Washington, D.C. 20004.

    (c)    Prior art. These documents and things are located at the offices of Kraft Foods UK, Ltd., Ruscote Ave., Banbury, OX16 2QU, United Kingdom, at the offices of Kraft Global Foods, Inc., 555 S. Broadway, Tarrytown, New York 10591, and at the offices of Baker Botts L.L.P., 1299 Pennsylvania Ave., NW; Washington, D.C. 20004.

    (d)    The Patent-in-Suit and the file history of the Patent-in-Suit. These documents are located at the offices of Baker Botts L.L.P., 1299 Pennsylvania Ave., NW; Washington, D.C. 20004.

**(C)**    **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered; and**

    Not applicable to Defendants.

**(D)**    **For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

    The Kraft Defendants are not aware of any such agreements.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700

Dated:  July 17, 2008
874773 / 31118

By: _/s/ David E. Moore_____
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE  19899-0951
    Tel:  302-984-6169
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

7

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on July 17, 2008, a true and correct copy of the

within document was caused to be served on the attorney of record at the following addresses as

indicated:

## VIA HAND DELIVERY & ELECTRONIC MAIL

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com
kkeller@ycst.com

## VIA ELECTRONIC MAIL

Michael A. Albert
Michael N. Rader
Laura Topper
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com

/s/ David E. Moore
David E. Moore

799719 / 31118

# EXHIBIT 3

| | |
|---|---|
| **From:** | Rader, Michael |
| **Sent:** | Tuesday, July 22, 2008 7:29 PM |
| **To:** | 'william.foster@bakerbotts.com' |
| **Cc:** | Steenburg, Charles; 'Keller, Karen' |
| **Subject:** | Keurig v. Kraft |

Dear Bill,

I'm writing to register Keurig's objection to Kraft's untimely attempt to inject new witnesses into this case through its Second Amended Initial Disclosures and Third Amended Initial Disclosures, served on Keurig on June 30 and July 17, respectively.  As you know, discovery in this case closed on April 1, 2008.  Moreover, we are now in the final phases of preparing our voluminous draft pre-trial papers for service on July 25.

Trial testimony from these previously-undisclosed witnesses would unfairly prejudice Keurig.  Kindly confirm in response to this e-mail that Kraft will not attempt to have these witnesses testify at trial, or Keurig will seek appropriate relief from the Court.

Best regards,

Michael Rader

WOLF, GREENFIELD & SACKS, P.C.

# EXHIBIT 4

# BAKER BOTTS LLP

THE WARNER
1299 PENNSYLVANIA AVE., NW
WASHINGTON, D.C.
20004-2400

TEL  +1 202.639.7700
FAX  +1 202.639.7890
www.bakerbotts.com

AUSTIN
BEIJING
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON
MOSCOW
NEW YORK
PALO ALTO
RIYADH
**WASHINGTON**

July 28, 2008

William S. Foster, Jr.
TEL  +1 202.639.1321
FAX  +1 202.639.1185
william.foster@bakerbotts.com

## *VIA EMAIL AND FIRST CLASS MAIL*

Michael N. Rader, Esquire
**WOLF, GREENFIELD & SACKS, P.C.**
600 Atlantic Avenue
Boston, Massachusetts  02210

Re:   *Keurig, Incorporated v. Kraft Foods Global, Inc., et al.*
USDC, District of Delaware
Civil Action No. 07-cv-00017-GMS

Dear Mike:

We are writing in response to your e-mail of July 22, 2008, regarding the identification of new witnesses in our amended Rule 26(a)disclosures.

The Kraft Defendants intend to solicit trial testimony from Messrs. Gage-Smith, Brown, and Adams regarding the production records for Kenco Singles™ cartridges that have been produced in this case.  Accordingly, prior to trial, we are willing to make these witnesses available for deposition at a time and location that is convenient for you.  We hope to resolve this matter without the involvement of the Court, but we will seek to arrange a discovery conference with the Court if you maintain your objection to these witnesses.

We ask that you contact us no later than August 1, 2008, regarding any potential depositions of the newly identified witnesses.  Please do not hesitate to contact us if you have any questions regarding this matter.

Best regards,

William S. Foster, Jr.

WSF:

## <u>RULE 7.1.1 CERTIFICATION</u>

I hereby certify that counsel for Plaintiff has complied with Rule 7.1.1 of the Local Rules

of Civil Practice and Procedure of the United States District Court for the District of Delaware.


<u>/s/ *Adam W. Poff*                                        </u>
Adam W. Poff (No. 3990)

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire, hereby certify that on August 4, 2008, a true and correct

copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

>Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
>David E. Moore, Esquire [*dmoore@potteranderson.com*]
>Potter Anderson & Corroon LLP
>Hercules Plaza
>1313 North Market Street, 6th Floor
>Wilmington, Delaware 19801

Additionally, I hereby certify that on August 4, 2008, copies of the foregoing

document were served by hand delivery and email on the above-listed counsel of record and on the

following non-registered participants in the manner indicated below:

### BY E-MAIL

>David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
>Baker Botts L.L.P
>The Warner
>1299 Pennsylvania Ave., NW
>Washington, D.C. 20004-2400

>YOUNG CONAWAY STARGATT & TAYLOR, LLP

>/s/ *Adam W. Poff*
>John W. Shaw (No 3362)  [*jshaw@ycst.com*]
>Adam W. Poff (No. 3990) [*apoff@ycst.com*]
>Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
>The Brandywine Building
>1000 West Street, 17th Floor
>Wilmington, DE 19801
>(302)-571-6600

>*Attorneys for Plaintiff Keurig, Incorporated*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,    )
                         )
    Plaintiff,           )
                         )
    v.                   )    C.A. No. 07-17 (GMS)
                         )
KRAFT FOODS GLOBAL, INC.,    )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and    )
KRAFT FOODS INC.,        )    **PUBLIC VERSION**
                         )
    Defendants.          )

## DEFENDANTS' OPPOSITION TO KEURIG'S MOTION *IN LIMINE* NO. 4

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

Dated: August 15, 2008
Public Version Dated: August 22, 2008
878745 / 31118

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft"), by counsel, hereby file this opposition to Keurig's Motion *in Limine* No. 4.   Plaintiff Keurig, Incorporated ("Keurig") seeks to exclude three employees of Kraft's Banbury, England facility – Mike Gage-Smith, Martin Brown, and Roy Adams – from testifying at trial regarding facts surrounding the production records showing which prior art Kenco Singles Cartridges ("Singles Cartridges") were in public use in this country from 1996 to 2000, a matter of significant importance to this case.  After the close of discovery, Keurig challenged the authenticity of the production records and the testimony of the custodian of the records, Michael Tamblin.  After that issue first arose in this case, Kraft sought the additional witnesses, not to introduce a new issue or defense in the case, but rather to provide support for an existing defense that had been extensively discovered.

Keurig ultimately moved *in limine* (No. 3) to exclude those production records at trial because, according to Keurig, Mr. Tamblin – the custodian of the records – gave insufficient testimony to authenticate the records.  And now Keurig seeks to exclude additional witnesses that can also authenticate and testify about the information contained in the production records in greater detail.  Keurig can't have its cake and eat it too.  As a matter of fundamental fairness, Keurig's Motion should be denied, and those witnesses should be permitted to testify.

## BACKGROUND

Keurig seeks to exclude Gage-Smith, Brown, and Adams on the ground that their identities were not disclosed timely.  But Keurig does not tell the whole story.  On February 26, 2008, Kraft's singles engineer, John MacMahon, was deposed ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Shortly thereafter, Kraft's counsel discovered that

MacMahon's recollection was not entirely correct.



Accordingly, production data prior to 2000 did exist, and subsequently Kraft produced records generated to Keurig on March 18, 2008.

Depositions for Mr. Hubert Weber, the former VP and General Manager-Tassimo Global, and a 30(b)(6) designee, as well as a follow-up deposition of Mr. Andrew Bentley regarding testing of Singles Cartridges, were already scheduled to occur in England at the beginning of April. Thus, Kraft quickly identified Michael Tamblin as the current custodian of the production records and then made him immediately available to testify about those records at the same time as the previously planned depositions.

After Keurig challenged the authenticity of the production records and Tamblin's testimony regarding those records, Kraft discovered that Mike Gage-Smith was primarily responsible for entering Singles data ███████ from 1996 to 2000, and, thus, could testify in greater detail about the production records. Shortly thereafter, on June 30, 2008 -- almost four months before trial -- Kraft amended its initial disclosures to include Mr. Gage-Smith as a potential witness. Upon further investigation, Kraft discovered two additional persons, Martin Brown and Roy Adams, who also worked with the ███████ system during the relevant time period and could testify in detail about the production records. Since the trial date was still more than three months away, Kraft immediately amended its disclosures to include Brown and Adams as potential witnesses and offered Keurig an opportunity to depose all

2

three witnesses at a time and location convenient to Keurig's counsel. Keurig rejected that request and instead sought to exclude the witnesses from testifying altogether.

## ARGUMENT

The testimony of Gage-Smith, Brown, and Adams should be permitted, because Kraft disclosed them to Keurig as soon as they were discovered, and Keurig knew their identity, their contact information, and the scope of their relevant knowledge well before trial. Keurig has declined Kraft's invitation to depose them – even within the U.S. at a time and place convenient to Keurig – because it is afraid of what the witnesses might say. It is clear that Keurig is simply trying to exclude evidence that hurts its case. Kraft should not be penalized as Keurig can only suffer prejudice due to its own inaction. The jury should hear testimony of Gage-Smith, Brown, and Adams in addition to the testimony of the other fact witnesses in this case.

The Federal Rules of Civil Procedure permit witnesses to testify even if they have been identified after the close of discovery.[1] *See* Fed. R. Civ. P. 37(c); *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3rd Cir. 1995). Rule 37 expressly prohibits discovery sanctions if substantial justification exists for the failure to timely disclose a witness <u>or</u> if the failure to disclose is harmless. Fed. R. Civ. P. 37 (emphasis added). Keurig's motion can be denied on

---

[1] In fact, in some cases it may be an abuse of discretion if a court's "exclusion of testimony results in fundamental unfairness in the trial of the case." *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3d Cir. 1995) (citing *Orjias v. Stevenson*, 31 F.3d 995, 1005 (10th Cir. 1994)). Kraft has produced a significant amount of documentary evidence that proves the invalidity of Keurig's '762 patent. In another contemporaneous motion (No. 3), Keurig seeks the exclusion of evidence because, in Keurig's view, Kraft's witness was unable to lay an appropriate foundation for the admission of the documents. But now that Kraft has disclosed these three additional witnesses who can testify in greater detail about the production records, Keurig seeks to preclude them from testifying. If the Court is inclined to consider granting Motion *in limine* No. 3 in the absence of the testimony that is the subject of this motion, fundamental fairness requires that Gage-Smith, Brown, and Adams be permitted to testify.

3

either ground. Substantial justification exists, and the failure to disclose prior to the close of discovery is harmless.

In ruling on whether a previously unidentified witness may be called at trial, the Court should consider the prejudice to the opposing party, the ability of a party to cure any prejudice, the likelihood of disruption to the trial, and the bad faith or willfulness in failing to comply with discovery obligations. *See Meyers v. Pennypack Woods Home Owner's Ass'n*, 559 F.2d 894, 904 (3d Cir. 1977); *Newman*, 60 F.3d at 156. All of those factors weigh heavily in favor of allowing the testimony here. There is no evidence of bad faith or willfulness on the part of Kraft, and there is little, if any, prejudice to Keurig.[2] Discovery had been ongoing for less than a year, and Kraft discovered the new witnesses as part of its Rule 26(e) obligation to supplement its disclosures – and only after Keurig challenged the authenticity of the decade-old production records. Pursuant to Rule 26, Kraft disclosed the witnesses to Keurig as soon as was practicable – and more than three months before trial. In this Circuit, when a party knows the names of previously undisclosed witnesses and the scope of their intended testimony well before trial, the nondisclosure of the witnesses during discovery is harmless. *Newman*, 60 F.3d at 156.

And to the extent Keurig claims prejudice, that can be cured. Kraft has offered on multiple occasions to afford Keurig an opportunity to depose all three witnesses at a time and place convenient to Keurig. If the Court concludes that the witnesses are able to testify at trial, Keurig would still have nearly two months to take their deposition. Moreover, allowing the testimony of these witnesses would comport with the purpose of the Federal Rules of Civil

---

[2] Keurig's citation to *Callaway v. Acushnet* is inapposite as the court did not consider a declaration accompanying a motion for summary judgment not only because of the late disclosure of the witness but also due to the witness' prior inconsistent declaration before the PTO. *See* 523 F.Supp. 2d 388, 401 (D. Del. 2007). Moreover, unlike the other cases cited by Keurig, Kraft has clearly identified both the witnesses and the subject matter of their testimony well before trial.

4

Procedure.[3]  Of course, if Keurig is willing to stipulate to the accuracy and admissibility of the

production records, testimony from these witnesses will be unnecessary and Kraft will not call

them at trial.

CONCLUSION

For the foregoing reasons, Keurig's Motion to exclude Mike Gage-Smith, Martin Brown,

and Roy Adams should denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated:  August 15, 2008
Public Version Dated:  August 22, 2008
878745 / 31118

By: _/s/ David E. Moore_____
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Tel:  302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

---

[3] *See Biltrite Corp. v. World Road Markings, Inc.*, 202 F.R.D. 359, 362 (D. Mass. 2001) ("The obvious purpose of the disclosure requirement of Rule 26(a)(1)(A) . . . is to give the opposing party information as to the identification and location of persons with knowledge so that they can be contacted in connection with the litigation, either for purposes of . . . being interviewed or for being deposed or for doing background investigation."); Fed. R. Civ. P. 26(a)(1)(A) Advisory Committee's Note (1993) (purpose of the Rule is to "assist other parties in deciding which depositions will actually be needed"; "counsel are expected to disclose the identity of those persons who may be used by them as witnesses or who, if their potential testimony were known, might reasonably be expected to be deposed or called as a witness by any of the other parties"). Kraft did that here.  Keurig knew the identity of the witnesses more than three months before trial.  Keurig has the opportunity to investigate them and to depose them to determine the extent of their knowledge regarding facts at issue in this case.  Keurig should avail itself of that opportunity, and the testimony should be admissible at trial.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 22, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on August 22, 2008, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: _/s/ David E. Moore_
     Richard L. Horwitz
     David E. Moore
     Potter Anderson & Corroon LLP
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     P.O. Box 951
     Wilmington, DE  19899-0951
     (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

805682 / 31118

# Exhibit 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>　　　　　Defendants. | Civil Action No. 07-017-GMS<br><br>**REDACTED – PUBLIC VERSION** |

## REPLY IN SUPPORT OF KEURIG's MOTION *IN LIMINE* NO. 4

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

Kraft still has provided no explanation for identifying three new witnesses (all Kraft employees) three months after the close of discovery. Deposing these witnesses on the eve of trial would not remedy the prejudice to Keurig if the witnesses were allowed to testify.

## I.    **Kraft Provides No Justification for Its Late Disclosure.**

Kraft's three new witnesses pertain to Singles cartridge "production records" that Kraft contends support its public-use invalidity defense – an issue on which it bears the burden of proof. Kraft offers no explanation why it waited until the last two weeks of the ten-month discovery period to produce the production records in the first place. (Mot. at 1). Kraft certainly has not shown substantial justification for delaying until three months after the close of discovery to identify three new witnesses who it claims can provide "greater detail" about the production records than Kraft's originally-identified witness, Mr. Tamblin. Cf. Opp. at 1 (conceding that the public-use issue was an "existing defense that had been extensively discovered").

Mr. Tamblin was deposed on April 2 (the day after discovery closed). He testified that he was not the custodian of the production records. His involvement with production records was limited to the traditional coffee packing business where he was employed. See Tamblin Depo. (Ex. 5)[1] at 55 (Q: Are you the custodian for that data? A: No.").[2] Keurig noted Mr. Tamblin's ignorance in its summary judgment letter opposition, filed April 16. (D.I. 91).[3] Kraft claims that it identified the new witnesses in response to Keurig "challeng[ing] Mr. Tamblin's testimony" (Opp. at 2), but offers <u>no</u> justification for waiting three months after Keurig's filing to do so.

---

[1]  Keurig's opening brief included Exs. 1-4. Exhibits to this brief begin at Ex. 5.

[2]  ██████████████████████████████████████████████ It is difficult to understand how Kraft could now contend that Mr. Tamblin <u>is</u> the "current custodian" for this data. (Opp. at 2).

[3]  Kraft says that Keurig's challenge occurred "after the close of discovery." (Opp. at 1). Of course it did. The production records were produced on March 18 and Mr. Tamblin was deposed on April 2, the day after discovery closed.

Moreover, Kraft mischaracterizes Keurig's challenge to the production records (and Mr. Tamblin's testimony thereon) as relating to "authenticity." Id. This is wrong. The parties agree that the document is what Mr. Tamblin says it is, see Fed. R. Evid. 901(a) – a copy of the report that he generated from Kraft computer data as it existed in March 2008. Keurig simply maintains that nothing about this document, or Mr. Tamblin's related testimony, contradicts sworn testimony from Kraft's Rule 30(b)(6) designee Mr. MacMahon establishing that the

██████████████████████████████

Mr. MacMahon testified that ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Mr. Tamblin, who was never the custodian of the data and knew nothing about the ██████████████ production lines, could not and did not contradict Mr. MacMahon's testimony ████████████ ██████████ (D.I. 110 at 2). At the close of discovery, all evidence pointed in only one direction - ██████████ production did occur during the relevant time period, and the purported production records produced by Kraft were incomplete and unreliable.[5] Kraft says that Keurig's challenge led it to "discover" the three new witnesses, but provides no explanation why it took three months for that discovery to occur regarding a defense that Kraft has pressed since the beginning of the case. All three are Kraft employees working in the same Kraft office complex as Mr. Tamblin and numerous other Kraft personnel who were deposed during two separate trips by counsel to England.

---

[4] Contrary to Kraft's assertion in its opposition brief (at 2), Mr. MacMahon most certainly did testify about "production records." (Ex. 6 at 73-75).

[5] For this reason, Keurig moved in limine to exclude the production records. (D.I. 110).

**II.    Keurig Would Be Prejudiced if the New Witnesses Were Permitted to Testify.**

Kraft now proposes to introduce the testimony of three additional witnesses to contradict Mr. MacMahon, Kraft's computer personnel, and Mr. Tamblin.  With less than two months before trial, it would defy "fundamental fairness" (Opp. at 1) to permit Kraft to re-write the record that Kraft itself created – with its own witnesses – during the discovery period.[6]

Preclusion is the only appropriate remedy because depositions at this late stage would not remedy the prejudice to Keurig. ███████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ Fairness would dictate that Keurig have the opportunity to re-depose Mr. MacMahon and to question the computer personnel who ███████████████████████████████████████████████ ██████████ Keurig would also need to retain an expert to scrutinize the computer system suddenly at issue.  With discovery having ended five months ago, the final pre-trial order being submitted today, and trial less than two months away, this is neither practical nor reasonable. See Transclean Corp. v. Bridgewood Servs., Inc., 77 F. Supp. 2d 1045, 1064 (D. Minn. 1999) (belated disclosure was not harmless, as the proposed reopening of discovery "would wreak its own distinctive prejudice"), vacated in part on other grounds, 290 F.3d 1364 (Fed. Cir. 2002).

---

[6] Kraft cites Newman v. GHS Osteopathic, Inc., 60 F.3d 153 (3d Cir. 1995) for its argument that that the untimely disclosures were "harmless." (Opp. at 3-4).  The Third Circuit's decision suggests nothing of the sort.  In Newman, the moving party – an ex-employee alleging discriminatory termination – attempted to preclude the defendant from calling the very supervisors with whom the ex-employee had clashed. Id. at 154-55.  He plainly knew their names and had "relevant knowledge" of them "well before trial." Id. at 156.  More importantly, the defendant's initial disclosures did identify the witnesses.  The plaintiff had unquestionably received at least a cover letter referencing the initial disclosures (if not the initial disclosures themselves) during discovery and, at a minimum, "should have sought the list." Id.  By contrast, Kraft identified Mr. Adams, Mr. Brown and Mr. Gage-Smith only well after discovery closed.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*[signature]*

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

# EXHIBIT 5

KEURIG v KRAFT                2 APRIL 2007      DEPOSITION OF M. TAMBLIN

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG INCORPORATED                  :
                                     :
                                     :
              Plaintiff              : Civil Action No.
                                     : 07-017 GMS
                  v                  :
                                     :
KRAFT FOODS GLOBAL, INC              :
TASSIMO CORPORATION, and             :
KRAFT FOODS INC,                     
              Defendants             :
                                     :

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL TAMBLIN

On Wednesday, 2nd April 2008

Commencing at 10.24 am

Taken at:
Baker Botts
41 Lothbury
London
EC2R 7HF
United Kingdom

Reported by: Miss Pamela Henley

MARTEN WALSH CHERER LTD 12-14 NEW FETTER LANE        LONDON EC4A 1AG
TEL: 020 7936 6000   E-MAIL: info@martenwalshcherer.com   FAX: 020 7427 0093

KEURIG v KRAFT                2 APRIL 2007        DEPOSITION OF M. TAMBLIN

Page 54

Tamblin - Rader

1
2       A.     Without looking to see what the
3   pack size is I really could not answer.
4       Q.     Okay. Do you know when the various
5   Lambert and Rychiger lines were installed?
6       A.     No, I do not.
7       Q.     R2 would that be --
8       A.     Rychiger 2.
9       Q.     -- if you could just turn to the
10  second page of the exhibit, if you look at the
11  first three rows you have a shift A on 9/28/1994;
12  do you see that?
13      A.     Yes.
14      Q.     Then you have a shift B on
15  9/29/1994, and then a shift A on that same date;
16  is that -- am I reading that right, that both
17  shift A and shift B worked on that product on 29th
18  September 1994?
19      A.     That is correct, yes.
20      Q.     If there is a gap between days what
21  does that suggest?
22      A.     It could either be a week-end where
23  it would not normally run, or it could be the line
24  was off for maintenance work.
25      Q.     Do you know how the line speeds of

Page 55

Tamblin - Rader

1
2   the Rychiger and Lambert lines compare?
3       A.     I do not know without looking at
4   the information that is in these sheets.
5       Q.     You would look to the sheets for
6   that?
7       A.     Yes.
8       Q.     So the data that your query brought
9   out into the Excel spreadsheet, is it part of your
10  job to manage that data in your current job?
11      A.     No.
12      Q.     Are you custodian for that data?
13      A.     No.
14      Q.     So you just use your query to get
15  it because you were asked to do that?
16      A.     For this particular spreadsheet,
17  yes. But on a weekly basis I use the application
18  to run the efficiency reports which are then sent
19  out to senior management.
20      Q.     Do those efficiency reports include
21  the singles product line?
22      A.     Yes, but it is -- as a line it does
23  not go into individual SKU detail. It would say
24  for this week line 1 should have produced 85 per
25  cent and produced 75.

Page 56

Tamblin - Rader

1
2       Q.     So you would do that for Lambert
3   and Rychiger?
4       A.     It is done by area, so it is done
5   for Maxpax coffee and flexibles.
6       Q.     So all of Maxpax would be lumped
7   together in that?
8       A.     Yes.
9       Q.     You would not be breaking out a
10  particular singles line?
11      A.     Not at all.
12      Q.     Were you ever responsible for
13  managing this particular data at any point in
14  time?
15      A.     Can you explain what you mean by
16  "managing".
17      Q.     At any point in time was it part of
18  your job to be the custodian for this data, to
19  have responsibility for it?
20      A.     Not for Maxpax. Within coffee area
21  when I was coffee production manager it was my
22  responsibility to input the line speeds and so on.
23      Q.     Who asked you to run the query to
24  provide this data?
25      A.     It came from one of our purchasing

Page 57

Tamblin - Rader

1
2   people. It was via John MacMahon.
3       Q.     You know Mr MacMahon?
4       A.     Yes.
5       Q.     How do you know him?
6       A.     We started within a few weeks of
7   each other at Kraft, or General Foods as it was
8   then.
9       Q.     Have you -- over the years have you
10  worked with him?
11      A.     Not in the last 25 years, no.
12      Q.     I think that is it. I am done.
13  Thank you for your time. If Mr Foster wants to
14  ask any questions he can do that.
15          MR FOSTER: Yes, I have a couple of
16  questions. Can you take a look through Exhibit 201
17  and tell me is this the entire amount of data that
18  you generated about Maxpax production?
19      A.     It should be the full year because
20  it is sorted by product code. It certainly looks
21  as if it was. This was the first year so it was
22  not a full year. This was the first year the
23  application was introduced, '94, so it is only a
24  part year.
25      Q.     So this is only a portion of the

15 (Pages 54 to 57)

# EXHIBIT 6

THIS EXHIBIT HAS BEEN
REDACTED IN ITS
ENTIRETY

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, Esquire, hereby certify that on September 2, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on September 2, 2008, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

### <u>BY E-MAIL</u>

> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
John W. Shaw (No 3362) [*jshaw@ycst.com*]
Adam W. Poff (No. 3990) [*apoff@ycst.com*]
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

        Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

        Defendants.

Civil Action No. 07-017-GMS

**REDACTED –
PUBLIC VERSION**

**KEURIG'S MOTION *IN LIMINE* NO. 5 – MOTION TO PRECLUDE KRAFT FROM
RELYING ON DEFENSES IDENTIFIED AFTER THE CLOSE OF DISCOVERY**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

Kraft is attempting trial-by-ambush. On August 11, Kraft for the first time disclosed four brand new defenses that it seeks to inject into the trial of this case: laches, obviousness of claim 1 of the '762 patent under 35 U.S.C. § 103, and written description and enablement under 35 U.S.C. § 112. Kraft never before mentioned any of these theories, let alone articulated a basis for them as required by Keurig's discovery requests and the Court's Scheduling Order. Keurig had no notice of the theories and no opportunity to take discovery on them. Discovery ended more than four months ago, the Pretrial Order is due in ten days, and trial starts in just over two months. Excluding Kraft's belated defenses is the only way to avoid severe prejudice to Keurig.

## I.    BACKGROUND

### A.    Kraft's Belated Disclosure of New Defenses

Keurig provided Kraft with a set of draft pretrial materials, including jury instructions, on July 25 as required by the Court's Scheduling Order. (D.I. 34). On August 11, Kraft responded with a modified set of materials. Kraft's draft included jury instructions on four defenses that had never before been raised: laches, obviousness, written description and enablement.[1] Kraft sent Keurig the jury instructions only; it still has provided no disclosure of its actual contentions.

### B.    Litigation History

#### 1.    Kraft's Answer to Keurig's Complaint

Kraft's February 28, 2007 answer to Keurig's complaint included a boilerplate affirmative defense that: "One or more claims of the '762 Patent are invalid [under 35 U.S.C.] §§ 101, 102, 103, and/or 112." (D.I. 12 ¶ 22; D.I. 13 ¶ 20; D.I. 14 ¶ 20). Kraft did not identify any specific claims or details. Kraft did not plead a laches defense.

---

[1] Keurig promptly objected and asked Kraft to drop the belated defenses. On August 13, Kraft purported to withdraw laches, not the other three. Keurig seeks an order excluding all four belated defenses. Given that Kraft continues to try to shift its theories, Keurig seeks clarity that Kraft will be limited to the defenses articulated in its invalidity contentions and expert reports.

### 2.     Kraft's Responses to Keurig's Interrogatories

Early in the case, Keurig served interrogatories requiring Kraft to:

State the basis for Defendant's [Invalidity] Defense…in detail sufficient for the Court to decide whether to grant or deny a motion for summary judgment thereon [and]

Identify all documents and things, including all Prior Art, that support your argument that one or more claims of the '762 patent is invalid.

(Ex. 1 at 4).  █████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

### 3.     Kraft's Invalidity Contentions

This Court's Scheduling Order required Kraft to serve, by August 10, 2007, Invalidity Contentions specifying, *inter alia*, (1) each combination of references allegedly rendering a claim obvious; and (2) "[a]ny grounds of invalidity based on…enablement or written description under 35 U.S.C. § 112(1) of any of the asserted claims, including the factual and legal basis for such invalidity contentions."  (D.I. 34 at 2-3).

Kraft's Invalidity Contentions (Ex. 3) did not say a single word about obviousness, enablement, or written description.  Kraft identified several pieces of alleged prior art and asserted that "the cited prior art anticipates."  (Id. at 2).

### 4.     The Close of Fact Discovery

Fact discovery closed on April 1, 2008.  (D.I. 34).  At no point before the close of discovery (or even since then) did Kraft supplement its Invalidity Contentions or its responses to Keurig's interrogatories.   Keurig therefore focused its discovery strategy and trial preparation on anticipation – the sole invalidity defense that Kraft had disclosed.

---

[2] Keurig served separate interrogatories on each Kraft defendant and received answers that were identical in relevant part.  In the interest of brevity, only one set is cited and attached here.

5.    **Expert Discovery**

Pursuant to the expert discovery schedule (D.I. 80), Kraft's expert Malcolm Taylor

prepared an April 15, 2008 report asserting that 

On May 13, 2008, Keurig served rebuttal expert reports from its engineering expert

Professor Alexander Slocum and its coffee expert Ted Lingle detailing their opinions that Kraft's

references do <u>not</u> anticipate.  Keurig's experts did not address obviousness, written description or

enablement, as Kraft and Mr. Taylor had never raised those defenses.

**II.    THE ONLY APPROPRIATE REMEDY IS EXCLUSION
        OF KRAFT'S BELATED DEFENSES.**

Kraft's belated laches, obviousness, written description and enablement defenses should

be excluded under Fed. R. Civ. P. 37 as a sanction for Kraft's untimely disclosure.  Exclusion is

the only remedy that will prevent severe prejudice to Keurig, which had no notice of these

defenses and was unable to take discovery or prepare for trial on them.  <u>Primos, Inc. v. Hunter's</u>

<u>Specialties, Inc.</u>, 451 F.3d 841, 851 (Fed. Cir. 2006) (affirming exclusion of prior art identified

after the close of discovery to avoid unfair and prejudicial surprise:  "[T]he purpose of discovery

is to enable parties to obtain the factual information needed to prepare their cases for trial.");

---

[3] Mr. Taylor discussed obviousness with respect to a dependent claim, but not claim 1.  Keurig
has since dropped the dependent claims to streamline the trial, leaving just claim 1 at issue.

Bridgestone Sports Co. v. Acushnet Co., C.A. No. 05-132, 2007 WL 521894, *4-5 (D. Del. Feb. 15, 2007) (precluding the defendant from relying on prior art disclosed after the close of discovery but six months before trial; noting that the plaintiff had "focused its attention during discovery on the numerous references identified by Acushnet in its validity contentions and not on these undisclosed references"); Edizone, L.C. v. Cloud Nine, C.A. 04-117, 2008 WL 584991, *3 (D. Utah Feb. 29, 2008) (granting motion to preclude invalidity theories disclosed "a few months" before trial: "Allowing Defendants to…add new theories at this late stage would have drastic consequences. The Court would be required to allow additional time for fact and expert discovery…"); Astrazeneca AB v. Mutual Pharm. Co., 278 F. Supp. 2d 491, 507 (E.D. Pa. 2003) ("To require Plaintiff to re-open depositions and attempt to secure fact discovery (and expert opinions), at this time, on a [belated] theory of invalidity…would be decidedly unfair.").

Had Keurig known about Kraft's theories, it would have conducted discovery differently. For example, the enablement defense would have led Keurig to question Kraft's engineers about whether undue experimentation would be needed to make the claimed invention work. Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., 42 U.S.P.Q. 2d 1369, 1377 (N.D. Ill. 1996) (granting motion to exclude untimely Section 112 defense: "Had Plaintiff been aware of Defendants' intention to raise this defense, it would have…deposed Sumitomo personnel on the issue of whether…undue experimentation would be necessary."); see also Convolve, Inc. v. Compaq Computer Corp., C.A. No. 00-5141, 2007 WL 2687629, *3 (S.D.N.Y. Sept. 12, 2007) (denying leave to amend invalidity contentions to assert obviousness on the basis of earlier materials addressing only anticipation: "[P]roof of obviousness involves evidence that would be irrelevant to anticipation. Accordingly, a patent holder needs to know which defense it will face in order to prepare its rebuttal.").

Preclusion is particularly important here because Kraft <u>still</u> has not articulated the substance of its contentions. Kraft has merely prepared draft jury instructions belying its plans to argue the new defenses at trial – without telling Keurig anything about how those arguments will unfold. This late, bare disclosure by Kraft is insufficient to support the new defenses as a matter of law. <u>Omegaflex, Inc. v. Parker Hannifin Corp.</u>, 425 F. Supp. 2d 171, 187 (D. Mass. 2006) (generic disclosure of possible defense "does not constitute the kind of support in the record necessary to sustain a theory's viability"), <u>reversed on other grounds</u>, 243 Fed. Appx. 592 (Fed. Cir. 2007); <u>Moore N.A., Inc. v. Poser Business Forms, Inc.</u>, C.A. No. 97-712, 2001 WL 253117, *7 (D. Del. Mar. 8, 2001) (since defendant's expert reports contained no discussion of enablement, defendant "will not be permitted to go forward with this defense.").

Kraft apparently intends to justify its late disclosure by arguing that it first realized it had an enablement defense during the June 11 deposition of Keurig's expert Professor Slocum, who explained that Singles cartridges are not suitable for same-side piercing. Because Kraft contends that Singles is similar to the '762 patent invention in its piercability, Kraft reasons that Professor Slocum must agree the patent is not enabled.[4] But Kraft has known Keurig's core contention that the Singles cartridges are not suitable for same-side piercing since the outset of the case. (Ex. 5 at 3). Accordingly, Kraft could not have been surprised by Prof. Slocum's testimony. <u>Cf.</u> <u>Heidelberg</u>, 42 U.S.P.Q. 2d at 1376 (excluding untimely defense because "there is no indication that the depositions did anything to enhance the Defendants' understanding of this defense...").

## III.   CONCLUSION

Keurig requests that Kraft be limited to the defenses that it disclosed during discovery.

---

[4] Kraft is wrong, but the Court need not reach the merits of the enablement issue to decide this motion. <u>Omegaflex</u>, 425 F. Supp. 2d at 187 ("Notwithstanding Plaintiff's strong opposition to Defendant's section 112 allegations on the merits, it would be next to impossible for Plaintiff to overcome the adverse effects of Defendant's late assertion of a written description deficiency.").

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

065927.1001

Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

Defendants.

Civil Action No. 07-017 GMS

## KEURIG'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT KRAFT FOODS GLOBAL, INC.

Pursuant to Fed. R. Civ. P. 33, Plaintiff, Keurig, Inc. ("Plaintiff" or "Keurig"), hereby

requests that Defendant, Kraft Foods Global, Inc. answer under oath the following Interrogatories

within thirty (30) days from the date of service hereof.

### INSTRUCTIONS AND DEFINITIONS

1.      When referring to a person, "identify" means to give, to the extent known,

the person's full name, present or last known address, and, when referring to a natural

person, the present or last known place of employment.

2.      When referring to documents, "identify" means to give, to the extent known,

the (a) type of document; (b) general subject matter; (c) date of the document; and (d)

author(s), addressee(s), and recipient(s).

3.      "Concerning" means referring to, describing, evidencing, or constituting.

4.      The terms "Defendant," "you," "yours," "Kraft Foods Global" and related

terms shall mean Kraft Foods Global, Inc., any parent corporations or organizations,

1

8.      Identify all persons who act or have acted as spokespeople for, or who consult or have consulted with, Defendant concerning Defendant's Products.

9.      Identify all studies, analyses or other evaluations of the '762 patent, and any other patent(s) concerning beverage filter cartridges and/or beverage dispensers that utilize beverage filter cartridges, and set forth in detail whether, and if so how, any such documents support or otherwise relate to your defense against the charge of infringement of the '762 patent.

10.     State the basis for Defendant's Second Affirmative Defense and Counterclaim for Declaratory Relief Regarding Invalidity, in detail sufficient for the Court to decide whether to grant or deny a motion for summary judgment thereon, including a claim chart setting forth the limitations of each claim of the '762 patent, your proposed construction of each such limitation, and the Prior Art that you believe invalidates each claim.

11.     State the basis for Defendant's Third Affirmative Defense, in detail sufficient for the Court to decide whether to grant or deny a motion for summary judgment thereon.

12.     State the basis for Defendant's First Affirmative Defense and Counterclaim for Declaratory Relief Regarding Non-Infringement, in detail sufficient for the Court to decide whether to grant or deny a motion for summary judgment thereon, including a claim chart setting forth the limitations of each claim of the '762 patent, your proposed construction of each such limitation, and an explanation of why you contend that Defendant has not infringed each claim (both literally and under the doctrine of equivalents).

13.     Identify all documents and things, including all Prior Art, that support your argument that one or more claims of the '762 patent is invalid.

14.     Identify all Keurig products ever in your possession, custody, or control, state the date on which each such Keurig product was acquired, and identify all persons having knowledge of Defendant's decision to acquire each such Keurig product.

4

Exhibit 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,            )
                                 )
    Plaintiff,            )
                                 )
    v.                    )    C. A. No. 07-17 (GMS)
                                 )
KRAFT FOODS GLOBAL, INC.,        )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and         )
KRAFT FOODS INC.,                )
                                 )
    Defendants            )

## DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS

Pursuant to the Court's Scheduling Order of July 17, 2007, Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively, "Kraft"), submits the following invalidity contentions for claims 1, 2, and 8-10 of U.S. Patent No. 6,607,762 ("'762 Patent") asserted by Plaintiff Keurig. Kraft reserves the right to supplement these invalidity contentions, or cite additional prior art, as discovery progresses or if Plaintiff Keurig modifies its disclosure of asserted claims or infringement contentions.

Kraft provides its invalidity contentions in the claim chart below. Kraft cites three (3) pieces of prior art, and submits four (4) invalidity contentions based on the cited prior art: the Kenco Singles® capsules in public use in the United States prior to the December 1, 1999 date of invention of the '762 Patent alleged by Plaintiff Keurig, as shown in Exhibit A; U.S. Patent No. 4,853,234 ("'234 Patent") to Bentley *et al.* entitled "Beverage Packages," as shown in Exhibit B; U.S. Patent No. U.S. Patent No. 4,452,130 to Klein entitled "Electrical Apparatus Useful to Prepare a Hot Beverage" ("'130 Patent"), as shown in Exhibit C; and as

further shown when inverted in Exhibit D; and, finally, the '130 Patent in view of its operation as disclosed.

These invalidity contentions are consistent with Keurig's infringement contentions in Keurig's Disclosure of Infringement Contentions served on July 27, 2007. As indicated in the Kraft defendants' non-infringement claim charts, the Tassimo® Discs do not infringe the '762 patent. Nevertheless, as shown by the following invalidity contentions, if claims 1, 2 and 8-10 of the '762 Patent are applied as Keurig applied these claims in its infringement claim charts, and reiterated in its counsel's letter dated August 3, 2007, then the cited prior art anticipates.

## Invalidity Claim Charts

### A. Kenco Singles™ Capsule

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
| --- | --- |
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The Kenco Singles capsule is a beverage filter cartridge. |
| an outer container having an access opening: | **YES.** The Singles capsule has an outer container with an access opening. |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The Kenco Singles includes a permeable filter received in and configured and arranged in the inner container such that it separates two chambers in the interior of the container so that infused beverage created in the first chamber must flow through the filter element before it can enter the second chamber. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The Kenco Singles include a first chamber in which a beverage medium is stored. Beverage media suitable for use with Singles capsules include, for example, roast and ground coffee, tea, and powdered chocolate. |

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The Kenco Singles capsule includes an aluminum foil lid closing the access opening. The Singles' lid having a section that directly covers the first chamber, in which beverage medium is stored and infused with liquid, and another section that directly covers the second chamber including the outlet. |
| the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** The section of the Singles' foil lid directly covering the first chamber is *pierceable* to accommodate an inflow of liquid for infusion with the stored beverage medium to produce a beverage in the same manner as depicted in the '762 Patent. *Cf.* '762 Patent, Column 3, Lines 40-46; **Fig. 5.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** The Singles' filter welded to the communication channels is a paper filter that permits a flow of brewed beverage from the first chamber to the second chamber. |
| the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** The section of the Singles' foil lid directly covering the second chamber is pierceable to expose to the outlet and permit an outflow of the brewed beverage to the exterior of the capsule. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that has a greater resistance to piercing than the aluminum foil lid. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that is impermeable to liquids and gases. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The Singles capsule has a lid comprising a layer of aluminum foil that is impermeable to liquids and gases. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The Kenco Singles capsule is a beverage filter cartridge. |
| an outer container having a access opening; | **YES.** The Singles capsule has an outer container with an access opening. |

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The Kenco Singles includes a permeable planar filter received in and configured and arranged in the inner container such that it separates two chambers in the interior of the container so that infused beverage created in the first chamber must flow through the filter element before it can enter the second chamber. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The Kenco Singles include a first chamber in which a beverage medium is stored. Beverage media suitable for use with Singles capsules include, for example, roast and ground coffee, tea, and powdered chocolate. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** The Kenco Singles capsule includes an aluminum foil lid closing the access opening. The aluminum foil lid and the polypropylene outer container are both impermeable to liquids and gases. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The Singles' lid includes a section that directly covers the first chamber, in which beverage medium is stored and infused with liquid, and another section that directly covers the second chamber including the outlet. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** The section of the Singles' foil lid directly covering the first chamber is *piercable* to accommodate an inflow of liquid for infusion with the stored beverage medium to produce a beverage in the same manner as depicted in the '762 Patent. *Cf.* '762 Patent, Column 3, Lines 40-46; **Fig. 5.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** The Singles' filter welded to the communication channels is a paper filter that permits a flow of brewed beverage from the first chamber to the second chamber. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** The section of the Singles' foil lid directly covering the second chamber is piercable to expose to the outlet and permit an outflow of the brewed beverage to the exterior of the capsule. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that has a greater resistance to piercing than the aluminum foil lid. |

## B.  U.S. Patent No. 4,853,234

| Claim Language – '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The '234 Patent discloses "a sealed beverage package containing one or more beverage ingredients and being formed from substantially air-and water-impermeable materials." '234 Patent, Abstract. |
| an outer container having an access opening: | **YES.** The '234 Patent discloses an outer container 20, that includes a lower edge 23 that defines an access opening. *See* Column 7, Lines 9-17; **Fig. 5.** |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The '234 Patent discloses that a filter 36 separates a first chamber 21, which contains beverage ingredients, from a second chamber 37, so that infused beverage created in the first chamber 21 must flow through the filter 36 before it can enter the second chamber 37. *See* '234 Patent, Column 7, Lines 41-46; **Fig. 4.** In addition, outlet channels 31, 32, 33 comprise slots 30 that can be formed of a dimension that acts as a filter to separate collection chamber 35, in fluid communication with second chamber 37, from first chamber 21. *See* '234 Patent, Column 7, Lines 27-30, 41-42. |
| a soluble beverage medium stored in said first chamber; and | **YES.** First chamber 21 contains beverage ingredients, such as roast and ground coffee particles. *See* '234 Patent, Column 7, Lines 12-15. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.** A foil 25 is sealed along the lower edge 23 of outer container 20. *See* '243 Patent, Column 7, Lines 17-21; **Fig. 6.** Foil 25 has a section directly covering the first chamber 21 and another section directly covering the second chamber 37. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Foil 25 is formed of a *piercable* material and includes a section overlying first chamber 21 that can be pierced to permit an inflow of liquid directly into chamber 21 to infuse the beverage ingredient stored therein. |

| Claim Language - '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** Filter 26 is a permeable filter, made of a conventional filter material, that accommodates a flow of brewed beverage from the first chamber 21 to the second chamber 37. *See* '234 Patent, Column 4, Lines 9-12. |
| the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** Foil 25 is formed of a piercable material and includes another section overlying second chamber 37 that can be pierced to permit an outflow of brewed beverage to the exterior of outer container 20. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Outer container 20, which is formed of rigid polypropylene, has a greater resistance to piercing than foil 25, which can be aluminum or a laminated material. *See* '243 Patent, Column 2, Lines 15-19. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** Outer container 20 is formed of a rigid plastic material, such as polypropylene, that is impermeable to liquids and gases. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** Foil 25 is formed of an aluminum sheet or a laminated material that is impermeable to liquids and gases. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The '234 Patent discloses "a sealed beverage package containing one or more beverage ingredients and being formed from substantially air-and water-impermeable materials." '234 Patent, Abstract. |
| an outer container having a access opening; | **YES.** The '234 Patent discloses an outer container 20, that includes a lower edge 23 that defines an access opening. *See* Column 7, Lines 9-17; **Fig. 5.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The '234 Patent discloses that a planar filter 36 separates a first chamber 21, which contains beverage ingredients, from a second chamber 37, so that infused beverage created in the first chamber 21 must flow through the filter 36 before it can enter the second chamber 37. *See* '234 Patent, Column 7, Lines 41-46; **Fig. 4.** |

| Claim Language - '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| a soluble beverage medium stored in said first chamber; and | **YES.** First chamber 21 contains beverage ingredients, such as roast and ground coffee particles. *See* '234 Patent, Column 7, Lines 12-15. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A foil 25 is sealed along the lower edge 23 of outer container 20. *See* '243 Patent, Column 7, Lines 17-21; **Fig. 6.** Both the outer container 20, which is formed of a rigid plastic material, and the foil 25, which is formed of aluminum or a laminate material, are impermeable to liquids and gases. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** Foil 25 has a section directly covering the first chamber 21 and another section directly covering the second chamber 37. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Foil 25 is formed of a *piercable* material (aluminum or a laminate) and includes a section overlying first chamber 21 that can be pierced to permit an inflow of liquid directly into chamber 21 to infuse the beverage ingredient stored therein. |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** Filter 26 is a permeable filter, made of a conventional filter material, that accommodates a flow of brewed beverage from the first chamber 21 to the second chamber 37. *See* '234 Patent, Column 4, Lines 9-12. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** Foil 25 is formed of a piercable material and includes another section overlying second chamber 37 that can be pierced to permit an outflow of brewed beverage to the exterior of outer container 20. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Outer container 20, which is formed of rigid polypropylene, has a greater resistance to piercing than foil 25, which can be aluminum or a laminated material. *See* '243 Patent, Column 2, Lines 15-19. |

### C.  U.S. Patent No. 4,452,130 (Inverted)

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| **Claim 1** | When inverted, the beverage filter cartridge disclosed in the '130 Patent has all of the elements of claim 1 of the '762 Patent.  This can be readily seen from the cartridge structure illustrated in an inverted posture depicted in Exhibit D. |
| A beverage filter cartridge comprising: | **YES.**  The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance.  *See* '130 Patent, Abstract. An inverted filter carrier is depicted in Exhibit D. |
| an outer container having an access opening: | **YES.**  An outer container 11 has an access opening.  *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.**  A filter 12 separates a first chamber storing a flavor substance 15 from a collecting channel 18 in fluid communication with a second chamber 17 via a passageway 19, so that infused beverage created in the first chamber must flow through the filter 12 before it can enter the second chamber 17. |
| a soluble beverage medium stored in said first chamber; and | **YES.**  The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage.  *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.**  A lid 14 seals the access opening of the outer container.  *See* '130 Patent Column 2, Lines 12-15.  The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.**  A section of the lid 14 overlying the chamber storing the flavor substance 15 is *pierceable* to accommodate an inflow of liquid, such as hot water, to infuse the flavor substance 15 to produce a brewed beverage. *Cf.* '130 Patent, Column 2, Lines 37-38 and 55-60; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.**  A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17.  *See* '130 Patent, Column 2, Lines 60-63. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** A section of lid 14 overlying second chamber 17 is *pierceable* to accommodate an outflow from the outside container 11. *Cf.* '130 Patent, Column 2, Lines 25-29. After a liquid under pressure is injected into the first chamber storing the flavor substance, brewed beverage can pass through the filter 12, and flow through the collecting channel 18 to a passageway 19. The brewed beverage can then flow to the second chamber 17 and exit the filter cartridge 11 at the outlet formed by the piercing of the lid 14 at the section overlying the second chamber. *See* Exhibit D; *cf.* '130 Patent, Column 2, Lines 61-65. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES. Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent, which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The lid 14 and a lower lid 13, which closes a lower portion of second chamber 17, seals the flavor substance stored in the filter unit 11 from the atmosphere and the water stored in cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The lid 14 closes the access opening of filter unit 11 to seal the flavor substance 15 stored therein from the atmosphere and the water stored in the cup 10. *See* '130 Patent, Column 2, Lines 12-15. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| **Claim 10** | When inverted, the beverage filter cartridge disclosed in the '130 Patent has all of the elements of claim 10 of the '762 Patent. This can be readily seen from the cartridge structure illustrated in an inverted posture depicted in Exhibit D. |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. An inverted filter carrier is depicted in Exhibit D. |
| an outer container having a access opening; | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A planar filter 12 separates a first chamber storing a flavor substance 15 from a collecting channel 18 in fluid communication with a second chamber 17 via a passageway 19, so that infused beverage created in the first chamber must flow through the filter 12 before it can enter the second chamber 17. The planar filter 12 assumes a frustoconical shape of the filter carrier 11. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 and the lower lid 13 seal the flavor substance 15 stored in the filter carrier 11 from the atmosphere and the water stored in a cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** A section of the lid 14 overlying the chamber storing the flavor substance 15 is *pierceable* to accommodate an inflow of liquid, such as hot water, to infuse the flavor substance 15 to produce a brewed beverage. *Cf.* '130 Patent, Column 2, Lines 37-38 and 55-60; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the and section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** A section of lid 14 overlying second chamber 17 is *pierceable* to accommodate an outflow from the outside container 11. *Cf.* '130 Patent, Column 2, Lines 25-29. After a liquid under pressure is injected into the first chamber storing the flavor substance, brewed beverage can pass through the filter 12, and flow through the collecting channel 18 to a passageway 19. The brewed beverage can then flow to the second chamber 17 and exit the filter cartridge 11 at the outlet formed by the piercing of the lid 14 at the section overlying the second chamber. *See* Exhibit E; *cf.* '130 Patent, Column 2, Lines 61-65. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Fig. 1 of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent, which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |

## D. U.S. Patent No. 4,452,130

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. |

| Claim Language – '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| an outer container having an access opening: | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1**. |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A filter 12 separates two chambers in the interior of the container so that infused beverage created in a first chamber, storing a flavor substance 15, must flow through the filter 12 before it can enter the second chamber 17. The filter 12 separates the first chamber from a collecting channel 18 in fluid communication with the second chamber 17 via a passageway 19. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Hot water outlets 25 pierce a section of the lid 14 overlying the chamber storing the flavor substance 15. *See* '130 Patent, Column 2, Lines 37-38; **Fig. 2**. |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** A tube 27 penetrates a section of lid 14 overlying second chamber 17 to access a lower lid 13 at a bottom portion of section of the second chamber 17 to accommodate an outflow from the outside container 11. *See* '130 Patent, Column 2, Lines 25-29. After brewed beverage drips through the filter 12, the beverage collects in the channel 18, flows through a passageway 19, and exits a hole at the bottom of second chamber 17. *Id.*, Column 2, Lines 61-65. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** **Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, U.S. Patent No. 5,111,740 to Klein ("'740 Patent"), which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. The '740 Patent is attached as Exhibit E. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The lid 14 and a lower lid 13, which closes a lower portion of second chamber 17, seals the flavor substance stored in the filter unit 11 from the atmosphere and the water stored in cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The lid 14 closes the access opening of filter unit 11 to seal the flavor substance 15 stored therein from the atmosphere and the water stored in the cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. |
| an outer container having a access opening; | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A planar filter 12 separates two chambers in the interior of the container so that infused beverage created in a first chamber, storing a flavor substance 15, must flow through the filter 12 before it can enter the second chamber 17. The filter 12 separates the first chamber from a collecting channel 18 in fluid communication with the second chamber 17 via a passageway 19. The planar filter 12 assumes a frustoconical shape of the filter carrier 11. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 and the lower lid 13 seal the flavor substance 15 stored in the filter carrier 11 from the atmosphere and the water stored in a cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Hot water outlets 25 pierce a section of the lid 14 overlying the chamber storing the flavor substance 15. *See* '130 Patent, Column 2, Lines 37-38; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the and section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** A tube 27 penetrates a section of lid 14 overlying second chamber 17 to access a lower lid 13 at a bottom portion of section of the second chamber 17 to accommodate an outflow from the outside container 11. *See* '130 Patent, Column 2, Lines 25-29. After brewed beverage drips through the filter 12, the beverage collects in the channel 18, flows through a passageway 19, and exits a hole at the bottom of second chamber 17. *Id.*, Column 2, Lines 61-65. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES. Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent", which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

By: _/s/ Kenneth L. Dorsney_____
    Richard L. Horwitz (#2246)
    Kenneth L. Dorsney (#3726)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    Tel: 302-984-6169
    rhorwitz@potteranderson.com
    kdorsney@potteranderson.com

Dated: August 10, 2007
812042 / 31118

*Attorneys for Defendants Kraft Foods Global, Inc.,
Tassimo Corporation, and Kraft Foods Inc.*

## **CERTIFICATE OF SERVICE**

I, Kenneth L. Dorsney, hereby certify that on August 10, 2007, a true and correct copy of

the within document was caused to be served on the attorney of record at the following addresses

as indicated:

## **VIA HAND DELIVERY**

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com
kkeller@ycst.com

## **VIA ELECTRONIC MAIL**

Michael A. Albert
Michael N. Rader
Laura Topper
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com

                                        */s/ Kenneth L. Dorsney*
                                         Kenneth L. Dorsney

799719 / 31118

Exhibit 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

      Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

      Defendants.

Civil Action No. 07-017-GMS

## PLAINTIFF'S RESPONSE TO DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORP., AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS

In response to Defendants Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.'s Joint Invalidity Contentions ("Invalidity Contentions"), Plaintiff Keurig, Incorporated ("Plaintiff" or "Keurig") provides the following validity contentions for asserted claims 1, 2, 8, 9, and 10 of United States Patent No. 6,607,762 (the "'762 patent").

Plaintiff bases these validity contentions on its current knowledge, understanding and belief as to the facts and information available to it as of the date of these disclosures. This case is still in the early stages of discovery and Plaintiff has not yet completed its investigation, collection of information, discovery or analysis related to this action. Accordingly, Plaintiff reserves the right to supplement, amend or modify the information contained herein and introduce such information and any subsequently-identified documents at trial. As discovery is taken, and additional details are provided regarding the alleged prior public use or if Defendants modify their invalidity contentions, Plaintiff's validity contentions may need to be amended, supplemented and/or corrected.

I.    **THE '762 PATENT IS VALID IN LIGHT OF THE**
      **ALLEGED PRIOR ART IDENTIFIED BY DEFENDANTS**

The alleged prior art identified in Defendants' Invalidity Contentions *inter alia* does not

disclose each and every element of the claimed invention of the '762 patent. Defendants, in their

Invalidity Contentions, allege that the '762 patent is invalid under four separate bases of

invalidity. Defendants contend that the '762 patent is anticipated by a capsule called Kenco

Singles which was allegedly in public use in the United States prior to the invention of the

claimed matter of the '762 patent.[1] Defendants also identify two prior art patents that allegedly

anticipate the '762 patent, including United States Patent No. 4,853,234, entitled "Beverage

Packages" (the "'234 patent"), and United States Patent No. 4,452,130, entitled "Electrical

Apparatus Useful to Prepare a Hot Beverage" (the "'130 patent").[2] Defendants also allege that

the '130 patent anticipates the '762 patent in a different configuration than disclosed in the '130

patent – a configuration Defendants have dubbed "inverted."

---

[1] Defendants contend that the Kenco Singles capsule was in public use in the United States more
than one year prior to the date of filing of the application that issued as the '762 patent.
However, Defendants have provided no evidence supporting this contention and Keurig does not
concede this issue.

[2] Defendants also included a copy of United States Patent No. 5,111,740, entitled "Electrical
Apparatus Useful to Prepare a Hot Beverage" (the "'740 patent"), in the Exhibits to their
Invalidity Contentions. However, Defendants' Invalidity Contentions provide no separate
allegations of invalidity with respect to this patent. Defendants' Invalidity Contentions simply
refer to the '740 patent in their contentions for the '130 patent. Accordingly, Keurig has not
provided a detailed response as to which elements are not taught or disclosed in this patent.
However, it is clear that the '740 patent does not disclose each and every element of the claimed
invention of the '762 patent. Keurig reserves the right to supplement this response if Defendants
supplement or otherwise amend their invalidity contentions to allege that the '740 patent
invalidates the '762 patent.

A.    <u>Kenco Singles Capsules Do not Anticipate the '762 Patent</u>

Kenco Singles capsules do not anticipate the '762 patent under 35 U.S.C. § 102 because the Kenco Singles capsules do not include each and every element of the claimed invention of the '762 patent.  With respect to independent claims 1 and 10 of the '762 patent, the Kenco Singles capsules do not include a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge.  Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the Kenco Singles capsules for at least these same reasons.  Accordingly, for at least these reasons, the Kenco Singles capsules do not anticipate the '762 patent.

B.    <u>The '234 Patent Does not Anticipate the '762 Patent</u>

The '234 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '234 patent does not disclose each and every element of the claimed invention of the '762 patent.  With respect to independent claims 1 and 10 of the '762 patent, the '234 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge.  Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '234 patent for at least these same reasons.  Accordingly, for at least these reasons, the '234 patent does not anticipate the '762 patent.

C.    <u>The '130 Patent Does not Anticipate the '762 Patent</u>

The '130 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '130 patent does not disclose each and every element of the claimed invention of the '762 patent.

3

With respect to independent claims 1 and 10 of the '762 patent, the '130 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '234 patent for at least these same reasons. Accordingly, for at least these reasons, the '234 patent does not anticipate the '762 patent.

### D.    The '130 Patent Does not Anticipate the '762 Patent in an "Inverted" Configuration

The '130 patent in an "inverted" configuration does not anticipate the '762 patent under 35 U.S.C. § 102. Defendants allege that the filter carrier unit disclosed in the '130 patent can be "inverted," *i.e.*, turned upside down, to anticipate the '762 patent. However, this "inverted" configuration is not disclosed or in any way suggested in the '130 patent. And the disclosure of the '130 patent does not enable a functioning beverage filter cartridge in the "inverted" configuration. In addition, with respect to independent claims 1 and 10 of the '762 patent, Defendants' "inverted" configuration of the '130 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '130 patent in Defendants' "inverted" configuration for at least these same reasons. Accordingly, for at least these reasons, Defendants' "inverted" configuration of the '130 patent does not anticipate the '762 patent.

4

## II.    CLAIM 10 OF THE '762 PATENT IS NOT INDEFINITE

Defendants, in their Invalidity Contentions, do not assert that any terms in the claims of the '762 patent are indefinite under 35 U.S.C. § 112(2). Indeed, Defendants, in their Invalidity Contentions, were able to identify where each of the elements of the claimed invention of the '762 patent are allegedly disclosed in the identified prior art, admitting that Defendants can (or at least claim to be able to) understand the claim language.

In Defendants Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.'s Joint Response to Plaintiff's Disclosures of Asserted Claims and Infringement Contentions, Defendants allege that the claim language "and the **and** [SIC] section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge" is indefinite. Defendants' suggestion that a minor typographical error evident from the face of the patent renders the patent claims indefinite is contrary to well established law.[3] This claim language includes a typographical error that was introduced during printing of the patent – "and the **and** section" should read "and the **second** section." It is clear from the context of the claim language and the disclosure in the specification that the second section of the lid is being referred to. Indeed, the prosecution history confirms that "and" was supposed to be "second." This claim language is from a claim added during prosecution of the application that issued as the '762 patent.[4] In the amendment where this language was added, the correct language ("second") appears. This amendment is part of the prosecution history and makes clear what the correct word is. Accordingly, this claim language is not insolubly ambiguous.

---

[3] *See, e.g., Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (holding that a district court can retroactively correct errors in claim language when the error is evident from the face of the patent).

[4] *See* Amendment to Office Action Mailed on September 24, 2002 at 4.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
*msquire@ycst.com*

*Attorneys for Plaintiff Keurig, Incorporated*

OF COUNSEL:

Michael A. Albert
Michael N. Rader
Laura E. Topper
Gerald B. Hrycyszyn
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

Dated: August 31, 2007

6

## CERTIFICATE OF SERVICE

I, Monté T. Squire, Esquire, hereby certify that on August 31, 2007, I caused copies

of the foregoing document to be served upon the following counsel in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

Richard L. Horwitz, Esquire
*rhorwitz@potteranderson.com*
David E. Moore, Esquire
*dmoore@potteranderson.com*
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

### BY E-MAIL

David Schlitz, Esquire
*david.schlitz@bakerbotts.com*
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

**CERTIFICATE OF SERVICE**

I, Karen E. Keller, Esquire, hereby certify that on August 22, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
David E. Moore, Esquire [*dmoore@potteranderson.com*]
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

Additionally, I hereby certify that on August 22, 2008, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

**BY E-MAIL**

David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
John W. Shaw (No 3362) [*jshaw@ycst.com*]
Adam W. Poff (No. 3990) [*apoff@ycst.com*]
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* NO. 5

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 21, 2008
Public Version Dated: August 28, 2008
880384 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

In its *Motion in Limine* No. 5, Keurig misleadingly tells only a small part of the story, leaving out the parts that should be fatal to its motion. After the close of fact discovery, Keurig, through its two technical experts, raised new theories as to why Kraft's asserted prior art does not anticipate claim 1 of the '762 Patent. When Keurig's technical experts were deposed regarding their respective rebuttal reports, they each made statements fatal to the validity of the '762 Patent. Accordingly, Kraft now asserts the defenses of lack of enablement and lack of written description, ***based upon admissions made by Keurig's own technical experts at their deposition.*** In addition, Kraft is asserting the defense of obviousness in response to assertions made by one of Keurig's technical experts for the first time in his rebuttal report.[1]

## BACKGROUND

As Keurig concedes, Kraft pled in its Answers that the asserted claims of the '762 Patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112. Pursuant to the Court's Scheduling Order, Kraft disclosed three pieces of prior art as anticipating claim 1. In turn, Keurig replied why the disclosed prior art is not anticipatory. Based upon the parties' contentions, Keurig asked the Court to construe the claim term "piercable to accommodate an inflow of liquid". Keurig argued that the term means, "designed to be pierced to form an inlet that allows an inflow of liquid without leakage." D.I. 43 (Ex. 1) at 10. The Court rejected this argument in its claim construction order. D.I. 53 (Ex. 2) at 2, n. 7. Thus, seemingly, the issue of whether the prior art disclosed a lid that when pierced formed a seal that allowed an inflow of liquid without leakage was no longer in the case.

Nevertheless, Keurig's technical expert, Dr. Slocum stated with regard to the prior art Kenco Singles Cartridge ("Singles Cartridge"), "The foil over the coffee bed lacks any kind of

---

[1] As stated in footnote 1 of its *Motion in Limine* No. 5, Kraft informed Keurig it would drop its laches defense. Nevertheless, Keurig continues to argue about that withdrawn defense.

support structure against which to press a gasket or other device to form a seal." Slocum Rebuttal Rep. (Ex. 3) at 21. Perhaps Dr. Slocum did not realize at the time of writing his rebuttal expert report that this argument invalidates the '762 patent. Neither of the two disclosed embodiments in the '762 Patent include a support structure against which to press a gasket or other device to form a seal. Thus, at his deposition, Dr. Slocum was forced to contrive his new "aspect ratio" theory.[2] Dr. Slocum had to concede, "Based on my model, I don't think [the cartridge shown in figures] three, four, or five makes a beverage." Slocum Depo. Tr. (Ex. 4) at 32:2-3. Thus, if Dr. Slocum is correct, then the '762 Patent is inoperable.

To avoid an invalidity determination, Keurig is trying to argue through its expert that the prior art Singles Cartridge does not produce a beverage. Keurig did not make this assertion in its reply to Kraft's invalidity contentions. Nor did it ask the Court to construe the term "beverage." But now they seek to present the expert testimony of Ted Lingle to construe the term "beverage", and provide the criteria for determining whether a drink is a beverage under that construction.[3] The '762 Patent does not disclose any criteria for determining if a drink is a beverage. At his deposition, Mr. Lingle testified that a person of ordinary skill in the art would not know if a particular cartridge produces a "beverage" without consulting a beverage expert. Lingle Depo Tr. (Ex. 5) at 76:2-7. If Mr. Lingle is correct, then the '762 Patent is invalid because it does not enable a person of ordinary skill in the art to construct a cartridge that produces a beverage.

Finally, at the beginning of this litigation Kraft asserted that U.S. Patent No. 4,853,234 ("the '234 Patent") discloses each and every limitation of claim 1 of the '762 Patent. In its

---

[2] At his deposition Dr. Slocum realized that he had unwittingly invalidated the '762 Patent, and, thus on the spot he shifted gears arguing that the second disclosed embodiment was operable due to its aspect ratio, which he had not discussed in his rebuttal report. Ex. 4 at 25:3-28:17.

[3] Kraft filed a motion *in limine* to exclude Mr. Lingle's testimony because he tries to provide a specialized definition of "beverage" and is not an expert in the relevant art of the '762 Patent.

response to Kraft's invalidity contentions, Keurig asserted that the '234 Patent does not anticipate claim 1 because it does not disclose "a single lid that is both: (1) pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage; and (2) pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge." But Keurig did not allege that Kraft's asserted prior art does not disclose the "lid having a first section overlying said first chamber and a second section overlying said second chamber," and Keurig has not amended its responses to Kraft's invalidity contentions to so state. After the close of fact discovery, Dr. Slocum opined that the '234 Patent does not disclose a lid overlying the first and second chambers. Ex. 3 at 3. Kraft is asserting the defense of obviousness, which is clearly pled in its Answers, in response to Keurig's newly raised theory of its own expert. In doing so, Kraft will rely on prior art and evidence produced during discovery.

ARGUMENT

## I.   Keurig Cannot be Prejudiced By Issues Raised By Its Own Experts

Keurig has proffered expert opinions that raise new issues pertaining to the validity of the '762 Patent. Now, Keurig attempts to claim it is somehow "prejudiced" by its own experts' opinions and disingenuously suggests that Kraft has not articulated the substance of its contentions. Kraft clearly set forth the basis of its Section 112 defenses in its motions *in limine* by noting that Keurig's expert testimony, if true, invalidates the '762 Patent. D.I. 106 at 3 (Ex. 6), D.I. 107 (Ex. 7) at 4. Moreover, Keurig even addresses Kraft's enablement defense in its opposition to the Slocum motion. D.I. 118 (Ex. 8) at 4, n.2. When asked the basis for its obviousness defense prior to Keurig's motion, Kraft pointed to Dr. Slocum's statements in his rebuttal report. (Ex. 9).

- 3 -

As clearly recognized within the Third Circuit, a defendant may raise an affirmative defense so long it is raised at a sufficiently pragmatic time, and the plaintiff is not prejudiced in its ability to respond. *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991). Here, Keurig not only has notice at a sufficiently pragmatic time, it has timely notice considering that Keurig's Section 112 defense is based on recent admissions by Keurig's technical experts and the Section 103 defense is in response to a new theory raised for the first time by one of Keurig's technical experts in his rebuttal report.

Furthermore, during Kraft's technical expert's deposition, Keurig's counsel elicited testimony from Mr. Taylor indicating that one of skill in the art would recognize that a single lid is needed to achieve a reliable seal with the cartridge disclosed by the '234 Patent. Taylor Depo. Tr. at (Ex. 10) 135:2-136:5. Mr. Taylor repeatedly notes that a design engineer would see that the cartridge was "designed for" a single lid. Ex. 10 at 141:8-18, 143:19-144:11, 180:10-11. Accordingly, Keurig is clearly on notice of Mr. Taylor's expert opinion that a consumer packaging engineer would choose a single lid to close the access opening of a cartridge.

While Keurig would not be prejudiced by allowing Kraft to assert defenses that arise out of assertions and admissions recently made by Keurig's technical experts, Kraft would be prejudiced if it is not allowed to assert those defenses. Keurig should not be allowed to rely on statements by its technical experts that are designed to help it avoid anticipation, and yet not suffer the consequences of the statements by those same experts that invalidate the patent under Section 112 as a matter of law.

## II. Kraft Relies Solely on Evidence Already Produced In Discovery

Keurig seeks the extraordinary remedy of barring Kraft from asserting defenses based solely on evidence produced during discovery and upon which its technical experts have opinied.

The cases that Keurig cites in support of its motion, which address the late disclosure of new evidence or prior art, are inapposite. In *Primos, Inc. v. Hunter's Specialties, Inc.*, the Federal Circuit held that the trial court did not abuse its discretion by excluding a prior art device that was not disclosed until just before trial. 451 F.3d 841, 851 (Fed. Cir. 2006). Hunter's Specialties failed to disclose the device even though they were aware of its existence over many years of discovery. Each of the *Bridgestone*, *Edizone*, and *Astrazeneca* decisions also were based on the late disclosure of prior art references. Here, Kraft is not asserting new prior art, but is simply relying upon the evidence already known to Keurig and discussed by its technical experts. Kraft is simply relying on the statements of Keurig's technical experts, which if true, render that patent *per se* invalid under Section 112.

In the opinion most directly on point from the District of Delaware, *Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 03-27-SLR, 2005 WL 1331172, at *5 n. 10 (D. Del. June 3, 2005) (citing *Charpentier*, 937 F.2d at 864), the Court found that Boston Scientific (BSC) had not been prejudiced by Cordis' failure to raise a defense in its answer because Cordis provided notice of the defense at pretrial, which gave BSC an opportunity to respond at trial *Id.*; *see also Boehringer Ingelheim Int'l GmbH v. Barr Labs.*, C.A. No. 05-700-JJF, 2008 WL 2756127, at *2 (D. Del. July 15, 2008) (defendant permitted to assert invalidity defense raised in pre-trial order)[4]. Here, Keurig will have an adequate opportunity to respond to Kraft's defenses at trial based on the evidence and prior art already produced in this case.

## CONCLUSION

For the foregoing reasons, Keurig's Motion *in Limine* No. 5 should be denied.

---

[4]  The purpose of the joint pre-trial order is to give each party sufficient notice of the opposing party's contentions and an opportunity to respond to such contentions at trial. *Thorn EMI N. Am., Inc. v. Intel Corp.*, 936 F. Supp. 1186, 1191 (D. Del. 1996)(citations omitted).

- 5 -

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 21, 2008
Public Version Dated: August 28, 2008
880384 / 31118

By: _/s/ David E. Moore_
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    Tel: 302-984-6169
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 28, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on August 28, 2008, the attached document was Electronically Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: _/s/ David E. Moore_
    Richard L. Horwitz
    David E. Moore
    Potter Anderson & Corroon LLP
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

805682 / 31118

# Exhibit 1

Case 1:07-cv-00017-GMS    Document 43    Filed 10/15/2007    Page 1 of 30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>Defendants. | Civil Action No. 07-017-GMS |

## KEURIG INCORPORATED'S OPENING CLAIM CONSTRUCTION BRIEF

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Chad S.C. Stover (No. 4919)
*cstover@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
Gerald B. Hrycyszyn
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: October 15, 2007

### A.    "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of beverage"

| Language from Claims 1 and 10 that Keurig Suggests Requires Construction | Keurig's Proposed Construction |
| --- | --- |
| piercable to accommodate an inflow of liquid | designed to be pierced to form an inlet that allows an inflow of liquid without leakage |
| piercable to accommodate an outflow of beverage | designed to be pierced to form an outlet that allows an outflow of beverage without leakage |

The claim language "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of beverage" should be construed as complete phrases and in the context of the entire claim, as clarified by the specification. The adjective "piercable" cannot be taken in isolation and construed in a vacuum as Kraft urges the Court to do. This word is part of larger phrases whose meaning lies at the heart of the claimed invention of the '762 patent, which is directed to **same-side piercing** of a single-serve beverage filter cartridge lid to create "a cleaner puncture and an improved seal" that avoids leakage.

While just about anything is theoretically "piercable" if given the right tools and enough force, the patent plainly does not cover any and all lids that can somehow be pierced. Rather, it covers a cartridge with a lid that is piercable in a particular manner, namely "to accommodate an inflow" or "outflow." What does this qualification to the word "piercable" require? As discussed below, the patent specification answers this question by clarifying that it must be designed to be pierced **so as to form** a particular type of seal onto an **inlet and outlet**, avoiding leakage.

The adjective "piercable" in claims 1 and 10 must be construed along with the claim language that it modifies, "to accommodate an inflow of liquid" and "to accommodate an outflow of beverage," in the context of the entire claim. "Proper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation." Pause Tech. LLC

- 10-

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,          )
                               )
        Plaintiff,             )
                               )
    v.                         )        Civil Action No. 07-017 (GMS)
                               )
KRAFT FOODS GLOBAL, INC.,      )
TASSIMO CORPORATION, and       )
KRAFT FOODS INC.,              )
                               )
        Defendants.            )
                               )

## ORDER CONSTRUING THE TERMS OF U.S. PATENT NO. 6,607,762

On December 3, 2007, the court held a *Markman* hearing in this patent infringement action concerning U.S. Patent No. 6,607,762 (the "'762 patent" or the "patent-in-suit"). After having considered the submissions of the parties and hearing oral argument on the matter, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, as used in the asserted claims of the '762 patent:

1.  The term "first and second chambers" is construed to mean, with regard to the first chamber, "the part of the cartridge into which the liquid is introduced and through which it flows before reaching the filter," and, with regard to the second chamber, "the part of the cartridge out of which the beverage flows after having passed through the filter."[1]

---

[1] In the court's view, Keurig's proposed construction better comports with the claim language and the specification, which disclose a filter defining two chambers both covered by a lid through which liquid enters one chamber and exits the other. '762 patent at 04:60-05:12; *see also id.* at 03:15-20 (embodiment in which filter defines one chamber, which receives the liquid, separate from the second chamber, from which the beverage exits). Accordingly, the court adopts this construction. *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) (construing terms to have the meaning presented in the patent document).

2.    The term "a [planar]$^2$ filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers" is construed to have its plain and ordinary meaning.$^3$

3.    The term "and a second section overlying said second chamber" is construed to have its plain and ordinary meaning.$^4$

4.    The term "piercable"$^5$ is construed below as part of the terms "piercable to accommodate an inflow of liquid into said first chamber" and "piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge."$^6$

5.    The term "piercable to accommodate an inflow of liquid" is construed to mean "capable of being pierced to permit a flow of liquid into."$^7$

---

$^2$ Claim 10 repeats this disputed term, which first appears in Claim 1, verbatim but for the addition of the word "planar" where indicated. *Cf.* '762 patent at 04:63 *with id.* at 06:10. The parties agree that, for the purposes of this case, this difference is immaterial. (D.I. 42 at 4.).

$^3$ This construction derives from the court's construction of "first and second chambers" and the term's otherwise ordinary meaning. *See* footnote 1; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*), *cert. denied*, 546 U.S. 1170.

$^4$ The court declines to adopt Kraft's construction, which would impermissibly read limitations from the preferred embodiment onto the claims. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

$^5$ This is the spelling used in the '762 patent.

$^6$ *See* footnote 7.

$^7$ Keurig argues that Kraft's proposed construction is so overbroad as to render these terms meaningless. *Cf. Nikken USA, Inc. v. Robinsons-May, Inc.*, 51 Fed. Appx. 874, 884-85 (Fed. Cir. 2002) (citing *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1578 (Fed. Cir. 1996)) (rejecting construction of claim term "attachable" because construction's overbreadth rendered the limitation meaningless). The court should instead adopt Keurig's proposed construction, Keurig argues, because that construction conveys the '762 patent's special, innovative purpose: avoiding leakage by locating the outlet at lid, not the cartridge base as in prior art. *See Medrad*, 401 F.3d at 1319 (claim construction must take place in context of specification and prosecution history, including invention's function, not in a vacuum). The specification does describe the invention's purpose. *E.g.*, '762 patent at 01:38-63. But certain prior art, cited in both the '762 patent's specification and prosecution history and so part of the intrinsic record, undermines the basis of Keurig's proposed construction. *Phillips*, 415 F.3d at 1317 (prosecution history, including prior art cited therein, is part of intrinsic record); *see* '762 patent at 01:17 (specifically citing as prior art U.S. Patent Nos. 5,325,765 and 5,840,189); (D.I. 47 at A19-22 (patentee citing prior art during examination).) Specifically, the prior-art '189 patent uses virtually this same disputed term to describe piercing both the lid and the base to accommodate liquid flow – even though that prior art lacks the patent-in-suit's focus on leakage and its

2

# Exhibit 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 4

1     UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - x

3     KEURIG, INCORPORATED,

4                       Plaintiff,

5          v.

6     KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
      KRAFT FOODS INC.,

7

                      Defendants.

8

      Civil Action No. 07-CV-0017-GMS

9     - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12        VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM

13                    Wednesday, June 11, 2008

14                    9:10 a.m. to 5:00 p.m.

15              WOLF, GREENFIELD & SACKS, P.C.

16                    600 Atlantic Avenue

17                 Boston, Massachusetts

18

19        Reporter:  Marianne R. Wharram, CSR/RPR

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC

             126 East 56th Street, Fifth Floor

24                New York, New York 10022

                    212-750-6434

25                   REF: 87765

```
 1                    SLOCUM

 2    that.

 3        Q.   We're going to get to that in length.  What

 4    else do you disagree with with Mr. Taylor?

 5             MR. RADER:  Same objection.  You can

 6    answer.

 7        A.   I want to make sure I accurately describe

 8    it.

 9        Q.   (BY MR. SCHLITZ)  Yeah, please do.

10        A.   Well, I think that's the -- that's the

11    primary thing, and that this device, he says on 20

12    -- excuse me, paragraph 20 --

13        Q.   Yes.

14        A.   -- he says a person skilled in the art

15    reviewing '234 would understand specifications to

16    describe a cartridge that could be used for

17    same-side piercing, even though it was designed for

18    opposite side.  And I just disagree, and my --

19    okay.  I'll --

20        Q.   On what basis do you disagree?

21        A.   Okay.  I was going to wait for you to ask

22    the next question.

23        Q.   Yeah.  Go ahead.

24        A.   Well, when I run tests -- well, so there's

25    two things.  First of all, there's some scientific
```

1              SLOCUM

2    philosophies or whatever why this type of approach

3    for this type of aspect ratio cartridge I -- is my

4    opinion fundamentally doesn't work well, if at all.

5    If you delete the manifolds and you just do

6    same-side piercing and with respect to can you

7    actually same-side pierce something like this

8    without making a mess, that's a separate --

9    separate issue, but just in terms of making a

10   beverage, and I believe, as I described when I

11   wrote my report, that when I run tests, I don't get

12   a beverage in the definition of my palate or

13   Mr. Lingle's expert opinion.

14       Q.   Let me understand what you just said.

15   First of all, when you said a cartridge, a rati--

16   what did you --

17       A.   Aspect ratio.

18       Q.   What is an aspect ratio of a cartridge?

19       A.   Okay, so when you -- when you want to

20   describe the aspect ratio of something -- so if I

21   can have a pen?

22       Q.   Here's a pen.

23       A.   It's easier for me to point with this than

24   a finger.  This is a little flatter than your

25   typical cartridge, but specifically, when I'm

```
 1                        SLOCUM
 2    referring to aspect ratio, the length and the width
 3    of a coffee bed and what's those -- what are those
 4    proportions with respect to the depth between where
 5    you're putting in the fluid and where it wants to
 6    exit.
 7         Q.  All right.
 8         A.  Now, all these flat cartridges, I would
 9    say, have a flat aspect ratio.  The depth is
10    shallow.
11         Q.  When you say these, you were pointing to
12    something.
13         A.  I'm sorry.  The Singles cartridges or the
14    cartridge from the '234 patent.
15         Q.  Okay.
16         A.  So when you go -- or the embodiment of
17    Figure -- nominally, Figure 4.
18         Q.  Right.
19         A.  Now, compare those proportions to what I
20    think is the actual useful embodiment of Figures 6,
21    7 and 8 of the '762 patent, which is that aspect
22    ratio is more kind of one-to-one, the depth with
23    here, and in the actual, these flat type
24    cartridges, it's like three or four-to-one is the
25    characteristic aspect ratio.  The problem with just
```

```
 1                        SLOCUM

 2    taking something of this aspect ratio and piercing,

 3    in the language of the patent, and then injecting

 4    your fluid is that the water, which comes in at a

 5    reasonable pressure, shoots right through the

 6    coffee, or whatever your drink is, into the filter

 7    and then rushes out your filter, so you don't get

 8    good wetting -- that's wetting, excuse me -- of the

 9    bed of -- and you end up putting through the

10    required amount of fluid to fill your cup, but it

11    really only acts on a small region of coffee, which

12    is why I think it comes out so -- so weak and why I

13    said yeck, it doesn't really taste like coffee.

14    When you have a -- and that's why I believe the

15    '234 and the Singles, they both have this

16    manifolding system --

17         Q.  All right.

18         A.  -- to evenly wet.  And I opened up

19    cartridges from the Singles machine after they were

20    used and I looked at the bed and I opened up the

21    cartridges after I would do my test and I looked at

22    the bed, and the tests I ran, you would always

23    burrow a hole.  And I can discuss more in terms of

24    scientific principles of aspect ratios if you want.

25         Q.  Please do.
```

```
 1                        SLOCUM
 2      A.  Based on my model, I don't think three,
 3  four, five makes a beverage.
 4      Q.  Now, when you were talking about the aspect
 5  ratio, and with regard to Figure 13, okay --
 6      A.  Correct.
 7      Q.  -- you say because -- in Figure 13, are you
 8  aware that the -- well, in what orientation would
 9  you have to use Figure 13?
10      A.  Um, I actually think it would -- it would
11  work -- this vertical orientation -- it would work
12  vertical orientation where, for example -- and it
13  would work in several.
14      Q.  Okay.
15      A.  It would work vertical orientation where
16  the gravity vector points -- I'm trying to figure
17  out how I'm going to do this with the video thing,
18  but where the area of the gravity vector would be
19  located on the lid.
20      Q.  Would the foil be down or up or sideways?
21      A.  That's a better way of putting it.  The
22  foil would be -- down would work.  I believe it
23  would work with the foil vertical.
24      Q.  Right.
25      A.  With the foil horizontal, or up, excuse me,
```

Exhibit 5

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF DELAWARE

----------------------------------------X

3   KEURIG, INCORPORATED,

4                          Plaintiff,

5   VS

6   KRAFT FOODS GLOBAL, INC., TASSIMO
    CORPORATION, and KRAFT FOODS, INC.,

7
                         Defendants.

8
    Civil Action No. 07-CV-0017-GMS

9   ----------------------------------------X

10

11

12        VIDEOTAPED DEPOSITION OF TED R. LINGLE

13             Friday, June 27, 2008

14              9:11 a.m. - 2:05 p.m.

15         WOLF, GREENFIELD & SACKS, P.C.

16              600 Atlantic Avenue

17           Boston, Massachusetts 02210

18

19     Court Reporter:  Loretta Hennessey, RDR, CRR

20

21

22

23     ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor

24             New York, New York 10022
                   212-750-6434

25                 REF: 87840

1                          LINGLE

2        Q.    Okay.  So one who is of ordinary skill in

3    the art in designing and making single-serve

4    beverage cartridges wouldn't have a metric, that

5    person would have to go to an expert in coffee; is

6    that correct?

7        A.    That's correct.

8        Q.    Okay.  What is the measure of acceptable

9    aroma profile?

10       A.    That's also subjective.

11       Q.    Okay.  And one of ordinary skill in the

12   art, an engineer in building, constructing

13   single-serve beverage cartridges, what would be the

14   metric that person would have to use to determine if

15   the resultant beverage satisfies the aroma profile?

16       A.    That would also be subjective.  They would

17   taste and smell the fluid and say, "yes, this smells

18   like coffee," or, "no, this doesn't smell like

19   coffee."

20       Q.    Okay.  But what I'm trying to understand

21   is what if that engineer, you know, thinks that a

22   beverage that has just barely traceable aroma is

23   acceptable.  Would you accept that?

24       A.    Accept it in what way?

25       Q.    Well, since it's subjective, could that

# Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT DELAWARE

KEURIG, INCORPORATED,                    )
                                         )
            Plaintiff,                   )
                                         )
        v.                               )    C.A. No. 07-17 (GMS)
                                         )
KRAFT FOODS GLOBAL, INC.,                )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and                 )
KRAFT FOODS INC.,                        )    **CONFIDENTIAL –
                                         )    ATTORNEY EYES ONLY
            Defendants.                  )    FILED UNDER SEAL**


## DEFENDANTS' MOTION IN LIMINE TO LIMIT EXPERT
## TESTIMONY OF DR. ALEXANDER SLOCUM


OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700


Dated:  August 4, 2008
877077 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Tel:  302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

'762 Patent, Col. 2, Lines 14-20. The figures for the two disclosed embodiments do not disclose a support structure against which to press a gasket or other device to form a seal.



FIG. 5                    FIG. 13

Thus, Dr. Slocum's opinion as to why Kraft's asserted prior art is not suitable for same-side piercing, if correct, would also apply to the '762 Patent, thereby rendering the asserted claims invalid for lack of enablement. Realizing the dilemma his opinion placed Keurig in, at his deposition, Dr. Slocum on the spot abandoned his argument regarding the need for a support structure and invented a new theory why Kraft's prior art would not invalidate the '762 Patent's claims. He raised his new "aspect ratio" theory.

He proceeded to opine that the '234 Patent and Singles cartridge, as well as the first embodiment of the '762 Patent, are not suitable for same side piercing because the cartridges have a flat aspect ratio. Slocum Dep. Tr. (Ex. 3) 27-28, 31-32. Dr. Slocum then asserted that a cartridge must have a one-to-one aspect ratio, like the embodiment shown in Figs. 7-9 of the '762 Patent, to directly inject fluid into the coffee bed for same side piercing. *Id.* at 27. But nowhere in his Expert or Rebuttal report does Dr. Slocum assert that Kraft's prior art fails to anticipate the '762 Patent due to its aspect ratio, nor does he discuss that for the same reason the first embodiment of the '762 Patent is inoperative. Plain and simple, Kraft was ambushed by Dr. Slocum at his deposition.

- 3 -

Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT DELAWARE

KEURIG, INCORPORATED,           )
                                )
        Plaintiff,              )
                                )
    v.                          )    C.A. No. 07-17 (GMS)
                                )
KRAFT FOODS GLOBAL, INC.,       )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and        )
KRAFT FOODS INC.,               )    **CONFIDENTIAL –**
                                )    **ATTORNEY EYES ONLY**
        Defendants.             )    **FILED UNDER SEAL**
                                )

## DEFENDANTS' MOTION IN LIMINE TO PRECLUDE
## EXPERT TESTIMONY OF TED LINGLE

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 4, 2008
877075 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

purported coffee brewing expert testify that in his judgment a drink does not meet his subjective criteria as to acceptable taste, odor, color, or strength to qualify as a cup of coffee. Mr. Lingle contends that a person of ordinary skill in the art could not even ascertain what a "beverage" is without consulting an expert. Lingle Dep. Tr. (Ex. 2) at 75-76. Of course, this renders the claims indefinite.[3] *See* 35 U.S.C § 112.

## II.  Lingle's Testimony Would Not Assist the Trier of Fact

Under Rule 702, expert testimony must "'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, (1993) (quoting Fed. R. Evid. 702). Mr. Lingle's testimony is not intended to assist the jury in understanding the evidence and making a factual determination. Rather, it is intended to set criteria for a beverage that are not in the patent-in-suit and then tell the jury that in his judgment the drink produced by the Singles cartridge does not have the flavor, color, odor or strength to qualify as a cup of coffee.

## III.  Lingle is Not an Expert in the Relevant Art of the '762 Patent

Rule 702 also requires that a technical expert in a suit for patent infringement have specialized knowledge in the relevant art of the patent-in-suit. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743 (3d Cir. 1994) (must be connection between expert testimony and factual issues in the case). But Mr. Lingle lacks expertise in brewer or beverage cartridge design, or even fluid mechanics. Lingle Dep. Tr. (Ex. 2) at 18, 93-94. In short, Mr. Lingle is not an expert in the single-serve beverage filter cartridge art – the relevant art of the '762 Patent. Rather, he is an expert in "[c]offee,

---

[3]  Mr. Lingle's proposed definition of "beverage" runs contrary to the maxim that claims should be construed to preserve validity. *See Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008).

Exhibit 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KEURIG, INCORPORATED,<br><br>          Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>          Defendants. | Civil Action No. 07-017-GMS |

**KEURIG'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*
TO PRECLUDE EXPERT TESTIMONY OF DR. ALEXANDER SLOCUM**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

See Taylor Depo. (Ex. C) at 107. By contrast, as noted above, Professor Slocum carefully

evaluated the liquids and reported on his observations in his expert report. While Professor

Slocum is not a coffee expert like Mr. Lingle, and will not duplicate Mr. Lingle's expert

testimony, he is entitled to describe his own observations as a skilled engineer performing his

experiments and observing the resulting liquids. Professor Slocum's observations of the Singles

liquids are not subject to attack by Kraft and are admissible at trial.

> **C.    Professor Slocum is Entitled to Testify Regarding the Singles Cartridge's Aspect Ratio, Which Merely Explains His Description of the "Burrowing" Phenomenon in His Rebuttal Expert Report.**

Professor Slocum's testimony regarding the "aspect ratio" of the Singles cartridge clearly

complies with Rule 26(a)(2)(B) because it is merely an explanation of the burrowing

phenomenon that he disclosed in his rebuttal expert report.[2] As noted above, Professor Slocum's

report explains that in a shallow Singles cartridge, the pressurized water "shoots through the

coffee grounds and literally burrows a hole." (Ex. A at 25). When pressed for further details

about this phenomenon at his deposition, Professor Slocum explained the connection between

the "shallowness" (or flat "aspect ratio") of the cartridge and the burrowing problem:

> The problem with just taking something of this aspect ratio and piercing … and then injecting your fluid is that the water, which comes in at a reasonable pressure, shoots right through the coffee, or whatever your drink is, into the filter and then rushes out your filter, so you don't get good wetting….And I opened up cartridges…after they were used and….you would always burrow a hole. And I can discuss more in terms of scientific principles of aspect ratios if you want.

(Ex. B at 27-28) (emphasis added).

---

[2] Professor Slocum's rebuttal report describes both the "sealing" and "burrowing" problems that occur when Singles cartridges are used in a same-side piercing configuration. (Ex. A at 21, 25). Kraft's suggestion in its motion (at 3) that Professor Slocum invented the latter at his deposition is wrong. Likewise, Kraft's suggestion (at 3) that Professor Slocum's testimony raised enablement issues is baseless – indeed, prior to filing its motion in limine (more than two months after Professor Slocum's deposition), Kraft never even mentioned enablement. It would be far too late for Kraft to raise such a defense this close to trial.

DB02:7138901.1
065927.1001

# Exhibit 9

# Foster, William

| | |
|---|---|
| **From:** | Foster, William |
| **Sent:** | Wednesday, August 13, 2008 7:44 PM |
| **To:** | 'Michael Rader' |
| **Cc:** | 'Charles Steenburg'; Schlitz, David |

**Subject:** RE: Keurig v. Kraft

Mike,

I am forwarding revised Jury Instructions, Contentions, and Verdict Form. We intend to assert the defenses of obviousness of claim 1, enablement and written description. Kraft's initial pleadings assert defenses of invalidity under Sections 103 and 112 and we have never indicated that they were withdrawn. During expert discovery, Keurig raised new theories responding to Kraft's invalidity contentions that necessitate the inclusion of instructions with regard to these defenses.

In its responses to Kraft's invalidity contentions, Keurig did not assert that the '234 Patent failed to disclose a lid that overlies the first and second chambers. Instead, Keurig argued that the '234 Patent fails to disclose a lid that is both piercable to accommodate an inflow and piercable to accommodate an outflow. But Dr. Slocum's report (at Paragraph 10) clearly indicates that he will testify the '234 Patent does not disclose a single lid overlying the first and second chambers. In this regard, Keurig has not amended its response to Kraft's invalidity contentions.

Further, either of Dr. Slocum's alternative opinions regarding piercability, one from his rebuttal report and a different one at deposition, would render the '762 Patent invalid under section 112. We detailed how Dr. Slocum's opinions, if accepted, invalidate the '762 Patent in our motion *in limine* related to his testimony.

I will be available to discuss these issues anytime tomorrow.

Thanks,
Bill

-----Original Message-----
**From:** Michael Rader [mailto:Michael.Rader@WolfGreenfield.com]
**Sent:** Wednesday, August 13, 2008 1:33 AM
**To:** Foster, William
**Cc:** Steenburg, Charles; Keller, Karen; Albert, Michael
**Subject:** Keurig v. Kraft

Dear Bill,

Please let me know when this afternoon would be a convenient time for you to meet and confer by telephone about the new defenses that Kraft apparently intends to raise based on the draft jury instructions that you provided to us this week. While we still have no disclosure from you of the nature of these defenses, we do note that Kraft intends to ask for jury instructions on laches, obviousness of claim 1, enablement and written description. None of these defenses have ever been articulated before and Keurig intends to promptly file a motion to exclude them. Please let us know if Kraft ever provided notice of the nature of these defenses in its invalidity contentions, interrogatory answers or expert reports. We have reviewed those papers and found nothing.

We intend to have our motion on file in the next day or two. We should agree on a briefing schedule that will permit the motion to be fully briefed by August 25 in compliance with Judge Sleet's scheduling order. I propose that Kraft file its opposition by Wednesday, August 20 and Keurig will file its reply by August 25.

I can be available for a meet-and-confer this afternoon after about 2 pm.

Best regards,

Michael Rader

WOLF, GREENFIELD & SACKS, P.C.

# Exhibit 10

# In The Matter Of:

*KEURIG, INCORPORATED v.*
*KRAFT FOODS GLOBAL, INC*

---

## MALCOLM E. TAYLOR
*July 3, 2008*

---

# MERRILL LEGAL SOLUTIONS

**101 Arch Street, 3rd Floor**
**Boston, MA 02110**
PH: 617-542-0300 / FAX: 617-338-6075

**TAYLOR, MALCOLM E. - Vol. 1**

1   A.  Yes, okay.

2   Q.  That's the basis for your opinion that there is a

3       single piece of foil covering the entire side that's

4       shown in figure 5?

5   A.  That's not the only reason.  Actually, the cartridge

6       is designed with a flange all the way around the

7       device which has a larger width than anywhere else

8       on the cartridge which is what I would do if I was

9       making this up to apply a label or a lid, if you

10      like, in this case over the full surface.  In order

11      to have a reliable seal, you need enough width of

12      flange in order to get that to occur.  If you work

13      with a narrow flange, it isn't going to work too

14      well and it isn't going to last too long.

15  Q.  You are talking about the narrow -- you are talking

16      about the top of the wall 39 in figure 5?

17  A.  Well, I'm talking about the flange which runs all

18      the way around which is --

19  Q.  So are you suggesting that it wouldn't work well to

20      seal that foil to the top of the wall 39 in

21      figure 5?

22  A.  No, I wouldn't.

23  Q.  And that's one of the assumptions underlying your

24      opinion that this patent describes a foil covering

1     the entire side?

2  A.  Absolutely.  This is designed with a wider flange

3     all the way around the device.  This one is only an

4     internal divider.  That's all it is as designed

5     there.

6  Q.  Now, are you aware that a cartridge of the design in

7     figures 4 and 5 in the '234 Patent was

8     commercialized for a period of time by Kraft?

9  A.  It was, but I know the reason too.

10  Q.  Now, let me show you a picture of that.  This is a

11     picture of Exhibit 81 which is that cartridge.  Are

12     you familiar with this photo?

13  A.  No, I'm not.  No, I haven't seen this before.

14  Q.  I'll represent to you it's a photograph of a

15     cartridge that Mr. MacMahon brought to the second

16     day of his deposition.  Do you recall reading about

17     that?

18  A.  Yes, I do remember it.

19  Q.  Okay.  And do you recall reading that he testified

20     that this cartridge is the commercial embodiment

21     that's being described in the '234 Patent?

22          MR. SCHLITZ:  Objection.  Mischaracterizes

23     his testimony.

24  A.  No.  What I remember him mentioning earlier in his

1   Q.  And at the same time, sir, I'd like you to turn to

2       the portion of the '234 Patent that you cite in your

3       report which is column 7, line 17 through 21.

4   A.  Column what, sir?

5   Q.  Column 7, line 17 through 21.  You cite that in your

6       report, right, in the middle of page 14?

7   A.  Right.

8   Q.  And the sentence there that you are citing is "In

9       use a laminated foil is sealed both along the upper

10      edge 22 of the body portion and the lower edge 23 of

11      the body portion"?

12  A.  Yes.

13  Q.  And you are citing that in your report for the idea

14      that the foil lid covers the entirety --

15  A.  That's correct.

16  Q.  -- of the side shown in figure 5?

17  A.  Yes, because I think that's what it was designed

18      for.

19  Q.  Now, I'd like you to please look at page 15 of

20      Mr. MacMahon's transcript?

21  A.  Yes.

22  Q.  Line 14, I directed his attention to column 7, this

23      is line 18, "In use a laminated foil is sealed both

24      along the upper edge 22 of the body portion and the

```
 1        you have in the sample in your hand, and not a foil

 2        that would cover the entire side including the

 3        outlet?"  And his answer was yes, correct?

 4   A.   Yes.

 5   Q.   So do you understand Mr. MacMahon's testimony?

 6   A.   I see it, yeah.

 7   Q.   And you understand that in substance his testimony

 8        is that the patent is describing a foil like what's

 9        shown in Exhibit 81 as opposed to one that covers

10        the entire side?

11             MR. SCHLITZ:  Objection.

12   A.   I see that.

13   Q.   And you stated earlier in your deposition today that

14        if the question came up about the meaning of some

15        language in one of the Kraft patents that

16        Mr. MacMahon was an inventor, you would defer to him

17        on what that language meant, didn't you?

18   A.   Yes, I did.

19   Q.   So would you agree with me that you'd have to defer

20        to Mr. MacMahon that the '234 Patent describes an

21        embodiment in which the foil covers the coffee bed

22        but not the outlet?

23   A.   In this case no, because it doesn't make any sense.

24   Q.   So in this case you won't defer to Mr. MacMahon's
```

1      testimony?

2  A.  No, because I think he's wrong.

3  Q.  Even though he's the inventor?

4  A.  Yeah, absolutely.  I mean I've designed enough of

5      these things in my life where I have to make a heat

6      seal.  Nobody in their right mind would design a

7      thing like that with a disk over a little area, and

8      you'd have -- I mean you would have a narrow rib

9      sealing the bottom of the label over the bed of the

10     coffee base because, you know, I don't think it's

11     designed for it.

12 Q.  Mr. Taylor, are you aware as you sit here today

13     based on the reading that you did that this

14     cartridge in Exhibit 81 was sold commercially for

15     over a year?

16 A.  Yes, I am.

17 Q.  You are aware of that?

18 A.  I am.

19 Q.  Now, I'd like to show you Mr. Bentley's transcript

20     for a moment.  While Charlie is getting that, do you

21     know what the Mark II and Mark III capsules refer

22     to?

23 A.  No, I don't think so because I don't know that I

24     ever saw them in reality.  I think I remember the

1  A.  Yes.

2            MR. RADER:  Objection.  Leading.

3  A.  Yes, it is.

4  Q.  Does the fact that Mr. Rader questioned you at

5       length about statements that Mr. Bentley and

6       Mr. MacMahon expressed about the commercial product,

7       do those statements in any way change your view that

8       this lid -- ledge 23 goes the whole way around?

9  A.  No, it doesn't.  That's what I indicated earlier.

10      This is my independent -- as a design engineer it

11      runs all the way around.  It's designed for one lid.

12 Q.  And your opinion is based on reading the '234

13      Patent; is that correct?

14 A.  Yes.

15 Q.  And your opinion is not based on reading

16      Mr. MacMahon or Mr. Bentley's deposition; is that

17      correct?

18 A.  That's correct.

19 Q.  Let's assume for the sake of argument in this case

20      that the commercial embodiment of the Mark II had

21      two lids, would that change your opinion as to what

22      the '234 Patent shows?

23 A.  No, it wouldn't.

24           MR. SCHLITZ:  Okay.  I have no other

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED, | |
| Plaintiff, | |
| v. | Civil Action No. 07-017-GMS |
| KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and KRAFT FOODS INC., | **REDACTED – PUBLIC VERSION** |
| Defendants. | |

## REPLY IN SUPPORT OF KEURIG'S MOTION *IN LIMINE* NO. 5

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

Well aware from the outset of this case (and from discovery) of the weaknesses in its anticipation theory, Kraft nonetheless made a tactical decision to press anticipation alone, rather than complicating its invalidity defense by raising "alternative" obviousness and enablement theories.[1] With trial less than two months away, Kraft cannot start over and raise these two[2] fact-intensive theories now. Keurig never had any reason to take discovery on these theories because Kraft did not raise them.[3] That expert discovery further clarified the weaknesses in Kraft's anticipation theory is no excuse – Kraft was long aware of Keurig's position and the facts supporting it, which expert testimony merely confirmed.

## I.    <u>Kraft Had the Facts and Contentions Underlying Its Belated Defenses Long Ago</u>.

From the beginning of this case, Kraft has bolstered its anticipation defense by arguing the alleged similarity of Singles to Keurig's '762 patent. <u>E.g.</u> Kraft's Invalidity Contentions (Mot. Ex. 3) at 3 (contention from Kraft that Singles operates "in the same manner as depicted in the '762 patent"). Keurig, in turn, stressed that Singles does not work with same-side piercing. <u>E.g.</u>, Mot. Ex. 5 (Keurig's <u>August 2007</u> response to Kraft's Invalidity Contentions) at 3. Thus, the depositions of Keurig's experts revealed nothing new. Kraft has been armed with the facts and contentions underlying its new enablement theory since August 2007, yet <u>never</u> raised enablement until discovery was over and the parties were working on jury instructions.

---

[1] The proposed enablement theory, for example, is at odds with Kraft's anticipation defense. Kraft contends that the Singles cartridge is similar to an embodiment shown in the '762 patent. Arguing that the '762 patent is not enabled would have made it difficult for Kraft to continue with its (apparently favored) contention that Singles anticipates.

[2] Kraft is nominally seeking to add a belated "written description" defense as well, but its opposition ignores this issue entirely.

[3] Keurig's patent is enabling and non-obvious, although the Court need not reach the merits of those issues to decide this motion. <u>Omegaflex, Inc. v. Parker Hannifin Corp.</u>, 425 F. Supp. 2d 171, 187 (D. Mass. 2006) ("Notwithstanding Plaintiff's strong opposition to Defendant's section 112 allegations on the merits, it would be next to impossible for Plaintiff to overcome the adverse effects of Defendant's late assertion of a written description deficiency.").

Similarly, Kraft learned of Keurig's position that the '234 patent fails to disclose a

"single lid" at the February 2008 deposition of ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ prompted Keurig to serve a request for

admission on February 29 asking Kraft to admit that the '234 patent "does not disclose a lid"

over both chambers. (Ex. 8 ¶ 16). Kraft refused, forcing Professor Slocum to address the issue

in his rebuttal report, which extensively cited ███████████████████ (Ex. 9 at 4-5).

Contrary to Kraft's contention in its opposition, Kraft knew of Keurig's position on this issue in

February – during discovery and long before Professor Slocum's rebuttal report.

## II.    Keurig's Expert Testimony Does Not Suggest an Enablement Problem, and Any Enablement Defense from Kraft Would Have Required Additional Discovery.

Professor Slocum will detail specific reasons why the Singles cartridge (and the

cartridges described in the prior art patents cited by Kraft) do not work with same-side piercing.

Mr. Lingle will explain that Professor Slocum's testing did not yield a beverage. Their

testimony will confirm that Keurig's '762 patent is not anticipated by the prior art.

Kraft therefore seeks to turn at the last minute to the question of enablement, which asks

whether a patent's specification allows a person of skill in the art to make and use the claimed

invention without "undue experimentation." The need for some experimentation based on the

patent's teachings is not fatal under this standard. For example, to be enabled, a patent need not

describe fine-tuning or "production details." Koito Mfg. Co. v. Turn-Key-Tech, LLC, 381 F.3d

1142, 1155-56 (Fed. Cir. 2004) (affirming judgment of enablement).

---

[4] Keurig's opening brief included Exs. 1-5. Exhibits to this brief begin at Ex. 6.

Kraft invites legal error by suggesting (Opp. at 4-5) that Keurig's experts' opinions on anticipation would render the '762 patent *per se* invalid under Section 112." For example, it is immaterial whether the '762 specification specifically describes a "support structure" under the foil. A specification "need not teach, and preferably omits, what is well known in the art." Falko-Gunter Falkner v. Inglis, 448 F.3d 1357, 1365 (Fed. Cir. 2006). Armed with the '762 patent's pioneering same-side piercing concept, one of skill in the art would resolve the routine details of an appropriate support structure.[5] At the very least, enablement presents a factual question about "undue experimentation" that would have required discovery. (Mot. at 4).

## III. Rebutting Kraft's Belated Defenses Would Require Discovery that Keurig Had No Reason to Take.

Both enablement and obviousness are fact-intensive inquiries. Kraft's invalidity contentions said nothing about these defenses, and Keurig had no reason to take discovery preparing to rebut them. This is precisely the point of Heidelberg (enablement) and Convolve (obviousness) – cases that Kraft ignores. The operative question is not whether Kraft's belated defenses would rely "on evidence already produced" (Opp. at 4), but whether Keurig should have to rebut theories on which it never had any reason to take discovery.

By contrast, Charpentier (cited by Kraft) concerned a defense that involved "no factual issues," and the plaintiff had not even claimed prejudice. 937 F.2d 859, 864 (3d Cir. 1991). Moreover, other defendants had previously raised the very same theory. Id. Similarly, Cordis addressed a purely legal issue that the accused infringer had raised at a pretrial conference in an earlier case. 2005 WL 1331172, *5 n.10 (D. Del. June 3, 2005). Kraft's suggestion (Opp. at 5) that "Cordis provided notice of the defense at pretrial" is misleading.

---

[5] By contrast, anticipation does not permit additions or changes to the prior art reference. And Kraft has never suggested that the claimed concept of same-side piercing was obvious. Even Kraft's belated obviousness contention concerns only the "single lid" issue in the '234 patent.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 25, 2008

- 4 -

# EXHIBIT 6

THIS EXHIBIT HAS BEEN
REDACTED IN ITS
ENTIRETY

# EXHIBIT 7



# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

      Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

      Defendants.

Civil Action No. 07-017 GMS

## KEURIG, INC.'S FIRST SET OF REQUESTS FOR ADMISSION TO DEFENDANTS TASSIMO CORP., KRAFT FOODS INC. AND KRAFT FOODS GLOBAL, INC.

Pursuant to Fed. R. Civ. P. 36, Plaintiff, Keurig, Inc. ("Plaintiff" or "Keurig"), hereby requests that Defendants Tassimo Corp., Kraft Foods Inc., and Kraft Foods Global, Inc. (collectively "Defendants" or "you") respond to the following Requests for Admission within thirty (30) days from the date of service hereof.

### INSTRUCTIONS AND DEFINITIONS

1.    The term T-DISC means a filter-type (e.g., PDONT 172) or espresso-type (e.g., PDONT 175) Tassimo Disc.

2.    All bold-faced terms and phrases herein are as defined in the Court's Order Construing the Terms of U.S. Patent No. 6,607,762 ("the '762 patent"), dated January 23, 2008.

## REQUESTS FOR ADMISSION

1.      Admit that a T-DISC is a beverage filter cartridge.

2.      Admit that a T-DISC includes an outer container having an access opening.

3.      Admit that a T-DISC includes a filter element received in and configured and arranged to subdivide the interior of the container into **first and second chambers.**

4.      Admit that ground coffee is a soluble beverage medium.

5.      Admit that tea is a soluble beverage medium.

6.      Admit that a T-DISC includes a soluble beverage medium stored in the first chamber.

7.      Admit that a T-DISC includes a lid closing the access opening, the lid having a first section overlying the first chamber and a second section overlying the second chamber.

8.      Admit that a T-DISC includes a lid closing the access opening, the first section of the lid being **piercable to accommodate an inflow of liquid** into the first chamber for infusion with the beverage medium to produce a beverage.

9.      Admit that a T-DISC includes a filter element being permeable to liquid to accommodate a flow of the beverage from the first chamber into the second chamber.

10.     Admit that a T-DISC includes a lid closing the access opening , the second section of the lid being **piercable to accommodate an outflow of the beverage** from the second chamber to the exterior of the cartridge.

11.     Admit that a T-DISC includes a lid and an outer container having an access opening, wherein the lid has less resistance to being pierced as compared to the resistance to piercing of the outer container.

12.     Admit that a T-DISC includes a lid that is impermeable to liquids and gases.

13.  Admit that you are unaware of any product made, sold, or offered for sale by Keurig covered by one or more claims of the '762 patent.

14.  Admit that you are unaware of any product made, sold, or offered for sale by a licensee of Keurig covered by one or more claims of the '762 patent.

15.  Admit that U.S. Patent No. 4,853,234 does not disclose the use of a single piece of foil covering both the outlet 37 and the bed 21 as shown in Figure 5 of the '234 patent.

16.  Admit that U.S. Patent No. 4,853,234 does not disclose a lid having a first section overlying a first chamber and a second section overlying a second chamber.

17.  Admit that U.S. Patent No. 4,853,234 does not anticipate the '762 patent.


YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Karen E. Keller

OF COUNSEL:

Michael A. Albert (BBO #558566)
Michael N. Rader (BBO #646990)
Laura Topper (BBO #652364)
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000

John W. Shaw (No. 3362)
jshaw@ycst.com
Karen E. Keller (No. 4489)
kkeller@ycst.com
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Buidling
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Dated:  February 29, 2008

*Attorneys for Plaintiff Keurig, Incorporated*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on February 29, 2008, I caused copies

of the foregoing document to be served upon the following counsel in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

Richard L. Horwitz, Esquire
*rhorwitz@potteranderson.com*
David E. Moore, Esquire
*dmoore@potteranderson.com*
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

### BY E-MAIL

David Schlitz, Esquire
*david.schlitz@bakerbotts.com*
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ KAREN E. KELLER

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on September 2, 2008, a true and

correct copy of the foregoing document was electronically filed with the Clerk of the Court using

CM/ECF which will send notification that such filing is available for viewing and downloading to

the following counsel of record:

Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
David E. Moore, Esquire [*dmoore@potteranderson.com*]
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

Additionally, I hereby certify that on September 2, 2008, copies of the foregoing

document were served by e-mail on the above-listed counsel of record and on the following non-

registered participants in the manner indicated below:

## BY E-MAIL

David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
John W. Shaw (No 3362)  [*jshaw@ycst.com*]
Adam W. Poff (No. 3990) [*apoff@ycst.com*]
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

# EXHIBIT 21

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT DELAWARE

KEURIG, INCORPORATED,

    Plaintiff,

    v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 07-17 (GMS)

**JURY TRIAL DEMANDED**

**PUBLIC VERSION**

## DEFENDANTS' MOTION IN LIMINE TO LIMIT EXPERT TESTIMONY OF DR. ALEXANDER SLOCUM

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: August 4, 2008
Public Version Dated: August 11, 2008
877077 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods, Inc. (collectively "Kraft"), by counsel, states the following in support of its Motion *in Limine* to limit the Expert Testimony of Dr. Alexander Slocum, serving as a technical expert for Plaintiff Keurig, Incorporated ("Keurig").[1]   In particular, Kraft respectfully moves to preclude any testimony: (1) based upon or relying upon the inadmissible opinions of Ted Lingle related to his specialized definition of claim term "beverage" in the asserted claims of U.S. Patent No. 6,707,762 ("the '762 Patent") as well as Mr. Lingle's inadmissible opinion applying his claim construction of the term "beverage" to the prior art; and (2) regarding the relative aspect ratios of beverage filter cartridges.

## ARGUMENT

### I.    Dr. Slocum Cannot Rely Upon the Inadmissible Opinions of Ted Lingle



In his Rebuttal report and at his deposition, Dr. Slocum relies upon the opinions of Ted Lingle regarding the definition of the claim term beverage.

In his Rebuttal report, Dr. Slocum states



But this statement was based on Mr. Lingle's inadmissible opinion he did

In his deposition, Dr. Slocum acknowledges that:

> Well, my understanding for the term beverage -- because I'm not
> an expert in that area, I relied -- the Court itself didn't give me an
> exact definition of what beverage is.  I have to refer back explicitly

---

[1] Pursuant to D. Del. LR 7.1.1, the parties met and conferred, and Plaintiff will oppose the motion.

> to that document, but in that respect, I relied on Mr. Lingle, who is
> an acknowledged expert in the field of coffee beverages.

Slocum Dep. Tr. (Ex. 3) at 8. Accordingly, Dr. Slocum reveals Keurig's gambit of using expert

testimony to usurp the Court's role in claim construction in view of Kraft's prior art, which

clearly anticipates the '762 Patent under the Court's *Markman* Order. As discussed in a

companion motion *in limine*, Mr. Lingle should be precluded from testifying at trial.

Accordingly, Dr. Slocum should be barred from testifying at trial with regard to Mr. Lingle's

opinion or from relying upon Mr. Lingle's opinion.

## II. Dr. Slocum Failed to Identify His Aspect Ratio Theory in Both His Expert and Rebuttal Reports

Kraft is relying upon the Singles cartridge as anticipatory prior art. In all material

respects the Singles cartridge is virtually identical to the only disclosed embodiment in the

provisional application from which the '762 Patent claims priority and to the first disclosed

embodiment in the '762 Patent.

In this litigation, Keurig has maintained that the lid of the Singles cartridge is not

piercable to accommodate an inflow of liquid. ■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■ But neither does the disclosure of the '762 Patent. The

specification of the '762 Patent states:

> The lid material has a lesser resistance to being yieldably pierced
> as compared to the resistance of the container bottom, and is thus
> less prone to inward distortion with accompanying buckling of the
> container sidewall. The net result is a cleaner puncture and in
> improved seal around the outlet probe.

'762 Patent, Col. 2, Lines 14-20.  The figures for the two disclosed embodiments do not disclose a support structure against which to press a gasket or other device to form a seal.



FIG. 5

FIG. 13

Thus, Dr. Slocum's opinion as to why Kraft's asserted prior art is not suitable for same-side piercing, if correct, would also apply to the '762 Patent, thereby rendering the asserted claims invalid for lack of enablement.  Realizing the dilemma his opinion placed Keurig in, at his deposition, Dr. Slocum on the spot abandoned his argument regarding the need for a support structure and invented a new theory why Kraft's prior art would not invalidate the '762 Patent's claims.  He raised his new "aspect ratio" theory.

He proceeded to opine that the '234 Patent and Singles cartridge, as well as the first embodiment of the '762 Patent, are not suitable for same side piercing because the cartridges have a flat aspect ratio.  Slocum Dep. Tr. (Ex. 3) 27-28, 31-32.  Dr. Slocum then asserted that a cartridge must have a one-to-one aspect ratio, like the embodiment shown in Figs. 7-9 of the '762 Patent, to directly inject fluid into the coffee bed for same side piercing.  *Id.* at 27.  But nowhere in his Expert or Rebuttal report does Dr. Slocum assert that Kraft's prior art fails to anticipate the '762 Patent due to its aspect ratio, nor does he discuss that for the same reason the first embodiment of the '762 Patent is inoperative.  Plain and simple, Kraft was ambushed by Dr. Slocum at his deposition.

Rule 26 requires that expert reports "must contain: a *complete* statement of *all* opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B) (emphases added). Keurig's violation requires the exclusion of these previously undisclosed opinions. Rule 37, which requires the exclusion of all opinions not disclosed as required by Rule 26, states:

> If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(l); *see also Inline Connection Corp. v. AOL Time Warner, Inc.*, 472 F. Supp. 2d 604, 612 (D. Del. 2007); *Johnson v. Vanguard Mfg., Inc.*, 34 Fed. Appx. 858, 859 (3d. Cir. 2002) (Trial court did not abuse its discretion by excluding expert opinion testimony not included in report). Accordingly, Dr. Slocum should not be permitted to testify at trial regarding the previously undisclosed aspect ratio theory.

Dr. Slocum's raised the issue of "aspect ratio" on his own accord. Neither Kraft nor its technical expert, Malcolm Taylor, discussed the aspect ratio of beverage cartridges. To the contrary, Dr. Slocum simply sprung his revised opinion upon Kraft when questioned as to why he believed Kraft's prior art did not anticipate the asserted claims of the '762 Patent. Thus, Dr. Slocum was not prompted by Kraft when presenting his new opinions with regard to invalidity.

Moreover, Dr. Slocum's "aspect ratio" theory completely contradicts the originally filed disclosure of the '762 Patent, which shows only the first embodiment of the '762 that looks just like the Singles cartridge. *See* U.S. Provisional Patent Application No. 60/183,569 (Ex. 4), Figs. 1-4. Dr. Slocum testified that the first embodiment of the '762 Patent showing a flat aspect ratio cartridge would not produce a beverage. Slocum Dep. Tr. (Ex. 3) at 31-32. He then opines that the cartridge illustrated in Figures 6-8 of the '762 patent is the "actual useful embodiment"

because its "aspect ratio is more kind of one-to-one." *Id.* at 27. But the "useful embodiment" was not disclosed until the filing date of the nonprovisional application -- February 13, 2001. Thus, allowing Dr. Slocum to present such new opinion testimony prejudices Kraft as it permits Keurig to present evidence narrowing the '762 Patent's scope to avoid Kraft's prior art, without giving Kraft an opportunity to present legal defenses related to the loss of priority.

## CONCLUSION

For the foregoing reasons, Kraft respectfully requests that the Court grant this Motion *in Limine* to limit Dr. Slocum's testimony at trial.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Dated: August 4, 2008
Public Version Dated: August 11, 2008
877077 / 31118

By: */s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 11, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on August 11, 2008, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: /s/ David E. Moore
     Richard L. Horwitz
     David E. Moore
     Potter Anderson & Corroon LLP
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     P.O. Box 951
     Wilmington, DE 19899-0951
     (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

1    UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF DELAWARE
     - - - - - - - - - - - - - - - - - - - - - - - x
3    KEURIG, INCORPORATED,
4                    Plaintiff,
5        v.
6    KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
     KRAFT FOODS INC.,
7
                     Defendants.
8
     Civil Action No. 07-CV-0017-GMS
9    - - - - - - - - - - - - - - - - - - - - - - - x
10
11
12       VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM
13                 Wednesday, June 11, 2008
14                  9:10 a.m. to 5:00 p.m.
15             WOLF, GREENFIELD & SACKS, P.C.
16                  600 Atlantic Avenue
17                 Boston, Massachusetts
18
19         Reporter:  Marianne R. Wharram, CSR/RPR
20
21
22
23       ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24              New York, New York 10022
                     212-750-6434
25                   REF: 87765

1            SLOCUM

2    construction, or claim construction, what different

3    terms mean.  That's what I have to ultimately abide

4    by is what is the Court's claim construction.

5        Q.  In your expert report, you opine about the

6    meaning of the word beverage; is that correct?

7            MR. RADER:  Objection to the form.  You

8    can answer.

9        A.  Well, my understanding for the term

10   beverage -- because I'm not an expert in that area,

11   I relied -- the Court itself didn't give me an

12   exact definition of what beverage is.  I have to

13   refer back explicitly to that document, but in that

14   respect, I relied on Mr. Lingle, who is an

15   acknowledged expert in the field of coffee

16   beverages.  And then, when I actually ran the

17   various tests in various scenarios, I also, because

18   I'm a fairly avid coffee drinker, would then taste

19   the stuff made by the various ways I did.

20       Q.  (BY MR. SCHLITZ)  But when you read the

21   patent, what was your understanding?  Before --

22   when did you speak to Mr. Lingle?

23       A.  I first met Mr. Lingle a couple of months

24   ago when I did my extensive tests with the hot

25   water to actually attempt to create the beverage.

```
1                          SLOCUM
2    referring to aspect ratio, the length and the width
3    of a coffee bed and what's those -- what are those
4    proportions with respect to the depth between where
5    you're putting in the fluid and where it wants to
6    exit.
7         Q.  All right.
8         A.  Now, all these flat cartridges, I would
9    say, have a flat aspect ratio.  The depth is
10   shallow.
11        Q.  When you say these, you were pointing to
12   something.
13        A.  I'm sorry.  The Singles cartridges or the
14   cartridge from the '234 patent.
15        Q.  Okay.
16        A.  So when you go -- or the embodiment of
17   Figure -- nominally, Figure 4.
18        Q.  Right.
19        A.  Now, compare those proportions to what I
20   think is the actual useful embodiment of Figures 6,
21   7 and 8 of the '762 patent, which is that aspect
22   ratio is more kind of one-to-one, the depth with
23   here, and in the actual, these flat type
24   cartridges, it's like three or four-to-one is the
25   characteristic aspect ratio.  The problem with just
```

1                          SLOCUM

2      taking something of this aspect ratio and piercing,

3      in the language of the patent, and then injecting

4      your fluid is that the water, which comes in at a

5      reasonable pressure, shoots right through the

6      coffee, or whatever your drink is, into the filter

7      and then rushes out your filter, so you don't get

8      good wetting -- that's wetting, excuse me -- of the

9      bed of -- and you end up putting through the

10     required amount of fluid to fill your cup, but it

11     really only acts on a small region of coffee, which

12     is why I think it comes out so -- so weak and why I

13     said yeck, it doesn't really taste like coffee.

14     When you have a -- and that's why I believe the

15     '234 and the Singles, they both have this

16     manifolding system --

17          Q.  All right.

18          A.  -- to evenly wet.  And I opened up

19     cartridges from the Singles machine after they were

20     used and I looked at the bed and I opened up the

21     cartridges after I would do my test and I looked at

22     the bed, and the tests I ran, you would always

23     burrow a hole.  And I can discuss more in terms of

24     scientific principles of aspect ratios if you want.

25          Q.  Please do.

1                         SLOCUM

2     you correct -- and please correct me if I'm

3     wrong -- are you of the opinion that because of the

4     aspect ratio of the first embodiment, it wouldn't

5     work?  Are we talking about the patent-in-suit?

6         A.  Okay, so if I'm looking at this guy, I

7     don't think that's a very -- now, they show two

8     nozzles here, but I still think you're going to get

9     burrowing between the two, and I don't think this

10    is a very useful embodiment, personally.

11        Q.  You said not useful.  I mean, would it

12    work?

13        A.  Well, I didn't construct this.  I just used

14    the Singles cartridge --

15        Q.  Right.

16        A.  -- and I did the Rychiger one, which is

17    back.  I'm sure I got some -- actually, I know I

18    got some flow into the manifold, but nominally,

19    like you said, if we ignore the manifold, which I'm

20    able to do by keeping it blocked, I never got what

21    I would call or Mr. Lingle called a good beverage,

22    so with that as a model of three, four, five, I --

23    I don't think this is a very good embodiment.

24        Q.  Now -- well, you say it's not very good.

25    Would it produce a beverage, in your opinion?

```
 1                        SLOCUM
 2       A.   Based on my model, I don't think three,
 3   four, five makes a beverage.
 4       Q.   Now, when you were talking about the aspect
 5   ratio, and with regard to Figure 13, okay --
 6       A.   Correct.
 7       Q.   -- you say because -- in Figure 13, are you
 8   aware that the -- well, in what orientation would
 9   you have to use Figure 13?
10       A.   Um, I actually think it would -- it would
11   work -- this vertical orientation -- it would work
12   vertical orientation where, for example -- and it
13   would work in several.
14       Q.   Okay.
15       A.   It would work vertical orientation where
16   the gravity vector points -- I'm trying to figure
17   out how I'm going to do this with the video thing,
18   but where the area of the gravity vector would be
19   located on the lid.
20       Q.   Would the foil be down or up or sideways?
21       A.   That's a better way of putting it.   The
22   foil would be -- down would work.   I believe it
23   would work with the foil vertical.
24       Q.   Right.
25       A.   With the foil horizontal, or up, excuse me,
```

# EXHIBIT 4

5446
N-Cup

PROVISIONAL PATENT APPLICATION

OF

NICHOLAS G. LAZARIS

AND

RODERICK H. BEAULIEU

FOR

BEVERAGE FILTER CARTRIDGE

5446
N-Cup

This invention relates generally to beverage filter cartridges of the type described in U.S. Patent No. 5,840,189, the disclosure of which is herein incorporated by reference.

A preferred embodiment of the invention is disclosed in the accompanying drawings,

5  wherein:

Figure 1 is a top plan view of the beverage filter cartridge;

Figure 2 is a longitudinal sectional view taken along line 2-2 of Figure 1;

Figure 3 is an exploded perspective view of the filter cartridge components; and

Figure 4 is a view similar to Figure 2 showing the beverage filter cartridge in use during a

10  brewing cycle.

Referring now to the drawings, a beverage filter cartridge in accordance with the present invention is generally depicted at 10. The cartridge includes an outer container 12, a filter element 14 and a lid 16.

15  The outer container 12 is generally tray-shaped, with a bottom wall 12a, a side wall 12b, and a series of laterally spaced support ribs 12c projecting upwardly from the bottom wall and extending in parallel relationship in the lengthwise direction of the container.

As can be best seen in Figure 2, the ribs 12c join the side wall 12 as at 18, and curve downwardly and then extend in parallel relationship to the bottom wall before again curving

20  upwardly to terminate as at 20, thereby forming an open exit chamber B.

The filter element 14 is formed from sheet material shaped to conform to the shape of the upper edges of the support ribs. The filter element is received in the container 12, with the edges 14a of its ends overlapping and sealed to the upper edge of the container side wall 12b, and with the edges 14b of its sides overlapping and sealed to outermost ribs 12c which project integrally

2



5446



FIG. 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KEURIG, INCORPORATED,<br><br>       Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>       Defendants. | Civil Action No. 07-017-GMS |

**KEURIG'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*
TO PRECLUDE EXPERT TESTIMONY OF DR. ALEXANDER SLOCUM**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

Kraft's motion *in limine* to limit the testimony of Keurig's engineering expert, MIT

Professor Alexander Slocum, is based on several erroneous assumptions.

First, Kraft incorrectly assumes that the testimony of Keurig's coffee expert Ted Lingle[1]

is inadmissible, and that Professor Slocum therefore cannot reference it. As explained in

Keurig's opposition to Kraft's companion motion *in limine* (D.I. 107), however, Mr. Lingle's

testimony is proper and Professor Slocum is entitled to rely on it. When a patented invention

encompasses multiple technical disciplines, it is addressed to people with skills in each of those

fields. E.g., Enzo Biochem., Inc. v. Calgene, Inc., 188 F.3d 1362, 1373 (Fed. Cir. 1999) (patents

involving "distinct arts" are to be assessed from the perspective of "the adepts of each"). In any

event, Professor Slocum made his own observations about the liquid in question – independent

of Mr. Lingle – that he explained in both his expert report and his deposition. Professor Slocum

is entitled to share those observations with the jury.

Kraft also argues that Professor Slocum should not be permitted to mention the Singles

cartridge's "aspect ratio" (i.e., the relation of its depth to its other dimensions). Kraft contends

that his deposition was the first time he stated that the Singles cartridge's shallowness prevents

satisfactory brewing with same-side piercing (because the water, injected through the foil lid,

burrows a hole through the thin coffee bed). But Professor Slocum explained the "burrowing"

phenomenon in his expert report. His use of the phrase "aspect ratio" in response to questioning

at deposition was merely another way of explaining the burrowing problem. Expert reports need

not use the exact same words that the expert ultimately utters at trial, so long as the concepts

expounded at the deposition (and at trial) are fairly disclosed in the report, as they were here.

---

[1] Mr. Lingle, a recognized expert in coffee brewing and "cupping" (tasting) will testify that the liquid produced by Kenco Singles cartridges in a same-side piercing configuration is not a "beverage" as required by claim 1 of Keurig's '762 patent.

## I.    BACKGROUND

Professor Slocum's rebuttal report outlines numerous flaws in the invalidity theories that Kraft and its engineering expert Malcolm Taylor have articulated.  Much of Professor Slocum's analysis concerns the Singles cartridge, the alleged prior art on which Kraft has focused throughout the case.

For example, Professor Slocum notes that the foil lid on a Singles cartridge (which is designed for conventional <u>opposite</u>-side piercing, not same-side piercing as in the '762 patent) lacks a support structure against which to press a gasket to form a reliable seal.  <u>See</u> Slocum Rebuttal Report (Ex. A) at 21.  Attempting to pierce the foil lid to accommodate an inflow of hot water therefore leads to catastrophic lid failure as Professor Slocum's tests showed.  <u>Id.</u> at 22, 25.  As Professor Slocum also notes in his report, this is <u>precisely</u> what Kraft itself told the European Patent Office when confronted with a Singles patent as prior art to its own patent application on the T-Disc (the Kraft product accused of infringement in this case).  <u>Id.</u> at 21-22.

Professor Slocum's testing of Singles cartridges also revealed another problem with any attempt to use them in a same-side piercing configuration.  Whatever water did traverse the foil lid into the coffee bed would "shoot[] through the coffee grounds and literally burrow[] a hole" through the coffee – rather than dispersing through the coffee bed and properly extracting the soluble coffee solids in the way the cartridge was designed to be used.  <u>Id.</u> at 25.  The burrowing problem led to production of a foul-tasting liquid that simply was not coffee.  Professor Slocum concluded that the liquid would not qualify as a beverage.  <u>Id.</u> at 25-26.

Indeed, the liquid was so appalling that Professor Slocum testified, "if I ever bought that anywhere, I'd take it right back and say I want my money back or a ... real cup of coffee." See Slocum Depo. (Ex. B) at 209. Mr. Lingle, an expert with over three decades of experience in the coffee industry, analyzed the liquid and concurred that it was not a beverage. (Ex. A at 25).

II.    **ARGUMENT**

A.    **Professor Slocum is Entitled to Rely on Mr. Lingle's Testimony.**

The first half of Kraft's motion is moot because it turns on the incorrect premise that Mr. Lingle's opinions are "inadmissible." (D.I. 106 at 1). Kraft argued that point in D.I. 107, and Keurig's opposition explains why Mr. Lingle's testimony plainly is admissible. Mr. Lingle is a recognized expert in growing, brewing, and "cupping" (tasting) coffee, and his testimony will address a question of fact on which he has undisputed expertise (i.e. whether the liquid created through same-side piercing of a Singles cartridge is a coffee beverage).

B.    **Kraft Does Not Challenge Professor Slocum's Entitlement to Describe His Own Independent Observations of the Singles Liquids.**

Professor Slocum personally observed and tasted the Singles liquids obtained from the various tests described in his rebuttal report, and Keurig is entitled to ask him to describe his observations for the jury. Professor Slocum's rebuttal report lists the objective measurements of "total dissolved solids" for those liquids, as well as Professor Slocum's sensory observations, and includes several photographs. (Ex. A at 23, 26). Kraft's counsel extensively questioned Professor Slocum regarding his observations at his deposition.

Notably, Kraft bears the burden of proving, by clear and convincing evidence, that the Singles cartridges produce a beverage when used in a same-side piercing configuration. Yet Kraft has offered no evidence on this point. Kraft elected not to retain a coffee expert, and its technical expert Mr. Taylor failed even to taste any of the liquids that he prepared in his tests.

- 3 -

See Taylor Depo. (Ex. C) at 107. By contrast, as noted above, Professor Slocum carefully evaluated the liquids and reported on his observations in his expert report. While Professor Slocum is not a coffee expert like Mr. Lingle, and will not duplicate Mr. Lingle's expert testimony, he is entitled to describe his own observations as a skilled engineer performing his experiments and observing the resulting liquids. Professor Slocum's observations of the Singles liquids are not subject to attack by Kraft and are admissible at trial.

### C.    Professor Slocum is Entitled to Testify Regarding the Singles Cartridge's Aspect Ratio, Which Merely Explains His Description of the "Burrowing" Phenomenon in His Rebuttal Expert Report.

Professor Slocum's testimony regarding the "aspect ratio" of the Singles cartridge clearly complies with Rule 26(a)(2)(B) because it is merely an explanation of the burrowing phenomenon that he disclosed in his rebuttal expert report.[2] As noted above, Professor Slocum's report explains that in a shallow Singles cartridge, the pressurized water "shoots through the coffee grounds and literally burrows a hole." (Ex. A at 25). When pressed for further details about this phenomenon at his deposition, Professor Slocum explained the connection between the "shallowness" (or flat "aspect ratio") of the cartridge and the burrowing problem:

> The problem with just taking something of this aspect ratio and piercing ... and then injecting your fluid is that the water, which comes in at a reasonable pressure, shoots right through the coffee, or whatever your drink is, into the filter and then rushes out your filter, so you don't get good wetting….And I opened up cartridges…after they were used and….you would always burrow a hole. And I can discuss more in terms of scientific principles of aspect ratios if you want.

(Ex. B at 27-28) (emphasis added).

_____

[2] Professor Slocum's rebuttal report describes both the "sealing" and "burrowing" problems that occur when Singles cartridges are used in a same-side piercing configuration. (Ex. A at 21, 25). Kraft's suggestion in its motion (at 3) that Professor Slocum invented the latter at his deposition is wrong. Likewise, Kraft's suggestion (at 3) that Professor Slocum's testimony raised enablement issues is baseless – indeed, prior to filing its motion in limine (more than two months after Professor Slocum's deposition), Kraft never even mentioned enablement. It would be far too late for Kraft to raise such a defense this close to trial.

Professor Slocum also stressed the connection between flat aspect ratios and burrowing several more times during the deposition. Id. at 152, 248-249.[3]

Kraft's motion tries to suggest that the flat "aspect ratio" of the Singles cartridge, and its consequences for the liquid produced via same-side piercing, were new concepts introduced in Professor Slocum's deposition. That simply is not true. Professor Slocum described the burrowing issue in his report. He amplified on it at deposition by further explaining the relationship between the cartridge's flat aspect ratio and burrowing. Disclosures under Rule 26(a)(2)(B) need not include each and every word that an expert ultimately uses at trial to explain his opinion. Indeed, it is perfectly permissible for trial testimony to "elaborate on" or provide "reasonable explanation" of the opinions contained in the expert report. Forest Labs., Inc. v. Ivax Pharms., Inc., 237 F.R.D. 106, 113, 116 (D. Del. 2006) (overruling defendant's objection to expert's testimony). See also Boehringer Ingelheim Int'l GMBH v. Barr. Labs., Inc., C.A. No. 05-700, 2008 WL 2756127, at *3 (D. Del. July 15, 2008) (expert's trial testimony was "a permissible synthesis of and/or elaboration on" the opinions in his report). Discussion of "aspect ratios" by Professor Slocum at trial would be entirely consistent with his expert report (and deposition) and therefore should be allowed.

## III.  CONCLUSION

For the above reasons, the Court should deny Kraft's motion *in limine* to limit Professor Slocum's expert testimony.

---

[3] Professor Slocum's detailed explanation of "aspect ratios" during his deposition provided Kraft yet further notice on the issue. Preclusion would therefore be inappropriate. Forest, 237 F.R.D. at 110-11 (rejecting challenge to admission of expert opinion following bench trial where expert report itself – even absent further explanation through deposition testimony – "sufficiently disclosed the opinions").

- 5 -

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

Exhibit A

CONFIDENTIAL – ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

       Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

       Defendants.

Civil Action No. 07-017 (GMS)

**CONFIDENTIAL
ATTORNEYS' EYES ONLY**

**RULE 26(A)(2)(B) REBUTTAL EXPERT REPORT OF
PROFESSOR ALEXANDER SLOCUM
<u>MAY 13, 2008</u>**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

64.    My tests of Lambert cartridges revealed that at least as much (and often much more) liquid exits through the inlet hole as through the outlet nozzle.  While the liquid that exits through the outlet nozzle can be captured in a cup, the liquid that exits through the inlet hole cannot easily be captured and instead oozes out of the hole, dripping all over the cartridge and onto the floor.  (Were the cartridge mounted inside a brewer, the coffee would of course drip into the brewer.)

65.    My tests of both Lambert and Rychiger cartridges also revealed another set of fundamental problems with creation of an inlet through the foil.  The foil over the coffee bed lacks any kind of support structure against which to press a gasket or other device to form a seal. (By contrast, the Tassimo T-Discs that are accused of infringement in this case are provided with a support structure, such that their lids are piercable to accommodate an inflow.)

66.    In a submission that I have reviewed, Kraft itself explained to the European Patent office ("EPO") that, because a patent describing the Singles cartridge does not describe an appropriate support structure like that of the T-Disc, its lid is not piercable to accommodate an inflow of water to brew a beverage.  Specifically, Kraft submitted a patent application for a claim covering

> A cartridge (1) containing one or more beverage ingredients (200) and being formed from substantially air- and water-impermeable materials, the cartridge defining a storage chamber (130; 134) containing the one or more beverage ingredients and a manifold chamber (16), the cartridge comprising an opening (12) through which the one or more beverage ingredients can be filled into the storage chamber, the opening being closed by a lid (5) having a first portion overlying the manifold chamber and a second portion overlying the storage chamber, **characterised in that** the first portion of the lid is piercable in use to accommodate an inflow of an aqueous medium into the manifold chamber and the lid is piercable in use to accommodate an outflow of beverage formed from interaction of the aqueous medium and the one or more beverage ingredients in the storage chamber.

(EP 1440913).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

67.     The EPO initially rejected this claim on the theory that the Singles-type cartridge disclosed in a prior art Kraft patent described all of these features.  In particular, the EPO reasoned that the disclosed cartridge technically included a lid with a "first portion overlying the manifold chamber" wherein that portion was "pierceable to accommodate an inflow of an aqueous medium into the manifold chamber" even though the cartridge was designed to be pierced on the opposite side for the inflow. (12/2/04 Communication Regarding EP Application No. 04 250 384.7).

68.     Kraft successfully responded by emphasizing that the cartridge lacked a "suitable element" against which the inlet piercer could abut (so as to avoid "a large degree of leakage") and therefore did not have a lid that was "suitable for being pierced to accommodate an inflow of aqueous medium into the manifold chamber." (6/9/05 Response).

69.     I agree with this analysis and in fact confirmed it empirically.  When attempting to pierce the foil lid over the Kenco coffee bed to create an inflow, with different needles, at a variety of pressures, and in a variety of orientations, I experienced spewing of coffee and liquid that was difficult to control, and danger of burns.  On one occasion I was burned by the hot liquid flowing over my rubber glove and onto my forearm.

70.     The following photograph is one example of the dangerous conditions that resulted when I attempted to pierce the foil side of a Singles cartridge to form an inlet for hot water.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



71.     The following table summarizes a series of tests that I performed, in conjunction with Ted Lingle, a coffee expert retained by Keurig.

| Experiment | Orientation of Cartridge | Pressure | Time to Dispense 180 ml | Total Dissolved Solids |
|---|---|---|---|---|
| 1 | Foil down, with plate | 3.2 psi | 19 seconds | 615 ppm |
| 2 | Foil down, with plate | 15.7 psi | 12 seconds | 635 ppm |
| 3 | Foil up, with plate | 14.7 psi | 27 seconds | 865 ppm |
| 4 | Foil up, with plate | 15.4 psi | 8.2 seconds | 629 ppm |
| 5 | Foil up, with plate | 3.4 psi | 1 minute 6 seconds | 674 ppm |
| 6 | Vertical, with plate; outlet nozzle at the bottom | 3.1 psi | 19.2 seconds | 802 ppm |
| 7 | Vertical, with plate; outlet nozzle at the bottom | 15 psi | 13.72 seconds | 769 ppm |
| 8 | Foil down, with plate; sealing tab removed | 15 psi | 9.13 seconds | 220 ppm |
| 9 | Foil down, with plate; sealing tab removed | 3 psi | 18.67 seconds | 327 ppm |

CONFIDENTIAL – ATTORNEYS' EYES ONLY

76.    The tests revealed that the cartridge structure would not permit me to obtain a satisfactory seal at the inlet.  Trying a variety of techniques, for example applying a metal plate to the foil side of the cartridge, and clamping the inlet hose with a pair of pliers, I was able to reduce but not eliminate the problem of water exiting the system at the inlet without entering the cartridge.  In some cases, for example at higher pressures like those at which Singles cartridges are designed to operate, the spewing water became an even more serious problem, posing risk of burns as previously noted.

77.    The tests also showed that even the water that did make it into the cartridge with the ground coffee did not brew a coffee beverage.   Instead, the pressurized liquid (bypassing the manifold) shoots through the coffee grounds and literally burrows a hole:



78.    The result was a liquid (in Mr. Taylor's language, a "coffee liquor") that I understand Mr. Lingle, an expert coffee "cupper," does not consider a beverage within the meaning of the '762 patent.  Although not a trained "cupper," I am an avid coffee drinker and I concur that the liquids produced would not qualify as a beverage:

CONFIDENTIAL – ATTORNEYS' EYES ONLY






| Experiment 2 | Experiment 8 |

79.     To avoid risk of burns I performed another series of experiments using cold water. In this series of experiments, I tried not only the Singles piercer, but a thin (1/8" outside diameter) metal needle piercer akin to a "hypodermic" type needle.  I ran the experiments at about 22 psi (within the expected pressure range for Singles cartridges)[12] and with a variety of parameters, including:

- Lambert-type and Rychiger-type cartridges

- orientation of the cartridge (vertical, foil up, and foil down); and

- with and without a metal plate covering the foil side (with a hole for the inflow piercer).

80.     Consistent with my results described earlier in this report, I found that the Singles cartridges failed to exhibit appropriate consistent sealing capability at the inlet, and therefore were not able to accommodate an inflow to brew a beverage as required by the '762 patent claims.  The following photographs are representative of the tests:

---

[12] I did not perform the hot water testing at 22 psi because the experiments would have posed an unacceptably high risk of burns from sputtering and spewing scalding water.

Exhibit B

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE
- - - - - - - - - - - - - - - - - - - - - - - - x
KEURIG, INCORPORATED,

                    Plaintiff,

      v.

KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
KRAFT FOODS INC.,

                    Defendants.

Civil Action No. 07-CV-0017-GMS
- - - - - - - - - - - - - - - - - - - - - - - - x




        VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM

                Wednesday, June 11, 2008

                9:10 a.m. to 5:00 p.m.

            WOLF, GREENFIELD & SACKS, P.C.

                600 Atlantic Avenue

                Boston, Massachusetts


        Reporter:  Marianne R. Wharram, CSR/RPR




        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
              New York, New York 10022
                  212-750-6434
                  REF: 87765

SLOCUM

1  philosophies or whatever why this type of approach
2  for this type of aspect ratio cartridge I -- is my
3  opinion fundamentally doesn't work well, if at all.
4  If you delete the manifolds and you just do
5  same-side piercing and with respect to can you
6  actually same-side pierce something like this
7  without making a mess, that's a separate --
8  separate issue, but just in terms of making a
9  beverage, and I believe, as I described when I
10  wrote my report, that when I run tests, I don't get
11  a beverage in the definition of my palate or
12  Mr. Lingle's expert opinion.
13      Q.  Let me understand what you just said.
14  First of all, when you said a cartridge, a rati--
15  what did you --
16      A.  Aspect ratio.
17      Q.  What is an aspect ratio of a cartridge?
18      A.  Okay, so when you -- when you want to
19  describe the aspect ratio of something -- so if I
20  can have a pen?
21      Q.  Here's a pen.
22      A.  It's easier for me to point with this than
23  a finger.  This is a little flatter than your
24  typical cartridge, but specifically, when I'm

SLOCUM

1  referring to aspect ratio, the length and the width
2  of a coffee bed and what's those -- what are those
3  proportions with respect to the depth between where
4  you're putting in the fluid and where it wants to
5  exit.
6      Q.  All right.
7      A.  Now, all these flat cartridges, I would
8  say, have a flat aspect ratio.  The depth is
9  shallow.
10      Q.  When you say these, you were pointing to
11  something.
12      A.  I'm sorry.  The Singles cartridges or the
13  cartridge from the '234 patent.
14      Q.  Okay.
15      A.  So when you go -- or the embodiment of
16  Figure -- nominally, Figure 4.
17      Q.  Right.
18      A.  Now, compare those proportions to what I
19  think is the actual useful embodiment of Figures 6,
20  7 and 8 of the '762 patent, which is that aspect
21  ratio is more kind of one-to-one, the depth with
22  here, and in the actual, these flat type
23  cartridges, it's like three or four-to-one is the
24  characteristic aspect ratio.  The problem with just

SLOCUM

1  taking something of this aspect ratio and piercing,
2  in the language of the patent, and then injecting
3  your fluid is that the water, which comes in at a
4  reasonable pressure, shoots right through the
5  coffee, or whatever your drink is, into the filter
6  and then rushes out your filter, so you don't get
7  good wetting -- that's wetting, excuse me -- of the
8  bed of -- and you end up putting through the
9  required amount of fluid to fill your cup, but it
10  really only acts on a small region of coffee, which
11  is why I think it comes out so -- so weak and why I
12  said yeck, it doesn't really taste like coffee.
13  When you have a -- and that's why I believe the
14  '234 and the Singles, they both have this
15  manifolding system --
16      Q.  All right.
17      A.  -- to evenly wet.  And I opened up
18  cartridges from the Singles machine after they were
19  used and I looked at the bed and I opened up the
20  cartridges after I would do my test and I looked at
21  the bed, and the tests I ran, you would always
22  burrow a hole.  And I can discuss more in terms of
23  scientific principles of aspect ratios if you want.
24      Q.  Please do.

SLOCUM

1      A.  Oh, okay.  So when you -- there's a
2  fundamental principle called St. Benant's
3  principle.  It's B-E-N-A-N-T.  And it says if you
4  want to control or dominate the structure of
5  something, you want to have three to four
6  characteristic dimensions.  So for example, if I
7  want to, you know, hold on -- if I was to try to
8  hold on to your arm and not have it move, if I just
9  grabbed the wrist, even with two hands, you could
10  pop your arm off, but if I were to grab the wrist
11  and the elbow, which is, you know, like three to
12  five arm thicknesses away, I could hold you pretty
13  well.  That also applies in fluid systems, and
14  particularly mixing chambers, that if I have an
15  inlet point and I want to now have mixing, I don't
16  want my outlet point to be -- and the reciprocal is
17  true -- one-third of a characteristic dimension
18  away.  I want it to be more than one.  So when you
19  look at this kind of an aspect ratio structure, a
20  characteristic dimension of import is, you know,
21  what is happening in the chamber.  Well, the
22  function is I want to as uniformly as possible mix
23  the water with all the coffee to get all the
24  flavoring out, so if I bring in my inlet point and

SLOCUM

1
2     A. I don't know.
3     Q. Okay. It is clear -- it says it is clear
4  from context that the laminated foil is intended to
5  cover compartment, 21, only. The outlet, 37, if
6  covered, would be covered by a separate foil. What
7  do you mean it's clear from context the laminate
8  foil is intended to cover compartment, 21, only?
9     A. They only talk about covering the coffee
10  bed region with foil. I don't have any indication
11  that the teaching says continue the foil and also
12  cover outlet, 37.
13     Q. Well, doesn't it say, quote, in use, a
14  laminated foil is sealed along the lower edge, 23,
15  of the body portion, and isn't this part of 23,
16  lower edge of the body portion?
17     A. Well, yes and no. Sure, you could seal it
18  everywhere as we just said. I'm not precluded from
19  running one strip of foil everywhere, but no in the
20  context of someone practicing it. I'm only going
21  to put the foil where I need the foil. And there's
22  nothing that teaches me that I need the foil over
23  there. And like, again, the Lambert cartridges,
24  for example, don't use foil. The Rychiger ones do
25  have a covering, although not foil, so sometimes

SLOCUM

1
2  you do and don't. This is the outlet, 37, you're
3  talking about, right?
4     Q. Right.
5     A. That's what I'm saying. Sometimes as
6  practiced in the art 37 is covered and sometimes
7  it's not. And I'm saying 37 as in figuratively,
8  not this particular patent.
9     Q. Okay. The -- now, in paragraph -- excuse
10  me. In paragraph six you say, if you turn to page
11  two, paragraph 6, second sentence, moreover, the
12  lid that is disclosed in the '234 patent is not
13  pierceable to accommodate an inflow of liquid,
14  paren, i.e., capable of being pierced to permit a
15  flow of liquid into, end quote, based on the
16  Court's claim construction to brew a coffee
17  beverage that can be extracted through the same lid
18  as required by the asserted claims. Do you see
19  that?
20     A. I do.
21     Q. Just so I understand, it's not -- you said
22  the lid is not pierceable. Now, is it -- you say
23  it's not pierceable to accommodate an inflow of
24  liquid. Is it not capable of being punctured to
25  allow inflow of liquid? I'm just trying to see

SLOCUM

1
2  where the dispute is.
3     A. Okay. I think earlier this morning we did
4  kind of a mapping between the Singles cartridge and
5  this cartridge where I pointed out that on
6  Figure 4, which is the other side, that the
7  castellations on the bottom form essentially the
8  same function as the filter paper.
9     Q. Right.
10     A. So I read this in terms again of the
11  function that this cartridge has to do when I read
12  the claim. So where I think we will have a problem
13  -- there's two problem areas with this design and
14  if we use it with -- using the input thing to punch
15  through the foil here. The first problem area that
16  we discussed extensively earlier was the issue of
17  do we have a leak or a weep versus a catastrophic
18  failure and I think we addressed that already in
19  terms of all the different possibilities, but
20  making the beverage, then we're going to have the
21  same burrowing issue here as we do the aspect ratio
22  problem I see of injecting water in here directly
23  as opposed to bringing this water in through this
24  encircling manifold.
25     Q. Mm-hmm. Okay. If you -- if you pierced up

SLOCUM

1
2  here within the manifold, would you have the same
3  problem?
4     A. I don't think you'd have the -- well, you
5  wouldn't have the burrowing issue.
6     Q. Right.
7     A. What you have here now, as I mentioned
8  earlier, this aspect ratio problem. Now you're
9  really severe on your aspect ratio, because your
10  piercing device is on the order of the size of this
11  dimension, but the foil goes way off on the other
12  sides, and the foil -- my experience in playing
13  with these things is you get kind of a trough shape
14  and then the fluid definitely squirts out.
15     Q. Wouldn't the fluid go along the manifold?
16     A. No, this is not the fluid squirting out --
17  I mean, the fluid would go along the manifold, but
18  it's very hard to make a -- I was not able to make
19  a seal on this just playing with -- on the Singles
20  cartridges, because the Singles cartridges also
21  have that -- I wish we had one here -- zone on this
22  manifold side that you could pierce way off on the
23  edge.
24     Q. Yeah, but if you pierced in here, in the
25  center, okay, it would distribute along the

SLOCUM

1
2     A. -- other than the normal we would vary by a
3  couple of degrees, but not -- I didn't start like
4  at 150 and go up in ten degree increments or
5  anything, no.
6     Q. Let's go back to something. You, I
7  believe, expressed the opinion that the patent
8  requires you to -- that a full cup or near a full
9  cup exit the container; is that correct?
10     MR. RADER: Objection.
11  Mischaracterizes.
12     Q. (BY MR. SCHLITZ) Well, if I
13  mischaracterized it, then please correct me. I'm
14  just trying to understand. This is a predicate for
15  the next question.
16     A. The cartridge, yes.
17     Q. Yes. Okay. And can you please point to me
18  or explain to me what the basis of that belief is?
19     A. Well, the basis of that belief is that what
20  the patent teaches, it's a beverage cartridge used
21  in a brewer. Well, all the beverage cartridges I
22  looked at, well, they all nominally will make a
23  cup, 180 milliliters, of coffee, so I used that as
24  my baseline, and if it -- it's to be in the art, all
25  teaching and intent, one skilled in the art, all

SLOCUM

1
2  the other terms we used before, that's what this
3  thing needs to be able to do to satisfy the
4  function of the claim and indeed the teaching and
5  what the patent is trying to help us build.
6     Q. And if you only get a half a cup, the
7  resultant -- what comes out of the container, or
8  cartridge, okay, you wouldn't consider that a
9  beverage?
10     A. I guess let me just paraphrase or clarify.
11  If I made a half cup of something and then turned
12  the flow of water off so no more water flowed into
13  the cup, pulled it away, and here I had this half
14  cup of coffee liquor, as it was described by our
15  ex-- the coffeeologist, you do a TDS on that and
16  the coffeeologist says that's an acceptable coffee,
17  that's a coffee beverage, then my answer is yes.
18     Q. It would be half a cup of beverage?
19     A. It would be half a cup of beverage.
20     Q. Right. Okay. And you as one of ord-- you
21  indicated in your footnote you consider yourself as
22  one of ordinary skill in the art; is that right?
23     A. Yeah, whatever footnote in here we have,
24  yes.
25     Q. All right. Okay. Without a -- without a

SLOCUM

1
2  whatever you just called it, a coffeeologist or
3  whatever, a Mr. Lingle next to you --
4     A. A cuppy -- a cupper, I think he refers to
5  himself to.
6     Q. Well, I think you're misusing the word
7  cupper.
8     A. Okay. I'm sorry. Without a Mr. Lingle
9  next to me.
10     Q. How would you know if it's a resultant
11  beverage?
12     A. I would taste it.
13     Q. Right. Would you test the TDS?
14     A. Oh, if I had a TDS meter I would, but I
15  tasted all of these in addition to the -- I think
16  he actually volunteered to taste some of them, so
17  -- and I know what I like, but --
18     Q. And test six just didn't meet your liking;
19  is that right?
20     MR. RADER: Objection to form. Go
21  ahead.
22     A. What I appear to like personally is
23  somewhere north of a thousand. You know, when I
24  say somewhere north of a thousand, I think the
25  actual -- did I write down what the actual number

SLOCUM

1
2  was out of the machine? I think it was around
3  1,200 or so. I think that's what the Kenco
4  normally brews or whatever, and that's okay.
5     Q. (BY MR. SCHLITZ) So number six didn't meet
6  your liking; is that correct?
7     A. Well, to be honest with you, 1 through 9,
8  none of them met my liking. Some were downright
9  awful, like 8 and 9.
10     Q. What was six?
11     A. You know, that's -- to me, that's just kind
12  of brown water, but I mean, I can detect that there
13  is coffee in it.
14     Q. Right.
15     A. And it smells like coffee. And when you
16  taste it, if I ever bought that anywhere, I'd take
17  it right back and say I want my money back or a
18  real -- a real cup of coffee.
19     Q. But that's you.
20     A. That's me, that's Mr. Lingle, that's --
21     Q. Well, Mr. Lingle has a gold -- a silver
22  tongue, doesn't he?
23     A. But that's me. That's me.
24     Q. That's you?
25     A. And I -- I consider myself an average

Page 246

SLOCUM

1
2   assuming my I think pretty generous estimates
3   there.
4       Q.  Okay.  Now, turning to page 21, paragraph
5   65, it says my problem -- my tests of both Lambert
6   and Rychiger cartridges, you also got another set
7   of fundamental problems with the creation of an
8   inlet to the foil.  The foil over the coffee bed
9   lacks any kind of support structure against which
10  to press a gasket or other device to form a seal.
11  Okay.  That -- in there, you were testing by
12  piercing the foil sort of midpoint in the first
13  chamber; is that correct?
14      A.  Correct.
15      Q.  Okay.  And then you say by contrast, the
16  Tassimo T-discs that are accused of infringing in
17  this case are provided with a support structure
18  such that the sides -- the lids are pierceable to
19  accommodate an inflow, but -- so here you're saying
20  that one of the things is you lack a -- a support
21  structure, right?
22      A.  Correct.
23      Q.  Okay.  But if we're using a -- this seal
24  that you mentioned earlier, okay, would that still
25  be a problem?

Page 247

SLOCUM

1
2       A.  Yes.  Would you like me to explain why?
3       Q.  Yes, please.  Yeah.
4       A.  So when you pierce through the foil, the
5   cartridge itself is not that rigid and the foil has
6   elasticity.  And I can -- when you initially
7   pierce, the foil bulges all the way in, I mean
8   really far in.  And when it finally pierces, pop,
9   it snaps through.  Now, I can push the seal up
10  against the foil such that the foil is still
11  deflected way in and the seal is pushing hard
12  against the foil.  And then a very curious thing
13  happens.  You can actually push it so the end of
14  the nozzle pushes all the way up against the filter
15  and you get no coffee.  You get basically clear
16  liquid.
17      Q.  What if you don't?  What if you don't?
18      A.  So the harder and further you push in, the
19  less weep, the less chance of catastrophic failure
20  you get is what my preliminary test showed, but you
21  get no -- you get no coffee, and no one would even
22  argue, because then the liquid is almost clear.  So
23  the way I ran the tests were in the condition where
24  the foil was nominally planar, and that's what -- I
25  just put the pressure of the seal to keep the foil

Page 248

SLOCUM

1
2   planar or maybe pushed in just a little bit to
3   start -- let the seal start to work, and that's
4   where I would get, you know, these -- that's how I
5   did my tests.  If you -- if you held it out so the
6   seal was never touching, then you always had
7   disaster, because you --
8       Q.  But if you put it slightly deeper, you'd
9   have less seepage?
10      A.  You would have a chance of it working
11  sometimes.  That's the weepage I was talking about
12  earlier.
13      Q.  And -- so I'm trying to understand what you
14  just said.  Are we talking about -- in what
15  orientation?
16      A.  All orientations.
17      Q.  Let's take the vertical orientation.  If
18  you put the -- if you put the piercer in halfway,
19  let's say, and you have a -- if you put the piercer
20  in and you have a -- some type of rubber seal,
21  okay, will it work?
22          MR. RADER:  Objection to form.  Go
23  ahead.
24      A.  The farther you push the piercer in, the
25  weaker the cup of coffee, because the burrow

Page 249

SLOCUM

1
2   distance, your aspect ratio, really goes off then.
3   The farther you push it in, the better your chance
4   of sealing, and when I say chance of sealing,
5   because every now and then you would get these
6   catastrophic failures.  I didn't run any -- enough
7   tests with it pushed all the way in, which is where
8   I'd notice I'd push it all the way in and I'd get
9   this kind of clear dribble coming out, and I think
10  on those I didn't see a catastrophic failure, but I
11  just wasn't making anything that even began to even
12  start to look like coffee, so I said this wasn't a
13  real test.  So I had to run my tests for meeting
14  what I thought was the intent of the claims and the
15  function and everything we've already been through
16  in what was a realistic use of the system.
17      Q.  So I can understand, in the '762 patent, if
18  you look at figures -- well, look at Figure 5.
19      A.  Okay.
20      Q.  Will that work without a support structure?
21      A.  Well, as I marked up here, you get
22  burrowing, so it doesn't work in terms of you don't
23  -- I don't feel you get a beverage.  Will it work
24  in terms of can I actually use this and not have
25  catastrophic failure?  Um, I don't think so.

Exhibit C

# In The Matter Of:

*KEURIG, INCORPORATEDv.*
*KRAFT FOODS GLOBAL, INC*

_____

## *MALCOLM E. TAYLOR*
*July 3, 2008*

_____

## *MERRILL LEGAL SOLUTIONS*
### *101 Arch Street, 3rd Floor*
### *Boston, MA 02110*
*PH: 617-542-0300 / FAX: 617-338-6075*

**TAYLOR, MALCOLM E. - Vol. 1**

Page 106

1  A. Yeah, it's a disposable.
2  Q. You said you tested three or four cartridges?
3  A. Yes. I didn't have many.
4  Q. In what orientations did you have them?
5  A. I had one upside down in the normal route. I had
6     another one like this as in the test I had at Kraft.
7  Q. How many did you do in each of those positions?
8  A. Two of each probably.
9  Q. And did you take contemporaneous notes of what you
10    were doing?
11 A. No. All I just -- all I wanted was a demonstration.
12    I was putting hot -- I put in hot water through and
13    the beverage I was having out of the other end was
14    brown, so it was obviously absorbing coffee. That's
15    all I have to do because that's all that's in the
16    claim.
17 Q. Did you see any water exiting through the hole where
18    you had pierced?
19 A. No, it wasn't in fact.
20 Q. In any of your experiments?
21 A. No.
22 Q. To your knowledge you didn't actually pressurize the
23    chamber, though?
24 A. No. I mean I didn't because it's not mentioned in

Page 107

1     the claim at all.
2  Q. How long did it take you to do the testing that you
3     did?
4  A. Couple of minutes.
5  Q. Couple of minutes?
6  A. Yeah.
7  Q. How long did it take you to sort of design in your
8     mind what the testing was going to look like?
9  A. It was also minutes.
10 Q. How did you secure the cartridge? Was it your wife
11    holding it?
12 A. Yes.
13 Q. How much liquid did you get out of the outlet?
14 A. Well, it was the excess of the amount of -- over the
15    amount that was left in the chamber obviously, but
16    it wasn't a huge amount because I wasn't aiming at
17    any specific volume.
18 Q. So you didn't measure the volume?
19 A. No, I didn't measure it because it wasn't necessary.
20 Q. Was it a couple of teaspoons?
21 A. Yeah, probably.
22 Q. Did you taste the liquid?
23 A. No, I don't have to because it's not in the claim.
24 Q. Did you smell the liquid?

Page 108

1  A. Yeah, a little bit, and it had a coffee smell.
2  Q. What temperature was the water that you injected?
3  A. It was hot. It was out of a kettle actually, so it
4     was as much as I could hold in the syringe because I
5     didn't have any insulation.
6  Q. Do you know what the temperature was?
7  A. No, I don't. It would have been somewhere in
8     between -- well, it might have been around 150 F
9     maybe.
10 Q. 150 degrees Farenheit?
11 A. F, right.
12 Q. Did you take any photos of the test?
13 A. No, I didn't.
14 Q. What did you do with the cartridges when you were
15    done?
16 A. I threw them out.
17 Q. Then what did you do with the liquid?
18 A. Also dumped it.
19 Q. Did you take any notes on your observations of the
20    test?
21 A. No. Only what is in the report.
22 Q. And how far in advance of preparing the report did
23    you do the test?
24 A. A week, a week or two probably.

Page 109

1  Q. Now, it says in the footnote in your report that you
2     did the hypodermic needle test on a Lambert-type
3     cartridge with the open inlet?
4  A. Right.
5  Q. That was one of the three or four that you did?
6  A. Yes.
7  Q. What orientation did you do that one?
8  A. One that was in the vertical because it's open. I
9     mean actually that was the one I had to have
10    inverted. I could have put something over the hole,
11    but I didn't.
12 Q. So you did that one vertically with the open hole
13    toward the top?
14 A. Upright, yeah.
15 Q. What would normally be the inlet hole?
16 A. Yes, right.
17 Q. And you did that in order to avoid leakage out the
18    hole?
19 A. Yes, because obviously it would leak if I laid it in
20    any other way.
21 Q. If you had pressurized it, would it have leaked
22    notwithstanding that the hole was at the top?
23 A. Well, of course, yes.
24 Q. Was the hypodermic needle normal to the surface of

28 (Pages 106 to 109)

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 15, 2008, a true and correct

copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

> Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
> David E. Moore, Esquire [*dmoore@potteranderson.com*]
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street, 6th Floor
> Wilmington, Delaware 19801

Additionally, I hereby certify that on August 15, 2008, copies of the foregoing

document were served by e-mail and hand delivery on the above-listed counsel of record and on the

following non-registered participants in the manner indicated below:

### BY E-MAIL

> David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
> Baker Botts L.L.P
> The Warner
> 1299 Pennsylvania Ave., NW
> Washington, D.C. 20004-2400

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> _(signature)_
>
> John W. Shaw (No 3362) [*jshaw@ycst.com*]
> Adam W. Poff (No. 3990) [*apoff@ycst.com*]
> Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
> (302)-571-6600
>
> *Attorneys for Plaintiff Keurig, Incorporated*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 07-17 (GMS)

**JURY TRIAL DEMANDED**

**PUBLIC VERSION**

---

## DEFENDANTS' REPLY IN SUPPORT OF MOTION *IN LIMINE* TO LIMIT EXPERT TESTIMONY OF DR. ALEXANDER SLOCUM

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 25, 2008
Public Version Dated: September 2, 2008
880808 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

In its response ("Opp'n"), Keurig concedes both that Dr. Slocum is not a coffee expert and that Dr. Slocum did not expressly mention "aspect ratio" in either of his reports. Dr. Slocum, who is admittedly not an expert in the coffee or beverage fields, is not qualified under *Daubert* to provide expert testimony as to whether the prior art Kenco Singles cartridge (the "Singles cartridge") produces a "beverage" and cannot provide a lay opinion under the guise of "expert" testimony. Further, Keurig attempts to equate Dr. Slocum's aspect ratio theory with a single statement regarding burrowing made in his rebuttal report. Slocum Rebuttal Rep. (Ex. 1) at 25. Dr. Slocum's theories of burrowing and aspect ratio, however, are distinct, and, thus, the burrowing statement is not sufficient identification of his aspect ratio theory. Thus, this Court should preclude Dr. Slocum from testifying as to these issues.

## ARGUMENT

### I. Dr. Slocum's Testimony Related to "Beverage" Should Be Excluded.

As explained in the Defendants' Motion *in Limine* to Preclude the Expert Testimony of Ted Lingle, testimony in which Ted Lingle construes the claim term "beverage" and sets criteria for determining whether a liquid constitutes a "beverage" under his claim construction is inadmissible. Yet, Dr. Slocum has indicated that he is relying on Mr. Lingle's expert opinion. Slocum Depo. Tr. (Ex. 2) at 210:4-6. Dr. Slocum should not be permitted to provide testimony related to or relying upon Mr. Lingle's inadmissible expert opinion. Nor should Keurig be permitted to indirectly provide Mr. Lingle's inadmissible opinions through Dr. Slocum's testimony. Keurig concedes that Dr. Slocum is not a coffee expert. Opp'n at 4. Nevertheless, it continues to seek to offer his opinion, which is based upon his lay palate[1], that the liquid produced by the Singles cartridge is not a "beverage." *Id.*

---

[1] During his deposition, Dr. Slocum asserted that he would offer his lay opinion, relying on his lay palate, at trial whether the liquid produced was a beverage. Ex. 2 at 210:7-211:2.

Further, Dr. Slocum should be precluded from testifying regarding the measurement of the total dissolved solids ("TDS") in liquids produced by the Singles cartridge using the same-side piercing method. The '762 patent does not mention TDS nor has Keurig established that one of ordinary skill in the consumer packaging art, when considering the plain and ordinary meaning of "beverage," would use such measurement. Rather, TDS is one of the criteria set by Mr. Lingle. Second, as Dr. Slocum admitted, Mr. Lingle measured the TDS, not him. Ex. 2 at 113:14-18, 200:24-201:5. Dr. Slocum does not purport to be an expert with regard to TDS measurements or the use of TDS as a criteria to determine what constitutes a "beverage." Thus, there is absolutely no basis for Dr. Slocum's testimony as to Mr. Lingle's TDS measurements.

Further, Dr. Slocum's testimony regarding whether the liquid produced by the Singles cartridge is a "beverage" and regarding the TDS measurements of such liquids plainly fails to satisfy the *Daubert* standard for expert testimony, and cannot be used as a backdoor through which to offer Mr. Lingle's inadmissible opinions. The Supreme Court requires that expert testimony be based on scientific knowledge derived by the scientific method. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 590 (1993). Because he is not an expert in the coffee field, Dr. Slocum's testimony as to whether the liquid produced constitutes "coffee" is nothing more than unsupported speculation. Accordingly, it should be excluded under *Daubert*. Additionally, Dr. Slocum's lay opinion as to whether the liquid produced constitutes "coffee" must be excluded under Rule 701 because Dr. Slocum is testifying as an expert. FED. R. EVID. 701 (stating that lay opinion testimony only is admissible "[i]f the witness is not testifying as an expert"). Therefore, this Court should preclude Dr. Slocum from offering such testimony.

## II.  Dr. Slocum's Aspect Ratio Theory Was Not Identified Until His Deposition.

Keurig argues that Dr. Slocum's aspect ratio theory "merely explains his description of the 'burrowing' phenomenon[,]'" which was identified in his rebuttal report. Opp'n at 4.

2

Contrary to Keurig's assertions, the two theories are not the same. Dr. Slocum distinguished the burrowing phenomenon from the aspect ratio theory, stating that the aspect ratio problem existed in the absence of the burrowing phenomenon:

> Q. Mm-hmm. Okay. If you -- if you pierced up here within the manifold, would you have the same problem?
> A. I don't think you'd have the -- well, <u>you wouldn't have the burrowing issue.</u>
> Q. Right.
> A. What you have here now, as I mentioned earlier, this <u>aspect ratio problem</u>. Now you're really severe on your aspect ratio, because your piercing device is on the order of the size of this dimension, but the foil goes way off on the other sides, and the foil -- my experience in playing with these things is you get kind of a trough shape and then the fluid definitely squirts out.

Ex. 2 at 152:25-153:14 (emphasis added). The burrowing issue and the aspect ratio issue are not the same, and it cannot be maintained that the single-sentence reference to burrowing in Dr. Slocum's rebuttal report adequately identifies the aspect ratio theory for purposes of Rule 26. FED. R. CIV. P. 26(a)(2)(B). Further, if an expert fails to identify an issue in his reports, mentioning the undisclosed issue during deposition "does not serve to place . . . [the proffered] testimony within the scope of [the] expert report." *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 237 F.R.D. 106, 113 (D. Del. 2006). Even if the issues were the same, which they clearly are not, Dr. Slocum never mentioned burrowing issue with respect to the '234 Patent in either of his reports, and, therefore, his opinion must be excluded with respect to the '234 Patent.

As Keurig conceded in its opposition, Dr. Slocum did not directly reference the aspect ratio theory in his reports. Instead, Dr. Slocum identified this theory for the first time during his deposition. Thus, Dr. Slocum's testimony as to the aspect ratio theory should be excluded.

## CONCLUSION

For the foregoing reasons, Kraft respectfully requests that the Court grant its Motion *in Limine* to limit Dr. Slocum's expert testimony at trial.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

By: */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    Tel: 302-984-6169
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

Dated: August 25, 2008
Public Version Dated: September 2, 2008
880808 / 31118

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 2, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on September 2, 2008, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: /s/ David E. Moore
    Richard L. Horwitz
    David E. Moore
    Potter Anderson & Corroon LLP
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - x

3   KEURIG, INCORPORATED,

4                     Plaintiff,

5        v.

6   KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
    KRAFT FOODS INC.,

7

                    Defendants.

8

    Civil Action No. 07-CV-0017-GMS

9   - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12      VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM

13              Wednesday, June 11, 2008

14               9:10 a.m. to 5:00 p.m.

15            WOLF, GREENFIELD & SACKS, P.C.

16                600 Atlantic Avenue

17               Boston, Massachusetts

18

19        Reporter:  Marianne R. Wharram, CSR/RPR

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC

          126 East 56th Street, Fifth Floor

24           New York, New York 10022

                   212-750-6434

25                 REF: 87765

SLOCUM

1
2    A. -- you see on the far right-hand side
3    there's that arrow --
4    Q. Yes.
5    A. -- coming up?  So that diameter of that
6    circle is -- that outer perimeter of that circle is
7    what, when the piercer goes through the foil which
8    covers the hole, it keeps moving forward until the
9    -- the little -- I think it's an O-ring, whatever
10   the structure is that pushes -- pushes down hard
11   against that --
12   Q. Right.
13   A. -- and now the seal is formed by pushing
14   hard against the foil, which is backed up by that
15   perimeter of the hard plastic, and that's what
16   forms a seal.  I'm not just -- and there are other
17   ways of sealing, but that's the way this particular
18   cartridge allows me to pierce it to accommodate the
19   inflow so I just don't get this violent squirting
20   out ever.
21   Q. Okay.  What other ways are there to seal?
22   A. What other ways are there to seal?
23   Q. Yes.
24   A. Well, for example, as I mentioned earlier,
25   the K-cup, which pierces the foil and there is

SLOCUM

1
2    nothing behind it to push against --
3    Q. Right.
4    A. -- so then it has this rubber kind of like
5    an inverted cone type lip seal.  And I've designed
6    a lot of seals in the past.  I think I could design
7    some O-ring-type seals, so that's my answer.
8    Q. So it's not necessary to have a structure
9    abut against it to create a seal?
10   A. I think -- right.  I could seal just like
11   the K-cups do now without having that particular
12   back-up, but this is one way to do it.
13   Q. Could you -- could you seal the Kenco
14   Singles without a hard structure to abut against?
15   A. The reason I'm hesitating is if you look at
16   a K-cup or -- let me point to the patent.  The
17   second embodiment, when I push down on the center,
18   if this is a square lid -- the K-cup is a round lid
19   which is a symmetric structure, so when you push on
20   it, you'll get symmetric deformation and the ring
21   is symmetric, and so everything -- you have a good
22   change of every-- actually, it does seal well.
23       When you have a square, when you push
24   on it, you tend to get folds.  It's the same reason
25   why it's hard to take a sheet of paper and fold it

SLOCUM

1
2    over a cone.  And the more non-square it is, the
3    harder it is, so that's why I can't answer yes or
4    no on that.  I -- I'd do my darnedest to try and I
5    think there's probably a pretty good chance I could
6    figure out how to, for example, adopt the Keurig
7    nozzle and seal to work, to seal against the foil
8    of a rectangular shape, for example, shown in the
9    first embodiment.
10   Q. So if I understand you correctly, the
11   absence of a hard surface to abut against is not
12   fatal to the ability to pierce the foil to permit
13   an inflow of liquid?
14   A. I don't -- I think the answer is correct.
15   I don't think the patent requires -- and I actually
16   don't think you have to have -- it depends what
17   pressures you want to do.  I don't think you have
18   to have a hard abut.
19   Q. Now, if you would look at -- if you would
20   look at the claim, look at page 3, first element.
21   Said filter element being permeable to liquid to
22   accommodate a flow of the beverage from said first
23   chamber to said second chamber.  Do you see that?
24   A. I do.
25   Q. And you opined that that is present; is

SLOCUM

1
2    that correct?
3    A. I do.
4    Q. And what did you do to make this
5    determination?
6    A. Well, I -- I bought a Tassimo machine --
7    Q. Yes.
8    A. -- and I used it.
9    Q. Okay.
10   A. And it made coffee.
11   Q. Well, you say it made coffee.  Why do you
12   say it made coffee?
13   A. I drank it.
14   Q. Did you test it?
15   A. You mean with the TDS?
16   Q. Yes.
17   A. No, I did not.  And -- okay.  And is that
18   the answer as far as --
19   Q. You said and something.  What were you
20   going to say?
21   A. Oh, and then I had taken apart the
22   cartridges.  Fluid goes in here, hence the coffee.
23   The only way out is through that papery thing.  And
24   when it makes coffee, I get a liquid with, you
25   know, some -- coffee has some -- grit is not the

SLOCUM

1
2    A.  I don't know.
3    Q.  Okay.  It is clear -- it says it is clear
4  from context that the laminated foil is intended to
5  cover compartment, 21, only.  The outlet, 37, if
6  covered, would be covered by a separate foil.  What
7  do you mean it's clear from context the laminate
8  foil is intended to cover compartment, 21, only?
9    A.  They only talk about covering the coffee
10  bed region with foil.  I don't have any indication
11  that the teaching says continue the foil and also
12  cover outlet, 37.
13    Q.  Well, doesn't it say, quote, in use, a
14  laminated foil is sealed along the lower edge, 23,
15  of the body portion, and isn't this part of 23,
16  lower edge of the body portion?
17    A.  Well, yes and no.  Sure, you could seal it
18  everywhere as we just said.  I'm not precluded from
19  running one strip of foil everywhere, but no in the
20  context of someone practicing it.  I'm only going
21  to put the foil where I need the foil.  And there's
22  nothing that teaches me that I need the foil over
23  there.  And like, again, the Lambert cartridges,
24  for example, don't use foil.  The Rychiger ones do
25  have a covering, although not foil, so sometimes

SLOCUM

1
2  you do and don't.  This is the outlet, 37, you're
3  talking about, right?
4    Q.  Right.
5    A.  That's what I'm saying.  Sometimes as
6  practiced in the art 37 is covered and sometimes
7  it's not.  And I'm saying 37 as in figuratively,
8  not this particular patent.
9    Q.  Okay.  The -- now, in paragraph -- excuse
10  me.  In paragraph six you say, if you turn to page
11  two, paragraph 6, second sentence, moreover, the
12  lid that is disclosed in the '234 patent is not
13  pierceable to accommodate an inflow of liquid,
14  paren, i.e., capable of being pierced to permit a
15  flow of liquid into, end quote, based on the
16  Court's claim construction to brew a coffee
17  beverage that can be extracted through the same lid
18  as required by the asserted claims.  Do you see
19  that?
20    A.  I do.
21    Q.  Just so I understand, it's not -- you said
22  the lid is not pierceable.  Now, is it -- you say
23  it's not pierceable to accommodate an inflow of
24  liquid.  Is it not capable of being punctured to
25  allow inflow of liquid?  I'm just trying to see

SLOCUM

1
2  where the dispute is.
3    A.  Okay.  I think earlier this morning we did
4  kind of a mapping between the Singles cartridge and
5  this cartridge where I pointed out that on
6  Figure 4, which is the other side, that the
7  castellations on the bottom form essentially the
8  same function as the filter paper.
9    Q.  Right.
10    A.  So I read this in terms again of the
11  function that this cartridge has to do when I read
12  the claim.  So where I think we will have a problem
13  -- there's two problem areas with this design and
14  if we use it with -- using the input thing to punch
15  through the foil here.  The first problem area that
16  we discussed extensively earlier was the issue of
17  do we have a leak or a weep versus a catastrophic
18  failure and I think we addressed that already in
19  terms of all the different possibilities, but
20  making the beverage, then we're going to have the
21  same burrowing issue here as we do the aspect ratio
22  problem I see of injecting water in here directly
23  as opposed to bringing this water in through this
24  encircling manifold.
25    Q.  Mm-hmm.  Okay.  If you -- if you pierced up

SLOCUM

1
2  here within the manifold, would you have the same
3  problem?
4    A.  I don't think you'd have the -- well, you
5  wouldn't have the burrowing issue.
6    Q.  Right.
7    A.  What you have here now, as I mentioned
8  earlier, this aspect ratio problem.  Now you're
9  really severe on your aspect ratio, because your
10  piercing device is on the order of the size of this
11  dimension, but the foil goes way off on the other
12  sides, and the foil -- my experience in playing
13  with these things is you get kind of a trough shape
14  and then the fluid definitely squirts out.
15    Q.  Wouldn't the fluid go along the manifold?
16    A.  No, this is not the fluid squirting out --
17  I mean, the fluid would go along the manifold, but
18  it's very hard to make a -- I was not able to make
19  a seal on this just playing with -- on the Singles
20  cartridges, because the Singles cartridges also
21  have that -- I wish we had one here -- zone on this
22  manifold side that you could pierce way off on the
23  edge.
24    Q.  Yeah, but if you pierced in here, in the
25  center, okay, it would distribute along the

SLOCUM

1
2   A.  Yeah, the thing doesn't function unless
3   it's with a brewer.
4   Q.  And it has to have the support of the
5   clamping mechanism, doesn't it?
6   A.  Yeah, you'd have to hold the -- you have to
7   hold the thing in place.
8   Q.  Okay.  Now, paragraph -- okay.  Now, you --
9   if you turn to page 14, paragraph 40, I have tested
10  Singles cartridges under various conditions to
11  evaluate that they meet these claim requirements,
12  and I conclude they do not.  I therefore disagree
13  with Mr. Taylor's conclusion.  What various
14  conditions?
15  A.  Well, let me go to my chart.
16  Q.  Page 21?  No, 23.
17  A.  It was 23 in the other report, I think.
18  Q.  Well, I have it on 23 here.
19  A.  Oh, yes.  Right.  Thank you.  Foil down
20  with plate, foil down with plate with different
21  pressures, then I did up with plate and I did two
22  different pressures, two different runs.  Or excuse
23  me; nominally the same pressure, but two runs, foil
24  up with plate at a low pressure, then vertical, so
25  I did all these different conditions in my table

SLOCUM

1
2   here.
3   Q.  Okay.  Looking at tests 6 and 7 --
4   A.  Mm-hmm.
5   Q.  -- you tested at 3.1 PSI and at 15 PSI; is
6   that correct?
7   A.  Correct.
8   Q.  How did you decide on those pressures?
9   A.  What I did was I played with pressure to
10  get a cup of coffee in what was a reasonable time,
11  and if I recall correctly, I asked -- I think the
12  Keurig device uses -- is a low pressure device.
13  It's like around the 3 PSI.  The higher pressure
14  came from -- I believe that was one of the
15  depositions and -- and I think that was actually
16  even higher, like the 20 PSI.  But that -- I can't
17  remember which of the Kraft people said their
18  Tassimo runs around 20 something, but you know, I
19  stepped things up.  You always start low and go
20  higher, and in my -- remember I said earlier I did
21  these preliminary tests to see what would happen,
22  because I wanted to do the actual coffee tests and
23  I wanted to be prepared.  And above 15 PSI, I would
24  typically get violent spurting.  And I did not want
25  to be playing with the hot water where I would get

SLOCUM

1
2   violent spurting.
3   Q.  Okay, but what about below 15?
4   A.  I would get spurting, but not typically
5   violent spurting.
6   Q.  At what PSI's?
7   A.  Well, sometimes it would spurt at 3 PSI,
8   sometimes it would weep.
9   Q.  Okay.  I'm sorry.  Sometimes it would spurt
10  at 3 and sometimes it would weep?  Is that what you
11  just said?
12  A.  Yes.
13  Q.  So that indicates that you did more than
14  one test at 3.1 PSI?
15  A.  This is just where I did the total
16  dissolved solids.  I also did tests -- let me see
17  where -- where I just used the cold liquid.
18  Q.  After this report, what did you do?  Did
19  you do any more tests at 3 PSI with a hot liquid?
20  A.  When I did my initial test for set-up, I
21  did 3 PSI and I kept increasing it until I got to
22  15, and then it routinely would spurt and then I
23  was like I'm not going to go any higher.
24  Q.  Go ahead.  I'm sorry.
25  A.  The only tests I did at the low and the

SLOCUM

1
2   higher -- you know, the 15, where I actually was
3   able to measure the TDS, that's when I was actually
4   with Mr. Lingle, because he's the person who does
5   those tests.
6   Q.  Okay.  And these were all the tests that
7   you did with Mr. Lingle, or did you do more with
8   Mr. Lingle?
9   A.  There may have been one or two other ones
10  where we were -- and then something went spliff and
11  we wouldn't be able to get a full cup, so I don't
12  know, maybe again as many where we couldn't get a
13  full cup, because it would spurt.  And part of my
14  thing was I needed to make a full cup of coffee in
15  this reasonable-ish time, because I'm playing
16  brewer, and can I actually make this beverage using
17  the Singles cartridge.
18  Q.  So one of the requirements is a full cup,
19  right?
20  A.  When I was not able to get a full cup --
21  Q.  Right.
22  A.  -- yeah, that would be a requirement,
23  because then I had a catastrophic failure.
24  Q.  It's not because you thought that the
25  patent required a full cup?

Page 210

SLOCUM

1  person.  I don't buy espressos.  I'm not really in
2  the mud -- the mud zone.
3  Q.  So is your opinion based on your personal
4  taste, or is it based on what Mr. Lingle told you?
5  A.  Both.
6  Q.  Okay.  And are you going to testify at
7  trial, render an opinion as to whether this
8  resulting beverage in test six, say, was a beverage
9  or not?
10  A.  To my lay palate --
11  Q.  Right.
12  A.  -- it's not.
13  Q.  Okay, but I'm asking you are you going to
14  offer -- render an opinion at trial whether it was
15  a beverage or not?
16  A.  If I'm asked at trial --
17  Q.  Yes.
18  A.  -- was six a beverage or not --
19  Q.  Right.
20  A.  -- I will say to my lay palate it was not.
21  Q.  So you're not an expert on that; is that
22  correct?
23  A.  Right.  That's why I said my lay palate.  I
24  am not an expert on that.  Mr. Lingle is the

Page 211

SLOCUM

1  expert.
2  Q.  Okay.  So one of ordinary skill in the art,
3  if they didn't have Mr. Lingle next to them, would
4  have to rely on their own taste preference; is that
5  correct?
6  MR. RADER:  Objection to form.
7  A.  Yeah, there is -- sorry.
8  MR. RADER:  Go ahead.
9  A.  There they'd get other lay people around,
10  typical consumers, people in the office and say
11  what do you think of this.  I would never design
12  something or release something like this that was
13  just based on my lonesome.  You've got to get some
14  -- some data or have an acknowledged expert who
15  will say -- who does have a lot of experience about
16  what's acceptable.
17  Q.  (BY MR. SCHLITZ)  And if there's data that
18  -- if you were presented with data that says that
19  consumers find acceptable a beverage that is 750
20  TDS, let's say, then you would say okay, that's a
21  beverage?
22  MR. RADER:  Objection to form.
23  A.  Yeah, if -- when you say if I was presented
24  with data that said consumers said, so I'm assuming

Page 212

SLOCUM

1  Mr. -- a Mr. Lingle tells me that if you can
2  consistently brew a better than 750, if that's a
3  beverage, I'm happy to say okay, you're the expert
4  telling me what will sell.
5  Q.  No, I'm saying if you don't have a
6  Mr. Lingle, you'd go to people in the office or
7  you'd rely on data, consumer data?
8  A.  Correct.
9  Q.  And I'm saying if you were presented with
10  consumer data that said that some people find a
11  beverage that has TDS of whatever number I gave
12  you --
13  A.  750.
14  Q.  -- 750, would you then say, well, that's a
15  beverage?
16  MR. RADER:  Objection to form.  Go
17  ahead.
18  A.  I guess so.
19  Q.  (BY MR. SCHLITZ)  Okay.  Now, if you turn
20  to paragraphs 41 and 42 of your opinion, 41 says a
21  Singles cartridge or single-serve beverage
22  cartridge is designed to be inserted into a Singles
23  brewing machine to produce a cup of coffee.
24  Diagram -- the Kraft diagram below shows how the

Page 213

SLOCUM

1  Kenco Singles cartridge works.  And so you
2  considered how the Singles was intended to work; is
3  that correct?
4  A.  Correct.
5  Q.  And it was intended to work in the
6  horizontal position, right?
7  A.  Correct.
8  Q.  Okay.  The Singles cartridge has a
9  generally rectangular hard plastic shell with an
10  opening on one side through which the coffee
11  grounds are introduced during manufacture, and it
12  goes on and you talk -- essentially, you describe
13  its intended use; is that correct?
14  A.  Correct.
15  Q.  What is the significance of its intended
16  use to your formulation of your opinion that the
17  Singles cartridge is not capable of being -- the
18  lid of the Singles cartridge is not pierceable --
19  capable of being pierced to permit an inflow of
20  liquid?
21  A.  Well, I look at the performance of the
22  device, the cartridge, and the way it was intended
23  to be used, and this is what I get out of it.  And
24  then I use it in this modified way that I was

# EXHIBIT 22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT DELAWARE

KEURIG, INCORPORATED,                 )
                                      )
      Plaintiff,                  )
                                      )
      v.                          )   C.A. No. 07-17 (GMS)
                                      )
KRAFT FOODS GLOBAL, INC.,             )   **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and              )
KRAFT FOODS INC.,                     )   **PUBLIC VERSION**
                                      )
      Defendants.                 )


## DEFENDANTS' MOTION IN LIMINE TO PRECLUDE
## EXPERT TESTIMONY OF TED LINGLE

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 4, 2008
Public Version Dated: August 11, 2008
877075 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively "Kraft"), by counsel, state the following in support of its Motion *in Limine* to preclude Ted Lingle from testifying as an expert witness at trial.[1]   In particular, Kraft respectfully moves to preclude Mr. Lingle's testimony because: (1) it is an improper attempt to usurp the Court's role with regard to claim construction; (2) it would not assist the jury as required by Rule 702; and (3) Mr. Lingle is not even one of ordinary skill in the relevant art of the patent-in-suit, let alone an expert in that art.

## ARGUMENT

### I.   Lingle's Report is an Improper Attempt to Provide Claim Construction

The patent-in-suit, U.S. Patent No. 6,607,762 ("the '762 Patent"), claims the structure of a single serve beverage filter cartridge.  Mr. Lingle does not purport to be one of ordinary skill in this art.  Rather, he purports to be an expert in coffee brewing.  Plaintiff Keurig, Incorporated ("Keurig") seeks to have Mr. Lingle testify as to the meaning of the term "beverage" as used in the asserted claims in the patent-in-suit and to establish the subjective criteria for determining whether a drink is a beverage.  Based upon that meaning and subjective criteria, Keurig intends to have Mr. Lingle and its technical expert, Dr. Slocum, testify that the prior art Kraft is relying upon to invalidate the patent-in-suit did not make a "beverage." ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[1] Pursuant to D. Del. LR 7.1.1, the parties met and conferred, and Plaintiff will oppose the motion.

He acknowledges, however, that under his specialized definition,[2] one of ordinary skill in the art

could not ascertain what a "beverage" is but ███████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

Moreover, when asked whether the term "beverage" has a meaning in the '762 Patent that is

different from its plain and ordinary meaning, Mr. Lingle replied: "I believe it does." *Id.* at 64.

Applying his definition of "beverage," a term for which Keurig did not seek claim construction,

Mr. Lingle contends that, according to his well-trained palate and sense of smell, beverages

brewed from the Kenco Singles™ ("Singles") cartridges ████████████████████████

████████████████████████████████████████████████████

     The time for construing the terms of the patent-in-suit is long passed.  The parties agreed

to special procedures in the Scheduling Order by which the Court would construe any disputed

claim terms.  *See* Scheduling Order (D.I. 34).  First, to determine which claim terms may be

disputed, the parties exchanged infringement and validity contentions, as well as responses

thereto.  Kraft identified the prior art it was relying upon, which it has consistently replied upon

throughout this litigation and intends to rely upon at trial.  Kraft's Joint Invalidity Contentions

(Ex. 4) at 1-2.  Keurig responded by asserting what was absent from that prior art, and there was

no statement that the identified prior art did not make a "beverage."  Keurig's Response to

Kraft's Joint Invalidity Contentions (Ex. 5).  Based upon the exchange of infringement and

invalidity contentions, the parties subsequently exchanged lists of disputed terms requiring

construction by this Court.  Keurig asked the court to construe "piercable to accommodate an

---

[2]  Dr. Alexander Slocum, Keurig's technical expert, understands that Mr. Lingle presents a specialized definition of "beverage" and testified in deposition that he relied on that definition rather than the plain and ordinary meaning of the term.  Slocum Dep. Tr. (Ex. 3) at 8.

inflow" and "piercable to accommodate an outflow." September 18, 2007 Letter from G. Hrycyszyn to D. Schlitz (Ex. 6). But Keurig did not contend that the term "beverage," standing alone or in the context of any claim element, needed construing.

The parties also did extensive briefing of the disputed claim terms. In its briefs, Keurig urged the Court to adopt its construction of the claim element "piercable to accommodate an outflow of beverage." Keurig's Opening Br. (Ex. 7) at 10-11. But Keurig argued that this element should construed to mean "designed to be pierced to form an outlet that allows an outflow of beverage without leakage." *Id.* at 10. It never stated that the term "beverage" needed to be construed and never proposed a definition for the term "beverage." Keurig did not propose criteria to determine if a drink is a beverage. And it did not offer the expert testimony of Mr. Lingle in this regard. At the *Markman* hearing, the meaning of "beverage" was not discussed. And of course, this Court has not construed the term "beverage."

Keurig cannot now rely upon "expert" testimony at trial in lieu of having requested and obtained a claim construction from this Court. It is axiomatic that claim construction is a question of law and is within the sole province of the Court. Keurig is attempting to usurp this Court's role and authority by having an expert witness dictate to the jury what a claim term means and the criteria for satisfying that claim term.

Having failed to make the term "beverage" a claim construction issue, Keurig cannot now contend that expert testimony is now needed to assist the jury in understanding the meaning of "beverage" and to set the criteria for determining whether a drink is a "beverage." Since Keurig did not seek a claim construction of "beverage" during the claim construction process, the term must be given its plain and ordinary meaning. There is no need for an expert to assist the jury in understanding the plain and ordinary meaning of a term. And it is not appropriate to have a

purported coffee brewing expert testify that in his judgment a drink does not meet his subjective criteria as to acceptable taste, odor, color, or strength to qualify as a cup of coffee. Mr. Lingle contends that a person of ordinary skill in the art could not even ascertain what a "beverage" is without consulting an expert. Lingle Dep. Tr. (Ex. 2) at 75-76. Of course, this renders the claims indefinite.[3] *See* 35 U.S.C § 112.

## II.     Lingle's Testimony Would Not Assist the Trier of Fact

Under Rule 702, expert testimony must "'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, (1993) (quoting Fed. R. Evid. 702). Mr. Lingle's testimony is not intended to assist the jury in understanding the evidence and making a factual determination. Rather, it is intended to set criteria for a beverage that are not in the patent-in-suit and then tell the jury that in his judgment the drink produced by the Singles cartridge does not have the flavor, color, odor or strength to qualify as a cup of coffee.

## III.     Lingle is Not an Expert in the Relevant Art of the '762 Patent

Rule 702 also requires that a technical expert in a suit for patent infringement have specialized knowledge in the relevant art of the patent-in-suit. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743 (3d Cir. 1994) (must be connection between expert testimony and factual issues in the case). But Mr. Lingle lacks expertise in brewer or beverage cartridge design, or even fluid mechanics. Lingle Dep. Tr. (Ex. 2) at 18, 93-94. In short, Mr. Lingle is not an expert in the single-serve beverage filter cartridge art – the relevant art of the '762 Patent. Rather, he is an expert in "[c]offee,

---

[3]  Mr. Lingle's proposed definition of "beverage" runs contrary to the maxim that claims should be construed to preserve validity. *See Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008).

coffee brewing, coffee tasting." *Id.* at 5. Keurig's other technical expert, Dr. Alexander Slocum, asserts that "a person of ordinary skill in the relevant art would include a *skilled mechanical or materials engineer.*" Slocum Dep. Tr. (Ex. 3) at 168 (emphasis added). Mr. Lingle studied civil engineering and he has never been a practicing engineer. Lingle Dep. Tr. (Ex. 2) at 5-6. Thus, not only is Mr. Lingle not an expert, he is not even a person of ordinary skill in the art. Accordingly, Mr. Lingle is not qualified as an expert to give opinions with respect to issues of infringement and validity with regard to the '762 Patent. Thus, the Court must preclude his testimony on those issues, as well as preclude Keurig's technical expert, Dr. Alexander Slocum, from relying on the subject matter disclosed in Mr. Lingle's expert reports.

## CONCLUSION

For the foregoing reasons, Kraft respectfully requests that the Court grant this Motion *in Limine* to testimony at trial.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel.  202-639-7700

By:  */s/ David E. Moore*
　　　Richard L. Horwitz (#2246)
　　　David E. Moore (#3983)
　　　Hercules Plaza, 6th Floor
　　　1313 North Market Street
　　　P.O. Box 951
　　　Wilmington, DE  19899-0951
　　　Tel:  302-984-6169
　　　rhorwitz@potteranderson.com
　　　dmoore@potteranderson.com

Dated:  August 4, 2008
877075 / 31118

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

- 5 -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 11, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on August 11, 2008, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By:  /s/ David E. Moore
      Richard L. Horwitz
      David E. Moore
      Potter Anderson & Corroon LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE  19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF DELAWARE

----------------------------------------X

3   KEURIG, INCORPORATED,

4                          Plaintiff,

5   VS

6   KRAFT FOODS GLOBAL, INC., TASSIMO

    CORPORATION, and KRAFT FOODS, INC.,

7

                           Defendants.

8

    Civil Action No. 07-CV-0017-GMS

9   ----------------------------------------X

10

11

12        VIDEOTAPED DEPOSITION OF TED R. LINGLE

13              Friday, June 27, 2008

14              9:11 a.m. - 2:05 p.m.

15          WOLF, GREENFIELD & SACKS, P.C.

16              600 Atlantic Avenue

17          Boston, Massachusetts 02210

18

19     Court Reporter:  Loretta Hennessey, RDR, CRR

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC

            126 East 56th Street, Fifth Floor

24              New York, New York 10022

                  212-750-6434

25                REF: 87840

```
 1                     LINGLE
 2    please swear in the witness.
 3                   TED R. LINGLE, Sworn
 4                   having been satisfactorily
 5    identified by production of his California driver's
 6    license and duly sworn, was examined and testified
 7    as follows:
 8                   DIRECT EXAMINATION
 9    BY MR. SCHLITZ:
10         Q.   Mr. Lingle, what is your area of
11    expertise?
12         A.   Coffee, coffee brewing, coffee tasting.
13         Q.   Now, you graduated from the United States
14    Military Academy; is that correct?
15         A.   That's correct.
16         Q.   In what year?
17         A.   1966.
18         Q.   Okay.  And you got a degree in civil
19    engineering; is that correct?
20         A.   That's correct.
21         Q.   What does civil engineering cover?
22         A.   Civil engineering was sort of a catch-all
23    degree for a heavily science-based education that
24    was somewhat unique to the Military Academy at the
25    time.  There were no majors.  All the cadets were
```

1                    LINGLE

2   required to take a fairly prescribed set of courses.

3   To give you an example, in the four years that I was

4   there, I had an opportunity to take three electives.

5       Q.   Okay.  Now, when you -- after you

6   graduated -- did you graduate from the Military

7   Academy?

8       A.   Yes, I did.

9       Q.   Okay.  Did you then go into the Army?

10      A.   Yes, I served four years on active duty.

11      Q.   Okay.  And what jobs did you have on

12   active duty?

13      A.   I was a Second Lieutenant.  I had an

14   opportunity to command a platoon and an opportunity

15   to command an armored recon troop in Germany, and

16   then I spent a year in Vietnam as an advisor to a

17   Vietnamese reserve military unit.

18      Q.   So you didn't practice as a civil

19   engineer, did you?

20      A.   No, I did not.

21      Q.   Okay.  And then when you left the Army --

22   how many years did you spend in the Army?

23      A.   I was in the Army for four years.

24      Q.   When you left the Army, what did you do,

25   what -- next job?

```
1                       LINGLE
2        Q.    And what is the Coffee Quality Institute?
3        A.    It's actually a non-profit 501(c)(3) trust
4   that SCAA started in 1996, and its purpose is to
5   work internationally, meaning working with
6   coffee-producing countries, to improve the quality
7   of coffee and the lives of the people who produce
8   it.
9        Q.    Okay.  It has nothing to do with designing
10  single-serve beverage cartridges, does it?
11       A.    No, it does not.
12       Q.    It has nothing to do with designing
13  brewers, does it?
14       A.    No, it does not.
15       Q.    And in your work here today as an expert
16  witness, were you -- is the Wolf Greenfield firm
17  paying you personally or are they paying the
18  organization?
19       A.    They're paying the organization.
20       Q.    And is that going to jeopardize their
21  non-tax status?
22       A.    No.
23       Q.    Well, how is this a, is your work in this
24  case part of the mission of a non-tax organization?
25       A.    It involves the, sort of the public
```

1                        LINGLE

2        A.    If -- it could be if the other components

3    were there, the aroma, taste, and body.

4        Q.    Well, how would one reading this patent in

5    suit -- you've read the patent, haven't you?

6        A.    Yes, I have.

7        Q.    Okay.  Now, you're an expert on coffee,

8    but how would one of ordinary skill in the art with

9    regard to the art of single-serve beverage

10   cartridge, how would that person know if it is a

11   coffee beverage?

12       A.    I'm not quite sure I understand your

13   question.  Could you repeat it?

14       Q.    You're one who's an expert, you told me,

15   in coffee, right?

16       A.    Yes, that's correct.

17       Q.    Now, the -- one of ordinary skill in the

18   art in building and constructing single-serve

19   coffee, excuse me, single-serve beverage cartridges

20   is not one who's an expert in coffee, you'd agree

21   with that?

22       A.    I'd agree with that.

23       Q.    Okay.  And how would that person know if

24   the, if the beverage that extracts, that exited a

25   cartridge was a coffee beverage?

```
1                      LINGLE
2        A.    Well, I'm sure that that engineer would
3    hire someone like me who is a coffee expert and can
4    advise them on what the parameters are that they're
5    shooting for in terms of creating a coffee beverage
6    with the right level of color, body and flavor.
7        Q.    All right.  So it would require hiring an
8    expert like you?
9        A.    Yes, it would require someone who
10   understands the coffee beverage.
11       Q.    Okay.  Now, there are not many of you in
12   the world, so if a, if a, an engineer of ordinary
13   skill in the art wanted to use TDS as a measure,
14   would that be an acceptable measure?
15       A.    That's an acceptable metric for measuring
16   on a scientific basis the extract that you've
17   created in that beverage cartridge.
18   But I would disagree with the premise that there
19   aren't many people like me in the world.  I'm sure
20   there are many coffee experts at a company like
21   Kraft.  I mean, I've met a few of them.  They're
22   very fine coffee people.
23       Q.    Absolutely.  And maybe you'll meet some
24   more at the trial.
25   But if someone's not at a major company like Kraft,
```

Page 64

1                        LINGLE
2    application, it means one that the average person
3    would go out on a commercial level and purchase
4    either for home use or for consumption away from
5    home.
6        Q.   Okay.  My question to you is, does
7    "beverage" have a meaning in the patent that is
8    different than its ordinary meaning?
9        A.   I believe it does.
10       Q.   Okay.  What do you believe the ordinary
11   meaning of "beverage" is?
12       A.   The ordinary meaning would be a product
13   that could be either sold or consumed for a person's
14   enjoyment.
15       Q.   So it's --
16       A.   I mean, there would be certain categories
17   I would exclude.  I wouldn't include tap water in
18   the context of a beverage.
19       Q.   So you think the word "beverage" has a
20   commercial, has a commercial connotation?
21       A.   When I read the patent, then I was
22   assuming, my assumption is the average person
23   reading that patent would assume this was a beverage
24   for commercial application.
25       Q.   Okay.  And what is the basis of that

1                           LINGLE

2        Q.    Okay.  And if they did hire someone who

3    held themselves out as having expertise in coffee

4    taste and smell --

5        A.    Uh-huh.

6        Q.    -- could that person say that a particular

7    strength coffee wouldn't be acceptable to anybody?

8        A.    Yes, you can establish parameters that

9    would categorically exclude some fluids as being

10   acceptable when represented as a coffee beverage.

11       Q.    All right.  And traditionally the metric

12   for that in the industry has been TDS; is that

13   right?

14       A.    Yes, that's been the most common.

15       Q.    Now, what is the -- going back to your

16   statement, "That is, one does not obtain output

17   liquid of sufficient strength and with an adequate

18   flavor and aroma profile," what is the measure of

19   adequate flavor?

20       A.    The flavor would be a subjective

21   measurement, so it's a person tasting the fluid

22   saying, no, this isn't right.

23       Q.    Okay.  But is there a metric for measuring

24   that?

25       A.    Not that I know of.

1                           LINGLE

2       Q.    Okay.  So one who is of ordinary skill in

3  the art in designing and making single-serve

4  beverage cartridges wouldn't have a metric, that

5  person would have to go to an expert in coffee; is

6  that correct?

7       A.    That's correct.

8       Q.    Okay.  What is the measure of acceptable

9  aroma profile?

10      A.    That's also subjective.

11      Q.    Okay.  And one of ordinary skill in the

12  art, an engineer in building, constructing

13  single-serve beverage cartridges, what would be the

14  metric that person would have to use to determine if

15  the resultant beverage satisfies the aroma profile?

16      A.    That would also be subjective.  They would

17  taste and smell the fluid and say, "yes, this smells

18  like coffee," or, "no, this doesn't smell like

19  coffee."

20      Q.    Okay.  But what I'm trying to understand

21  is what if that engineer, you know, thinks that a

22  beverage that has just barely traceable aroma is

23  acceptable.  Would you accept that?

24      A.    Accept it in what way?

25      Q.    Well, since it's subjective, could that

1                         LINGLE

2    is outside the acceptable range for consumers?

3         A.    Yes, using the metric as an analogy.

4         Q.    Okay.  But if it were in the -- if that

5    metric were in the acceptable range for consumers,

6    would you have any reason to say that the piercing

7    into the manifold area would not produce a

8    acceptable coffee beverage?

9         A.    Well, I'd still want to taste the beverage

10   so we're not using soluble solids as the only method

11   of --

12        Q.    I understand that.  But you explained why

13   you thought piercing directly into the coffee bed,

14   but I'm -- since -- if you use the manifold, and you

15   get this more even distribution, why would it not

16   create a coffee beverage?

17        A.    If I understand your question correctly,

18   you're saying if we use the manifold with same-side

19   piercing?

20        Q.    Yes.

21        A.    I'm not exactly sure of the answer because

22   it has to do with the fluid dynamics of the way the

23   water would actually move through that manifold, and

24   I think that's more in the area of expertise of

25   someone who's an expert in fluid design.

```
 1                        LINGLE

 2        Q.   And that's not your area?

 3        A.   No.  I understand some of fluid mechanics,

 4   but that's not my area of expertise.

 5        Q.   Okay.  And under any circumstances, you're

 6   not going to agree with what I have to say.

 7   Now, but you, you told me earlier that when you were

 8   working for Lingle Brothers, you did, you did tell

 9   customers about drip filter coffee, right?

10        A.   Yes.

11        Q.   Okay.  So the -- I think you used the word

12   -- when you were saying why the Kenco Singles using

13   same-side piercing would not produce a particularly

14   acceptable cup of coffee, you mentioned several

15   things.  You mentioned, I think, pressure; is that

16   right?

17        A.   The flow rate, yes, the pressure.

18        Q.   The flow rate?  What is the flow rate?

19        A.   That would be the rate at which the water

20   travels through the coffee bed.

21        Q.   Is that speed or is that --

22        A.   That's speed.

23        Q.   That's speed?  Okay.

24   Now, would the rate that it is, that the water is

25   introduced into the coffee bed, would that make a
```

# EXHIBIT 3

Page 1

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - x

3   KEURIG, INCORPORATED,

4                        Plaintiff,

5        v.

6   KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
    KRAFT FOODS INC.,

7

                        Defendants.

8

    Civil Action No. 07-CV-0017-GMS

9   - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12      VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM

13                Wednesday, June 11, 2008

14                9:10 a.m. to 5:00 p.m.

15            WOLF, GREENFIELD & SACKS, P.C.

16                600 Atlantic Avenue

17                Boston, Massachusetts

18

19        Reporter:  Marianne R. Wharram, CSR/RPR

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor

24                New York, New York 10022
                        212-750-6434

25                    REF: 87765

1                          SLOCUM

2    construction, or claim construction, what different

3    terms mean.  That's what I have to ultimately abide

4    by is what is the Court's claim construction.

5         Q.   In your expert report, you opine about the

6    meaning of the word beverage; is that correct?

7                   MR. RADER:  Objection to the form.  You

8    can answer.

9         A.   Well, my understanding for the term

10   beverage -- because I'm not an expert in that area,

11   I relied -- the Court itself didn't give me an

12   exact definition of what beverage is.  I have to

13   refer back explicitly to that document, but in that

14   respect, I relied on Mr. Lingle, who is an

15   acknowledged expert in the field of coffee

16   beverages.  And then, when I actually ran the

17   various tests in various scenarios, I also, because

18   I'm a fairly avid coffee drinker, would then taste

19   the stuff made by the various ways I did.

20        Q.   (BY MR. SCHLITZ)  But when you read the

21   patent, what was your understanding?  Before --

22   when did you speak to Mr. Lingle?

23        A.   I first met Mr. Lingle a couple of months

24   ago when I did my extensive tests with the hot

25   water to actually attempt to create the beverage.

1                         SLOCUM

2    opinion as to whether the patent discloses a single

3    foil?

4         A.  Well, yeah, if there was a single piece of

5    foil everywhere, then that is a single piece of

6    foil.

7         Q.  And are you basing your opinion on the

8    commercial product?

9         A.  No.  That helps.  It doesn't say it has to

10   be that way.

11        Q.  But how does it help?

12        A.  It helps me understand how one skilled in

13   the art and practices the art --

14        Q.  Okay.

15        A.  -- and verifies my reading of -- of this.

16   As you said earlier, could it go that way?  It

17   could.

18        Q.  Now, you say in footnote four, in my

19   opinion, a person of ordinary skill in the relevant

20   art would include a skilled mechanical or materials

21   engineer, whether or not he or she had specifically

22   worked in the consumer packaging industry.  Okay.

23   I take it that is your opinion today as to what one

24   of ordinary skill in the art would be?

25        A.  Correct.

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEURIG, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 07-17 (GMS) |
| | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | **JURY TRIAL DEMANDED** |
| TASSIMO CORPORATION, and | ) | |
| KRAFT FOODS INC., | ) | |
| | ) | |
| Defendants | ) | |

## DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS

Pursuant to the Court's Scheduling Order of July 17, 2007, Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively, "Kraft"), submits the following invalidity contentions for claims 1, 2, and 8-10 of U.S. Patent No. 6,607,762 ("'762 Patent") asserted by Plaintiff Keurig. Kraft reserves the right to supplement these invalidity contentions, or cite additional prior art, as discovery progresses or if Plaintiff Keurig modifies its disclosure of asserted claims or infringement contentions.

Kraft provides its invalidity contentions in the claim chart below. Kraft cites three (3) pieces of prior art, and submits four (4) invalidity contentions based on the cited prior art: the Kenco Singles® capsules in public use in the United States prior to the December 1, 1999 date of invention of the '762 Patent alleged by Plaintiff Keurig, as shown in Exhibit A; U.S. Patent No. 4,853,234 ("'234 Patent") to Bentley *et al.* entitled "Beverage Packages," as shown in Exhibit B; U.S. Patent No. U.S. Patent No. 4,452,130 to Klein entitled "Electrical Apparatus Useful to Prepare a Hot Beverage" ("'130 Patent"), as shown in Exhibit C; and as

further shown when inverted in Exhibit D; and, finally, the '130 Patent in view of its operation as disclosed.

These invalidity contentions are consistent with Keurig's infringement contentions in Keurig's Disclosure of Infringement Contentions served on July 27, 2007. As indicated in the Kraft defendants' non-infringement claim charts, the Tassimo® Discs do not infringe the '762 patent. Nevertheless, as shown by the following invalidity contentions, if claims 1, 2 and 8-10 of the '762 Patent are applied as Keurig applied these claims in its infringement claim charts, and reiterated in its counsel's letter dated August 3, 2007, then the cited prior art anticipates.

<u>**Invalidity Claim Charts**</u>

**A. Kenco Singles™ Capsule**

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The Kenco Singles capsule is a beverage filter cartridge. |
| an outer container having an access opening: | **YES.** The Singles capsule has an outer container with an access opening. |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The Kenco Singles includes a permeable filter received in and configured and arranged in the inner container such that it separates two chambers in the interior of the container so that infused beverage created in the first chamber must flow through the filter element before it can enter the second chamber. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The Kenco Singles include a first chamber in which a beverage medium is stored. Beverage media suitable for use with Singles capsules include, for example, roast and ground coffee, tea, and powdered chocolate. |

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

Defendants.

Civil Action No. 07-017-GMS

## PLAINTIFF'S RESPONSE TO DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORP., AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS

In response to Defendants Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.'s Joint Invalidity Contentions ("Invalidity Contentions"), Plaintiff Keurig, Incorporated ("Plaintiff" or "Keurig") provides the following validity contentions for asserted claims 1, 2, 8, 9, and 10 of United States Patent No. 6,607,762 (the "'762 patent").

Plaintiff bases these validity contentions on its current knowledge, understanding and belief as to the facts and information available to it as of the date of these disclosures. This case is still in the early stages of discovery and Plaintiff has not yet completed its investigation, collection of information, discovery or analysis related to this action. Accordingly, Plaintiff reserves the right to supplement, amend or modify the information contained herein and introduce such information and any subsequently-identified documents at trial. As discovery is taken, and additional details are provided regarding the alleged prior public use or if Defendants modify their invalidity contentions, Plaintiff's validity contentions may need to be amended, supplemented and/or corrected.

I.    **THE '762 PATENT IS VALID IN LIGHT OF THE
ALLEGED PRIOR ART IDENTIFIED BY DEFENDANTS**

The alleged prior art identified in Defendants' Invalidity Contentions *inter alia* does not

disclose each and every element of the claimed invention of the '762 patent. Defendants, in their

Invalidity Contentions, allege that the '762 patent is invalid under four separate bases of

invalidity. Defendants contend that the '762 patent is anticipated by a capsule called Kenco

Singles which was allegedly in public use in the United States prior to the invention of the

claimed matter of the '762 patent.[1] Defendants also identify two prior art patents that allegedly

anticipate the '762 patent, including United States Patent No. 4,853,234, entitled "Beverage

Packages" (the "'234 patent"), and United States Patent No. 4,452,130, entitled "Electrical

Apparatus Useful to Prepare a Hot Beverage" (the "'130 patent").[2] Defendants also allege that

the '130 patent anticipates the '762 patent in a different configuration than disclosed in the '130

patent – a configuration Defendants have dubbed "inverted."

---

[1] Defendants contend that the Kenco Singles capsule was in public use in the United States more than one year prior to the date of filing of the application that issued as the '762 patent. However, Defendants have provided no evidence supporting this contention and Keurig does not concede this issue.

[2] Defendants also included a copy of United States Patent No. 5,111,740, entitled "Electrical Apparatus Useful to Prepare a Hot Beverage" (the "'740 patent"), in the Exhibits to their Invalidity Contentions. However, Defendants' Invalidity Contentions provide no separate allegations of invalidity with respect to this patent. Defendants' Invalidity Contentions simply refer to the '740 patent in their contentions for the '130 patent. Accordingly, Keurig has not provided a detailed response as to which elements are not taught or disclosed in this patent. However, it is clear that the '740 patent does not disclose each and every element of the claimed invention of the '762 patent. Keurig reserves the right to supplement this response if Defendants supplement or otherwise amend their invalidity contentions to allege that the '740 patent invalidates the '762 patent.

2

065927.1001

A.    **Kenco Singles Capsules Do not Anticipate the '762 Patent**

Kenco Singles capsules do not anticipate the '762 patent under 35 U.S.C. § 102 because the Kenco Singles capsules do not include each and every element of the claimed invention of the '762 patent. With respect to independent claims 1 and 10 of the '762 patent, the Kenco Singles capsules do not include a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the Kenco Singles capsules for at least these same reasons. Accordingly, for at least these reasons, the Kenco Singles capsules do not anticipate the '762 patent.

B.    **The '234 Patent Does not Anticipate the '762 Patent**

The '234 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '234 patent does not disclose each and every element of the claimed invention of the '762 patent. With respect to independent claims 1 and 10 of the '762 patent, the '234 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '234 patent for at least these same reasons. Accordingly, for at least these reasons, the '234 patent does not anticipate the '762 patent.

C.    **The '130 Patent Does not Anticipate the '762 Patent**

The '130 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '130 patent does not disclose each and every element of the claimed invention of the '762 patent.

With respect to independent claims 1 and 10 of the '762 patent, the '130 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '234 patent for at least these same reasons. Accordingly, for at least these reasons, the '234 patent does not anticipate the '762 patent.

     **D.**    **The '130 Patent Does not Anticipate the**
                    **'762 Patent in an "Inverted" Configuration**

The '130 patent in an "inverted" configuration does not anticipate the '762 patent under 35 U.S.C. § 102. Defendants allege that the filter carrier unit disclosed in the '130 patent can be "inverted," *i.e.*, turned upside down, to anticipate the '762 patent. However, this "inverted" configuration is not disclosed or in any way suggested in the '130 patent. And the disclosure of the '130 patent does not enable a functioning beverage filter cartridge in the "inverted" configuration. In addition, with respect to independent claims 1 and 10 of the '762 patent, Defendants' "inverted" configuration of the '130 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge. Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '130 patent in Defendants' "inverted" configuration for at least these same reasons. Accordingly, for at least these reasons, Defendants' "inverted" configuration of the '130 patent does not anticipate the '762 patent.

4

                                            

## II.    CLAIM 10 OF THE '762 PATENT IS NOT INDEFINITE

Defendants, in their Invalidity Contentions, do not assert that any terms in the claims of the '762 patent are indefinite under 35 U.S.C. § 112(2). Indeed, Defendants, in their Invalidity Contentions, were able to identify where each of the elements of the claimed invention of the '762 patent are allegedly disclosed in the identified prior art, admitting that Defendants can (or at least claim to be able to) understand the claim language.

In Defendants Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.'s Joint Response to Plaintiff's Disclosures of Asserted Claims and Infringement Contentions, Defendants allege that the claim language "and the **and** [SIC] section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge" is indefinite. Defendants' suggestion that a minor typographical error evident from the face of the patent renders the patent claims indefinite is contrary to well established law.[3] This claim language includes a typographical error that was introduced during printing of the patent – "and the **and** section" should read "and the **second** section." It is clear from the context of the claim language and the disclosure in the specification that the second section of the lid is being referred to. Indeed, the prosecution history confirms that "and" was supposed to be "second." This claim language is from a claim added during prosecution of the application that issued as the '762 patent.[4] In the amendment where this language was added, the correct language ("second") appears. This amendment is part of the prosecution history and makes clear what the correct word is. Accordingly, this claim language is not insolubly ambiguous.

---

[3] *See, e.g., Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (holding that a district court can retroactively correct errors in claim language when the error is evident from the face of the patent).

[4] *See* Amendment to Office Action Mailed on September 24, 2002 at 4.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
*msquire@ycst.com*

*Attorneys for Plaintiff Keurig, Incorporated*

OF COUNSEL:

Michael A. Albert
Michael N. Rader
Laura E. Topper
Gerald B. Hrycyszyn
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

Dated: August 31, 2007

6

# EXHIBIT 6


**SPECIALISTS IN INTELLECTUAL PROPERTY LAW**

**Gerald B. Hrycyszyn**
ghrycyszyn@wolfgreenfield.com
direct dial 617.646.8313

September 18, 2007

David Schlitz, Esq.
Baker Botts L.L.P.
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

   Re: Keurig v. Kraft, et al.
     Civil Action No. 07-017 GMS
     <u>Our File No.: K0502.60000US00</u>

Dear David:

   In accordance with our agreement regarding the claim construction schedule, Keurig provides the following notice of the claim terms that it contends require construction:

1. "first and second chambers" in claims 1 and 10 of the '762 patent;
2. "piercable to accommodate an inflow" in claims 1 and 10 of the '762 patent; and
3. "piercable to accommodate an outflow" in claims 1 and 10 of the '762 patent.

       Very truly yours,

       WOLF, GREENFIELD & SACKS, P.C.

       Gerald B. Hrycyszyn

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

     Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

     Defendants.

Civil Action No. 07-017-GMS

## KEURIG INCORPORATED'S OPENING CLAIM CONSTRUCTION BRIEF

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Chad S.C. Stover (No. 4919)
*cstover@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
Gerald B. Hrycyszyn
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated:  October 15, 2007

### A.  "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of beverage"

| Language from Claims 1 and 10 that Keurig Suggests Requires Construction | Keurig's Proposed Construction |
|---|---|
| piercable to accommodate an inflow of liquid | designed to be pierced to form an inlet that allows an inflow of liquid without leakage |
| piercable to accommodate an outflow of beverage | designed to be pierced to form an outlet that allows an outflow of beverage without leakage |

The claim language "piercable to accommodate an inflow of liquid" and "piercable to accommodate an outflow of beverage" should be construed as complete phrases and in the context of the entire claim, as clarified by the specification. The adjective "piercable" cannot be taken in isolation and construed in a vacuum as Kraft urges the Court to do. This word is part of larger phrases whose meaning lies at the heart of the claimed invention of the '762 patent, which is directed to **same-side piercing** of a single-serve beverage filter cartridge lid to create "a cleaner puncture and an improved seal" that avoids leakage.

While just about anything is theoretically "piercable" if given the right tools and enough force, the patent plainly does not cover any and all lids that can somehow be pierced. Rather, it covers a cartridge with a lid that is piercable in a particular manner, namely "to accommodate an inflow" or "outflow." What does this qualification to the word "piercable" require? As discussed below, the patent specification answers this question by clarifying that it must be designed to be pierced **so as to form** a particular type of seal onto an **inlet and outlet**, avoiding leakage.

The adjective "piercable" in claims 1 and 10 must be construed along with the claim language that it modifies, "to accommodate an inflow of liquid" and "to accommodate an outflow of beverage," in the context of the entire claim. "Proper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation." Pause Tech. LLC

- 10-

v. TiVo Inc., 419 F.3d 1326, 1331 (Fed. Cir. 2005) (internal citations omitted). In the context of

the claim language, the adjective "piercable" modifies the phrase "to accommodate," whose

plain and ordinary meaning is "to fit, adapt, or make suitable." Webster's New Universal

Unabridged Dictionary at A52-A53; see also Oxford Dictionary of Current English at A54-A56

(accommodate – "to adapt to or fit in with"). Taken together, "piercable," meaning "capable of

being pierced," and "to accommodate," meaning "to fit, adapt, or make suitable," should be read

to mean adapted or made suitable to be pierced, i.e., "designed to be pierced."

Moreover, taken together with the remaining words in those phrases, "piercable to

accommodate **an inflow of liquid**" and "piercable to accommodate **an outflow of beverage**,"

must be read in light of the purpose of the invention, which in this case is a single-serve beverage

filter cartridge that allows same-side piercing of the cartridge while minimizing leakage. "[T]he

interpretation to be given a [patent claim] term can only be determined and confirmed with a full

understanding of what the inventors actually invented and intended to envelop with the claim."

Phillips, 415 F.3d at 1316. It is therefore important to "consider the functions of an invention"

when determining the meaning of the claim terms. Medrad, Inc. v. MRI Devices Corp., 401 F.3d

1313, 1319 (Fed. Cir. 2005). Here, the specification of the '762 patent emphasizes that the

claimed single-serve beverage filter cartridge is designed such that the "first and second lid

sections are yieldably **piercable**, respectively, **from the same direction** . . . [such that the] net

result is a **cleaner puncture and an improved seal**." ('762 Patent at A7, col. 2, ll. 6-20

(emphasis added)). And the specification further states that the claimed invention is targeted at

avoiding potential problems with the design of prior art cartridges which "can **adversely affect**

**the puncturing process, resulting in leakage**." ('762 Patent at A7 at col. 1, ll. 45-50 (emphasis

added)). A person of ordinary skill in the art certainly would not view a cartridge as being

- 11 -

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

        Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

        Defendants.

Civil Action No. 07-017-GMS

**REDACTED –
<u>PUBLIC VERSION</u>**

**KEURIG'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*
TO PRECLUDE EXPERT TESTIMONY OF TED LINGLE**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

Kraft seeks to preclude Keurig's coffee expert, Ted Lingle, from testifying that Kenco Singles cartridges (which Kraft alleges constitute prior art) fail to "produce a beverage" via same-side piercing as required by claim 1 of Keurig's '762 patent. Kraft's motion should be denied. Mr. Lingle is a recognized leader and expert in the coffee industry, and will address a factual question about coffee on which he has considerable – and undisputed – expertise.[1]

Kraft had the opportunity to present expert testimony that Singles cartridges produce a beverage via same-side piercing – an issue on which Kraft bears the burden of proof – but elected not to do so. If Kraft is nevertheless going to claim that the "beverage" claim limitation is met, then Keurig is certainly entitled to respond. Kraft's motion is an improper attempt to compensate for its own tactical choice not to retain a coffee expert by excluding Keurig's expert.

Mr. Lingle's testimony will not, as Kraft tries to suggest, intrude on the Court's role in construing the claims. Kraft (like Keurig) elected not to ask the Court to construe the term "beverage," preferring instead to let that term have its ordinary meaning. The ordinary meaning of "beverage," and the appropriate method for determining whether a particular liquid meets that standard, are questions of fact for the jury as to which Mr. Lingle's testimony can be helpful.

## I.    BACKGROUND

Mr. Lingle has extensive experience in all aspects of the coffee industry, including growing, roasting and brewing. He has written several books on coffee brewing. See Opening Expert Report (Ex. A) at 2-3. Keurig retained him as an expert on a number of issues, and Mr. Lingle prepared opening and rebuttal expert reports detailing his opinions. (Exs. A and B).

---

[1] As a threshold matter, Kraft's motion is fatally flawed because it seeks to preclude all testimony from Mr. Lingle, yet addresses only his rebuttal expert report on patent validity and provides no explanation why he should be precluded from offering the testimony outlined in his opening expert report (e.g., on infringement and damages issues). In any event, as explained below, Kraft's request to exclude Mr. Lingle's validity testimony is meritless.

### A.    Mr. Lingle's Infringement and Damages-Related Opinions

Mr. Lingle's opening report (Ex. A) describes his opinions related to infringement and damages – issues on which Keurig bears the burden of proof.

On infringement, Mr. Lingle will testify that the ground coffee and tea in Kraft's accused T-Discs are soluble beverage media as required by claim 1 of the '762 patent. (Ex. A at 8).[2]

Mr. Lingle will also provide background information about the coffee industry and the coffee brewing process, and will explain the benefits of Keurig's same-side piercing invention. (Ex. A at 11-13). This testimony is relevant to the question of how valuable the invention is, and therefore what reasonable royalty Keurig should receive under the Georgia-Pacific factors.

### B.    Mr. Lingle's Validity-Related Opinions

Mr. Lingle's rebuttal report (Ex. B) explains his opinions regarding Kraft's invalidity defense. Mr. Lingle will testify that Singles cartridges simply do not "produce a beverage" via same-side piercing as required by claim 1 of the '762 patent. Having analyzed the liquids that Keurig's engineering expert Professor Alexander Slocum obtained when testing Singles cartridges in a same-side piercing configuration, Mr. Lingle will explain that water injected through the foil lid of a Singles cartridge (rather than through the pre-molded inlet hole on the opposite side) burrows a hole through the coffee bed, over-extracting some of the coffee and under-extracting the rest. Same-side piercing of Singles cartridges thus produces a weak and foul-tasting liquid that fails both objective and subjective criteria for qualifying as a beverage. (Ex. B at 2-8). See also Lingle Depo. (Ex. D) at 28-30, 84, 90-91, 119-120.

---

[2] Although this point is uncontroversial, Kraft has refused to concede it. See Kraft's Resp. to Keurig's Req. for Admission Nos. 4-6 (Ex. C at 3).

C.    **Procedural Posture**

Keurig notified Kraft of its position that Singles cartridges fail to meet the "to produce a beverage" limitation almost a year ago, on August 31, 2007, in its response to Kraft's invalidity contentions. Keurig explained that Singles cartridges lack "a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium <u>to produce a beverage</u>; and (2) piercable to accommodate an <u>outflow of a beverage</u> from a second chamber to the exterior of the cartridge." (Ex. E at 3) (emphasis added).[3] In other words, Keurig explained that Singles cartridges (designed for opposite-side piercing) simply would not work to make a beverage if one tried to use them with same-side piercing.

In January 2008, Kraft revealed to Keurig, for the first time, that it had conducted physical tests of Singles cartridges in a same-side piercing configuration.[4] After learning of Kraft's tests, Keurig asked its experts to perform their own tests to determine (*inter alia*) whether Singles cartridges produce a beverage via same-side piercing.

II.    **ARGUMENT**

A.    **Mr. Lingle's Testimony Regarding Testing of Singles Cartridges Will Assist the Jury in Resolving a Key Question of Fact.**

Mr. Lingle analyzed the liquids Professor Slocum obtained from Singles cartridges when he pierced them in the manner Kraft suggests. He measured the solids dissolved in the liquids using an accepted scientific instrument. He also viewed, smelled and tasted the liquids, and applied his undisputed decades of expertise as a coffee "cupper" or taster.

---

[3] Kraft's brief incorrectly asserts that Keurig's August 2007 communication to Kraft ignored the "to produce a beverage" claim limitation. (D.I. 107 at 2).

[4] ██████████████████████████████████████████████████████████████ Because Kraft refused to produce its engineer's report on his apparatus and tests, Keurig has moved *in limine* to exclude evidence of the testing. (D.I. 108).

Based on all these forms of testing, Mr. Lingle concluded that the liquids do not meet the plain and ordinary meaning of a "beverage."[5]  Determining plain and ordinary meaning, and assessing whether that meaning is satisfied, are classic questions of fact that in no way intrude on the Court's role in claim construction.  In Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157 (Fed. Cir. 2008), for example, because the district court did not specify a particular way of determining "wall thickness" as a matter of claim construction, the Federal Circuit held that the appropriate method was a question of fact for the jury based on expert testimony.  Id. at 1181.  See also Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc., 510 F. Supp. 2d 356, 362 n.2 (D. Del. 2007) ("The issues of when it is determined that ACA is at an 'acceptable level' or how it is determined that ACA is at an 'acceptable level' are essentially different, potentially triable, issues of fact….Accordingly, the court will not foreclose expert testimony as to the meaning of the acceptability limitation."); Agere Systems, Inc. v. Atmel Corp., C.A. No. 02-CV-864, 2005 WL 2994702, *11 (E.D. Pa. Aug. 17, 2005) (court denied motions in limine and allowed each party "to present its case to the jury based on its belief as to what the plain and ordinary meaning of the patents' language is").  Likewise, because this Court's Markman order did not address the word "beverage" or specify a particular method of determining whether a liquid constitutes one, Mr. Lingle should be allowed to describe the term's plain and ordinary meaning and explain to the jury how he evaluated the Singles liquids against that standard.

---

[5] Kraft argues that Mr. Lingle applied a definition of "beverage" other than its ordinary meaning. (D.I. 107 at 2).  Kraft bases its argument on a single line from Mr. Lingle's deposition that it takes out of context.  In fact, Mr. Lingle explained that the ordinary meaning of "beverage" is a liquid that "could be either sold or consumed for a person's enjoyment" (Ex. D at 64), and that this ordinary meaning is consistent with the '762 patent's focus on consumer acceptability.  Id. at 65-66.  In the specific context of brewed coffee beverages as described in the '762 patent, Mr. Lingle explained that there are certain objective criteria (measurement of dissolved solids) and subjective criteria (evaluation of texture, body, taste and aroma) that are used to determine whether a particular liquid meets that plain and ordinary meaning.  Id. at 28-30, 84.  Mr. Lingle does not rely on, nor will he testify to, anything other than plain and ordinary meaning.

- 4 -

**B.    Mr. Lingle's Expertise Puts Him in an Ideal Position to Assess Whether Singles Cartridges Produce a Beverage With Same-Side Piercing.**

Mr. Lingle's decades of experience in coffee brewing, including as a coffee "cupper" (taster) and renowned cupping trainer, and Executive Director of the Coffee Quality Institute, more than qualify him to testify regarding whether the Singles liquids constitute coffee beverages. Kraft's argument to the contrary (D.I. 107 at 4-5) turns on the false premise that only a person of skill in the technical art encompassing the entire claim (including the engineering and fluid dynamics aspects thereof) can offer expert testimony on issues related to infringement or invalidity. This simply is not true; when a patented invention encompasses multiple technical disciplines, it is addressed to people with skills in each of those fields. E.g., Enzo Biochem., Inc. v. Calgene, Inc., 188 F.3d 1362, 1373 (Fed. Cir. 1999) (patents involving "distinct arts" are to be assessed from the perspective of "the adepts of each"). Kraft makes much of Mr. Lingle's testimony that he is not a practicing engineer with skill in all the arts to which the '762 patent relates, but as a matter of law this is simply irrelevant given Mr. Lingle's undisputed expertise in one of these arts, namely analyzing coffee liquids. Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd., 122 F.3d 1040, 1042 (Fed. Cir. 1997) (rejecting as "meritless" the defendants' objection to expert testimony on the ground that the expert had acknowledged he was not a person of ordinary skill in the art). Cf. Sprint Commc'ns Co. v. Vonage Holdings Corp., 500 F. Supp. 2d 1290, 1345 (D. Kan. 2007) (declining to strike expert who "may not technically qualify as a person of ordinary skill in the art....[because] any shortcomings in his qualifications go to the weight of his testimony, not its admissibility."). Indeed, Kraft does not cite a single patent case in which an expert was precluded based on the specific nature of his or her expertise.

**III.    CONCLUSION**

Kraft's motion *in limine* to preclude Mr. Lingle's expert testimony should be denied.

- 5 -

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Michael A. Albert
Michael N. Rader
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated: August 15, 2008

- 6 -

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

      Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

      Defendants.

Civil Action No. 07-017 (GMS)

## RULE 26(A)(2)(B) EXPERT REPORT OF TED LINGLE
## APRIL 15, 2008

## I.    SCOPE OF WORK AND COMPENSATION

I have been engaged by counsel for Keurig, Incorporated ("Keurig") to examine the materials discussed in the body of this report and/or listed in Exhibit A, and to evaluate whether Defendants' (collectively, "Kraft") Tassimo "T-Discs" include all of the features described in the asserted claims of Keurig's U.S. Patent No. 6,607,762 ("the '762 patent"). I have also been asked to provide a perspective on background issues such as the coffee industry, the process of brewing coffee, the development of "single-serve" systems like those sold by Keurig and Kraft, and the value of particular benefits that the invention described in the '762 patent makes possible.

I expect to provide testimony at trial conveying and explaining the opinions set forth in this report. I further expect to provide testimony covering additional background information pertinent to this case. My testimony may include use of exhibits and demonstrations. I have not yet prepared such exhibits or demonstrations, but expect to do so in accordance with the Court's scheduling orders. In support of my opinions, I may also use any of the documents produced by the parties in discovery and/or industry publications, and particularly those documents referred to in the body of this report or in any exhibit hereto. If additional documents come to light at a later time, I reserve the right to address those as well.[1]

My compensation in this case, which follows my standard fee schedule and is not contingent in any way on the outcome of this litigation, is as follows: $100 per hour for trial preparation activities; $300 per hour for deposition testimony; $1,500 for a half-day of trial testimony; and $2,500 for a full day of trial testimony.

---

[1] For example, I understand from Keurig's counsel that Kraft recently produced a large quantity of documents that Keurig's counsel has not yet been able to review in detail.

## II.    QUALIFICATIONS

I am the Executive Director of the Coffee Quality Institute ("CQI"), a non-profit organization that the Specialty Coffee Association of America (SCAA) founded in 1996 in order to improve the quality of coffee and also the lives of the people who produce it.  I became Executive Director of CQI in 2006.

I previously served for 15 years as the Executive Director of the SCAA, an organization that I co-founded with other industry members in 1983.  The SCAA is the trade association for the specialty coffee industry and is involved in setting quality standards and providing industry training in the areas of coffee processing, roasting, cupping and brewing.  During my tenure as Executive Director, the SCAA grew in size from 350 to over 2,400 members.  The SCAA also established a number of technical standards that advance quality guidelines in all facets of coffee, from seed to cup.  I remain on the organization's staff as Senior Advisor on technical specifications for coffee quality.

I also worked as vice president of marketing for Lingle Bros. Coffee, Inc. for 20 years from 1970 to 1990.  During this period I directed the company's sales programs for the food service, office coffee service, and specialty coffee market segments.  I was responsible for establishing quality standards for the company's products and conducting training programs for both company personnel and customers.  In addition, I represented the company on various coffee industry boards and committees.

I graduated from the United States Military Academy with a B.S. in civil engineering.

I have served on committees of the National Coffee Association and the National Coffee Service Association.  I was also Chairman and a member of the Board of Directors of the Coffee Development Group/Promotion Fund of the International Coffee Organization.

I have received a number of coffee industry honors.  In 1998, I was awarded the National Medal of Merit by the Federation of Coffee Growers of Colombia.  In 2004, I was awarded the Order Flor de Café Medal of Merit by the Guatemalan National Coffee Association.  In 2007, I was awarded the Bwana Kahawa Lifetime Achievement Award by the Eastern African Fine Coffees Association (EAFCA).  EAFCA officers dubbed me the "grandfather of the specialty coffee movement."

I have testified before the U.S. House Committee on International Relations Subcommittee on the Western Hemisphere at hearings concerning "The Coffee Crisis in the Western Hemisphere."

Through my three decades of  practical work experience in the coffee industry, I have become intimately familiar with the process of brewing coffee and the many variables that contribute to the quality of the product.  I pioneered the use of the Coffee Conductivity Meter, an electronic instrument used to measure coffee strength.  I also have extensive experience

"cupping" coffee (i.e., evaluating the sensory effects of coffee's aroma, taste, and body).  I travel extensively internationally teaching these skills in many coffee producing countries.

I have written a number of books related to the coffee industry.  For example, I wrote The Coffee Cupper's Handbook, which is now in its third edition.  Coffee cupping is the traditional means for professional coffee tasters to make sensory evaluations of coffee beans.  I wrote the Cupper's Handbook in order to promote the discussion of meaningful and accurate coffee flavor terminology.  The book describes flavor chemistry and explains the sources of coffee's aroma, taste, and body.

Likewise, The Coffee Brewing Handbook: A Systematic Guide to Coffee Preparation is a compendium of the many scientific studies on coffee brewing conducted by the coffee industry during the last fifty years.  I wrote the Brewing Handbook to help coffee merchants understand how to maximize the potential of the coffee beans that they purchase.

I have also written shorter books (The Basics of Cupping Coffee and The Basics of Brewing Coffee) in order to distil the content of my handbooks for a broader audience.

Exhibit B lists various books and articles that I have written, particularly over the last ten years.  I regularly write for CQI and SCAA circulars as well as other trade publications.

A list of the cases during the last four years in which I have testified as an expert either at trial or by deposition is provided in Exhibit C.

## III.    SUMMARY OF OPINIONS

Based on my review of Kraft's products, as well as the other materials listed in Exhibit A, it is my opinion that Kraft's Tassimo T-Discs having an internal filter (i.e., filter coffee, crema, tea, and espresso T-Discs) include all of the features in the asserted claims (i.e., claims 1, 2, 8, 9, and 10) of Keurig's '762 patent.

It is also my opinion that various advantages of the same-side piercing technology described in Keurig's '762 patent, and adopted in Kraft's Tassimo / T-Disc system, translate into real-world benefits that boost sales of Kraft's Tassimo brewers and T-Discs.

**"[A] soluble beverage medium stored in said first chamber"**

Any coffee, crema coffee, espresso, or tea T-Disc sold by Kraft has a soluble beverage medium stored in the first chamber of the cartridge (i.e., the portion of the cartridge into which water flows before passing through the filter). As discussed above, a significant portion of the substances found in ground coffee and tea are soluble in hot water. These soluble substances in fact give coffee and tea their aroma and taste. As I explain more fully in the background section, coffee brewing is the art of controlling coffee strength (i.e., solubles concentration) and extraction (i.e., solubles yield). Total dissolved solids has been a key metric for the coffee industry for more than 50 years, and the coffee conductivity meter that I pioneered is a useful tool for making these measurements.

The fact that not <u>all</u> of the substances in roasted ground coffee or tea are soluble under normal brewing conditions is immaterial. Most of the insoluble bean fiber is left behind in the spent coffee grounds (or leaf fiber in the case of tea), and additional insoluble substances are removed during the brewing process by means of a filter (one of the components described and claimed in the '762 patent). If only instant coffee or other <u>completely</u> soluble ingredients constituted a "soluble beverage medium," there would be no need for a filter. Accordingly, I see no basis for interpreting the word "soluble" in the claim to mean "completely soluble," as I understand Kraft has proposed. Indeed, such an extreme interpretation would directly contradict other aspects of the '762 patent specification. The '762 patent explains that the beverage medium loaded into the first chamber is "typically roasted ground coffee." (Col. 3, line 20). Roasted ground coffee, which is not "completely" soluble, is the ingredient for Kraft's coffee, crema coffee, and espresso T-Discs.

One can look at the "soluble beverage medium" issue from another angle as well. That portion of the coffee grounds which dissolves to form the coffee is of course a "soluble beverage medium." I understand from Keurig's counsel that in U.S. patent law, adding material or structure to a device that infringes a patent claim does not avoid infringement. In the case of the T-Disc, using coffee grounds that include a soluble component and an insoluble component does not change the fact that the soluble component (at a minimum) constitutes a soluble beverage medium.

**"a lid closing the access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber"**

A T-disc has a lid that covers the access opening. This lid is necessary to retain the contents of the T-disc inside the outer container. A portion of the lid covers the section of the cartridge into which water flows before it passes through the internal filter. In other words, a "first section" of the lid (shown in blue below) overlies the "first chamber" as the Court has construed the term. Another portion of the lid covers the section of the cartridge into which the liquid (now a solution of water and coffee or tea "soluble solids") flows after passing through the filter (shown in red below):

### Claim 8

Infringement of claim 8 depends on infringement of claim 1.  The only additional requirement is that the outer container be "impermeable to liquids and gases."  The T-Disc satisfies this limitation.  The hard plastic of the container keeps unwanted liquid from reaching the beverage media (roast and ground coffee, tea, etc.) inside the T-Disc.  I have personally tested T-Discs and observed that they are watertight.  The hard plastic of the container also minimizes the flow of oxygen and other gases into the beverage media.  Kraft informs customers that T-Discs can be enjoyed up to six weeks after opening the outer carton wrapping.[2]  Assuming timely delivery of a T-Disc to a consumer, six weeks is a commercially reasonable period of time for the T-Disc to remain unspoiled.  Hence, the T-Disc would be considered effectively oxygen impermeable.

### Claim 9

Infringement of claim 9 depends on infringement of claim 1.  The only additional requirement is that the lid be "impermeable to liquids and gases."  The T-Disc satisfies this limitation.  The lid keeps unwanted liquid from reaching the beverage media (roast and ground coffee, tea, etc.) inside the T-Disc.  As noted above, I have personally tested T-Discs and observed that they are watertight.  The content of the lid also minimizes the flow of oxygen and other gases into the beverage media.  The lid includes an aluminum layer, and aluminum is known to be a good oxygen barrier.

### Claim 10

Independent claim 10 of the '762 patent essentially combines the requirements of independent claim 1 with the requirements of dependent claims 2, 8, and 9.  T-Discs therefore infringe claim 10 for the reasons that I have explained above.[3]

**B.    The Benefits of Same-Side Piercing to Kraft's Tassimo & T-Disc System**

The same-side piercing invention described in Keurig's '762 patent offers a number of important advantages that contribute to the desirability of the Tassimo and T-Disc system.

By making the inlet and outlet piercers operate from the same direction, the developers of the Tassimo brewers were able to incorporate a very simple combined design that includes both piercers in one unit which can be made of plastic (rather than metal, which is more expensive) and is easily removable from the brewer.

---

[2]  Response to Frequently Asked Question No. 18, http://www.tassimo.ca/tassimo/page?siteid=tassimo-prd&locale=caen1&PagecRef=531.

[3] Claim 10 does require a "planar filter element" whereas simply claim 1 specifies a "filter element."  I understand that Kraft agrees that the distinction is immaterial for the purposes of the present case.  The Court noted this agreement in the Claim Construction Order (page 2, note 2).



This design, which is made possible by the same-side piercing invention, has a variety of advantages including the following:

• The cheaper the piercer unit, the lower the price that Kraft or its partners need to charge for the Tassimo brewers. Particular "price points" (e.g., under $100) can be important when it comes to coffee brewers, helping Kraft to sell more brewers and ultimately more T-Discs.

• The Tassimo brewer's piercer unit can readily be removed and cleaned – even in the dishwasher. The Tassimo User Guide[4] specifically notes that the piercing unit is "easily removable" and "dishwasher safe." For sanitation reasons, this is particularly important when using a milk T-Disc to make a latte, cappuccino, or chai tea. In fact, the Tassimo User Guide recommends rinsing the piercing unit after using a milk or chocolate T-Disc. My understanding is that Kraft has actively promoted the Tassimo system's ability to produce milk-based drinks – a feature that current Keurig systems do not include. In short, same-side piercing, which facilitates removal and cleaning of the piercer unit, plays an important role in Defendants' ability to differentiate their products in this way.

• The piercer can also be removed to check for blockage or damage. Defendants advise such inspection in response to several frequently asked questions (e.g., Nos. 33 and 35).[5] Defendants also sell replacement piercer units. The ability of customers to troubleshoot and repair Tassimo brewers in this manner distinguishes Tassimo from typical consumer electronic devices (including most coffee brewers) and fosters favorable word-of-mouth.

---

[4] http://www.tassimodirect.com/tassimo/cust/UserGuide.pdf.

[5] http://www.tassimo.ca/tassimo/page?siteid=tassimo-prd&locale=caen1&PagecRef=531.

- By allowing the key mechanical components and tubing for both the inflow and outflow to sit in the roughly the same location (<u>underneath</u> the T-Disc, which is inserted with the lid down), the same-side piercing invention also gave designers the flexibility to create a compact and attractive brewer.  Defendants tout the fact that Tassimo is only 30.2 cm high, "making it a compact addition to any kitchen." (FAQ 23).

    I, Ted R. Lingle submit this report pursuant to Fed. R. Civ. P. 26(a)(2).  I may adjust my analysis in light of the views offered by Kraft (or its expert witnesses) or based on information that is provided to me in the future.  I may express additional views in an expert report submitted in rebuttal to expert reports submitted by Kraft.

    I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated:  April 14, 2008                                        _____

                                                                            Ted R. Lingle

Exhibit B

CONFIDENTIAL – ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

       Plaintiff,

v.

KRAFT FOODS GLOBAL, INC.,
TASSIMO CORPORATION, and
KRAFT FOODS INC.,

       Defendants.

Civil Action No. 07-017 (GMS)

**CONFIDENTIAL
ATTORNEYS' EYES ONLY**

**RULE 26(A)(2)(B) REBUTTAL EXPERT REPORT OF TED LINGLE
<u>MAY 13, 2008</u>**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.  SCOPE OF WORK AND QUALIFICATIONS

I have been engaged by counsel for Keurig, Incorporated ("Keurig") to review and respond to the expert report submitted by Malcolm E. Taylor dated April 15, 2008.  As described more fully in the expert report that I previously submitted in this case, I have worked in the coffee industry for decades and I am intimately familiar with the process by which a coffee beverage is produced, from seed to cup.

I expect to provide testimony at trial conveying and explaining the opinions set forth in this report.  I further expect to provide testimony covering additional background information pertinent to this case and my testimony.  My testimony may include use of exhibits and demonstrations. I have not yet prepared such exhibits or demonstrations, but expect to do so in accordance with the Court's scheduling orders.  In support of my opinions, I may also use any of the documents produced by the parties in discovery and/or industry publications, and particularly those documents referred to in the body of this report or in any exhibit hereto.  If additional documents come to light at a later time, I reserve the right to address those as well.

Exhibit A lists the additional materials (apart from those listed in Exhibit A of my opening report) that I have reviewed for this report.

## II.  SUMMARY OF OPINIONS

In my opinion, piercing the foil lid of a Singles cartridge containing ground coffee (like those that Mr. Taylor and the Kraft employees tested) and injecting a quantity of water into the cartridge (as opposed to making use of the pre-molded inlet hole on the side of the cartridge opposite the foil lid) does not produce a "beverage" within the meaning of Keurig's '762 patent. That is, one does not obtain output liquid of sufficient strength and with an adequate flavor and aroma profile so as to be accepted as a coffee beverage by consumers.  Therefore, while the Singles cartridge does contain a "soluble beverage medium," it does not have a single lid with both (1) a "first section … being pierceable to accommodate an inflow of liquid … for infusion with the beverage medium to produce a beverage" and (2) a "second section … being permeable to accommodate an outflow of the beverage to the exterior of [the] cartridge."

In my opinion U.S. Patent Nos. 4,853,234 ("the '234 patent") and 4,452,130 ("the '130 patent") likewise fail to disclose a cartridge meeting the above claim limitations.  A typical engineer in the coffee industry reading the patents would not understand them to describe a cartridge that is potentially (let alone necessarily) capable of producing a beverage within the meaning of the '762 patent when making use of the same-side piercing concept that Keurig's inventors pioneered.

It is also my opinion that the outer container of the Singles cartridge is not impermeable to gases within the meaning of that phrase as used in claim 8 of the '762 patent.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

III.    **OPINIONS AND EXPLANATIONS**

    A.    **The Singles Cartridge is Not Capable of Converting
A Soluble Beverage Medium Into a Corresponding
Beverage Through Same-Side Piercing.**

    Mr. Taylor opines that the Singles cartridge[1] has a lid with (1) a "first section … being pierceable to accommodate an inflow of liquid … for infusion with the beverage medium to produce a beverage" and (2) a "second section … being piercable to accommodate an outflow of the beverage to the exterior of [the] cartridge." Specifically, Mr. Taylor concludes that (1) the foil lid of the Singles cartridge is physically capable of being pierced to permit a flow of liquid into the coffee storage chamber; and (2) the lid is also physically capable of being pierced a second time to permit a flow of liquid out of the cartridge after that liquid has been in contact with the ground coffee.

    Mr. Taylor's analysis overlooks the defining feature of the '762 patent invention: a single-serve filter cartridge that takes a soluble beverage medium (e.g., ground coffee) and converts it into a finished product that consumers will want to purchase and drink. For example, the '762 patent notes the "widespread acceptance" that certain prior art single-serve filter cartridges had gained in the marketplace. (Col. 1, lines 35-36). The patent stresses the value of using impermeable materials for the outer container and lid, or enclosing the cartridges within an impermeable wrap. This prevents oxidation and preserves freshness. In the context of the '762 patent, therefore, "beverage" means a brewed liquid (e.g., coffee) of sufficient strength and with an adequate flavor and aroma profile so as to be accepted by consumers for purchase and consumption.

    While Mr. Taylor suggests that it is theoretically possible to take a Singles cartridge (designed for conventional opposite-side piercing), inject hot water into the lid, and ultimately collect a "coffee liquor" through a second piercing of the same lid, he offers no analysis of or opinion on whether that "liquor" constitutes a beverage within the meaning of the '762 patent.

    Working with Alexander Slocum, a professor of engineering at the Massachusetts Institute of Technology, I tested a series of Singles cartridges and concluded that the liquid obtained when trying to use those cartridges in a same-side piercing setup is not a beverage within the meaning of the '762 patent. I observed Professor Slocum carry out a series of experiments using a newly-opened sleeve of Singles cartridges containing ground coffee (specifically, Kenco Colombian Coffee) as the soluble beverage medium:

---

[1] I understand that Keurig and Kraft disagree as to whether the Singles cartridge qualifies as "prior art" to Keurig's '762 patent. I have not been asked to render an opinion on that subject.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

The table below details the sets of parameters tested, all of which involved piercing the foil lid for both inflow of water and outflow of liquid.  The table also indicates the corresponding total dissolved solids (TDS)[2] of the liquids obtained from the testing.  The testing was performed using parameters designed to duplicate the water volume (180 mL) and peak temperature (185 degrees F) generated by a Singles brewer.[3]

| Experiment | Orientation | Pressure | Time | TDS |
|---|---|---|---|---|
| 1 | Foil down, with plate | 3.2 psi | 19 seconds | 615 ppm |
| 2 | Foil down, with plate | 15.7 psi | 12 seconds | 635 ppm |
| 3 | Foil up, with plate | 14.7 psi | 27 seconds | 865 ppm |
| 4 | Foil up, with plate | 15.4 psi | 8.2 seconds | 629 ppm |
| 5 | Foil up, with plate | 3.4 psi | 1 minute 6 seconds | 674 ppm |
| 6 | Vertical, with plate; outlet nozzle at the bottom | 3.1 psi | 19.2 seconds | 802 ppm |
| 7 | Vertical, with plate; outlet nozzle at the bottom | 15 psi | 13.72 seconds | 769 ppm |

These experiments, using Singles cartridges containing ground coffee as the soluble beverage medium, yielded liquids that simply did not constitute coffee beverages within the meaning of the '762 patent.[4]  Photos of several of the liquids follow below.

---

[2] These readings were taken using a coffee conductivity meter.  My earlier report describes this instrument and my role in its development.

[3] A Singles brewer was tested using a Kenco Colombian Singles cartridge in order to establish these parameters.  I also inspected a Singles cartridge after it had been used in the Singles brewer and noted that it had been pierced on the foil side only for the outlet.  In other words, the Singles brewer uses conventional opposite-side piercing technology.

[4] I was not present when Kraft's engineers (or Mr. Taylor) tested Singles cartridges and therefore did not see or taste the resulting liquids.  Even if those liquids constituted coffee beverages within the meaning of the '762 patent (which I doubt in light of Professor Slocum's results) such tests would not establish that Singles cartridges are necessarily piercable to accommodate an inflow and an outflow and to produce a beverage as I understand is required by the '762 patent claims.  Professor Slocum's testing shows that, under a wide variety of conditions and parameters, Singles cartridges do not meet those claim limitations.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



Experiment 2

CONFIDENTIAL – ATTORNEYS' EYES ONLY



Experiment 4

CONFIDENTIAL – ATTORNEYS' EYES ONLY



Experiment 5

CONFIDENTIAL – ATTORNEYS' EYES ONLY

I smelled and tasted several of these liquids, confirming my visual analysis that they do not constitute coffee beverages within the meaning of the '762 patent. The TDS measurements also support this conclusion. Even the strongest of the liquids obtained in Professor Slocum's testing (experiment 3 – 865 ppm) had a TDS reading almost 20 percent lower than that of the cup of coffee brewed by inserting a Kenco Colombian Singles cartridge into an actual Kenco Singles brewer for opposite-side piercing as designed (1080 ppm).

I also understand that Professor Slocum did further same-side-piercing testing using the Kenco Colombian Singles cartridges. In particular, I understand that he removed the inlet seals (so as to simulate cartridges produced on a "Lambert" production line) and obtained output liquids less than one third as concentrated (220 and 327 ppm) as the Singles brewer baseline. Based on the TDS readings alone, such liquids plainly do not constitute beverages within the meaning of the '762 patent.





---

[5] A person of skill in the art, viewing the Singles cartridge, would appreciate that the manifold is intended to be used and that the cartridge is intended to be pierced for the inlet at the beveled inlet hole on the side of the cartridge opposite the foil lid. For purposes of the experiments described in this report, I asked Professor Slocum to use the Singles cartridges in a same-side piercing setup even though one of skill in the art would not have been motivated to do so.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**B.    The Cartridges Described in the '234 and '130 Patents Are
Not Capable of Converting a Soluble Beverage Medium Into a
Corresponding Beverage Through Same-Side Piercing.**

For similar reasons, it is my opinion that the '234 and '130 patents likewise fail to
disclose a cartridge with a soluble beverage medium and a lid that is both (1) capable of being
pierced to accommodate an inflow of liquid for infusion with the beverage medium to produce a
beverage within the meaning of the '762 patent and (2) capable of being pierced to accommodate
an outflow of that beverage to the exterior of the cartridge.

As with Kenco Singles cartridges, the embodiments described in the '234 and '130
patents are designed for conventional opposite-side piercing.  There is no disclosure or
suggestion in either of these patents of the idea of same-side piercing through a foil lid for both
inflow of liquid and outflow of beverage.

The cartridges described in the '234 patent are similar in many respects to the Singles
cartridges; the '234 patent even describes using water at high pressures up to 150 psi. (Col. 5,
lines 35-36).  The embodiment that Mr. Taylor discusses in his report is also described as
including slots through which the water passes before infusing up through the beverage medium
(after traveling down the inlet, from the top of the cartridge to the bottom). (Col. 7, lines 22-26).
This manifold-based distribution of the hot water is critical for transforming the soluble beverage
medium (e.g., ground coffee) into a corresponding beverage.  If one instead tried to utilize the
cartridges described in the '234 patent by means of same-side piercing, the results would be
similar to what I observed with the Singles cartridge testing described and illustrated above.

The cartridge in the '130 patent is designed for the ordinary top-down flow of hot water
through the soluble beverage medium.  Mr. Taylor nevertheless proposes to flip the cartridge
upside down and have the hot water flow up through the coffee bed.  What might happen in such
a scenario, and whether it would produce a coffee beverage, is unknown.[6]  In my opinion,
without even distribution of hot water jets as provided with a Singles-type manifold system, the
"upside down" approach is very unlikely to produce a beverage within the meaning of the '762
patent.

**C.    The Singles Cartridge is Not Impermeable to Gases.**

Claim 8 of the '762 patent requires that the outer container of the cartridge be
"impermeable to liquids and gases."  Singles cartridges do not meet this requirement because
Kraft's own packaging materials indicate that the cartridges are only best if used within one
month of opening the metallic sleeve that serves as an oxygen barrier:

---

[6] Mr. Taylor reports neither having made nor tested cartridges as described in the '234 and '130
patents.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



The package pictured above contained cartridges with closed inlet holes, yet Kraft includes the same one-month recommendation on sleeves containing cartridges with <u>open</u> inlet holes even though the contents of those cartridges are directly open to the air:



CONFIDENTIAL – ATTORNEYS' EYES ONLY

According to Kraft's own packaging, therefore, the outer container of the Kenco Singles cartridges adds no additional oxygen barrier protection relative to a cartridge that is completely open to the air (via a hole in the container).



I, Ted R. Lingle, submit this report pursuant to Fed. R. Civ. P. 26(a)(2). I may adjust my analysis in light of the views offered by Kraft (or its expert witnesses) or based on information that is provided to me in the future.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated: May 13, 2008

Ted R. Lingle

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit A – Additional Materials Considered for Rebuttal Report

- Expert Witness Report of Malcolm E. Taylor (dated 4/15/08), including Exhibits 1-15

- U.S. Patent No. 4,853,234

- U.S. Patent No. 4,452,130

- Various Kenco Singles cartridges

- Deposition Transcript of Andrew Bentley (2/27/08)

- Deposition Transcript of Hubert Weber (4/1/08)

Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,                    )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )    C.A. No. 07-17 (GMS)
                                         )
KRAFT FOODS GLOBAL, INC.,                )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and                 )
KRAFT FOODS INC.,                        )
                                         )
          Defendants                     )

## DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, AND KRAFT FOODS INC.'S RESPONSE TO KEURIG'S FIRST SET OF REQUESTS FOR ADMISSION

Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively, "the Kraft Defendants"), by counsel, hereby submits its Response to Keurig, Inc.'s ("Keurig"), First Requests for Admission, as follows:

## GENERAL OBJECTIONS

The Kraft Defendants generally object to Keurig's Requests for Admission (the "Requests") on the grounds stated below. These objections apply to each of the Requests unless otherwise specifically indicated below. Neither the Kraft Defendants' specific objections nor its responses shall be deemed a waiver of these General Objections.

1.    The Kraft Defendants object to the Requests to the extent they impose any requirement or discovery obligation exceeding those set forth in the Federal Rules of Civil Procedure and the Local Rules of U.S. District Court for the District of Delaware.

3.     Admit that a T-DISC includes a filter element received in and configured and arranged to subdivide the interior of the container into **first and second chambers**.

**RESPONSE**:   This Request is answered with regard to the Court's Order Construing the Terms of U.S. Patent No. 6,607,762 ("Order"), dated January 23, 2008.  To the same extent that the Kenco Singles Cartridge includes a filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers, the T-DISC likewise includes a filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers.  If, and to the extent, Plaintiff applies the Court's claim constructions in a way as to deny that the Kenco Singles Cartridge includes a filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers, it is denied that the T-DISC includes a filter element received in and configured and arranged to subdivide the interior of the container into first and second chambers.

4.     Admit that ground coffee is a soluble beverage medium.

**RESPONSE**:  Denied.

5.     Admit that tea is a soluble beverage medium.

**RESPONSE**:  Denied.

6.     Admit that a T-DISC includes a soluble beverage medium stored in the first chamber.

**RESPONSE**:   This Request calls for a claim construction, and, thus, the Kraft Defendants can neither admit nor deny.

3

Exhibit D

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------X

KEURIG, INCORPORATED,

                          Plaintiff,

VS

KRAFT FOODS GLOBAL, INC., TASSIMO
CORPORATION, and KRAFT FOODS, INC.,

                          Defendants.

Civil Action No. 07-CV-0017-GMS

---------------------------------------X


          VIDEOTAPED DEPOSITION OF TED R. LINGLE

               Friday, June 27, 2008

                9:11 a.m. - 2:05 p.m.

           WOLF, GREENFIELD & SACKS, P.C.

                600 Atlantic Avenue

            Boston, Massachusetts 02210


      Court Reporter:  Loretta Hennessey, RDR, CRR


          ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
                New York, New York 10022
                     212-750-6434
                     REF: 87840

Page 26

LINGLE

1  Lingle knows, he can certainly answer.
2  Q.  Is the aroma, taste, body and color
3  measured in any other way than TDS?
4
5  A.  It can be, but traditionally it has not
6  been.
7  Q.  In what other way can it be measured?
8  A.  You can measure color with light
9  refraction.  You can measure body with an oven
10  dehydration.
11  Essentially the coffee industry was trying to find
12  some parameter, some metric for evaluating what it
13  did that was inexpensive, easily understood and
14  readily applied.  And so in the '50s the Coffee
15  Brewing Center came up with this concept of
16  dissolved solids as a way of evaluating on a
17  scientific level what was contained in that
18  beverage.
19  Q.  Okay.  Now, on Page 4, the penultimate
20  paragraph references Exhibit D, and that's the page
21  that we looked at at the very back with this chart
22  on it; is that correct?
23  A.  That's correct.
24  Q.  And this came from a book that you wrote?
25  A.  Yes.

Page 27

LINGLE

1
2  Q.  Okay.  Is the information in that book
3  still accurate?
4  A.  Yes.
5  Q.  Okay.  Now, in your area of expertise in
6  coffee consumption, how many cups a day does the
7  average coffee drinker drink?
8  (Discussion off the record.)
9  Q.  Okay.  What is the average number of cups
10  of coffee a day a coffee consumer drinks in the
11  United States?
12  A.  I believe that number this year was
13  something on the order of 2.7.
14  Q.  And do you know if that's broken down to
15  so many cups at home and then so many cups away from
16  home per day?
17  A.  Yes, the National Coffee Association does
18  coffee drinking trend studies that get into those
19  various aspects about where coffee is consumed and
20  in what quantity and what type.
21  Q.  Okay.  And how many cups a day does the
22  average coffee drinker drink at home?
23  A.  I don't recall those numbers.  I'd have to
24  look at that study.
25  Q.  Do you believe it's at least one?

Page 28

LINGLE

1
2  A.  I'm sure it's at least one.
3  Q.  Do you think it's at least two?
4  A.  Yeah, I think that would depend on the
5  coffee drinker.
6  Q.  Okay.  Now, a little while ago you said
7  that a beverage has to have a certain amount of TDS
8  in order to be, total dissolved solids in it, to be
9  acceptable to the average consumer?
10  A.  That is correct.
11  Q.  Let's drill that down a little bit.  If a,
12  if a beverage has less than -- well, you -- while we
13  certainly don't accept the number a thousand, you
14  used the number a thousand.  Okay?  If a beverage
15  has a thousand, is measured at a thousand TDS, then
16  you would say that is a coffee beverage; is that
17  correct?
18  A.  Right, with the understanding that that
19  number represents a uniform or controlled extraction
20  of the flavoring material.  The TDS is a
21  metric, and it was a way the industry used to
22  measure the extraction of the, from the beverage
23  medium, the ground particles.  And in that number is
24  the assumption that there's particulate matter,
25  meaning suspended solids that create body, and also

Page 29

LINGLE

1
2  a certain level of gaseous material that create
3  coffee's aroma.
4  And so you can't use a single number as being
5  reflective of the entire beverage, which has color,
6  body, and flavor, "flavor" meaning taste and aroma.
7  The dissolved solids, things that dissolve, are
8  basically the things that we taste, but the
9  assumption in that number, that metric is that those
10  other components are present.  So I can't really say
11  that there's a single number that separates the
12  coffee as being a beverage versus one that's not.
13  Q.  Well, on Page 4 in the second paragraph,
14  when I asked you, how do you measure aroma, taste,
15  body and color, you said with, by the total
16  dissolved solids, didn't you?
17  A.  I said that was the most common method,
18  but not the only method.
19  Q.  But not the only method.  But it's the
20  most common method?
21  A.  That's correct.
22  Q.  Okay.  So if we have -- using your number,
23  if a -- if the minimum acceptable to a consumer is a
24  thousand, while I don't accept that number, if you
25  take that number, then is that a coffee beverage?

LINGLE

1
2    A.  And I answered that as yes.
3    Q.  Okay.  And just so I understand, that
4  would be one percent; is that correct?
5    A.  Right.  Correct.
6    Q.  Now, if a beverage measures less than a
7  thousand, using your number, in your view it's no
8  longer a coffee beverage; is that correct?
9    A.  It would depend on the other factors.  I
10  can't say and would not pretend to say that TDS is
11  the sole definition of what constitutes a coffee
12  beverage; it's simply a measurement indicating the
13  amount of flavoring material that's present.
14    Q.  Well, doesn't it also measure, correspond
15  to aroma?
16    A.  If the coffee's been properly brewed,
17  then, yes, they're all in proportion.  If the
18  coffee's not properly brewed, then you can have a
19  high TDS, but none of the other parameters that
20  constitute a coffee beverage.
21    Q.  What do you mean "properly brewed"?
22    A.  The uniform extraction from all the
23  particles.
24    Q.  So, well -- so a beverage that has 900
25  TDSs, could be a coffee beverage; is that right?

LINGLE

1
2    A.  If -- it could be if the other components
3  were there, the aroma, taste, and body.
4    Q.  Well, how would one reading this patent in
5  suit -- you've read the patent, haven't you?
6    A.  Yes, I have.
7    Q.  Okay.  Now, you're an expert on coffee,
8  but how would one of ordinary skill in the art with
9  regard to the art of single-serve beverage
10  cartridge, how would that person know if it is a
11  coffee beverage?
12    A.  I'm not quite sure I understand your
13  question.  Could you repeat it?
14    Q.  You're one who's an expert, you told me,
15  in coffee, right?
16    A.  Yes, that's correct.
17    Q.  Now, the -- one of ordinary skill in the
18  art in building and constructing single-serve
19  coffee, excuse me, single-serve beverage cartridges
20  is not one who's an expert in coffee, you'd agree
21  with that?
22    A.  I'd agree with that.
23    Q.  Okay.  And how would that person know if
24  the, if the beverage that extracts, that exited a
25  cartridge was a coffee beverage?

LINGLE

1
2    A.  Well, I'm sure that that engineer would
3  hire someone like me who is a coffee expert and can
4  advise them on what the parameters are that they're
5  shooting for in terms of creating a coffee beverage
6  with the right level of color, body and flavor.
7    Q.  All right.  So it would require hiring an
8  expert like you?
9    A.  Yes, it would require someone who
10  understands the coffee beverage.
11    Q.  Okay.  Now, there are not many of you in
12  the world, so if a, if a, an engineer of ordinary
13  skill in the art wanted to use TDS as a measure,
14  would that be an acceptable measure?
15    A.  That's an acceptable metric for measuring
16  on a scientific basis the extract that you've
17  created in that beverage cartridge.
18  But I would disagree with the premise that there
19  aren't many people like me in the world.  I'm sure
20  there are many coffee experts at a company like
21  Kraft.  I mean, I've met a few of them.  They're
22  very fine coffee people.
23    Q.  Absolutely.  And maybe you'll meet some
24  more at the trial.
25  But if someone's not at a major company like Kraft,

LINGLE

1
2  just picks up the patent and wants to design -- but
3  is an engineer, has a couple of years experience,
4  he's a mechanical engineer, couple of years
5  experience in developing consumer products, okay,
6  that person who doesn't have a silver palate like
7  you that can taste at least different things, how
8  would that person know?
9    A.  Well, the literature on coffee brewing and
10  what constitutes an acceptable coffee beverage is
11  fairly widespread, so anyone who's going to the
12  trouble of designing a brewing cartridge, which is
13  really a fairly sophisticated brewing system, is
14  going to spend the time to understand what the final
15  result should be from that cartridge design.
16    Q.  Okay.  Now, in your -- explain, if you
17  would, please, explain why you believe a drink has
18  to be acceptable to consumers to be considered a
19  coffee beverage?
20    A.  When you talk about brewed coffee and
21  coffee beverage, then in my mind implicit in that is
22  one that's commercially viable, meaning that someone
23  will pay you for it with the expectation of getting
24  a cup of coffee.
25    Q.  And you've read the patent in suit, I take

Page 62

LINGLE

1
2  it's based on the, my understanding of what the
3  patent says.
4      Q.  If you would turn to the first, not the
5  coverage page but the first page of this rebuttal
6  report.  Okay.  Are you there?
7      A.  Uh-huh.
8      Q.  Okay.  Under "Summary of Opinion," it
9  says, on the fourth line -- well, let's read the
10  whole thing.  "In my opinion, piercing the foil lid
11  of a Singles cartridge containing ground coffee
12  (like those that Mr. Taylor and the Kraft employees
13  tested) and injecting a quantity of water into the
14  cartridge (as opposed to making use of the
15  pre-molded inlet hole on the side of the cartridge
16  opposite the foil lid)," and this is what I'm
17  interested in, "does not produce a 'beverage' within
18  the meaning of Keurig's '762 patent."  Do you see
19  that?
20      A.  Uh-huh.
21      Q.  You put the word "beverage" in quotations,
22  and you say "'beverage' within the meaning of
23  Keurig's '762 patent."  Do you see that?
24  Does the word "beverage" in Claim 1 of the patent,
25  where it appears, have a special meaning that's

Page 63

LINGLE

1
2  different than the ordinary and usual meaning of
3  that word?
4      A.  I think that is defined in the patent as a
5  brewed beverage.
6      Q.  Right.
7      A.  Okay?  And so I wanted to put the word in
8  quotes to emphasize that we're using this word,
9  which could be generic, in a very specific
10  application, and that's brewed beverage.
11      Q.  Okay.
12      A.  Again, brewed coffee beverage.
13      Q.  Wait.  Let's take this in parts.
14      A.  Okay.
15      Q.  You say, so it's not used in its generic
16  sense.  Do you mean its ordinary sense?
17      A.  Ordinary --
18          MR. RADER:  Objection to form.
19      Q.  Excuse me?
20      A.  Ordinary in what those of us who are
21  consumers would interpret that to mean, consumers of
22  a beverage, one that we purchased.
23      Q.  I'm sorry, and this is not your fault, I
24  just didn't understand what you just said.
25      A.  To me the word "beverage" in this

Page 64

LINGLE

1
2  application, it means one that the average person
3  would go out on a commercial level and purchase
4  either for home use or for consumption away from
5  home.
6      Q.  Okay.  My question to you is, does
7  "beverage" have a meaning in the patent that is
8  different than its ordinary meaning?
9      A.  I believe it does.
10      Q.  Okay.  What do you believe the ordinary
11  meaning of "beverage" is?
12      A.  The ordinary meaning would be a product
13  that could be either sold or consumed for a person's
14  enjoyment.
15      Q.  So it's --
16      A.  I mean, there would be certain categories
17  I would exclude.  I wouldn't include tap water in
18  the context of a beverage.
19      Q.  So you think the word "beverage" has a
20  commercial, has a commercial connotation?
21      A.  When I read the patent, then I was
22  assuming, my assumption is the average person
23  reading that patent would assume this was a beverage
24  for commercial application.
25      Q.  Okay.  And what is the basis of that

Page 65

LINGLE

1
2  assumption?
3      A.  That it basically talked about a brewed
4  beverage, meaning one that was prepared in a way
5  that involved controlled strength and controlled
6  extraction in order to meet some beverage standard,
7  either tea or coffee or whatever.
8      Q.  And what is the word -- what is it in the
9  words "brewed beverage" that to you connotes
10  controlled, some type of controlled standard?
11      A.  That's basically the science of coffee
12  brewing is controlling the extraction, controlling
13  the strength.  It's not a random process, it's a
14  controlled process.
15      Q.  Okay.  And is there anything explicit in
16  the patent that you point to that says it has to be
17  commercially acceptable?
18      A.  In the patent it uses the phrase
19  "widespread acceptance."
20      Q.  Right.
21      A.  Okay?  And when you're reading a patent
22  about a product that's designed to commercially
23  produce a beverage, then I think it's fair to assume
24  that that's the intent of those words.
25      Q.  Okay.  I'm sorry, you just said when

Page 66

LINGLE

1                LINGLE
2  you're reading a --
3         MR. SCHLITZ:  Can you read back what
4  he just said.
5         (Answer read).
6     Q.  What is it in the patent that suggests to
7  you or, rather, explicitly says to you that it is
8  designed to commercially, designed for a commercial
9  product?
10        MR. RADER:  Objection, asked and
11  answered.
12     A.  The whole intent of that brewing cartridge
13  is to produce a coffee beverage that's commercially
14  viable.
15     Q.  Okay.  That's your reading of it, and I'm
16  saying:  What -- can you point to me what it is in
17  the patent that leads you to believe that?
18     A.  The nature of the product, I mean, it's
19  designed to produce a beverage.  The understanding
20  that I have that I'm assuming the person who granted
21  the patent would have, that that was a commercial
22  application, and the fact that it was suggesting
23  that it was an advance on a current, existing patent
24  that had widespread acceptance.  Everything there
25  says this is a commercial product.

Page 67

1                LINGLE
2     Q.  And is your opinion based on your belief
3  that the apparatus built according to this patent
4  has to have commercial acceptance?
5     A.  That the resulting product has a
6  commercial acceptance in the marketplace, yes.
7     Q.  So, just so the record is clear, you are
8  -- your opinion is based on your understanding or
9  belief that the patent requires that the apparatus
10  that is disclosed and built would have commercial
11  acceptance?
12     A.  That the intent of this patent is for a
13  commercial device.
14        MR. SCHLITZ:  Okay.  Could you read
15  back his answer, please.
16        (Answer read).
17     Q.  And thus is it your opinion that -- okay.
18     (Discussion off the record.)
19     Q.  So --
20        MR. SCHLITZ:  Give me the patent,
21  please.
22     (Document marked as Exhibit 3
23     for identification)
24     (Document exhibited to witness.)
25     Q.  You have the patent in front of you?

Page 68

1                LINGLE
2     A.  Yes, I do.
3        MR. RADER:  Did you mark this as
4  Exhibit 3?
5     Q.  Now, if you would turn to column 5.  This
6  is -- if you first look --
7     A.  Excuse me for a minute.
8     Q.  Yes?
9     A.  Being an old guy, I need to go get my
10  glasses if I'm going to look at this.
11     Q.  You know what, I'm older than you so I
12  certainly understand that.
13     A.  Well, maybe not.
14     Q.  Maybe not, maybe so.  We're about the
15  same.
16        VIDEO OPERATOR:  Going off the
17  record, the time is 11:04.
18     (Video off.)
19     (Discussion off the record.)
20     (Video on.)
21        VIDEO OPERATOR:  We're back on the
22  record, the time is 11:06.
23     Q.  We're looking at Claim 1 of the patent,
24  and on Page 5 it says, "A lid closing said access
25  opening, said lid having a first section overlying

Page 69

1                LINGLE
2  said first chamber and a second section overlying
3  said second chamber."  Now this is where I would ask
4  you to concentrate.  "The first section of said lid
5  being pierceable to accommodate an inflow of liquid
6  into said first chamber for infusion with the
7  beverage medium to produce a beverage."  Do you see
8  that?
9     A.  Yes, I do.
10     Q.  Now, in your report you actually
11  acknowledge that the Court has already interpreted
12  the terms "said lid being pierceable to accommodate
13  inflow of liquid;" is that correct?
14     A.  That's correct.
15     Q.  And what did the Court -- do you remember
16  what the Court said that means?  It's not a pop
17  quiz.
18     A.  No, I don't recall specifically.
19     Q.  Okay.  Well, if I tell you that it said,
20  "capable of being pierced to permit an inflow of
21  liquid."  Okay?
22  Then it goes on to say -- so that those terms the
23  Court has already --
24     A.  Uh-huh.
25     Q.  -- construed.

Page 82

LINGLE

1 you're referring to when you say "it."
2
3     Q.   Okay.  Well, let me understand that.  You
4 ran eight or nine tests with Professor Slocum; is
5 that correct?
6     A.   That's correct.
7     Q.   Okay.  Now, you didn't run -- and let's
8 turn to Page 4 of your rebuttal report.  You have
9 one set of variables which is foil down, with a
10 plate.  Do you see that?
11     A.   Yes.
12     Q.   And it's at 3.2 psi, right?
13     A.   Yes.
14     Q.   And for 19 seconds, right?  And you got
15 615 PPMs.
16 Now, that would, if I understand it, you put 615
17 PPM, in fact that should be 6,150 PPM?
18     A.   Yes.
19     Q.   Okay.  And you only did that once, right?
20 Correct?
21     A.   That is correct.
22     Q.   Okay.  But then you have another set of
23 variables, which is foil down, with plate, at 15.7
24 psi at 12 seconds and you got 635 PPMs.
25     A.   Uh-huh.

Page 83

LINGLE

1
2     Q.   Then you have foil up, with plate, at 14.7
3 psi for 27 seconds and you got 865.  So the 865 is
4 several hundred more than the foil down, with plate,
5 so that would be variable is what you're saying to
6 me?
7          MR. RADER:  Objection to form.
8     A.   That is correct.
9     Q.   Right.  Okay.  Is part of your opinion
10 based on the fact that there is that variability?
11     A.   Yes, that's what I've testified.
12     Q.   Okay.  Now, so that we're not -- so I
13 understand this and we're not caught in the, in
14 these numbers, just the fact that what is, what TDS
15 is acceptable.  Okay?  And let's assume for a moment
16 that, let's assume that 665 was a, is acceptable to
17 consumers but -- excuse me, 865 is acceptable to
18 consumers but 635 is not.  Okay?
19     A.   But I think that's not a fair assumption,
20 because the assumption we have is that if it's
21 reasonably well brewed, that number is going to be
22 close to a thousand, so...
23     Q.   I'm sorry, say that again now?
24     A.   If the coffee is brewed correctly, that
25 number is going to be close to a thousand.

Page 84

LINGLE

1
2     Q.   What number?
3     A.   The "acceptable to consumer" number.
4     Q.   I understand that.  We can even use your
5 number.  Okay?
6     A.   Okay.
7     Q.   If this -- if your third test was a
8 thousand -- no, let's say if your third test was
9 1200, okay, but your first two tests -- and we're --
10 for this discussion, although I don't agree with it,
11 we'll accept the one percent, a thousand, as the
12 cut-off for acceptability.
13 If the third test was a 1200 but if the first two
14 tests were only 800, okay, or 615, 635, okay, would
15 you then be opining that the -- would it still be
16 your opinion that the Kenco Singles is not capable
17 of producing a coffee beverage?
18     A.   I would say yes, but with the
19 understanding that my opinion is not based totally
20 on dissolved solids, it's also based on the texture,
21 the body of the beverage, the taste of the beverage,
22 and the aroma of the beverage --
23     Q.   Right.
24     A.   -- that there's a subjective element here
25 as well.

Page 85

LINGLE

1
2     Q.   You said "yes," something.  What were you
3 saying yes to?
4     A.   Yes, that the beverage that I watched
5 produced with single-side piercing of that Kenco
6 cartridge would not be an acceptable coffee beverage
7 for the consumer.
8     Q.   Okay.  But I was trying to understand is
9 it, if you, in my example of 1200 in example, in
10 test 3, but 615, 635 in tests 1 and 2, is it not
11 acceptable because of the variability?
12     A.   No, my point on variability was not
13 suggesting that that be tied directly to
14 acceptability.
15     Q.   Okay.
16     A.   It's that the fact that when used in
17 single-side piercing does not create the same result
18 when it's used in the way it was designed, which is
19 opposite-side piercing.
20     Q.   Okay.  Well, I'm going to get to that
21 because that's a very interesting observation.  But
22 in order to be capable of producing a coffee
23 beverage, in your mind, does it have to be, and to
24 satisfy the claims, does it have to be capable of
25 producing a coffee beverage at all variables?

LINGLE

1  same for tests 1 through 7; is that correct?
2     A.   That's correct.
3     Q.   Okay.  Now, going back to something we
4  talked about earlier, your -- if I understand you
5  correctly, your opinion is based on, that the Kenco
6  Singles is not capable of producing a coffee
7  beverage when used in same-side piercing, is based
8  on your, the tests that you performed, you and
9  doctor, Professor Slocum, and your review of Mr.
10  Bentley and Mr. Rowan's test results, right?
11     A.   (Witness nods.)
12     Q.   And we've already talked about that Mr.
13  Rowan and Mr. Bentley, it's simply based on the
14  metrics because you weren't able to taste and smell?
15     A.   Uh-huh.
16     Q.   Okay.  And if I understood you correctly,
17  you said that the reason -- well, I don't want to
18  presume.  What -- do you have an opinion as to the
19  reason that the Kenco's Singles cartridge is not
20  capable of producing a beverage cartridge, a coffee
21  beverage?
22     A.   When used in same-side piercing?
23     Q.   Yes.
24     A.   It's because the injection of the fluid at

LINGLE

1  one point causes the fluid to move through the
2  coffee and tunnel, meaning it's overextracting some
3  coffee particles and underextracting or not
4  extracting others, so you get a partial extraction
5  and a poor flavor.
6     Q.   Okay.  And why is that with regard to the
7  Kenco's Singles, why do you get those tunneling and
8  you don't get full wetting and such, that you
9  just --
10     A.   The nature of the fluid in moving through
11  the particles is to follow the path of least
12  resistance.
13     Q.   Yes.  And explain that.
14     A.   Well, it means the water wants to exit the
15  cartridge as soon as it can, so as soon as it
16  encounters an obstacle like a coffee particle,
17  instead of trying to move through the coffee
18  particle, it moves around it, so the water in effect
19  bypasses the coffee and moves directly to the exit
20  point, and that's what produces that weak,
21  underextracted sort of tasteless brew.
22     Q.   Okay.  Now, and I think you said something
23  about the manifold.  What were you saying about the
24  manifold?

LINGLE

1     A.   Well, the cartridge is a well-engineered
2  cartridge that's designed to take the inlet water
3  and move it to, I think it's five or six different
4  openings on the side of the cartridge, and in also
5  disbursing the flow of the water into the cartridge
6  from one single point to about ten or 12 different
7  points.  It also greatly reduces the pressure.  And
8  by reducing the pressure, then it slows down the
9  flow, and that causes the particles to be wetted and
10  extracted in a uniform manner before the resulting
11  beverage exits the cartridge.
12     Q.   Okay.  Now, if you were to inject water
13  through the foil, but into the, into the manifold,
14  would the Kenco's Singles cartridge produce a coffee
15  beverage?
16     A.   No, I believe that's the test that
17  Professor Taylor and Mr. Bentley did, and it still
18  came up short --
19     Q.   Because --
20     A.   -- so there -- I'm not --
21     Q.   Came up short in what measurement?
22     A.   Low in the soluble solids.
23     Q.   Okay.  But what you've just said is based
24  on your belief that the metric, the resulting metric

LINGLE

1  is outside the acceptable range for consumers?
2     A.   Yes, using the metric as an analogy.
3     Q.   Okay.  But if it were in the -- if that
4  metric were in the acceptable range for consumers,
5  would you have any reason to say that the piercing
6  into the manifold area would not produce a
7  acceptable coffee beverage?
8     A.   Well, I'd still want to taste the beverage
9  so we're not using soluble solids as the only method
10  of --
11     Q.   I understand that.  But you explained why
12  you thought piercing directly into the coffee bed,
13  but I'm -- since -- if you use the manifold, and you
14  get this more even distribution, why would it not
15  create a coffee beverage?
16     A.   If I understand your question correctly,
17  you're saying if we use the manifold with same-side
18  piercing?
19     Q.   Yes.
20     A.   I'm not exactly sure of the answer because
21  it has to do with the fluid dynamics of the way the
22  water would actually move through that manifold, and
23  I think that's more in the area of expertise of
24  someone who's an expert in fluid design.

LINGLE

1
2  and the flavor of that beverage.
3      Q.  I understand.  And you think those were
4  all quite weak?
5      A.  Some were, in terms of a normal coffee
6  flavor, undetectable.
7      Q.  But at least the 865, the one that got 865
8  certainly was detectable?
9      A.  Not as I would define a coffee beverage.
10  If I could expand for just a minute.
11     Q.  Yes, okay.
12     A.  When we think of a coffee beverage, it's
13  really a balance of ingredients, and the reason we
14  do that is because there's no single component that
15  represents coffee's flavor.  Coffee's a very complex
16  beverage, it has some 1200 different compounds that
17  are part of it.  So what we're really tasting when
18  we taste a coffee beverage is the balance of the
19  mixture.  If a portion of that mixture is absent, or
20  is not present in sufficient strength to raise it
21  above our threshold, our taste threshold, it's just
22  the same as it isn't there.
23     Q.  Right.
24     A.  So the resulting sort of flavor, the
25  subjective evaluation of the outflow of the tests we

LINGLE

1
2  ran on the Kenco cartridges did not represent a
3  coffee beverage, it's not just the TDS.
4      Q.  What I'm trying to say is because it
5  didn't have, in your opinion, enough coffee aroma,
6  but in an ice coffee, the aroma is practically
7  nonexistent?
8      A.  That's correct.
9      Q.  Okay.  And in an iced coffee the flavor
10  has been substantially diluted with the ice, right?
11     A.  But you still have a coffee-like flavor.
12     Q.  You have a coffee-like flavor.  Right.
13  Okay.
14  You're saying at 865, you wouldn't have a coffee
15  flavor?
16     A.  None of those extracts had a coffee-like
17  flavor.
18     Q.  Okay.  Well, what was the flavor --
19  describe to me the flavor that, on test 3, foil up,
20  with plate, 14.7 psi, 27 seconds, 865.
21     A.  All of the flavors were bitter and
22  astringent.
23     Q.  I didn't ask you -- I asked you about that
24  one.
25     A.  It was bitter and astringent.

LINGLE

1
2      Q.  Bitter and astringent.  Okay.  Some people
3  like it bitter and astringent, don't they?
4      A.  Not if that's the only coffee compound you
5  taste.
6      Q.  Okay.  Now, let me understand this.  Your
7  view is because it didn't -- it burrowed and it
8  didn't go through the coffee, it didn't pick up
9  enough, it didn't pick up enough of it, okay, but
10  you mentioned some 1400 compounds or something in
11  coffee?
12     A.  1200.
13     Q.  1200 compounds.  Any reason -- it would
14  pick up those compounds in those where it did touch
15  or did extract, right?
16     A.  (Witness nods.)
17     Q.  It just didn't have enough of it, isn't
18  that your point?  It's not that it didn't have the
19  1200 compounds, it's just didn't have enough to suit
20  your tastes?
21     A.  It didn't have enough to pass the
22  threshold I have for evaluating what is a coffee and
23  what's not a coffee.
24     Q.  But that is -- didn't pass that threshold?
25  Right.  Okay.  I'm just going back again to the ice

LINGLE

1
2  coffee, make sure I understand.  Okay?
3      A.  Uh-huh.
4      Q.  When you have ice coffee, the aroma
5  practically goes away because --
6      A.  (Witness nods.)
7      Q.  Okay.  But it's still a coffee?
8      A.  The flavor you get is still a recognizable
9  coffee flavor.
10     Q.  Okay.  But the flavor you get has been
11  substantially diluted, right?
12     A.  As the ice melts, the flavor is diluted.
13     Q.  Okay.  But it's still a coffee as the ice
14  melts?
15     A.  That's correct.
16     Q.  Okay.  And so it can be, it can be -- in
17  ice coffee, it can have a very weak coffee flavor as
18  the ice melts?
19     A.  The ice will dilute the flavor.
20     Q.  Okay.  Turning to your, turning to your
21  rebuttal report in the third paragraph under Summary
22  of Opinions, you say, "It is also my opinion that
23  the outer container of the Singles cartridge is not
24  impermeable to gases within the meaning of that
25  phrase as used in claim 8 of the '762 patent."  Do

Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED,<br><br>        Plaintiff,<br><br>v.<br><br>KRAFT FOODS GLOBAL, INC.,<br>TASSIMO CORPORATION, and<br>KRAFT FOODS INC.,<br><br>        Defendants. | Civil Action No. 07-017-GMS |

## PLAINTIFF'S RESPONSE TO DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORP., AND KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS

In response to Defendants Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.'s Joint Invalidity Contentions ("Invalidity Contentions"), Plaintiff Keurig, Incorporated ("Plaintiff" or "Keurig") provides the following validity contentions for asserted claims 1, 2, 8, 9, and 10 of United States Patent No. 6,607,762 (the "'762 patent").

Plaintiff bases these validity contentions on its current knowledge, understanding and belief as to the facts and information available to it as of the date of these disclosures. This case is still in the early stages of discovery and Plaintiff has not yet completed its investigation, collection of information, discovery or analysis related to this action. Accordingly, Plaintiff reserves the right to supplement, amend or modify the information contained herein and introduce such information and any subsequently-identified documents at trial. As discovery is taken, and additional details are provided regarding the alleged prior public use or if Defendants modify their invalidity contentions, Plaintiff's validity contentions may need to be amended, supplemented and/or corrected.

### A.    Kenco Singles Capsules Do not Anticipate the '762 Patent

Kenco Singles capsules do not anticipate the '762 patent under 35 U.S.C. § 102 because the Kenco Singles capsules do not include each and every element of the claimed invention of the '762 patent.  With respect to independent claims 1 and 10 of the '762 patent, the Kenco Singles capsules do not include a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge.  Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the Kenco Singles capsules for at least these same reasons.  Accordingly, for at least these reasons, the Kenco Singles capsules do not anticipate the '762 patent.

### B.    The '234 Patent Does not Anticipate the '762 Patent

The '234 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '234 patent does not disclose each and every element of the claimed invention of the '762 patent.  With respect to independent claims 1 and 10 of the '762 patent, the '234 patent does not disclose a single lid that is both: (1) piercable to accommodate an inflow of liquid into a first chamber for infusion with a beverage medium to produce a beverage; and (2) piercable to accommodate an outflow of a beverage from a second chamber to the exterior of the cartridge.  Claims 2, 8 and 9, which depend from claim 1, are also not anticipated by the '234 patent for at least these same reasons.  Accordingly, for at least these reasons, the '234 patent does not anticipate the '762 patent.

### C.    The '130 Patent Does not Anticipate the '762 Patent

The '130 patent does not anticipate the '762 patent under 35 U.S.C. § 102 because the '130 patent does not disclose each and every element of the claimed invention of the '762 patent.

3

Exhibit F

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

Exhibit G

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

KEURIG, INCORPORATED,       )
                                   )
        Plaintiff,        )
                                   )
       v.               )    C. A. No. 07-17 (GMS)
                                   )
KRAFT FOODS GLOBAL, INC.,    )    **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and    )
KRAFT FOODS INC.,          )
                                   )
        Defendants     )

**DEFENDANTS KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, AND
KRAFT FOODS INC.'S JOINT INVALIDITY CONTENTIONS**

Pursuant to the Court's Scheduling Order of July 17, 2007, Defendants Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods Inc. (collectively, "Kraft"), submits the following invalidity contentions for claims 1, 2, and 8-10 of U.S. Patent No. 6,607,762 ("'762 Patent") asserted by Plaintiff Keurig. Kraft reserves the right to supplement these invalidity contentions, or cite additional prior art, as discovery progresses or if Plaintiff Keurig modifies its disclosure of asserted claims or infringement contentions.

Kraft provides its invalidity contentions in the claim chart below. Kraft cites three (3) pieces of prior art, and submits four (4) invalidity contentions based on the cited prior art: the Kenco Singles® capsules in public use in the United States prior to the December 1, 1999 date of invention of the '762 Patent alleged by Plaintiff Keurig, as shown in Exhibit A; U.S. Patent No. 4,853,234 ("'234 Patent") to Bentley *et al.* entitled "Beverage Packages," as shown in Exhibit B; U.S. Patent No. U.S. Patent No. 4,452,130 to Klein entitled "Electrical Apparatus Useful to Prepare a Hot Beverage" ("'130 Patent"), as shown in Exhibit C; and as

further shown when inverted in Exhibit D; and, finally, the '130 Patent in view of its operation as disclosed.

These invalidity contentions are consistent with Keurig's infringement contentions in Keurig's Disclosure of Infringement Contentions served on July 27, 2007. As indicated in the Kraft defendants' non-infringement claim charts, the Tassimo® Discs do not infringe the '762 patent. Nevertheless, as shown by the following invalidity contentions, if claims 1, 2 and 8-10 of the '762 Patent are applied as Keurig applied these claims in its infringement claim charts, and reiterated in its counsel's letter dated August 3, 2007, then the cited prior art anticipates.

## Invalidity Claim Charts

### A. Kenco Singles™ Capsule

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The Kenco Singles capsule is a beverage filter cartridge. |
| an outer container having an access opening: | **YES.** The Singles capsule has an outer container with an access opening. |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The Kenco Singles includes a permeable filter received in and configured and arranged in the inner container such that it separates two chambers in the interior of the container so that infused beverage created in the first chamber must flow through the filter element before it can enter the second chamber. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The Kenco Singles include a first chamber in which a beverage medium is stored. Beverage media suitable for use with Singles capsules include, for example, roast and ground coffee, tea, and powdered chocolate. |

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The Kenco Singles capsule includes an aluminum foil lid closing the access opening. The Singles' lid having a section that directly covers the first chamber, in which beverage medium is stored and infused with liquid, and another section that directly covers the second chamber including the outlet. |
| the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** The section of the Singles' foil lid directly covering the first chamber is *pierceable* to accommodate an inflow of liquid for infusion with the stored beverage medium to produce a beverage in the same manner as depicted in the '762 Patent. *Cf.* '762 Patent, Column 3, Lines 40-46; **Fig. 5.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** The Singles' filter welded to the communication channels is a paper filter that permits a flow of brewed beverage from the first chamber to the second chamber. |
| the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** The section of the Singles' foil lid directly covering the second chamber is pierceable to expose to the outlet and permit an outflow of the brewed beverage to the exterior of the capsule. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that has a greater resistance to piercing than the aluminum foil lid. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that is impermeable to liquids and gases. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The Singles capsule has a lid comprising a layer of aluminum foil that is impermeable to liquids and gases. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The Kenco Singles capsule is a beverage filter cartridge. |
| an outer container having a access opening; | **YES.** The Singles capsule has an outer container with an access opening. |

| Claim Language - '762 Patent | Kenco Singles™ Capsule |
|---|---|
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The Kenco Singles includes a permeable planar filter received in and configured and arranged in the inner container such that it separates two chambers in the interior of the container so that infused beverage created in the first chamber must flow through the filter element before it can enter the second chamber. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The Kenco Singles include a first chamber in which a beverage medium is stored. Beverage media suitable for use with Singles capsules include, for example, roast and ground coffee, tea, and powdered chocolate. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** The Kenco Singles capsule includes an aluminum foil lid closing the access opening. The aluminum foil lid and the polypropylene outer container are both impermeable to liquids and gases. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The Singles' lid includes a section that directly covers the first chamber, in which beverage medium is stored and infused with liquid, and another section that directly covers the second chamber including the outlet. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** The section of the Singles' foil lid directly covering the first chamber is *piercable* to accommodate an inflow of liquid for infusion with the stored beverage medium to produce a beverage in the same manner as depicted in the '762 Patent. *Cf.* '762 Patent, Column 3, Lines 40-46; **Fig. 5.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** The Singles' filter welded to the communication channels is a paper filter that permits a flow of brewed beverage from the first chamber to the second chamber. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** The section of the Singles' foil lid directly covering the second chamber is piercable to expose to the outlet and permit an outflow of the brewed beverage to the exterior of the capsule. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** The Singles capsule has a hard plastic outer container made of polypropylene that has a greater resistance to piercing than the aluminum foil lid. |

**B.  U.S. Patent No. 4,853,234**

| Claim Language - '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.**  The '234 Patent discloses "a sealed beverage package containing one or more beverage ingredients and being formed from substantially air-and water-impermeable materials." '234 Patent, Abstract. |
| an outer container having an access opening: | **YES.**  The '234 Patent discloses an outer container 20, that includes a lower edge 23 that defines an access opening.  *See* Column 7, Lines 9-17; **Fig. 5.** |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.**  The '234 Patent discloses that a filter 36 separates a first chamber 21, which contains beverage ingredients, from a second chamber 37, so that infused beverage created in the first chamber 21 must flow through the filter 36 before it can enter the second chamber 37.  *See* '234 Patent, Column 7, Lines 41-46; **Fig. 4.**  In addition, outlet channels 31, 32, 33 comprise slots 30 that can be formed of a dimension that acts as a filter to separate collection chamber 35, in fluid communication with second chamber 37, from first chamber 21.  *See* '234 Patent, Column 7, Lines 27-30, 41-42. |
| a soluble beverage medium stored in said first chamber; and | **YES.**  First chamber 21 contains beverage ingredients, such as roast and ground coffee particles.  *See* '234 Patent, Column 7, Lines 12-15. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.**  A foil 25 is sealed along the lower edge 23 of outer container 20.  *See* '243 Patent, Column 7, Lines 17-21; **Fig. 6.**  Foil 25 has a section directly covering the first chamber 21 and another section directly covering the second chamber 37. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.**  Foil 25 is formed of a *piercable* material and includes a section overlying first chamber 21 that can be pierced to permit an inflow of liquid directly into chamber 21 to infuse the beverage ingredient stored therein. |

| Claim Language - '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** Filter 26 is a permeable filter, made of a conventional filter material, that accommodates a flow of brewed beverage from the first chamber 21 to the second chamber 37. *See* '234 Patent, Column 4, Lines 9-12. |
| the second section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** Foil 25 is formed of a piercable material and includes another section overlying second chamber 37 that can be pierced to permit an outflow of brewed beverage to the exterior of outer container 20. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Outer container 20, which is formed of rigid polypropylene, has a greater resistance to piercing than foil 25, which can be aluminum or a laminated material. *See* '243 Patent, Column 2, Lines 15-19. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** Outer container 20 is formed of a rigid plastic material, such as polypropylene, that is impermeable to liquids and gases. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** Foil 25 is formed of an aluminum sheet or a laminated material that is impermeable to liquids and gases. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The '234 Patent discloses "a sealed beverage package containing one or more beverage ingredients and being formed from substantially air-and water-impermeable materials." '234 Patent, Abstract. |
| an outer container having a access opening; | **YES.** The '234 Patent discloses an outer container 20, that includes a lower edge 23 that defines an access opening. *See* Column 7, Lines 9-17; **Fig. 5.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** The '234 Patent discloses that a planar filter 36 separates a first chamber 21, which contains beverage ingredients, from a second chamber 37, so that infused beverage created in the first chamber 21 must flow through the filter 36 before it can enter the second chamber 37. *See* '234 Patent, Column 7, Lines 41-46; **Fig. 4.** |

| Claim Language - '762 Patent | U.S. Patent No. 4,853,234 |
|---|---|
| a soluble beverage medium stored in said first chamber; and | **YES.** First chamber 21 contains beverage ingredients, such as roast and ground coffee particles. *See* '234 Patent, Column 7, Lines 12-15. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A foil 25 is sealed along the lower edge 23 of outer container 20. *See* '243 Patent, Column 7, Lines 17-21; **Fig. 6**. Both the outer container 20, which is formed of a rigid plastic material, and the foil 25, which is formed of aluminum or a laminate material, are impermeable to liquids and gases. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** Foil 25 has a section directly covering the first chamber 21 and another section directly covering the second chamber 37. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Foil 25 is formed of a *piercable* material (aluminum or a laminate) and includes a section overlying first chamber 21 that can be pierced to permit an inflow of liquid directly into chamber 21 to infuse the beverage ingredient stored therein. |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** Filter 26 is a permeable filter, made of a conventional filter material, that accommodates a flow of brewed beverage from the first chamber 21 to the second chamber 37. *See* '234 Patent, Column 4, Lines 9-12. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** Foil 25 is formed of a piercable material and includes another section overlying second chamber 37 that can be pierced to permit an outflow of brewed beverage to the exterior of outer container 20. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Outer container 20, which is formed of rigid polypropylene, has a greater resistance to piercing than foil 25, which can be aluminum or a laminated material. *See* '243 Patent, Column 2, Lines 15-19. |

## C.  U.S. Patent No. 4,452,130 (Inverted)

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| **Claim 1** | When inverted, the beverage filter cartridge disclosed in the '130 Patent has all of the elements of claim 1 of the '762 Patent.  This can be readily seen from the cartridge structure illustrated in an inverted posture depicted in Exhibit D. |
| A beverage filter cartridge comprising: | **YES.**  The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance.  *See* '130 Patent, Abstract.  An inverted filter carrier is depicted in Exhibit D. |
| an outer container having an access opening: | **YES.**  An outer container 11 has an access opening.  *See* '130 Patent; Column 2, Lines 6-9; *Fig. 1.* |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.**  A filter 12 separates a first chamber storing a flavor substance 15 from a collecting channel 18 in fluid communication with a second chamber 17 via a passageway 19, so that infused beverage created in the first chamber must flow through the filter 12 before it can enter the second chamber 17. |
| a soluble beverage medium stored in said first chamber; and | **YES.**  The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage.  *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.**  A lid 14 seals the access opening of the outer container.  *See* '130 Patent Column 2, Lines 12-15.  The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.**  A section of the lid 14 overlying the chamber storing the flavor substance 15 is *piercable* to accommodate an inflow of liquid, such as hot water, to infuse the flavor substance 15 to produce a brewed beverage.  *Cf.* '130 Patent, Column 2, Lines 37-38 and 55-60; *Fig. 2.* |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.**  A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17.  *See* '130 Patent, Column 2, Lines 60-63. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** A section of lid 14 overlying second chamber 17 is *pierceable* to accommodate an outflow from the outside container 11. *Cf.* '130 Patent, Column 2, Lines 25-29. After a liquid under pressure is injected into the first chamber storing the flavor substance, brewed beverage can pass through the filter 12, and flow through the collecting channel 18 to a passageway 19. The brewed beverage can then flow to the second chamber 17 and exit the filter cartridge 11 at the outlet formed by the piercing of the lid 14 at the section overlying the second chamber. *See* Exhibit D; *cf.* '130 Patent, Column 2, Lines 61-65. |
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES. Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent, which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The lid 14 and a lower lid 13, which closes a lower portion of second chamber 17, seals the flavor substance stored in the filter unit 11 from the atmosphere and the water stored in cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The lid 14 closes the access opening of filter unit 11 to seal the flavor substance 15 stored therein from the atmosphere and the water stored in the cup 10. *See* '130 Patent, Column 2, Lines 12-15. |

- 9 -

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| **Claim 10** | When inverted, the beverage filter cartridge disclosed in the '130 Patent has all of the elements of claim 10 of the '762 Patent. This can be readily seen from the cartridge structure illustrated in an inverted posture depicted in Exhibit D. |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. An inverted filter carrier is depicted in Exhibit D. |
| an outer container having a access opening; | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A planar filter 12 separates a first chamber storing a flavor substance 15 from a collecting channel 18 in fluid communication with a second chamber 17 via a passageway 19, so that infused beverage created in the first chamber must flow through the filter 12 before it can enter the second chamber 17. The planar filter 12 assumes a frustoconical shape of the filter carrier 11. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 and the lower lid 13 seal the flavor substance 15 stored in the filter carrier 11 from the atmosphere and the water stored in a cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 (Inverted) |
|---|---|
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** A section of the lid 14 overlying the chamber storing the flavor substance 15 is *piercable* to accommodate an inflow of liquid, such as hot water, to infuse the flavor substance 15 to produce a brewed beverage. *Cf.* '130 Patent, Column 2, Lines 37-38 and 55-60; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** A section of lid 14 overlying second chamber 17 is *piercable* to accommodate an outflow from the outside container 11. *Cf.* '130 Patent, Column 2, Lines 25-29. After a liquid under pressure is injected into the first chamber storing the flavor substance, brewed beverage can pass through the filter 12, and flow through the collecting channel 18 to a passageway 19. The brewed beverage can then flow to the second chamber 17 and exit the filter cartridge 11 at the outlet formed by the piercing of the lid 14 at the section overlying the second chamber. *See* Exhibit E; *cf.* '130 Patent, Column 2, Lines 61-65. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** Fig. 1 of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent, which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |

## D.  U.S. Patent No. 4,452,130

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| **Claim 1** | |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. |

| Claim Language – '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| an outer container having an access opening: | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A filter 12 separates two chambers in the interior of the container so that infused beverage created in a first chamber, storing a flavor substance 15, must flow through the filter 12 before it can enter the second chamber 17. The filter 12 separates the first chamber from a collecting channel 18 in fluid communication with the second chamber 17 via a passageway 19. |
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid having a first section overlying said first chamber and a second section overlying said second chamber, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being pierceable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Hot water outlets 25 pierce a section of the lid 14 overlying the chamber storing the flavor substance 15. *See* '130 Patent, Column 2, Lines 37-38; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the second section of said lid being pierceable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge. | **YES.** A tube 27 penetrates a section of lid 14 overlying second chamber 17 to access a lower lid 13 at a bottom portion of section of the second chamber 17 to accommodate an outflow from the outside container 11. *See* '130 Patent, Column 2, Lines 25-29. After brewed beverage drips through the filter 12, the beverage collects in the channel 18, flows through a passageway 19, and exits a hole at the bottom of second chamber 17. *Id.*, Column 2, Lines 61-65. |

| Claim Language – '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| **Claim 2** | |
| The beverage filter cartridge of claim 1 wherein said lid has less resistance to being pierced as compared to the resistance to piercing of said container. | **YES.** **Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, U.S. Patent No. 5,111,740 to Klein ("'740 Patent"), which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. The '740 Patent is attached as Exhibit E. |
| **Claim 8** | |
| The beverage filter cartridge of claim 1 wherein said outer container is impermeable to liquids and gases. | **YES.** The lid 14 and a lower lid 13, which closes a lower portion of second chamber 17, seals the flavor substance stored in the filter unit 11 from the atmosphere and the water stored in cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 9** | |
| The beverage filter cartridge of claim 1 or 8 wherein said lid is impermeable to liquids and gases. | **YES.** The lid 14 closes the access opening of filter unit 11 to seal the flavor substance 15 stored therein from the atmosphere and the water stored in the cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| **Claim 10** | |
| A beverage filter cartridge comprising: | **YES.** The '130 Patent discloses a beverage filter cartridge, which is described as a filter carrier useful to prepare a hot beverage from a flavor substance. *See* '130 Patent, Abstract. |
| an outer container having a access opening; | **YES.** An outer container 11 has an access opening. *See* '130 Patent; Column 2, Lines 6-9; **Fig. 1.** |
| a planar filter element received in and configured and arranged to subdivide the interior of said container into first and second chambers; | **YES.** A planar filter 12 separates two chambers in the interior of the container so that infused beverage created in a first chamber, storing a flavor substance 15, must flow through the filter 12 before it can enter the second chamber 17. The filter 12 separates the first chamber from a collecting channel 18 in fluid communication with the second chamber 17 via a passageway 19. The planar filter 12 assumes a frustoconical shape of the filter carrier 11. |

| Claim Language - '762 Patent | U.S. Patent No. 4,452,130 |
|---|---|
| a soluble beverage medium stored in said first chamber; and | **YES.** The '130 Patent discloses that the flavor substance 15 is infused with water to brew a beverage. *See* '130 Patent, Column 2, Lines 55-65. |
| a lid closing said access opening, said lid and said outer container being impermeable to liquids and gases, | **YES.** A lid 14 seals the access opening of the outer container. *See* '130 Patent Column 2, Lines 12-15. The lid 14 and the lower lid 13 seal the flavor substance 15 stored in the filter carrier 11 from the atmosphere and the water stored in a cup 10. *See* '130 Patent, Column 2, Lines 12-15. |
| said lid having first section overlying said first chamber and a second section overlying said second chamber, | **YES.** The lid 14 includes a section that directly covers the first chamber storing the flavor substance 15 and another section that directly covers the second chamber 17. |
| the first section of said lid being piercable to accommodate an inflow of liquid into said first chamber for infusion with the beverage medium to produce a beverage, | **YES.** Hot water outlets 25 pierce a section of the lid 14 overlying the chamber storing the flavor substance 15. *See* '130 Patent, Column 2, Lines 37-38; **Fig. 2.** |
| said filter element being permeable to liquid to accommodate a flow of the beverage from said first chamber into said second chamber, and | **YES.** A brewed beverage can pass through filter 12 into collecting channel 18 through the passageway 19 and into the second chamber 17. *See* '130 Patent, Column 2, Lines 60-63. |
| the and section of said lid being piercable to accommodate an outflow of the beverage from said second chamber to the exterior of said cartridge, | **YES.** A tube 27 penetrates a section of lid 14 overlying second chamber 17 to access a lower lid 13 at a bottom portion of section of the second chamber 17 to accommodate an outflow from the outside container 11. *See* '130 Patent, Column 2, Lines 25-29. After brewed beverage drips through the filter 12, the beverage collects in the channel 18, flows through a passageway 19, and exits a hole at the bottom of second chamber 17. *Id.*, Column 2, Lines 61-65. |
| said lid having less resistance to being pierced as compared to the resistance to piercing of said container. | **YES. Fig. 1** of the '130 patent shows that the lid 14 is a thinner layer than the outer container 11, which must be sufficiently rigid to withstand the piercing force of the tube 27 as it pierces lid 14. In addition, the '740 Patent", which incorporates the filter carrier of the '130 Patent by reference, describes that the lid is made of foil. *See* '740 Patent, Column 2, Lines 60-66. |

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated:  August 10, 2007
812042 / 31118

By:  _/s/ Kenneth L. Dorsney_____
     Richard L. Horwitz (#2246)
     Kenneth L. Dorsney (#3726)
     Hercules Plaza, 6th Floor
     1313 North Market Street
     P.O. Box 951
     Wilmington, DE  19899-0951
     Tel:  302-984-6169
     rhorwitz@potteranderson.com
     kdorsney@potteranderson.com

*Attorneys for Defendants Kraft Foods Global, Inc.,*
*Tassimo Corporation, and Kraft Foods Inc.*

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on August 10, 2007, a true and correct copy of

the within document was caused to be served on the attorney of record at the following addresses

as indicated:

## VIA HAND DELIVERY

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com
kkeller@ycst.com

## VIA ELECTRONIC MAIL

Michael A. Albert
Michael N. Rader
Laura Topper
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com

                              /s/ Kenneth L. Dorsney
                              Kenneth L. Dorsney

799719 / 31118

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 22, 2008, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
David E. Moore, Esquire [*dmoore@potteranderson.com*]
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

Additionally, I hereby certify that on August 22, 2008, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

## BY E-MAIL

David Schlitz, Esquire [*david.schlitz@bakerbotts.com*]
Baker Botts L.L.P
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
John W. Shaw (No 3362) [*jshaw@ycst.com*]
Adam W. Poff (No. 3990) [*apoff@ycst.com*]
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,                )
                                     )
      Plaintiff,                  )
                                     )
      v.                          )   C.A. No. 07-17 (GMS)
                                     )
KRAFT FOODS GLOBAL, INC.,            )   **JURY TRIAL DEMANDED**
TASSIMO CORPORATION, and             )
KRAFT FOODS INC.,                    )   **PUBLIC VERSION**
                                     )
      Defendants.                 )

## KRAFT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF TED LINGLE

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated: August 25, 2008
Public Version Dated: September 2, 2008
880806 / 31118

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: 302-984-6169
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

The basis for Kraft's Motion to Exclude the Testimony of Ted Lingle is simple. Keurig offers his testimony for impermissible purposes – claim construction of the term "beverage" and to impose criteria not specified in the '762 Patent. This is a usurpation of the Court's role. Furthermore, far from assisting the jury in its factual determinations as Keurig suggests, Mr. Lingle's testimony would mislead the jury as to the requirements of Claim 1 of the patent.

As Keurig must, it admits the term "beverage" must be given its plain and ordinary meaning in this patent infringement action. If Keurig wanted to offer a different definition of "beverage," it should have done so during *Markman*. *See, e.g., O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (when the parties raise an actual dispute about the scope of claims, the Court must resolve that dispute during claim construction). Keurig does not dispute that it failed to request and obtain a claim construction from this Court on the term "beverage."[1] Rather, Keurig now seeks to have Mr. Lingle provide "expert" testimony as to the ordinary meaning of "beverage." It erroneously contends that the ordinary meaning of "beverage" is a factual question for the jury and that Mr. Lingle will assist the jury in making that "factual" determination. But in actuality Keurig is attempting to have Mr. Lingle give the word "beverage" a specialized meaning and impose criteria for whether a drink meets his claim construction of "beverage."

The ordinary meaning of beverage is clear: a "beverage" is a "liquid for drink; esp. such liquid other than water (as tea, milk, fruit juice, beer) usually prepared (as by flavoring, heating,

---

[1] Keurig claims that it raised the issue of the term beverage in August 2007 in its responses to Kraft's invalidity contentions. Opp'n at 3. That claim is disingenuous. While the word "beverage" appears in the responses, Keurig's discussion concerned whether the lid was pierceable to accommodate an inflow of liquid and an outflow of beverage. Keurig never asserted that Kenco Singles cartridge did not produce a "beverage." Keurig's undermines its position on the same page of its opposition. Right after Keurig claims that in August 2007 it explained that the Kenco Singles cartridges would not work to make a beverage, it then states it was not until January 2008 that it tested the Singles cartridges.

mixing) before being consumed." WEBSTER THIRD NEW INTERNATIONAL DICTIONARY (2002); *see also Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*, 515 F.3d 1331, 1337 (Fed. Cir. 2008) (supporting the use of the customary meaning of claim terms). Absent "expert" testimony, any jury will understand that familiar meaning. But Lingle testified that he believed "beverage" had a meaning different from the ordinary meaning. Lingle Depo. Tr. (Ex. 1) at 64. Dr. Slocum also understood that Lingle proposed a specialized definition of "beverage." Slocum Depo. Tr. (Ex. 2) at 8. Lingle ultimately defined "beverage" as "a brewed liquid (e.g., coffee) of sufficient strength and with adequate flavor and aroma profile so as to be accepted by consumers for purchase and consumption." Lingle Rebuttal Rep. (Ex. 3) at 2. This definition is not even remotely similar to the ordinary meaning of "beverage." Allowing Mr. Lingle to testify will mislead the jury into believing it should use Mr. Lingle's specialized meaning, not the ordinary meaning of "beverage."

Lingle's definition of "beverage" – coupled with a close examination of his rebuttal report – confirms that Keurig is attempting to improperly offer claim construction in the form of expert testimony. In support of his definition, Mr. Lingle cites to a statement about widespread acceptance the prior art had in the marketplace. He is clearly opining on the meaning of "beverage" in light of the specification. And, it is undisputed that construing a claim term in light of the patent specification is the sole province of the court. *See, e.g., O2 Micro,* 521 F.3d at 1360. For this reason alone, Kraft's motion to exclude should be granted.[2]

---

[2] In addition, Lingle's testimony on invalidity and infringement should be excluded. Keurig does not dispute that Lingle lacks the technical expertise in the art of the '762 Patent. Rather, Keurig states only that his "experience in coffee brewing, including as a coffee 'cupper' and renowned cupping trainer" somehow qualifies he to as an expert on the Singles cartridge. The fact that Lingle may be able to differentiate taste and aroma of one cup of coffee from another does not mean that he can opine on issues related to the structures of beverage filter cartridges.

Keurig's arguments find little support in the cited cases. *Cordis Corp. v. Medtronic AVE, Inc.* does not support the argument that an expert can construe claim language or that it is a question of fact.[3] *See* 511 F.3d 1157 (Fed. Cir. 2008). If anything, *Cordis* supports Kraft's position that claim construction is a matter of law that is the exclusive province of the courts. There, the Federal Circuit reversed the trial court's claim construction, substituted its own, and rejected AVE's positions that contravened that claim construction. The *Talecris* case is likewise inapposite. *Talecris* does not pertain to whether an expert can usurp the role of the court in claim construction. Rather, it pertains to the issue of indefiniteness, which is a factual issue. *See* 510 F. Supp. 2d 356, 360 (D. Del. 2007).

Lastly, the *Agere* case does not support Keurig's position either, but rather supports Kraft's position. Therein, the court instructed the jury that "to the extent that words are not defined as a matter of law then obviously they have the ordinary meaning that you [the jury] understand the words to mean." 2005 WL 2994702, *11 (E.D. Pa. 2005). The court reviewed the expert's testimony to ensure that his testimony did not offer an impermissible claim construction. *See id.* at *12. This suggests that an expert cannot provide claim construction, even with regard to words that are to be given their ordinary meaning.

## CONCLUSION

For the aforementioned reasons, Kraft's Motion *in Limine* to exclude the testimony of Mr. Ted Lingle should be granted.

---

[3] Furthermore, the *Cordis* panel did not hold that the appropriate methodology for measuring "substantially uniform thickness" is a question of fact. The court stated, "Even if the issue of the proper methodology for measurement should have been treated as a pure question of law, however, we reject AVE's argument that the trial court should have adopted AVE's methodology in determining how the wall thickness should be measured." 511 F.3d at 1168-69.

POTTER ANDERSON & CORROON LLP

OF COUNSEL

David M. Schlitz
William S. Foster, Jr.
C. John Brown
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700


Dated:  August 25, 2008
Public Version Dated:  September 2, 2008
880806 / 31118

By:  _/s/ David E. Moore_____
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE  19899-0951
    Tel: 302-984-6169
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendants*
*Kraft Foods Global, Inc., Tassimo*
*Corporation, and Kraft Foods Inc.*

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 2, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on September 2, 2008, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com
kkeller@ycst.com

Michael A. Albert
Michael N. Rader
Laura Topper
Gerald B. Hrycyszyn
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
malbert@wolfgreenfield.com
mrader@wolfgreenfield.com
ltopper@wolfgreenfield.com
ghrycyszyn@wolfgreenfield.com

By: /s/ David E. Moore
     Richard L. Horwitz
     David E. Moore
     Potter Anderson & Corroon LLP
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     P.O. Box 951
     Wilmington, DE 19899-0951
     (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

805682 / 31118

# EXHIBIT 1

Page 1

1  UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF DELAWARE

   ---------------------------------------X

3  KEURIG, INCORPORATED,

4                        Plaintiff,

5  VS

6  KRAFT FOODS GLOBAL, INC., TASSIMO

   CORPORATION, and KRAFT FOODS, INC.,

7

                        Defendants.

8

   Civil Action No. 07-CV-0017-GMS

9  ---------------------------------------X

10

11

12        VIDEOTAPED DEPOSITION OF TED R. LINGLE

13             Friday, June 27, 2008

14              9:11 a.m. - 2:05 p.m.

15          WOLF, GREENFIELD & SACKS, P.C.

16                600 Atlantic Avenue

17           Boston, Massachusetts 02210

18

19     Court Reporter:  Loretta Hennessey, RDR, CRR

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC

           126 East 56th Street, Fifth Floor

24             New York, New York 10022

                    212-750-6434

25                  REF: 87840

LINGLE

1  it's based on the, my understanding of what the
2  patent says.
3      Q.  If you would turn to the first, not the
4  coverage page but the first page of this rebuttal
5  report.  Okay.  Are you there?
6      A.  Uh-huh.
7      Q.  Okay.  Under "Summary of Opinion," it
8  says, on the fourth line -- well, let's read the
9  whole thing.  "In my opinion, piercing the foil lid
10 of a Singles cartridge containing ground coffee
11 (like those that Mr. Taylor and the Kraft employees
12 tested) and injecting a quantity of water into the
13 cartridge (as opposed to making use of the
14 pre-molded inlet hole on the side of the cartridge
15 opposite the foil lid)," and this is what I'm
16 interested in, "does not produce a 'beverage' within
17 the meaning of Keurig's '762 patent."  Do you see
18 that?
19     A.  Uh-huh.
20     Q.  You put the word "beverage" in quotations,
21 and you say "'beverage' within the meaning of
22 Keurig's '762 patent."  Do you see that?
23 Does the word "beverage" in Claim 1 of the patent,
24 where it appears, have a special meaning that's

LINGLE

1  different than the ordinary and usual meaning of
2  that word?
3      A.  I think that is defined in the patent as a
4  brewed beverage.
5      Q.  Right.
6      A.  Okay?  And so I wanted to put the word in
7  quotes to emphasize that we're using this word,
8  which could be generic, in a very specific
9  application, and that's brewed beverage.
10     Q.  Okay.
11     A.  Again, brewed coffee beverage.
12     Q.  Wait.  Let's take this in parts.
13     A.  Okay.
14     Q.  You say, so it's not used in its generic
15 sense.  Do you mean its ordinary sense?
16     A.  Ordinary --
17         MR. RADER:  Objection to form.
18     Q.  Excuse me?
19     A.  Ordinary in what those of us who are
20 consumers would interpret that to mean, consumers of
21 a beverage, one that we purchased.
22     Q.  I'm sorry, and this is not your fault, I
23 just didn't understand what you just said.
24     A.  To me the word "beverage" in this

LINGLE

1  application, it means one that the average person
2  would go out on a commercial level and purchase
3  either for home use or for consumption away from
4  home.
5      Q.  Okay.  My question to you is, does
6  "beverage" have a meaning in the patent that is
7  different than its ordinary meaning?
8      A.  I believe it does.
9      Q.  Okay.  What do you believe the ordinary
10 meaning of "beverage" is?
11     A.  The ordinary meaning would be a product
12 that could be either sold or consumed for a person's
13 enjoyment.
14     Q.  So it's --
15     A.  I mean, there would be certain categories
16 I would exclude.  I wouldn't include tap water in
17 the context of a beverage.
18     Q.  So you think the word "beverage" has a
19 commercial, has a commercial connotation?
20     A.  When I read the patent, then I was
21 assuming, my assumption is the average person
22 reading that patent would assume this was a beverage
23 for commercial application.
24     Q.  Okay.  And what is the basis of that

LINGLE

1  assumption?
2      A.  That it basically talked about a brewed
3  beverage, meaning one that was prepared in a way
4  that involved controlled strength and controlled
5  extraction in order to meet some beverage standard,
6  either tea or coffee or whatever.
7      Q.  And what is the word -- what is it in the
8  words "brewed beverage" that to you connotes
9  controlled, some type of controlled standard?
10     A.  That's basically the science of coffee
11 brewing is controlling the extraction, controlling
12 the strength.  It's not a random process, it's a
13 controlled process.
14     Q.  Okay.  And is there anything explicit in
15 the patent that you point to that says it has to be
16 commercially acceptable?
17     A.  In the patent it uses the phrase
18 "widespread acceptance."
19     Q.  Right.
20     A.  Okay?  And when you're reading a patent
21 about a product that's designed to commercially
22 produce a beverage, then I think it's fair to assume
23 that that's the intent of those words.
24     Q.  Okay.  I'm sorry, you just said when

# EXHIBIT 2

Page 1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

     - - - - - - - - - - - - - - - - - - - - - - - - x

3    KEURIG, INCORPORATED,

4                      Plaintiff,

5         v.

6    KRAFT FOODS GLOBAL, INC., TASSIMO CORPORATION, and
     KRAFT FOODS INC.,

7

                     Defendants.

8

     Civil Action No. 07-CV-0017-GMS

9    - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12       VIDEOTAPED DEPOSITION OF ALEXANDER H. SLOCUM

13              Wednesday, June 11, 2008

14               9:10 a.m. to 5:00 p.m.

15          WOLF, GREENFIELD & SACKS, P.C.

16               600 Atlantic Avenue

17               Boston, Massachusetts

18

19       Reporter:  Marianne R. Wharram, CSR/RPR

20

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC

            126 East 56th Street, Fifth Floor

24              New York, New York 10022

                   212-750-6434

25                 REF: 87765

SLOCUM

1
2  performed in this case?
3      A.  So I was asked as an expert to look at the
4  patent-in-suit -- excuse me -- and answer whatever
5  questions I could for them in terms of technically
6  what is happening in the use of -- for example,
7  specifically in the expert report, I -- I believe
8  you have a copy of, these Kenco Singles cartridges
9  and how they function, and then my report details
10 all the questions I answered and the work I did on
11 them.
12     Q.  Let's break that down a little bit.  When
13 did you start working on this case?
14     A.  Sometime last year.  I -- I don't recall
15 the exact date.
16     Q.  Was it in the winter of last year, the
17 fall, the spring, fall?
18     A.  Well, I believe it was last fall I started
19 the experiments.
20     Q.  You started the experiments, but you said
21 you studied the patent.  When did you study the
22 patent?
23     A.  I don't -- I don't recall the exact date.
24     Q.  Well, I'm not asking you the exact date.
25 I'm asking you the approximate date.

SLOCUM

1
2      A.  It was -- It was last year, I think
3  fall-ish time.
4      Q.  And how much time did you spend studying
5  the patent?
6      A.  When you say studying the patent, I read it
7  through, tried to understand all the elements, and
8  I probably spent on that part -- a wild guess is
9  maybe a day total in terms of actually just reading
10 the patent and understanding it well.
11     Q.  You say that part.  Is there any other part
12 of your study of the patent?
13     A.  Everything in conjunction with my report,
14 because I would refer back to the patent to
15 understand the terms, you know, the Court's claim
16 construction that was issued.  I had to make sure
17 that when I was looking at, for example, the Kenco
18 Singles cartridges and performing and designing my
19 tests that what I did would be able to address the
20 issues that Mr. Rader asked me to look at.
21     Q.  And in studying the patent, did you come to
22 some conclusions about what the terms in the patent
23 mean?
24     A.  I believe I understand what the terms mean
25 and also what the Court told me in the

SLOCUM

1
2  construction, or claim construction, what different
3  terms mean.  That's what I have to ultimately abide
4  by is what is the Court's claim construction.
5      Q.  In your expert report, you opine about the
6  meaning of the word beverage; is that correct?
7          MR. RADER:  Objection to the form.  You
8  can answer.
9      A.  Well, my understanding for the term
10 beverage -- because I'm not an expert in that area,
11 I relied -- the Court itself didn't give me an
12 exact definition of what beverage is.  I have to
13 refer back explicitly to that document, but in that
14 respect, I relied on Mr. Lingle, who is an
15 acknowledged expert in the field of coffee
16 beverages.  And then, when I actually ran the
17 various tests in various scenarios, I also, because
18 I'm a fairly avid coffee drinker, would than taste
19 the stuff made by the various ways I did.
20     Q.  (BY MR. SCHLITZ)  But when you read the
21 patent, what was your understanding?  Before --
22 when did you speak to Mr. Lingle?
23     A.  I first met Mr. Lingle a couple of months
24 ago when I did my extensive tests with the hot
25 water to actually attempt to create the beverage.

SLOCUM

1
2  Prior to that time, I had done some preliminary
3  tests, also using hot water, and I don't recall if
4  the Court -- I had the claim construction at the
5  time.  I'm not sure it would have made a difference
6  at that point, because again, the Court doesn't
7  define beverage -- and I have to look again -- in
8  terms of a scientific definition, but prior to
9  that, my definition, to answer your question, of
10 beverage, if I make -- excuse me -- coffee using a
11 product in the way it's supposed to be used, and
12 then I make coffee with the same product in the way
13 that I was asked to test it, they should taste the
14 same if it's making a beverage, just to my own
15 palate.
16     Q.  So that's your -- that was your definition
17 of beverage, when you read the patent?
18         MR. RADER:  Objection to the form.
19 Mischaracterized, but you can answer.
20     Q.  (BY MR. SCHLITZ)  I don't want to
21 mischaracterize your testimony, Doctor.  I'm just
22 trying to understand.  What you just said is your
23 -- was your understanding of beverage; is that
24 correct?
25     A.  Correct.  You said what was my

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY